UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSHUA G. STEGEMANN,

                              Plaintiff,

                                                                9:21-CV-0949
v.                                                              (MAD/ML)

UNITED STATES OF AMERICA; and
PAMELA C. PEDERSEN,

                              Defendants.
_____

APPEARANCES:                                          OF COUNSEL:

JOSHUA G. STEGEMANN
  *Pro Se* Plaintiff
Ray Brook Correctional Facility
Post Office Box 900
Ray Brook, New York 12977

CARLA B. FREEDMAN                                     EMER M. STACK, ESQ.
United States Attorney                                Assistant United States
  Counsel for Defendants                              Attorney
100 South Clinton Street, Suite 9000
Syracuse, New York 13261


MIROSLAV LOVRIC, United States Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

        Currently before the Court, in this civil rights action filed by Joshua G. Stegemann

("Plaintiff") against the United States of America and Pamela C. Pedersen (collectively

"Defendants"), is (1) Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1),

12(b)(2), and 12(b)(6), or, in the alternative, for summary judgment pursuant to Fed. R. Civ. P.

56 (Dkt. No. 37), and (2) Plaintiff's motion to supplement the Amended Complaint pursuant to

Fed. R. Civ. P. 15(d) (Dkt. No. 43).  For the reasons set forth below, I (1) recommend that

Defendants' motion be granted in part and denied in part, and (2) deny Plaintiff's motion to supplement the Amended Complaint.

## I.    RELEVANT BACKGROUND

### A.    Administrative Proceedings

On or about February 4, 2021, Plaintiff filed an administrative tort claim—which was assigned number TRT-NER-2021-03094 ("Claim 1")—alleging that Federal Correctional Institute Ray Brook ("FCI Ray Brook") failed to protect him from contracting COVID-19 because "the FBOP continues to pack too many prisoners into cramped cellblocks and multiple occupancy cells."[1]  (Dkt. No. 37, Attach. 3 at ¶ 8; Dkt. No. 37, Attach. 6.)  On August 13, 2021, Claim 1 was denied.  (Dkt. No. 37, Attach. 3 at ¶ 9; Dkt. No. 37, Attach. 7.)

On or about May 17, 2021, Plaintiff filed an administrative tort claim—which was assigned number TRT-NER-2021-05401 ("Claim 2")—alleging medical staff informed him that his kidneys were failing and his contraction of COVID-19 exacerbated the alleged kidney disease.  (Dkt. No. 37, Attach. 3 at ¶ 10; Dkt. No. 37, Attach. 8.)  On January 21, 2022, Claim 2 was denied.  (Dkt. No. 37, Attach. 3 at ¶ 11; Dkt. No. 37, Attach. 9.)

On or about July 14, 2021, Plaintiff filed an administrative tort claim—which was assigned number TRT-NER-2021-06819 ("Claim 3")—alleging that he had chronic kidney disease ("CKD") since February 2017, and that Defendant Pederson "withheld the CKD diagnosis" and failed to treat him for that condition.  (Dkt. No. 37, Attach. 3 at ¶ 12; Dkt. No. 37, Attach. 10.)  On February 22, 2022, Claim 3 was denied.  (Dkt. No. 37, Attach. 3 at ¶ 13; Dkt. No. 37, Attach. 11.)

---

[1]    Federal Bureau of Prisons hereinafter referred to as the "FBOP."

### B.    Proceedings in this Court

On August 23, 2021, Plaintiff commenced this action by the filing of a verified complaint against Defendant United States of America.  (Dkt. No. 1.)  After Plaintiff paid the filing fee, United States District Judge Mae A. D'Agostino reviewed the Complaint pursuant to 28 U.S.C. §§ 1915, 1915A and held that Plaintiff's negligence and medical malpractice claims pursuant to the Federal Tort Claims Act ("FTCA") survived *sua sponte* review, but Plaintiff's *Bivens* claim against Defendant United States of America was not cognizable and was therefore dismissed with prejudice.  (Dkt. No. 6.)

On December 9, 2021, Plaintiff filed a verified Amended Complaint against Defendants asserting the following three claims: (1) a claim of negligence pursuant to the FTCA against Defendant United States of America regarding Plaintiff's contraction of COVID-19 at FCI Ray Brook in December 2020; (2) a claim of medical malpractice pursuant to the FTCA against Defendant United States of America regarding Plaintiff's alleged delayed treatment for kidney disease; and (3) a claim of deliberate indifference to a serious medical condition against Defendant Pederson pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Eighth Amendment.  (Dkt. No. 9, 10.)  On January 6, 2022, Judge D'Agostino accepted Plaintiff's Amended Complaint for filing and deemed it the operative pleading.  (Dkt. No. 10.)

On June 27, 2022, Defendants filed the pending motion in lieu of filing an answer.  (Dkt. No. 37.)  To date, the parties have not engaged in any discovery or exchanged mandatory disclosures.

**C.       Parties' Briefing on Defendants' Motion to Dismiss**

   **1.       Defendants' Memorandum of Law**

Generally, in support of their motion to dismiss, Defendants assert the following four arguments: (1) the Court lacks subject matter jurisdiction over Plaintiff's claims because (a) Plaintiff failed to exhaust administrative remedies regarding his FTCA medical malpractice claim in Claims 2 and 3 before commencing this action, (b) the discretionary function exception precludes subject matter jurisdiction over his FTCA negligence claim, and (c) a claim against an employee of the United States in his or her official capacity is a claim against the United States and thus, the Court lacks subject matter jurisdiction over Plaintiff's *Bivens* claim against Defendant Pederson in her official capacity; (2) the Court lacks personal jurisdiction over Defendant Pederson because (a) the Amended Complaint fails to allege any facts plausibly suggesting that New York's long-arm statute supports jurisdiction over Defendant Pederson as a non-domiciliary, and (b) assuming *arguendo* that New York's long-arm statute supported jurisdiction over Defendant Pederson, the exercise of personal jurisdiction over her does not comport with due process considerations; (3) in the alternative, Plaintiff fails to state a claim upon which relief may be granted against Defendants because (a) with respect to his negligence claim, Plaintiff fails to allege facts plausibly suggesting any action or inaction by a FBOP employee that caused him to contract COVID-19 or how he came to be infected with COVID-19, (b) with respect to his medical malpractice claim, Plaintiff fails to allege facts plausibly suggesting that Defendant Pederson's purported failure to disclose Plaintiff's abnormal laboratory result deviated from accepted medical practice, and (c) with respect to his *Bivens* claim, the Amended Complaint fails to allege facts plausibly suggesting the subjective prong of an Eighth Amendment deliberate indifference claim; and (4) in the alternative, summary

judgment is warranted on Plaintiff's medical malpractice and *Bivens* claims because (a) with respect to his medical malpractice claim, the medical records indicate that Plaintiff does not—and did not—have any signs of severe or progressive kidney disease or damage, and (b) with respect to his *Bivens* claim, (i) the medical records indicate that Plaintiff does not—and did not—have a serious or urgent condition to satisfy the objective prong of an Eighth Amendment claim, and (ii) Defendant Pederson is entitled to qualified immunity. (Dkt. No. 37, Attach. 1.) In addition, Defendants argue that leave to amend should be denied because Plaintiff has already amended the complaint once and thus, "has already had sufficient opportunity to allege a claim against Defendant[s]" and "because a lack of jurisdiction is among the defects in Plaintiff's claims, the claims cannot be cured by further pleading, rendering any attempt at amendment futile." (*Id*. at 47-48.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion to dismiss, Plaintiff asserts the following four arguments: (1) jurisdiction and venue are proper; (2) Defendant Pederson's failure to disclose and treat Plaintiff's diminished kidney function and correlated symptoms violated New York and New Hampshire law; (3) FBOP has a duty to protect its prisoners from infectious disease and its negligent failure to test and quarantine inmates it was accepting from the United States Marshals is not excused by the discretionary function exception; and (4) based on Defendants' own papers, there are genuine issues of material fact that preclude the granting of summary judgment in favor of Defendants. (*See generally* Dkt. No. 42.)

More specifically, with respect to his first argument, Plaintiff argues that he filed Claim 1 on December 29, 2020, he filed an amended claim—Claim 2—on May 7, 2021, and a second amended claim—Claim 3—on July 6, 2021. (Dkt. No. 42 at 2.) Plaintiff argues that his

amended claims—Claims 2 and 3—incorporated the reference number assigned to Claim 1, which was denied on August 13, 2021.  (*Id*.)  Plaintiff argues that pursuant to 28 C.F.R. § 14.2(c), an administrative claim may be amended any time before final agency action and— because the amended claims (Claims 2 and 3) incorporated Claim 1 and were received before the denial on August 13, 2021—all claims were "denied implicitly by the August 13, 2021 denial." (*Id*. at 2-3.)  In addition, Plaintiff argues that venue is proper in this Court for his *Bivens* claim pursuant to 28 U.S.C. § 1391(e)(1)(C) because Plaintiff resides in the Northern District of New York.  (*Id*. at 3.)

With respect to his second argument, Plaintiff argues that, to the extent the Court is conducting a choice of law consideration, New York law should apply because the action is proceeding in New York.  (*Id*.)  Notwithstanding, Plaintiff argues that the laws of New York and New Hampshire are "remarkably similar" and that a jury should determine whether the FBOP's "failure to disclose and treat [his] diminished eGFR and correlative symptoms for more than 4 years meets the bar for a medical malpractice and/or negligence claim in this case."  (*Id*. at 5-6.)

With respect to his third argument, Plaintiff argues that the FBOP "operated under a policy and procedure requiring 'screening of inmates' whereby '[a]ll newly-arriving inmates are screened for COVID-19 exposure and risk factors and symptoms.'"  (Dkt. No. 42 at 7 [citing N.D.N.Y. Case. No. 1:13-CR-0357 (GLS), Dkt. No. 303, Attach. 1 at 14].)  Plaintiff argues that, as a result, the employees of FCI Ray Book had a mandatory duty to test and quarantine newly arriving inmates to prevent the spread of COVID-19 infections among the FCI Ray Brook population.  (Dkt. No. 42 at 8.)  Thus, Plaintiff argues that the discretionary exception is not applicable to his negligence claim.  (*Id*.)

Finally, with respect to his fourth argument, Plaintiff argues that Defendants are not entitled to summary judgment because the only monitoring of Plaintiff's eGFR between February 2017 (when his low eGFR was detected) and 2021 (when he learned of his low eGFR levels), were urinalysis tests that are inaccurate. (*Id*. at 9-10.) In addition, Plaintiff argues that after his low eGFR level was detected in April 2021, he began medication, which caused his eGFR levels to normalize and his symptoms to alleviate. (*Id*. at 10.) Further, Plaintiff argues that Defendant Pederson is not entitled to qualified immunity at this juncture. (*Id*.)

### 3.    Plaintiff's Letter in Further Support

Approximately four days after filing his opposition to Defendants' motion, Plaintiff filed affidavits in further opposition, which included a cover letter that contained additional arguments. (Dkt. No. 44.) Plaintiff's cover letter argued that he was in receipt of a letter conceding service on Defendant Pederson, which thus waives any argument regarding personal jurisdiction. (*Id*.) In addition, Plaintiff argues that because Defendant Pederson's employment with the FBOP was "essentially . . . Nationwide" the Court should exercise personal jurisdiction over her. (*Id*.)

### 4.    Defendants' Reply Memorandum of Law[2]

Generally, in further support of their motion to dismiss, or alternatively for summary judgment, Defendants assert the following three arguments: (1) the Court lacks subject matter jurisdiction over Plaintiff's claims because (a) Claims 2 and 3 were not administratively exhausted before Plaintiff filed suit, (b) the discretionary function exception bars Plaintiff's COVID-19 related FTCA claim, and (c) the Court lacks subject matter jurisdiction over

---

[2]    Defendants' reply memorandum of law also addresses Plaintiff's motion to supplement the Amended Complaint, which is discussed *infra* in Part I.D. of this Report and Recommendation.

Plaintiff's *Bivens* claim against Defendant Pederson because she was acting in an official capacity; (2) the Court lacks personal jurisdiction over Defendant Pederson; and (3) Plaintiff has not otherwise stated a claim against Defendants because (a) Plaintiff fails to state a negligence claim arising out of his COVID-19 infection, (b) Plaintiff fails to state a FTCA medical malpractice claim and, alternatively, summary judgment is warranted, and (c) Plaintiff fails to state a *Bivens* claim against Defendant Pederson, and, alternatively, summary judgment is warranted. (*See generally* Dkt. No. 47.)

More specifically, with respect to their first argument, Defendants argue that Claims 2 and 3 were not amendments to Claim 1. (Dkt. No. 47 at 4.) In support of this argument, Defendants identify that (1) Claim 1 alleged solely that employees at FCI Ray Brook failed to protect Plaintiff from contracting COVID-19, and did not mention any alleged kidney disease, Defendant Pederson, or FCI Berlin, (2) the date of incident listed on Claim 1 (December 23, 2020) differs from the date of incident listed on Claims 2 and 3 (May 3, 2021), (3) Claim 2 did not specify that it was an amendment or correction of Claim 1, and (4) Claim 3 did not (a) mention either Claim 1 or 2,[3] or (b) mention that it was an amendment of any prior administrative tort claims. (*Id*. at 4-7.) In addition, Defendants argue that the documents supplied by Plaintiff in opposition to Defendants' motion underscore that the discretionary function exception applies to the FBOP's COVID-19 response because those documents "consist largely of non-binding guidance for [F]BOP officials managing prisons" and Plaintiff has failed to meet his burden to prove that the discretionary function does not apply. (*Id*. at 7-9.) Moreover, Defendants argue that even if the discretionary function does not bar Plaintiff's

---

[3]    As set forth below in Part III.A.1. of this Order and Report-Recommendation, this assertion is inaccurate. Claim 3 refers to Claims 1 and 2. (Dkt. No. 37, Attach. 10 at 5.)

COVID-19 related claim, that claim still fails pursuant to 28 U.S.C. § 2680(f), which immunizes the Government from suit for damages caused by the negligent carrying out of a quarantine. (*Id.* at 9-10.) Further, Defendants argue that Plaintiff failed to address their argument that the Court lacks subject matter jurisdiction over his *Bivens* claim against Defendant Pederson in her official capacity. (*Id.* at 10-11.)

With respect to their second argument, Defendants argue that Plaintiff failed to meaningfully address their argument that the Court lacks personal jurisdiction over Defendant Pederson. (Dkt. No. 47 at 11-14.) Defendants argue that the venue provision cited by Plaintiff—28 U.S.C § 1391(e)(1)(c)—does not apply to Plaintiff's *Bivens* action against Defendant Pederson in her individual capacity. (*Id.*) Defendants argue that, in any event, Plaintiff's opposition misses the mark because he focuses on whether venue is proper and fails to present any assertion that the exercise of personal jurisdiction over Defendant Pederson is proper. (*Id.*) Defendants argue that, to the extent the Court considers Plaintiff's supplemental arguments contained in his letter (Dkt. No. 44): (1) Defendants timely objected to personal jurisdiction over Defendant Pederson and thus, have not waived the defense, and (2) the Court does not have nationwide jurisdiction over a defendant who lives outside of the forum state simply because the individual is a federal government employee. (*Id.*)

With respect to their third argument, Defendants argue that even if Plaintiff could overcome the jurisdictional deficiencies, the Amended Complaint fails to state a claim upon which relief may be granted. (Dkt. No. 47 at 14-21.) Defendants argue that Plaintiff's Amended Complaint fails to allege facts plausibly suggesting that any FBOP actor caused him to become infected with COVID-19. (*Id.* at 14-15.) Defendants argue that testing in January 2022 demonstrated no evidence of renal compromise thus undermining any purported kidney disease

diagnosis pursuant to which the medical malpractice claim is based. (*Id.* at 15-17.) Finally, Defendants argue that in the absence of a kidney disease diagnosis, it cannot be said that Plaintiff suffers from the serious medical need he claims to support his Eighth Amendment *Bivens* claim against Defendant Pederson. (*Id.* at 17-18.)

### D.    Parties' Briefing on Plaintiff's Motion to Supplement the Amended Complaint

#### 1.    Plaintiff's Motion to Supplement the Amended Complaint

Generally, in support of his motion to supplement the Amended Complaint, Plaintiff argues that because no discovery has occurred, Defendants cannot and will not sustain any prejudice by the supplementation. (Dkt. No. 43 at 1.) In sum, Plaintiff seeks to supplement the Amended Complaint to include (1) allegations that Claims 2 and 3 were amendments to Claim 1, and (2) add a cause of action regarding the management of his antidepressant medications. (*See generally* Dkt. No. 43, Attach. 1.)

#### 2.    Defendants' Opposition to Plaintiff's Motion to Supplement the Amended Complaint

Generally, in opposition to Plaintiff's motion to supplement, Defendants assert the following three arguments: (1) the supplemental facts regarding Plaintiff's antidepressant medication in 2022 are unrelated to those set out in the operative pleading, (2) Plaintiff's proposed supplemental allegations—that Claims 2 and 3 were amendments to Claim 1—do not concern an event that happened *after* the filing of the Amended Complaint and are a legal conclusion or argument that should be rejected, and (3) any supplementation of the Amended Complaint regarding Plaintiff's antidepressants has not been administratively exhausted and thus, the supplementation would be futile. (Dkt. No. 47 at 18-21.)

### 3.    Plaintiff's Letter in Support of his Motion to Supplement

Plaintiff appears to argue that he has now administratively exhausted the claim regarding his antidepressants.  (Dkt. No. 49.)  Plaintiff attaches a document titled Central Office Administrative Remedy Appeal dated received September 1, 2022 (Dkt. No. 49 at 2), and a document titled "Administrative Remedy No. 1122982-A2, Part B – Response" dated October 6, 2022 (*id.* at 3), that appears to deny Plaintiff's request that his Mirtazapine be restored.

### 4.    Defendants' Response to Plaintiff's Letter Brief

In response to Plaintiff's letter, Defendants argue that regardless of whether Plaintiff's claims regarding his prescription for antidepressant medication has been administratively exhausted, the Court should still deny Plaintiff's motion to supplement because that claim is unrelated to those set out in the operative pleading.  (Dkt. No. 50.)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction."  *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it.  *Makarova v. United States.*, 201 F.3d 110, 113 (2d Cir. 2000).  A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction.  *Makarova*, 201 F.3d at 113.  The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence.  *Id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).  When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be

resolved, and inferences drawn in favor of the plaintiff.  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Makarova*, 201 F.3d at 113).

Where a defendant proffers evidence beyond the pleadings in challenging subject-matter jurisdiction, that defendant is said to have made a fact-based challenge.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016).  "A court reviewing a Rule 12(b)(1) motion . . . can look to evidence outside the pleadings, including affidavits, to resolve disputed *jurisdictional* facts."  *Glob. Art Exhibitions, Inc. v. Kuhn & Bulow Italia Versicherungsmakler GmbH*, 20-CV-1395, 2022 WL 2159823, at \*3 (S.D.N.Y. June 15, 2022) (emphasis added) (citing *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

### B.     Legal Standard Governing Motions to Dismiss for Lack of Personal Jurisdiction

Rule 12(b)(2) of the Federal Rules of Civil Procedure authorizes motions to dismiss on the basis of lack of personal jurisdiction over a defendant.  "On a Rule 12(b)(2) motion . . . the plaintiff bears the burden of showing that the court has jurisdiction over the defendant."  *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566-67 (2d Cir. 1996).  "When a defendant moves to dismiss a complaint under Rule 12(b)(2) for want of personal jurisdiction, courts must perform a two-part analysis."  *Harris v. Ware*, 04-CV-1120, 2005 WL 503935, at \*1 (E.D.N.Y. Mar. 4, 2005); *accord, Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015).  "First, personal jurisdiction over a defendant must be established under the law of the state where the federal court sits."  *Harris,* 2005 WL 503935, at \*1 (citing *Bank Brussels Lamber v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)); *accord, Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (holding that the alleged defamatory remarks of the operator of a website that rates moving companies was not a business transaction for the purposes of jurisdiction under New York State's long-arm statute).

"Second, if jurisdiction is established under the governing statute, courts must determine whether the exercise of jurisdiction under the relevant state law would violate the defendant's due process rights." *Harris,* 2005 WL 503935, at *1 (citation omitted); *accord, Best Van Lines, Inc.*, 480 F.3d at 242-43. Due process requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "In reviewing a Rule 12(b)(2) motion, 'a court may consider documents beyond the pleadings in determining whether personal jurisdiction exists.'" *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015) (quoting *Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC*, 11-CV-0420, 2012 WL 204102, at *2 (S.D.N.Y. Jan. 24, 2012)).

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction, a district court has considerable procedural leeway." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). "Where . . . the issue of personal jurisdiction 'is decided . . . without discovery, the plaintiff need show only a prima facie case' of jurisdiction on a motion under Rule 12(b)(2)." *Bonkowski v. HP Hood LLC*, 15-CV-4956, 2016 WL 4536868, at *1 (E.D.N.Y. Aug. 30, 2016) (quoting *Volkswagenwerk Akiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)); *see Troma Entm't, Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 217 (2d Cir. 2013). Plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *see Troma*, 729 F.3d at 217 (noting that, to survive a motion to dismiss for lack of personal jurisdiction, the allegations in the complaint, when taken as true, must be "legally sufficient allegations of jurisdiction.").

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the pleadings and affidavits are to be construed in the light most favorable to plaintiff, and all doubts are to be resolved in plaintiff's favor. *Bonkowski*, 2016 WL 4536868, at *1. Plaintiff's allegations must provide "factual specificity necessary to confer jurisdiction." *Jazini by Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998). Conclusory statements, without supporting facts, are insufficient. *Jazini by Jazini*, 148 F.3d at 185. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Moreover, "where a defendant 'rebuts [a plaintiff's] unsupported allegations with direct highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiff[ ] do[es] not counter that evidence—the allegation may be deemed refuted.'" *Leroi, Inc. v. Tran Source Logistics, Inc.*, 15-CV-0565, 2016 WL 4997228, at *4 (N.D.N.Y. Sept. 19, 2016) (Suddaby, C.J.).

"It is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Schukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2d Cir. 2003)). Thus, jurisdictional discovery is appropriate when the party has made a "colorable basis for personal jurisdiction, which could be established with further development of the factual record." *Leon*, 992 F. Supp. 2d at 194. However, "[w]here [a plaintiff does] not establish a prima facie case that the district court has jurisdiction over the defendant, the district court does not err in denying jurisdictional discovery." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 18-19 (2d Cir. 2015) (citing *Jaznini by Jazini*, 148 F.3d at 186 (2d Cir. 1998)).

### C.    Legal Standard Governing Motions to Dismiss for Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added).[4]

---

[4]    *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (McAvoy, C.J.).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213, n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id*. at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id*. at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id*.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated

to "'make reasonable allowances to protect *pro se* litigants'" from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[5]

---

[5]    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 421-22 (2d Cir. 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12(d) if the "matters outside the pleadings" in consist of (1) documents attached to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint . . . . Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint . . . . However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") (internal quotation marks and

Moreover, in the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the extent those papers are consistent with the allegations in the complaint.[6]

### D.    Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[7] As for the materiality requirement, a dispute of fact is

---

citations omitted); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (" "[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

[6]    *See Drake v. Delta Airlines, Inc.*, 147 F.3d 169, 170, n. 1 (2d Cir. 1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) ("In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, . . . and therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Sharpe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004) (Hurd, J.)

[7]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply

"material" if it "might affect the outcome of the suit under the governing law . . . . Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

In addition, "[the movant] bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of the . . . [record] which it believes

demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S.

317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must

come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ.

P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant

willfully fails to respond to a motion for summary judgment, a district court has no duty to

perform an independent review of the record to find proof of a factual dispute–even if that non-

movant is proceeding *pro se*.[8]  (This is because the Court extends special solicitude to the *pro se*

litigant largely by ensuring that he or she has received notice of the consequences of failing to

properly respond to the motion for summary judgment.)[9]  As has often been recognized by both

the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's

procedural rules.[10]

---

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[8]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[9]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[10]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[11]–even when the non-movant was proceeding *pro se*.[12]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[13] Stated another way, when a non-movant fails to oppose a legal argument

---

[11]    Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

[12]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

[13]    *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1[b][3]); *Devito v.*

asserted by a movant, the movant may succeed on the argument by showing that the argument

possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested

therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct.

30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009

WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### E.    Legal Standards Governing Exhaustion of FTCA Claims

"The United States, as sovereign, is immune from suit unless it waives immunity and

consents to be sued."  *Cooke v. United States*, 918 F.3d 77, 81 (2d Cir. 2019).  The FTCA

includes a "limited waiver" of sovereign immunity and "allows for a tort suit against the United

States under specified circumstances."  *Hamm v. United States*, 482 F.3d 135, 137 (2d Cir.

2007).  Under the statute, a private citizen may sue for injuries caused by "the negligent or

wrongful act or omission of any employee of the government while acting within the scope of his

office or employment, under circumstances where the United States, if a private person, would

be liable to the claimant in accordance with the law of the place where the act or omission

occurred."  28 U.S.C. § 1346(b)(1).  "Any waiver of the government's sovereign immunity is to

be strictly construed in favor of the government."  *Long Island Radio Co. v. NLRB*, 841 F.2d

474, 477 (2d Cir. 1988).

---

*Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004)
(McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude
expert testimony as "a concession by plaintiff that the court should exclude [the expert's]
testimony" on that ground).

The FTCA requires that a claimant must first exhaust all administrative remedies before filing an action in federal district court. *See Phillips v. Generations Family Health Ctr.*, 723 F.3d 144, 147 (2d Cir. 2013) (citing 28 U.S.C. § 2675(a)) ("The claimant can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a decision within six months after the claim was filed)."). "In other words, the FTCA requires a plaintiff to exhaust all administrative remedies before filing suit in federal court." *Chapman v. Doe (One)*, 19-CV-1257, 2019 WL 6493971, at *6-7 (N.D.N.Y. Dec. 3, 2019) (citing *Celestine v. Mount Vernon Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005)). That requirement is jurisdictional and cannot be waived. *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005).

The FTCA requires tort claimants against the federal government to "present" an administrative claim to the alleged agency tortfeasor as a precondition to bringing a lawsuit. 28 U.S.C. § 2675(a). More specifically, that provision mandating presentment before claimants can sue the government states:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

28 U.S.C. § 2675(a). Proper presentment allows the government to "investigate, evaluate, and consider settlement of a claim" in order to "eas[e] court congestion and avoid unnecessary litigation." *Romulus v. United States* ("*Romulus I*"), 983 F. Supp. 336, 338 (E.D.N.Y. 1997) (internal quotation marks omitted), *aff'd*, 160 F.3d 131 (2d Cir. 1998) ("*Romulus II*").

To satisfy the presentment requirement, the claimant has the burden to sufficiently provide information regarding the nature and merits of their claim. *Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983). The "mere act of filing a SF-95 [notice of claim] does not necessarily fulfill the presentment requirement." *Romulus II*, 160 F.3d at 132. Rather, "[a] claimant must provide more than conclusory statements which afford the agency involved no reasonable opportunity to investigate." *Id.* An SF-95 "must provide a reviewing agency with sufficiently specific information as to the basis of the claim, the nature of the claimant's injuries, and the amount of damages sought such that the agency can reasonably understand what it must investigate to determine liability, to value the claim, and to assess the advisability of settlement." *Collins v. United States*, 996 F.3d 102, 119 (2d Cir. 2021). A claimant can provide this information by narrative, evidence, or other means. *Id.* at 114. While "a conclusory assertion of claims" will not suffice, the presentment requirement "does not necessarily require that a claimant provide an agency with supporting evidence." *Id.* at 105.

Pursuant to Department of Justice regulations, a claimant may amend a properly presented claim "at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. § 2675(a)" to treat a claim as final after six months without a final agency disposition. 28 C.F.R. § 14.2(c). The filing of an amendment restarts the agency's time to respond to the claim. 28 C.F.R. § 14.2(c) ("Upon the timely filing of an amendment to a pending claim, the agency shall have six months in which to make a final disposition of the claim as amended and the claimant's options under 28 U.S.C. § 2675(a) shall not accrue until six months after the filing of an amendment.").

### F.    Legal Standards Governing the Discretionary Exception to FTCA Claims

Under the FTCA, the United States has consented to be sued under certain conditions, but has expressly declined to be sued "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved [was] abused." 28 U.S.C.A. § 2680(a).   This "discretionary function exception"

> is a form of retained sovereign immunity. As a result, the FTCA's waiver of federal sovereign immunity does not encompass actions based upon the performance of, or failure to perform, discretionary functions. Because the FTCA is structured as a grant of subject matter jurisdiction to the federal courts, a finding that the discretionary function exception applies is tantamount to holding that the court lacks jurisdiction.[14] The exception applies only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis.

*Reichhart v. U.S.*, 408 F. App'x 441, 443 (2d Cir.2011) (citations and internal quotation marks omitted).

In determining whether the allegedly-negligent acts "involved an element of judgment or choice,"

> it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies. The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive.

*United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citations and internal quotation marks omitted); *see also Berkovitz v. United States*, 486 U.S. 531, 544 (1991) ("When a suit charges an

---

[14]    *See also*, *Molchatsky v. United States*, 713 F.3d 159, 161–163 (2d Cir. 2013) (indicating that if the discretionary function exception applies, the Court lacks subject matter jurisdiction.).

agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply.").  The aforementioned reference to "statute, regulation or policy" includes internal "agency guidelines."  *Gaubert*, 499 U.S. at 322.

> Furthermore, even assuming the challenged conduct involves an element of judgment, it [must then be] decided whether that judgment is of the kind that the discretionary function exception was designed to shield. Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.

*Gaubert*, 499 U.S. at 322-323 (citations and internal quotation marks omitted).  Where the alleged "type of negligence" arises from factors such as inattentiveness, laziness, absentmindedness or other such "conduct unrelated to any plausible policy objectives," it is not shielded by the discretionary function exception.  *Coulthurst v. United States.*, 214 F.3d 106, 110-111 (2d Cir.2000); *see also Id.*, 214 F.3d at 109 ("Such negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy.").

 "Plaintiff bears the initial burden to state a claim that is not barred by the discretionary function exception."  *Molchatsky*, 713 F.3d at 162 (citing *Gaubert*, 499 U.S. at 324-25 (1991)).

## III.    ANALYSIS

Because Defendants have moved for dismissal under Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(6) and 56, the Court must first assess whether it has jurisdiction over Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) and 12(b)(2) before turning to the question of whether Plaintiff has failed to state a claim upon which relief can be granted or is entitled to summary judgment relief.  *See Corrado v. New York United Court Sys.*, 163 F. Supp. 3d 1, 10-11 (E.D.N.Y. 2016) (quoting *Hertzner v. United States Postal Serv.*, 05-CV-2371, 2007 WL 869585, at *3 (E.D.N.Y.

Mar. 20, 2007); *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim.")) (holding that "'the Court must first address the preliminary question[] of . . . personal jurisdiction' before considering the legal sufficiency of the allegations in the amended complaint."); *Wong v. CKX, Inc.*, 890 F. Supp.2d 411, 414-15 (S.D.N.Y. 2012) ("When presented with a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has subject matter jurisdiction necessary to consider the merits of the action.").

### A.     Subject Matter Jurisdiction

### 1.     FTCA Negligence Claim Regarding Plaintiff's Contraction of COVID-19

After carefully considering the matter, I recommend that Defendants' motion to dismiss based on the discretionary exception be denied without prejudice to renew.

Plaintiff cites to memoranda from the FBOP establishing "Action Plans" for federal prisons on how to manage the COVID-19 pandemic.[15]  (Dkt. No. 42 at 7 [citing Dkt. No. 42, Attach. 1 at 4, 9].)  "On this record, [I am unable] to determine whether these memoranda represent official policy of the [F]BOP such that prison officials lacked the discretion to take different actions, whether the memoranda were mere guidance to federal prison officials, or whether [FCI Ray Brook] adopted or adhered to the memoranda."  *Sanford v. United Sates*, 21-

---

[15]     Defendants characterize these memoranda as consisting of "largely . . . non-binding guidance for [F]BOP officials managing prison facilities" (Dkt. No. 47 at 7), whereas, Plaintiff describes them as "non-discretionary . . . written policy and procedure (Dkt. No. 42 at 8).

2552, 2022 WL 1446881, at *4 (D.S.C. Mar. 22, 2022), *report and recommendation adopted by*,

2022 WL 1210717 (D.S.C. Apr. 25, 2022); *see Sanford*, 2022 WL 1210717 (denying without

prejudice to renew the defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1)

because it was unclear whether the FBOP's "Coronavirus (COVID-19) Phase Eight Action

Plan," "Coronavirus (COVID-19) Phase Nine Action Plan, and "Modified Operations,"

implemented mandatory or discretionary protocol).

      More specifically, the memoranda cited by Plaintiff do not establish whether the

protective measures described in them are mandatory policies, mere guidance, or something else.

(*See generally* Dkt. No. 42, Attach. 1 at 2-10.)  For example, the "[F]BOP Modified Operations"

that Plaintiff cites states, *inter alia*,

> Prior to entering the institution, or in Receiving and Discharge: All new
> intakes to an institution including voluntary surrenders, [F]BOP-to-
> [F]BOP transfers, or transfers from outside the [F]BOP system are
> screened by medical staff for COVID-19 – including a symptom screen, a
> temperature check, and an approved viral PCR test (either an Abbott ID
> NOW point-of-care [POC] test or a commercial PCR test) performed on a
> sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares
> swab.

(Dkt. No. 42, Attach. 1 at 9.)  Indeed, Defendants appear to concede that the memoranda cited by

Plaintiff may include some binding policy.  (Dkt. No. 47 at 7 [referring to the memoranda as

consisting "*largely* of non-binding guidance"] [emphasis added].)  In addition, the record does

not reflect whether the memoranda was adopted as policy by FCI Ray Brook.

      Thus, I conclude that the record before the Court is insufficiently developed to determine

whether the discretionary function exception bars Plaintiff's claims that FCI Ray Brook officials

failed to follow policy to protect incarcerated individuals from COVID-19.  *See Gaubert*, 499

U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)) (A defendant fails to

meet the first prong of the test for the discretionary function exception if "a 'federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow,'

because 'the employee has no rightful option but to adhere to the directive.'"); *cf. Cohen v.*

*United States*, 21-CV-10774, 2022 WL 16925984, at *15 (S.D.N.Y. Nov. 14, 2022) (dismissing

the plaintiff's FTCA negligence claim because the plaintiff admitted that he was not asserting a

negligent guard theory of liability and instead was alleging negligence in the design of policies

and procedures regarding the maintenance and upkeep of the prison, which was barred by the

discretionary exception).  As a result, I recommend that the Court deny without prejudice to

renew Defendants' motion to dismiss arguing that the Court lacks subject matter jurisdiction

over Plaintiff's FTCA negligence claim.  *See Farmer v. United States*, 21-2572, 2022 WL

4180995, at *4 (D.S.C. Mar. 24, 2022) (recommending denial of the defendant's motion to

dismiss without prejudice because on the record before the court, the court was unable "to

determine whether" the FBOP memoranda "establishing 'Action Plans' for federal prisons on

how to manage the COVID-19 pandemic . . . . represent official policy of the [F]BOP such that

prison officials lacked the discretion to take different actions, whether the memoranda were mere

guidance to federal prison officials, or whether FCI-Williamsburg adopted or adhered to the

memoranda."), *report and recommendation adopted by*, 2022 WL 3500363 (D.S.C. Aug. 18,

2022).

## 2.    FTCA Medical Malpractice Claim Regarding Plaintiff's Kidney Disease

Upon close review of Plaintiff's Claims 1, 2, and 3, I conclude that Claims 2 and 3 were

amendments within the meaning of 28 C.F.R. § 14.2(c).

Claim 1 states that it was signed by Plaintiff on December 29, 2020.  (Dkt. No. 37,

Attach. 6 at 2.)  In addition, Claim 1 lists a "date and day of accident" as December 23, 2020,

and seeks $1,000,000.00 in damages.  (*Id.*)  Claim 1 alleges, in sum, that Plaintiff contracted

COVID-19 because too many prisoners were housed in close proximity to one another and that, as a result of his infection, Plaintiff has experienced severe headaches, muscle spasms, muscle aches, loss of smell, and loss of taste.  (*Id*. at 4.)

Claim 2 states that it was signed by Plaintiff on May 7, 2021.  (Dkt. No. 37, Attach. 8 at 3.)  In addition, Claim 2 lists a "date and day of accident" as May 3, 2021, and seeks $500,000.00 in damages.  (*Id*.)  Claim 2 states that "[i]n addition to the things listed in [Plaintiff's] 12/29/20 Standard Form 95 Tort Claim (See Claim No.: TRT-NER-2021-03094), FBOP medical staff has informed [Plaintiff that his] kidneys are failing. . . . COVID infection like the COVID infection inflicted on [Plaintiff] in December, 2020, (*Cf*. Claim No.: TRT-NER-2021-03094) causes and exacerbates AKI [acute kidney injury]."  (*Id*. at 3-4.)

Claim 3 states that it was signed by Plaintiff on July 6, 2021.  (Dkt. No. 37, Attach. 10 at 3.)  In addition, Claim 3 lists a "date and day of accident" as May 3, 2021, and seeks $500,000.00 in damages.  (*Id*.)  Claim 3 alleges that on May 3, 2021, ANP Sorrell informed Plaintiff that he suffers from CKD dating back to February 2017 when Defendant Pederson learned of his condition.  (*Id*.)  Moreover, Claim 3 alleges that Plaintiff "suffer[ed] through a COVID infection" caused by "FBOP's clear negligence . . . (*Cf*. Claim Nos. TRT-NER-2021-03094 and TRT-NER-2021-05401) while unknowingly suffering from severe CKD comorbidity, thus resulting in exacerbated and accelerated damaged to [his] life-sustaining organs."  (*Id*. at 5.)

Thus, Claim 1 relates to Plaintiff's COVID-19 diagnosis on December 23, 2020 (*see generally* Dkt. No. 37, Attach. 6), and Claims 2 and 3 relate to Plaintiff's alleged diagnosis of kidney disease on May 3, 2021—which was known to FBOP officials including Defendant Pederson in February 2017 but not disclosed to Plaintiff—that both intensified his COVID-19 symptoms and was exacerbated by his COVID-19 infection (*see generally* Dkt. No. 37, Attach.

8; Dkt. No. 37, Attach. 10).  I conclude that Claims 1, 2, and 3 overlap and are interconnected, which supports a finding that Claims 2 and 3 were amendments to Claim 1.  *See Martinez v. United States*, 20-CV-7275, 2021 WL 4224955, at *12-13 (S.D.N.Y. Sept. 16, 2021) (concluding that the second claim was its own discrete, separate claim and noting, *inter alia*, that the plaintiff's claims "appear to pertain to different time periods during which [the p]laintiff was in the custody of different facilities and was receiving medical care from different providers").

Moreover, Claim 2 references Claim 1, and Claim 3 references Claims 1 and 2, which also supports a finding that Claims 2 and 3 were amendments to Claim 1.  *See Martinez*, 2021 WL 4224955, at *12 (noting that the plaintiff's later-filed claim did not contain any reference to his previously-filed claim "nor was there any indication that [the p]laintiff then had a claim outstanding with [F]BOP.").

Penultimately, Claims 2 and 3 relate to events that occurred before the event at issue in Claim 1, which also supports a finding that Claims 2 and 3 were amendments to Claim 1.  More specifically, Claims 2 and 3, relate to Plaintiff's kidney disease, which, although diagnosed after his COVID-19 diagnosis, was allegedly left untreated for over four years and caused an exacerbation of Plaintiff's COVID-19 symptoms.  *See Rawers v. United States*, 488 F. Supp. 3d 1059, 1131 (D.N.M. 2020) (finding that the plaintiff's letter could not "be characterized soundly as an amendment" to her initial claim because the letter made "no additional claim or statements concerning the accident or events before [her] initial Form SF-95 filing" and concluding that because the letter "provid[ed] additional [information about events] that occurred after she first filed her claim" the letter was "not an amendment under 28 C.F.R. § 14.2.").

Finally, I find unpersuasive Defendants' argument that the Court is beholden to FBOP's interpretation of Claims 2 and 3 as discrete claims, as opposed to amendments of Claim 1.

(*Compare* Dkt. No. 47 at 6 [arguing that because "the [F]BOP did not view the second and third SF-95s as amendments" "[t]he Court must defer to an agency's interpretation of its own regulations"] [internal quotation marks omitted], *with* Dkt. No. 47 at 20 [arguing that Plaintiff's supplementation including allegations that Claims 2 and 3 were amendments of Claim 1, should be rejected because, *inter alia*, those allegations are "nothing more than a legal conclusion or argument."].)  Although the denial letter dated August 13, 2021, from the Northeast Regional Office only referred to Claim 1, it failed to specify that Claims 2 and 3 were still pending despite the explicit references in Claims 2 and 3 to Claim 1.  (*Compare* Dkt. No. 37, Attach. 7 at 2, *with* Dkt. No. 37, Attach. 8 at 3-4 and Dkt. No. 37, Attach. 10 at 5.)  I decline to conclude that any denial letter must explicitly reference other pending claims to clarify the status of those claims. However, where, as here, Defendants intend to argue that later-filed claims that reference previously filed claims are not amendments and, instead, are stand-alone, discrete claims, it would behoove the Government to make its position clear when responding to the initially filed claim.

For each of these reasons, resolving all ambiguities and drawing all inferences in favor of Plaintiff, I find that Claims 2 and 3 were amendments to Claim 1.  *Aurecchione*, 426 F.3d at 638 (citing *Makarova*, 201 F.3d at 113); *see Wooding v. United States*, 05-CV-1681, 2007 WL 2071674, at *3 (W.D. Pa. July 13, 2007) ("I note that the Government has not identified a single case, nor has independent research revealed one, where a claimant who had timely submitted a Standard Form 95 with respect to a particular incident, and who had submitted, prior to final agency action, an amendment pursuant to § 14.2(c) of that Form setting forth additional facts relating to that incident, was not permitted to pursue a particular legal theory which would have arisen from those additional facts.").  As a result, I recommend that the Court deny Defendants'

motion to dismiss arguing that the Court lacks subject matter jurisdiction over Plaintiff's FTCA medical malpractice claim.

### 3.    *Bivens* Claim Against Defendant Pederson in her Official Capacity

After carefully considering the matter, I recommend that, to the extent Plaintiff's Amended Complaint is construed as alleging a *Bivens* claim against Defendant Pederson in her official capacity, it be dismissed because the Court lacks subject matter jurisdiction for the reasons set forth in Defendants' memoranda of law.  (Dkt. No. 37, Attach. 1 at 23-25; Dkt. No. 47 at 10-11); *see Mendez v. Schenk*, 21-CV-1090, 2022 WL 17729301, at *3 n.5 (N.D.N.Y. Dec. 16, 2022) (Sannes, C.J.) (citing *Bivens*, 403 U.S. at 410; *Chapman v. Doe (One)*, 19-CV-1257, 2019 WL 6493971, at *6-7 (N.D.N.Y. Dec. 3, 2019) (Suddaby, C.J.) (noting that *Bivens* does not "allow claims for monetary damages against the United States, federal agencies, or federal agents in their official capacities"); *Carno v. United States*, 17-CV-7998, 2019 WL 2287966, at *6 (S.D.N.Y. May 28, 2019) ("Under the Eleventh Amendment to the U.S. Constitution, the United States, as a sovereign, is immune from suits raising Constitutional violations.")) ("Neither *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny nor Section 1983 allow claims for monetary damages against the United States, federal agencies, or federal agents in their official capacities.").

### B.    Personal Jurisdiction Over Defendant Pederson

After carefully considering the matter, I recommend that Plaintiff's *Bivens* claim against Defendant Pederson in her individual capacity be dismissed because the Court lacks personal jurisdiction over her for the reasons set forth in Defendants' memoranda of law.  (Dkt. No. 37, Attach. 1 at 27-32; Dkt. No. 47 at 11-14).  The following is intended to supplement, not supplant, those reasons.

As stated above in Part II.B. of this Report and Recommendation, "personal jurisdiction over a defendant must be established under the law of the state where the federal court sits." *PDO Max, Inc. v. Malcmacher*, 21-CV-1274, 2022 WL 17415123, at *4 (N.D.N.Y. Dec. 5, 2022) (Suddaby, J.)  Here, Plaintiff must establish that Defendant Pederson should be subject to personal jurisdiction under New York State law.  As a non-domiciliary of New York, the Court has jurisdiction over Defendant Pederson if she:

> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or
> (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
> (3) commits a tortious act without the state causing injury to a person or property within the state, . . . if [s]he
>> (i)    regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>> (ii)   expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or
> (4) owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a).

As set forth in Defendants' moving memorandum of law (Dkt. No. 37, Attach. 1) and the accompanying declaration of Defendant Pederson (Dkt. No. 37, Attach. 13), New York's long-arm statute does not permit the assertion of personal jurisdiction over Defendant Pederson. Although Defendant Pederson owns real property located in New York, N.Y. C.P.L.R. § 302(a)(4) requires "a relationship between the property and the cause of action sued upon." *Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381, 390 (E.D.N.Y. Mar. 10, 2015) (quoting *Lancaster v. Colonial Motor Freight Line, Inc.*, 177 A.D.2d 152, 159 (N.Y. App. Div. 1st Dep't 1992)).  Plaintiff's allegations and the evidence before the Court fail to show any such relationship.  *See, e.g., A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557,

574 (E.D.N.Y. 2011) (holding that the plaintiff failed to establish jurisdiction over the defendant under section 302(a)(4) where the plaintiff did not "allege any connection between the property in New York State and the claimed injury").

Moreover, as set forth in Defendants' reply memorandum of law (Dkt. No. 47), Plaintiff's opposition, which focused on venue, missed the mark because venue and personal jurisdiction are two distinct concepts.  Further, the Supreme Court held:

> A suit for money damages which must be paid out of the pocket of the private individual who happens to be—or formally was—employed by the Federal Government plainly is not one "essentially against the United States," and thus is not encompassed by the venue provisions of § 1391(e).

*Stafford v. Briggs*, 444 U.S. 527, 542 (1980).  It is also unclear whether 28 U.S.C. § 1391(e) applies to former federal employees, like Defendant Pederson who retired on July 31, 2021, before the commencement of this action.  (Dkt. No. 37, Attach. 12 at ¶ 2); *Compare Ross v. United States*, 574 F. Supp. 536, 540 (S.D.N.Y. 1983) (quoting 28 U.S.C. § 1391(b); citing *Stafford*, 444 U.S. at 535-36) (holding that "Section 1391(e) applies only to present federal employees.  These individual defendants are all former federal employees.  The proper venue, thus, 'is only in the judicial district where all defendants reside or in which the claim arose.'"), *with Stafford*, 444 U.S. 533 n.4 (noting that the First Circuit concluded "that because 28 U.S.C. § 1391(e) was drafted in the present tense, Congress did not mean it to apply to former officials.  Although respondents sought certiorari on this question, we declined review.").

As a result, I recommend that Plaintiff's *Bivens* claim against Defendant Pederson in her individual capacity be dismissed because the Court lacks personal jurisdiction over her.[16]

---

[16]    In the alternative, I recommend that the Court sever Plaintiff's *Bivens* claim against Defendant Pederson in her individual capacity and transfer it to District Court for the District of New Hampshire.  *See Williams v. Smith*, 16-CV-0115, 2020 WL 759684, at *6-7 (W.D.N.Y. Feb. 11, 2020) (citing Fed. R. Civ. P. 22; 28 U.S.C. §§ 113(a), 1404(a)) (severing the plaintiff's

C.    **Failure to State a Claim Upon Which Relief May be Granted**

1.    **FTCA Negligence**

Under New York state law, a plaintiff alleging negligence must establish "(1) that the

defendant owed the plaintiff a cognizable duty of care; (2) that the defendant breached that duty,

and (3) that the plaintiff suffered proximately caused damages." *Feder v. Target Stores*, 15 F.

Supp. 3d 253, 256 (E.D.N.Y. 2014) (citing *King v. Crossland Savings Bank*, 111 F.3d 251, 255

(2d Cir. 1997)).

Based on the undersigned's independent research, there are few cases considering

whether an incarcerated plaintiff can assert a negligence claim alleging that he contracted an

infectious disease while incarcerated because of the defendants' failure to comply with proper

procedures to protect him.  I find unpersuasive Defendants' argument that Plaintiff does not—

and could never—assert a negligence claim based on such allegations merely because he cannot

point with certainty to the cause of his COVID-19 infection.  It is virtually impossible for anyone

to identify with certainty the cause of a respiratory virus, like COVID-19.  Notwithstanding,

other courts have recognized the viability of similar negligence claims against the United States

brought by FBOP prisoners.

For example, Defendants' moving memorandum of law highlighted a Third Circuit case

for the proposition that "bacteria, [like viruses] . . . are apt to spread, even potentially in the face

of disease prevention efforts of the highest quality, and the mere contraction of an infection

would not, on its own, put [a federal inmate] on notice that some act or omission by prison

officials was the cause."  (Dkt. No. 37, Attach. 1 at 36 [citing *Royster v. United States*, 475 F.

---

"North Carolina claims" and noting that the court had the option to either dismiss the severed
claims or transfer them to the Eastern District of North Carolina).

App'x 417, 421 (3d Cir. 2012)].)  Despite Defendants' use of this quote to suggest that Plaintiff

does not—and could not—assert a claim, the Third Circuit in *Royster* was considering when the

statute of limitations accrues and held that it begins to accrue when the plaintiff learned of the

allegedly negligent acts taken by the United States actors that caused his injury (not when he

learned of his diagnosis).  *Royster*, 475 F. App'x at 421.  As a result, the Third Circuit vacated

the district court's granting summary judgment to the United States and remanded the case for

further proceedings.  *Id*.  Thus, the *Royster* decision implies that an incarcerated plaintiff *may*

assert a FTCA negligence claim against the United States based on the contraction of a

communicable disease without identifying with certainty the source of the infection.  *Id.*

The undersigned's independent research identified two additional cases that considered

similar arguments as those set forth in Defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6).

In *Bailey v. Bauer*, 20-CV-0802, 2021 WL 1720269, at *4 (S.D. Ill. Apr. 30, 2021), the District

Court for the Southern District of Illinois held—with minimal analysis—that the inmate

plaintiff's FTCA negligence claim alleging, *inter alia*, that he was negligently exposed to the risk

of infection with COVID-19 by allowing another inmate to access the plaintiff's cell "may

proceed at this time" and survived *sua sponte* review pursuant to 28 U.S.C. §§ 1915, 1915A.

*Bailey*, 2021 WL 1720269, at *4.

In *Walker v. United States*, 21-CV-1881, 2022 WL 1472872, at *3 (M.D. Pa. May 10,

2022), the District Court for the Middle District of Pennsylvania held that the inmate plaintiff

failed to plausibly allege the third and fourth elements of a negligence claim pursuant to

Pennsylvania law (that such a breach caused the harm in question and that the plaintiff incurred

actual loss or damage) because he "fail[ed] to show a causal connection between the conduct of

prison staff and his COVID-19 infection."  *Walker*, 2022 WL 1472872, at *3.  The court held

that "[w]ithout knowing when he was exposed to the virus, [the plaintiff] is unable to identify the individuals who exposed him to COVID-19 and fails to precisely identify the actions or inactions that resulted in his exposure to the virus." *Id.*  The court noted that "[a]t this time, there are no inmates that are infected with COVID-19" (without a citation to the record) and concluded that "[i]t is clear from the complaint that USP-Canaan took COVID-19 seriously and took reasonable steps to address the COVID-19 pandemic within the constraints of appropriate institutional safety concerns." *Id.*  As a result, the district court held that "the conduct of the [F]BOP officials did not proximately cause [the plaintiff]'s infection of COVID-19." *Id.*

Although there was minimal analysis by the court in *Bailey*, and the *Royster* court did not squarely address the issues presently before this Court, I find them compelling.  The court in *Walker* appears to make a factual determination with a more robust record than is presently before this Court.[17]

Here, Plaintiff alleges in the Amended Complaint that he was "exposed to COVID infection . . . because the FBOP failed to properly test and quarantine the hold-over prisoners it

---

[17]     Defendants also cite to a case from 1921 issued by the Supreme Court of Arkansas.  (Dkt. No. 37, Attach. 1 at 36 [citing *Davis v. Rodman*, 227 S.W. 612, 613 (Ark. 1921)].)  The undersigned found this case—from over one hundred years ago issued by state (other than New York State) court, unpersuasive.  Moreover, Defendants cite several cases that granted summary judgment to support their position that Plaintiff fails to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 37, Attach. 1 at 37 [citing *Mabry v. N.Y.C. Dep't of Corr.*, 465 F. App'x 31, 32 (2d Cir. 2012); *Davis v. Cruise Operator, Inc.*, 16-CV-62391, 2017 WL 3057610, at *6 (S.D. Fla. July 19, 2017); *Malles v. Lehigh Cnty.*, 639 F. Supp. 2d 566, 581 (E.D. Pa. 2009)].)  Finally, Defendants cited a case dismissing a conditions of confinement claim pursuant to the Eighth Amendment and 42 U.S.C. § 1983, which has different elements than that of a negligence claim.  (Dkt. No. 37, Attach. 1 at 37 [citing *Narvaez v. City of New York*, 16-CV-1980, 2017 WL 1535386, at *9 (S.D.N.Y. Apr. 17, 2017)].)

housed at [FCI] Ray Brook."[18]  (Dkt. No. 9 at 4, ¶ 8.)  At this juncture—during which the pleadings are to be construed in the light most favorable to plaintiff, and all doubts are to be resolved in plaintiff's favor—I find that Plaintiff states a claim upon which relief may be granted. *Bonkowski*, 2016 WL 4536868, at *1.  As a result, I recommend denying Defendants' motion to dismiss for failure to state a claim.[19]

### 2.     FTCA Medical Malpractice

For the reasons set forth by Defendants in their memorandum of law, I find that New Hampshire law governs Plaintiff's FTCA medical malpractice claim.  (Dkt. No. 37, Attach. 1 at 38 [citing *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020)].)  In addition, Defendants

---

[18]     Further, it is undisputed that Plaintiff was in the custody of FBOP at all times relevant to his contraction of COVID-19.  Thus, any exposure that Plaintiff had to COVID-19 was caused by the action—or inaction—of FBOP employees.

[19]     The Court may decline to address Defendants' immunity argument pursuant to 28 U.S.C. § 2680(f) because it was made for the first time in their reply memorandum of law (Dkt. No. 47 at 9-10) and "[t]he law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered."  *Adecco USA, Inc. v. Staffworks, Inc.*, 20-CV-0744, 2022 WL 16571380, at *5 n.4 (N.D.N.Y. Nov. 1, 2022) (D'Agostino, J.) (citing *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument raised for the first time in a reply brief."); *see also Sacchi v. Verizon Online LLC*, 14-CV-0423, 2015 WL 1729796, at *1 n.1 (S.D.N.Y. Apr. 14, 2015) ("Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it")).  To the extent that the Court is inclined to consider this argument, I recommend that it be rejected at this juncture.  "[T]here is scant caselaw applying the quarantine exception to humans."  *Pressley v. United States*, 21-CV-0202, 2023 WL 22192, at *4 (S.D. Ind. Jan. 3, 2023).  "The questions of whether—and if so, how—the quarantine exception applies to humans in the context of the COVID-19 pandemic has not been addressed by the [Second] Circuit."  *Pressley*, 2023 WL 22192, at *4.  The undersigned is "reluctant to rely on a single district case [*Wallace v. United States Dep't of Just.*, 21-CT-3035-D, 2021 WL 2853692, at *1 (E.D.N.C. June 24, 2021), *aff'd*, 21-7017, 2022 WL 1024613 (4th Cir. Apr. 6, 2022)]] outside the [Second] Circuit, or to conclude that [Plaintiff's] claims—raised by human beings—in this case [is] barred by an exception that has previously only been applied to livestock.  The exception is an affirmative defense, and the application of it to [Plaintiff's] claims are not clear enough to dismiss the claims without discovery."  *Id.* (citing *Parrott v. United States*, 536 F.3d 629, 634-35 (7th Cir. 2008)).

correctly cite the standard for establishing a medical malpractice claim in New Hampshire.  (Dkt. No. 37, Attach. 1 at 38 [citing N.H. Rev. Stat. Ann. § 507-E:2 (I)].)

I find that the Amended Complaint alleges facts plausibly suggesting that Defendant Pederson's failure to disclose to Plaintiff his abnormal laboratory result deviated from accepted medical practice.  More specifically, Plaintiff alleges that Defendant Pederson "discovered that [Plaintiff] had severely diminished eGRF and elevated creatine level, which indicates kidney disease and reduced kidney function," but did not treat, diagnose, or reveal that information to Plaintiff.  (Dkt. No. 9 at 3.)  Instead, Plaintiff alleges that it was not until May 2021, when "[s]taff explained [to Plaintiff] that . . . [his] kidneys are damaged and not working properly and that [his] kidney function was diminished."  (*Id*. at 4.)

As Plaintiff noted in his opposition memorandum of law, "eGFR is a measure of kidney function.  In adults, the normal eGFR number is more than 90.  An eGFR below 60 for three months or more . . . indicates chronic kidney disease."  *Pullins v. Comm'r of Soc. Sec.*, 18-CV-1303, 2019 WL 6724586, at *3 n.2 (W.D.N.Y. Dec. 11, 2019).  Moreover, "[t]he Renal Association emphasizes that values around 60 should not be 'over-interpreted' and the importance of repeat testing."  *Saxon v. United States*, 12-CR-0320, 2020 WL 4548078, at *2 n.6 (S.D.N.Y. Aug. 5, 2020) (citation omitted).

Despite Plaintiff's eGFR level of 59 in February of 2017, Plaintiff asserts in his opposition that follow-up blood tests were not ordered and that the routine urine tests were insufficient because "they display the same results as the urine test taken simultaneously to the blood test that revealed an eGFR of 59."  (Dkt. No. 42 at 5.)  Although not entirely clear, it appears as though Plaintiff is alleging that the urine test taken at the same time as his blood sample in February 2017, indicated normal kidney functioning, while his blood reflected a low

eGFR. (*See* Dkt. No. 42 at 9-10 [arguing that "[t]he urinalysis taken on August 15, 2017 and

October 15, 2017 mean nothing because the results of those urine samples are identical to the

results of the urinalysis taken simultaneously with the initial eGFR of 59."].) Thus, Plaintiff

alleges that urinalysis is an insufficient mode of "repeated tested." Moreover, Plaintiff alleges

that the next time his blood was drawn—over four years later—it again reflected a low eGFR

level. (Dkt. No. 9 at 4.)

Construing the Amended Complaint and Plaintiff's opposition liberally and drawing all

reasonable inferences in favor of Plaintiff, I find that he alleges facts plausibly suggesting that

Defendant Pederson deviated from accepted medical practice by failing to conduct follow up

blood testing of Plaintiff's kidney functions after the February 2017 urine test was inconclusive

or contradictory to the February 2017 blood test. As a result, I recommend that Defendant's

motion to dismiss Plaintiff's medical malpractice claim for failure to assert a claim be denied.

### D.    Motion for Summary Judgment

For the reasons set forth in Plaintiff's opposition memorandum of law and the reasons set

forth above in Part III.C.2. of this Report and Recommendation, I find that genuine issues of

material fact remain for trial regarding Plaintiff's medical malpractice claim. (Dkt. No. 42 at 9-

10.) For example, Defendants aver that the laboratory results after the February 2017 result

"yielded no significant abnormalities with respect to Plaintiff's kidney function." (Dkt. No. 37,

Attach. 1 at 39.) However, as Plaintiff identifies, the urinalysis taken simultaneous to Plaintiff's

blood work in February 2017 reflected normal levels in contrast with Plaintiff's blood results,

which indicated an eGFR value of 59. (Dkt. No. 42 at 10.) Thus, there is an issue of fact

regarding whether it was a deviation from the standard of care to rely on uranalysis under these

circumstances. Moreover, the mere fact that Plaintiff may not have sustained any long-term

kidney damage—as Defendants assert—does not mean necessarily that Plaintiff will be unable to establish a medical malpractice claim premised on Defendant Pederson's alleged deviation from the standard of medical care, which caused Plaintiff, *inter alia*, pain and suffering until he was prescribed the proper medication in 2021.

Further, although Defendants' motion provided sufficient notice to Plaintiff regarding its request that the Court, in the alternative, convert their Rule 12(b)(6) motion into a summary judgment motion pursuant to Rule 56, I find that at this juncture, the granting of summary judgment in favor of Defendants would be inappropriate. To date, the parties have not exchanged mandatory disclosures, attended a conference pursuant to Fed. R. Civ. P. 16, or engaged in any discovery. (*See generally* docket sheet.) This court lacks the medical training and expertise necessary to determine, in the absence of expert opinion evidence, whether the medical judgment exercised by Defendant Pederson—and any other FBOP medical providers involved with the care of Plaintiff's kidneys between February 2017 and May 2021—fell below an acceptable standard of professional care. *See Brady v. Weeks Medical Center*, 19-CV-0655, 2021 WL 3115940, at *5 (D.N.H. July 22, 2021) (citing N.H. Rev. Stat. Ann. § 507-E:2 (emphasis added) ("In any action for medical injury, the plaintiff shall have the burden of proving by affirmative evidence which *must include expert testimony of a competent witness* or witnesses" three essential elements: (1) the standard of reasonable care; (2) defendant's breach of that standard; and (3) proximate causation.); *see also Smith v. HCA Health Servs. of New Hampshire, Inc.*, 159 N.H. 159, 161 (N.H. 2009); *Goudreault v. Kleeman*, 158 N.H. 236, 245 (N.H. 2009)) (holding that the plaintiff's medical malpractice claims were subject to dismissal because "absent expert medical testimony, those claims cannot proceed"); *Roberts v. Wentworth-Douglass Hosp.*, 09-CV-0034, 2011 WL 1230334, at *4 (D.N.H. Mar. 29, 2011) (noting that

"[u]nder New Hampshire law, a plaintiff cannot prevail on a medical malpractice claim without expert testimony as to the applicable medical standard of care and causation.")

As a result, I recommend that Defendants' motion pursuant to Fed. R. Civ. P. 56 be denied at this juncture without prejudice to renew at the close of discovery.

## IV.    PLAINTIFF'S MOTION TO SUPPLEMENT THE AMENDED COMPLAINT

The standard for a motion to supplement is the same as for a motion to amend the pleadings under Fed. R. Civ. P. 15(a).  *Klos v. Haskell*, 835 F. Supp. 710, 715 (W.D.N.Y. 1993) (Fisher, M.J.), *adopted by* 835 F. Supp. at 713 (W.D.N.Y. 1993) (Telesca, D.J.).  Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility."  *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283).  However, "[c]ourts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case."  *Amusement Indus. v. Stern*, 07-CV-11586, 2014 WL 4460393, at *13 (S.D.N.Y. Sept. 10, 2014); *see also Mitchell v. Cuomo*, 17-CV-0892, 2019 WL 1397195, at *3 (N.D.N.Y. Mar. 28, 2019) (McAvoy, J.) (overruling the plaintiff's objections to the Magistrate Judge's denial of the plaintiff's motion to supplement where "[t]he proposed First Amendment claims are neither related to nor pertain to the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d)"); *Beckett v. Inc. Vill. of Freeport*, 11-CV-2163, 2014 WL 1330557, at *6 (E.D.N.Y. Mar. 31, 2014) ("Supplemental pleadings are limited to subsequent events related to the claim or defense presented in the original pleading." (internal quotation marks omitted)); *Brooks v. Rock*, 11-CV-1171, 2014 WL 1292232, at *3

(N.D.N.Y. Mar. 28, 2014) (Sharpe, C.J.) (denying motion to amend to add allegations of retaliation and failure to protect from alleged conspiracy, where the original facts occurred in 2011 and the proposed new facts occurred in 2013); *Smith v. Goord*, 04-CV-6432, 2007 WL 496371, at *3 (W.D.N.Y. Feb. 12, 2007) (denying motion to add claims against original and new defendants based on events occurring more than one year after the original alleged events).

For the reasons set forth in Defendants' memoranda of law (Dkt. No. 47 at 19-20; Dkt. No. 50), asserting that Plaintiff's proposed supplements are unrelated to the events set forth in his Amended Complaint, Plaintiff's motion to supplement is denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion to supplement the Amended Complaint (Dkt. No. 43) is **DENIED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 9) be **DISMISSED** to the extent that it asserts a *Bivens* claim against Defendant Pederson in her individual and official capacities, and **SURVIVE** to the extent that it asserts FTCA claims for negligence and medical malpractice against Defendant United States; and it is further respectfully

**RECOMMENDED** that Defendants' motion to dismiss and motion for summary judgment (Dkt. No. 37) be **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[20]

---

[20]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[21]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: February  9 , 2023
       Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[21]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2022 WL 2159823
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

GLOBAL ART EXHIBITIONS, INC., Plaintiff,
v.
KUHN & BÜLOW ITALIA
VERSICHERUNGSMAKLER GMBH, ERGO
Versicherungs AG, Mannheimer Versicherung AG,
Basler Sachversicherungs-AG, Helvetia Schweizerische
Versicherungsgesellschaft in Liechtenstein AG, and
Gothaer Allgemeine Versicherung AG, Defendants.

20-CV-1395 (KMW)
|
Signed June 15, 2022

**Synopsis**
**Background:** Privately held company that sold and exhibited
works of fine art brought action against five "all-risk" insurers
from Germany and Liechtenstein and insurance broker,
alleging breach of contract covering several works of art it
arranged to send to an exhibition in Genoa, Italy, which were
seized by Italian authorities upon suspicion the works were
forgeries. Defendants moved to dismiss for lack of subject
matter jurisdiction, on basis of forum non conveniens, and for
failure to state a claim.

**Holdings:** The District Court, Kimba M. Wood, J., held that:

[1] under New York conflict-of-law rules, German law, rather
than New York law, applied to action;

[2] contractual precondition to payment in all-risk policies,
which made payment pursuant to its confiscation clause
contingent on insured first recovering its confiscated works of
art, did not render privately held company's breach of contract
claim unripe for resolution;

[3] "doubt" prong of policies' postponement clause did
not render company's breach of contract claim unripe for
resolution;

[4] provision in policies' postponement clause which
permitted insurers to delay reimbursement of insured's legal
costs if official or criminal proceedings were in progress
against policyholder or insured "on account of the claim

incident" did not render privately held company's breach of
contract claim unripe for resolution;

[5] when deciding motion to dismiss on forum non
conveniens grounds, company was entitled to higher degree
of deference due to its choice of "home" forum;

[6] Germany was adequate alternative forum for action; but

[7] private interests weighed against dismissal of action on
forum non conveniens grounds; and

[8] public interests weighed against dismissal of action on
forum non conveniens grounds.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Forum Non
Conveniens; Motion to Dismiss for Failure to State a Claim;
Motion to Dismiss for Lack of Subject Matter Jurisdiction.

West Headnotes (33)

**[1]    Federal Courts**  ⬥  Dismissal or other
disposition

A case is properly dismissed for lack of
subject matter jurisdiction when the district court
lacks the statutory or constitutional power to
adjudicate it. 🚩 Fed. R. Civ. P. 12(b)(1).

1 Case that cites this headnote

**[2]    Federal Courts**  ⬥  Weight and sufficiency

On motion to dismiss for lack of subject matter
jurisdiction the plaintiff, as the party asserting
jurisdiction, has the burden to prove subject-
matter jurisdiction by a preponderance of the
evidence. 🚩 Fed. R. Civ. P. 12(b)(1).

1 Case that cites this headnote

**[3]    Federal Courts**  ⬥  Evidence;  Affidavits
**Federal Courts**  ⬥  Presumptions and burden
of proof

A court reviewing a motion to dismiss for lack of subject matter jurisdiction takes all uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts. Fed. R. Civ. P. 12(b)(1).

1 Case that cites this headnote

**[4]**    **Federal Courts**   Evidence; Affidavits

In determining questions of foreign law on motion to dismiss for lack of subject matter jurisdiction, a court may consider any relevant materials, whether or not submitted by a party or admissible pursuant to the Federal Rules of Evidence. Fed. R. Civ. P. 12(b)(1), 44.1.

**[5]**    **Federal Courts**   Ripeness; Prematurity
       **Federal Courts**   Prudential concerns

Constitutional ripeness, unlike prudential ripeness, is jurisdictional issue properly analyzed pursuant to motion to dismiss for lack of subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[6]**    **Contracts**   Agreements relating to actions and other proceedings in general
       **Contracts**   Intention of Parties

When applying the conflict-of-law rules of New York, courts will generally enforce choice-of-law clauses and contracts should be interpreted so as to effectuate the parties' intent.

**[7]**    **Insurance**   Particular Applications of Rules
       **Insurance**   Property insurance

Under New York conflict-of-law rules, German law, rather than New York law, applied to action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; applicable German rules of contract interpretation were similar to New York's rules, as disputes regarding the meaning of contracts were resolved under German law by determining the objective interpretation of disputed provisions, based on the wording and accompanying circumstances of agreement, taking into account the custom of trade and principle of good faith and intentions of the parties.

**[8]**    **Federal Courts**   Contracts

Under New York law, an unmet precondition to performance can render a breach of contract claim unripe and suitable for dismissal on a motion to dismiss for lack of subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[9]**    **Federal Courts**   Ripeness; Prematurity

Constitutional ripeness is question of district court's authority to hear case pursuant to Article III. U.S. Const. art. 3, § 2, cl. 1.

**[10]**    **Federal Courts**   Trade, Business, and Finance

Under German law, contractual precondition to payment in "all-risk" policies, which made payment pursuant to its confiscation clause contingent on insured first recovering confiscated works of art, did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries, as insurers had present obligation to pay company; policy itself did not dictate the time by which covered legal costs had to be paid, company alleged it was in dire need of

funds to finance its legal expenses, and it could be reasonably inferred that company took care to demand partial payment under policy to increase its prospects of timely access to legal funds. U.S. Const. art. 3, § 2, cl. 1.

[11]    **Federal Courts** 🔑 Trade, Business, and Finance

Under German law, "doubt" prong of "all-risk" policies' postponement clause, which permitted insurers to delay reimbursement of insured's legal costs if there was "doubt about policyholder's or the insured party's entitlement to receive payment," did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries, despite contention that policy exclusion for loss or damage caused by "natural state and properties" of insured works resulted in requisite "doubt" warranting postponement; phrase "natural state and properties" did not refer to authenticity or authorship of item but, rather, referred to item's physical properties. U.S. Const. art. 3, § 2, cl. 1.

[12]    **Federal Courts** 🔑 Trade, Business, and Finance

Under German law, "doubt" prong of "all-risk" policies' postponement clause, which permitted insurers to delay reimbursement of insured's legal costs if there was "doubt about policyholder's or the insured party's entitlement to receive payment," did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries, despite

contention that policy exclusion for loss or damage caused by "intentional behavior on the part of the policyholder" resulted in requisite "doubt" warranting postponement; art exhibition organizer, rather than company, was policyholder, it was implausible that organizer approved or consciously accepted its actions would cause it to incur legal costs due to criminal prosecution of its chief corporate officers, and conduct alleged did not support claim that conduct was intentional, because if purported fraud in obscuring inauthenticity of artwork had remained successfully hidden, they would have prevented the insured event from occurring, and company would never had incurred legal costs at issue. U.S. Const. art. 3, § 2, cl. 1.

[13]    **Federal Courts** 🔑 Trade, Business, and Finance

Under German law, provision in "all-risk" policies' postponement clause which permitted insurers to delay reimbursement of insured's legal costs if official or criminal proceedings were in progress against policyholder or insured "on account of the claim incident" did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; term "official proceedings" was limited to proceedings initiated by a government body, not a civil claim such as the one brought by palace which hosted exhibition against the exhibition organizer. U.S. Const. art. 3, § 2, cl. 1.

[14]    **Federal Courts** 🔑 Discretion in general

The doctrine of "forum non conveniens" is a discretionary device permitting a court in rare instances to dismiss a claim, even if the court is a permissible venue with proper jurisdiction over the claim.

**[15]**  **Federal Courts** 👉 Parties' choice of forum;
forum-shopping

**Federal Courts** 👉 Public and private
interests; balancing interests

**Federal Courts** 👉 Availability and adequacy

When exercising its discretion and determining
whether to dismiss action on forum non
conveniens grounds a court: (1) determines
the degree of deference properly accorded the
plaintiff's choice of forum; (2) considers whether
the alternative forum proposed by the defendants
is adequate to adjudicate the parties' dispute;
and (3) balances the private and public interests
implicated in the choice of forum.

**[16]**  **Federal Courts** 👉 Weight and sufficiency

A defendant generally bears a heavy burden
when it seeks to invoke doctrine of forum non
conveniens.

**[17]**  **Federal Courts** 👉 Convenience of parties
and witnesses; location of evidence

Dismissal on forum non conveniens grounds is
warranted only if chosen forum is shown to
be genuinely inconvenient and selected forum
significantly preferable.

**[18]**  **Federal Courts** 👉 Evidence; Affidavits

Court deciding motion to dismiss on forum
non conveniens grounds may consider pleadings
as well as affidavits from both moving and
opposing parties.

**[19]**  **Federal Courts** 👉 Parties' choice of forum;
forum-shopping

Privately held company that sold and exhibited
works of fine art was entitled to higher degree of
deference for its choice of Southern District of
New York as forum when determining whether
to dismiss, on basis of forum non conveniens
in Germany, its action against five "all-risk"
insurers from Germany and Liechtenstein and

insurance broker, alleging breach of contract
covering several works of art it arranged to
send to an exhibition in Genoa, Italy, which
were seized by Italian authorities upon suspicion
the works were forgeries; company's principal
place of business was in Manhattan, within
the geographic jurisdiction of its chosen forum,
company hired Italian art exhibition organizer to
arrange insurance coverage for works of art to be
exhibited in Italy, and it was organizer that placed
company's insurance policy with German broker.

**[20]**  **Federal Courts** 👉 Parties' choice of forum;
forum-shopping

When deciding motion to dismiss on forum non
conveniens grounds, courts give a high degree of
deference to the plaintiff's choice of forum.

**[21]**  **Federal Courts** 👉 Parties' choice of forum;
forum-shopping

On motion to dismiss on forum non conveniens
grounds, a court will increase or decrease the
level of deference owed to plaintiff's choice of
forum depending upon: (1) whether the lawsuit
was brought in the forum for legitimate reasons,
such as the plaintiff's or the lawsuit's bona fide
connection to the United States and to the forum
of choice; and (2) whether considerations of
convenience favor the conduct of the lawsuit in
the United States.

**[22]**  **Federal Courts** 👉 Parties' choice of forum;
forum-shopping

Great deference is given to plaintiff's choice of
forum, for purposes of forum non conveniens
analysis, when plaintiff sues in his or her home
forum.

**[23]**  **Federal Courts** 👉 Parties' choice of forum;
forum-shopping

On motion to dismiss on forum non conveniens
grounds, courts afford less deference to
a plaintiff's choice of forum when the
plaintiff sought out business relationships in

the alternative forum and, therefore, could reasonably expect to litigate there.

**[24]**   **Federal Courts** 🔑 Availability and adequacy
**Federal Courts** 🔑 Amenability to process

An alternative forum is "adequate," for purposes of forum non conveniens analysis, if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute.

**[25]**   **Federal Courts** 🔑 Availability and adequacy
**Federal Courts** 🔑 Amenability to process

Germany was adequate alternative forum for action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries, thereby weighing in favor of dismissal of action on forum non conveniens grounds; all defendants were either German entities subject to service of process in Germany or had indicated their willingness to submit to jurisdiction of German court, and German courts permitted litigation of breach of contract claims such as one company raised against insurers.

**[26]**   **Federal Courts** 🔑 Availability and adequacy

Alternative forum is sufficient, for purposes of forum non conveniens analysis, even if its procedures and causes of action differ from those in plaintiff's chosen forum, unless remedies in foreign forum are tantamount to no remedy at all.

**[27]**   **Federal Courts** 🔑 Presumptions and burden of proof

On motion to dismiss on forum non conveniens grounds, the defendant bears the burden of establishing that the balance of private and public

interest factors tilts heavily in favor of the alternative forum.

**[28]**   **Federal Courts** 🔑 Public and private interests; balancing interests

On motion to dismiss for forum non conveniens, balancing the private interests implicated by choice of forum entails a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country.

**[29]**   **Federal Courts** 🔑 Convenience of parties and witnesses; location of evidence
**Federal Courts** 🔑 Public and private interests; balancing interests

Private interest factors to consider in determining whether to dismiss action on forum non conveniens grounds include: (1) relative ease of access to sources of proof; (2) availability of compulsory process to force attendance of unwilling witnesses; (3) cost of obtaining attendance of willing witnesses; and (4) all other practical problems that make trial of case easy, expeditious, and inexpensive.

**[30]**   **Federal Courts** 🔑 Convenience of parties and witnesses; location of evidence
**Federal Courts** 🔑 Public and private interests; balancing interests

Private interests weighed against dismissal, on forum non conveniens grounds, of action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; sources of proof were distributed across Germany, Italy and the United States, German courts would not have greater ability than American court to secure

evidence from non-parties in Italy through use of compulsory process, cost of obtaining testimony from willing witnesses was fairly minor factor, and defendants seemed to have substantially more resources than company with which to bear the inconveniences of distant litigation.

**[31]** **Federal Courts** 👈 Burden placed on court and public

**Federal Courts** 👈 Public and private interests; balancing interests

On motion to dismiss on forum non conveniens grounds, relevant public interests implicated by choice of forum include: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home and unfairness of burdening citizens in unrelated forum with jury duty; and (3) and avoidance of unnecessary problems in conflict of laws, or in application of foreign law.

**[32]** **Federal Courts** 👈 Burden placed on court and public

**Federal Courts** 👈 Public and private interests; balancing interests

Public interests implicated by choice of Southern District of New York as forum weighed against dismissal, on forum non conveniens grounds, of action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; although Southern District of New York was one of nation's busiest dockets, its administration was very efficient, New York had stronger local interest in controversy, and need to apply foreign law weighed only slightly in favor of dismissal.

**[33]** **Federal Courts** 👈 Public and private interests; balancing interests

When assessing relevant public interests implicated by choice of forum and deciding motion to dismiss on forum non conveniens grounds, courts must guard against excessive reluctance to undertake task of deciding foreign law, a chore federal courts must often perform.

**Attorneys and Law Firms**

Benjamin Yehuda Kaufman, Mark C. Rifkin, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, for Plaintiff.

Andreas Albert Frischknecht, Theodore Robert DeBonis, Andrew Taylor Grant, Chaffetz Lindsey LLP, New York, NY, for Defendants Mannheimer Versicherung AG, ERGO Versicherungs AG, Gothaer Allgemeine Versicherung AG, Helvetia Schweizerische Versicherungs-gesellschaft in Liechtenstein AG, Basler Sachversicherungs-AG.

## OPINION & ORDER

KIMBA M. WOOD, United States District Judge:

**\*1** Plaintiff Global Art Exhibitions, Inc. ("Global Art") brought this action against five insurers from Germany and Lichtenstein ("Insurer Defendants") and insurance broker Kuhn & Bülow Italia Versicherungsmakler GmbH. It alleges breach of an insurance contract covering several works of art that Global Art arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion that the works were forgeries. Global Art contends that Insurer Defendants were obligated to make payments pursuant to the insurance policy's coverage of legal expenses in connection with confiscation of the insured works of art.

Insurer Defendants moved to dismiss. (ECF No. 64.) The Court's prior Opinion and Order resolved the motion's assertion that the Court lacked personal jurisdiction, and withheld consideration of the remaining grounds for the motion to dismiss until such time as Insurer Defendants came into compliance with New York Insurance Law § 1213(c). (ECF No. 93.) They have now done so. In accordance with the Order at ECF No. 118, this Opinion and Order resolves Insurer Defendants' remaining grounds for their motion to dismiss: lack of subject-matter jurisdiction, *forum*

*non conveniens*, and failure to state a claim upon which relief can be granted. For the following reasons, the remainder of the motion is DENIED.

## BACKGROUND

The Court's November 16, 2021 Opinion described many of the facts of the case:

> Plaintiff Global Art is a privately held Delaware company that sells and exhibits works of fine art and has its principal place of business in New York, New York. (First Amended Complaint ("FAC") ¶¶ 16, 34, ECF No. 55.) An Italian art exhibition organizer, MondoMostre Skira s.r.l ("Skira"), requested the assistance of Global Art as Skira organized an exhibition to be held at the Palazzo Ducale in Genoa, Italy. (*Id.* ¶¶ 2, 36.) Global Art arranged for the lending of at least twelve works by the Italian painter Amedeo Modigliani and French painter Moïse Kisling. (*Id.* ¶¶ 34, 36–37.) [1] Two of these works are owned by Global Art, which also arranged for the loan of the works owned by others. (*Id.*)

> Defendant Kuhn & Bülow Italia Versicherungsmakler GmbH ("Kuhn & Bülow") is a German insurance broker upon which Skira called to arrange for insurance to cover works lent for the Genoa exhibition. (*Id.* ¶ 38.) Kuhn & Bülow coordinated the creation of Policy No. EP 1032, an "all-risk" insurance policy that, in pertinent part, covered the twelve Modigliani and Kisling works shown in the Genoa exhibition that were lent by or through Global Art. (*Id.* ¶ 40.) The five other defendants in this case ("Insurer Defendants") are insurance firms based in Germany or Liechtenstein that each insured a specified percentage of the policy covering the works displayed in Genoa. (*See id.* ¶ 46.)

> Global Art or the relevant owner received individual "Certificates of Insurance" specifying the coverage for the twelve works in question. These certificates state that the insurance policy is a so-called "nail-to-nail" policy, which provides coverage up to the value of the work from almost any conceivable form of loss, depreciation, damage, or theft occurring between the departure of the work from its place of origin and its return after the exhibition. (*See, e.g., id.*, Ex. C §§ 1–4.) Notably, section 5 of the "Written Agreements" appended to each certificate is a clause specifying that if the work were to be confiscated, the insurers would reimburse up to €500,000 for court and legal fees required to regain possession of the work. (*See,*

> *e.g., id.*, Ex. C § 5.) The other owners whose works were lent through Global Art assigned to Global Art the right to pursue "defense costs and related damages" under the policy. (*Id.* ¶ 35.) Skira paid the premiums for the policy in full. (*Id.* ¶ 72.)

> **\*2** The exhibition did not go smoothly. Acting upon allegations of inauthenticity, Italian authorities seized twenty-one works from the exhibition, including twelve lent by or through Global Art. (*Id.* ¶¶ 3, 53–54.) Legal proceedings in Italy relating to the seized artwork have been ongoing since at least mid-2018 (Frischknecht Decl., Ex. B, ECF No. 82) and remain pending (FAC ¶ 58.) Global Art has repeatedly demanded the return of the twelve seized Modigliani and Kisling works, but they remain in the custody of Italian officials. (*Id.* ¶ 60.)

*Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, No. 20-CV-1395, 2021 WL 5331678, at \*1–2 (S.D.N.Y. Nov. 16, 2021) (Wood, J.). [2]

In March 2018, Global Art made its first request for payment of legal costs pursuant to the confiscation clauses contained in the Written Agreements appended to the Certificates of Insurance and in the Kuhn & Bülow Terms and Conditions of Art Insurance 2016 (collectively, the "Policy"). (*See* Galimberti Decl., Ex. B, ECF No. 67-2.) Global Art made repeated demands for payment over the course of more than two years; Insurer Defendants have yet to make any such payment. (FAC ¶¶ 5–7.)

Global Art then brought this case, alleging Insurer Defendants breached their contractual obligations by failing to advance court costs and legal fees necessary for Global Art to regain possession of the confiscated works of art. (*Id.* ¶ 71.) Insurer Defendants moved to dismiss, asserting that the Court lacked personal jurisdiction over them, that Global Art's claim is not ripe, that the case should be dismissed under the doctrine of *forum non conveniens* in favor of a German court, and that the complaint failed to state a claim upon which relief could be granted. (ECF No. 64.) This Court's November 16, 2021 Opinion decided the question of personal jurisdiction, dismissing the claims based on insurance coverage of three non-U.S.-based works of art for lack of personal jurisdiction. (Op. at 11, ECF No. 93.) The Court held in abeyance the other asserted grounds for the motion to dismiss until Insurer Defendants came into compliance with New York Insurance Law § 1213(c). (*Id.* at 6.) Insurer Defendants posted the security necessary to comply with the New York Insurance

Law in January, making it now appropriate to resolve the balance of the motion to dismiss. (ECF No. 105.)

## DISCUSSION

The Court has yet to adjudicate two primary grounds for Insurer Defendants' motion to dismiss. First, Insurer Defendants moved to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, rooted in the contention that Plaintiff lacks standing because its claim is not ripe. Insurer Defendants argue that they have no present obligation to pay under the contract's provision of confiscation coverage, either because (a) successful recovery of the works of art is a precondition that must be satisfied before an obligation to pay arises, or (b) Insurer Defendants are entitled to postpone insurance payments if there is "doubt" about an insured's entitlement to the payment or there are "official or criminal proceedings" against the policyholder or insured party as a result of the claim incident. Second, Insurer Defendants moved to dismiss under the doctrine of *forum non conveniens*. As explained below, neither line of argument has merit.[3]

## I. Ripeness

**\*3** **[1]** **[2]** **[3]** **[4]** **[5]** Insurer Defendants' argument based on ripeness implicate the Court's subject-matter jurisdiction. They therefore present a threshold question that is properly adjudicated in a Rule 12(b)(1) motion. *See Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330 (S.D.N.Y. 2014) (Castel, J.) (citing *Auerbach v. Bd. of Educ.*, 136 F.3d 104, 108–09 (2d Cir. 1998)).[4] "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff, as the party asserting jurisdiction, has the burden to prove subject-matter jurisdiction by a preponderance of the evidence. *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019). A court reviewing a Rule 12(b)(1) motion takes all uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts. *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*,

752 F.3d 239, 243 (2d Cir. 2014). In determining questions of foreign law, a court may consider any relevant materials, whether or not submitted by a party or admissible pursuant to the Federal Rules of Evidence. *See Kashef v. BNP Paribas SA*, 442 F. Supp. 3d 809, 824 (S.D.N.Y. 2020) (Nathan, J.) (citing Fed. R. Civ. P. 44.1).

### A. Precondition to Payment Obligation

**[6]** Insurer Defendants argue that they have no present obligation to pay Plaintiff pursuant to the Policy—and that such an obligation will not arise unless and until Plaintiff recovers the confiscated works of art. As a matter of contract interpretation, the first question to resolve is under which law the meaning of this contract is determined. When applying the conflict-of-law rules of New York, "courts will generally enforce choice-of-law clauses and ... contracts should be interpreted so as to effectuate the parties' intent." *See Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 25 N.Y.S.3d 21, 45 N.E.3d 917, 919 (2015). The Kuhn & Bülow Terms and Conditions of Art Insurance ("K&B Terms" or "Kuhn & Bülow Terms and Conditions") contain a valid choice-of-law clause selecting German law.[5]

**[7]** Accordingly, German law governs in this action. The applicable German rules of contract interpretation are quite similar to those that might prevail under New York law. Insurer Defendants' German-law expert states, and Plaintiff does not contest, that disputes regarding the meaning of contracts are resolved under German law by determining "the objective interpretation of the disputed provisions[,] ... based on the wording and accompanying circumstances of the agreement, taking into account the custom of trade and the principle of good faith ... [and] the intentions of the parties." (First Schöne Decl. ¶ 13, ECF No. 69.)

**\*4** **[8]** **[9]** The second question is whether, under German law, the Policy makes payment pursuant to its confiscation clause contingent on the insured party first recovering its confiscated works of art. An unmet precondition to performance can render a breach of contract claim unripe and suitable for dismissal on a Rule 12(b)(1) motion. *See MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 356 (S.D.N.Y. 2014) (Scheindlin, J.) ("When there is a contractual condition that has not been met, the insured's claim against the insurer is barred and is not ripe for adjudication.").[6] Insurer Defendants' arguments that such a condition exists are unpersuasive.

Insurer Defendants assert that the text of the Policy creates a precondition that an insured party successfully recover confiscated works of art before payment becomes due on reimbursement of related legal costs. The Written Agreements attached to the Certificates of Insurance associated with each of the covered works of art provide, "In the case of confiscation, the insurers will reimburse up to EUR 500.000,00 for costs – e. g. court and lawyer fees – which the lender might have to bear in order to resume possession of the objects of art." (FAC, Exs. C–F, H–L ("Written Agreements") § 5, ECF Nos. 55-3, 55-4, 55-5, 55-6, 55-8, 55-9, 55-10, 55-11, 55-12.) The Written Agreements expressly incorporate the Kuhn & Bülow Terms and Conditions. (*See* FAC at 2–3.) That document states that "[t]he risks of seizure, confiscation, deprivation of possession or other interventions on high authority of or in connection with insured items of art are included in insurance cover." (K&B Terms § 8(j)(1), ECF No. 55-1.) It also has its own provision regarding costs relating to confiscation: "The insurers shall reimburse costs for [two categories of costs] in order to return the insured items of art to the power of control or the disposition of the policyholder or of the insured party." (*Id.* § 8(j)(2).) The two categories of covered costs are (1) "bonds, securities or guarantees which the policyholder/the insured party must provide" and (2) "experts, specialists, lawyers and legal costs, inasmuch as their services were required." (*Id.*) The second category is the one at issue in this case.

**\*5**  Insurer Defendants emphasize that the Policy covers legal costs "in order to return the insured items of art" and includes lawyers' work only "inasmuch as their services were required." (*See* Mem. at 8, ECF No. 65; Reply at 2, ECF No. 81.) Insurer Defendants' briefing does not make entirely clear why this language should be read to condition Plaintiff's entitlement to payment on it first successfully recovering the works confiscated by Italian authorities. Implicitly, they suggest that a service may be considered "required" for a certain outcome only if that outcome actually occurs. (*See* Mem. at 8–9.) The meaning of the word "required" does not support this interpretation. *See* Require, *New Oxford American Dictionary* 1483 (3d ed. 2010) (defining "require" as "need for a particular purpose" or "cause to be necessary"). Indeed, Plaintiff alleges explicitly that the legal services for which it seeks reimbursement are "*necessary* to protect and retrieve these [confiscated] works of art." (FAC ¶ 9 (emphasis added).) [7]

Because the Policy itself does not dictate the time by which covered legal costs must be paid, the due date of payment is determined according to the standard rules of German insurance law. The parties agree that section 14 of the German Insurance Contract Act (*Versicherungsvertragsgesetz*, or "VVG") governs the time of performance of insurance payments, so long as it is not displaced by specific contractual terms. (*See* Third Schöne Decl. ¶ 9, ECF No. 117-1; Siefarth Aff. ¶ 6, ECF No. 116-1.) The statute describes two paths to triggering an obligation to pay pursuant to an insurance contract. The due date for payment is the earlier of (1) "when enquiries necessary to establish the occurrence of the insured event and the extent of the insurer's liability have been concluded," or (2) one month after notification to the insurer of the insured event, if the insured party "demands part payment in the amount which the insurer will at least be expected to pay." *Versicherungsvertragsgesetz* ("VVG") § 14. [8]

**[10]**  Plaintiff's allegations are sufficient at this stage of litigation to show that payment is already due pursuant to German insurance law. To be sure, Plaintiff does not explicitly allege that Insurer Defendants have concluded their necessary inquires or that Plaintiff demanded partial payment—one or the other of which would be necessary to trigger Insurer Defendants' duty to pay. Plaintiff does, however, allege that it is in dire need of funds to finance its legal expenses. (FAC ¶¶ 6–7; *see also* Opp'n at 15 n.13, ECF No. 74.) Insurer Defendants do not controvert this fact. Global Art's president writes that "Plaintiff presently lacks the ability to pay the bills from Mr. Sterpi and the experts who have been retained to aid in the defense of the works," has "not yet been able to raise the funds necessary to pay those bills," and faces "greatly reduced" chances of success in litigation if it does not secure sufficient funds. (Guttmann Decl. ¶¶ 10–11, ECF No. 100-1.) The Court may reasonably infer that the cash-strapped Plaintiff took care to demand partial payment at least once while making "repeated demands for payment under the Policy" (FAC ¶¶ 5, 8), to increase its prospects of timely access to legal funds. Because the due date for reimbursement of legal costs is determined pursuant to VVG § 14, Insurer Defendants have a present obligation to pay. The motion to dismiss on the basis that a contractual precondition to payment makes Global Art's claim unripe is denied.

**B. Postponement Clause**

**\*6**  Insurer Defendants also contend that the contract's "postponement clause" entitles them to delay reimbursement

of Global Art's legal costs to an as-yet-undetermined date. They assert that their right to postpone payment makes Global Art's claims unripe, justifying a 🚩Rule 12(b)(1) dismissal. [9] Section 15(6) of the Kuhn & Bülow Terms and Conditions states, "[t]he insurer can postpone the payment if (a) there is doubt about the policyholder's or the insured party's entitlement to receive payment; [or] (b) official or criminal proceedings are in progress against the policyholder or the insured party on account of the claim incident." (K&B Terms § 15(6).) Insurer Defendants argue that their right to postpone payment pursuant to this clause has been triggered both by "doubt" about whether Global Art is entitled to receive payment due to two coverage exclusions in the Policy and by ongoing "official or criminal proceedings." Both arguments fail.

### i. Doubt Regarding Global Art's Entitlement to Receive Payment

Two coverage exclusions form the basis for Insurer Defendants' arguments based on the "doubt" prong of the postponement clause. [10] The Kuhn & Bülow Terms and Conditions expressly exclude from the scope of insurance coverage "[l]oss or damage caused by," among other sources, "(a) inherent vice or the natural state and properties of the items on exhibition, shrinkage and the acquisition of odours" and "(j) intentional behaviour on the part of the policyholder." (K&B Terms § 4(2)(a), (j).) The section discussing coverage of legal costs arising from the confiscation of insured works has a "natural state and properties" exclusion, as well. It excludes from cover "loss or damage which has arisen because of the natural state and properties of the goods, even if confiscation, deprivation of possession or other interventions by high authority has/have been the cause of such loss or damage." (*Id.* § 8(j)(4).)

 [11] The first exclusion, for loss or damage caused by the "natural state and properties" of the insured works, does not apply. Neither party could identify a single instance of a German court interpreting the phrase *natürliche Beschaffenheit* ("natural state and properties") to refer to the authenticity or authorship of an item. (*See* Third Schöne Decl. ¶ 19; Siefarth Aff. ¶ 22.) Rather, the phrase refers to an item's *physical* properties, as is shown by the examples in section 4(2)(a) of the Kuhn & Bülow Terms and Conditions: "shrinkage and the acquisition of odours." (K&B Terms § 4(2)(a).) This interpretation accords with the traditional

conception of the "natural state and properties" of goods that is used in German insurance law—a recent version of the German Insurance Contract Act [VVG] listed examples of losses from *natürliche Beschaffenheit* that included damage "caused by internal spoilage, shrinkage, ordinary leakage, as well as by defective packing of the goods or by rats or mice." (Siefarth Aff. ¶ 20 (quoting an English translation of the pre-2008 version of VVG § 131).)

 **\*7**  [12]   The second exclusion, for loss or damage caused by "intentional behaviour on the part of the policyholder" (K&B Terms § 4(2)(j)), does not apply either. Global Art President Joseph Guttmann and two individual co-defendants are accused of, *inter alia*, (i) placing forged works of art into circulation and (ii) misleading the Palazzo Ducale about the authenticity of those forgeries. (*See* Berman Decl., Ex. A at 4, ECF No. 66-1.) Insurer Defendants suggest that they may withhold payment until the conclusion of the criminal litigation because either alleged act might constitute "intentional behaviour." If so, they contend, Global Art's legal costs would be a "loss or damage" that was caused by this intentional behavior and that therefore is excluded from coverage. This argument falls short, because the alleged acts of Guttmann and his co-defendants are not "intentional behaviour" within the meaning of the Policy.

Based on the German-law experts' submissions, the exclusion clause's use of the word "intentional" refers to the intent *to cause* the insured event, not merely the intent *to commit an act* that ultimately results in the insured event. Insurer Defendants' expert writes that the exclusion clauses "include language that appears to be an English translation of predefined legal terms that can be found in statutory provisions of German law." (First Schöne Decl. ¶ 20.) He elaborates that the language of the "intentional behaviour" exclusion "highly corresponds with § 81(1) VVG, which states: 'The insurer shall not be obligated to effect payment if the policyholder intentionally causes the insured event.' " (Third Schöne Decl. ¶ 21.) Both parties' experts provide judicial decisions that bear on the meaning of "intentional behaviour." All four of these judicial decisions are in alignment—each analyzes the intent to cause an insured event. (*See id.* ¶¶ 21, 23; Siefarth Aff. ¶¶ 26–27.)

Under German law, intent encompasses two elements: knowledge and will. (*See* Third Schöne Decl., Ex. K at 3, ECF No. 117-12.) In the insurance context, the knowledge element requires that a person "acted in the awareness that his actions could cause damage to another person." (Third Schöne Decl.,

Ex. L at 3, ECF No. 117-13; *see also* Third Schöne Decl., Ex. K at 3 ¶ 60.) The will element requires, at a minimum, that the actor "approved or consciously accepted" that his or her actions would cause the insured event. (Third Schöne Decl., Ex. L at 3.) The "insured event" in the instant case is the incurrence of legal costs required to regain possession of insured works of art that have been confiscated. The will element would therefore be satisfied only if the policyholder "approved or consciously accepted" (*id.*) that its actions would cause it to incur reimbursable legal costs.

Insurer Defendants' argument that the conduct of Guttmann and his co-defendants could satisfy the will element fails for three reasons. First, the Policy excludes coverage only for losses and damage caused by "intentional behaviour on the part of *the policyholder.*" (K&B Terms § 4(2)(j) (emphasis added).) Insurer Defendants acknowledge that Skira is the policyholder (*see* Mem. at 1, 4, 10, 21) and provide no reason to believe that the exclusion would apply to the actions of Global Art. Insurer Defendants misstep by speculating about the intent of Guttmann and his individual co-defendants without explaining why those individuals' intent should be attributed to Skira. Second, it is implausible that Skira—or Global Art, for that matter—"approved or consciously accepted" that its actions would cause it to incur legal costs *due to the criminal prosecution of its chief corporate officers.* (*See* Berman Decl., Ex. A at 3.) Those officers are alleged to have committed fraud in the companies' core line of business (*see* FAC ¶¶ 34, 36), which can be expected to cause significant harm to the companies. Third, the conduct alleged is insufficient to support Insurer Defendants' claim that the conduct was intentional. Insurer Defendants emphasize that Guttmann was accused of misleading the Palazzo Ducale regarding the authenticity of the insured works of art. (*See* Mem. at 11.) But obscuring the inauthenticity of artwork indicates an attempt to keep the supposed fraud hidden and thereby *avoid* confiscation and litigation. If the co-defendants had successfully kept their purported fraud hidden, they would have prevented the "insured event" from occurring—Plaintiff would never have incurred the legal costs at issue in this case. The co-defendants' actions belie the suggestion that they "approved or consciously accepted" that their conduct would cause the insured event.

**\*8** Other provisions of the Policy further undermine Insurer Defendants' reliance on the "intentional behaviour" exclusion. The Policy contains separate, narrow remedies for instances in which covered works of art are found to be forgeries, or insured parties are discovered to have misrepresented the authenticity of covered works. One express provision lowers the insured value of works if they are revealed to be forgeries. (*See* K&B Terms § 7.) Another provision grants a remedy to insurers that discover that an insured party or policyholder submitted "incomplete and incorrect information" about "risk-significant circumstances"—such as the authenticity of a work. (*See id.* § 9(2).) In such cases, the insurers have a limited right to withdraw from the insurance policy. (*See id.* § 9(5).) It strains credulity to believe that the drafters of a contract would write a clause that merely *reduces* the insured value of forged works, and also create a *limited* remedy of withdrawal for non-disclosure of inauthenticity, if they intended to swallow both with an expansive definition of the "intentional behaviour" that affords a much more potent remedy—a complete excuse to performance.

Finally, the terminology used in the exclusion clauses bolsters the conclusion that neither of the Policy's coverage exclusions applies to the legal costs at issue. The exclusion clauses carve out from coverage certain types of "loss or damage" (*id.* § 4(2)), but every reference to coverage for legal expenses uses a different term: "costs" (*see id.* §§ 4(2)(b), 8(j)(2); Written Agreements § 5). The use of these different terms appears to be deliberate: The distinction is made even in a single, two-sentence-long subsection. That passage reads, "*Loss or damage* caused by the following are excluded ... [b] direct *damage* to the items of art because of seizure and confiscation. The *costs* arising from this are, however, included in insurance cover as according to § 8, Sub-section j [the confiscation clause]." (K&B Terms § 4(2)(b) (emphases added).) The wording suggests that legal costs are not subject to any of the exclusions for "loss or damage."

### ii. Official or Criminal Proceedings

Insurer Defendants' invocation of their right to postpone payment when "official or criminal proceedings are in progress against the policyholder or the insured party on account of the claim incident" is unavailing. (*See* K&B Terms § 15(6).) First, although there are pending criminal proceedings that relate to the confiscation at issue, neither Global Art nor Skira is party to those proceedings; instead, the criminal proceedings are against *individuals*, including Guttmann and five others. (*See* Berman Decl., Ex. A at 3.)

Second, although the Palazzo Ducale brought a civil claim against Skira related to the confiscation (*see* Berman Decl.,

Ex. B at 2–4, ECF No. 66-2), Insurer Defendants provide no support for their contention that civil litigation is an "official ... proceeding[ ]" within the meaning of the postponement clause (K&B Terms § 15(6)). In fact, the parties' submissions suggest the opposite—that the phrase "official proceedings" excludes civil litigation and is closely associated with investigative efforts by governmental entities.

The final declaration by Insurer Defendants' German-law expert Friedrich Tobias Schöne states that German courts construe the phrase "official proceedings" to be related to an insurer's "enquiries necessary to establish the occurrence of the insured event and the extent of the insurer's liability." (Third Schöne Decl. ¶ 30 (quoting VVG § 14(1)).) Those enquiries must be completed before a full insurance payment becomes due pursuant to the German Insurance Contract Act. *See* VVG § 14(1). Schöne characterizes the judicial decisions he cites as reflecting the "well-established" legal principle that "official investigations," or *behördliche Ermittlungen*, [11] may "postpone the due date of payments if their outcome may in some way influence the insurer's obligation to indemnify." (Third Schöne Decl. ¶ 33.) He also directs the Court to a helpful leading commentary on the German Insurance Contract Act. The commentary first explains that it is permissible in principle for insurance contracts expressly to condition the due date for payment on the conclusion of "official investigative proceedings," because such proceedings often produce information that is material to the existence of an insured event. (Third Schöne Decl., Ex. P at 3 ¶ 30, ECF No. 117-17.) The commentary then appears to equate "official investigation proceedings" with "the investigative work of authorities" and, namely, "[i]nvestigation proceedings by the police and the public prosecutor's office." (*Id.* at 3 ¶¶ 20, 30.)

 **\*9** **[13]** Taken as a whole, the materials provided suggest that the meaning of "official proceedings" in the Policy is limited to proceedings initiated by a governmental body, such as a prosecutor's office or regulatory agency. At a minimum, Insurer Defendants have provided no arguments or supporting authority affirmatively indicating that civil litigation initiated by a private party constitutes an "official proceeding." The civil claim that the Palazzo Ducale brought against Skira is therefore insufficient to trigger Insurer Defendants' right to delay payments pursuant to the Policy's postponement clause.

Insurer Defendants have failed to establish that Plaintiff's claim is unripe because a precondition to payment is not yet satisfied or because the Policy gives them the right to

postpone payment under the present circumstances. Global Art's breach of contract claim thus presents a controversy within the subject-matter jurisdiction of this Court.

## II. *Forum Non Conveniens*

 **[14]** **[15]** **[16]** **[17]** **[18]** Insurer Defendants also move to dismiss under the doctrine of *forum non conveniens*, urging that Germany is the appropriate forum. "The doctrine of *forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim."

🚩 *Carey v. Bayerische Hypo–Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (internal citation and quotation marks omitted). The exercise of the Court's discretion is guided by the three-step process set forth by Second Circuit:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

🚩 *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing 🚩 *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001)). A defendant generally "bears a heavy burden" when it seeks to invoke *forum non conveniens*. 🚩 *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). Dismissal is warranted "only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." 🚩 *Iragorri*, 274 F.3d at 74–75. A court deciding a motion to dismiss for *forum non conveniens* may consider the pleadings as well as affidavits from both moving and opposing parties. *See* 🚩 *Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014).

### A. Step One: Deference to Plaintiff's Choice of Forum

**[19] [20] [21] [22]** Courts give a high degree of deference to the plaintiff's choice of forum. *See Norex Petroleum*, 416 F.3d at 154. A court will increase or decrease the level of deference, depending upon whether the lawsuit was brought in the forum for legitimate reasons, such as "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," and whether "considerations of convenience favor the conduct of the lawsuit in the United States." *Iragorri*, 274 F.3d at 72. Great deference is given when a plaintiff sues in its home forum. *See id. at 71.* Global Art is thus entitled to a higher-than-typical degree of deference, given that its principal place of business is in Manhattan, within the geographic jurisdiction of its chosen forum, the Southern District of New York. *See N.H. Ins. Co. v. Sphere Drake Ins. Ltd.*, No. 01-CV-3226, 2002 WL 1586962, at *6 (S.D.N.Y. July 17, 2002) (Jones, J.), *aff'd in part, vacated in part on other grounds*, 51 F. App'x 342 (2d Cir. 2002).

**\*10 [23]** Insurer Defendants' arguments for reduced deference to Plaintiff's choice of forum are unavailing. Courts afford less deference to a plaintiff's choice of forum when the plaintiff sought out business relationships in the alternative forum and therefore could reasonably expect to litigate there. *See Carey*, 370 F.3d at 238. Insurer Defendants contend that Plaintiff should not be surprised that it would be required to litigate insurance claims "in Europe" given its dealings on the continent. (Mem. at 13.) But Global Art hired an *Italian* company, Skira, to arrange insurance coverage for works of art to be exhibited in *Italy*. It was Skira that then placed Global Art's insurance policy with a German company, Kuhn & Bülow. (*See* FAC ¶ 38.) Seeking out relationships and doing business in Italy is not tantamount to consent to litigate in Germany. *See Petersen Energia Inversora S.A.U. v. Argentine Republic*, No. 15-CV-2739, 2020 WL 3034824, at *8 (S.D.N.Y. June 5, 2020) (Preska, J.) ("*Carey*'s holding is not that any plaintiff voluntarily conducting business internationally is automatically entitled to lesser deference with respect to her choice of forum.").

Global Art's strong showing at step one of the analysis entitles its choice of forum to a particularly high degree of deference. This deference "recalibrate[s] the balance for purposes of the remaining analysis," raising the bar that Insurer Defendants must surpass at steps two and three. *Norex Petroleum*, 416 F.3d at 157.

## B. Step Two: Adequacy of Alternative Forum

**[24] [25]** With respect to the second step in the analysis, Germany is clearly an adequate alternative forum for this litigation. "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). Both conditions are met here. First, all Defendants either are German entities subject to service of process in Germany or have indicated their willingness to submit to the jurisdiction of a German court. (*See* FAC ¶¶ 17–22; Mem. at 14 n.9.) Second, German courts permit litigation of breach of contract claims such as the one Global Art has raised against Insurer Defendants. *See, e.g., NCA Holding Corp. v. Norddeutsche Landesbank Girozentrale*, No. 96-CV-9321, 1999 WL 39539, at *2 (S.D.N.Y. Jan. 28, 1999) (McKenna, J.) (dismissing breach of contract claims on the basis of *forum non conveniens*, in favor of an alternative forum in Germany).

**[26]** Plaintiff argues that several aspects of the German judicial process would make it financially impracticable to bring suit in that country. But an alternative forum is sufficient even if its procedures and causes of action differ from those in a plaintiff's chosen forum, unless the remedies in the foreign forum are "tantamount to no remedy at all." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009). Features such as the German requirement that plaintiffs post security for litigation costs and that the losing party in a lawsuit pays the attorneys' fees for the prevailing party do not meet that standard. Furthermore, Plaintiff was mistaken in raising concerns about German courts' prohibition of contingent-fee arrangements in the discussion of this factor. Such matters are properly considered in the balancing of interests during the third step of the *forum non conveniens* inquiry. *See Murray v. Brit. Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996). Germany is an adequate alternative forum for the instant litigation.

## C. Step Three: Balancing of Private and Public Interests

**[27]** In the final step of the analysis, the Court weighs the private and public interests implicated by the choice of forum. "The defendant bears the burden of establishing ... that the balance of private and public interest factors tilts heavily in favor of the alternative forum." *Abdullahi*, 562 F.3d at 189.

The showing required of Insurer Defendants in this case is even stronger than is usually necessary, because of the high degree of deference afforded Plaintiff's choice of its home forum.

### i. Private Interests

**\*11** **[28]** **[29]** Balancing the private interests entails "a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74. The United States Supreme Court has set forth a non-exhaustive set of factors to consider. As relevant here, those factors include (1) "relative ease of access to sources of proof"; (2) availability of compulsory process to force the attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; and (4) "all other practical problems that make trial of a case easy, expeditious[,] and inexpensive." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

Each of the first three of these factors depends on the location of evidence necessary to a trial in this case and the difficulties associated with seeking to produce that evidence before a court in the Southern District of New York.[12] Success for Global Art on its breach of contract claim against Insurer Defendants would require, at minimum, establishing that a binding contract exists, determining the meaning of that contract with respect to coverage of legal expenses in the case of confiscated covered artwork, assessing whether Insurer Defendants' conduct was in breach of the agreement, and, if so, fixing the amount of damages owed to Plaintiff.

**[30]** The sources of proof for this claim are distributed across Germany, Italy, and the United States. With respect to the existence and meaning of the contract, the relevant documentary evidence and witnesses are concentrated in Germany and Italy. As stated previously, disputes regarding the meaning of contracts are resolved under German law by determining "the objective interpretation of the disputed provisions[,] ... based on the wording and accompanying circumstances of the agreement, taking into account the custom of trade and the principle of good faith ... [and] the intentions of the parties[.]" (First Schöne Decl. ¶ 13.) Plaintiff

alleges that Skira, an Italian firm, arranged for Kuhn & Bülow, a German firm, to procure an insurance policy for works of art to be shown in Genoa. (*See* FAC ¶ 38.) The lead underwriter for Insurer Defendants was employed by the German firm ERGO and states that he communicated solely with Kuhn & Bülow—not Skira or any of the owners of the art, including Global Art. (Hummels Decl. ¶ 8, ECF No. 68.) Evidence that would assist the Court in deciding how the custom of trade, principle of good faith, and intentions of parties apply would thus be found largely in Germany, but also in Italy. In contrast, deciding whether Insurer Defendants' failure to pay constitutes breach of the contract would require determining the existence of a qualifying confiscation event in Italy, ascertaining whether the legal expenses American firm Global Art incurred for Italian counsel are within the scope of the Policy's coverage, and establishing that Global Art made appropriate demands for payment. The evidence and witnesses relevant to these questions would be found primarily in the United States and Italy. The evidence needed to determine the quantum of damages would be found in the United States and Italy, as well. The meaning of the contract could well be the most intensely contested of the aforementioned questions at trial. Even if it is, the ease of access to sources of proof would weigh only slightly in favor of a German forum.

**\*12** Notably, Insurer Defendants do not contend that German courts would have a greater ability than this Court to secure evidence from non-parties in Italy through the use of compulsory process. They also do not identify non-party witnesses or custodians of documentary evidence who reside in Germany and who would be outside the reach of this Court's jurisdiction.[13] The availability of compulsory process is a neutral factor.

The cost of obtaining testimony from willing witnesses is, in the era of modern communications and transportation technology, a fairly minor factor. *See Petersen Energía*, 2020 WL 3034824, at \*11 n.11 ("[D]epositions can be conducted via videoconference; documents located overseas can be uploaded easily and reviewed by the parties via e-discovery platforms; and, if it comes to it, the parties can request that the Court allow trial witnesses to testify via video pursuant to the good cause exception in *Fed. R. Civ. P. 43*."). Because Insurer Defendants do not identify the witnesses whose attendance they would likely seek (and do not even estimate the number of likely witnesses from Germany) it is difficult to credit their argument that the cost of obtaining testimony would be burdensome.

Finally, the Court notes that Insurer Defendants seem to have substantially more resources than Plaintiff with which to bear the inconveniences of distant litigation. Plaintiff asserts in its briefing that Global Art "is a very small company with modest means compared to the Insurer Defendants." (Opp'n at 15 n.13.) Plaintiff states that Germany's prohibition on contingent-fee arrangements for legal services, requirement that plaintiffs post security costs in advance, and rule that a losing party pays its adversary's legal costs make it "virtually impossible" for a firm of its size to litigate in Germany. (*Id.* at 15.) The unavailability of contingent-fee arrangements, along with the need for plaintiffs to post security, accentuates the financial burden Plaintiff would need to bear if litigating in Germany. *See* *Murray*, 81 F.3d at 292.

In contrast, the complaint alleges that four out of five Insurer Defendants are wholly owned subsidiaries of internationally prominent insurance providers. (FAC ¶¶ 18, 20–22.) For example, lead underwriter ERGO is a subsidiary of global giant Munich Re. *Cf.* *Carey*, 370 F.3d at 238 ("For an individual of modest means, the obligation to litigate in a foreign country is likely to represent a considerably greater obstacle than for a large business organization—especially one maintaining a business presence in foreign countries."). The relative resources of the parties weigh slightly in favor of litigation in the Southern District of New York.

Insurer Defendants have not shown the private interest factors to weigh in favor of dismissal.

### *ii.* Public Interests

[31] The final consideration is the public interests implicated by the choice of forum. Relevant factors include (1) "the administrative difficulties flowing from court congestion," (2) the " 'local interest in having localized controversies decided at home' " and "the unfairness of burdening citizens in an unrelated forum with jury duty," and (3) "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." *Piper Aircraft,* 454 U.S. at 241 n.6, 102 S.Ct. 252 (quoting *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839).

*13 [32] The first factor, administrative difficulties flowing from court congestion, is neutral. The Southern District of New York may have one of the nation's busiest dockets, but its administration is very efficient. Insurer Defendants do not contend that the relevant German courts have less congested dockets, and there is no basis to assume that they do. *See* *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.,* 421 F. Supp. 2d 741, 774 (S.D.N.Y. 2006) (Leisure, J.). In any case, when a federal court has a "full complement of judges for the District," as the Southern District likely will soon, [14] it makes the concern of judicial burden "of little or no present significance." *Guidi v. Inter-Cont'l Hotels Corp.,* 224 F.3d 142, 147 n.5 (2d Cir. 2000).

Second, New York has a stronger local interest in the controversy in this litigation. "New York has an extremely strong interest in ensuring that [foreign] insurers follow through on the commitments they make to New York citizens." *Twin City Fire Ins. Co. v. Harel Ins. Co.*, No. 10-CV-7842, 2011 WL 3480948, at *3 (S.D.N.Y. Aug. 5, 2011) (Jones, J.). That interest is reflected by the state's requirement that unauthorized non-U.S. insurers post security before litigating against a New York resident in relation to an insurance contract—a provision that has already been addressed in this case. (*See* Op. at 4–6.) The statute imposing that requirement has the explicit legislative aim of providing New York residents with the option to resolve their insurance controversies in their home forum. *See* N.Y. Ins. L. § 1213(a) (describing a purpose of "subject[ing] certain insurers to the jurisdiction of the courts of this state" because of concerns that non-U.S. insurers would present to New York residents "the often insuperable obstacle of resorting to distant forums for the purpose of asserting [their] legal rights"). Germany certainly has an interest in the operations of companies that are organized under its laws and housed within its borders. But Insurer Defendants have not shown that Germany's interest in this litigation is as strong as that of New York. Trying the case before a New York jury would be an effectuation of New York public policy, not an unfair burden on the people of New York. The local interest factor weighs in favor of the Court retaining jurisdiction over this case.

[33] Third, the need to apply foreign law in this case weighs only slightly in favor of dismissal. Courts "must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981). The questions of German law in this case are relatively straightforward issues of contract interpretation and of the substantive law of insurance. They are not the type of

novel questions that deserve to be resolved in the first instance by a court of the relevant jurisdiction. *Cf.* 🚩 *Finch v. Xandr, Inc.*, No. 21-CV-5964, 2021 WL 5910071, at *5 (S.D.N.Y. Dec. 14, 2021) (Marrerro, J.) (dismissing case presenting novel questions relating to the United Kingdom's General Data Protection Regulation). Accordingly, the Court gives this factor little weight.

**\*14** In sum, the public factors weigh in favor of leaving Plaintiff's choice of forum undisturbed.

Insurer Defendants have not met their burden to show that balance of private and public factors tilts heavily in favor of an alternative forum in Germany. Particularly in light of the high degree of deference due Plaintiff's choice of its home forum, the Court will not disturb Global Art's decision to bring this case in the Southern District. Insurer Defendants' motion to dismiss for *forum non conveniens* is denied.

## CONCLUSION

For the foregoing reasons, the remainder of Insurer Defendants' motion to dismiss is DENIED. The parties are directed to submit by July 6, 2022 a joint proposed Scheduling Order and Discovery Plan, based on the templates found on this Court's individual web page. An Initial Pretrial Conference will be held in this case on July 20, 2022 at 2:00 p.m. in Courtroom 26A of the Daniel Patrick Moynihan United States Courthouse.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2022 WL 2159823

---

## Footnotes

1    There is ambiguity in the complaint regarding whether the number of Modigliani and Kisling works lent by or through Global Art totaled twelve or fourteen. What is clear is that there were nine such works originally from New York City that were lent by or through Global Art, insured by Insurer Defendants, and seized by Italian authorities. (*See* FAC ¶ 48.)

2    This Opinion is also accessible at ECF No. 93.

3    Insurer Defendants also move pursuant to 🚩 Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, advancing two theories. First, they maintain that, because Insurer Defendants do not have a present obligation to pay pursuant to the contract, Plaintiff fails to state a breach of contract claim upon which relief can be granted. This argument mirrors those addressed in the analysis of Insurer Defendants' 🚩 Rule 12(b)(1) motion. It is baseless for the same reasons outlined below. Second, Insurer Defendants attack two aspects of Plaintiff's prayer for relief: the prayer for punitive damages and the request for injunctive relief. Motions to dismiss aimed at prayers for relief are premature except when such relief is categorically barred. *See Doe v. Indyke*, 457 F. Supp. 3d 278, 283 (S.D.N.Y. 2020) (Engelmayer, J.). Insurer Defendants' briefing, which asserts that Plaintiff has not pled the elements necessary for punitive damages in a breach of contract claim under New York law, includes no such argument.

4    Some questions of ripeness implicate only prudential, and not jurisdictional concerns. *See* 🚩 *Simmonds v. I.N.S.*, 326 F.3d 351, 354 n.2 (2d Cir. 2003) (Calabresi, J.). Such is not the case here—Insurer Defendants contend that Plaintiff's claims are contingent on events that may never come to pass. This argument poses the question of whether the claims present a "case or controversy" that falls within this Court's jurisdiction under Article III. Constitutional ripeness, unlike prudential ripeness, is a jurisdictional issue properly analyzed

pursuant to Rule 12(b)(1). *Cf. In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 109–10 (2d Cir. 2013).

5    Plaintiff's German-law expert writes that the choice-of-law clause, which states that "the statutory regulations and provisions of German legislation shall apply" (Kuhn & Bülow Terms and Conditions § 24, ECF No. 55-1), is "not worded in the way a typical choice of law clause under German law would be drafted" (Siefarth Decl. ¶ 11, ECF No. 76). Insurer Defendants' expert explains persuasively that this language is a translation of a standard choice-of-law clause written in German. (*See* Second Schöne Decl. ¶ 6, ECF No. 83.) The Policy evinces the parties' clear intent that German law apply.

6    Insurer Defendants refer the Court to several judicial decisions in which courts have granted a Rule 12(b)(1) motion to dismiss breach of contract claims for lack of ripeness when a condition precedent has not yet been satisfied. These decisions, and other similar decisions the Court has reviewed, involve conditions precedent that were stated expressly or are otherwise clear and unambiguous. *See EMR (USA Holdings), Inc. v. Goldberg*, No. 18-CV-7849, 2019 WL 5537878, at *5 (S.D.N.Y. Oct. 25, 2019) (Ramos, J.) (plaintiff had not satisfied condition precedent that "is black letter law in New York"); *Beazley Ins. Co. v. Ace Am. Ins. Co.*, 150 F. Supp. 3d 345, 354–55 (S.D.N.Y. 2015) (Rakoff, J.) (policy stated that coverage obligations "attach ... only after" other coverage was exhausted); *MBIA*, 33 F. Supp. 3d at 356 (policy stated "[n]o action shall lie against Underwriters unless, as a condition precedent thereto, ... the amount of the Assureds' obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them"); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003) (Rakoff, J.) ("[T]he insurance contract between the parties expressly provides that defendant's payment obligation only arises 30 days after [submission of proofs of loss]."). Constitutional ripeness is a question of this Court's authority to hear a case pursuant to Article III. *See Simmons*, 326 F.3d at 357. Accordingly, these authorities, rather than analogous decisions by German courts, bear on the question of how clearly a contractual precondition must be stated to deny the Court subject-matter jurisdiction. However, Insurer Defendants fail entirely to demonstrate that a condition precedent to their obligation to pay remains unsatisfied.

7    Insurer Defendants also assert without explanation that the contract's use of the word "reimburse" strengthens their argument that coverage is subject to a precondition of successful recovery of the confiscated works. The plain meaning of this term lends no support to this contention. *See* Reimburse, *New Oxford American Dictionary* 1472 (3d ed. 2010) (defining "reimburse" as "repay (a person who has spent or lost money)"). Global Art has incurred costs for legal services in the litigation regarding the authenticity of the covered works and it has made expenditures to the relevant counsel. (*See* Guttmann Decl. ¶¶ 9–11 ("I have no choice but to pay Mr. Sterpi's bills on a current basis to defend the authenticity of the works and resume possession of them.... Plaintiff has been forced to sell several of its other works to raise the funds necessary to continue to pay the bills from Mr[.] Sterpi and the experts.").) A payment from Insurer Defendants to Global Art today would thus fit within the meaning of "reimbursement."

8    All citations to the *Versicherungsvertragsgesetz*, or German Insurance Contract Act, refer to the English translation provided by the Federal Ministry of Justice (*Bundesministerium der Justiz*) at https://www.gesetze-im-internet.de/englisch_vvg/englisch_vvg.html.

9    Insurer Defendants do not provide support for the proposition that this type of "postponement clause"—in contrast to a clear contractual precondition to an obligation—should be analyzed as a jurisdictional issue. Their arguments fail even under the Rule 12(b)(1) standard, which allocates the burden of proof more

favorably to a moving defendant than does the 🚩 Rule 12(b)(6) standard. *See Williams v. Long Beach Mortg. Co.*, No. 15-CV-5952, 2016 WL 5720810, at *3 (S.D.N.Y. Sept. 30, 2016) (Karas, J.), *aff'd*, 709 F. App'x 92 (2d Cir. 2018). For this reason, the Court assumes without deciding that the issues presented by the postponement clause should be analyzed under the 🚩 Rule 12(b)(1) standard.

10 Insurer Defendants also raise a meritless argument that "doubt" is created by the uncertainty about whether Global Art will regain possession of the insured works at the conclusion of the Italian proceedings. As explained above, Global Art's entitlement to reimbursement is not contingent on first regaining possession of the insured works of art.

11 The parties' experts direct the Court to authorities discussing German phrases including *behördliche Ermittlungen, behördliches verfahren*, and *behördliche Ermittlungsverfahren* as relevant to the meaning of "official proceedings" in the Policy.

12 Insurer Defendants do not address at length whether the claims against Kuhn & Bülow, which has not appeared in this action, should be dismissed for *forum non conveniens.* The Court briefly notes that the questions posed by Kuhn & Bülow are similar to those discussed in the rest of the *forum non conveniens* analysis. First, Kuhn & Bülow is amenable to suit in Germany, like the other Defendants. (*See* First Schöne Decl. ¶ 28.) Second, the balance of private and public interests would be similar, given that the second and third causes of action premise Kuhn & Bülow's alleged liability largely upon Insurer Defendants' failure to pay Global Art for the legal fees it has incurred after the Modigliani and Kisling works were confiscated. The fourth asserted cause of action is inscrutable, as it does not explain how Kuhn & Bülow is alleged to be liable. (*See* FAC ¶¶ 88–90.)

13 The ability to obtain documentary evidence and testimony from the parties is of little concern. *See* 🚩 *Fuji Photo Film Co. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) (McMahon, J.) ("[P]arties can compel the testimony of their own employees without the need for subpoena.").

14 While the Southern District has several vacancies today, they are likely to be filled in short order. *See Current Judicial Vacancies*, U.S. Courts, https://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies (last accessed June 14, 2022) (listing nominees for all three S.D.N.Y. vacancies that have been open for more than three months).

---

2005 WL 503935
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Atiya HARRIS; Rafael Severino; Rafael Severino,
Jr., an infant under 18 years of age, by his father
and natural guardian, Rafael Severino; and Rachelle
Severino, an infant under 18 years of age, by her father
and natural guardian, Rafael Severino, Plaintiffs,
v.
Stacey D. WARE, Defendant.

No. 04 CV 1120(JG).
|
March 4, 2005.

**Attorneys and Law Firms**

William S. Kanas, Sanford L. Pirotin, P.C., Westbury, New
York, for Plaintiffs.

Robert F. McCarthy, The Law Offices of McDonald, Cohen
and Rayhill, New York, New York, for Defendants.

*MEMORANDUM AND ORDER*

GLEESON, J.

**\*1** This diversity action arises from a motor vehicle accident
that took place in Delaware. Plaintiffs Atiya Harris and Rafael
Severino, on behalf of himself and his two minor children,
Rafael Severino, Jr. and Rachelle Severino, allege that
defendant Stacey Ware negligently and recklessly operated
her vehicle, causing each plaintiff serious personal injuries,
as defined by 🚩 New York State Insurance Law § 5102(d).
Rafael Severino also alleges loss of the company of his two
minor children.

Ware moves to dismiss the complaint for lack of personal
jurisdiction and improper venue, pursuant to 🚩 Rules 12(b)
(2) and 🚩 12(b)(3) of the Federal Rules of Civil Procedure.
Alternatively, she moves for either an order transferring the
action to the District of Delaware, pursuant to 28 U.S.C. §
1404(a), or an order applying the laws of Delaware to these
proceedings and, accordingly, dismissing the complaint as
time-barred. I heard oral argument on March 4, 2005. For the

following reasons, Ware's motion is granted to the extent that
the complaint is transferred to the District of Delaware.

FACTS [1]

On March 24, 2001, Rafael Severino and his children were
passengers in a vehicle owned and operated by Harris. They
were driving in the state of Delaware. The plaintiffs were, and
presently are, citizens of New York. On the same date, Ware
was operating a motor vehicle with the consent of the vehicle's
owner. Ware was, and presently is, a citizen of Delaware. An
impact occurred between the two vehicles on Christiana Mall
Road in Delaware, resulting in plaintiffs sustaining "serious
and permanent personal injuries." (Compl.¶¶ 11, 19, 28, 37.)
Plaintiffs allege that the impact and the resulting injuries were
caused by Ware's "negligent, reckless and careless" operation
of the vehicle she was driving. (*Id.* at ¶ 13.)

Plaintiffs filed the instant action on March 17, 2004.

DISCUSSION

A. *The Standard for a Motion to Dismiss Under* 🚩*Rule
12(b)(2)*

When a defendant moves to dismiss a complaint under
🚩 Rule 12(b)(2) for want of personal jurisdiction, courts
must perform a two-part analysis. First, personal jurisdiction
over a defendant must be established under the law of
the state where the federal court sits. *Bank Brussels
Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784
(2d Cir.1999). Under Rule 4(k)(1)(A) of the Federal Rules
of Civil Procedure, the service of a summons establishes
personal jurisdiction over a defendant "who could be
subjected to the jurisdiction of a court of general jurisdiction
in the state in which the district court is located." *Id.* Second, if
jurisdiction is established under the governing statute, courts
must determine whether the exercise of jurisdiction under the
relevant state law would violate the defendant's due process
rights." *Bank Brussels Lambert,* 171 F.3d at 784.

"[T]he plaintiff bears the burden of establishing that the court
has jurisdiction over the defendant." *DiStefano v. Carozzi
North America, Inc.,* 286 F.3d 81, 84 (2d Cir.2001) (citing
🚩 *Bank Brussels Lambert,* 171 F.3d at 784). Where a court

does not conduct a " 'full-blown evidentiary hearing, ... the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials" ' to survive a motion to dismiss under Rule 12(b)(2). *Bank Brussels Lambert,* 171 F.3d at 784 (quoting *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981)). In other words, prior to discovery, a plaintiff may defeat a jurisdiction-testing motion "by pleading in good faith, *see* Fed. R. Civ. Proc. 11, legally sufficient allegations of jurisdiction." *Jazini v. Nissan Motor Company, Ltd.,* 148 F.3d 181, 184 (2d Cir.1998) (quotation marks omitted).

**\*2** Once discovery regarding a defendant's contacts with the forum is conducted, the plaintiff bears a heavier burden. After discovery, " 'the plaintiff's prima facie showing ... must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." ' *Bank Brussels Lambert,* 171 F.3d at 784 (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996)).

If the plaintiff fails to make the requisite showing, I may dismiss the complaint pursuant to Rule 12(b)(2). The Second Circuit has held that a district court also has the "power to transfer venue even it if lacks personal jurisdiction over defendants," if the requirements of the governing statute, 28 U.S.C. § 1404(a), are met. *Fort Knox Music, Inc. v. Baptiste,* 257 F.3d 108, 113 (2d Cir.2001) (citing *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 466 (1962)).

B. *New York's Long-Arm Statute*
Both parties agree that my determination of personal jurisdiction in this case is governed by New York's long arm statute, N.Y. Civ. Prac. Law & R. § 302, specifically § 302(a)(3)(ii). [2] The statute states, in relevant part, that a court may exercise jurisdiction over a person whose domicile is not in New York if he "commits a tortious act without the state causing injury to person or property within the state ... if he (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce." § 302(a)(3)(ii).

To establish personal jurisdiction, plaintiffs must show that an injury occurred within the state and that the elements of clause (ii) of the long-arm statute have been established.

*Ingraham v. Carroll,* 90 N.Y.2d 592, 596 (1997). New York courts apply the situs of injury test to determine whether an injury occurred within the state. *DiStefano,* 286 F.3d at 84-85. "[I]t is well established that the situs of the injury is the location where the event giving rise to the injury occurred, and not where the resultant damages occurred." *O'Brien v. Hackensack Univ. Med. Center,* 760 N.Y.S.2d 425 (1st Dep't 2003); *see McGowan v. Smith,* 52 N.Y.2d 268, 275 (1981); *Carte v. Parkoff,* 543 N.Y.S.2d 718, 719 (2d Dep't 1989). "[T]he residence of the injured party in New York," when the injury occurred elsewhere, "is not sufficient to satisfy the clear statutory requirement of an 'injury within the state." ' *McGowan,* 52 N.Y.2d 274-75 (holding that injury caused by a product purchased in New York did not satisfy statutory requirement because injury occurred while the product was being used in Canada).

C. *Personal Jurisdiction*
Ware argues that plaintiffs offer no evidence or allegations that (1) she is a resident of New York; (2) transacts or conducts any business in the state; (3) derives substantial revenue from activity in the state; or (4) derives revenue from interstate or international commerce. In response, plaintiffs argue that Ware could have foreseen that her actions would have consequences in New York because Harris's car had New York license plates, and because plaintiffs reside in New York and would seek medical treatment there. They also argue that "no proof exists that ... Ware did not derive substantial revenue from interstate or international commerce," or that Ware does not own, use or possess real property in New York. (Kanas Aff't ¶ 11.)

**\*3** Plaintiffs have failed to establish jurisdiction. As stated above, they bear the initial burden of alleging through affidavits or other supporting materials, facts that establish personal jurisdiction over the defendant. Here, plaintiffs make no allegations that Ware has the requisite contacts with New York. The fact that Harris's car had New York license plates is insufficient.

Even if there were sufficient allegations to meet the contacts requirement of § 302(a)(3)(ii), the situs of injury requirement is not met. The accident occurred in Delaware. Although plaintiffs claim that they continue to suffer injuries from it here in New York, those allegations are legally insufficient to confer personal jurisdiction under New York's long-arm statute. The situs of injury test requires courts to "locate

the original event which caused the injury." *DiStefano, 286 F.3d at 84* (quotation marks omitted). That event is "distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort ." *Id.* The original event in this case occurred in Delaware.

Accordingly, plaintiffs do not meet their burden of showing that the court has personal jurisdiction over Ware under New York's long-arm statute.

**D. *Venue***

Under the statutory provision governing venue,

> [a] civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Plaintiffs argue that venue is proper under 28 U.S.C. § 1391(a)(2). Ware argues that since the accident occurred in Delaware, venue is improper in New York. She moves to dismiss the complaint on this basis, or alternatively, petitions the court to transfer the case to the District of Delaware, pursuant to 28 U.S.C. § 1404(a). Section 1404(a) states:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Ware resides in Delaware and is subject to personal jurisdiction in that state. She is not subject to personal jurisdiction in New York. Moreover, the events giving rise to plaintiffs' claims occurred entirely in Delaware. The fact that plaintiffs received medical care in New York does not tip the balance in favor of a finding that venue is proper in this state. For the convenience of the parties and witnesses, as well as in the interest of justice, the Clerk is respectfully directed to transfer the case to the United States District Court for the District of Delaware. *See* 28 U.S.C. §§ 1391(a), 1404(a). The provision of Rule 83.1 of the Local Rules of the Eastern District of New York, which requires a five-day delay, is waived.

**\*4** So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 503935

---

**Footnotes**

1   The following facts are drawn from the complaint, the parties' submissions with respect to this motion, and the affidavits thereto. To the extent that the parties' statements differ, the plaintiffs' version is included here.

2   The other sections confer jurisdiction upon non-domiciliary defendants if they transact any business within the state or contract to supply goods or services in the state, if plaintiffs' injury arose out of a tortious act that

occurred within the state, or if defendants own, use of possess any real property within the state. N.Y. Civ. Prac. Law. & R. §§ 302(1), (2) and (4).

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML     Document 51     Filed 02/09/23     Page 68 of 396

Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC, Not Reported in...

2012 A.M.C. 330

2012 WL 204102

United States District Court,
S.D. New York.

GREATSHIP (INDIA) LIMITED, Petitioner,

v.

MARINE LOGISTICS SOLUTIONS
(MARSOL) LLC, Respondent.

No. 11 Civ. 420(RJH).
|
Jan. 24, 2012.

***MEMORANDUM OPINION AND ORDER***

RICHARD J. HOLWELL, District Judge.

 **\*1** Respondent Marine Logistics Solutions, LLC ("Marsol") chartered two vessels owned by petitioner Greatship (India) Limited ("Greatship"). Marsol defaulted on two payments to Greatship, who referred the matter to arbitration in London. On September 22, 2010, the arbitrators awarded Greatship damages of $2,168,700 with interest, an award which Marsol has neither appealed nor paid. On January 20, 2011, Greatship petitioned this court to enforce the award pursuant to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), codified at 9 U.S.C. § 201 *et seq.* (2006), and the Federal Arbitration Act, codified at 9 U.S.C. § 1 *et seq.* Marsol now moves to dismiss the petition under Fed.R.Civ.P. 12(b)(2), arguing that the court lacks personal jurisdiction over it. Because Greatship's allegations do not support a finding of jurisdiction over Marsol, Marsol's motion to dismiss is GRANTED.

**Factual Background**

The following facts are undisputed between the parties.

Greatship, an Indian business entity, is the owner of two vessels, the Greatship Amrita and the Greatship Anjali. (Pet.'s Mem. of Law in Opp. To Resp.'s Mot. to Dismiss ("Opp.") at 1; Verified Petition ("Pet.") ¶ 2.) Marsol is an offshore logistics service provider, registered in Dubai, United Arab Emirates. (Hashmi Decl. ¶ 3; D'Ambrosio Decl. Ex. 1.) Marsol time chartered the Greatship Amrita and the Greatship

Anjali under two charterparties[1] dated November 27, 2007. (Opp. at 1.)

On or about October 19, 2009, Greatship and Marsol agreed to early re-delivery of the vessels, and entered into two settlement agreements (the "Amrita Agreement" and the "Anjali Agreement"). (Opp. at 1; *see* D'Ambrosio Decl. Ex. 1, Ex. 2.) In the Amrita Agreement, Marsol agreed to pay Greatship $1,811,516.00 for outstanding time charter hire, and $450,000.00 in compensation for early redelivery of the Greatship Amrita. (*Id.*) In the Anjali Agreement, Marsol agreed to pay Greatship $557,596.71 for outstanding time charter hire. (*Id.*) The Amrita Agreement contained a schedule for payments of the total settlement amounts, and provided that if Marsol were to default on any two consecutive installments, "the defaulting sums along with all other sums ... shall become due and payable immediately and shall carry an interest in the measure of 10% (ten percent) annually until the date of realization." (*Id.* at 1–2.) Clauses in each settlement agreement provided that each would be governed in accordance with English law, and that disputes arising out of the agreements would be referred to arbitration in London. (*Id.* at 2; Resp. Mot. to Dismiss ("MTD") at 2.) The settlement agreements nowhere mention the United States, New York State, or any other state. (*See* D'Ambrosio Decl. Exs. 1 & 2.)

Marsol allegedly defaulted on its October and November 2009 installments due under the agreements. (Opp. at 2; MTD at 2.) Greatship then referred the dispute to arbitration in London, in accordance with the arbitration clauses. (Opp. at 2; MTD at 2.) On September 22, 2010, the arbitrators awarded Greatship principal damages of $2,168,700, with interest. (Opp. at 2; *see* MTD at 2.) Greatship subsequently made demands for payment, but Marsol has not paid. (Opp. at 2; *see* MTD at 2.)

 **\*2** On January 20, 2011, Greatship petitioned this court to enforce the award pursuant to the New York Convention. (Pet.¶ 1.) On June 6, 2011, Marsol moved under Rule 12(b)(2) to dismiss the petition for lack of jurisdiction.

**Discussion**

"A court is 'obligated to dismiss an action against a defendant over which it has no personal jurisdiction' upon motion by that defendant." *Stone v. Ranbaxy Pharm., Inc.,* No. 10 Civ. 8816, 2011 WL 2462654, at \*1 (S.D.N.Y. June 16, 2011) (quoting *In re Ski Train Fire,* 230 F.Supp.2d 403, 406

Case: 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 69 of 396

Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC, Not Reported in...

2012 A.M.C. 330

(S.D.N.Y.2002)). "A plaintiff opposing a motion to dismiss a complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) 'bears the burden of establishing that the court has jurisdiction over the defendant.' " *Anderson v. Marr,* No. 10 Civ. 818, 2011 WL 3423694, at *4 (S.D.N.Y. July 18, 2011) (quoting *DiStefano v. Carozzi N. Am., Inc.,* 286 F.3d 81, 84 (2d Cir.2001)). Prior to discovery, the plaintiff need only plead facts which, if true, would establish jurisdiction over the moving defendant. *Id.; Stone,* 2011 WL 2462654, at *1. "At the pre-discovery stage, a court may consider documents beyond the pleadings in determining whether personal jurisdiction exists, and any pleadings and other documents considered by the Court must be interpreted in the light most favorable to the plaintiff." *Anderson,* 2011 WL 3423694, at *4. However, "conclusory allegations are not enough to establish personal jurisdiction." *Gmurzynska v. Hutton,* 257 F.Supp.2d 621, 625 (S.D.N.Y.2003). Instead the allegations supporting jurisdiction must be factually supported. *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00 Civ. 5663, 2001 WL 1468168, at *3 (S.D.N.Y. Nov.19, 2001) (citing *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990)).

To enforce a foreign arbitral award under the New York Convention, the enforcing court must have *in personam* or *quasi in rem* jurisdiction over the party ordered to pay. *Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic,* 582 F.3d 393, 398 (2d. Cir.2009); *Adrian Shipholding Inc. v. Lawndale Group S.A.,* No. 08 Civ. 11124, 2010 WL 1372627, at *2 (S.D.N.Y. Mar. 26, 2010) ("[T]he Court of Appeals has recently imposed a requirement that courts in this Circuit find personal or quasi in rem jurisdiction before confirming a foreign arbitral award.") (citing *Frontera* ). The federal statute that implements the New York Convention does not itself confer personal jurisdiction over the parties to an award. *Opal Finance Ltd. v. Agrenco Madeira Comercio Int'l LDA,* No. 08 Civ. 8279, 2010 WL 476711, at *1 (S.D.N.Y. Feb.3, 2010). Personal jurisdiction must therefore be established either under state law, or, since the New York Convention is enacted by federal statute, by Federal Rule of Civil Procedure 4(k)(2).

Accordingly, to enforce a foreign arbitral award in this court, the petitioner must show either (1) that the respondent is " 'present' in New York," *Ford v. Department of Soc. Servs.,* No 10 Civ. 3800, 2011 WL 1458138, at *2 (S.D.N.Y. Mar.22, 2011) (quoting N.Y. C.P.L.R. 301 (McKinney 2010)),

and therefore subject to general personal jurisdiction; (2) that the respondent "has committed acts within the scope of New York's long-arm statute," *Ford,* 2011 WL 1458318, at *2 (quoting N.Y. C.P.L.R. 302), and is therefore subject to specific personal jurisdiction over claims arising from those acts; or (3) that, under Rule 4(k)(2), the respondent is not subject to the jurisdiction of any one state, but that the exercise of general federal personal jurisdiction over the respondent is nevertheless consistent with the requirements of due process [2], *see Kiobel v. Royal Dutch Petroleum Co.,* No. 02 Civ. 7618, 2010 WL 2507025, at *6 (S.D.N.Y. June 21, 2010) (citing *Porina v. Marward Shipping Co., Ltd.,* 521 F.3d 122, 127 (2d Cir.2008)).

### N.Y. C.P.L.R. 301

**\*3** N.Y. C.P.L.R. 301 provides for general personal jurisdiction with respect to any cause of action over a defendant who "is 'doing business' and is therefore 'present' in New York." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985)). The defendant must "do[ ] business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Id.* (internal quotation marks omitted). "In order to establish that this standard is met, a plaintiff must show that a defendant engaged in continuous, permanent, and substantial activity in New York." *Id.* (internal quotation marks omitted). New York courts consider several factors in this analysis, "including 'the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York.' " *Fagan v. Republic of Austria,* No. 08 Civ. 6715, 2011 WL 1197677, at * 12 (S.D.N.Y. Mar. 25, 2011) (quoting *Xiu Feng Li v. Hock,* 371 F. App'x 171, 174 (2d Cir.2010)).

To find general personal jurisdiction under N.Y. C.P.L.R. 301, the defendant must be doing business in New York at the time the action was filed, not when the claim arose. *Pieczenik v. Dyax Corporation,* No. 00 CV 243, 2000 WL 959753, at *3 (S.D.N.Y. July 11, 2000); *Yurman Designs, Inc. v. A.R. Morris Jewelers, L.L.C.,* 41 F.Supp.2d 453 (S.D.N.Y.1999); *Lancaster v. Colonial Motor,* 177 A.D.2d 152, 581 N.Y.S.2d 283, 287 (App.Div.1992).

2012 A.M.C. 330

Registration pursuant to *§ 304(b) of the Business Corporation Law* is considered consent to general personal jurisdiction. *Augsbury Corp. v. Petrokey Corp.,* 97 A.D.2d 173, 470 N.Y.S.2d 787, 789 (App.Div.1983). Such consent is revoked when the registration expires or is surrendered. *See Greenman–Perdesen, Inc. v. Berryman & Henigar, Inc.,* No. 09 Civ. 167, 2009 WL 2523887, at *5 (S.D.N.Y. Aug. 18, 2009) (finding that defendant had not consented to personal jurisdiction merely because it had been, but no longer was, registered to do business in New York).

Greatship does not allege facts that establish or suggest that Marsol has engaged in any commercial activity in New York. Greatship merely alleges (I) that Marsol "maintains an agency and/or parent-subsidiary relationship with Emirates Trading Agency L .L.C." ("ETA"), such that Marsol was the "sale & purchase division" of ETA, and that ETA was registered to do business in New York pursuant to *§ 304(b) of the New York Business Corporation Law* from January 20, 2009 until October 25, 2010, when it surrendered its authority (Opp. at 7–8); and (II) that Marsol once commenced a lawsuit in this court, *Marine Logistics Solutions (Marsol) LLC v. Eneroil Offshore Drilling Ltd.,* No. 09 Civ. 5135 (S.D.N.Y. June 2, 2009) (voluntarily dismissed July 27, 2009), albeit not against Greatship.

These allegations do not establish or suggest that Marsol was "doing business" in New York under *N.Y. C.P.L.R. 301.* The jurisdictional acts of a parent in New York may be imputed to a foreign subsidiary, but only where "the subsidiary is acting as an agent for the parent, or the parent's control is so complete that the subsidiary is a 'mere department' of the parent." *Irwin v. ZDF Enterprises GmbH,* No. 04 Civ. 8027, 2006 WL 374960, at *8 (S.D.N.Y.2006) (citing *ESI, Inc. v. Coastal Corp.,* 61 F.Supp.2d 35, 51 (S.D.N.Y.1999); *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir.1996)). Greatship's conclusory allegation that Marsol maintains an "agency and/ or parent subsidiary relationship" with ETA is not sufficient to support jurisdiction. But even if it were, ETA surrendered its registration on October 25, 2010, and thereby revoked its consent, before the present petition was filed. *See Greenman– Perdesen,* 2009 WL 2523887, at *5. Therefore, the identified registration alone would not support general jurisdiction even over ETA, let alone its alleged subsidiary, Marsol.

**\*4** As for Marsol's commencement of a single case in New York District Court, a party's appearance as petitioner in one proceeding does not necessarily subject it to personal jurisdiction in another proceeding, even in the same court. *Gulf Ins. Co. v. Caldor Corp.,* No. 03 Civ. 2894, 2006 WL 1586571, at *3 (S.D.N.Y. June 9, 2006) (citing *Andros Compania Maritima, S.A. v. Intertanker Ltd.,* 718 F.Supp. 1215, 1215–17 (S.D.N.Y.1989)). Nor is the mere filing of a lawsuit in New York considered to be "doing business" in the state. *N.Y. Bus. Corp. Law § 1301(b) (1)* (McKinney 2003) ("a foreign corporation shall not be considered to be doing business in this state ... by reason of ... [m]aintaining or defending any action or proceeding, whether judicial, administrative, arbitrative or otherwise ...."); *see also Gruman v. Plotkin,* 61 A.D.2d 1024, 403 N.Y.S.2d 88, 89 (App.Div.1978) (noting that foreign corporation was not "doing business" by commencing action in New York Supreme Court to enforce mortgage note).

In his declaration, Marsol's general manager states that Marsol has no presence, offices or facilities in New York; does not do business in New York; does not solicit business in New York; does not own or lease any property in New York; has no employees located in New York; and has no revenue attributable to New York. (Hashmi Decl. at 2.) Greatship has not alleged facts that, if proven, would contradict these assertions. In total, Greatship's factual showing is plainly insufficient to establish that Marsol was "doing business" here.

### N.Y. C.P.L.R. 302

*N.Y. C.P.L.R. 302,* New York's long-arm statute, *inter alia* "confers jurisdiction over any non-domiciliary who transacts any business within the state so long as the cause of action arises from this conduct." *Kennedy Johnson Gallagher, LLC v. Payne,* No. 10 Civ. 1363, 2010 WL 3958749, at *2 (S.D.N.Y. Oct.5, 2010) (internal quotation marks and alterations omitted); *see* N.Y. C.P.L.R. 302(a)(1); *Opticare Acquisition Corp. v. Castillo,* 25 A.D.3d 238, 806 N.Y.S.2d 84, 91 (App.Div.2005). A party "transacts business within the state" for the purposes of N.Y. C.P.L.R. 302 "when it purposefully avails itself of the privilege of conducting activities within New York." *Kennedy Johnson Gallagher,* 2010 WL 3958749, at *2. To support jurisdiction under N.Y. C.P.L.R. 302, there must be "a substantial nexus between the transaction of business and the cause of action sued upon."

Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC, Not Reported in...

2012 A.M.C. 330

*Id.; see Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 249 (2d Cir.2007).

Greatship does not allege that Marsol transacted any business in New York related to the charterparties, settlement agreement, arbitration, or default. As noted *supra,* Marsol asserts that it does not do business in New York, and Greatship has not suggested that the present cause of action arose from any New York activity. Accordingly, New York's long-arm statute does not confer jurisdiction over Greatship's claims.

### Federal Rule of Civil Procedure 4(k)(2)

**\*5** Greatship also asserts that jurisdiction is proper over Marsol pursuant to Rule 4(k)(2). "To establish personal jurisdiction over a defendant pursuant to Federal Rule of Civil Procedure 4(k)(2), a plaintiff must show that (1) the plaintiff's cause of action arises under federal law, (2) the defendant is not subject to the jurisdiction of any one state, and (3) the exercise of personal jurisdiction over the defendant is consistent with the requirements of due process." *Kiobel,* 2010 WL 2507025, at \*6 (citing *Porina,* 521 F.3d at 127); *see also* Fed.R.Civ.P. 4(k)(2) ("For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."). "Rule 4(k)(2) is designed to fill a gap in the enforcement of federal law for courts to exercise personal jurisdiction over defendants having sufficient contacts with the United States to justify the application of United States law ... but having insufficient contact with any single state to support jurisdiction under state long-arm legislation." *Daventree Ltd. v. Republic of Azerbaijan,* 349 F.Supp.2d 736, 760 (S.D.N.Y.2004).

Greatship's claims arise under the New York Convention, and therefore under federal law. Although the Court has found that Marsol is not subject to personal jurisdiction in New York, Greatship does not certify (nor has the court ascertained *sua sponte* ) that Marsol is not subject to jurisdiction in any other state. But even if that were so, the Court would still lack jurisdiction over Marsol because the exercise of jurisdiction pursuant to Rule 4(k)(2) would not comport with due process.

Due process for the purposes of Rule 4(k)(2) requires that the defendant have sufficient minimum contacts with

the United States, and that the exercise of jurisdiction is reasonable. *Porina,* 521 F.3d at 127. The first step of the analysis, establishing minimum contacts with the United States, is a "more stringent" test than the comparable standard under states' long-arm statutes, and requires a plaintiff to show that the defendant had "continuous and systematic general business contacts" with the United States, contacts that "approximate physical presence in the United States." *NewMarkets Partners LLC v. Oppenheim,* 638 F.Supp.2d 394, 404 (S.D.N.Y.2009) (quoting *Porina,* 521 F.3d at 128 and *BBC Chartering & Logistic v. Usiminas Mecanica S/A,* No. 08 Civ. 200, 2009 WL 259618, at \*5 (S.D.N.Y. Feb. 4, 2009)) (internal quotation marks removed). If the defendant's contacts are deemed insufficient, the court's analysis ends, but if sufficient minimum contacts exist, the court proceeds to inquire whether the exercise of jurisdiction is reasonable. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560 (2d Cir.1996). This second step of the analysis considers such factors as "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 129 (2d Cir.2002); *Tamam v. Fransabank Sal,* 677 F.Supp.2d 720, 731 (S.D.N.Y.2010). A weak but sufficient showing of minimum contacts requires a strong showing of reasonableness. *See Bank Brussels,* 305 F.3d at 129; *Tamam,* 677 F.Supp.2d at 731.

**\*6** Greatship fails to establish sufficient minimum contacts between Marsol and the United States. Beyond the tenuous contacts between Marsol and New York discussed *supra,* Greatship further asserts that Marsol regularly transacts business in U.S. dollars and that the settlement agreements required payment to Greatship in U.S. dollars. (Opp. at 6.) Greatship deems this relevant because "all international U.S. dollar transfers are processed by intermediary banks in the United States." The settlement agreements, however, do not suggest or require the use of any bank or facility in the United States, and Greatship has not alleged that Marsol has ever actually processed a transaction with a U.S. bank. Even if it had, " 'the routine acceptance and remittal of commercial instruments incidentally bound for the forum

Case 9:21-cv-00949-MAD-ML  Document 51  Filed 02/09/23  Page 72 of 396
Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC, Not Reported in...

2012 A.M.C. 330

state' are insufficient to establish minimum contacts." *See Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries,* No. 03 Civ. 1681, 2004 WL 2199547, at * 15 (S.D.N.Y. Sep. 29, 2004) (quoting Froning & Deppe, Inc. v. Continental Illinois Nat'l Bank & Trust Co., 695 F.2d 289, 292 (7th Cir.1982)). Greatship also identifies that a vessel named "Marsol I" was classified as recently as 2005 with the Houston -based American Bureau of Shipping. Greatship provides no direct evidence that the present respondent was or is the owner of the Marsol I, or that such classification was purposefully acquired by Marsol. But even if Marsol were both owner and classifier of the Marsol I, the total activity alleged by Greatship is not the sort of continuous and systematic general business contact that could approximate physical presence in the United States. Courts in this district have found minimum contacts lacking under a Rule 4(k) (2) analysis when the defendant in question had far more connection with the United States than does Marsol. *See, e.g., Nursan Metalurji Endustrisi A.S. v. M/V TORM GERTRUD,* No. 07 Civ. 7687, 2009 WL 536059, at *3–4 (S.D.N.Y. Feb.27, 2009) (no minimum contacts sufficient for Rule 4(k)(2) when defendant had an office in Connecticut and owned several ships that conducted trade in American ports); *BBC Chartering,* 2009 WL 259618 at *5 (no minimum contacts where defendant attended fifteen meetings in the United States, supplied steel for two United States municipal construction projects and submitted bids for two more, placed two advertisements in a United States trade magazine, and issued a press release announcing a strategic decision to expand participation in the U.S. market); *see also Porina,* 521 F.3d at 129 (holding that a vessel's owner was not subject to personal jurisdiction under Rule 4(k)(2) with respect to an unrelated suit where the vessel had repeatedly visited U.S. ports at the direction of its charterers).

As Greatship has not shown that the exercise of jurisdiction pursuant to Rule 4(k)(2) would comport with due process, the court need not proceed to examine the reasonableness of such exercise. The Court finds that it does not have general federal jurisdiction over Marsol.

### Request for Discovery

**\*7** Greatship asks for discovery to further establish its jurisdictional allegations against Marsol, but does not point to any particular information it hopes to obtain.

"District courts have considerable discretion in determining how best to handle jurisdictional questions." *Best Van Lines, Inc. v. Walker,* No. 03 Civ. 6585, 2004 WL 964009 (S.D.N.Y. May 5, 2004), *affirmed,* 490 F.3d 239 (2d Cir.2007). "While discovery on the jurisdictional question is sometimes appropriate when there is a motion to dismiss for lack of jurisdiction, plaintiff must first make a threshold showing that there is some basis for the assertion of jurisdiction." *Daval Steel Prods. v. M.V. Juraj Dalmatinac,* 718 F.Supp. 159, 162 (S.D.N.Y.1989). To be granted the opportunity for jurisdictional discovery, a plaintiff "must, at the least, allege facts that would support a colorable claim of jurisdiction." *Id.* (citing Lehigh Valley Industries, Inc. v. Birenbaum, 527 F.2d 87, 93–94 (2d Cir.1975)).

The court has given Greatship's allegations their most favorable interpretation, and found them insufficient to support any colorable claim of jurisdiction. As Greatship has failed to make a threshold showing that this court has any jurisdiction over Marsol, it would be inappropriate to grant Greatship further discovery. *See* Best Van Lines, 490 F.3d at 255 ("We conclude that the district court acted well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case for jurisdiction."); *see, e.g., Del Medical Imaging Corp. v. CR Tech USA, Inc.,* No. 08 Civ. 8556, 2010 WL 1487994, at *8 (S.D.N.Y. Apr. 13, 2010) (denying jurisdictional discovery where plaintiff "failed to allege any facts that could lead this Court to exercise personal jurisdiction over [defendant] and ... failed to point to any relevant information that it hopes to obtain in discovery ....").

### CONCLUSION

For the foregoing reasons, defendant Marsol's motion to dismiss **[8]** is GRANTED and Greatship's petition is dismissed without prejudice. The Clerk of Court is ordered to close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 204102, 2012 A.M.C. 330

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 73 of 396

Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC, Not Reported in...

2012 A.M.C. 330

### Footnotes

1    A charterparty is a "charter or deed made between owners and merchants for hire of a ship, and safe delivery of the cargo." III Oxford English Dictionary 50 (2d ed.1991).

2    Although the *Frontera* court also adopted the suggestion of the district court (Holwell, J.) and held that a sovereign state and its agents do not enjoy due process protections, *Frontera,* 582 F.3d at 399–401 (overruling in part *Texas Trading & Mill. Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir.1981)), that holding does not extend to privately-owned foreign corporations. *Frontera* at 401 (*citing Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 418–19, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999); *Metro. Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 571 (2d Cir.1996)). Accordingly, any exercise of jurisdiction over Marsol must comport with the requirements of due process.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 74 of 396

Bonkowski v. HP Hood LLC, Not Reported in Fed. Supp. (2016)

2016 WL 4536868

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Tomasz BONKOWSKI and

Teresa Bonkowski, Plaintiffs,

v.

HP HOOD LLC, Defendants.

15-CV-4956 (RRM) (PK)

|

Signed 08/30/2016

**Attorneys and Law Firms**

Dennis A. Breen, Lurie, Ilchert, MacDonnell & Ryan, New York, NY, for Plaintiffs.

Erin D. Roach, Ahmuty Demers McManus, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

ROSLYNN R. MAUSKOPF, United States District Judge

**\*1** Tomasz and Teresa Bonkowski ("Bonkowski"), New York residents, bring this tort action in diversity against HP Hood LLC, a Delaware corporation with its principal place of business in Massachusetts. (Comp. (Doc. No. 1); Bonkowski Mem. in Opp'n ("Bonkowski Opp'n") (Doc. No. 11-5) at 1 (ECF pagination).) Hood now moves to dismiss this action, alleging that this Court lacks personal jurisdiction over Hood, and seeks transfer to the District of Massachusetts. (Hood Mot. (Doc. No. 12).) For the reasons that follow, the Court agrees with Hood on both grounds.

## BACKGROUND

The following facts, taken from the parties moving papers, are not in dispute. Hood produces and distributes milk and other dairy and non-dairy products throughout the United States, including in the State of New York. (Nightingale Aff. (Doc. 12-4 at 1.) To that end, Hood operates plants throughout the country, including in the State of New York, and also maintains an administrative office in the city of Binghamton, New York. (*Id.*) Hood is a Delaware corporation with its principal place of business in Massachusetts. (*Id.*) Hood is

authorized to do business in New York, having registered with the New York Secretary of State and appointing an entity for service of process and filing within the state. (Bonkowski Aff. (Doc No. 11-4) at 1 and Ex. B.)

On May 29, 2015, Tomasz Bonkowski, a truck driver with Foodliner, Inc., was delivering goods to Hood from New York and was injured after tripping over a raised metal plate at Hood's Agawam, Massachusetts facility. (Bonkowski Opp'n at 1.) He sustained injuries to his right shoulder, and left hand and arm, and is receiving his medical treatment in Brooklyn, which has, to date, included at least one surgical procedure. (*Id.* at 2, 7.)

Bonkowski maintains that this Court may assert personal jurisdiction over Hood because of Hood's contacts with New York and because Hood has consented to such jurisdiction by virtue of registering to do business in New York and by litigating in New York courts. (*See generally* Bonkowski Opp'n.) Hood maintains that following the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746, 748–49 (2014), none of the grounds alleged by Bonkowski meets the requisites of the Due Process clause. (*See generally*, Hood Mot.) As discussed more fully below, the Court agrees with Hood. In addition, Hood seeks transfer of this action to the District of Massachusetts pursuant to 28 U.S.C. § 1406(a) based on improper venue. The Court grants that motion as well.

## DISCUSSION

### I. Personal Jurisdiction

Personal jurisdiction in a diversity case is determined by the law of the state in which the district court sits. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). Plaintiff bears the burden of demonstrating that the Court may exercise personal jurisdiction over defendants. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 170 (E.D.N.Y. 2015) (quoting *Dorchester Fin. Sec., Inc. v.*

*Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013)). Where, as here, the issue of personal jurisdiction "is decided initially on the pleadings and without discovery, the plaintiff need show only a *prima facie* case" of jurisdiction on a motion under Rule 12(b)(2). *Volkswagenwerk Aktiengesellschaft,* 751 F.2d at 120; *accord Tamam v. Fransabank Sal,* 677 F. Supp. 2d 720, 725 (S.D.N.Y. 2010). In considering a Rule 12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are to be resolved in plaintiff's favor. *See DiStefano,* 286 F.3d at 84.

**\*2** Courts may exercise either general or specific personal jurisdiction. *Daimler AG,* 134 S. Ct. at 751; *Brown v. Lockheed Martin Corp.,* 814 F.3d 619, 624–25 (2d Cir. 2016). General jurisdiction allows a court to adjudicate "any and all" claims against a defendant, regardless of whether the claims are connected to the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915 (2011); *Brown,* 814 F.3d at 624. Specific jurisdiction renders a defendant amenable to suit only with respect to claims "arising out of or relating to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n.8 (1984); *Goodyear,* 131 S. Ct. at 2851; *Brown,* 814 F.3d at 624–25. "Whether specific or general, however, the exercise of personal jurisdiction over a defendant is informed and limited by the U.S. Constitution's guarantee of due process, which requires that any jurisdictional exercise be consistent with 'traditional notions of fair play and substantial justice.' " *Brown,* 814 F.3d at 625 (quoting *International Shoe Co. v. Washington,* 326 U.S. 310 (1945)).

Here, Bonkowski relies solely on *New York Civil Practice Law and Rules section 301,* New York's general jurisdiction statute. It provides that a New York court "may exercise jurisdiction over persons, property, or status as might have been exercised heretofore." New York courts have interpreted *Section 301* to exercise jurisdiction over an out-of-state corporation that "has engaged in such a continuous and systematic course of 'doing business' in New York that a finding of its presence in New York is warranted." *Sonera Holding B.V. v. Cukurova Holding A.S.,* 750 F.3d 221, 224

(2d Cir. 2014) (alterations and internal quotation marks omitted) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs.,* 77 N.Y.2d 28, 33 (1990)). A corporation is "doing business" in New York if it "does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir 2000) (internal quotation marks omitted).

However, after *Daimler,* the relevant inquiry is not whether a corporation's activities within a forum are "in some sense continuous and systematic," but rather "whether that corporation's affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State." *134 S.Ct. 746, 749* (quoting *Goodyear,* 131 S. Ct. at 2851); *see also, Brown,* 814 F.3d at 626–27; *Chatwal Hotels & Resorts LLC v. Dollywood Co.,* 90 F. Supp. 3d 97, 103–04 (S.D.N.Y. 2015). And after *Daimler,* "[e]xcept in a truly exceptional case, a corporate defendant may be treated as essentially at home only where it is incorporated or maintains its principal place of business – the 'paradigm' cases." *Brown,* 814 F.3d at 627 (internal citation and quotation marks omitted); *Gucci America, Inc. v. Weixing Li,* 768 F.3d 122, 135 (2d. Cir 2014).

In this case, Hood's contacts with New York state do not comport with *Daimler'*s due process standards and thus are not sufficient to give rise to personal jurisdiction over Hood in this Court. New York is neither Hood's place of incorporation, nor its principal place of business, and this case falls outside the "paradigm" established by *Daimler.* As such, Bonkowski "bears a heavy burden when [ ]he asserts that [Hood's] presence in [New York] presents such an 'exceptional case.' " *Brown,* 814 F.3d 627. Bonkowski has failed to carry his burden.

Bonkowski has not sought discovery here and relies solely on the factual averments contained in Hood's motion regarding the extent of Hood's operations. (*See generally,* Bonkowski Opp'n.) He points to the fact that Hood is a national company with manufacturing operations across the United States, some of which are located in New York. Otherwise, Hood's presence in New York is limited to an administrative office located in Binghamton, New York. As *Daimler* counsels, in assessing the extent of a corporation's contacts in a state for general jurisdiction purposes, we must assess the

Bonkowski v. HP Hood LLC, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 76 of 396

company's local activity not in isolation but *in the context of the company's overall activity.*" *Brown,* 814 F.3d at 629 (emphasis in original). Bonkowski does not even attempt to analyze Hood's amount of business in New York as compared with its overall national presence. *See Ritchie Capital Mgmt., LLC v. Costco Wholesale Corp.,* 2015 U.S. Dist. LEXIS 176994 at \*12 (S.D.N.Y. Sept. 21, 2015). Indeed, while Hood's contacts are not insubstantial, they appear to be a small portion of its entire operations. A corporation "that operates in many places can scarcely be deemed at home in all of them." *Daimler,* 134 S.Ct at 761, n.20; *see also, Gucci America, Inc.* 768 F.3d at 135 (holding branch offices of bank incorporated and headquartered elsewhere insufficient to establish personal jurisdiction after *Daimler*); *Ritchie Capital Mgmt.,* at \*18–19 (finding that only 2.53% of the total number of Costco warehouses, with 1.8% of its nationwide employee pool, does not give rise to personal jurisdiction in New York over Costco, headquartered and incorporated elsewhere); *Chatwal,* 90 F. Supp. 3d at 104 (finding that sporadic contracts with New York companies and other contacts with New York were insufficient to give rise to the "exceptional case" after *Daimler*).

 **\*3** Bonkowski attempts to bolster his argument by alleging that Hood "has consented to jurisdiction by naming an agent for service of process in the State of New York, and has utilized New York State and Federal Courts for actions on numerous occasions." (Bonkowski Opp'n at 6–7.) Neither argument saves the day.

First, "a foreign corporation shall not be considered to be doing business in this state ... by reason of carrying on in this state any one or more of the following activities: (1) maintaining or defending any action or proceeding, whether judicial, administrative, arbitrative or otherwise ...." N.Y. Bus. Corp. L. § 1301(b)(1). Moreover, Bonkowski's list of New York cases in which Hood is a litigant is of little value as all of the filings precede *Daimler*. (Breen Aff. (Doc. No. 11) at Ex. C.) In addition, Bonkowski does not provide any detail regarding these cases. Thus, Hood could be subject to *specific personal jurisdiction* if the causes of action arose out of Hood's conduct in New York state, or out of Hood's conduct outside of the state causing injury within the state. [1]

*See* CPLR § 302; *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 246 (2d Cir. 2007) (holding that personal jurisdiction may lie where corporation has purposefully availed itself of

the privilege of conducting activities in New York where there is an articulable nexus between plaintiff's claim and the corporation's transaction in New York.)

Equally unavailing is Bonkowski's argument that Hood has "consented" to personal jurisdiction by registering to do business in New York state. While courts have held that a corporation has constructively consented to personal jurisdiction where it is authorized to do business in New York state, *see, e.g.,* *Augsbury Corp. v. Petrokey Corp.,* 97 A.D. 2d 173, 175 (3d Dep't 1983), *Chong v. Healthtronics, Inc.,* 2007 U.S. Dist. LEXIS 45956 at \*17, 2007 WL 1836831 (E.D.N.Y June 20, 2007), they have done so prior to *Daimler*. And cases post-*Daimler* that have considered the continued viability of consent to jurisdiction through registration have done so without analysis, relying on the long-standing, pre-*Daimler* Appellate Division authority. *See, e.g.,* *Aybar v. Aybar,* No. 706909/2016, 2016 N.Y. Slip. Op. 31139 (N.Y. Sup. Ct. May 25, 2016); *Bailen v. Air & Liquid Sys. Corp.,* No. 190318/12, 2014 N.Y. Slip Op. 32079 (N.Y. Sup. Ct. August 5, 2014).

The New York Court of Appeals has not defined the scope of New York's business registration statutes and its impact on personal jurisdiction either pre– or post-*Daimler*, and this Court declines to so do. In *Brown v. Lockheed Martin Corp.,* the Second Circuit found it "prudent – in the absence of a controlling interpretation by the Connecticut Supreme Court, or a clearer legislative mandate than Connecticut law now provides – to decline to construe the state's registration and agent-appointment statutes as embodying actual consent by every registered corporation to the state's exercise of general jurisdiction over it." 814 F.3d at 626. Finding neither controlling case law nor a scintilla of discussion on this point from either party, the Court declines to give New York's statutory scheme such an expansive reading. [2] As the Circuit noted in *Brown* in the context of the Connecticut statute: "If mere registration and the accompanying appointment of any in-state agent – without an express consent to general jurisdiction – nonetheless sufficed to confer general jurisdiction by implicit consent, every corporation would be subject to general jurisdiction in every state in which it registered, and *Daimler*'s ruling would be robbed of meaning by a back-door thief." *Id.* at 640.

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 77 of 396

Bonkowski v. HP Hood LLC, Not Reported in Fed. Supp. (2016)

**\*4** For the reasons discussed herein, this Court lacks personal jurisdiction over Hood.

## II. Improper Venue

Hood also moves to transfer this action to the District of Massachusetts based on improper venue pursuant to 28 U.S.C. § 1406(a). A plaintiff bears the burden of establishing that venue is proper. *Cold Spring Harbor Lab. v. Ropes & Gray LLP*, 762 F. Supp. 2d 543, 551 (E.D.N.Y. 2011). "If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a prima facie showing." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).

Pursuant to 28 U.S.C. § 1391(b), venue is proper in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

An entity is "deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction ...." 28 U.S.C. § 1391(c).

Because the Court does not have personal jurisdiction over Hood as discussed above, Hood is not a resident this judicial district and thus venue does not lie under subsection (b)(1). Additionally, venue is improper under subsection (b)(2) since the events upon which this suit is based occurred in Massachusetts, not in New York. [3] Furthermore, subsection (b)(3) is not applicable as the action may otherwise be brought in the District of Massachusetts where Hood is amenable to jurisdiction based on its principal place of business. For these reasons, venue is improper in the Eastern District of New York.

### a. Transfer Pursuant to 28 U.S.C. § 1406

Pursuant to 28 U.S.C. § 1406(a), if a case is filed in the wrong district, the Court has the discretion to dismiss or transfer the case in the interest of justice. *See Minnette v. Time Warner*, 997 F.2d 1023, 1026 (2d Cir. 1993); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 456 (E.D.N.Y. 2015). The Court may transfer the case even where it does not have personal jurisdiction over the defendant. *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962). When determining whether to dismiss or transfer, "the Court takes into account the ultimate goal of the 'expeditious and orderly adjudication of cases and controversies on their merits.' " *Fedele v. Harris*, 18 F. Supp. 3d 309, 319 (E.D.N.Y. 2014) (quoting *Goldlawr*, 369 U.S. at 466–67).

**\*5** In this case, the interests of justice warrant transfer to the District of Massachusetts. Massachusetts is where Bonkowski sustained the injury for which he brings this suit. The majority of witnesses are, presumably, located there, and Hood maintains its principal place of business in that state. *See Hatfield v. Asphalt Int'l, Inc.*, 2004 U.S. Dist. LEXIS 2036 at \*16, 2004 WL 287680 (S.D.N.Y. Feb. 11, 2004) ("Defendants would not be prejudiced, but would likely benefit by having the case transferred to the [transferee state] given that their business operations, and presumably many potential witnesses and relevant documents, are based there."). While Bonkowski is not time-barred from refiling his claims in the District of Massachusetts, [4] dismissal "would force him to expend significant time and money filing a new action in a new forum." *Id.* On the other hand, transfer will allow the action to proceed expeditiously to adjudication on the merits. *See Goldlawr*, 369 U.S. at 466–67 (explaining "the general purpose" of § 1406(a) as "removing whatever obstacles may impede an expeditious and orderly adjudication of cases and controversies on their merits"). For these reasons, the Court finds that transfer is warranted.

## CONCLUSION

For the reasons stated herein, this Court lacks personal jurisdiction over Hood. Moreover, venue is improper in this District. As such, the Clerk of Court is hereby ordered to

**Bonkowski v. HP Hood LLC, Not Reported in Fed. Supp. (2016)**

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 78 of 396

transfer this action to the United States District Court for the District of Massachusetts, and close the file in this Court.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4536868

## Footnotes

1    In fact, the patent infringement case cited by Bonkowski, *Steuben Foods Inc. v. HP Hood*, 12-CV-211, filed in the Western District of New York, relied on both general *and specific* personal jurisdiction over Hood. And while Hood did not contest general jurisdiction, it subjected itself to the jurisdiction of the court long before *Daimler* changed the landscape with respect to the application of the due process analysis on the jurisdictional requirements under New York law.

2    As a case in point, the Delaware Supreme Court recently found that *Daimler* rendered untenable the longstanding interpretation of the Delaware business registration statute that previously upheld implied consent to general jurisdiction. *Genuine Parts Co. v. Cepec*, 2016 Del. LEXIS 247 (Del. April 18, 2016) (overruling 🚩 *Sternberg v. O'Neil*, 550 A.2d 1105, 1107 (Del. 1988).)

3    Bonkowski suggests that the fact that he is receiving medical treatment in Brooklyn provides a basis for venue in this District. His argument is without merit. *Trehern v. OMI Corp.*, 1999 U.S. Dist. LEXIS 919, 1999 WL 47303 (S.D.N.Y. February 1, 1999) (finding that post-accident medical treatment is not a substantial part of the events underlying a tort claim; rather, the injury sustained from the accident is the defining event, not the hospitals or physician's offices where he obtained treatment.)

4    Bonkowski sustained injuries on May 29, 2015. The relevant statute of limitations for personal injury actions in Massachusetts is three years beginning from the date of the injury. *See* 🚩 Mass. Gen. Laws Ch. 260 § 2A (West 2016). *See also* 🚩 *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1086–87 (S.D.N.Y. 1984) (holding that where both jurisdiction and venue are improper in the transferor court, the law of the transferee court applies); 🚩 *Nose v. Rementer*, 610 F. Supp. 191, 192 (D. Del. 1985) ("It is also clear that when a transfer is made because a court lacks personal jurisdiction over the defendants that the law of the transferee forum becomes the law applicable to the case.").

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4997228

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

LEROI, INC., Plaintiff,

v.

CSC3C, INC., d/b/a Body Gems, Defendant.

5:15-CV-0565 (GTS/DEP)

|

Signed 09/19/2016

**Attorneys and Law Firms**

BOND SCHOENECK & KING, PLLC, One Lincoln Center, OF COUNSEL: FREDERICK J.M. PRICE, ESQ., JONATHAN L. GRAY, ESQ., KATE I. REID, ESQ., Syracuse, NY 13202, Counsel for Plaintiff.

ECKELL, SPARKS, LEVY, AUERBACH, MONTE, SLOANE, MATTHEWS & AUSLANDER, P.C., 344 West Front Street, OF COUNSEL: PATRICK T. HENIGAN, ESQ., Folsom, PA 19033, Counsel for Defendant.

UNDERBERG & KESSLER LLP, 300 Bausch & Lomb Place, OF COUNSEL: PAUL F. KENEALLY, ESQ., Rochester, NY 14604, Counsel for Defendant.

**DECISION and ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this copyright infringement action by LeRoi, Inc. ("Plaintiff") against CSC3C, Inc., d/b/ a Body Gems ("Defendant" or "Body Gems"), is Defendant's motion to dismiss Plaintiff's Complaint for lack of personal jurisdiction and improper venue pursuant to 🚩 Fed. R. Civ. P. 12(b)(2) and (3). (Dkt. No. 12.) For the reasons set forth below, Defendant's motion is denied without prejudice.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**

Generally, Plaintiff's Complaint alleges as follows. (Dkt. No. 1 [Plf.'s Compl.].)

**1. Plaintiff's Business**

Plaintiff, a New York State corporation with its principle place of business in Fulton, New York, "designs, produces, and sells unique and proprietary body jewelry." (*Id.* at ¶¶ 7, 9.) Plaintiff is the owner by assignment of a copyright registration of a "Skull Design," consisting of a "skull ornament," bearing several unique elements that, taken together, represent its Skull Design trade dress. (*Id.* at ¶ 13[a]-[g]; *accord*, Dkt. No. 1, Attach. 1, at 4 [1] [U.S. Copyright Office Certificate of Registration, effective December 19, 2014].) Plaintiff's Skull Design has been in continuous and exclusive use (apart from the actions that form the basis of Plaintiff's Complaint) for more than 14 years. (Dkt. No. 1 at ¶ 18.)

**2. Defendant's Business and Alleged Infringing Activity**

Defendant, a Pennsylvania corporation, has marketed, advertised and sold–and continues to market, advertise, and sell–skull body jewelry bearing the exact same features that make up Plaintiff's copyright protected Skull Design and distinctive aspects of its skull design trade dress ("Infringing Design").[2] (*Id.* at ¶¶ 1-6, 8, 21.) Defendant has "regularly sold and distributed goods through New York State retail outlets and distributors, and has derived substantial revenue from those sales" as well as through the interstate sale of goods generally. (*Id.* at ¶¶ 5-6.)

In June 2014, at the "Association of Professional Piercers Show," held in Las Vegas, Nevada, Plaintiff "observed a skull design identical to [its] Skull Design" in a catalogue located at Defendant's booth. (*Id.* at ¶ 20.) Plaintiff later "obtained a copy of Body Gems' catalog[ue] advertising the" Infringing Design for sale. (*Id.*; *accord*, Dkt. No. 1, Attach. 2, at 4 ["Exhibit L," featuring, among other items, "DT-SKULL001"].) Moreover, Plaintiff observed the Infringing Design advertised on "Body Gems' social media pages on Facebook and Instagarm." (Dkt. No. 1 at ¶ 20.)

The June 2014 trade show was "not the first time Body Gems has advertised, marketed and sold the Infringing Design." (*Id.* at ¶ 27.) In May 2003, Plaintiff learned that Body Gems was advertising, marketing, and selling the Infringing Design, notified Body Gems of Plaintiff's "proprietary rights," and demanded that it cease and desist in its activities with regard to that design. (*Id.*) Body Gems agreed to do so. (*Id.*)

**\*2** On December 19, 2014, Plaintiff sent a letter to Body Gems, "reminding Body Gems of [Plaintiff's] proprietary Skull Design, indicating that [Plaintiff] recently discovered that Body Gems was advertising for sale and selling the Infringing Design ... and demanding that Body Gems cease and desist from all further manufacturing, distributing, selling, offering for sale, advertising and promoting the Infringing Design." (*Id.* at ¶ 28.) Despite Defendant's awareness of Plaintiff's rights, Defendant "has failed to substantively respond to any of [Plaintiff's] assertions and demands beyond a general denial," and has continued advertising the Infringing Design on its "social media pages[.]" (*Id.* at ¶ 30.)

Based on these factual allegations, Plaintiff's Complaint asserts five claims: (1) a claim for copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 501 *et seq.*; (2) a claim for trade-dress infringement in violation of section 43 of the Lanham Act, 15 U.S.C. § 1125; (3) a claim for deceptive trade practices in violation of New York General Business Law § 349; (4) a claim for unfair competition in violation of New York State common law; and (5) a claim for unjust enrichment in violation of New York State common law. (Dkt. No. 1 at ¶¶ 32-62.) Familiarity with the particular nature of these claims, as well as the factual allegations supporting them, is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### B. Parties' Briefing on Defendant's Motion to Dismiss

#### 1. Defendant's Memorandum of Law

Generally, in support of its motion to dismiss, Defendant advances two arguments. (Dkt. No. 12, Attach. 2 [Def.'s Memo. of Law].) First, Defendant argues that Plaintiff's Complaint fails to allege facts plausibly suggesting that the Court has personal jurisdiction over Defendant pursuant to section 302 of the New York Civil Practice Law and Rules ("CPLR") (New York's long arm statute), because (a) any sales and distributions made by Defendant in New York State are sporadic, (b) Defendant does not earn significant revenue from sales in New York State, (c) Defendant has not made any effort to direct jewelry or products to New York State, (d) Defendant does not maintain any office or any personnel in New York State, and no officers of Defendant have been to

New York State in ten years, (e) Defendant does not "advertise or sell products on any regular basis to New York citizens," and (f) notions of fair play and substantial justice militate against exercising personal jurisdiction over Defendant, in that "[t]he locale [for suit] was chosen for the convenience of Plaintiff and the hardship that was placed on Defendant was ignored." (*Id.* at 3-8. [3])

Second, Defendant argues that, even if the Court concludes that it has personal jurisdiction over Defendant for purposes of this case, venue is improper under 28 U.S.C. § 1391 because (a) Defendant does not reside in, do any business in, and "may not be found" in New York State, and (b) none of the events giving rise to the Plaintiff's claims occurred in New York State. [4] (*Id.* at 8-9.)

#### 2. Plaintiff's Opposition Memorandum of Law

**\*3** Generally, in response to Defendant's motion to dismiss, Plaintiff advances five arguments: (1) Plaintiff has made a *prima facie* showing that Defendant has transacted business within the State of New York for purposes of CPLR § 302(a)(1), because (a) on at least one occasion, Defendant sold jewelry with its Infringing Design to a store located in this District through Defendant's commercial website, after Defendant was notified that its skull jewelry infringed Plaintiff's copyright, (b) Defendant "regularly exploited social media advertising and e-commerce to market and sell its products to global clientele," including through Amazon.com ("Amazon"), and (c) a clear nexus exists between Defendant's business in New York State and Plaintiff's claims (which concern Defendant's sale of the Infringing Design) (Dkt. No. 16, Attach. 3, at 4-7 [Plf.'s Opp'n Memo. of Law] ); (2) Plaintiff has made a *prima facie* showing that Defendant is subject to personal jurisdiction pursuant to CPLR § 302(a)(2) because it sold "at least one infringing good in New York" (*id.* at 7); (3) Plaintiff has made a *prima facie* showing that Defendant is also subject to personal jurisdiction in New York State under CPLR § 302(a)(3)(ii) because it has alleged facts plausibly suggesting, and submitted evidence showing, that (a) Defendant has completed out-of-state sales of the Infringing Design, (b) Defendant derives substantial review from interstate commerce, (c) Defendant should have reasonably expected that its acts would have consequences in New York State, given that Plaintiff notified Defendant about Plaintiff's proprietary interests as early as 2003, (d) Defendant's "social

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 81 of 396

*Leroi, Inc. v. Csc3c, Inc., Not Reported in Fed. Supp. (2016)*

media webpages are replete with references to" interstate sales (including in New York, Ohio, Louisiana, Arizona, Maryland, Massachusetts, and California) and international sales (including in Belgium, Italy, Scotland, and Canada), and (e) Collins' affidavit is conclusory and insufficient to rebut Plaintiff's *prima facie* showing that the Court may properly exercise personal jurisdiction over Defendant in this case (*id.* at 8-10); (4) the Court's exercise of personal jurisdiction over Defendant comports with due process because (a) Defendant continued to sell the Infringing Design–including within the Northern District of New York–even after Plaintiff requested that Defendant cease and desist such activity in 2003, (b) Defendant has not asserted or established that litigation in New York State would be a sufficient inconvenience, and (c) Plaintiff is located in New York State (*id.* at 10-12); and (5) venue is proper in this District because (a) a copyright infringement defendant "may be found," for purposes of 28 U.S.C. § 1400(a), wherever the defendant is amenable to personal jurisdiction, and (b) Defendant has not argued that a specific non-party witness is inconvenienced (*id.* at 12-13).[5]

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply, Defendant advances two arguments: (1) Plaintiff has not alleged facts plausibly suggesting that the Court has specific jurisdiction over Defendant because (a) the transaction to which Plaintiff referred in its opposition to Defendant's motion occurred before Plaintiff's copyright registration of the Skull Design, and (b) Plaintiff has not asserted or established that the jewelry at issue in that transaction was "even arguably similar to the item [for] which Plaintiff claims protection" (Dkt. No. 17 at 2-3 [Def.'s Reply Memo. of Law] ); and (2) Plaintiff has not alleged facts plausibly suggesting that the Court has general jurisdiction over Defendant because Plaintiff has produced evidence of "perhaps two transactions" that were "random" and of "minimal economic value" to Defendant, rather than continuous and systematic (*id.* at 3-4).

## II. GOVERNING LEGAL STANDARDS

### A. Standard Governing Motion to Dismiss for Lack of Personal Jurisdiction

**\*4** "When a defendant moves to dismiss a complaint under Rule 12(b)(2) for want of personal jurisdiction, courts must perform a two-part analysis." *Harris v. Ware*, 04-CV-1120, 2005 WL 503935, at \*1 (E.D.N.Y. Mar. 4, 2005);

*accord,* *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015). "First, personal jurisdiction over a defendant must be established under the law of the state where the federal court sits." *Harris*, 2005 WL 503935, at \*1 (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 [2d Cir. 1999]); *accord,* *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007). "Under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, the service of a summons establishes personal jurisdiction over a defendant 'who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located.' " *Harris*, 2005 WL 503935, at \*1 (citation omitted).

"Second, if jurisdiction is established under the governing statute, courts must determine whether the exercise of jurisdiction under the relevant state law would violate the defendant's due process rights." *Id.* (citation omitted); *accord, Best Van Lines, Inc.*, 480 F.3d at 242-43. These due process rights require that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (quoting *Thomas v. Ashcroft*, 470 F.3d 491, 495 [2d Cir. 2006]). In determining whether the required showing has been made, district courts "construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci*, 732 F.3d at 167 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 [2d Cir. 2010]); *accord,* *A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). Unless a court conducts "a full-blown evidentiary hearing," the plaintiff need only make "a prima facie showing of jurisdiction through its own affidavits

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 82 of 396

Leroi, Inc. v. Csc3c, Inc., Not Reported in Fed. Supp. (2016)

and supporting materials to survive a motion to dismiss under Rule 12(b)(2)." *Harris*, 2005 WL 503935, at *1 (internal quotation marks and citations omitted). What this means is that, "prior to discovery, a plaintiff may defeat a jurisdiction-testing motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Id.* (internal quotation marks and citations omitted); *accord, Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 35 (2d Cir. 2010) ("Such a [*prima facie*] showing entails making 'legally sufficient allegations of jurisdiction,' including 'an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant.'") (quoting *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 [2d Cir. 2003] [per curiam] ). However, where a defendant "rebuts [a plaintiff's] unsupported allegations with direct highly specific, testimonial evidence regarding a fact essential to jurisdiction–and plaintiff[ ] do[es] not counter that evidence– the allegation may be deemed refuted." *MEE Direct LLC v. Tran Source Logistics, Inc.*, 12-CV-6916, 2012 WL 6700067, at *2 (S.D.N.Y. Dec. 26, 2012) (citation, internal quotation marks, and footnote omitted).

### B. Standard Governing Motion to Dismiss for Improper Venue

**\*5** Section 1391 of Title 28 of the United States Code provides, in pertinent part, that a civil action is properly brought in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). As in a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that venue is proper when served with a motion to dismiss under Fed. R. Civ. P. 12(b)(3). *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). Where

the Court relies solely on the submissions of the parties in ruling on the motion, the plaintiff satisfies that burden by pleading facts sufficient to demonstrate a *prima facie* showing of jurisdiction or venue by way of the complaint's allegations, affidavits, and other supporting evidence, which are evaluated in the light most favorable to the plaintiff." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364-65 (2d Cir. 1986).

## III. ANALYSIS

### A. Whether Plaintiff has Made a *Prima Facie* Showing that the Court May Exercise Personal Jurisdiction Over Defendant Pursuant to CPLR § 302

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 16, Attach. 3, at 4-12 [Plf.'s Opp'n Memo. of Law].) To those reasons, the Court adds the following four points, which are intended to supplement (and not to supplant) those reasons.

First, with respect to CPLR § 302(a)(1), [6] Defendant argues that the single New York State transaction allegedly involving the Skull Design identified by Plaintiff (i.e., Pauldine's purchase of a "gold skull" in October 2014) occurred before Plaintiff obtained its copyright registration of the Skull Design, and that Plaintiff has not asserted or established that the gold skull was similar to the Plaintiff's Skull Design. (Dkt. No. 17 at 2-3 [Def.'s Reply Memo. of Law].) The Court finds that, at least at this juncture, Defendant's arguments are unpersuasive.

As an initial matter, the fact that Plaintiff has identified only one specific transaction potentially involving the Skull Design is not dispositive because CPLR § 302(a)(1) "is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloé*, 616 F.3d at 170 (citations omitted). As to the second requirement of CPLR 302(a)(1), the Court finds that Defendant's New York State sales of allegedly infringing goods are intimately tied to Plaintiff's claims, which concern copyright infringement. *See Carr-Stock v. Orthotic Rehab. Prods., Inc.*, 832 F. Supp. 2d 229, 237 (W.D.N.Y. 2011) (concluding that plaintiff had satisfied the second requirement's "nexus test" because "Defendant's New York sales of allegedly infringing goods are intimately

tied to Plaintiff's patent infringement claim[, and i]n cases involving claims of patent infringement, 'the tortious act occurs where products are distributed and infringing sales are made' ") (quoting *Millennium, L.P. v. Dakota Imaging, Inc.*, 03-CV-1838, 2003 WL 22940488, at *5 (S.D.N.Y. Dec. 15, 2003)); *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F. Supp. 433, 436 (S.D.N.Y. 1996) (concluding that personal jurisdiction existed because shipments of allegedly infringing goods into New York "were purposeful and substantially related to plaintiffs' claim of trademark infringement"); *Chloé*, 616 F.3d at 170 (noting that a "single act of shipping a counterfeit Chloé bag might well be sufficient, by itself, to subject [defendant] to the jurisdiction of a New York court under section 302(a)(1)"); [7] *see also* *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981) (requiring "some articulable nexus between the business transacted and the cause of action sued upon"). Moreover, while Defendant's observation that the October 2014 sale apparently occurred before Plaintiff's copyright was registered is well taken (and may be of relevance with regard to Plaintiff's ability to recover or the extent of its recovery), Plaintiff's Complaint alleges that Defendant continues to advertise, market, and sell products constituting the Infringing Design, and that Defendant has not "substantively responded" to Plaintiff's December 2014 cease and desist letter. (Dkt. No. 1 at ¶¶ 21, 30.) Defendant has not asserted otherwise, and also has not asserted that the 2014 sale of the gold skull was the only (or even the most recent) such sale to a New York customer. *See, e.g., Carr-Stock*, 832 F. Supp. 2d at 237 ("Plaintiff has established the first requirement by providing this Court with an affidavit alleging that Defendant sells and ships goods to customers in the Western District of New York, including devices that violate Plaintiff's patent.... That the sales transactions on which this affidavit is based pre-date the alleged breach [of contract] is not fatal to Plaintiff's argument, where this Court has not granted leave for further discovery and where Defendant has submitted no affidavit that it does not continue to sell allegedly infringing goods in New York and the Western District."). Finally, Pauldine's affidavit identifies the gold skull that Pauldine purchased as stock code number "SKULL001" (Dkt. No. 16, Attach. 1, at ¶ 3 [Pauldine Aff.]; *accord, id.* at 4 ["Exhibit 1," Invoice] ), which is a highly similar stock code number associated with a Body Gems catalogue item that Plaintiff's Complaint identifies as the Infringing Design (Dkt. No. 1 at ¶ 20 [Plf.'s Compl.]; *accord*, Dkt No. 1, Attach. 2, at 4 ["Exhibit L," featuring, among other items, "DT-SKULL001"].)

**\*6** Second, while CPLR § 302(a)(2) [8] generally "reach[es] only tortious acts performed by a defendant who was physically present in New York when he committed the act" (*Gordon v. Invisible Children, Inc.*, 14-CV-4122, 2015 WL 5671919, at *5 (S.D.N.Y. Sept. 24, 2015)) (quoting *Virgin Enters. Ltd. v. Virgin Eves LAC*, 08-CV-8564, 2009 WL 3241529, at *4 [S.D.N.Y. Sept. 30, 2009]), courts applying this provision "have held that [c]opyright infringement is deemed to take place at the point of consumer purchase and therefore [u]nder certain circumstances, a non-domiciliary who merely supplies infringing goods to the party that ultimately passes them off in New York may be subject to jurisdiction under 302(a)(2)." *Evergreen Media Holdings, LLC v. Warren*, 105 F. Supp. 3d 192, 198 (D. Conn. 2015) (collecting cases) (citations, footnote, and internal quotation marks omitted). "Specifically, the supplier must sell the goods to the latter party 'with full knowledge that the[y] ... will or can reasonably be expected to be resold in the jurisdiction, where [they] will infringe the plaintiff's mark.' " *Dan-Dee Int'l., Ltd. v. Kmart Corp.*, 99-CV-11689, 2000 WL 1346865, at *4 (S.D.N.Y. Sept. 19, 2000) (quoting *Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 91 [S.D.N.Y. 1997]); *accord, Mag Jewelry Co., Inc. v. Cherokee, Inc.*, 02-CV-0466, 2004 WL 825588, at *2 (E.D.N.Y. Mar. 31, 2004) ("This Court is imbued with personal jurisdiction over non-domiciliary copyright infringers under CPLR 302(a)(2) in several circumstances[, including] when the infringer has offered at least one copy of an infringing work for sale in New York, even if there is no actual sale, [or] when the infringer has sold a product to a company with full knowledge that the product would or could reasonably be expected to be resold in the jurisdiction, where it would infringe the plaintiff's mark.") (internal citations and quotation marks omitted). In this case, the Court concludes that Defendant should reasonably have expected that the products it sold to jewelry retail customers located in New York State–including the allegedly infringing gold skull sold to Pauldine (who owned JP Jewelers)–would be resold to customers in New York State.

Third, with respect to CPLR § 302(a)(3)(ii), [9] Defendant argues that it does not derive substantial revenue from sales in New York State (Dkt. No. 12, Attach. 2, at 5 [Def.'s Memo. of Law]; *accord*, Dkt. No. 12, Attach. 1 [Collins Aff.] [asserting that Defendant "does not derive substantial (if any) revenue from goods used or consumed in the State of New York"].) While revenue derived from sales in New York State is a pertinent factor in determining whether a non-domiciliary is

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 84 of 396

Leroi, Inc. v. Csc3c, Inc., Not Reported in Fed. Supp. (2016)

subject to personal jurisdiction in New York under CPLR § 302(a)(3)(i), the issue under CPLR § 302(a)(3)(ii) is whether the non-domiciliary "derives substantial revenue from *interstate or international* commerce." CPLR § 302(a)(3)(ii) (emphasis added). Defendant advances no argument with regard to the extent of the revenue it derives from interstate or international commerce, or the proportionality of such revenue to the revenue it derives from local commerce.

*See* LaMarca, 95 N.Y.2d at 215 (explaining that the "substantial revenue" requirement "is designed to narrow 'the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character' ") (quoting Ingraham v. Carroll, 99 N.Y.2d 592, 599 [1997]); *see also* Lawson v. Full Tilt Poker Ltd., 930 F. Supp. 2d 476, 485-86 (S.D.N.Y. 2013) ("No specific dollar threshold is required for the revenue to be deemed substantial, and the main concern is the overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums.") (quoting Gucci Am., Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228, 242 [S.D.N.Y. 2010]).

**\*7** Fourth, and finally, in its reply, Defendant argues that, in light of two United States Supreme Court cases decided since *Queen Bee*, "the court may not exercise general jurisdiction over Defendant." (Dkt. No. 17 at 3-4 [citing Daimler AG v. Bauman, 134 S. Ct. 746 (2014), and Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011)] ). However, Plaintiff does not argue that the Court may exercise general jurisdiction over Defendant, as provided in CPLR § 301, New York State's general jurisdiction statute; rather, as discussed above, Plaintiff argues that the Court may exercise specific jurisdiction over Defendant pursuant to various provisions of CPLR § 302, New York's long-arm statute, which confers specific jurisdiction in certain limited circumstances. Accordingly, the Court has no occasion to determine whether it may exercise general jurisdiction over Defendant.

For each of these reasons, and construing all of the filed pleadings and affidavits in the light most favorable to Plaintiff at the early stage of this case (*see, supra,* Part II.A of this Decision and Order), the Court concludes that Plaintiff has met its burden of making a *prima facie* showing that personal jurisdiction over Defendant exists pursuant to CPLR § 302(a)(1), (2), and (3)(ii).[10] However, because the Court's

conclusion is based on the above-described factual allegations and preliminary evidence, the Court denies Defendant's motion only without prejudice.

## B. Whether Plaintiff Has Made a *Prima Facie* Showing that Exercising Personal Jurisdiction over Defendant Comports with the Due Process Clause

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law.[11] (Dkt. No. 16, Attach. 3, at 10-12 [Plf.'s Opp'n Memo. of Law.].) The Court would add only two brief points, which, again, are intended to supplement (and not to supplant) those reasons.

First, the Court's finding with regard to this issue is based also on the points discussed above in Part III.A of this Decision and Order, and the fact that Defendant has not sufficiently countered the factual allegations asserted, and declarations adduced by, Plaintiff.

**\*8** Second, again, because the Court's finding is based on the above-described factual allegations and preliminary evidence, the Court denies this part of Defendant's motion only without prejudice.

## C. Whether Plaintiff Has Made a *Prima Facie* Showing that Venue Is Proper

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 16, Attach. 3, at 12-13 [Plf.'s Opp'n Memo. of Law.].) The Court would add only three brief points, which are intended to supplement (and not to supplant) those reasons.

First, " '[i]t is well-established that a defendant 'may be found' in any district in which he is amenable to personal jurisdiction; thus, venue and jurisdiction are coextensive.' " Mag Jewelry Co., Inc., 2004 WL 825588, at \*1 (quoting Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc., 829 F. Supp. 62, 66 [S.D.N.Y 1993]) (internal quotation marks omitted); *accord*, 28 U.S.C. § 1391(c)(2).

Second, Defendant does not request a change of venue pursuant to 28 U.S.C. § 1404(b).

Third, again, because the Court's finding is based on the above-described factual allegations and preliminary

evidence, the Court denies this part of Defendant's motion only without prejudice.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion to dismiss Plaintiff's Complaint for lack of personal jurisdiction and improper venue (Dkt. No. 12) is **DENIED without prejudice**; and it is further

**ORDERED** that Defendant file an answer to the Plaintiff's Complaint within 14 days of the date of this Decision & Order pursuant to 🏴 Fed.R.Civ.P. Rule 12(a)(4)(a), and this case is referred back to Magistrate Judge Peebles for the setting of pretrial scheduling deadlines.

Dated: September 19, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4997228

## Footnotes

1    Page citations to the exhibits attached to Plaintiff's Complaint refer to the pagination generated by CM/ECF, the Court's electronic filing system.

2    Plaintiff alleges that its "Skull Design has formed the foundation of a line of skull-themed body jewelry (each including the same Skull Design, but with differences in size and composition, e.g., gold or silver) sold by [Plaintiff] and collectively branded as 'Skull Factory.' " (Dkt. No. 1 at ¶ 17.)

3    Page citations to Defendant's memorandum of law refer to the pagination generated by CM/ECF, the Court's electronic filing system. Defendant is respectfully reminded that, pursuant to the Court's Local Rules of Practice, (1) all pleadings, motions, and other documents presented for filing must bear consecutively-numbered pagination (N.D.N.Y. L.R. 10.1[a][7] ), and (2) memoranda of law must contain a table of contents (N.D.N.Y. L.R. 7.1[a][1] ).

4    In support of its motion to dismiss, Defendant has also filed an affidavit, sworn to by Defendant's president Scott Collins. (Dkt. No. 12, Attach. 1 [Collins Aff.].) Collins asserts that Defendant (1) "has not conducted any business within" New York State "for at least ten years," (2) does not "target any business activities towards residents of" New York State, (3) "does not engage in a regular of [*sic*] persistent course of conduct in" New York State, (4) "does not derive substantial (if any) revenue from goods used or consumed in" New York State, and (5) "has no contacts with" New York State and "never expected to engage in any conduct which has consequences within" New York State including "being forced to defend an action within" New York State. (*Id.*)

5    In support of its opposition to Defendant's motion, Plaintiff has also filed two affidavits, one sworn to by James Pauldine (Dkt. No. 16, Attach. 1), and the other by David Carlson (Dkt. No. 16, Attach. 2), as well as an attorney declaration from Kate Reid (Dkt. No. 16). Pauldine asserts, in part, as follows: (1) he is the owner and president of JP Jewelers, Inc., which is located in Oswego, New York, and "has been in the business of making and selling jewelry since September 2009"; (2) Body Gems advertises its products on the website Instagram; (3) on or about October 1, 2014, Pauldine contacted Body Gems by telephone and placed an order for a "14 karat gold skull (stock code number 'SKULL001') and a few captive beads"; and (4) as shown on the invoice attached as an exhibit to Pauldine's affidavit, Pauldine paid $189.03 for the order by telephone, using a business credit card, and Body Gems shipped the order from its Feasterville, Pennsylvania, address. (Dkt. No. 16, Attach. 1, at ¶¶ 1-5.)

Leroi, Inc. v. Csc3c, Inc., Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 86 of 396

Carlson asserts, in part, as follows: (1) he is employed by Resurrected Tattoo in Syracuse, New York, where he has been a "Senior Body Piercer" since 2013; (2) in February 2015, Carlson placed an order with Body Gems, by telephone, for numerous items, including "design tops, clicker designs, and moon-shaped seam rings," based on a Body Gems advertisement that he saw on the internet website Instagram; and (3) as shown on the invoice attached as an exhibit to Carlson's affidavit, Resurrected Tattoo paid $2,261.73 for the order, which was shipped to its Syracuse studio on February 18, 2015. (Dkt. No. 16, Attach. 2, at ¶¶ 1-5.)

Finally, Reid asserts, in part, as follows: (1) Defendant operates a " 'store front' business page" on Amazon.com, which Reid accessed online in October 2015 (Dkt. No. 16 at ¶ 2 [Reid Decl.]; *accord, id.* at 5 ["Exhibit 1"] ); (2) Defendant has posted "online advertisements on facebook.com," including an advertisement documenting a "recent shipment of belly rings to New York" (*id.* at ¶ 3; *accord, id.* at 7 ["Exhibit 2"] ); (3) the Facebook page of "I Prick U Body Works, a body piercing business in Staten Island, New York," stated that business had purchased jewelry from Defendant (*id.* at ¶ 4; *accord, id.* at 9 ["Exhibit 3"] ); and (4) in postings to its own Facebook page, Defendant announced that it had shipped jewelry to Belgium, Italy, Scotland, and Canada (*id.* at ¶ 5; *accord, id.* at 11-16 ["Exhibit 4"] ).

6    "[A] court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... transacts any business within the state or contracts anywhere to supply goods or services in the state."

CPLR § 301(a)(1). "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Licci,* 732 F.3d at 168 (quotation marks omitted).

7    In *Chloé,* the Second Circuit did not decide whether "the single act of shipping a counterfeit" product was sufficient to confer personal jurisdiction, because, among other things, the defendant "also operated a highly interactive website" where bags were offered for sale to New York (and other) consumers. *Chloé,* 616 F.3d at 170. In this case, the proof submitted by Plaintiff supports the conclusion that Defendant's internet presence includes (1) a " 'store front' business page" on Amazon.com (Dkt. No. 16 at ¶ 2 [Reid Decl.] ), (2) product advertisements on its Facebook page, including an announcement that it had shipped products to New York, other states, and other countries (*id.* at ¶¶ 3-6), and (3) product advertisements on Instagram (Dkt. No. 16, Attach. 1, at ¶ 3 [Pauldine Aff.]; Dkt. No. 16, Attach. 2, at ¶ 3 [Carlson Aff.] ). *See also Two's Co., Inc. v. Hudson,* 13-CV-3338, 2014 WL 903035, at *5 (S.D.N.Y. Mar. 6, 2014) ("Creating a site, like placing a product into the stream of commerce, may be felt nationwide–or even worldwide–but, without more, it is not an act purposefully directed toward the forum state. That 'something more' in this case is the shipping of products from Defendant to consumers in New York. The combination of the semi-interactive website which allows out-of-state consumers to commence a purchase through the website and the actual sale of products to New York on several occasions satisfies the 'transacting business' prong of New York's long-arm statute.") (citation and internal quotation marks omitted); *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC,* 15-CV-8459, 2016 WL 3748480, at *3 (S.D.N.Y. July 8, 2016) ("Regularly offering and selling goods via an online marketplace such as Amazon.com can provide a basis for personal jurisdiction under CPLR § 302(a), even though Defendants do not control their Amazon.com 'storefront' or its interactivity to the same extent that they control their own highly interactive website."); *EnviroCare Techs., LLC v. Simanovsky,* 11-CV-3458, 2012 WL 2001443, at *3 (E.D.N.Y. June 4, 2012) (concluding that jurisdiction existed where defendants sold "allegedly infringing goods ... online through [their] Amazon storefront and the goods were shipped to New York by Amazon"). In its reply to Plaintiff's opposition, Defendant does not address any aspect of its online presence or Plaintiff's arguments related thereto.

8    Section 302(a)(2) of the CPLR provides that a court may exercise personal jurisdiction over a non-domiciliary "who in person or through an agent ... commits a tortious act within the state ...." CPLR § 302(a)(2).

9   "[A] court may exercise personal jurisdiction over any non-domiciliary, ... who in person or through an agent ... commits a tortious act without the state causing injury to person or property within the state ... if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce[.]" CPLR § 302(a)(3)(ii). "This provision rests the exercise of jurisdiction on five elements: (1) [t]he defendant committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; (5) the defendant derives substantial revenue from interstate or international commerce." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006) (citing *LaMarca v. Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 [N.Y. 2000]).

10  "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial. But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion." *Lifeguard Licencing Corp.*, 2016 WL 3748480, at *2 (quoting *Marine Midland Bank, N.A.*, 664 F.2d at 904).

11  *See also* *Chloé*, 616 F.3d at 171 ("We conclude that assertion of personal jurisdiction over Ubaldelli comports with due process for the same reasons that it satisfies New York's long-arm statute. Namely, by offering bags for sale to New York consumers on [defendant's] website and by selling bags–including at least one counterfeit Chloé bag–to New York consumers, Ubaldelli has 'purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' ") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 [1985]); *id.* at 173 ("In light of our holding that Chloé 'has made a threshold showing of minimum contacts at the first stage of the inquiry,' Ubaldelli's generalized complaints of inconvenience arising from having to defend himself from suit in New York do not add up to 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.' ") (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 [2d Cir. 1996]) (internal citations and quotation marks omitted).

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3672105
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter RUSYNIAK; and Anthony Rusyniak, Plaintiffs,

v.

Ena Paola GENSINI; Gunilla De Montaigu;
and Concha Futura, S.A., Defendants.

No. 5:07–CV–0279 (GTS/GHL).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Costello, Cooney & Fearon, PLLC, Robert M. Smith, Esq.,
Kristen L. Pickard, Esq., of Counsel, Syracuse, NY, for
Plaintiffs.

Hiscock & Barclay, LLP, Robert A. Barrer, Esq., of Counsel,
Syracuse, NY, for Defendants Gunilla De Montaigu and
Concha Futura, S.A.

Greene, Hershdorfer & Sharpe, Victor J. Hershdorfer, Esq., of
Counsel, Syracuse, NY, for Defendant Ena Paola Gensini.

*MEMORANDUM DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court in the above-
captioned action is a motion by Defendants containing two
alternative requests for relief: (1) a request for reconsideration
of Part III.D.5 of the Court's Decision and Order of May
5, 2009, denying Defendants' request for dismissal of all of
Plaintiffs' claims due to the doctrine of *forum non conveniens;*
and (2) a request for dismissal of the First Cause of Action
of Plaintiffs' Third Amended Complaint (asserting a claim of
violation of Panama law) as barred by the three-year statute of
limitations set forth in the certified translation of Article 1652
of the Panamanian Code. (Dkt. No. 61.) For the reasons set
forth below, Defendants' motion is granted in part, and denied
in part.

**I. REQUEST FOR RECONSIDERATION**
To the extent that Defendants' motion requests
reconsideration of the Court's decision to denying their

request for dismissal of all of Plaintiffs' claims due to the
doctrine of *forum non conveniens,* that motion is untimely.

Defendants' motion was filed on June 8, 2009. (Dkt. No.
61.) The Order of which reconsideration was sought was
entered on May 5, 2009. (Dkt. No. 56.) *See* N.D.N.Y.
L.R. 7.1(g) (setting ten-day deadline for motions for
reconsideration). Defendants' attempt to characterize the
Order of which reconsideration is sought as being the Court's
Text Order of May 29, 2009, is unconvincing. That Text
Order merely indicates the extent to which Plaintiffs' signed
Third Amended Complaint fails to comport with the Court's
Decision and Order of May 5, 2009 (and was issued in
response to Plaintiffs' request for guidance). Even liberally
construed, Defendants' motion for reconsideration expressly
and repeatedly challenges the substance of the Court's Order
of May 5, 2009 (specifically, Part III.D.5. thereof), and only
that Order. (*See, e.g.,* Dkt. No. 61, Part 2, ¶ 4; Dkt. No. 61,
Part 4, Points II and III.)

In any event, even if the Court were to consider the
merits of Defendants' motion for reconsideration, the Court
would deny that motion as without cause: there has been
no intervening change of controlling law, no previously
unavailable evidence, and there exists no clear error of law or
manifest injustice with regard to the relevant portion of the
prior decision in question.

For these reasons, Defendants' request for reconsideration is
denied.

**II. REQUEST FOR DISMISSAL OF FIRST CAUSE OF
ACTION**
To the extent that Defendants' motion alternatively requests
the dismissal of the First Cause of Action of Plaintiffs'
Third Amended Complaint (asserting a claim of violation of
Panama law) as barred by the three-year statute of limitations
set forth in the certified translation of Article 1652 of the
Panamanian Code, that motion is granted.

Defendants are correct that Plaintiffs failed, in their response
papers, to oppose this request. (*See* Dkt. No. 63.) The closest
that Plaintiffs come to opposing this request is when, in a
supplemental letter request, they (correctly) point out that
Defendants have improperly broadened the target of their
Panamanian-statute-of-limitations argument from Plaintiffs'
First Cause of Action to all of Plaintiffs' causes of action.
(Dkt. No. 66; *see also* Dkt. No. 61, Part 4, at 7–8.) As a
result of Plaintiffs' failure to address Defendants' argument

regarding Plaintiffs' First Cause of Action, Defendants' burden on this motion is somewhat lightened with regard to that cause of action. [1]

**\*2** After carefully reviewing the parties' motion papers, and Plaintiffs' Third Amended Complaint, the Court finds that Defendants have met their lightened burden on their motion to dismiss Plaintiff's First Cause of Action. The Court reaches this conclusion based on substance of the certified translation provided by Defendants (i.e., the certified translation of Article 1652 of the Commercial Code of the Republic of Panama). (Dkt. No. 61, Part 3.) The Court reaches this conclusion also based on the reasons stated in Part III.D.7.a. of the Court's Order of May 5, 2009. (*See* Dkt. No. 56, at 44–47.) *See also* 🔖 *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 231–33 (N.D.N.Y.2009) (Suddaby, J.).

For these reasons, Defendants' request to dismiss Plaintiff's First Cause of Action is granted.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion (Dkt. No. 61) is *GRANTED* **in part,** and *DENIED* **in part,** in accordance with the above Decision and Order; and it is further

**ORDERED** that Defendants' motion for reconsideration of the May 5, 2009 Decision and Order is *DENIED,* however, the First Cause of Action of Plaintiffs' Third Amended Complaint (Dkt. No. 58) is *DISMISSED* as barred by the three-year statute of limitations set forth in the certified translation of Article 1652 of the Panamanian Code; and it is further

**ORDERED** that counsel for all parties are directed to attend an in-person pretrial conference on **NOVEMBER 19, 2009 at 2:00 p.m.** in Judge Suddaby's chambers in Syracuse, New York, at which counsel are directed to appear with settlement authority.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3672105

---

## Footnotes

1    *See Cossey v. David,* 04–CV–1501, 2007 WL 3171819, at \*7 (N.D.N.Y. Oct. 29, 2007) (Lowe, M.J. *adopted by* Scullin, J.) (noting that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy "their modest burden of demonstrating entitlement to the relief requested through that argument"); 🔖 *Saunders v. Ricks,* 03–CV–598, 2006 WL 3051792, at \*9 (N.D.N.Y. Oct. 18, 2006) (Lowe, M.J. *adopted by* Hurd, J.) ("By failing to respond to Defendants' first argument ... Plaintiff may be deemed to have consented to that argument under Local Rule of Practice 7.1(b)(3). Thus, Plaintiff's claim against those Defendants may be dismissed on that ground alone [provided that] ... Defendants have met their modest threshold burden to demonstrate entitlement to the relief requested in their motion for summary judgment."); *Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at \*27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ).

---

2009 WL 2473509
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donna ESTE–GREEN, Plaintiff,
v.
Michael J. ASTRUE, Comm'r
of Social Security, Defendant.

No. 5:09–CV–0722 (GTS/GHL).
|
Aug. 7, 2009.

West KeySummary

1    **Social Security** 🔑 Exhaustion of other
remedies

Representative for a social security payee
failed to exhaust her administrative remedies
before filing her claim since there was no
final decision after a hearing. The Social
Security Administration (SSA) garnished the
representative's wages after attempting to work
out a repayment plan since the representative
was overpaid on behalf of the payee. The
representative contacted the SSA to complain
about the garnishment and shortly thereafter, the
representative filed the action with the Small
Claims Court, without having a hearing or final
order from the Commissioner of Social Security.

Social Security Act, § 205(g), 🔖 42 U.S.C.A. §
405(g).

27 Cases that cite this headnote

**Attorneys and Law Firms**

Donna Este–Green, Hempstead, NY, pro se.

Hon. Andrew T. Baxter, United States Attorney for the
Northern District of New York, William H. Pease, Esq.,
Assistant U.S. Attorney, of Counsel, Syracuse, NY.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* action
filed by Donna Este–Green ("Plaintiff") to recover funds
allegedly owed to her by the Social Security Administration,
is a motion by Michael J. Astrue, Commissioner of Social
Security ("Defendant") to dismiss the action pursuant
to 🔖 Fed.R.Civ.P. 12(b)(1) for lack of subject matter
jurisdiction due to Plaintiff's failure to exhaust her
administrative remedies before filing suit. (Dkt. No. 3.)
Plaintiff has not opposed the motion. For the reasons set
forth below, Defendant's motion is granted, and Plaintiff's
Complaint is dismissed.

**I. BACKGROUND**

**A. Procedural History**
On or around May 27, 2009, Plaintiff brought this
action in Small Claims Court, City of Ithaca, County
of Tompkins ("Small Claims Court"), naming the Social
Security Administration ("SSA") as Defendant. (Dkt. No. 1,
Part 3.) Liberally construed, Plaintiff's Complaint alleges that
the SSA wrongfully garnished her wages in the amount of
five hundred seventy-one dollars ($571.00). (*Id.*) On June 24,
2009, the United States Attorney's Office for the Northern
District of New York removed this case from the Small
Claims Court, pursuant to the exclusive original jurisdiction
of the District Court under 🔖 42 U.S.C. §§ 405(g)-(h)
and 🔖 1383(c)(3), "because Plaintiff's claim appeared to
relate to the payment of Social Security benefits to her as
representative payee for the account of Albertina King." (Dkt.
No. 3.)

**B. Relevant Facts**
In 1999, Plaintiff had been acting as representative payee
for Albertina King, who had been receiving Social Security
benefits under Title II of the Act. (Dkt. No. 3.) In October
1999, the SSA issued an overpayment to Plaintiff on Albertina
King's account. (*Id.*) In March 2001, the SSA and Plaintiff
arranged a repayment plan pursuant to which Plaintiff agreed
to repay the amount due the SSA in fifty-dollar installments
beginning on April 15, 2001. (*Id.*) In October 2007, the
SSA sent a letter to Plaintiff, in which the SSA stated the

following: (1) Plaintiff had been overpaid as representative payee; (2) Plaintiff had the right to question the decision about her overpayment and to ask that the SSA not recover the overpayment; (3) the SSA's past attempts to recover this overpayment had not been successful; (4) there are actions that the SSA can take to recover the money, including wage garnishment; (5) Plaintiff could prevent the wage garnishment by taking certain steps within sixty days of the letter, including repaying the debt, agreeing to a definite repayment plan and repaying the debt according to that plan, asking the SSA to review the finding that she owed the amount stated and that the SSA had the right to collect it, asking the SSA to waive collection of the overpayment, or asking the SSA to review its plan to collect up to fifteen percent of her disposable pay. (*Id.*) In addition, the letter informed Plaintiff of how she could repay the SSA. (*Id.*)

**\*2** Plaintiff returned this letter to the SSA, stating that the overpayment was not her fault. (*Id.*) Plaintiff indicated that she could not afford the amount owed, and that the money that she received was used for the payee's burial. (*Id.*) In March, 2008, Plaintiff spoke with a supervisor of the SSA by telephone and negotiated a repayment plan agreement for installments of twenty dollars ($20). (*Id.*) On April 29, 2008, the SSA sent Plaintiff a billing statement indicating her debt of five hundred seventy-one dollars ($571), and that a minimum payment of twenty dollars ($20) must reach the SSA by May 15, 2008. (*Id.*) On May 6, 2008, documentation issued in connection with the administrative garnishment of Plaintiff's wages was returned to the SSA from Plaintiff's employer, stating that Plaintiff was no longer employed there. (*Id.*)

On April 17, 2009, the SSA issued an order to Plaintiff's employer to garnish her wages. (*Id.*) Plaintiff's employer completed this order and returned it to the SSA. (*Id.*) On May 21, 2009, Plaintiff contacted the SSA to complain about the garnishment. (*Id.*) Shortly thereafter, Plaintiff filed this action with the Small Claims Court, and the Complaint was mailed to the SSA on May 27, 2009.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d

Cir.2000) (citing Fed.R.Civ.P. 12[b][1] ). With regard to a challenge to a determination by the Social Security Administration, "[a]ny individual may seek judicial review under 42 U.S.C. § 405(g) 'after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy.'" *Diagnostic Cardioline Monitoring of New York, Inc. v. Leavitt,* 171 F. App'x. 374, 375 (2d Cir. March 17, 2006) (citing 42 U.S.C. § 405[g] ). "This final-decision-after-a-hearing requirement is critical to the federal court's grant of subject matter jurisdiction over these claims." *Leavitt,* 171 F. App'x. at 375 (citing *Weinberger v. Salfi,* 422 U.S. 749, 763–64 [1975] ). "In the absence of a final decision after a hearing, the federal court lacks subject matter jurisdiction to entertain the claim, and it must be dismissed." *Id.* (citation omitted).

### B. Standard Governing Unopposed Motions

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Defendant's motion to dismiss was properly filed, and Plaintiff has failed to oppose them. Therefore, the Court must determine whether Defendant has met her burden to "demonstrate entitlement to the relief requested" under Local Rule 7.1(b)(3). [1] An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1(b)(3) is a more limited endeavor than a review of a contested motion. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [3]

## III. ANALYSIS

**\*3** After carefully considering the file in this action, including Defendant's motion to dismiss and Plaintiff's Complaint, the Court finds that Defendant has met his lightened burden on his unopposed motion: he has demonstrated entitlement to the relief requested by presenting an argument that is facially meritorious. Even if the Court were to subject Defendant's motion to the more rigorous

scrutiny appropriate for contested motions, the Court would find that Defendant has met his burden: Plaintiff failed to exhaust her administrative remedies prior to commencing this action. [4] As a result, the Court lacks subject matter jurisdiction over Plaintiff's claims, and her Complaint is dismissed.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Complaint is ***DISMISSED.*** The clerk is directed to enter judgment and close the case.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2473509

---

### Footnotes

1    *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

2    *See, e.g., Ciaprazi v. Goord,* 02–CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03–CV–0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.), *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report–Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109–1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96–CV–1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95–CV–989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

3    *See, e.g., Hernandez v. Nash,* 00–CV–1564, 2003 U.S. Dist. LEXIS 16258, at *7–8, 2003 WL 22143709(N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord,* *Topliff v. Wal–Mart Stores East LP,* 04–CV–0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05–CV–0380, 2007 U.S. Dist. LEXIS 24356, at *5–6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04–CV–1311, 2007 U.S. Dist. LEXIS 26583, at *28–29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03–CV–0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

4    As noted by Defendant in his motion to dismiss, because Plaintiff failed to follow the required SSA regulations before bringing this action, there is no final decision for the Court to review under 42 U.S.C. § 405(g).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 94 of 396

2019 WL 6493971
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Darrell CHAPMAN, also known as
Darrell Bishop Chapman, Plaintiff,
v.
John DOE (ONE), et al., Defendants.

9:19-CV-1257 (GTS/CFH)
|
Signed 12/03/2019

**Attorneys and Law Firms**

DARRELL CHAPMAN, 43749, Plaintiff, pro se, Albany County Correctional Facility, 840 Albany Shaker Road, Albany, NY 12211.

**DECISION AND ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a pro se civil rights Complaint filed by plaintiff Darrell Chapman ("Plaintiff") pursuant to 42 U.S.C. § 1983 and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. Dkt. No. 1 ("Compl."). Plaintiff, who is presently confined at Albany County Correctional Facility ("Albany County C.F."), paid the full filing fee of $400.00.

**II. SUFFICIENCY OF THE COMPLAINT**

**A. Standard of Review**

Under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

When reviewing a complaint, the court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading that sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at \*1 (S.D.N.Y. Nov. 30, 1998) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. Rule Civ. Proc. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

**\*2** While pro se parties are held to less stringent pleading standards, the Second Circuit has held that "district courts may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee." *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). Indeed, "district courts are especially likely to be exposed to frivolous actions and, thus, have [a] need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources." *Id.* at 364. A cause of action is properly deemed frivolous "where it lacks an

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 95 of 396

arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

**B. Summary of the Complaint**

The incidents that form the foundation for the Complaint occurred while Plaintiff was confined, as a pretrial detainee, at Albany County C.F. *See* Compl. at 4, 5. The following facts are set forth as alleged by Plaintiff in his Complaint.

On September 27, 2019, Plaintiff was a passenger in a prison van operated by defendants John Doe #1 and John Doe #2, employees of Albany County C.F. Compl. at 5. Plaintiff, and seven other detainees, were being transported from Albany C.F. to Court. *Id.* While en route to Court, Plaintiff observed Defendants driving at unsafe speeds, while operating cell phones, and "tailgating." *Id.* Before the return trip to Albany County C.F., Plaintiff asked Defendants to fasten his seatbelt. *Id.* Plaintiff, who was shackled at the ankles and handcuff with a waist chain, was unable to fasten his own seatbelt. Compl. at 6. Defendants refused and told Plaintiff to "sit back and be quiet." *Id.* Plaintiff again observed John Doe #1 was driving at unsafe speeds, handling his cell phone, and changing lanes in an unsafe manner. *Id.* Plaintiff yelled to Defendants to "slow down," but was told to "shut the hell up." *Id.*

While traveling to Albany County C.F., the van was involved in a collision with another motor vehicle when John Doe #1 "excellerated [sic] in an effort to cut [a] car off and prevent the car from being in front of the van and slowing it down[.] Compl. at 6. The impact caused Plaintiff to be "violently tossed from his seat head first into a metal security gate covering the window[.]" *Id.*

Several hours after the accident, Plaintiff was transported to the hospital. Compl. at 6. When Plaintiff arrived at the hospital, John Doe #1 and John Doe #2 refused to remove his restraints to allow the medical staff to examine Plaintiff. *Id.* at 7. The medical staff monitored Plaintiff's blood pressure and heart rate. *Id.*

For five days after the accident, Plaintiff completed "sick call requests" complaining of severe back pain, neck pain, pain in his foot/ankle, and headaches. Compl. at 7. On October 3, 2019, Plaintiff was seen by Defendant Jane Doe, an employee of the Albany County medical staff. *Id.* Plaintiff told Jane Doe that he believed he had a "concussion from hitting [his] head during the crash." *Id.* Plaintiff asked for X-rays, CAT scans and/or MRI films. *Id.* Jane Doe ordered X-rays and prescribed

Motrin. Compl. at 7. Jane Doe denied Plaintiff's request for a back brace, a second mattress, and an appointment with a doctor. *Id.* at 8.

Construing the Complaint liberally [1], Plaintiff asserts the following claims: (1) deliberate indifference claims against John Doe #1 and John Doe #2 related to the motor vehicle accident; (2) deliberate medical indifference claims against John Doe #1, John Doe #2, and Jane Doe; and (3) failure-to-protect claims against Albany County C.F.; and (4) claims, pursuant to the FTCA, against the United States Marshal Service ("USMS"). *See* Compl. at 9-10. Plaintiff seeks monetary damages. *See id.* at 11-12.

**\*3** For a more complete statement of Plaintiff's claims, reference is made to the Complaint.

**C. Nature of Action**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 (" Section 1983"), which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990); *see also Myers v. Wollowitz,* No. 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that "[ Section] 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). " Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993).

The Court will construe the allegations in the Complaint with the utmost leniency. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**III. ANALYSIS**

**A.  Section 1983 Claims**

**1. Fourteenth Amendment Claims**

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 96 of 396

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

Because Plaintiff was confined as a pretrial detainee, his deliberate indifference claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See* Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. Such a claim is typically analyzed under a two-pronged standard. First, the pretrial detainee must satisfy the "objective prong" showing that the conditions were "sufficiently serious" as to constitute objective deprivations of constitutional rights. *Id.* at 29. To satisfy the objective prong, " 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.' " *Id.* (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013); LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972)). The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment. *Darnell*, 849 F.3d at 30.

Second, the pretrial detainee must satisfy the "subjective prong" by showing that the officer acted with deliberate indifference to the challenged conditions. *Darnell*, 849 F.3d at 29. As to the "mens rea" prong, a pretrial detainee must allege facts showing that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

In Bruno v. City of Schenectady, 2018 WL 1357377 (2d Cir. 2018), the Second Circuit, applied *Darnell* to a deliberate medical indifference claim and held, "an official does not act in a deliberately indifferent manner toward an arrestee unless the official 'acted *intentionally* to impose the alleged condition, or *recklessly* failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should

have known, that the condition posed an excessive risk to health or safety.' " *Id.* (emphasis supplied).

### a. Claims Against John Doe #1 and John Doe #2

**\*4** Plaintiff claims that John Doe #1 and John Doe #2 were deliberately indifferent to his safety and medical needs. *See* Compl. at 9.

"[M]otor-vehicle accidents, by themselves, do not implicate the Constitution's protections, and 'allegations of a public official driving too fast for the road conditions are grounded in negligence' and are therefore not actionable under Section 1983." Cuffee v. City of New York, No. 15CV8916, 2017 WL 1232737, at \*7 (S.D.N.Y. Mar. 3, 2017), *adopted*, 2017 WL 1134768 (S.D.N.Y. Mar. 27, 2017). Moreover, "the failure to provide a seatbelt is not, in itself, 'sufficiently serious' to constitute an Eighth [or Fourteenth] Amendment violation." Jabbar v. Fischer, 683 F.3d 54, 58 (2d Cir. 2012). "[A]n in-custody plaintiff injured during transport may, however, state a deliberate-indifference claim if he or she alleges facts in addition to the absence of seatbelts and reckless driving, that, taken as a whole, suggest that the plaintiff was exposed to conditions posing an unreasonable risk of serious harm, and that the defendants were aware of those conditions." *Cuffee*, 2017 WL 1232737, at \*7.

Here, the Complaint contains facts plausibly suggesting that John Doe #1 and John Doe #2 were deliberately indifferent to an excessive risk to Plaintiff's safety. *See* Torres v. Amato, 22 F.Supp.3d 166, 174 (N.D.N.Y. 2014) ("[E]vidence of the defendant's refusal to secure the plaintiff's seatbelt, combined with the defendant's reckless driving [may be] sufficient for a jury to 'conclude that there was a substantial risk of harm to the plaintiff and that the defendant knew of and disregarded the substantial risk of harm.' ") (citing Rogers v. Boatright, 709 F.3d 403 (5th Cir. 2013)); *see also Cuffee,* 2017 WL 1232737, at \*8 (denying motion to dismiss where the plaintiff plead that the officer drove recklessly, at an excessive speed, with knowledge that the plaintiff was not wearing a seatbelt).

Thus, the Court finds that Plaintiff's Fourteenth Amendment deliberate indifference claims against John Doe #1 and John Doe #2, related to Plaintiff's safety, survive sua sponte review and require a response. In so ruling, the Court expresses no

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 97 of 396

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

A different conclusion is reached however, with respect to Plaintiff's medical claims against John Doe #1 and John Doe #2. While Plaintiff alleges that John Doe #1 and John Doe #2 refused to remove his restraints, he does not allege how the restraints impeded any examination or treatment, nor does he allege that he suffered any injury as a result. *See* Shell v. Brzezniak, 365 F.Supp.2d 362, 378 (W.D.N.Y. 2005) (dismissing the plaintiff's Eighth Amendment claim against officer because decision to refuse to allow medical staff to remove handcuffs did not pose an excessive risk to the plaintiff's health or safety). Accordingly, Plaintiff's Fourteenth Amendment medical indifference claims against John Doe #1 and John Doe #2 are dismissed, without prejudice, pursuant to 28 U.S.C. § 1915A for failure to state a claim.

**b. Claims Against Jane Doe**

**\*5** Even assuming that Plaintiff suffered from a serious medical need, Plaintiff does not set forth facts to infer that Jane Doe acted with a culpable state of mind. Plaintiff admits that Jane Doe ordered X-rays and prescribed medication for his headaches, neck pain, and back pain. *See* Compl. at 7. Plaintiff claims that Jane Doe denied his request for a second mattress, back brace, to see a doctor, and CAT scan/ MRI films. *See id.* at 7-8. These allegations amount to a disagreement with the nature of treatment and not a violation of Plaintiff's constitutional rights. *See* Wright v. Conway, No. 05-CV-6723, 584 F.Supp.2d 604, 607 (W.D.N.Y. Nov. 5, 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed.");

*see* Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g. the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") (citation omitted).

Even if Jane Doe's decisions surrounding Plaintiff's treatment implicate medical malpractice or negligence, the issues do not give rise to a Fourteenth Amendment violation.

*See* Charles v. Orange Cty., 925 F.3d 73, 87 (2d Cir. 2019) (holding that "something more than mere negligence" and "mere medical malpractice" is necessary to establish deliberate indifference in the Fourteenth Amendment context) (citation omitted).

For these reasons, Plaintiff's medical indifference claims against Jane Doe are dismissed without prejudice pursuant to 28 U.S.C. § 1915A for failure to state a claim. [2]

**2. Sovereign Immunity**

Plaintiff asserts Section 1983 claims against Albany County C.F. and the USMS for failure to protect him from Does' deliberate indifference. *See* Compl. at 10. The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); Hans v. Louisiana, 134 U.S. 1, 10-21 (1890); Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 267 (1997); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. Gollomp v. Spitzer, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see* Quern v. Jordan, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally* Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir. 1977); Dawkins v. State of New York, No. 93-CV-1298 (RSP/GJD), 1996 WL 156764 at \*2 (N.D.N.Y. 1996). Actions for damages against a state official in his or her official capacity are essentially actions against the state. *See* Will v. Mich. Dep't. of State Police, 491 U.S. 58, 71 (1989).

**\*6** Plaintiff's claims for monetary damages against Albany County C.F. are dismissed, with prejudice, pursuant to 28 U.S.C. § 1915A as Plaintiff seeks relief from a defendant

**Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)**

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 98 of 396

immune from suit under 🔶 section 1983. *See Richardson v. Nassau Cty.,* 277 F.Supp.2d 196, 204 (E.D.N.Y. 2003); *see also Simmons v. Gowanda Corr. Facility,* No. 13-CV-0647, 2013 WL 3340646, at \*2 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v.* 🔶 *Court Officer Shield No. 207,* 180 F.3d 409, 411 (2d Cir. 1999)).

Moreover, the United States has sovereign immunity. 🔶 *U.S. Dep't of Energy v. Ohio,* 503 U.S. 607, 615 (1992). Therefore, to the extent that the Complaint could be construed to include a 🔶 Section 1983 claim against the USMS, that claim is dismissed with prejudice. *Toomer v. Cty. of Nassau,* No. 07-CV-01495, 2009 WL 1269946, at \*10 (E.D.N.Y. May 5, 2009); *see also Queen v. U.S. Bureau of Prisons,* No. CIV-09-883, 2010 WL 455175, at \*2 (W.D. Okla. Feb. 2, 2010) (holding that the USMS enjoy sovereign immunity from a 1983 action) (citation omitted).

**B. FTCA**

Plaintiff asserts claims, pursuant to the FTCA, alleging that the USMS failed to protect him from Does' deliberate indifference. *See* Compl. at 10. The FTCA constitutes a waiver of the Government's sovereign immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the laws of the place where the act or omission occurred." 🔶 28 U.S.C. § 1346(b)(1). The statute of limitations for actions brought pursuant to the FTCA is set forth in 28 U.S.C. § 2401(b), which provides that:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b). The only proper defendant to an action under the FTCA is the United States. *See* ⚠️ *Watts v. U.S. Federal Bureau of Prisons,* No. 9:07-CV-773, 2009 WL 81285, at \*4 & n. 1 (N.D.N.Y. Sep. 30, 2008) (Peebles, M.J.) (citing cases), *adopted,* ⚠️ 2009 WL 81285, at \*1 (N.D.N.Y. Jan. 9, 2009) (Hurd, J.). Tort claims, such as claims of medical malpractice, are actionable under the FTCA. 🔶 *United States v. Kubrick,* 444 U.S. 111 (1979).

It is clear that "[u]nder the FTCA, before a claimant can file suit, he or she must first present the claim to the appropriate federal agency ... within two years of the date the claim accrued." 🔶 *Phillips v. Generations Family Health Ctr.,* 723 F.3d 144, 147 (2d Cir. 2013) (citing 28 U.S.C. § 2675(a)). "The claimant can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a decision within six months after the claim was filed)." *Id.* (citing 28 U.S.C. § 2675(a)). In other words, the FTCA requires a plaintiff to exhaust all administrative remedies before filing suit in federal court. 🔶 *Celestine v. Mount Vernon Health Ctr.,* 403 F.3d 76, 82 (2d Cir. 2005).

**\*7** Here, the Complaint lacks facts suggesting that Plaintiff filed an administrative claim with the USMS or any other federal agency and therefore, no cause of action exists based on the statements in Plaintiff's Complaint. Accordingly, Plaintiff's FTCA claims against the USMS are dismissed, without prejudice. *See Toomer,* 2009 WL 1269946, at \*12 (dismissing the plaintiff's claims against the USMS (or the United States as liberally construed) due to failure to exhaust under the FTCA).

In light of Plaintiff's status as a pro se litigant, the Court has also considered whether the Complaint states claims cognizable under 🔶 *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). *Bivens* actions, although not precisely parallel to actions pursuant to 🔶 42 U.S.C. § 1983 against state actors, are the analog to such actions; and the constitutional standard of review is the same for either type of action. *Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir. 1995) (per curiam). Thus, federal courts have

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 99 of 396

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

"typically incorporated 🚩 § 1983 law into *Bivens* actions." *Tavarez, 54 F.3d at 110.*

However, claims for monetary damages under *Bivens* may not be brought against the United States, federal agencies, or federal agents in their official capacities. *See* 🚩 *Bivens, 403 U.S. at 410; Petrazzoulo v. U.S. Marshals Serv., 999 F. Supp. 401, 406 (W.D.N.Y. 1998)* (dismissing *Bivens* claim against the USMS, a federal agency); 🚩 *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994)* (holding that a *Bivens* action "must be brought against the federal officers involved in their individual capacities[.]").

Consequently, Plaintiff's *Bivens* claim for monetary damages against the USMS is dismissed with prejudice.

### C. Service Issues

Because Plaintiff has paid the filing fee, he is responsible for serving the summonses and Complaint on Defendants. However, despite finding that a response to the Complaint is required, there is an impediment to service. The only remaining defendants are John Doe defendants whose identities are not presently known. Under normal circumstances, when a pro se plaintiff includes Doe defendants, together with named defendants, the Complaint is served upon the named defendants and the plaintiff pursues discovery to identify the Doe defendants. In this case, however, Plaintiff has not identified *any* defendant by name.

In light of the foregoing, the Clerk of Court shall send a copy of the Complaint and this Decision and Order to the Office of the County Attorney for Albany County. Pursuant to 🚩 *Valentin v. Dinkins, 121 F.3d 72 (2d. Cir. 1997)* (per curiam), the Court requests that the County Attorney's Office attempt to ascertain the full name of the defendants. [3] The County Attorney's Office is also requested, to the extent that it is able to identify the defendants, to provide the address where the defendants can currently be served. The County Attorney need not undertake to defend or indemnify these individuals at this juncture. This order merely provides a means by which Plaintiff may name and properly serve the defendants as instructed by the Second Circuit in *Valentin.*

### IV. CONCLUSION
**WHEREFORE**, it is hereby

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) 🚩 Section 1983 claims against Albany County Correctional Facility and the USMS; and (2) *Bivens* claims against the USMS; and it is further

**\*8 ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted: (1) Fourteenth Amendment medical claims against John Doe #1, John Doe #2, and Jane Doe; and (2) FTCA claims against the USMS [4] ; and it is further

**ORDERED** that Albany County C.F., the USMS, and Jane Doe are **DISMISSED** as defendants herein; and it is further

**ORDERED** that the Fourteenth Amendment deliberate indifference claim, related to Plaintiff's safety, against John Doe #1 and John Doe #2 survive the Court's sua sponte review under 28 U.S.C. § 1915A and require a response; and it is further

**ORDERED** that the Office of the County Attorney for Albany County is hereby requested to produce the information specified above, to the extent that it can, regarding the identity of the defendants within thirty (30) days of the filing date of this Decision and Order. The information should be sent to the Clerk of the Court for the Northern District of New York along with a copy of this Decision and Order, as well as to Plaintiff at his address of record. Once this information is provided, the Clerk shall return this file to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

### All Citations

Not Reported in Fed. Supp., 2019 WL 6493971

## Footnotes

1    The Court is mindful of the Second Circuit's instruction that a pleading by a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that it suggests. *See, e.g.,* 🚩 *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts" that a pro se plaintiff's pleadings must be construed liberally); 🚩 *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."); 🚩 *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.").

2    To the extent that the Complaint could be read to include a Fourteenth Amendment claim against the "Medical Staff," *see* Compl. at 10, that claim is dismissed for failure to state a claim upon which relief may be granted. Only "persons" may act under the color of state law, a defendant in a 🚩 § 1983 action must qualify as a "person." The use of the term, "Medical Staff" as a name for alleged defendants, without naming specific staff members, is not adequate to state a claim against a "person" as required in 🚩 § 1983 actions. *See Martin v. UConn Health Care,* 99-CV-2158, 2000 WL 303262, at *1-2 (D. Conn. Feb. 9, 2000); *Ferguson v. Morgan,* No. 90 Civ. 6318, 1991 WL 115759, at *1 (S.D.N.Y. June 20, 1991) (holding that Otisville Correctional Facility medical staff not a person under 🚩 § 1983).

3    In 🚩 *Valentin,* 121 F.3d at 75-75, the Second Circuit held that district courts must assist pro se incarcerated litigants with their inquiry into the identities of unknown defendants.

4    If Plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 869585
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Rona HERTZNER, Plaintiff,
v.
UNITED STATES POSTAL SERVICE,
John E. Potter, Postmaster General, Richard
Kitson, and Jeff Smith, Defendants.

No. 05–cv–2371 (DRH)(ARL).
|
March 20, 2007.

**Attorneys and Law Firms**

Law Office of Frederick K. Brewington, by Frederick K. Brewington, Esq., Hempstead, NY, for Plaintiff.

United States Attorneys Office, Eastern District of New York, by James Halleron Knapp, Esq., Central Islip, NY, for Defendants, United States Postal Service and John E. Potter, Postmaster General.

***MEMORANDUM & ORDER***

On Motion to Dismiss (doc. # 18)

HURLEY, Senior District Judge.

**\*1** Plaintiff Rona Hertzner ("Plaintiff" or "Hertzner") brings a complaint of employment discrimination, retaliation and hostile work environment based on gender, religion, disability, and perceived sexual orientation against Defendants United States Postal Service ("USPS" or "Postal Service"), Postmaster General John E. Potter ("Potter"), Richard Kitson, Postmaster of the Farmingdale, New York post office ("Kitson"), and Jeff Smith, a Senior Labor Relations Specialist with the Postal Service ("Smith"). The Complaint states four causes of action: a Title VII cause of action, an American with Disabilities Act cause of action, a constitutional cause of action for violations of the First, Fifth and Fourteenth Amendments, and a § 1983 cause of action for municipal violations. Defendants USPS and Potter (the "Moving Defendants") move to dismiss Plaintiff's Complaint in its entirety claiming (1) improper service pursuant to

Federal Rule of Civil Procedure 12(b)(5), and (2) failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(5). For the reasons stated, *infra,* Moving Defendants' Motion to Dismiss is GRANTED.

**I. BACKGROUND**

On a motion for dismissal, a court must accept as true all facts alleged in a plaintiff's complaint and must draw all inferences in favor of the plaintiff. *See Twombly v. Bell Atlantic Corp., 425 F.3d 99, 106 (2d Cir.2005)* (citing *Todd v. Exxon Corp., 275 F.3d 191, 197 (2d Cir.2001)*). Thus, this summary of facts is based on the Plaintiff's Amended Complaint (doc. # 2).

In January 1987, Plaintiff Hertzner began working for the Postal Service at its Farmingdale, New York facility. There, Plaintiff alleges she was harassed, humiliated, degraded, and intimidated by co-workers because of her religion (Judaism), gender (female) and perceived sexual orientation (homosexual). Plaintiff complained of this treatment to her supervisors and the Postal Service's Equal Employment Office to no avail. Her exposure to this treatment caused Plaintiff to develop "Major Depression Recurrent, Post Traumatic Stress Disorder" (Pl.'s Am. Compl. at ¶ 18). Eventually, "[b]ecause of the extreme hostile work environment, Plaintiffs [*sic* ] mental health situation deteriorated, forcing Plaintiff to take an unpaid medical leave of absence in or about April 1999." (*Id.* at ¶ 20.)

In early June 2001, Plaintiff was notified by letter of Defendant Kitson that she was the successful bidder for a position in the Farmingdale post office. This June 6th letter also advised Hertzner that she was " 'required to submit medical documentation showing that [she was] able to return to full duty within six (6) months.' " (*Id.* at ¶ 21.) While the Amended Complaint indicates Plaintiff responded to Kitson's letter on June 10, 2001, it does not indicate the contents of the response letter. (*See id.*) Yet, for reasons not made known to the Court, Kitson advised Plaintiff—in a letter dated June 15, 2001—that her acceptance letter was "deemed unacceptable". (*Id.*) In a follow-up letter dated June 19, 2001, "Kitson notified Plaintiff of his proposal to separate Plaintiff from her employment with Defendant USPS because she had been out on medical leave for more than one year." (*Id.* at ¶ 22.) Thereafter, on July 11, 2001, through her then-attorney,

Plaintiff sent Kitson a letter stating that she could return to work if the Postal Service could provide a "workplace free from sexual harassment and gender and/or sexually motivated or infused humor and comments." (*Id.*). In response, on July 23, 2001, Kitson sent a letter stating the Postal Service's no-tolerance policy, but not indicating a plan of accommodation for Plaintiff's disability. (*See id.* at ¶ 23). Hertzner contacted Kitson on August 10, 2001, to advise him that she had changed physicians and that her new psychiatrist needed additional time to perform a full evaluation of Hertzner before being able to advise her to return to work. Shortly thereafter, on August 14, 2001, Kitson decided to separate Plaintiff from her employment with the USPS.

**\*2** In January 2003, Plaintiff filed a Charge of Discrimination Case against the Defendants with the Postal Service's Equal Employment Opportunity office. Plaintiff received a Notice of Right to Sue Within 90 Days on February 16, 2005. On May 17, 2005, Hertzner filed her initial complaint commencing this case. There is no record evidence that the May 17th complaint was served. Rather, the case docket evidences that Plaintiff filed her Amended Complaint (*i.e.,* the Complaint subject to the instant Motion to Dismiss) on June 30, 2005. [1]

The case docket contains a July 19, 2005 entry for a "SUMMONS Returned Executed" (*see* doc. # 3) and a July 20, 2005 entry for a "SUMMONS Returned Executed" (*see* doc. # 4). Document # 3 is an Affidavit of Service purporting service of Plaintiff's Amended Complaint, together with a Summons, on Defendants Kitson and Smith on July 19, 2005, at the Farmingdale Postal Service building located at 318 Main Street in Farmingdale, New York. Document # 4 is actually two Affidavits of Service purporting service of Plaintiff's Amended Complaint with the corresponding Summons on (1) the United States Postal Service and (2) on Postmaster General John E. Potter, both at 475 L'Enfant Plaza, SW, Washington, D.C. These affidavits indicate service on July 14, 2005. (*See* doc. # 4.)

Further, the Court takes judicial notice of the following facts. In May 1999 and represented by her current counsel, Plaintiff filed a prior employment discrimination case against the then-Postmaster General, the USPS, the Equal Employment Office of the USPS, the Farmingdale post office postmaster and a supervisor, as well as five employees of the Farmingdale post office. *See Hertzner v. Henderson,* No. 99–CV–2544 (JM) (E.D.N.Y.1999) (hereinafter, "*Hertzner I*"). In addition to a cause of action under Title VII, Plaintiff alleged causes

of action under § 1983 and under various New York State statutory and common laws. All defendants moved to dismiss Hertzner's 1999 complaint with prejudice except for her Title VII cause of action against then U.S. Postmaster General Henderson. Plaintiff opposed the dismissal motion and cross moved to amend her 1999 compliant and to be able to cure service defects. In a February 14, 2000, Memorandum of Decision and Order, Judge Mishler determined that: (1) pursuant to 42 U.S.C. § 2000e–16c, the court lacked subject jurisdiction over the individual defendants and Hertzner "concede[d] that the joinder of the individual defendants was inappropriate," *Hertzner I,* slip op. at 2–3 (E.D.N.Y. Feb. 14, 2000), and (2) pursuant to Federal Rules of Civil Procedure 4(I) and 4(m), "[s]ervice of process was not made on the Postmaster General," *id.* at 3–5. The court stated: "In the instant case, the plaintiff's failure to make proper service occurred as a result of the plaintiff's counsel's error. This does not constitute a justifiable excuse for the failure to make proper service." *Id.* at 7. The court also found the Government "did not mislead the plaintiff or act improperly." *Id.* Thus, the court denied Hertzner's complaint in its entirety and with prejudice. *See id.* at 8.

## II. DISCUSSION

### A. Rule 12(b)(5) *Motion to Dismiss Standard of Review*

**\*3** Where a defendant moves for dismissal under Rules 12(b)(2), (5), and (6), "the Court must first address the preliminary questions of service and personal jurisdiction." *Mende v. Milestone Tech., Inc.,* 269 F.Supp.2d 246, 251 (S.D.N.Y.2003) (citing *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 221 (2d Cir.1963) ("logic compel[s] initial consideration of the issue of jurisdiction over the defendant —a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim")). Where a court is presented with a Rule 12(b)(5) dismissal motion arguing insufficiency of process, " 'a Court must look to matters outside the complaint to determine whether it has jurisdiction.' " *Id.* (quoting *Darden v. DaimlerChrysler N. Am. Holding Corp.,* 191 F.Supp.2d 382, 387 (S.D.N.Y.2002)). " 'Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process.' " *Id.* (quoting *Howard v. Klynveld Peat Mrwick Goerdeler,* 977

F.Supp. 654, 658 (S.D.N.Y.1997), *aff'd,* 173 F.3d 855 (2d Cir.1999). When a defendant makes a Rule 12(b)(5) motion, it is the plaintiff's burden of proof to establish its service of process was adequate. *See Preston v. New York,* 233 F.Supp.2d 452, 466 (S.D.N.Y.2002).

**B.** *Rule 12(b)(6) Motion to Dismiss Standard of Review*

When presented with a Rule 12(b)(6) motion to dismiss, a court must accept as true all facts alleged by the plaintiff in his complaint. *Twombly,* 425 F.3d at 106. Likewise, the court must draw all inferences in favor of the plaintiff. *Id.; see also Dangler v. N.Y. City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999) ("In ruling on [a motion for dismissal], the court is to look only to the allegations of the complaint and any documents attached to or incorporated by reference in the complaint to assume all well-pleaded factual allegations to be true, and to view all reasonable inferences that can be drawn from such allegations and documents in the light most favorable to the plaintiff.") (internal citations omitted). "A complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* (quoting *Todd v. Exxon,* 275 F.3d at 197) (further citation omitted). Yet, "[a] plaintiff must allege ... those facts necessary to a finding of liability." *Armon v. Morgan Stanley Inv. Advisors, Inc.,* 464 F .3d 338, 343 (2d Cir.2006) (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346–47 (2005)) (emphasis in original). "At the pleading stage ... the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N. Y.,* 375 F.3d 168, 177 (2d Cir.2004) (citation, brackets, and internal quotation marks omitted)) (ellipses in Twombly).

**C. The Instant Motion to Dismiss Pursuant to Rule 12(b)(5)**

**\*4** Since the Moving Defendants moved for dismissal pursuant to Rules 12(b)(5) and (6), the Court will first address the issue of service, *i.e.,* Moving Defendants' Rule 12(b)(5) arguments. As the plaintiff herein and in order to defeat the Moving Defendants' Motion to Dismiss, it is

Hertzner's burden of proof to establish that her service of process was proper and timely. To do so, Hertzner must show she has satisfied the requirements of both Rule (4)(i) and Rule (4)(m).

**1. Rule (4)(i)**

Since one of the Moving Defendants is an agency of the United States (*i.e.,* the USPS) and the other Moving Defendant is an Officer of the United States (*i.e.,* Postmaster General Potter), Federal Rule of Civil Procedure 4(i)(1) applies. That Rule reads:

(1) Service upon the United States shall be effected

(A) by delivering a copy of the summons and of the complaint to the United States attorney for the district in which the action is brought or to an assistant United States attorney or clerical employee designated by the United States attorney in a writing filed with the clerk of the court or by sending a copy of the summons and of the complaint by registered or certified mail addressed to the civil process clerk at the office of the United States attorney *and*

(B) *by also* sending a copy of the summons and of the complaint by registered or certified mail to the Attorney General of the United States at Washington, District of Columbia

...

Fed.R.Civ.P. 4(i)(1)(A) and (B) (emphasis added). Looking to matters outside of Plaintiff's Amended Complaint to determine if Hertzner has met her burden of establishing service on the proper parties as required by the Federal Rules, the Court finds she has failed to meet her burden. Indeed, Plaintiff offers no competent evidence that overcomes the Declaration submitted by the Moving Defendants. *See Mende,* 269 F.Supp.2d at 251 (requiring more than conclusory statements to overcome defendant's sworn affidavit that he was never served with process).

The Moving Defendants submit the Declaration of Assistant U.S. Attorney James H. Knapp, of counsel to Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York. Knapp's Declaration supports the Moving Defendants' position that the proper parties—*i.e.,* the U.S. Attorney's Office for the Eastern District of New York and the U.S. Attorney General—were never properly served with process. (*See* Knapp Decl., doc. # 20.) Made pursuant to 28 U.S.C. § 1746, Knapp's Declaration states that Plaintiff's

Amended Complaint was received by the Eastern District U.S. Attorney's Office on August 23, 2005, *via facsimile from the USPS. (See id.* at ¶ 2.) Mistakenly believing the Amended Complaint had been properly served on the Eastern District U.S. Attorney's Office, Knapp contacted Plaintiff's counsel to discuss a possible extension to reply to the Amended Complaint. (*See id.* at ¶ 3.) However, Knapp "subsequently learned that plaintiff had in fact failed to properly serve either the initial complaint or the amended complaint on the [U.S. Attorney's Office]." (*Id.* at ¶ 4.) In a follow-up telephone conversation on August 23rd with Plaintiff's counsel, "plaintiff's counsel, knowing that the amended complaint had not been served on the [Eastern District U.S. Attorney's Office], requested that, in exchange for plaintiff's consent to an extension of time ... defendants waive all jurisdictional defenses." (*Id.* at ¶ 5.) Knapp "declined to waive defendants' jurisdictional defenses based on plaintiff's service deficiency and *advised plaintiff's counsel that the [Eastern District U.S. Attorney's Office] had not been served with plaintiff's amended complaint.*" (*Id.* (emphasis added).) Despite being so advised, Plaintiff's attorney called Knapp at the end of September 2005 to inquire about the status of the Defendants' responsive pleading to the Amended Complaint. (*See id.* at ¶ 7 .) In response, Knapp "*again advised plaintiff's counsel* that the [Eastern District U.S. Attorney's Office] had not been served with plaintiff's amended complaint." (*Id.* at ¶ 8 (emphasis added).) The Eastern District U.S. Attorney's Office was not served with plaintiff's Amended Complaint until October 4, 2005 (*see id.* at ¶ 9), and the U.S. Attorney General was not served with Plaintiff's Amended Complaint until October 6, 2005 (*see* doc. # 6, Affidavit of Service). Thus, the evidence before the Court demonstrates that service of Plaintiff's Amended Complaint and the Summons was not properly effected since it was not made upon the U.S. Attorney for the Eastern District of New York and the U.S. Attorney General within the time limitation of Rule 4(m).

### 2. Rule 4(m)

**\*5** Not only must Hertzner demonstrate that she served the proper parties as required by Rule 4(i), she must also establish that her service of the Summons and of her Amended Complaint on those parties was timely. Federal Rule of Civil Procedure 4(m) is the applicable rule for determining timeliness of service:

**(m) Time Limit for Service.** If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall

dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).

(a) *Within Rule 4(m)'s 120–day Limitation*
Again, it is the Plaintiff's burden of proof to demonstrate timely service. Here, Plaintiff commenced her action on May 17, 2005; that means she was required to effect service on the U.S. Attorney for the Eastern District of New York and on the U.S. Attorney General on or before September 14, 2005. Yet, the record is devoid of any competent evidence from Plaintiff showing that her service on the Eastern District U.S. Attorney's Office or on the Attorney General was made by that date. *See Mende,* 269 F.Supp.2d at 251 (requiring more than conclusory statements to overcome defendant's sworn affidavit that he was never served with process). In contrast, the Moving Defendants submit Knapp's Declaration that supports their position that Plaintiff's service of process was effected outside Rule 4(m)'s 120–day limit. Indeed, the record shows that the Eastern District U.S. Attorney's Office was not served with Plaintiff's Amended Complaint until October 4, 2005 (*see id.* at ¶ 9), and the U.S. Attorney General was not served with Plaintiff's Amended Complaint until October 6, 2005 (*see* doc. # 6, Affidavit of Service). Thus, the evidence before the Court demonstrates that service of Plaintiff's Amended Complaint and the Summons was eventually made on the proper parties, but beyond Rule 4(m)'s 120–day time limit.

(b) *"Good Cause Shown" Extension*
In her Opposition Memorandum, Plaintiff appears to conflate Rule 4(m)'s mandatory "good cause shown" extension, *see* Rule 4(m) ("if the plaintiff shows good cause for the failure, the court *shall* extend the time for service" (emphasis added)), with a court's discretionary power to extend the time for service "even if there is no good cause shown," *id.* advisory committee's notes ("Relief *may* be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service.") (emphasis added). Indeed, Plaintiff argues that the Court should use its discretion to allow late service of the Amended Complaint and Summons because she has provided "good cause shown". (*See* Pl.'s Opp'n Mem. at 9.) However, the Court will examine Plaintiff's

"good cause shown" argument separately from her argument for a discretionary extension.

**\*6** Plaintiff's counsel asserts—albeit in Hertzner's opposition papers—that he was on vacation when Attorney Knapp called his office on August 23rd. However, while on vacation, Plaintiff's counsel gave instructions to his office "to serve the office of the U.S. Attorney and the office of the Post Master General." (*Id.* at 9.) [2] He believed this was done. Thereafter, upon his return to the office on September 6, 2005, and up to and including September 28, 2005, Plaintiff's counsel was involved in two other trials. Thus, "during the entire month of September, Mr. Brewington's office was heavily engaged in trial and trial preparation, including numerous Court appearances in both the State and Federal Courts, which will account for *the oversight* in following up the service upon the U.S. Attorney and Post Master General's Offices." (*Id.* at 10 (emphasis added).) On this basis and in her opposition papers, Plaintiff "request[s] that service of the Summons and Complaint be deemed *nunc pro tunc.*" (*Id.*)

Juxtaposing Plaintiff's argument against the case law she relies upon, *Reese v. University of Rochester,* No. 04–CV–6117 (FE), 2005 WL 1458632 (W.D.N.Y. June 25, 2005),[3] Plaintiff has failed to show good cause requiring the granting of an extension. In *Reese,* plaintiff's attorney delivered copies of the summons and complaint to a process server approximately two months *before* her Rule 4(m) 120–day deadline. The process server "experienced several incidents which prevented him from effecting service upon defendant, including a broken foot and emergency surgery." *Id.* at * 1. The process server did not affect service until 17 days after the Rule 4(m) deadline. *See id.* As the *Reese* court stated: "Good cause will not be found where, as is the case here, the omission is the product of an attorney's inadvertence, neglect, mistake or misplaced reliance." *Id.* (citing McGregor v. United States, 933 F.2d 156, 160 (2d Cir.1991)). This was because plaintiff's attorney "failed to follow up to ensure that [the summons and complaint] had been served." *Id.* at *2. In other words, counsel's "misplaced reliance on the process server [was] insufficient to demonstrate good cause which would warrant extending plaintiff's time to serve defendant." *Id.*

The same is true here: It was the attorney's inadvertence, neglect, mistake or misplaced reliance that resulted in service not being effected in a timely manner. In short, Plaintiff has not met his burden of establishing good cause to warrant

an extension of Rule 4(m)'s 120–day deadline. *See, e.g.,* Carroll v. Certified Moving & Storage, Co., LLC, No. 04–CV–4446 (ARR), 2005 WL 1711184, *2 (E.D.N.Y. July 19, 2005) (collecting cases).

### (c) *Discretionary Extension*

Plaintiff also argues that if good cause is not found to allow Plaintiff to untimely serve the Amended Complaint and Summons, the Court may still, in its discretion, extend Plaintiff's time to serve. (*See id.* at 10–11.) Plaintiff continues her reliance on *Reese* to support this alternative argument.

**\*7** While the *Reese* court found the plaintiff was "unable to establish good cause for her failure to timely serve defendant," it did find that she was "entitled to a discretionary extension." *Reese,* 2005 WL 1458632, at *1. In making this determination, the court considered four factors:

> whether: (1) any applicable statutes of limitations would bar the action once refiled; (2) the defendant had actual notice of the claims asserted in the complaint; (3) defendant attempted to conceal the defect in service; and (4) defendant would be prejudiced by extending plaintiff's time for service.

*Id.* (citing Sleigh v. Charles, Inc., 2004 WL 2126742, *5 (S.D.N.Y.2004)); cf. Fed.R.Civ.P. 4(m) advisory committee's notes ("Relief *may* be justified, for example, if the applicable statute of limitations would bar the refiled action, or if the defendant is evading service or conceals a defect in attempted service." (emphasis added)); Carroll, 2005 WL 1711184, *2 (noting the factors identified by the Advisory Committee are not exhaustive). Finding the first and fourth factors relevant (*i.e.,* the applicable statute of limitation would have run, and defendants would suffer little prejudice), the *Reese* court found a discretionary extension of time warranted. *See id.*

The Court now considers whether a discretionary extension is warranted in this case. First, Plaintiff filed her initial complaint on the 90th day from receipt of her "Right to Sue" letter from the EEOC. (*Cf.* Pl.'s Amended Compl. at ¶ 6 (stating "On February 16, 2005, Plaintiff received a

Notice of Right to Sue Within 90 Days ..."), *with* Docket Entry # 1 (Complaint, dated May 17, 2005).) There were no remaining days within which to commence this case; thus, Plaintiff's action will be time barred upon refiling. This factor generally weighs in favor of a plaintiff. *See Beauvoir,* 234 F.R.D. 55, 58 (E.D.N.Y.2006) (citing Carroll, 2005 WL 1711184, at *2). Second, it is undisputed that the Eastern District U.S. Attorney's Office had actual notice of Plaintiff's claims since it received a copy of the summons and complaint, via facsimile, from the USPS before the expiration of Rule 4(m)'s 120–day deadline and before service was effected upon them in early October 2005. However, there is no indication in the record that the Attorney General had any notice of Plaintiff's Amended Compliant until service upon him in early October 2005. These two situations appear to cancel each other out, making this factor a neutral one. Third, the U.S. Attorney informed Plaintiff's counsel on August 23, 2005— and before the expiration of Rule 4(m)'s 120–day limitation —that, despite receipt of the faxed copy of the Summons and Amended Complaint, service had not been effected upon the Moving Defendants. (*See* Knapp Decl. at ¶¶ 4–5.) In fact, Moving Defendants affirmatively informed Plaintiff's counsel that they would not waive any jurisdictional defenses and "advised plaintiff's counsel that the [Eastern District of New York U.S. Attorney's Office] had not been served with plaintiff's amended complaint." (*Id.* at ¶ 6.). Thus, there was no concealment by the Moving Defendants of Plaintiff's service defect. This factor weighs against Plaintiff. Fourth, there is no indication that the Moving Defendants would be prejudiced by extending Plaintiff's time for service. This is another factor favoring Plaintiff's argument for a discretionary extension.

 **\*8** Yet, as the Moving Defendants correctly notes, Plaintiff "points to absolutely no attempts to effect service on the [U.S. Attorney for the Eastern District of New York] and the [U.S. Attorney General] within the 120–day time limit under Rule 4(m)." (Moving Defs.' Reply Mem. at 5 (doc. # 22).) Indeed, when Attorney Knapp advised Plaintiff's counsel that the Eastern District U.S. Attorney's Office had not been served, three weeks remained on Plaintiff's Rule 4(m) 120– day deadline. Counsel's assertion in Plaintiff's opposition papers aside (*i.e.,* that while on his vacation, he instructed his office "to serve the office of the U.S. Attorney and the office of the Post Master General" (Pl.s' Opp'n Mem. at 9) [4] ), there is no competent evidence that counsel attempted to effect service on the proper parties before expiration of Rule 4(m)'s 120–day deadline. This is in contrast to those cases relied upon by Plaintiff wherein courts granted

discretionary extensions. [5] Furthermore, upon his return from vacation, Plaintiff's counsel still had a week within which to effect service. The fact that counsel was actively engaged in litigation of other cases does not excuse him from inquiring as to the status of service in the instant case. (Certainly, this was a task that could have been delegated to a staff member.) At the very least, time remained to make a timely request of the Court for an extension. Yet, there is no evidence that such a request was made as to the Moving Defendants.

Moreover, the Court notes that Hertzner's first action against the Postal Service, *et al.,* alleging employment discrimination was dismissed for failure to serve the U.S. Attorney and the Attorney General within Rule 4(m)'s 120–day deadline. *See Hertzner I,* No. 99–CV–2544 (JM), slip op. (E.D.N.Y. Feb. 14, 2000) . [6] This additional factor tips the scale of equities against the granting of a discretionary extension in the present case. If the Federal Rules did not so provide, certainly Judge Mishler's Memorandum of Decision in *Hertzner I* provided Plaintiff's attorney with a clear roadmap as to service required in this case: Counsel was required to effect service on both the U.S. Attorney and the Attorney General within 120 days of the filing of Plaintiff's complaint. Yet, Plaintiff's counsel failed to do so. Thus, here, the Court declines to use its discretionary authority to extend Plaintiff's time to effect service on the Moving Defendants.

### D. The Instant Motion to Dismiss Pursuant to Rule 12(b)(6)

Since the Plaintiff has failed to meet her burden of showing that the Court has jurisdiction over the Moving Defendants, the Court has no jurisdiction over the Moving Defendants. In turn, without such jurisdiction, the Court "lacks power to dismiss [the C]omplaint for failure to state a claim." *Arrowsmith,* 320 F.2d at 221. Thus, the Court does not consider the Moving Defendants' Rule 12(b)(6) arguments. [7]

### CONCLUSION

 **\*9** For the foregoing reasons, the Moving Defendants' Motion to Dismiss (doc. # 18) is GRANTED; Plaintiff's Amended Complaint against the Moving Defendants is dismissed with prejudice.

It is FURTHER ORDERED that the individual defendants, Kitson and Smith, shall serve an answer or other responsive pleading within 20 days of the date of this Order.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 869585

## Footnotes

1    The Court takes judicial notice of the filing of the Amended Complaint on June 30, 2005.

2    The Court notes that even if counsel's office had effected service as directed by counsel, it would still not be proper under the Federal Rules since Rule 4(i) requires the appropriate U.S. Attorney Office to be served (here, the U.S. Attorney Office for the Eastern District of New York) and the U.S. Attorney General be served, *not* the Office of the Postmaster General.

3    Plaintiff also cites the following cases in support of her argument that she employed due diligence in effecting service on the Moving Defendants: *Sleigh v. Charlex, Inc.,* No. 03–CV–1329, 2004 WL 2126742 (S.D.N.Y. Sept. 14, 2004); *Mejia v. Castle Hotel, Inc.,* 164 F.R.D. 343 (S.D.N.Y.1996); *Beauvoir v. U.S. Secret Service,* No. 05–CV–2819, 2006 WL 628758 (E.D.N.Y. June 200, 2005); and, *Spinale v. United States,* No. 03–CV–1704, 2005 WL 659150 (S .D.N.Y. Mar. 16, 2005).

4    *See supra* note 2.

5    In *Reese,* plaintiff's attorney delivered the summons and complaint to the process server *before* the expiration of Rule 4(m)'s 120–day time limit. 2005 WL 1458632, *1 (granting discretionary extension). The same was true in *Carroll:* The plaintiff's summons and complaint was delivered to a process server for service *before* the expiration of Rule 4(m)'s 120–day time limit. 🚩 2005 WL 1711184, *1 (granting discretionary extension). A slightly different fact scenario occurred in *Mejia:* Incorrect papers were delivered by plaintiff's attorney to a process server for service, but *before* the expiration of Rule 4(m)'s 120–day time limit; the mistake was rectified within five days of discovery, although after the 120–day deadline. 164 F.R.D. at 345. In *Sleigh,* the Court would not grant a discretionary extension under Rule 4(m) as to those defendants on whom the plaintiff made no attempt to serve. 2004 WL 2126742, *5. It is unclear from the court's opinion in *Beauvoir* when plaintiff's counsel delivered papers to the process server to effect service; however, Beauvoir's attorney submitted an affidavit in opposition to dismissal that stated, because of its inexperience with federal litigation, counsel detrimentally relied upon the process server to properly effectuate service. 234 F.R.D. at 57 (granting discretionary extension).

6    One would think that this prior dismissal would prompt Plaintiff's counsel to be hyper-vigilant in ensuring timely, proper service in the present case. Unfortunately, the evidence connotes otherwise.

7    The Court notes that the Moving Defendants argued for dismissal pursuant to 🚩 Rule 12(b)(6) on behalf of themselves, *as well as* for the individual defendants, Kitson and Smith. Because it lacks jurisdiction over the Moving Defendants, the Court cannot consider these arguments as to the Moving Defendants. Similarly, since the Eastern District U.S. Attorney's Office "does not presently have authorization to represent the individual defendants Richard Kitson and Jeff Smith," (Moving Defs.' Mem. Supp. Mot. Dismiss at 2, n. 1), the Court

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 108 of 396

declines to consider the 🚩 Rule 12(b)(6) arguments advanced on behalf of Kitson and Smith by the Moving Defendants.

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1446881
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina.

Roderick SANFORD, Plaintiff,

v.

UNITED STATES of America, Defendant.

C/A No. 0:21-2552-RMG-PJG
|
Signed 03/22/2022

**Attorneys and Law Firms**

Roderick Sanford, Salters, SC, Pro Se.

Martin L. Holmes, US Attorneys Office, Charleston, SC, for
Defendant.

## ORDER AND REPORT AND RECOMMENDATION

Paige J. Gossett, UNITED STATES MAGISTRATE JUDGE

 **\*1** Plaintiff Roderick Sanford, a self-represented federal
prisoner, filed this action pursuant to the Federal Tort Claims
Act, 🚩 28 U.S.C. §§ 2671–2680, 🚩 1346(b). Plaintiff
files this action *in forma pauperis* under 🚩 28 U.S.C. §
1915 and § 1915A. This matter is before the court pursuant
to 🚩 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)
(2) (D.S.C.) for a Report and Recommendation on the
Government's motion to dismiss. (ECF No. 22.) Pursuant
to 🚩 Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975),
the court advised Sanford of the summary judgment and
dismissal procedures and the possible consequences if he
failed to respond adequately to the Government's motion.
(ECF No. 26.) The motion has been extensively briefed [1] and
is ready for disposition. (See ECF Nos. 22, 31, 34, 35, &
38.) Having reviewed the record presented and the applicable
law, the court finds that the Government's motion should be
granted in part and denied in part without prejudice to renew
on a more fully developed record of jurisdictional facts.

## BACKGROUND

The following allegations are taken as true for purposes of
resolving the Government's motion to dismiss. This matter
arises out of the Federal Bureau of Prison's ("BOP's")
response to the COVID-19 pandemic. Sanford is an inmate
in the Federal Correctional Institution ("FCI") Williamsburg
in Salters, South Carolina. Sanford contracted COVID-19
around December 22, 2020, which caused and continues to
cause Sanford serious physical injury.

Sanford claims that despite laws and BOP policy requiring
that protective measures be taken to protect inmates from
contracting COVID-19, those laws and policies were not
adhered to at FCI Williamsburg. For example, Sanford alleges
that prison officers were tested after entering the prison,
rather than outside the prison. Sanford also alleges that
incoming inmates who tested positive before entering the
prison were placed on Sanford's cell block. Sanford further
alleges that quarantine procedures were not followed for
inmates who returned from hospitalization for non-COVID
reasons. Sanford claims that as a direct result of these
failures to follow BOP policy, he contracted COVID-19.
Additionally, Sanford alleges that despite the BOP's inherent
inability to follow COVID-19 guidelines issued by the Center
for Disease Control and Prevention ("CDC") in prisons,
Sanford's requests for home confinement and compassionate
release were denied.

Sanford pursued his remedies in the BOP, which were denied
on July 26, 2021. Sanford filed this action on August 10,
2021, raising claims of negligence against the Government
and seeking damages.

## DISCUSSION

### A. Rule 12(b)(1) Standard

Dismissal under 🚩 Federal Rule of Civil Procedure 12(b)
(1) examines whether the complaint fails to state facts
upon which jurisdiction can be founded. It is the plaintiff's
burden to prove jurisdiction, and the court is to "regard the
pleadings' allegations as mere evidence on the issue, and may
consider evidence outside the pleadings without converting
the proceeding to one for summary judgment." 🚩 Richmond,
Fredericksburg & Potomac R.R. Co. v. United States, 945
F.2d 765, 768 (4th Cir. 1991).

 **\*2** To resolve a jurisdictional challenge under 🚩 Rule 12(b)
(1), if the moving party contends that the complaint fails to

allege facts upon which subject matter jurisdiction can be based, the court must assume that the facts alleged in the complaint are true. 🚩 Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009) (quoting 🚩 Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). If the moving party contends the facts alleged are untrue, the court may resolve factual dispute by weighing evidence necessary to determine whether the court has jurisdiction. Id.

Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., 🚩 Erickson, 551 U.S. 89, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. 🚩 Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

## B. The Government's Motion

The Government argues the court lacks subject matter jurisdiction over this action because Sanford's negligence claims are barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 🚩 28 U.S.C. §§ 2671-🚩2680, 🚩1346(b).

The FTCA provides for a limited waiver of the United States' sovereign immunity from suit by allowing a plaintiff to recover damages in a civil action for loss of property or personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 🚩 28 U.S.C. § 1346(b)(1); see also 🚩 Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001) ("The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred.").

However, the FTCA does not waive the United States' sovereign immunity for:

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

🚩 28 U.S.C. § 2680(a). The purpose of this "discretionary function exception" is to protect the discretion of the executive branch to make policy judgments. Blanco Ayala v. United States, 982 F.3d 209, 214 (4th Cir. 2020); see also 🚩 Wood v. United States, 845 F.3d 123, 128 (4th Cir. 2017) ("In short, the discretionary function exception is driven by separation of powers concerns, shielding decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently."). The burden is on the plaintiff to establish that the discretionary function exception does not foreclose his claim. Blanco Ayala, 982 F.3d at 214 (quoting 🚩 Seaside Farm, Inc. v. United States, 842 F.3d 853, 857 (4th Cir. 2016)).

To determine whether the discretionary function exception applies, the court must undertake a two-step inquiry. Sanders v. United States, 937 F.3d 316, 328 (4th Cir. 2019); 🚩 Rich v. United States, 811 F.3d 140, 145 (4th Cir. 2015). First, the court must determine whether the nature of the defendant's actions is discretionary—that is, whether the actions involve an element of judgment or choice. 🚩 United States v. Gaubert, 499 U.S. 315, 322 (1991); 🚩 Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988). The action is not considered discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." Id. Second, if the actions are discretionary, the court must then determine whether the defendant's decision was made based

on considerations of public policy. 🔖Gaubert, 499 U.S. at 322-23; 🔖Berkovitz, 486 U.S. at 536-37.

**\*3** Here, the Government argues that the discretionary function exception applies because Sanford's claims are based on actions by prison officials that involved judgments and choices about the appropriate response to COVID-19, and that such decisions inherently involve balancing public policy considerations about safety, health, and resources. In response, Sanford argues that the first step of the discretionary function exception inquiry is not met here because the officials' actions were constrained by laws or policies meant to protect inmates at FCI Williamsburg, and therefore, the purportedly negligent officials lacked discretion to disregard those policies. Sanford specifies four laws or policies to which the officials allegedly failed to adhere.

First, Sanford argues that 🔖18 U.S.C. § 4042(a), which provides for the general duties of the BOP, including the management of prisons and the safekeeping, care, and subsistence of all inmates, provides a nondiscretionary duty to protect inmates from COVID-19. But the statute itself provides no specific direction as to how the BOP is to fulfill those duties, much less how to prevent the spread of COVID-19. Courts have routinely refused to find that this statute mandates specific, non-discretionary conduct such that failure to adhere to it would preclude the application of the discretionary function exception. 🔖Palay v. United States, 349 F.3d 418, 428-29 (7th Cir. 2003) (collecting circuit courts of appeal cases holding the same); see also 🔖Rich v. United States, 811 F.3d 140, 145 (4th Cir. 2015) (stating the BOP "retains discretion regarding the implementation" of the "broad directives" in 🔖§ 4042(a)). Therefore, to the extent Sanford's negligence claims are based on decisions by BOP officials pursuant to its general duties under 🔖18 U.S.C. § 4042, the discretionary function exception would bar his claims.

Second, Sanford points to statutes allowing inmates to serve their remaining sentences under home confinement or have their sentences reduced. See 🔖18 U.S.C. § 3582(c) (compassionate release or reduction of sentence); 🔖18 U.S.C. § 3624(c) (home confinement); CARES Act, Pub. L. 116-136, Mar. 27, 2020, 134 Stat 281 (lengthening the allowable time for home confinement). However, each

of those statutes or laws expressly leaves those decisions in the BOP's discretion after consideration of matters of public policy. See, e.g., 🔖18 U.S.C. § 3624(c)(2) ("The authority under this subsection *may* be used to place a prisoner in home confinement....") (emphasis added); see also Crowe v. United States, 430 F. App'x 484, 485 (6th Cir. 2011) (stating the BOP has broad discretion under 🔖18 U.S.C. § 3582(c) to move for compassionate release); [2] McCarson v. Reherman, C/A No. 2:20-1386-HMH, 2020 WL 2110770 (D.S.C. May 4, 2020) (noting that the CARES Act affords the BOP broad discretion in determining whether home confinement is appropriate for inmates). Therefore, to the extent Sanford's negligence claims are based on prison officials' failure to grant Sanford's requests for home confinement or compassionate release, those claims are barred by the discretionary function exception.

Third, Sanford points to prison officials' inability to follow the CDC's COVID-19 Guidelines. However, as pointed out by the Government, CDC Guidelines are only advisory and do not mandate any particular conduct on the part of BOP officials. (Def.'s Mot., ECF No. 22 at 7.) Notably, Sanford does not allege that the BOP adopted any particular CDC Guidelines as its own policy. Therefore, any decision by prison officials not to follow CDC guidance is discretionary and barred by the discretionary function exception.

**\*4** Fourth, Sanford points to memoranda from the BOP establishing "Action Plans" for federal prisons on how to manage the COVID-19 pandemic. The Government characterizes these memoranda as "non-binding guidance" whereas Sanford describes them as "non-discretionary protective measures" or "non-discretionary instructions" by the BOP. (Compare Pl.'s Resp., ECF No. 31 at 2; with Def.'s Reply, ECF No. 34 at 2.) On this record, the court is not able to determine whether these memoranda represent official policy of the BOP such that prison officials lacked the discretion to take different actions, whether the memoranda were mere guidance to federal prison officials, or whether FCI-Williamsburg adopted or adhered to the memoranda. Sanford attaches two examples of the memoranda as a supplement to his response in opposition to the Government's motion to dismiss. (ECF No. 35.) The memoranda do not establish whether the protective measures described within them are mandatory policies, mere guidance, or something else. For instance, the memoranda describe themselves as "guidance" in one instance (ECF No. 35 at 1), but in other instances, appear to mandate prisons follow certain rules and

create a system for compliance review (ECF No. 35 at 2, 4, 12-13). Nor does the record reflect whether the memoranda reflect actual policy adopted by FCI Williamsburg. Therefore, the record before the court is insufficiently developed to determine whether the discretionary function exception bars Sanford's claims that prison officials failed to follow FCI Williamsburg's policy to protect inmates from COVID-19.

### RECOMMENDATION

Based on the foregoing, the court recommends the Government's motion to dismiss be granted in part and denied in part, without prejudice to its ability to raise the discretionary function exception argument on a more developed record regarding FCI Williamsburg's COVID-19 policy. To the extent Sanford's negligence claims are based on prison officials' failure to follow other laws or policies cited in Sanford's Complaint, those claims are barred by the discretionary function exception to the FTCA, and any such claims should be dismissed for lack of subject matter jurisdiction.

*The parties' attention is directed to the important notice on the next page.*

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' " Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

### All Citations

Slip Copy, 2022 WL 1446881

### Footnotes

1      The plaintiff filed a motion for extension of time to file further briefing, which is hereby granted *ex post facto.* (ECF No. 37.)

2      Inmates may now seek compassionate release from a federal district court after exhausting their administrative rights to appeal the BOP's failure to bring such a motion on the inmates' behalf. First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 4

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1210717
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Rock Hill Division.

Roderick SANFORD, Plaintiff,
v.
UNITED STATES of America
(Warden Brian K. Dobbs), Defendant.

Civil Action No. 0:21-2552-RMG
|
Signed 04/25/2022

**Attorneys and Law Firms**

Roderick Sanford, Salters, SC, Pro Se.

Martin L. Holmes, US Attorneys Office, Charleston, SC, for
Defendant.

**ORDER AND OPINION**

Richard Mark Gergel, United States District Judge

**\*1** Before the Court is the Magistrate Judge's Report and
Recommendation (R & R) that Defendant's motion to dismiss
be granted in part and denied without prejudice in part. (Dkt.
No. 54.) For the reasons set forth below, the Court adopts the
R & R as the order of the Court.

**I. Background**

Plaintiff is a federal inmate proceeding *pro se* to bring one
claim of negligence against "The United States (Warden Brian
K. Dobbs)" for having "failed to use reasonable care when
it neglected to protect plaintiff from contracting COVID-19."
Plaintiff brings the claim "pursuant to ... the Federal Tort
Claims Act[.]" (Dkt. No. 1 at 1.) He alleges that, while
incarcerated at FCI Williamsburg, the Bureau of Prisons
("BOP") had a duty to manage and regulate correctional
institutions and provide protection; that the Attorney General
issued an April 2020 memorandum instructing BOP directors
to increase the use of home confinement at institutions most
affected by Covid-19; that the Centers for Disease Control
and Prevention ("CDC") issued 2019 findings that older
adults and those with serious medical conditions might be at
higher risk for illness from Covid-19 and specific protective
measures should be implemented such as mask-wearing

and social distancing; that he requested compassionate
release/home confinement from the Warden because it was
impracticable to follow the preventative guidelines while in
confinement with cell mates and little room; that the Warden
abandoned the preventative guidelines by, inter alia, failing
to test officers outside the facility and allowing inmates who
tested positive into the facility or to pass meal trays; and that
as a result of these failures, Plaintiff contracted Covid-19 and
suffered respiratory complications and muscle pain. (Dkt. No.
1 at 3-6.) Plaintiff filed an administrative tort claim. In July
2021, the BOP denied the claim, notifying Plaintiff that an
investigation into his claim for personal injury and negligence
for failing to protect him from contracting Covid-19 revealed
that FCI Williamsburg responded to the Covid-19 pandemic
in accordance with national guidance and that his medical
records, reflecting symptoms and quarantining for 5 days, do
not support any injury. (Dkt. No. 1-1.)

Defendant moves to dismiss the complaint in its entirety
under Rule 12(b)(1) for lack of subject matter jurisdiction.
(Dkt. No. 22.) Plaintiff responded in opposition (Dkt. No.
31), Defendant replied (Dkt. No. 34), and Plaintiff filed a
sur-reply (Dkt. No. 38). The Magistrate Judge recommends
that Defendant's motion to dismiss be granted in part and
denied without prejudice in part: dismiss portions of the claim
based on prison officials' failure to follow statutory or CDC
guidelines, and retain the portion of the claim based on their
failure to follow BOP's own Covid-19 response plan. (Dkt.
No. 54 at 8.) Plaintiff filed an objection. (Dkt. No. 70.)

**II. Legal Standard**

**A. Review of the R & R**

The Magistrate Judge makes only a recommendation to this
Court that has no presumptive weight and the responsibility
to make a final determination remains with the Court.
*Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The
Court may "accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge." 28 U.S.C. § 636(b)(1)(C). Where there are specific
objections to the R & R, the Court "makes a *de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection is
made." *Id.* Where there are no objections to the R & R, the
Court reviews the R & R to "only satisfy itself that there is
no clear error on the face of the record in order to accept the
recommendation." Fed. R. Civ. P. 72 advisory committee's
note; *see also Camby v. Davis*, 718 F.2d 198, 199 (4th Cir.

1983) ("In the absence of objection ... we do not believe that it requires any explanation.").

## B. Motion to Dismiss Under Rule 12(b)(1)

**\*2** Rule 12(b)(1) allows a defendant to move to dismiss the claim for lack of subject matter jurisdiction. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.,* 369 F.3d 385, 390 (4th Cir. 2004). Article III limits federal courts' jurisdiction to "cases" and "controversies." U.S. Const. art. III, § 2. "[A]s such, there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick, Md.,* 191 F.3d 394, 399 (4th Cir. 1999). To determine whether jurisdiction exists, the court is to "regard the pleadings' allegations as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991) (internal citation omitted). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (internal citation omitted).

The plaintiff bears the burden of proof. *See Evans. v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999).

## III. Discussion

Defendant moves to dismiss the negligence claim on the basis that it is barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, 1346(b). The FTCA provides for a limited waiver of the United States' sovereign immunity from suit by allowing a plaintiff to recover damages in a civil action for loss of property or personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Medina v. United States,* 259 F.3d 220, 223 (4th Cir. 2001) ("The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred.").

But the FTCA does not waive the United States' sovereign immunity for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The purpose of this "discretionary function exception" is to protect the discretion of the executive branch to make policy judgments. *Blanco Ayala v. United States,* 982 F.3d 209, 214 (4th Cir. 2020); *see also Wood v. United States,* 845 F.3d 123, 128 (4th Cir. 2017) ("In short, the discretionary function exception is driven by separation of powers concerns, shielding decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently."). The burden is on the plaintiff to establish that the discretionary function exception does not foreclose his claim. *See Blanco,* 982 F.3d at 214.

To determine whether the discretionary function exception forecloses a claim, the court must undertake a two-step inquiry. *See Sanders v. United States,* 937 F.3d 316, 328 (4th Cir. 2019). First, the court must determine whether the nature of the defendant's actions is discretionary; that is, whether the actions involve an element of judgment or choice. *See United States v. Gaubert,* 499 U.S. 315, 322 (1991). The action is not considered discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." *Id.* Second, if the actions are discretionary, the court must then determine whether the defendant's decision was made based on considerations of public policy. *See Gaubert,* 499 U.S. at 322-23; *Berkovitz,* 486 U.S. at 536-37.

**\*3** Here, Plaintiff alleges that he was injured by contracting Covid-19 as a result of prison officials' negligent failure to follow certain statutes, CDC guidelines and BOP Covid-19 procedures. First, regarding the statutes, ⚑18 U.S.C. § 4042(a) provides the BOP's general duty to manage and safekeep facilities, but the BOP "retains discretion regarding the implementation" or the "broad directives" in § 4042(a). ⚑*Rich v. United States*, 811 F.3d 140, 145 (4th Cir. 2015). Legislation concerning an inmate's reduced sentence or in home confinement (such as § 3582(c), § 3624(c), and the CARES Act) similarly leave that decision to the BOP's discretion upon initial application from the inmate. *See, e.g.*, § 3582(c)(2) ("The authority under this subsection may be used to place a prisoner in home confinement"); *McCarson v. Reherman*, No. 2:20-cv-1386-HMH-MGB, 2020 WL 2110770 (D.S.C. May 4, 2020) (noting that the "CARES Act affords the BOP broad discretion during the COVID-19 pandemic"). The discretionary function exception to the FTCA therefore applies to Plaintiff's claim as it relates to prison officials' failure to adhere to statutory authority. Second, regarding the CDC's 2019 statements on measures such as social distancing, mask wearing and quarantining, because the agency's guidelines are advisory and do not mandate any particular conduct by the BOP, prison officials may in their discretion not adopt them as BOP policy. Therefore, Plaintiff's claim as it relates to failure to follow the CDC guidelines is barred by the discretionary function exception to the FTCA. The Court has conducted a *de novo* review in light of Plaintiff's objection to the R & R (Dkt. No. 70) and finds that the Magistrate Judge's recommendation to dismiss as to statutory and CDC guidance is appropriate.

Last, regarding the BOP's own Covid-19 response plan, the parties contest whether it is a discretionary guideline or mandatory procedure. The record before the Magistrate Judge did not include a BOP Covid-19 plan, and therefore the Magistrate Judge recommended that the Defendant's motion to dismiss be denied without prejudice as to this aspect of the claim in light of the contested facts. In his objection to the R & R, Plaintiff provides several relevant documents. First, a June 30, 2020 BOP "Coronavirus (Covid-19) Phase

Eight Action Plan." (Dkt. No. 70-2 at 29.) The Plan discusses inmate intake, movement, court visits, and other conduct. Second, an August 5, 2020 BOP "Coronavirus (Covid-19) Phase Nine Action Plan." (Dkt. No. 70-2 at 37.) It addresses the same topics as Phase Eight plus inmate travel, legal access and programming. Last, a November 25, 2020 "BOP Modified Operations" that addresses conduct such as social visiting, tours, staff training, and contractors. (Dkt. No. 70-2 at 49.) On the Court's initial review of these documents, it remains contested whether the BOP implement mandatory or discretionary protocol. At this stage in the proceeding, the Court finds that a more robust record of fact is warranted in order to determine whether the FTCA's discretionary function exception may apply to FCI Williamsburg officials' alleged failure to follow or implement these or other BOP Covid-19 response plans. As a result, the Court denies without prejudice Defendant's motion to dismiss Plaintiff's negligence claim as it relates to BOP Covid-19 response plans. The Court, therefore, adopts the Magistrate Judge's recommendation to deny without prejudice Defendant's motion on this issue, but for a different reason than stated in the recommendation.

## IV. Conclusion

For the foregoing reasons, the Court **ADOPTS** the R & R (Dkt. No. 54) as the order of the Court. Defendant's motion to dismiss (Dkt. No. 22) is **granted in part and denied without prejudice in part**. The portions of Plaintiff's negligence claim relating to prison officials' failure to follow statutory and CDC guidelines are dismissed. The portion of Plaintiff's negligence claim relating to prison officials' failure to follow BOP Covid-19 response plans survives. Discovery and summary judgment will be limited to the claim of negligence relating to failure to follow BOP Covid-19 response plans. This matter is referred back to the Magistrate Judge for further proceedings.

**AND IT IS SO ORDERED.**

## All Citations

Slip Copy, 2022 WL 1210717

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 16925984

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Michael COHEN, Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

21-cv-10774 (LJL)

|

Signed November 14, 2022

## Synopsis

**Background:** Former private attorney and advisor for now-former President brought damages claims under 🚩*Bivens* and Federal Tort Claims Act (FTCA) against United States, President, now-former Attorney General, and officers within Bureau of Prisons (BOP), asserting claims under First, Fourth, and Eighth Amendments, and FTCA claims for torts under New York law, based on allegations that when plaintiff was on furlough for federal crimes, he was remanded to prison because he wanted to publish a book critical of President when he was still in office, and that conditions of solitary confinement were unsafe. Defendants filed motions to dismiss.

**Holdings:** The District Court, Lewis J. Liman, J., held that:

[1] under Supreme Court precedent, there is no implied private of action for damages, under 🚩*Bivens*, for First Amendment retaliation;

[2] availability of alternative remedial structures was special factor counseling against extension of 🚩*Bivens* remedy to plaintiff's claims under Fourth and Eighth Amendments;

[3] plaintiff's confinement was privileged, precluding FTCA liability of United States for false arrest or false imprisonment in violation of New York law;

[4] plaintiff failed to state a claim for abuse of process under New York law;

[5] discretionary function exception to FTCA's waiver of sovereign immunity applied to claims of negligent hiring,

retention, training, and supervision under New York common law; and

[6] discretionary function exception to FTCA's waiver of sovereign immunity applied to claims of negligent failure of BOP to protect.

Motions granted.

**Procedural Posture(s):** Motion to Dismiss.

West Headnotes (42)

**[1]** **Constitutional Law** 🔑 Political speech, beliefs, or activity in general

The ability to publicly criticize even the most prominent politicians and leaders without fear of retaliation is a hallmark of American democracy, and political speech is core First Amendment speech. U.S. Const. Amend. 1.

**[2]** **Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

It is a prized American privilege under the First Amendment to speak one's mind, although not always with perfect good taste, on all public institutions. U.S. Const. Amend. 1.

**[3]** **Courts** 🔑 Supreme Court decisions

A federal district court is bound by the Supreme Court's precedents.

**[4]** **Action** 🔑 Statutory rights of action

Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress, and the judicial task is not to give effect to a statute's purpose but rather to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy.

**[5]** **Action** 🔑 Statutory rights of action

When deciding whether to recognize an implied cause of action under federal law, the determinative question is one of statutory intent.

**[6]**    United States    Constitutional Violations; Bivens Claims

Expanding the *Bivens* damages remedy under federal law is a disfavored judicial activity.

**[7]**    **Constitutional Law**    Creation of rights of action

United States    Constitutional Violations; Bivens Claims

Under two-step test for determining whether a private right of action for damages under *Bivens* can be implied, a court first asks if the case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court, meaning that it presents a new context, and then asks if there are special factors counseling hesitation in the absence of affirmative action by Congress, in which case a court should decline to extend *Bivens*, but those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy.

**[8]**    Action    Statutory rights of action

In all but the most unusual circumstances, prescribing a cause of action under federal law is a job for Congress, not the courts.

**[9]**    United States    Constitutional Violations; Bivens Claims

Even in a particular case, a court likely cannot predict the systemwide consequences of recognizing a cause of action for damages under *Bivens*, and that uncertainty alone is a special factor that forecloses relief.

**[10]**    United States    Constitutional Violations; Bivens Claims

A plaintiff cannot justify an extension of an implied private right of action for damages under *Bivens*, based on parallel circumstances with *Bivens* or its progeny, unless he also satisfies the analytic framework prescribed by intervening case law.

**[11]**    United States    Particular Rights, Acts, and Claims

There is no implied private action for damages, under *Bivens*, for First Amendment retaliation. U.S. Const. Amend. 1.

**[12]**    United States    Searches, seizures, and forfeitures

*Bivens* claims for unlawful seizure under Fourth Amendment, brought by former private attorney and advisor for now-former President, arose in new context, so that court was required to ask if there were special factors counseling hesitation in recognizing *Bivens* damages remedy, in action against President, now-former Attorney General, and officers within Bureau of Prisons (BOP), alleging that when plaintiff was on furlough for federal crimes, he was remanded to prison because he wanted to publish a book critical of President when he was still in office; Supreme Court *Bivens* precedent in Fourth Amendment context involved employees of different federal agency, i.e., Bureau of Narcotics, the BOP officers were not performing functions in common and recurrent sphere of law enforcement, and precedent did not involve a President or Attorney General as defendant. U.S. Const. Amend. 4.

**[13]**    United States    Constitutional Violations; Bivens Claims

A case that involves a new category of defendants presents a new context for an

implied right of action for damages under 🚩 *Bivens*, so that a court is required to ask if there are special factors counseling hesitation in recognizing 🚩 *Bivens* damages remedy in absence of affirmative action by Congress.

1 Case that cites this headnote

**[14]    United States** 👉 **Prisons**

🚩 *Bivens* claims under Eighth Amendment, brought by former private attorney and advisor for now-former President, arose in new context, so that court was required to ask if there were special factors counseling hesitation in recognizing 🚩 *Bivens* damages remedy, in action against President, now-former Attorney General, and officers within Bureau of Prisons (BOP), relating to conditions of solitary confinement when plaintiff, who was on furlough for federal crimes, was remanded to prison allegedly because he wanted to publish a book critical of President when he was still in office; Supreme Court precedent under progeny of 🚩 *Bivens* involved claim for inadequate medical care in violation of Eighth Amendment. U.S. Const. Amend. 8.

1 Case that cites this headnote

**[15]    United States** 👉 **Constitutional Violations; Bivens Claims**

**United States** 👉 **Existence and Exclusivity of Other Remedies**

If there is even a single reason to pause before applying 🚩 *Bivens* in a new context, a court may not recognize a 🚩 *Bivens* damages remedy, and where there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new 🚩 *Bivens* cause of action, and it does not matter if those existing remedial structures do not provide complete relief or are not as effective as an individual damages remedy.

1 Case that cites this headnote

**[16]    United States** 👉 **Particular remedies**

Likely availability of alternative remedial structures, i.e., writ of habeas corpus challenging conditions of confinement and power of federal courts to enjoin unconstitutional actions by federal officials, was special factor counseling against extension of implied right of action for damages under 🚩 *Bivens*, in action by former private attorney and advisor for now-former President against President, now-former Attorney General, and officers within Bureau of Prisons (BOP), asserting Fourth Amendment unlawful seizure claim and Eighth Amendment conditions of confinement claim relating to solitary confinement, based on allegations that when plaintiff was on furlough for federal crimes, he was remanded to prison because he wanted to publish a book critical of President when he was still in office. U.S. Const. Amends. 4, 8.

**[17]    Injunction** 👉 **Prospective, preventive, or future-oriented nature of remedy**

A prospective injunction does not normally provide plaintiffs with redress for harms they have already suffered.

**[18]    Civil Rights** 👉 **Injunction**

An injunction is primarily focused on stopping an unconstitutional violation from occurring on an ongoing basis, and it does not seek to punish someone for what they have done and thus, in turn, deter that person from committing similar wrongs in the future.

**[19]    Constitutional Law** 👉 **Bill of Rights or Declaration of Rights**

The Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities.

**[20]**    **United States**    👉    Color of law

For an official's actions to be under color of authority, as required for availability of *Bivens* damages remedy, the conduct must be cloaked with official power and the official must purport to be acting under color of official right.

**[21]**    **United States**    👉    Judicial intervention; immunity

**United States**    👉    Color of law

An action by the President could be taken under color of authority, as required for availability of *Bivens* damages remedy, while at the same time not being legitimately within the President's official capacity and thus not subject to presidential immunity.

**[22]**    **United States**    👉    Necessity of waiver or consent

**United States**    👉    Conditions and restrictions

The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.

**[23]**    **United States**    👉    In general; place of injury

The source of substantive liability under the Federal Tort Claims Act (FTCA), for negligent conduct of federal officials and employees while acting within scope of office or employment, is law of the State. 28 U.S.C.A. § 1346(b).

**[24]**    **United States**    👉    Constitutional torts

The Federal Tort Claims Act (FTCA) has not waived the Government's sovereign immunity with respect to claims that its employees have committed constitutional torts under the federal Constitution. 28 U.S.C.A. § 1346(b).

**[25]**    **United States**    👉    Constitutional torts

The Federal Tort Claims Act (FTCA) has not waived the Government's sovereign immunity with respect to claims that its employees have committed a federal constitutional tort based on retaliation for exercising First Amendment free speech rights. U.S. Const. Amend. 1; 28 U.S.C.A. § 1346(b).

**[26]**    **Civil Rights**    👉    Other particular rights

New York law does not recognize a freestanding common-law tort claim for retaliation for speech protected by the First Amendment. U.S. Const. Amend. 1.

**[27]**    **False Imprisonment**    👉    Nature and form of remedy

False arrest and false imprisonment overlap under New York law, and the former is a species of the latter.

1 Case that cites this headnote

**[28]**    **False Imprisonment**    👉    Nature and Elements of False Imprisonment

Under New York law, the elements of a false arrest and false imprisonment claim are: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.

1 Case that cites this headnote

**[29]**    **False Imprisonment**    👉    Illegality of Arrest

For purposes of the lack of privilege element of a false arrest and false imprisonment claim under New York law, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause.

1 Case that cites this headnote

**[30]**  **False Imprisonment**  ☞  Illegality of Arrest

A claim for false imprisonment will lie under New York law only where the confinement does not stem from legal process.

**[31]**  **False Imprisonment**  ☞  False imprisonment and malicious prosecution distinguished

Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process, e.g., he is bound over by a magistrate or arraigned on charges, and thereafter, unlawful detention forms part of the damages for the entirely distinct tort of malicious prosecution, which remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process.

**[32]**  **False Imprisonment**  ☞  Judicial process

The tort of false arrest does not permit recovery for confinement imposed pursuant to legal process.

**[33]**  **United States**  ☞  False imprisonment, false arrest, malicious prosecution, and abuse of process

Confinement of former private attorney and advisor for now-former President was privileged, precluding liability of United States for false arrest or false imprisonment under New York law, in action under Federal Tort Claims Act (FTCA), based on allegations that when plaintiff was on furlough for federal crimes, he was remanded to prison because he wanted to publish a book critical of President when he was still in office; plaintiff, as inmate on furlough, remained in legal custody of Attorney General in service of term of imprisonment, and plaintiff's complaint was not about the absence of legal process but for wrongs incurred while he was subject to legal process. 🚩 28 U.S.C.A. § 2680(a); 28 C.F.R. § 570.38(b)(1).

**[34]**  **Process**  ☞  Nature and elements in general

To prove abuse of process under New York law, plaintiff must show that the defendant: (1) employs regularly issued legal process to compel performance or forbearance of some act; (2) with intent to do harm without excuse of justification; and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

**[35]**  **Process**  ☞  Nature and elements in general

The tort of abuse of process under New York law lies in causing process to issue lawfully but to accomplish some unjustified purpose.

**[36]**  **United States**  ☞  False imprisonment, false arrest, malicious prosecution, and abuse of process

Former private attorney and advisor for now-former President failed to state a claim for abuse of process under New York law, as basis for liability of United States under Federal Tort Claims Act (FTCA), in action alleging that when plaintiff was on furlough for federal crimes, he was remanded to prison because he wanted to publish a book critical of President when he was still in office; plaintiff did not allege that there was abuse in the process of obtaining court order pursuant to which he was confined. 🚩 28 U.S.C.A. § 2680(a).

**[37]**  **Damages**  ☞  Particular cases

**Damages**  ☞  Government; criminal justice

District court would deem former private attorney and advisor for now-former President to have abandoned his claims under New York law for intentional and negligent infliction of emotional distress, in action against United States under Federal Tort Claims Act (FTCA), based on allegations that when plaintiff was on furlough for federal crimes, he was remanded to prison because he wanted to publish a book critical of President when he was still in office, where plaintiff did not address the

arguments of United States, in support of its motion to dismiss, that emotional distress claims would not lie because conduct underlying claims were within ambit of traditional tort claims, and that emotional distress claims would be unavailable upon district court's dismissal of false imprisonment and abuse of process claims.

⚑ 28 U.S.C.A. § 2680(a).

**[38]    United States** ⚐ **Element of judgment or choice**

The discretionary function exception to the Federal Tort Claims Act's (FTCA) waiver of sovereign immunity of United States covers only acts that are discretionary in nature and that involve an element of judgment or choice, and it is the nature of the conduct, rather than the status of the actor, that governs whether the exception applies. ⚑ 28 U.S.C.A. § 2680(a).

**[39]    United States** ⚐ **Discretionary Acts or Functions**

The discretionary function exception to the Federal Tort Claims Act's (FTCA) waiver of sovereign immunity of United States marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals. ⚑ 28 U.S.C.A. § 2680(a).

**[40]    United States** ⚐ **Element of judgment or choice**

**United States** ⚐ **Considerations of public policy**

The discretionary function exception to the Federal Tort Claims Act's (FTCA) waiver of sovereign immunity of United States bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question must be grounded in considerations of

public policy or susceptible to policy analysis.

⚑ 28 U.S.C.A. § 2680(a).

**[41]    United States** ⚐ **Employment**

Discretionary function exception to Federal Tort Claims Act's (FTCA) waiver of sovereign immunity of United States applied to claims of negligent hiring, retention, training, and supervision under New York common law, relating to plaintiff, while on furlough for federal crimes, being remanded to prison allegedly because he wanted to publish a book critical of President when he was still in office. ⚑ 28 U.S.C.A. § 2680(a).

**[42]    United States** ⚐ **Prisons**

Discretionary function exception to Federal Tort Claims Act's (FTCA) waiver of sovereign immunity of United States applied to claims of negligent failure of Bureau of Prisons (BOP) to protect, relating to placement of former private attorney and advisor for now-former President in solitary confinement when plaintiff, while on furlough for federal crimes, was remanded to prison allegedly because he wanted to publish a book critical of President when he was still in office; plaintiff, who complained of unsafe conditions in his cell, challenged only the design of policies and procedures for maintenance and upkeep of prisons. ⚑ 18 U.S.C.A. § 4042; ⚑ 28 U.S.C.A. § 2680(a).

**Attorneys and Law Firms**

Jeffrey K. Levine, Law Offices of Jeffrey K. Levine, New York, NY, Andrew C. Laufer, Law Office of Andrew C. Laufer, PLLC, New York, NY, for Plaintiff.

Allison Rovner, Alyssa O'Gallagher, United States Attorney's Office, New York, NY, for Defendants United States of America, William Barr, Michael Carvajal, Jon Gustin, Patrick McFarland, James Petrucci, Enid Febus, Adam Pakula.

Alina Habba, Michael T. Madaio, Habba Madaio & Associates LLP, Bedminster, NJ, for Defendant Donald J. Trump.

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1**  Plaintiff Michael Cohen's complaint centers around allegations of serious violations of his constitutional rights by the United States government, then-President Donald J. Trump, then-Attorney General William Barr, and various officers within the Federal Bureau of Prisons. Cohen alleges —and another Court found with respect to certain of the defendants, *see infra*—that the defendants remanded him to prison because he wanted to publish a book critical of the then-President. He seeks redress for the violations of his constitutional rights through this damages action.

**[1]**    **[2]**  Cohen's complaint and the motions to dismiss now before this Court raise fundamental questions about the meaning and value of constitutional rights, the relationship between a citizen and the government, and the role of the federal courts in protecting those rights. The ability to publicly criticize even our most prominent politicians and leaders without fear of retaliation is a hallmark of American democracy; political speech is core First Amendment speech. "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Bridges v. California*, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941). And it is a further hallmark of American democracy that, where one's rights have been violated, one may seek to vindicate those rights in the courts. In the oft-quoted words of Chief Justice John Marshall: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury v. Madison*, 5 U.S. 137, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). The Court today must consider the limits of these hallmark principles.

**BACKGROUND**

The following facts are drawn from the complaint and are taken as true for the purposes of this motion to dismiss.

Plaintiff Michael D. Cohen ("Cohen" or "Plaintiff") was formerly employed by individual defendant Donald J. Trump ("Trump") as his attorney and personal advisor for over a decade. Dkt. No. 3 ("Compl.") ¶ 48. In August and November of 2018, Cohen pleaded guilty to various crimes including lying to Congress and campaign finance violations; he was sentenced to thirty-six months of incarceration. *Id.* ¶¶ 4, 52– 53. In May of 2019, he voluntarily surrendered for service of his sentence at FCI Otisville. *Id.* ¶ 54.

While incarcerated, Cohen began to work on a book about his association with Trump. *Id.* ¶ 55. The book chronicles the arc of his experiences with Trump and describes how, upon reflection, he came to the realization that his actions in furtherance of Trump's agenda ultimately led to his own downfall. *Id.* ¶ 56. Cohen publicly spoke about his forthcoming book in ways that made it clear that the book would be critical of and perhaps damaging to Trump; he publicly stated that his book would be unfavorable to Trump and would substantiate the descriptions he gave during his congressional testimony of Trump as "a cheat, a liar, a conman, [and] a racist," among other things. *Id.* ¶¶ 57, 59. The complaint also alleges that Cohen was privy to years of non-public behavior by Trump, which included witnessing anti-Semitic and racist remarks by him; that the book included quotes and documentary evidence of such behavior; and that Trump was aware that Cohen was witness to many years of such behavior that, if made public, could damage Trump's reputation and his future political goals, including, at that time, his potential run for a second term as President in 2020. *Id.* ¶¶ 57–58, 60.

**\*2**  Cohen's incarceration in 2019 and the beginning of 2020 was uneventful. *Id.* ¶ 62. Upon completion of his sentence, Cohen was to be released from FCI Otisville on November 21, 2021. *Id.* ¶ 63. The onset of the COVID-19 pandemic, however, altered this. *Id.* ¶ 64. COVID-19 caused significant concerns for prison populations because the virus spreads easily within the close confines of a prison; this was particularly concerning for Cohen because he has various health comorbidities that make him highly susceptible to COVID-19 risks. *Id.* ¶¶ 64–65. Cohen petitioned the defendants for early release from FCI Otisville based on Congress's passage of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L. No. 116-136, and then-Attorney General Barr's memoranda of March 26, 2020 and April 3, 2020. *Id.* ¶ 66. Cohen submitted his request to officials from the Federal Bureau of Prisons

("FBOP") on March 31, 2020; the officials determined that Cohen should be released on furlough and then transferred to home confinement. *Id.* ¶¶ 67–68. The FBOP granted Cohen furlough approval on April 18, 2020; the furlough time period was from May 1, 2020 to May 31, 2020. *Id.* ¶ 69.

During that time period, while on furlough, Cohen made several public statements via Twitter regarding the imminent publication of his book about Trump, a number of which were accompanied by the hashtag #WillSpeakSoon. *Id.* ¶ 72. Cohen planned to release his book by late September of 2020. *Id.*

On July 9, 2020, in compliance with a directive by defendant Adam Pakula, a probation officer with U.S. Probation and Pretrial Services, Cohen reported to the U.S. Probation Office in downtown Manhattan, along with his attorney, in order to transition from furlough to home confinement. *Id.* ¶ 73. They met with Pakula as well as defendant Enid Febus, a supervisory probation officer. *Id.* Pakula and Febus gave Cohen a Federal Location Monitoring Program Participant Agreement ("FLM"), which set forth conditions for Cohen's home confinement. *Id.* ¶ 74. In the first paragraph, it contained a broad provision prohibiting Cohen from engaging with the media in any form, including books, and from posting on social media:

> No engagement of any kind with the media, including print, tv, film, books, or any other form of media/ news. Prohibition from all social media platforms. No posting on social media and a requirement that you communicate with friends and family to exercise discretion in not posting on your behalf or posting information about you. The purpose is to avoid glamorizing or bringing publicity to your status as a sentenced inmate serving a custodial term in the community.

*Id.* ¶ 75. Cohen viewed this condition as an attempt to chill and restrain his First Amendment rights; he also suspected that this condition was not a standard one in FLMs for those transferring to home confinement, partially because he noted that the document was not in the standard FLM form, contained grammatical and typographical errors, and was not

identified with its federal form designation. *Id.* ¶¶ 76–78. He and his attorney inquired why the paragraph was included in the FLM, since it did not appear to be standard and would prohibit the publication of his book. *Id.* ¶ 79. Febus replied —and Pakula agreed—that that this was the standard form used, and that Cohen was not being treated differently than other prisoners.[1] *Id.* ¶¶ 80–81. Cohen and/or his attorney asked whether it would be possible to adjust the language of the paragraph or remove it entirely; the parties agreed to table the question so that they could "run it up the chain of command," and continued with reviewing the rest of the FLM. *Id.* ¶¶ 84–86. Cohen was not asked at that time or at any other point in the meeting to sign the FLM agreement, nor did he refuse to sign the agreement, withhold consent to electronic monitoring, or refuse any other condition of home confinement. *Id.* ¶¶ 87–88.

**\*3** After Cohen, his attorney, Pakula, and Febus finished reviewing the agreement, Pakula and Febus directed Cohen and his attorney to remain in the waiting area while they waited for a response from their supervisors about the first paragraph of the FLM. *Id.* ¶ 89. After waiting for about an hour and half—during which time Cohen's attorney checked in with Pakula and Febus to see if everything was alright, and was assured that everything was fine and that they were just waiting for a response from their supervisors—three United States marshals came to the waiting area and served Cohen's attorney with a remand ordered by defendant Patrick McFarland that stated that Cohen had failed to agree to the terms of FLM and was being remanded for that reason. *Id.* ¶¶ 90–91. Cohen was shackled, handcuffed, and remanded to prison. *Id.* ¶ 92. Cohen's attorney explained that the meeting had not concluded, that they were still waiting to hear back as to what, if anything, could be adjusted, that Cohen had not refused to agree to the terms of the FLM, and that Cohen was prepared to sign the FLM "as is." *Id.* ¶ 95. Pakula and Febus responded that it was "out of their hands," and that the proposed FLM was no longer on the table. *Id.* ¶ 96.

Cohen was transported to the Metropolitan Correctional Center ("MCC") in Manhattan and then transported back to FCI Otisville, where he was placed in a special segregated housing unit and then transferred to solitary confinement for sixteen days. *Id.* ¶¶ 98–100. While in solitary confinement, he spent all but thirty minutes of his day alone in a twelve by eight-foot cell with poor ventilation, no air conditioning, and temperatures frequently over one hundred degrees. *Id.* ¶¶ 101–102. These conditions caused health problems for Cohen; his blood pressure was elevated, resulting in severe

headaches, shortness of breath, and anxiety, which required immediate medical attention. *Id.* ¶ 102. While incarcerated, Cohen was unable to proceed with drafting his book and was unable to make any public statements. *Id.* ¶ 103.

Cohen filed a habeas petition against Barr, Michael Carvajal, in his official capacity as Director of the FBOP, and James Petrucci, in his official capacity as Warden of FCI Otisville, challenging his incarceration on July 20, 2020, eleven days after having been remanded. On July 23, 2020, Judge Hellerstein issued an order granting Cohen's motion for a preliminary injunction directing these defendants to release Cohen to home confinement. *Id.* ¶ 108. Judge Hellerstein found that the defendants' "purpose in transferring Cohen from release on furlough and home confinement back to custody was retaliatory in response to Cohen desiring to exercise his First Amendment rights to publish a book critical of the President and to discuss the book on social media." *Cohen v. Barr*, 2020 WL 4250342, at *1 (S.D.N.Y. July 23, 2020). Cohen had spent two weeks either in the special segregated housing unit or in solitary confinement. Compl. ¶ 27.

Cohen filed the complaint in this case on December 17, 2021. *See generally id.* The complaint names as defendants: (i) the United States of America, (ii) former President Trump, (iii) former Attorney General Barr, (iv) Director of the FBOP Carvajal, (v) Administrator of the Residential Reentry Management Branch of the FBOP Jon Gustin, (vi) Residential Reentry Manager of the FBOP McFarland, (vii) Warden of FCI Otisville Petrucci, (viii) Supervisory Probation Officer Febus, (ix) Probation Officer Pakula, and (x) John and Jane Doe (1-10) agents, servants, and employees of the United States.

The United States and the individual defendants with the exception of Trump filed a joint motion to dismiss on March 31, 2022; Trump filed a separate motion to dismiss the same day. Dkt. Nos. 39, 41. Cohen filed oppositions to the motions on May 27, 2022. Dkt. Nos. 59, 61. The defendants filed replies on June 17, 2022. Dkt. Nos. 67, 68. The Court held oral argument on the motions on August 2, 2022.

### DISCUSSION

Cohen's complaint asserts seven causes of action. Broadly, they can be grouped into two categories. First, Cohen brings claims against all the individual defendants, including Trump,

for violations of his First, Fourth, and Eighth Amendment rights; the claims are brought under a *Bivens* cause of action. *See* Compl. ¶¶ 139–142. Second, Cohen brings claims against the United States for (i) retaliation; (ii) false arrest, false imprisonment, and abuse of authority and process; (iii) negligent failure to protect; (iv) negligent infliction of emotional distress; (v) intentional infliction of emotional distress; and (vi) negligent hiring, retention, training, and supervision. *See* Compl. ¶¶ 111–138. These claims are all brought under the Federal Tort Claims Act ("FTCA").

**\*4** The Court turns first to the *Bivens* claims brought against all the individual defendants and then considers the FTCA claims against the United States.

## I. Cohen's *Bivens* Claims

The seventh cause of action in the complaint—the only one brought against the individual defendants—is brought as a *Bivens* cause of action for violations of Cohen's First, Fourth, and Eight Amendment rights, and alleges that defendants intentionally retaliated against Cohen by remanding him to prison for exercising his right to free speech, in violation of his First Amendment rights; committed an unlawful seizure in so doing, in violation of his Fourth Amendment rights; and placed him in dangerous solitary confinement conditions, in violation of his Eighth Amendment rights. Compl. ¶¶ 139–142. All of the individual defendants move to dismiss this count. They do not dispute that Cohen's constitutional rights were violated and that he suffered injury as a result. They instead argue that the *Bivens* cause of action is not available for Cohen's claims. *See* Dkt. No. 40 at 20; Dkt. No. 42 at 10.

**[3]** The Supreme Court has held that whether a *Bivens* cause of action is available is an "antecedent issue" to whether a plaintiff has alleged a violation of a clearly established constitutional right. *See Wood v. Moss*, 572 U.S. 744, 757, 134 S.Ct. 2056, 188 L.Ed.2d 1039 (2014); *see also Hernandez v. Mesa*, —— U.S. ——, 137 S. Ct. 2003, 2006, 198 L.Ed.2d 625 (2017) ("The Court turns first to the *Bivens* question, which is 'antecedent' to the other questions presented." (quoting *Wood*, 572 U.S. at 757, 134 S.Ct. 2056)). At this stage, therefore, the question before this Court is simple: Assuming, in the first instance, that

Cohen has sufficiently alleged that federal officials violated his constitutional rights, is there a judicial mechanism through which he can vindicate those rights and seek to recover for the harm he suffered from those who harmed him? It is a question that, here, is strengthened by the fact that—with regard to Cohen's First Amendment claim—another court in this District has already found Cohen's constitutional rights *were* violated. The question thus becomes whether the Constitution and the courts afford Cohen a forum in which to seek relief for the injury he suffered as a result of that violation. It is a question that, in 1803—"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," *Marbury*, 1 Cranch at 163—or in 1971—"Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty," *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 395, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)—likely would have been answered in the affirmative. His claim would have been entertained either in state or in federal court. It is a question to which the answer seems intuitive; what, after all, is the value of a right if one has no recourse when that right is violated? But it is also a question that the Supreme Court has unequivocally answered in the negative. The Court is bound by that ruling. *See State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents.").

**\*5**  In 1971, in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court squarely considered this question for the first time, in the Fourth Amendment context; as it put it, the question before the Court was "merely whether petitioner, if he can demonstrate an injury consequent upon the violation by federal agents of his Fourth Amendment rights, is entitled to redress his injury through a particular remedial mechanism normally available in the federal courts." 403 U.S. at 397, 91 S.Ct. 1999. In *Bivens*, the petitioner, Webster Bivens, alleged that agents of the now-defunct Federal Bureau of Narcotics violated his Fourth Amendment rights by entering his apartment, searching it, and arresting him, all without a warrant and with unreasonable force. *Id.* at 389, 91 S.Ct. 1999. The Court concluded that Bivens was entitled to redress his alleged constitutional injury through the mechanism of a damages suit against the federal officers. Justice Brennan, writing for the majority, noted: "That damages may be obtained for injuries

consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition." *Id.* at 395, 91 S.Ct. 1999. After looking to *Marbury*, the Court held that "petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment." *Id.* at 397, 91 S.Ct. 1999.

After *Bivens*, the Supreme Court twice extended the implied cause of action to other constitutional rights: In *Davis v. Passman*, the Court expanded the *Bivens* action to sex discrimination under the due process clause of the Fifth Amendment, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and in *Carlson v. Green*, the Court expanded the *Bivens* action to a violation of Eight Amendment rights in a federal prison, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). In each of these cases, the Court treated the expansion of *Bivens* as the straightforward application of settled law and settled constitutional principles.

In the era after *Bivens*, *Passman*, and *Carlson*, however, the Court's jurisprudence markedly shifted. By 2001, in *Correctional Services Corp. v. Malesko*, the Court recognized that it had "consistently refused to extend *Bivens* liability to any new context or new category of defendants." 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

**[4]**  This shift has frequently been explained in context of the broader shift in the Court's approach towards implying damages remedies for statutory violations. *Bivens* was decided in an era in which the Court took an expansive view of the ability of the courts to fashion a remedy to persons injured as a result of a violation of a congressional statute. *See, e.g.*, *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) ("While this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve that result."). The Court later retreated from that view, instead believing that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created

by Congress," and that "[t]he judicial task" is not to give effect to the statute's purpose but rather "to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Indeed, this contextualization of the Court's newfound hostility towards the *Bivens* cause of action has repeatedly been professed by the Court itself:

"*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action— decreeing them to be 'implied' by the mere existence of a statutory or constitutional provision." *Malesko*, 534 U.S. at 75, 122 S.Ct. 515 (Scalia, J., concurring).

**[5]  [6]  [7]** In *Ziglar v. Abbasi*, against the backdrop of the September 11 terrorist attacks, the Court again considered the availability—and continued force—of the *Bivens* cause of action. — U.S. ——, 137 S. Ct. 1843, 198 L.Ed.2d 290 (2017). The Court emphasized that *Bivens* and its progeny were part of an "*ancien regime*" in which "the Court followed a different approach to recognizing implied causes of action than it follows now." *Id.* at 1855. Under the new approach, "the Court adopted a far more cautious course before finding implied causes of action," and "clarified ... that, when deciding whether to recognize an implied cause of action, the 'determinative' question is one of statutory intent." *Id.* at 1855–56. The *Ziglar* Court did recognize that "[t]he decision to recognize an implied cause of action under a statute involves somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." *Id.* at 1856. The Court failed, however, to give significant meaning to that distinction, recounting that "the Court's expressed caution as to implied causes of actions under congressional statutes led to similar caution with respect to actions in the *Bivens* context, where the action is implied to enforce the Constitution itself." *Id.* Noting that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)), the Court clarified the somewhat piecemeal *Bivens* jurisprudence into a cohesive—and narrow—two-

step test, which first asks "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by this Court," meaning that it presents a new context, *id.* at 1859, and then asks if there are "special factors counselling hesitation in the absence of affirmative action by Congress," in which case a court should decline to extend *Bivens, id.* at 1857, 91 S.Ct. 1999.

**\*6** *Hernandez v. Mesa*, the next significant *Bivens* case confronted by the Court, followed the reasoning and analysis of *Ziglar*. Again distinguishing *Bivens, Passman*, and *Carlson* as "the products of an era when the Court routinely inferred 'causes of action' that were 'not explicit' in the text of the provision that was allegedly violated," but from which the Court has now retreated as it "came to appreciate more fully the tension between this practice and the Constitution's separation of legislative and judicial power," the Court declined to extend a *Bivens* cause of action to a lawsuit brought under the Fourth Amendment by the family of Sergio Hernandez, a fifteen-year-old Mexican citizen who was shot and killed by a U.S. border patrol agent, allegedly without provocation. — U.S. ——, 140 S. Ct. 735, 741, 206 L.Ed.2d 29 (2020). The *Hernandez* Court applied the same "two-step inquiry" articulated in *Ziglar*, asking first "whether the request involves a claim that arises in a new context or involves a new category of defendants," with "new context" understood to mean any context that "is different in a meaningful way from previous *Bivens* cases decided by this Court," and then, if a claim arises in a new context, asking "whether there are any special factors that counsel hesitation about granting the extension." *Id.* at 743 (internal quotation marks and citations omitted).

**[8]** Finally, and most recently, in *Egbert v. Boule*, the Supreme Court considered the availability of a *Bivens* cause of action for a First Amendment retaliation claim and a Fourth Amendment excessive force claim. Rejecting both claims, the Court stated that "our cases have made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." — U.S. ——, 142 S. Ct. 1793, 1800, 213 L.Ed.2d 54 (2022). The Court provided an even narrower test than that articulated

in 🚩*Ziglar* and 🚩*Hernandez*—"[w]hile our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." 🚩*Id.* at 1803.

**[9]** **[10]** Explaining that test, the 🚩*Egbert* Court made clear that, effectively, it operates as a bar to a 🚩*Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth and Eighth Amendment claims factually indistinguishable from 🚩*Bivens,* 🚩*Passman,* or 🚩*Carlson.* In an all-encompassing articulation of the special factors inquiry, the Court majority stated that "[e]ven in a particular case, a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action under 🚩*Bivens.* That uncertainty alone is a special factor that forecloses relief." 🚩*Id.* at 1804. And claims that paralleled 🚩*Bivens,* 🚩*Passman,* or 🚩*Carlson* exactly could also be foreclosed: "Even assuming the factual parallels [to 🚩*Passman*] are as close as Boule claims, 🚩*Passman* carries little weight because it predates our current approach to implied causes of action and diverges from the prevailing framework in three important ways." 🚩*Id.* at 1808. Departing from 🚩*Ziglar*'s assurance that "this opinion is not intended to cast doubt on the continued force, or even the necessity, of 🚩*Bivens* in the search-and-seizure context in which it arose," 🚩137 S. Ct. at 1856, 🚩*Egbert* held that where a case is directly parallel to 🚩*Bivens,* 🚩*Passman,* or 🚩*Carlson,* even that is insufficient, because those cases do not align with the Court's current approach to 🚩*Bivens*; "a plaintiff cannot justify a 🚩*Bivens* extension based on 'parallel circumstances' with 🚩*Bivens,* 🚩*Passman,* or 🚩*Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law," 🚩142 S. Ct. at 1809. Concluding, the Court all but held that *no* case would ever be able to satisfy that analytic framework, because "if we were called to decide 🚩*Bivens* today, we would decline to discover any implied causes of action in the Constitution." 🚩*Id.* at 1809.

**[11]** Applying those principles to the First Amendment claim before it, and in keeping with its sweeping rejection of 🚩*Bivens,* the 🚩*Egbert* Court went beyond merely holding that a damages cause of action should not be extended to the particular facts of the case before it; seemingly rejecting the fact-specific inquiry set forth in its prior 🚩*Bivens* jurisprudence, it categorically held that "there is no 🚩*Bivens* action for First Amendment retaliation." 🚩*Id.* at 1807.

**\*7** **[12]** **[13]** That holding squarely forecloses Cohen's First Amendment retaliation claim here. And the Court's broader 🚩*Bivens* jurisprudence forecloses his Fourth Amendment claim as well; there is no question that it is factually distinct from the Fourth Amendment claim implied in 🚩*Bivens.* The federal officers at issue in 🚩*Bivens* were members of the Federal Bureau of Narcotics, while the federal officers named as individual defendants in Cohen's complaint are members of the Bureau of Prisons, in addition to the former President and former Attorney General. Under the Court's current jurisprudence, this distinction alone appears to be enough to create a new context because one of the oft-quoted examples of a "new context" is a case that involves a "new category of defendants." 🚩*Malesko,* 534 U.S. at 68, 122 S.Ct. 515; *see* 🚩*Egbert,* 142 S. Ct. at 1803; 🚩*Ziglar,* 137 S. Ct. at 1876. Nor were the Bureau of Prisons officers performing functions "in the common and recurrent sphere of law enforcement," as in 🚩*Bivens, see* 🚩*Ziglar,* 137 S. Ct. at 1857; rather, they were effectuating a remand of a federal prisoner who had already been sentenced to a term of incarceration.

**[14]** Likewise, Cohen's Eighth Amendment claim arises in a new context. In 🚩*Carlson,* the Eighth Amendment claim centered on grossly inadequate medical care provided to an inmate during a severe asthma attack. 🚩446 U.S. at 16 n.1, 100 S.Ct. 1468. Cohen's Eighth Amendment claim centers on the conditions of his solitary confinement, which—although he claims "posed serious health risks"—did not result in him receiving inadequate medical care. Compl. ¶ 102. To the contrary, the complaint states that the conditions resulted in Cohen's "blood pressure bec[oming] dangerously high resulting in severe headaches, shortness of breath, and anxiety requiring immediate medical attention," implying, if anything, that "immediate medical attention" was provided to him. *Id.* Cohen's claim asserts a somewhat different "mechanism of injury" (conditions of confinement as opposed to deliberate indifference to medical needs) and

thus presents a new context under the Supreme Court's precedents. *Egbert*, 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1859); *see, e.g., Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021) (mem.) (holding that Eight Amendment claim based on conditions of "confinement in a chilled room with constant lighting, no bedding, and only paper-like clothing" bore little resemblance to the facts in *Carlson*); *Schwarz v. Meinberg*, 761 F. App'x 732 (9th Cir. 2019) (mem.) (holding that Eighth Amendment claim based on unsanitary cell conditions presented a new context). While these contexts are undoubtedly similar, the Supreme Court has counseled that "even a modest extension [of *Bivens* liability] is still an extension." *Ziglar*, 137 S. Ct. at 1864.

 **[15]**  Because Cohen's claims arise in a new context, the next question is whether there are "special factors" which the Supreme Court has stated indicate "that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed' " and thus further prevent the Court from recognizing a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1803 (quoting *Ziglar*, 137 S. Ct. at 1858). The Supreme Court has stated that "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy," *id.* (quoting *Hernandez*, 140 S. Ct. at 743), and where there are "alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action,' " *id.* at 1804 (quoting *Ziglar*, 137 S. Ct. at 1858). It does not matter if those existing remedial structures "do not provide complete relief" or are "not as effective as an individual damages remedy." *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 372, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)).

 **[16]**  In this case, defendants point to two remedial structures that they argue preclude this Court from recognizing a *Bivens* remedy for Cohen: (i) the FBOP's Administrative Remedy Program and (ii) a writ of habeas corpus. Dkt. No. 40 at 27–29. Cohen does not contest that he had these remedial structures available to him; to the contrary, he admits that he availed himself of the latter option. *See* Oral Argument Tr. at 56 ("Again, one thing about the habeas relief. My client was

freed because of the habeas relief. That stopped the bleeding, your Honor.").

 **\*8**  While the Supreme Court has held that the FBOP's Administrative Remedy Program is an alternative remedial structure sufficient to preclude *Bivens* liability in prior cases, *see, e.g., Malesko*, 534 U.S. at 74, 122 S.Ct. 515 (declining to find *Bivens* remedy where "[i]nmates in respondent's position [ ] have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program"), this Court is reluctant to find—assuming that Cohen's allegations are true as it must at this stage—that Cohen could have successfully remedied the alleged constitutional violations in such a forum. Cohen alleges in his complaint that senior FBOP officials, including the Director of the FBOP and the Warden of FCI Otisville, effectively acted at the behest of President Trump in committing the various Constitutional violations alleged. *See, e.g.,* Compl. ¶ 39. Yet, it is precisely these senior FBOP officials who exercise control over the Administrative Remedy Program: Complaints are made to the Warden and are appealed to the General Counsel who appears to report up to the Director of the FBOP.[2] If Cohen's allegations are thus proved, it is hard to imagine that the same individuals who committed the constitutional violations against Cohen would, in any meaningful sense, provide a remedy for those violations.

Defendants' argument that Cohen had an alternative remedial structure through a writ of habeas corpus is more persuasive. *See Ziglar*, 137 S. Ct. at 1865 ("And there might have been alternative remedies available here, for example, a writ of habeas corpus."); *Rodriguez v. Easter*, 2022 WL 356478, at *6 (D. Conn. Feb. 7, 2022) ("[C]ourts that have applied the *Ziglar* analysis to a claim of First Amendment retaliation by an inmate have noted the existing alternative remedial structures, including the BOP administrative grievance process and writ of habeas corpus."). While the Supreme Court has left open the availability of habeas relief for federal prisoners challenging the conditions of their confinement (as Cohen does here), *see Ziglar*, 137 S. Ct. at 1862–63 ("[W]e have left open the question whether they might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *Bell v. Wolfish*, 441 U.S. 520, 527, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (leaving "to another

day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself"), the Second Circuit has held that prisoners in federal custody may seek habeas relief related to the conditions of their confinement under 🚩 *28 U.S.C. § 2241*, *see* 🏴 *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) ("This court has long interpreted 🚩 *§ 2241* as applying to challenges to the execution of a federal sentence, 'including such matters as the administration of parole, ... prison disciplinary actions, prison transfers, type of detention and prison conditions.' ");

🏴 *Roba v. United States*, 604 F.2d 215, 219 (2d Cir. 1979) ("At that point petitioner's challenge to his transfer while seriously ill would be a challenge to the conditions of his confinement, for which habeas corpus relief under 🚩 *§ 2241* would be available."); 🏴 *Elleby v. Smith*, 2020 WL 2611921, at *2 (S.D.N.Y. May 22, 2020) ("[T]he Second Circuit has held that both habeas petitions, at least for prisoners in federal custody ... may address conditions of confinement and seek the remedy of transfer (*e.g.*, to a different prison population or facility)."); 🏴 *Ilina v. Zickefoose*, 591 F. Supp. 2d 145, 146–49 (D. Conn. 2008) (describing 🚩 *§ 2241* as a "broad remedy available to federal prisoners challenging the conditions of their confinement"). That Cohen could successfully avail himself of habeas relief is borne out by the fact that he was able to do so in this case.

**\*9** Cohen also likely could have sought relief through the right of federal courts to enjoin unconstitutional actions by state and federal officers. "Availability of federal equitable relief to remedy constitutional violations has been presumed by the courts," ⚠️ *Jensen v. Farrell Lines, Inc.*, 625 F.2d 379, 383 (2d Cir. 1980), and "it is established practice ... to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution," 🏴 *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (quoting 🏴 *Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)); *see* 🏴 *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 337, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015) (Sotomayor, J., concurring) ("That parties may call upon the federal courts to enjoin unconstitutional government action is not subject to serious dispute."); *see also* Stephen I. Vladeck, *Douglas and the Fate of* Ex Parte Young, Yale L.J. (Forum) (Apr. 30, 2012) ("Whether or not *Ex parte Young* itself articulated

this rule, it is now generally understood that injunctive relief for constitutional violations does not require a freestanding statutory cause of action (and instead arises under the relevant constitutional provision).''). As the Supreme Court stated in 🏴 *Armstrong*, the "ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 🏴 *575 U.S. at 327*, 135 S.Ct. 1378. Thus, even if habeas relief were not available, a citizen imprisoned by the President to prevent him from expressing critical views of that President on the eve of an election is not without remedy. Cohen—and if there ever are any others similarly situated—could have sought an injunction for defendants' violations of the Constitution. *See* 🏴 *Ojo v. United States*, 364 F. Supp. 3d 163, 174 (E.D.N.Y. 2019) (finding "there were alternative channels that plaintiff could have pursued" including "injunctive or declaratory relief to challenge and seek alterations to the BOP Policy affecting the provision of dental care."); *see also* 🏴 *Malesko*, 534 U.S. at 74, 122 S.Ct. 515 ("And unlike the 🏴 *Bivens* remedy, which we have never considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.").

**[17]** **[18]** It is worth noting that these alternative remedial structures are hardly adequate replacements for a suit for monetary damages. These alternative remedies would not compensate Cohen for or address the harms Cohen had already suffered prior to the issuance of the injunction. While Cohen would have been able to enjoin the defendants, as he did in this case, "a prospective injunction" does not "normally provide plaintiffs with redress for harms they have already suffered." 🏴 *Ziglar*, 137 S. Ct. at 1879. Moreover, those avenues for prospective relief do not eliminate the deterrent effect that imprisonment (in solitary confinement) can have on all but the most intrepid. And, while 🏴 *Bivens* is "concerned solely with deterring the unconstitutional acts of individual officers," 🏴 *Egbert*, 142 S. Ct. at 1806 (quoting 🏴 *Malesko*, 534 U.S. at 71, 122 S.Ct. 515), the injunctive relief that Cohen was awarded in his prior case in front of Judge Hellerstein does little to deter the unconstitutional acts of the defendants. An injunction is primarily focused on stopping an unconstitutional violation from occurring on an ongoing basis. It does not seek to punish someone for what they have done and thus, in turn, deter that person from

committing similar wrongs in the future. *See Sec. & Exch. Comm'n v. Stubos*, 2022 WL 6776741, at *10 (S.D.N.Y. Oct. 11, 2022) ("Injunctive remedies, as discussed, are tailored to deter future violations of law by that individual; not to punish the defendant and, through that punishment, send a message to those in the community not to do similar bad acts."). Nevertheless, the Supreme Court has instructed that it does not matter whether the existing remedies provide "complete relief" or appear inadequate. *Egbert*, 142 S. Ct. at 1804 (citation omitted). These difficult issues merit, and will no doubt receive, further consideration in the future, if not in this case.

As things currently stand, however, the Supreme Court's precedents squarely and unequivocally foreclose the *Bivens* claims here. None of the claims present a direct parallel to *Bivens, Passman*, or *Carlson*; even if one did, the *Egbert* Court has thrown into doubt the availability of the *Bivens* cause of action for any new claim, particularly where, as here, alternative remedial structures are in place.

As such, Cohen's *Bivens* claims must be dismissed. Before doing so, however, this Court pauses to reiterate the profound violence this holding does to Cohen's constitutional rights. Cohen's complaint alleges an egregious violation of constitutional rights by the executive branch—nothing short of the use of executive power to lock up the President's political enemies for speaking critically of him. The Supreme Court's precedents ensure that there is at best a partial remedy for the abuse of power and violation of rights against the perpetrators of those wrongs. And those precedents rest on a mistaken proposition—that the Court's reluctance to imply a damages remedy for *statutorily created* rights where Congress did not explicitly intend for there to be such a remedy necessarily must extend to a reluctance to find such a remedy for *constitutionally guaranteed* rights.

**\*10**  **[19]**  As Justice Harlan articulated in *Bivens*, "[I]t must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities." *403 U.S. at 407, 91 S.Ct. 1999* (Harlan, J., concurring). The notion that, for there to be any remedy for such a right, it must be explicitly provided for by one of the very branches of government from whom the right is designed to protect the individual is particularly insidious. And it does not logically follow from the Court's decisions in the statutory realm. The parallel to a jurisprudential shift towards looking to express congressional intent [3] in deciding whether to recognize an implied cause of action for a right conferred by Congress is emphatically not looking towards congressional intent in deciding whether to recognize an implied cause of action for a right conferred by the Constitution itself. Unlike statutory rights, constitutional rights do not stem from Congress; there is no reason why the remedies for such rights must then stem from Congress, and much reason to think that they need not. [4]  This is the precise distinction that the Supreme Court recognized, but failed to give meaning to, in *Ziglar*: "The decision to recognize an implied cause of action under a statute implies somewhat different considerations than when the question is whether to recognize an implied cause of action to enforce a provision of the Constitution itself." *137 S. Ct. at 1856*. Rather, a proper inquiry—one parallel to that articulated in *Sandoval*, one still removed from the "heady days" where the Court looked to whether it believed a damages remedy *should* normatively be available for a particular right, and one that would honor the important distinction between rights conferred by a legislative majority and rights conferred by the Constitution—would look to whether the framers—in the language they used, the structure of the government they established, the limitations they intended to place on executive power, and the authority they gave to the federal courts—intended for there to be such a remedy.

There are powerful reasons to believe that, in many circumstances, the answer to that question will be yes, [5] reasons that are not easily brushed aside with the Supreme Court's rejection of *Marbury*'s promise—drawn from English common law, *see Marbury*, 1 Cranch at 163 (quoting Blackstone's commentaries)—that, if one's rights are violated by executive officials, the courts provide a legal remedy for that violation.

* * *

**[20]**  **[21]**  For the foregoing reasons, the complaint's claims against all the individual defendants, brought under the *Bivens* cause of action, are dismissed. [6]

## II. Cohen's FTCA Claims

**\*11** Cohen's remaining causes of action—all brought against the United States—are brought under the FTCA. Cohen asserts claims for retaliation under New York common law; false arrest, false imprisonment, and abuse of authority and process under New York common law; negligent failure to protect under 18 U.S.C. § 4042; negligent infliction of emotional distress under New York common law; intentional infliction of emotional distress under New York common law; and negligent hiring, retention, training, and supervision under New York common law. The United States moves to dismiss all of Cohen's FTCA claims.

**[22]** **[23]** "The United States, as sovereign, is immune from suit save as it consents to be sued, ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (internal quotation marks omitted) (quoting *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). " 'The FTCA, 28 U.S.C. §§ 13469(b), 2401(b), and 2671–2680, constitutes a limited waiver by the United States of its sovereign immunity' and allows for tort suits against the United States under specified circumstances." *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting *Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998)). "Under the FTCA, a private citizen may sue for injuries caused by 'the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' " *Id.* (quoting 28 U.S.C. § 1346(b)). The FTCA waives sovereign immunity for claims that are:

> [1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* (quoting *FDIC v. Meyer*, 510 U.S. 471, 477, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). The "source of substantive liability under the FTCA" is "law of the State." *FDIC*, 510 U.S. at 478, 114 S.Ct. 996.

**[24]** **[25]** **[26]** Cohen's first FTCA claim is a claim for "retaliation," for "the exercising of his right to free speech," which he asserts is "a tort under the laws of the state of New York." In defending the claim in his opposition to the United States' motion to dismiss, however, Cohen makes it clear that the only substantive source of this claim is the First Amendment. *See* Dkt. No. 59 at 27 (concluding that "defendants did imprison Mr. Cohen for the lawful exercise of his First Amendment rights"); *see also id.* at 26 (first quoting *Lancaster v. Incorporated Village of Freeport*, 22 N.Y.3d 30, 978 N.Y.S.2d 101, 1 N.E.3d 302 (2013) (considering a First Amendment retaliation claim); then quoting *People v. Oeser*, 280 A.D.2d 782, 721 N.Y.S.2d 147 (3d Dep't 2001) (not considering free speech claims at all); then quoting *People v. Bollander*, 147 Misc.2d 897, 558 N.Y.S.2d 795 (Sup. Ct. 1990) (considering whether fear of retaliatory prosecution for challenging a conviction implicates due process rights, which is inapposite to Cohen's claim, and not considering free speech claims at all); and then quoting *People v. Douglas*, 183 Misc.2d 418, 704 N.Y.S.2d 438, 439 (Sup. Ct. 1999) (noting that "retaliatory" motivation behind indictment "was particularly offensive and repugnant to the fair administration of law," and therefore dismissing an indictment). That a handful of New York cases, one arising in the First Amendment context, mention the word "retaliation" does not demonstrate a freestanding New York common law tort claim for retaliation. Rather, Cohen's claim is clearly predicated on the First Amendment. "The FTCA 'has not waived the Government's sovereign immunity with respect to claims that its employees have committed constitutional torts' under the federal constitution." *Hernandez v. United States*, 939 F.3d 191, 205 (2d Cir. 2019) (alteration adopted) (quoting *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994)). [7] As such, Cohen's first cause of action against the United States for First Amendment retaliation is not cognizable under the FTCA and must be dismissed.

**\*12** **[27]** **[28]** **[29]** **[30]** **[31]** **[32]** Cohen's second FTCA claim is for false arrest, false imprisonment, and abuse of authority and process under New York common law. "False arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Hernandez*, 939 F.3d at 199 (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016) (per curiam)). "For purposes of the privilege element of a false arrest and false imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause." *Id.* (internal quotation marks omitted) (quoting *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 47 N.E.3d 747 (2016)). A claim for false imprisonment will only lie where the confinement does not stem from legal process. As the Supreme Court articulated:

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.

*Wallace*, 549 U.S. at 389–90, 127 S.Ct. 1091. "[T]he tort of false arrest does not permit recovery for 'confinement imposed pursuant to legal process.' " *Coakley v. Jaffe*, 72 F. Supp. 2d 362, 363 (S.D.N.Y. 1999) (quoting *Heck v. Humphrey*, 512 U.S. 477, 483, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)).

**[33]** Cohen's false arrest and false imprisonment claim are based on the marshals' shackling him, handcuffing him, and remanding him to MCC and then to FCI Otisville, and his confinement there for sixteen days. The first three elements of a claim for false arrest and/or false imprisonment are not in contention; there is no doubt that defendants intended to confine Cohen, that Cohen was aware of his confinement, and that Cohen did not consent to his confinement. The fourth element, however, is plainly absent. The complaint alleges that Cohen was shackled, handcuffed, remanded, and confined during his thirty-six-month period of incarceration; although he was temporarily released on furlough with a planned transfer to home confinement, an inmate on furlough "[r]emains in the legal custody of the U.S. Attorney General, in service of a term of imprisonment." 28 C.F.R. § 570.38(b)(1). "Plaintiff's confinement was uncategorically privileged because he was a convicted felon serving his sentence." *McGowan v. United States*, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015). Just as a prisoner serving a term of incarceration in prison would not have a claim for false imprisonment for his transfer from one cell to another, or even from standard conditions to solitary confinement, Cohen does not have a claim for false imprisonment for his remand and confinement. Cohen's only response is that "it has already been adjudicated by the Honorable Alvin K. Hellerstein that plaintiff's incarceration was not 'privileged' and was a result of retaliatory conduct engaged in by defendants for the lawful exercise of his First Amendment rights." Dkt. No. 59 at 28. That argument does not hold water; Judge Hellerstein found that Cohen's remand was an unconstitutional retaliation for Cohen's exercise of his First Amendment rights, but it does not follow that the remand and his confinement—effectuated pursuant to a remand order for an inmate in federal custody—was the product of "the absence of legal process," *see Wallace*, 549 U.S. at 390, 127 S.Ct. 1091. Rather, Cohen's complaint is not about the absence of legal process but for wrongs incurred while Cohen was subject to legal process and as a result of that process for which a claim of false imprisonment does not lie.

**\*13** **[34]** **[35]** **[36]** "To prove abuse of process, plaintiff must show that the defendant '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.' " *Hernandez*, 939 F.3d at 204 (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). The United States argues that this claim, too, fails "[f]or similar reasons." Dkt. No. 40 at 12. They argue that the FBOP exercising its authority to determine where a

prisoner serves a sentence of incarceration is not exercising "legal process"; no court order is required to effectuate its decisions. *See* 🔖 *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942) for the proposition that "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it"). In some sense, the government's argument appears troubling: Cohen cannot pursue a false imprisonment claim for his being shackled, handcuffed, remanded to prison, and confined because it was done pursuant to valid legal process in the form of his sentence from Judge Pauley, and thus "his confinement was legally permitted during the duration of his sentence," Dkt. No. 40 at 12, but Cohen also cannot pursue an abuse of process claim for being shackled, handcuffed, remanded to prison, and confined because that was not done pursuant to any legal process, *i.e.*, a court order. After all, as the unavailability of a false imprisonment claim reflects, Cohen's entire period of detention is pursuant to legal process; without his sentence, the Bureau of Prisons would not possess the authority to remand him to prison without a separate court order. But—as the only case Cohen cites recognizes—the tort of abuse of process lies in "*causing process to issue* lawfully but to accomplish some unjustified purpose." 🔖 *Bd. of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n*, 38 N.Y.2d 397, 380 N.Y.S.2d 635, 343 N.E.2d 278, 280 (1975). The "abuse" referenced by the tort is that "for maliciously abusing the process of the court," *i.e.*, it addresses those cases in which the process of the court "is manipulated to achieve some collateral advantage, whether it be denominated extortion, blackmail, or retribution." 🔖 *Id.*, 380 N.Y.S.2d 635, 343 N.E.2d at 281, 283. Cohen does not allege that there was an abuse in the process of obtaining the court order pursuant to which he was confined. What he complains about is that the FBOP perverted its authority under already issued legal process, to accomplish goals for which that process was not originally intended. In short, since Cohen alleges no misconduct in connection with causing the process to issue, he does not properly allege a claim for abuse of process and his second cause of action must be dismissed.

[37] Third, the government argues that Cohen's emotional distress claims—for negligent infliction of emotional distress and intentional infliction of emotional distress—relate to the same conduct as his false imprisonment and abuse of process claims, and therefore must fall with those claims. Dkt. No. 40 at 12 (first citing *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) for the proposition that

"[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort authority"; and then citing *Rheingold v. Harrison Town Police Dep't*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008) for the proposition that "[t]o the extent a plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory"). Cohen nowhere addresses this argument or defends the availability of his emotional distress claims if his false imprisonment and abuse of process claims are dismissed. Therefore, the Court deems the claims abandoned. *See, e.g.*, *Pincover v. J.P. Morgan Chase Bank, N.A.*, ---- F.Supp.3d ----, ----, 2022 WL 864246, at *11 (S.D.N.Y. Mar. 22, 2022) ("A court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (first quoting *Williams v. Mirabal*, 2013 WL 174187, at *2 (S.D.N.Y. Jan 16, 2013)); and then quoting 🔖 *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004))).

[38] [39] Finally, the United States moves to dismiss Cohen's remaining FTCA claims—for negligent failure to protect and negligent hiring, retention, training, and supervision—as barred by the FTCA's discretionary function exception, which provides that the Government is not liable for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

🔖 28 U.S.C. § 2680(a). "The exception covers only acts that are discretionary in nature, acts that 'involve an element of judgment or choice,' and 'it is the nature of the conduct, rather than the status of the actor that governs whether the exception

applies.' " *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (citations omitted and alterations adopted) (first quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); and then quoting *United States v. S.A. Empresa de Viavao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). "[E]ven 'assuming the challenged conduct involves an element of judgment,' it remains to be decided 'whether that judgment is of the kind that the discretionary function exception was designed to shield.' " *Id.* (quoting *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954). The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Varig Airlines*, 467 U.S. at 808, 104 S.Ct. 2755.

**\*14** **[40]** The Second Circuit has described a two-part test, termed the *Berkovitz*-*Gaubert* test, as "the framework for evaluating whether particular governmental conduct falls under the" discretionary function exception:

> According to the *Berkovitz*-*Gaubert* test, the [discretionary function exception] bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve "an element of judgment or choice" and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in "considerations of public policy" or susceptible to policy analysis.

*Coulthurst v. United States*, 214 F.3d 106, 109–10 (2d Cir. 2000).

**[41]** The governmental conduct challenged in the two remaining causes of action is (1) "negligently operating and managing FCI Otisville," Compl. ¶ 123, presumably in placing Cohen in solitary confinement in a space with poor ventilation, no air conditioning, and daily temperatures exceeding one-hundred degrees, *id.* ¶ 102; and (2) "negligence, carelessness, and recklessness ... in failing to meet its duty of care to plaintiff in its screening, hiring, training, supervising, evaluating, managing, controlling, and retaining of defendants and other agents, servants, and employees of the United States," *id.* ¶ 137. As to the second of

these, even assuming that it is well-plead and not conclusory, it clearly falls within the discretionary function exception. *See, e.g.*, *Saint-Guillen v. United States*, 657 F. Supp. 2d 376, 387 (E.D.N.Y. 2009) ("[F]ederal courts have found such hiring, training, and supervision decisions generally fall within the exception."); *Li v. Aponte*, 2008 WL 4308127, at \*8 (S.D.N.Y. Sept. 16, 2008) (holding that the plaintiff's "common law claims against the United States for negligent hiring, training and supervision are barred by the 'discretionary function' exception of the FTCA," and collecting cases for the proposition that "[p]ersonnel decisions of the United States generally fall within the discretionary function exception to the FTCA"). Cohen's negligent hiring, retention, training, and supervision claim therefore cannot proceed.

**[42]** As to the first of this challenged conduct—the negligent operation and management of FCI Otisville—however, it is a closer call. The Second Circuit has held that certain negligence claims related to prison management are not subject to the discretionary function exception. *See Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000).* In *Coulthurst*, the plaintiff, who was a federal prisoner, was lifting weights in the prison exercise room and suffered an injury when a cable on a lateral pull down machine snapped. *Id.* at 107. He brought claims against the prison for " 'negligence and carelessness' in that the defendant 'failed to diligently and periodically inspect the weight equipment, and the cable' and 'failed to replace the cable after undue wear and tear.' " *Id.* at 108 (citation omitted). The district court dismissed the claim as barred by the discretionary function exception, and the Second Circuit vacated. *Id.* at 108, 111. In doing so, the Second Circuit distinguished between the type of negligence that is involved in designing deficient procedures or decisions about how frequently to inspect the exercise equipment, which involve "elements of judgment and choice" as well as "considerations of public policy," *id.* at 109, and thus would be subject to the discretionary function exception, and the type of negligence that results from an individual officer being carelessly inattentive or lazy in not checking on things, which does not involve elements of judgment and choice or considerations of governmental policy and would not be subject to the discretionary function exception, *id.* The Second Circuit found that the complaint was ambiguous as to which type of negligence was alleged, and therefore that the

district court was wrong to dismiss the claim entirely as barred by the discretionary function exception. *Id.* at 109–10.

**\*15** Cohen's allegations in his complaint are similarly ambiguous as to what type of negligence Cohen is alleging. While Cohen alleges generally that his negligent failure to protect claim is based on the United States' breach of its duty "in negligently operating and managing FCI Otisville," Compl. ¶ 123, it is not clear whether Cohen claims that the alleged "negligence" resulted from the policies and procedures governing FCI Otisville (which allowed for the unsafe conditions in Cohen's cell to occur perhaps due to concerns about costs or resource allocation) or from the carelessness of an individual guard in failing to check that the cell was well-ventilated, air conditioned, and a safe temperature.

To clarify this issue, the Court asked Cohen's counsel at oral argument which of these two theories (or both) he was alleging. Oral Argument Tr. 50. Cohen's counsel stated that he was only alleging that the "policies and procedures in place during COVID at Otisville were egregiously bad in that they, aside from deliberately indifferent, were just negligent

in the maintenance and upkeep." *Id.* at 50–51. In other words, Cohen admitted that he was *not* asserting a negligent guard theory of liability. Unfortunately for Cohen, this concession is fatal to his ability to assert this claim: *Coulthurst* is clear that the designing of such policies and procedures regarding maintenance and upkeep of prisons are subject to the discretionary function exception and thus Cohen's claim of negligent failure to protect must be dismissed accordingly.

## CONCLUSION

The motions to dismiss are GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 38,[8] 39, 41.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2022 WL 16925984

## Footnotes

1   The complaint alleges that "[i]n a July 22, 2020 signed declaration made under penalty of perjury and submitted to the Court in *Cohen v. Barr et al., supra*, document number 23, defendant Pakula admitted in great detail how he and defendant Febus lied to plaintiff." *Id.* ¶ 82. The declaration, however—which is referred to and relied upon by the complaint and is thus incorporated by reference, and which the Court can take judicial notice of the contents of as a public record pursuant to Federal Rule of Evidence 201(b), *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)—does not contain such a broad admission. Rather, Pakula states that he drew the FLM agreement presented to Cohen from an agreement sent to him by a probation officer in another district as an example of an FLM agreement used for high-profile inmates. Declaration of Adam Pakula, *Cohen v. Barr et al.*, 1:20-cv-05614, 2020 WL 4250342 (S.D.N.Y. July 22, 2020), ECF No. 23. Taking Cohen's allegations here as true—particularly, that Febus and Pakula told Cohen that this was the standard form and that he was not being treated differently than other prisoners—Pakula's declaration does indicate that the statements made to Cohen were not true, in that he was, at least, being treated differently than lower-profile prisoners, and this was not the standard form used in such cases.

2   *See* Administrative Remedy Program, FBOP (Jan. 6, 2014), https://www.bop.gov/policy/progstat/1330_018.pdf; FBOP – Administrative Remedy Program, D.C. Corrections Information Counsel, https://cic.dc.gov/sites/default/files/dc/sites/cic/page_content/attachments/BOP% 20Administrative% 20Remedies% 2011.15.17% 20REVISED.pdf (last visited Nov. 11, 2022); Experienced Leadership, FBOP, https://www.bop.gov/about/agency/leadership.jsp (last visited Nov. 11, 2022).

3    *See* Steven I. Vladeck, *Bivens Remedies and the Myth of the "Heady Days,"* 8 U. St. Thomas L.J. 513, 521–22 (2011) ("Whatever the merits of *Sandoval's* approach, it is worth emphasizing that the crux of the dispute between the majority and the dissenters—and between more recent and older case law—boils down to methodological disagreements over statutory interpretation. There is simply no dispute today that congressional intent is dispositive when it comes to the existence of a private cause of action to enforce a federal statute....").

4    *See* George D. Brown, *Letting Statutory Tails Wag Constitutional Dogs—Have the Bivens Dissenters Prevailed?*, 64 Ind. L.J. 263, 265 (1989) ("One may agree with the Court's reservations about judicial lawmaking, its concern for the doctrine of separation of powers and its general views about the superior institutional competence of Congress. These positions ... should not be determinative in the 🚩 *Bivens* context. The basic question is availability of judicial relief for constitutional violations. In the recent cases the statutory tail comes to wag the constitutional dog. That is, the Court's emphasis on the statutory component of the remedial issues tends to obscure and downgrade their constitutional dimension. It is as if the whole problem involved only the judiciary's role in an article I legislative scheme. Yet the 🚩 *Bivens* doctrine deals with judicial enforcement of rights whose origin is outside of, and hierarchically superior to, any statute.").

5    *See, e.g.*, Walter Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv. L. Rev. 1532, 1542 (1972) ("Given a common law background in which courts created damage remedies as a matter of course, it is not unreasonable to presume that the judicial power would encompass such an undertaking on the part of the federal courts, unless there were some contrary indication that the judicial implementation of such a remedy was not to be a part of the article III judicial power. While with one exception prior to 🚩 *Bivens*, the Court has never explicitly exercised the judicial power to create a damage remedy in a case arising under the Constitution, its power to do so would seem rather easily established.").

6    Defendant Trump also moves to dismiss the claims against him for the independent reason that they are barred by presidential immunity. Because the claims against Trump are dismissed along with the claims against the other individual defendants, the Court need not address his claimed immunity here. Nonetheless, it is worth noting—and rejecting—Trump's argument that, effectively, a president may *never* be subject to a damages suit for violations of constitutional rights because "[i]t is blackletter law that a president is entitled to absolute immunity for acts taken within the scope of his official duties," Dkt. No. 42 at 1 (quoting 🚩 *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982)), and 🚩 *Bivens* claims—if available at all—are available only for actions taken by the official "under color of his authority," 🚩 *Bivens*, 403 U.S. at 389, 91 S.Ct. 1999. Trump reasons that "[s]ince a president is entitled to absolute immunity for 'acts within the outer perimeter of his official capacity,' it follows that a 🚩 *Bivens* claim—which must arise from an act performed 'under color of his authority'—cannot be maintained against a [p]resident." Dkt. No 42 at 3. But the language of these two doctrines is not the same, and there is no reason to assume that the one wholly subsumes the other. For an official's actions to be "under color of authority," "the conduct must be 'cloaked with official power and the official must purport' to be acting under color of official right.' " *Mueller v. Gallina*, 137 F. App'x 847, 850 (6th Cir. 2005) (mem.) (internal quotation marks omitted and alterations adopted) (quoting 🚩 *Browning v. Clinton*, 292 F.3d 235, 250 (D.C. Cir. 2002)). One could imagine a situation, for example, in which the President ordered Secret Service to kidnap his political opponent a few weeks before an election—asserting, all the while, that he was doing so in an exercise of executive authority. Such an action could be taken under *color* of authority, while at the same time not legitimately within the president's official capacity, and thus not subject to presidential immunity.

7    In *Hernandez*, the Second Circuit also held that a FTCA claim could not be brought against a federal officer on the theory that his actions violated the New York State constitution. 939 F.3d at 205-06.

8    Defendants' request to stay discovery in this matter pending adjudication of their motions to dismiss, Dkt. No. 38 has already been addressed, Dkt. No. 66, and nonetheless should be denied as moot.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4180995
Only the Westlaw citation is currently available.
United States District Court, D. South Carolina.

Josand FARMER, Plaintiff,
v.
UNITED STATES of America, Defendant.

C/A No. 0:21-2572-TMC-PJG
|
Signed March 24, 2022

**Attorneys and Law Firms**

Josand Farmer, Salters, SC, Pro Se.

Andrew Robert de Holl, US Attorneys Office, Charleston, SC, for Defendant.

### REPORT AND RECOMMENDATION

Paige J. Gossett, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff Josand Farmer, a self-represented federal prisoner, filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, 1346(b). Plaintiff files this action *in forma pauperis* under 28 U.S.C. § 1915 and § 1915A. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on the Government's motion to dismiss. (ECF No. 32.) Pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the court advised Farmer of the summary judgment and dismissal procedures and the possible consequences if he failed to respond adequately to the Government's motion. (ECF No. 33.) Farmer filed a response in opposition to the motion, (ECF No. 40) and the Government replied, (ECF No. 44). Having reviewed the record presented and the applicable law, the court finds that the Government's motion should be granted in part and denied in part without prejudice to renew on a more fully developed record of jurisdictional facts.

### BACKGROUND

The following allegations are taken as true for purposes of resolving the Government's motion to dismiss. This matter arises out of the Federal Bureau of Prison's ("BOP's") response to the COVID-19 pandemic. Farmer is an inmate in the Federal Correctional Institution ("FCI") Williamsburg in Salters, South Carolina. Farmer contracted COVID-19 around December 22, 2020, which caused and continues to cause Farmer serious physical injury.

Farmer claims that despite laws and BOP policy requiring that protective measures be taken to protect inmates from contracting COVID-19, those laws and policies were not adhered to at FCI Williamsburg. For example, Farmer alleges that prison officers were tested after entering the prison, rather than outside the prison. Farmer also alleges that incoming inmates who tested positive before entering the prison were placed on Farmer's cell block. Farmer further alleges that quarantine procedures were not followed for inmates who returned from hospitalization for non-COVID reasons. Farmer claims that as a direct result of these failures to follow BOP policy, he contracted COVID-19. Additionally, Farmer alleges that despite the BOP's inherent inability to follow COVID-19 guidelines issued by the Center for Disease Control and Prevention ("CDC") in prisons, Farmer's requests for home confinement and compassionate release were denied.

Farmer pursued his remedies in the BOP, which were denied on July 26, 2021. Farmer filed this action on August 11, 2021, raising claims of negligence against the Government and seeking damages.

### DISCUSSION

#### A. Rule 12(b)(1) Standard

Dismissal under Federal Rule of Civil Procedure 12(b)(1) examines whether the complaint fails to state facts upon which jurisdiction can be founded. It is the plaintiff's burden to prove jurisdiction, and the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

**\*2** To resolve a jurisdictional challenge under Rule 12(b)(1), if the moving party contends that the complaint fails to

allege facts upon which subject matter jurisdiction can be based, the court must assume that the facts alleged in the complaint are true. 🚩 Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009) (quoting 🚩 Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). If the moving party contends the facts alleged are untrue, the court may resolve factual dispute by weighing evidence necessary to determine whether the court has jurisdiction. Id.

Further, while the federal court is charged with liberally construing a complaint filed by a *pro se* litigant to allow the development of a potentially meritorious case, see, e.g., 🚩 Erickson, 551 U.S. 89, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact where none exists. 🚩 Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990).

## B. The Government's Motion

The Government argues the court lacks subject matter jurisdiction over this action because Farmer's negligence claims are barred by the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 🚩 28 U.S.C. §§ 2671-🚩2680, 🚩1346(b).

The FTCA provides for a limited waiver of the United States' sovereign immunity from suit by allowing a plaintiff to recover damages in a civil action for loss of property or personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 🚩 28 U.S.C. § 1346(b)(1); see also 🚩 Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001) ("The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred.").

However, the FTCA does not waive the United States' sovereign immunity for:

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

🚩 28 U.S.C. § 2680(a). The purpose of this "discretionary function exception" is to protect the discretion of the executive branch to make policy judgments. Blanco Ayala v. United States, 982 F.3d 209, 214 (4th Cir. 2020); see also 🚩 Wood v. United States, 845 F.3d 123, 128 (4th Cir. 2017) ("In short, the discretionary function exception is driven by separation of powers concerns, shielding decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently."). The burden is on the plaintiff to establish that the discretionary function exception does not foreclose his claim. Blanco Ayala, 982 F.3d at 214 (quoting 🚩 Seaside Farm, Inc. v. United States, 842 F.3d 853, 857 (4th Cir. 2016)).

To determine whether the discretionary function exception applies, the court must undertake a two-step inquiry. Sanders v. United States, 937 F.3d 316, 328 (4th Cir. 2019); 🚩 Rich v. United States, 811 F.3d 140, 145 (4th Cir. 2015). First, the court must determine whether the nature of the defendant's actions is discretionary—that is, whether the actions involve an element of judgment or choice. 🚩 United States v. Gaubert, 499 U.S. 315, 322 (1991); 🚩 Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988). The action is not considered discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." Id. Second, if the actions are discretionary, the court must then determine whether the defendant's decision was made based

on considerations of public policy. 🚩Gaubert, 499 U.S. at 322-23; 🚩Berkovitz, 486 U.S. at 536-37.

**\*3** Here, the Government argues that the discretionary function exception applies because Farmer's claims are based on actions by prison officials that involved judgments and choices about the appropriate response to COVID-19, and that such decisions inherently involve balancing public policy considerations about safety, health, and resources. In response, Farmer argues that the first step of the discretionary function exception inquiry is not met here because the officials' actions were constrained by laws or policies meant to protect inmates at FCI Williamsburg, and therefore, the purportedly negligent officials lacked discretion to disregard those policies. Farmer specifies four laws or policies to which the officials allegedly failed to adhere.

First, Farmer argues that 🚩18 U.S.C. § 4042(a), which provides for the general duties of the BOP, including the management of prisons and the safekeeping, care, and subsistence of all inmates, provides a nondiscretionary duty to protect inmates from COVID-19. But the statute itself provides no specific direction as to how the BOP is to fulfill those duties, much less how to prevent the spread of COVID-19. Courts have routinely refused to find that this statute mandates specific, non-discretionary conduct such that failure to adhere to it would preclude the application of the discretionary function exception. 🚩Palay v. United States, 349 F.3d 418, 428-29 (7th Cir. 2003) (collecting circuit courts of appeal cases holding the same); see also 🚩Rich v. United States, 811 F.3d 140, 145 (4th Cir. 2015) (stating the BOP "retains discretion regarding the implementation" of the "broad directives" in 🚩§ 4042(a)). Therefore, to the extent Farmer's negligence claims are based on decisions by BOP officials pursuant to its general duties under 🚩18 U.S.C. § 4042, the discretionary function exception would bar his claims.

Second, Farmer points to statutes allowing inmates to serve their remaining sentences under home confinement or have their sentences reduced. See 🚩18 U.S.C. § 3582(c) (compassionate release or reduction of sentence); 🚩18 U.S.C. § 3624(c) (home confinement); CARES Act, Pub. L. 116-136, Mar. 27, 2020, 134 Stat 281 (lengthening the allowable time for home confinement). However, each of

those statutes or laws expressly leaves those decisions in the BOP's discretion after consideration of matters of public policy. See, e.g., 🚩18 U.S.C. § 3624(c)(2) ("The authority under this subsection *may* be used to place a prisoner in home confinement....") (emphasis added); see also Crowe v. United States, 430 F. App'x 484, 485 (6th Cir. 2011) (stating the BOP has broad discretion under 🚩18 U.S.C. § 3582(c) to move for compassionate release); 1 McCarson v. Reherman, C/A No. 2:20-1386-HMH, 2020 WL 2110770 (D.S.C. May 4, 2020) (noting that the CARES Act affords the BOP broad discretion in determining whether home confinement is appropriate for inmates). Therefore, to the extent Farmer's negligence claims are based on prison officials' failure to grant Farmer's requests for home confinement or compassionate release, those claims are barred by the discretionary function exception.

Third, Farmer points to prison officials' inability to follow the CDC's COVID-19 Guidelines. However, as pointed out by the Government, CDC Guidelines are only advisory and do not mandate any particular conduct on the part of BOP officials. (Def.'s Mot., ECF No. 32 at 9-14.) Notably, Farmer does not allege that the BOP adopted any particular CDC Guidelines as its own policy. Therefore, any decision by prison officials not to follow CDC guidance is discretionary and barred by the discretionary function exception.

**\*4** Fourth, Farmer points to memoranda from the BOP establishing "Action Plans" for federal prisons on how to manage the COVID-19 pandemic. The Government characterizes these memoranda as "non-binding guidance" whereas Farmer describes them as "non-discretionary protective measures" or "non-discretionary instructions" by the BOP. (Compare Pl.'s Resp., ECF No. 40 at 2; with Def.'s Reply, ECF No. 44 at 2.) On this record, the court is not able to determine whether these memoranda represent official policy of the BOP such that prison officials lacked the discretion to take different actions, whether the memoranda were mere guidance to federal prison officials, or whether FCI-Williamsburg adopted or adhered to the memoranda. Farmer attaches two examples of the memoranda to his response in opposition to the Government's motion to dismiss. (ECF No. 40-2.) The memoranda do not establish whether the protective measures described within them are mandatory policies, mere guidance, or something else. For instance, the memoranda describe themselves as "guidance" in one instance (ECF No. 40-2 at 1), but in other instances, appear to mandate prisons follow certain rules and create a system for compliance review (ECF No. 40-2 at 1-4, 6-8, 10). Nor does

the record reflect whether the memoranda reflect actual policy adopted by FCI Williamsburg. Therefore, the record before the court is insufficiently developed to determine whether the discretionary function exception bars Farmer's claims that prison officials failed to follow FCI Williamsburg's policy to protect inmates from COVID-19.

## RECOMMENDATION

Based on the foregoing, the court recommends the Government's motion to dismiss be granted in part and denied in part, without prejudice to its ability to raise the discretionary function exception argument on a more developed record regarding FCI Williamsburg's COVID-19 policy. To the extent Farmer's negligence claims are based on prison officials' failure to follow other laws or policies cited in Farmer's Complaint, those claims are barred by the discretionary function exception to the FTCA, and any such claims should be dismissed for lack of subject matter jurisdiction.

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself

that there is no clear error on the face of the record in order to accept the recommendation.' " *Diamond v. Colonial Life & Acc. Ins. Co.,* 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

**All Citations**

Slip Copy, 2022 WL 4180995

## Footnotes

1    Inmates may now seek compassionate release from a federal district court after exhausting their administrative rights to appeal the BOP's failure to bring such a motion on the inmates' behalf. First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 3500363
Only the Westlaw citation is currently available.
United States District Court, D.
South Carolina, Rock Hill Division.

Josand FARMER, Plaintiff,
v.
UNITED STATES of America, Defendant.

Civ. No. 0:21-cv-2572-TMC
|
Signed August 18, 2022

**Attorneys and Law Firms**

Josand Farmer, Salters, SC, Pro Se.

Andrew Robert de Holl, US Attorneys Office, Charleston, SC, for Defendant.

**ORDER**

Timothy M. Cain, United States District Judge

**\*1** Plaintiff Josand Farmer, a federal inmate proceeding *pro se*, brought this action pursuant to the Federal Tort Claims Act ("FTCA") against Defendant United States of America. (ECF No. 1). In accordance with 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(e) (D.S.C.), this case was referred to a magistrate judge for all pretrial proceedings. Now before the court is the magistrate judge's Report and Recommendation ("Report"), recommending that Defendant's motion to dismiss (ECF No. 32) be granted in part and denied in part without prejudice. (ECF No. 61). Both parties filed objections, (ECF Nos. 70; 73), and Defendant also filed a reply to Plaintiff's objections, (ECF Nos. 74; 79). The matter is now ripe for the court's disposition.

**I. Background**

Plaintiff alleges Defendant "failed to use reasonable care when it neglected to protect [him] from contracting COVID-19" while he was housed at FCI Williamsburg in Salters, South Carolina. (ECF No. 1 at 1). Specifically, Plaintiff asserts that Defendant had a statutory duty to provide suitable quarters, protection, care, and subsistence for prisoners, *id.* at 2–3 (citing 28 U.S.C. § 4042); that Defendant

had a duty pursuant to a 2020 memorandum issued by the Attorney General instructing the United States Bureau of Prisons ("BOP") to increase the use of home confinement at correctional facilities most affected by Covid-19, *id.* at 3; that Defendant had a duty to implement the guidance and protective measures prescribed by the Centers for Disease Control and Prevention ("CDC") to mitigate the spread of the Covid-19 virus, *id.* at 4; and that Defendant had a duty to manage prisoners' exposure to Covid-19 pursuant to specified BOP "action plans," (ECF No. 40-2). Plaintiff asserts that he contracted Covid-19 and is suffering the long-term effects of contacting the virus, as a result of FCI Williamsburg's failure to follow the guidelines by, for example, failing to test officers outside the facility and allowing inmates who tested positive into the facility or to pass meal trays. (ECF No. 1 at 4–5). [1]

Plaintiff unsuccessfully pursued administrative tort remedies which were denied in July 2021. Plaintiff subsequently filed this FTCA action, asserting a negligence claim against Defendant. *See generally id.* Defendant then filed the instant motion pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, (ECF No. 32), seeking to dismiss for lack of subject matter jurisdiction based on the discretionary function exception to the FTCA's sovereign immunity waiver, (ECF No. 32-2). Plaintiff filed a response in opposition, (ECF No. 40), Defendant replied (ECF No. 44), and Plaintiff filed a sur-reply (ECF No. 46).

**\*2** The magistrate judge issued a Report recommending that Defendant's motion to dismiss be granted to the extent that Plaintiff's claims Defendant breached duties imposed by 18 U.S.C. §§ 3582, 3624, 4042, or the CARES Act or arising under the CDC's Covid-19 guidelines. (ECF No. 61 at 5–7). However, the magistrate judge concluded that "the record before the court is insufficiently developed to determine whether the discretionary function exception bars Farmer's claims that prison officials" at FCI Williamsburg failed to follow directives emanating from BOP "Action Plans." *Id.* at 7. As previously noted, both parties filed objections, (ECF Nos. 70; 73), and Defendant replied to Plaintiff's objections, (ECF Nos. 74; 79). The court has carefully considered all of the documents submitted by the parties and concludes that a hearing is unnecessary for the court to rule on the matter.

**II. Legal Standards**

*District Court's Review of the Report*

The recommendations set forth in the Report have no presumptive weight, and this court remains responsible for making a final determination in this matter. 🔖 *Wimmer v. Cook*, 774 F.2d 68, 72 (4th Cir. 1985) (quoting *Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). The court is charged with making a *de novo* determination of those portions of the Report to which a specific objection is made, and the court may accept, reject, modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions. 🔖 28 U.S.C. § 636(b)(1). However, the court need only review for clear error "those portions which are not objected to—including those portions to which only 'general and conclusory' objections have been made[.]" *Dunlap v. TM Trucking of the Carolinas, LLC*, 288 F. Supp. 3d 654, 662 (D.S.C. 2017). "An objection is specific if it 'enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute.' " *Id.* at 662 n.6 (quoting 🔖 *United States v. One Parcel of Real Prop., With Bldgs., Appurtenances, Improvements, & Contents, Known As: 2121 E. 30th St., Tulsa, Okla.*, 73 F.3d 1057, 1059 (10th Cir. 1996)). On the other hand, objections which merely restate arguments already presented to and ruled on by the magistrate judge or the court do not constitute specific objections. *See, e.g.,* 🔖 *Howard v. Saul*, 408 F. Supp. 3d 721, 726 (D.S.C. 2019). Furthermore, in the absence of specific objections to the Report, the court is not required to give any explanation for adopting the magistrate judge's recommendation. *Greenspan v. Brothers Prop. Corp.*, 103 F. Supp. 3d 734, 737 (D.S.C. 2015) (citing *Camby v. Davis*, 718 F.2d 198, 199–200 (4th Cir. 1983)).

Additionally, since Plaintiff is proceeding *pro se*, this court is charged with construing his filings liberally in order to allow for the development of a potentially meritorious case. *See* 🔖 *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); 🔖 *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). This does not mean, however, that the court can ignore the Plaintiff's failure to allege or prove facts that establish a claim currently cognizable in a federal district court. *See* 🔖 *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

🔖 *Rule 12(b)(1) Motions to Dismiss*

A motion to dismiss pursuant to 🔖 Rule 12(b)(1) for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. *See* 🔖 Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick*, 191 F.3d 394, 399 (4th Cir. 1999); *see also* 🔖 *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) ("Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto."). Any motion questioning a court's subject matter jurisdiction "must be considered before other challenges because the court must find it has jurisdiction before determining the validity of any claims brought before it." *Sumpter v. United States*, No. 5:06-cv-01004-RBH, 2007 WL 776113, at *1 (D.S.C. March 9, 2007) (citing 🔖 *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)). To determine whether jurisdiction exists, the court is to "regard the pleadings' allegations as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." 🔖 *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (internal citation omitted). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (internal citation omitted). The plaintiff bears the burden of proof. *See* 🔖 *Evans*, 166 F.3d at 647.

### III. Discussion

### A. Applicable Law

**\*3** Defendant moves to dismiss this action on the grounds that it is barred by the discretionary function exception to the FTCA. (ECF No. 32-2 at 4–14). The FTCA provides for a limited waiver of the United States' sovereign immunity from suit by allowing a plaintiff to recover damages in a civil action for loss of property or personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b)(1); *see also Sanders v. United States*, 937 F.3d 316, 327 (4th Cir. 2019). Although the FTCA effects a waiver of the United States' sovereign immunity from suit in tort actions, this waiver is subject to certain exceptions. *See Sanders*, 937 F.3d at 327. For example, the FTCA does not waive sovereign immunity for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This "discretionary function exception" is intended to protect the discretion of the executive branch to make policy judgments. *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020); *see also Wood v. United States*, 845 F.3d 123, 128 (4th Cir. 2017) ("In short, the discretionary function exception is driven by separation of powers concerns, shielding decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently.").

The Supreme Court has adopted a two-step inquiry for determining whether the United States enjoys sovereign immunity for conduct purportedly covered by the discretionary function exception. *See Berkowitz v. United States*, 486 U.S. 531, 536–37 (1988). First, the court must determine whether the defendant's alleged conduct "involves an element of judgment or choice." *Id.* at 536.; *see also United States v. Gaubert*, 499 U.S. 315, 322 (1991). The action is not considered discretionary if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." *Id.* Second, if the court determines that the conduct at issue is the product of judgment or choice—and is, therefore, discretionary— the court must then "determine whether the decision made was based on considerations of public policy." *Wood*, 845 F.3d at 128 (internal quotation marks omitted). The second step is aimed at "prevent[ing] judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Sanders*, 937 F.3d at 328 (internal quotation marks omitted). "FTCA plaintiffs have the burden of showing

that the discretionary function exception does not foreclose their claim." *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016).

The magistrate judge properly identified the foregoing principles as providing the relevant framework for considering Defendant's motion. (ECF No. 61 at 3–5). Neither party objects to this portion of the Report; thus, the court adopts it and incorporates it herein.

### B. Plaintiff's Objections to the Report

#### 1.

To the extent Plaintiff contends that prison officials breached their general duty pursuant to 18 U.S.C. § 4042(a) to manage and safekeep facilities, (ECF No. 1 at 2–3), the magistrate judge determined that the discretionary function exception applies. (ECF No. 61 at 5). The magistrate judge explained that "the statute itself provides no specific direction as to how the BOP is to fulfill those duties, much less how to prevent the spread of Covid-19," and noted that courts "have routinely refused to find that this statute mandates specific, non-discretionary conduct such that failure to adhere to it would preclude the application of the discretionary function exception." *Id.* Accordingly, the magistrate judge concluded that the discretionary function exception bars Plaintiff's claim to the extent it is grounded in § 4042. *Id.* at 5–6.

Plaintiff objects to this specific determination, acknowledging that the statute affords "broad discretion" but arguing such discretion "is not applicable" when the statute "prescribes a specific course of action." (ECF No. 70 at 1–2). He fails, however, to identify which part of the statute imposes specific duties. The court agrees with the magistrate judge, overrules this objection, and adopts this portion of the Report. *See Sanford v. United States*, No. 0:21-cv-2552-RMG, 2022 WL 1210717, at *3 (D.S.C. Apr. 25, 2022) (holding that the FTCA's discretionary function exception applies to identical claim that prisoner's Covid-19 exposure resulted from prison officials' failure to adhere to § 4042(a)).

#### 2.

**\*4**  To the extent Plaintiff cites additional statutes as bases for his FTCA claim (ECF No. 1 at 4)—including 📁 § 3582(c) (compassionate release); 📁 § 3624(c) (home confinement); and the CARES Act, Pub. L. No. 116-136, 134 Stat 281, 516 (2020) (permitting the BOP to lengthen home confinement under 📁 § 3624(c)(2))—the magistrate judge noted that such statutes "expressly leave[ ] ... decisions in the BOP's discretion after consideration of matters of public policy," and concluded that the discretionary function exception bars this aspect of Plaintiff's claim as well. (ECF No. 61 at 6.) Plaintiff does not specifically object to this portion of the Report. Having reviewed the analysis and conclusion of the magistrate judge, the court adopts and incorporates this portion of the Report. *See Sanford,* 2022 WL 1210717, at \*3 (concluding that the discretionary function exception to the FTCA applies to identical claim based on the same statutes).

3.

Regarding Plaintiff's attempt to impose FTCA liability as a result of Defendant's alleged failure to follow the CDC's Covid-19 guidelines, the magistrate judge observed that "CDC Guidelines are only advisory and do not mandate any particular conduct on the part of BOP officials." (ECF No. 61 at 6.) The magistrate judge determined that "any decision by prison officials not to follow CDC Guidelines is discretionary and barred by the discretionary function exception." *Id.* at 7. Despite filing an 80-page document objecting to the Report, Plaintiff does not specifically address the magistrate judge's conclusion that the CDC Guidelines themselves— as opposed to internal BOP policies—are merely advisory. The court agrees with the magistrate judge and adopts and incorporates this portion of the Report. *See Sanford,* 2022 WL 1210717, at \*3 ("[R]egarding the CDC's 2019 statements on measures such as social distancing, mask wearing and quarantining, because the agency's guidelines are advisory and do not mandate any particular conduct by the BOP, prison officials may in their discretion not adopt them as BOP policy. Therefore, Plaintiff's claim as it relates to failure to follow the CDC guidelines is barred by the discretionary function exception to the FTCA."). To the extent Plaintiff's objections specifically challenge this portion of the Report, the court overrules them.

C. Defendant's Objection to the Report

With regard to Plaintiff's assertion that Defendant is liable under the FTCA for failing to comply with BOP's Covid-19 response "Action Plan" as reflected in internal BOP memoranda Plaintiff submitted to the court, (ECF Nos. 40 at 2; 40-2), Defendant contends these memoranda merely contain "non-binding guidance" for federal correctional institutions, (ECF No. 44 at 2), while Plaintiff argues that they set forth "non-discretionary protective measures" or "instructions" by the BOP, (ECF No. 40 at 2). The magistrate judge concluded as follows:

> On this record, the court is not able to determine whether these memoranda represent official policy of the BOP such that prison officials lacked the discretion to take different actions, whether the memoranda were mere guidance to federal prison officials, or whether FCI-Williamsburg adopted or adhered to the memoranda. [Plaintiff] attaches two examples of the memoranda to his response in opposition to the Government's motion to dismiss. (ECF No. 40-2.) The memoranda do not establish whether the protective measures described within them are mandatory policies, mere guidance, or something else. For instance, the memoranda describe themselves as "guidance" in one instance (ECF No. 40-2 at 1), but in other instances, appear to mandate prisons follow certain rules and create a system for compliance review (ECF No. 40-2 at 1-4, 6-8, 10). Nor does the record reflect whether the memoranda reflect actual policy adopted by FCI Williamsburg. Therefore, the record before the court is insufficiently developed to determine whether the discretionary function exception bars [Plaintiff's] claims that prison officials failed to follow FCI Williamsburg's policy to protect inmates from COVID-19.

**\*5**  (ECF No. 61 at 7). Accordingly, the magistrate judge recommended that the court deny Defendant's motion to dismiss in part "without prejudice to [Defendant's] ability to raise the discretionary function exception argument on a more developed record regarding FCI Williamsburg's COVID-19 policy." *Id.* at 7.

Defendant objects on three grounds to the magistrate judge's conclusion that its motion should be denied with respect to Plaintiff's FTCA claim as related to the BOP Action Plans submitted by Plaintiff. (ECF No. 73). First, Defendant contends the magistrate judge erroneously considered the BOP Action Plan memoranda, which Plaintiff did not identify in the complaint as a basis for his FTCA claim but presented for the first time in his response to the motion to dismiss. *Id.* at 2. Defendant suggests, therefore, that the magistrate judge effectively allowed Plaintiff to amend his complaint and denied Defendant an opportunity to fully address the issue. *Id.* The court notes, however, that Defendant addressed these documents in its reply. *See* (ECF No. 44). In light of the liberal construction the court is obliged to apply to *pro se* filings, the court overrules this objection.

Defendant next argues that the magistrate judge failed to account for Plaintiff's burden of proof under the circumstances. (ECF No. 73 at 2–3). The Report states that "[t]he memoranda do not establish whether the protective measures described within them are mandatory policies, mere guidance, or something else," and concludes that "the record before the court is insufficiently developed to determine whether the discretionary function exception" applies. (ECF No. 61 at 7). As noted above, "FTCA plaintiffs have the burden of showing that the discretionary function exception does not foreclose their claim." *Seaside Farm*, 842 F.3d at 857. However, as also explained, the moving party should prevail on a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute," *Richmond*, 945 F.2d at 768. The magistrate judge implicitly found that the facts are in dispute, noting that "the memoranda describe themselves as 'guidance' in one instance ..., but in other instances, appear to mandate prisons follow certain rules and create a system for compliance review." (ECF No. 61 at 7). Therefore, the court overrules this objection.

Finally, Defendant objects to the Report to the extent that the magistrate judge found the BOP memoranda were not discretionary. (ECF No. 73 at 4–6). The court overrules this objection for the reasons stated in the Report and previously recounted by the court in full in this order. Specifically, the magistrate judge observed that the memoranda, in certain passages, appear to employ non-discretionary, mandatory language. Therefore, the court declines to deviate from the magistrate judge's recommendation. *See Sanford*, 2022 WL 1210717, at \*3 (denying Defendant's motion to dismiss based on the discretionary function exception with respect to BOP action plan memoranda on the basis that "it remains contested whether the BOP implement[ed] mandatory or discretionary protocol" and "that a more robust record of fact is warranted in order to determine whether the FTCA's discretionary function exception may apply").

### IV. Conclusion

For the foregoing reasons, the Court **ADOPTS** the Report (ECF No. 61) and incorporates it herein. Accordingly, the court **GRANTS in PART** and **DENIES in PART without prejudice** Defendant's motion to dismiss. (ECF No. 32). The portions of Plaintiff's FTCA claim relating to prison officials' failure to follow the specified statutory and CDC guidelines are **DISMISSED**. The portion of Plaintiff's FTCA claim relating to prison officials' failure to follow the BOP Covid-19 action plans survives at this time. Discovery and summary judgment will be limited to the claim of negligence relating to failure to follow BOP Covid-19 action plans. This matter is returned to the magistrate judge for further proceedings.

**\*6  IT IS SO ORDERED.**

### NOTICE OF RIGHT TO APPEAL

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

**All Citations**

Slip Copy, 2022 WL 3500363

## Footnotes

1    Plaintiff sought compassionate release from his sentence on the grounds that these same alleged actions at FCI Williamsburg created a substantial risk of contracting Covid-19, but his motion was denied on the grounds that he failed to provide sufficient proof "establishing that his recent COVID-19 diagnosis has created the medical problems alleged in the pro se motion." ⚑ *United States v. Farmer*, No. 5:10-cr-271-FL-3, 2021 WL 2188745, at *11 (E.D.N.C. May 28, 2021), *aff'd*, No. 21-6887, 2022 WL 1619040 (4th Cir. May 23, 2022).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4224955

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Richard MARTINEZ, Plaintiff,

v.

UNITED STATES of America, Robert Beaudouin,
M.D., Mandeep Singh, P.A., Yoon Kang, P.A.,
Warden MCC, the GEO Group, Inc., the Brooklyn
Hospital Center, Phillip McPhearson, M.D.,
and John/Jane Does Nos. 1-10, Defendants.

20-CV-7275 (VEC)
|
Signed 09/16/2021

**Attorneys and Law Firms**

Jaehyun Oh, Eli Avery Fuchsberg, The Jacob D. Fuchsberg
Law Firm, LLP, New York, NY, for Plaintiff.

Samuel Hilliard Dolinger, Talia Kraemer, U.S. Attorney's
Office, New York, NY, for Defendants United States of
America, Robert Beaudouin, MD, P.A. Mandeep Singh, P.A.
Yoon Kang.

Matthew Rainis, Lawrence, Worden, Rainis & Bard, PC,
Melville, NY, for Defendant The GEO Group, Inc.

Patrick J. Brennan, Christopher Pio Fox, Furman, Kornfeld &
Brennan LLP, New York, NY, for Defendants The Brooklyn
Hospital Center, Phillip McPhearson, M.D.

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

**\*1** Between July 2018 and November 2019, Plaintiff was
in federal custody — first at Queens Detention Facility
("QDF"), a private facility operated by Defendant The GEO
Group, Inc. ("GEO Group"), and later at the Metropolitan
Correctional Center ("MCC"), a U.S. Bureau of Prisons
("BOP") facility — while awaiting trial on a criminal charge.
Over the course of those 16 or so months, Plaintiff repeatedly
complained about, *inter alia*, blood in his urine, painful
urination, and back, leg, and chest pain. Although Plaintiff
received some care from the medical staff at QDF and MCC,
Plaintiff was not seen by a urologist or oncologist for months,
despite MCC medical personnel issuing multiple referrals.

Unfortunately, by the time Plaintiff did see appropriate
specialists in November 2019, it was too late; Plaintiff was
diagnosed with Stage IV prostate cancer and found to be
paraplegic as a result of tumors having spread to his spine.
According to Plaintiff, Defendants are liable for providing
substandard medical care and failing to diagnose and treat his
serious medical ailments before they had progressed to such
a devastating state.

Plaintiff has sued those who were involved in his medical care
while in pretrial detention. Plaintiff has sued three members
of MCC's medical staff, Dr. Robert Beaudouin, P.A. Mandeep
Singh, and P.A. Yoon Kang (collectively the "Individual
Federal Defendants," and with the United States, the "Federal
Defendants"), pursuant to *Bivens v. Six Unknown Named
Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for
cruel and unusual punishment under the Eighth Amendment
and for deprivation of his substantive due process rights under
the Fifth Amendment.[1] Plaintiff has also sued the United
States under the Federal Tort Claims Act, 28 U.S.C. § 2671
*et seq.*, for medical malpractice, negligence, and negligent
hiring, supervision, and retention. Finally, Plaintiff brings a
state law medical malpractice claim against the non-federal
Defendants involved in Plaintiff's care.[2]

Federal Defendants moved to dismiss Plaintiff's *Bivens* and
FTCA claims pursuant to Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6). Notice of Mot., Dkt. 65. For the
following reasons, Federal Defendants' motion to dismiss is
GRANTED in part and DENIED in part.

**BACKGROUND**[3]

**\*2** On or around July 26, 2018, Plaintiff, who at the time
was 49 years old, was arrested. Compl. ¶¶ 41–42, Dkt. 1.
Between the date of his arrest and August or September 2018,
Plaintiff was held as a pretrial detainee at QDF, a private
facility managed by the GEO Group. *Id.* ¶¶ 41, 46. While
incarcerated at QDF, Plaintiff complained to the medical
staff about blood in his urine (the medical term for which
is hematuria) and painful, frequent urination; a urine sample
revealed red or orange colored urine with a foul odor. *Id.* ¶ 43.
QDF medical staff suspected that Plaintiff had a urinary tract
infection ("UTI"); although no urine culture was performed,
they placed Plaintiff on antibiotics. *Id.* ¶¶ 44–45.

In late August or early September 2018, BOP transferred Plaintiff to MCC. *Id.* ¶¶ 46–47. Shortly after arriving at MCC, on September 11, 2018, Plaintiff had a urine sample collected for analysis; the urinalysis yielded abnormal results. *Id.* ¶ 47. The results of the urinalysis were co-signed by Dr. Beaudouin on May 3, 2019, with no treatment or additional testing occurring during the intervening eight months. *Id.* On May 31, 2019, Plaintiff was evaluated by Dr. Beaudouin for hematuria, which Plaintiff reported having started nine months prior but having worsened in the prior two weeks. *Id.* ¶ 48. Dr. Beaudouin determined that Plaintiff may have a UTI, and he prescribed Plaintiff antibiotics. *Id.* Dr. Beaudouin also requested a computerized tomography ("CT") scan of Plaintiff's abdomen and pelvis and issued a referral for a urology evaluation, both of which were scheduled to occur within a month. *Id.* ¶¶ 48–49.

Nearly two months later, on July 24, 2019, Plaintiff was taken to Kingsbrook Jewish Medical Center for a CT scan, the results of which indicated that Plaintiff had multiple enlarged lymph nodes and an enlarged prostate; combined with Plaintiff's history of hematuria, the Kingsbrook medical staff warned of malignancy and recommended that Plaintiff undergo a prostate-specific antigen ("PSA") test. *Id.* ¶ 51. Plaintiff's PSA test indicated a significantly elevated PSA level, and, on August 4, 2019, at which point Plaintiff still had not seen a urologist, Dr. Beaudouin created an administrative note stating that he would rewrite the urology referral and would request a prostate biopsy to further evaluate Plaintiff for prostate cancer. *Id.* ¶¶ 52–53.

On August 28, 2019, following a second PSA test that confirmed Plaintiff's significantly elevated PSA level (Plaintiff's reading was then more than 50 times the normal range), Dr. Beaudouin referred Plaintiff to the emergency room for evaluation to rule out prostate cancer and requested that Plaintiff be evaluated by a urologist. *Id.* ¶¶ 54–55. On August 30, 2019, Plaintiff was taken to the Brooklyn Hospital Center, where he underwent a urinalysis but did not see a urologist or have a prostate biopsy performed; he was discharged with instructions to follow up with a urologist. *Id.* ¶ 56.

On September 21, 2019, Plaintiff, who reported continued hematuria and pain, was seen by P.A. Kang. *Id.* ¶ 60. On that same date, Plaintiff underwent additional urinalysis — which again yielded abnormal results, including elevated white and red blood cell counts — and Dr. Beaudouin again referred Plaintiff to a urologist. *Id.* ¶ 60. Despite the fact that the urology referral was approved on September 26, 2019, Plaintiff was not taken to a urologist. *Id.* On October 18, 2019, Dr. Beaudouin entered an administrative note stating that Plaintiff had been scheduled for an appointment at the urology clinic the previous day but that the correctional services department had not taken him to the appointment. *Id.* ¶ 62.

**\*3** In late October 2019, Plaintiff was seen by P.A. Singh twice for a variety of complaints, including sharp chest pain and persistent, sharp lower back pain radiating to his groin that had been ongoing for five weeks but was worsening. *Id.* ¶¶ 64–65. P.A. Singh referred Plaintiff to cardiology for an echocardiogram and prescribed him Tylenol. *Id.* On October 29, 2019, Plaintiff saw Dr. Beaudouin for back pain, hematuria, painful urination, and nocturia, or waking in the night to urinate. *Id.* ¶ 66. Dr. Beaudouin prescribed Tamsulosin — commonly known by the brand name Flomax — for "disorder of the prostate" and Tylenol, and he instructed Plaintiff to follow up with sick call as needed; at that time, Plaintiff's medical records indicated there were pending urology and cardiology appointments. *Id.* ¶¶ 52–53.

Plaintiff's health issues continued into November 2019. In addition to Plaintiff's consultations with the MCC medical staff, between September 13, 2019, and November 4, 2019, Plaintiff made approximately nine sick call requests to MCC medical staff, in which he repeatedly complained of hematuria, pain in his back, leg, shoulder, and chest. *See id.* ¶¶ 58, 59, 61, 63, 67, 68. On November 7, 2019, Plaintiff reported to P.A. Singh intense chest pain, leg pain and numbness, and continued hematuria. *Id.* ¶ 69. P.A. Singh responded to Plaintiff's complaints by stating that he would not die from urinating blood given that Plaintiff had been urinating blood for seven months; P.A. Singh also informed Plaintiff that he was not in the midst of a medical emergency, which would require Plaintiff to have a heart attack or to have stopped breathing. *Id.* ¶ 69. On November 10, 2019, Plaintiff reported to P.A. Singh that he could barely stand, was in severe pain, and had been experiencing urinary incontinence; P.A. Singh again informed Plaintiff that his condition was not an emergency and that he had already spoken to the doctor about Plaintiff's case. *Id.* ¶ 71. Between November 10–12, 2019, Plaintiff could not get out of bed, a fact of which medical staff and MCC guards were aware. *Id.* ¶ 72.

On November 12, 2019, Plaintiff saw Dr. Beaudouin, who noted that Plaintiff complained of numbness and weakness in his lower body. *Id.* ¶ 73. At Dr. Beaudouin's request, Plaintiff was transferred to a hospital; an MRI of his thoracic spine

revealed a large spinal tumor and spinal cord compression. *Id.* ¶¶ 73–74. Plaintiff was transferred to Bellevue Hospital for emergency decompression surgery, which was performed on November 13, 2019. *Id.* ¶¶ 74–75. After surgery, Plaintiff was determined to be paraplegic and diagnosed with Stage IV prostate cancer. *Id.* ¶ 76. Plaintiff has undergone significant medical treatment, but his condition is permanent and fatal. *See id.* ¶¶ 76–78.

Plaintiff first filed an administrative claim with BOP on December 16, 2019. *Id.* ¶ 6; *see also* Dkt. 67-1. Plaintiff filed a second administrative claim with BOP on May 5, 2020, which Plaintiff contends operated as a supplement, providing BOP with additional information on his claims and their value. Compl. ¶ 7; *see also* Dkt. 67-2.

## DISCUSSION

### I. Legal Standard on a Motion to Dismiss

### A. Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry," pursuant to which the court may properly dismiss a claim for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation omitted). Plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a Rule 12(b)(1) motion, "the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)). To the extent "jurisdictional facts are placed in dispute," however, "the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon*, 752 F.3d at 243 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

**\*4** The United States is generally immune from suit pursuant to the doctrine of sovereign immunity. *See FDIC v. Meyer*,

510 U.S. 471, 475 (1994). Congress, however, may waive the United States' immunity, with the conditions of the government's consent to suit strictly construed. *See Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998). "The waiver of sovereign immunity is a prerequisite to subject-matter jurisdiction." *Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999) (citation omitted). "Whether the United States is immune from suit is a jurisdictional question, and, therefore, is properly decided on a [ Rule] 12(b)(1) motion." *Ruiz v. United States*, No. 17-CV-6727, 2019 WL 952712, at \*2 (S.D.N.Y. Feb. 27, 2019) (citation omitted).

### B. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). The court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In deciding a motion brought pursuant to Rule 12(b)(6), Courts are generally confined to "the four corners of the complaint" and must "look only to the allegations contained therein." *Perez v. Westchester Foreign Autos, Inc.*, No. 11-CV-6091, 2013 WL 749497, at \*5 (S.D.N.Y. Feb. 28, 2013) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

### II. *Bivens* Claims [4]

Plaintiff brings *Bivens* claims against each of the Individual Federal Defendants, as well as the Jane/John Doe Defendants and the Warden of MCC,[5] for failing to provide him with adequate medical care despite knowing that failing to do so posed an excessive risk to his well-being. Plaintiff alleges that his pattern of complaints and his symptoms did or should have made clear to Defendants that he would suffer

permanent harm if he did not receive appropriate treatment, yet Defendants did not ensure that Plaintiff received proper medical treatment from necessary specialists and did not ensure that their referrals were acted upon.

**\*5** Because the Court finds that, based on Plaintiff's allegations, a reasonable jury could find that Dr. Beaudouin and P.A. Singh were deliberately indifferent to Plaintiff's medical needs, their motion to dismiss the *Bivens* claims is denied. Plaintiff's allegations are insufficient, however, to plead that P.A. Kang was deliberately indifferent to his medical needs, and, therefore, the *Bivens* claims against her are dismissed.

### A. Applicable Law

Pursuant to *Bivens*, a plaintiff may sue a federal officer in his personal capacity for violating certain of plaintiff's constitutional rights. "To state a claim under *Bivens*, a plaintiff must allege that an individual defendant personally committed a specific wrongful act that violated a well-established constitutional right of which a reasonable person would have known." *Adekoya v. Holder*, 751 F. Supp. 2d 688, 694 (S.D.N.Y. 2010) (citing *Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir. 1987)).

Although a pretrial federal detainee may not assert a claim for inadequate medical treatment under the Eighth Amendment's Cruel and Unusual Punishment Clause, a pretrial detainee may assert such a claim under the Due Process Clause of the Fifth Amendment. *See* *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (holding Eighth Amendment inapplicable to pretrial detainees); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment. We see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment.") (cleaned up). A pretrial detainee's due process rights "are at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citation omitted).

A two-prong test applies to claims of inadequate medical care brought under the Due Process Clause. *See* *Darnell*, 849 F.3d at 21 n.3 (holding that the analysis applicable to inadequate medical care claims arising under the Fourteenth Amendment applies equally to claims arising under the Fifth Amendment). A plaintiff must show that: (1) he had a serious medical need; and (2) the defendant acted with a deliberate indifference to plaintiff's serious medical need. *See* *Charles v. Orange County*, 925 F.3d 73, 85–86 (2d Cir. 2019) (citation omitted). The first prong has been termed the "objective prong," in that "the challenged conditions [must be] sufficiently serious to constitute objective deprivations of the right to due process." *Darnell*, 849 F.3d at 29. The second prong, known as the "subjective prong," is more accurately referred to as the "*mens rea* prong." *Id.* This prong requires a showing that "the officer acted with at least deliberate indifference to the challenged conditions[,]" understood to mean roughly "recklessness," but where recklessness can be defined either "subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)." *Id.* (citation omitted).

### B. Deliberate Indifference

On this motion, the Individual Federal Defendants concede that Plaintiff's medical needs were "sufficiently serious" to satisfy the objective prong of Plaintiff's claims. *See* Defs. Reply at 3, Dkt. 75. Accordingly, the Court need only decide whether Plaintiff has alleged adequately that the Individual Federal Defendants were deliberately indifferent to Plaintiff's serious medical needs.

**\*6** To plead deliberate indifference, a plaintiff must allege that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendant] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Because deliberate indifference requires only a showing of "something akin to recklessness," a plaintiff need not allege "a malicious or callous state of mind." *Charles*, 925 F.3d at 86 (citing *Darnell*, 849 F.3d at 33–34). A plaintiff may not, however, rely on a showing of "mere negligence" to plead adequately deliberate indifference. *Id.* at 87. Although "mere medical malpractice is not tantamount to deliberate indifference, ... it may rise to the level of deliberate indifference when it

involves culpable recklessness, i.e., an act or a failure to act ... that evinces a conscious disregard of a substantial risk of serious harm." 🚩 *Cuoco,* 222 F.3d at 107 (cleaned up). "Whether [a defendant] knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." 🚩 *Charles,* 925 F.3d at 87 (citation omitted).

### i. Dr. Beaudouin

Plaintiff appears to assert multiple bases for finding Dr. Beaudouin liable for reckless indifference to Plaintiff's serious medical needs. First, Plaintiff contends that Dr. Beaudouin was responsible for failing to review Mr. Martinez's initial urinalysis results for over eight months, and thus he was responsible for the initial eight-month delay in treatment. Pl. Opp. at 17 (citing Compl. ¶¶ 47, 144), Dkt. 72. Reviewing the allegations in the light most favorable to Plaintiff and drawing all inferences in his favor, the Court infers that no medical professional reviewed the results from Plaintiff's September 2018 urinalysis until May 2019 and will ascribe this period of delay to Dr. Beaudouin at this stage of the case. [6] Plaintiff alleges that Dr. Beaudouin co-signed the results of the urinalysis in May 2019, and Dr. Beaudouin was otherwise responsible for ordering urinalysis and similar tests during Plaintiff's time at MCC. *See* Compl. ¶ 47.

Plaintiff's allegations fall short of pleading deliberate indifference based solely on this eight-month delay in reviewing test results. Plaintiff does not include any allegations concerning his medical ailments at the time the urinalysis was ordered at MCC; he had previously complained of hematuria and painful, frequent urination, but those complaints were lodged at QDF. *See id.* ¶ 43. To allege that Dr. Beaudouin was deliberately indifferent to Plaintiff's serious medical needs by failing to review the results for eight months, Plaintiff had to allege facts giving rise to an inference that Dr. Beaudouin knew or should have known of a substantial risk to Plaintiff's health. *See* 🚩 *Charles,* 925 F.3d at 87. Plaintiff has not done so here. [7]

The bulk of Plaintiff's allegations concern the treatment, or lack thereof, that he received between May 2019 and November 2019. [8] Distilled, Plaintiff alleges that, by failing to ensure that Plaintiff received the necessary tests and

treatment by a urologist — despite continued complaints and test results highly indicative of advanced prostate cancer — Dr. Beaudouin was deliberately indifferent to the near-certainty that Plaintiff had prostate cancer. The primary basis for Dr. Beaudouin's liability, therefore, rests on the fact that, knowing the previous referrals failed to result in Plaintiff being seen by a specialist and knowing that Plaintiff required immediate medical attention from a specialist, given his test results and symptoms, he failed to take action to ensure that Plaintiff received care from a urologist.

**\*7** Defendants argue that Plaintiff failed to plead that Dr. Beaudouin was deliberately indifferent to his medical needs. First, Defendants argue that Plaintiff's own pleading acknowledges that the Individual Federal Defendants each provided Plaintiff with adequate care during the course of his incarceration at MCC, notwithstanding the delay in facilitating Plaintiff's appointment with a urologist. *See* Defs. Mem. at 10, 12, Dkt. 66. Second, Defendants contend that Plaintiff failed to allege that any of the Individual Federal Defendants were in any way responsible for the delay in Plaintiff receiving an appointment with a urologist. *See id.* at 10–11, 18–20. Neither argument is availing at this stage of the case.

Defendants are correct that Dr. Beaudouin provided a host of medical services to Plaintiff between May and November 2019. *See, e.g.,* Compl. ¶¶ 48, 49, 55, 60, 66, 73. But the fact that Dr. Beaudouin prescribed Plaintiff certain medicines, issued referrals to specialists, ordered multiple tests, and facilitated his trip to a hospital does not, *ipso facto,* absolve him of liability inasmuch as Plaintiff's allegations are predicated on Dr. Beaudouin's failure to ensure that he received care from a urologist. The provision of some medical care while other critical care is not provided does not absolve Dr. Beaudouin of liability for the delay in provision of the omitted, critical service. *See* 🚩 *Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir. 1994) (holding that "the fact that [defendant] frequently examined [plaintiff does not] necessarily vindicate [defendant]" where "[t]he course of treatment [plaintiff] received clearly did not alleviate his suffering"); 🚩 *Price v. Reilly,* 697 F. Supp. 2d 344, 364 (E.D.N.Y. 2010) ("The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent.") (citation omitted); *see also* 🚩 *Lloyd v. Lee,* 570 F. Supp. 2d 556, 562–63, 569–70 (S.D.N.Y. 2008) (denying motion to dismiss claim for deliberate indifference based on

failure to follow-up on referrals despite consistent treatment during the period of delay). The Second Circuit has expressly

> decline[d] to adopt a rule that in effect would exempt general practitioners from being found deliberately indifferent to a patient's serious medical needs as long as that general practitioner at some point refers the patient to a specialist, regardless of the extent of contact that general practitioner has with the patient.

*Hathaway*, 37 F.3d at 68.

A doctor's failure to follow up and ensure necessary treatment after issuing a referral for treatment or to a specialist can, under certain circumstances, provide a basis for liability on a claim for deliberate indifference. Plaintiff relies heavily on *Lloyd*, in which the court concluded that the plaintiff had stated a plausible claim of deliberate indifference against doctors who, despite repeated requests that an MRI of the Plaintiff be taken, had "permitted nine months to go before the MRI was actually taken." *Lloyd*, 570 F. Supp. 2d at 561. The court held that the plaintiff's complaint "plausibly allege[d] that doctors knew that Lloyd was experiencing extreme pain and loss of mobility, knew that the course of treatment they [had] prescribed was ineffective, and declined to do anything to attempt to improve Lloyd's situation besides re-submitting MRI request forms." *Id.* at 569. Accordingly, the court found that "[a] reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that Lloyd was given an MRI," and had they "followed up on the numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that Lloyd experienced for more than a year could have been averted." *Id.* (citation omitted).

 **\*8** In the wake of *Lloyd*, several other courts in the Second Circuit have held that a doctor can be found to have been deliberately indifferent based on a failure to ensure that a detainee received a necessary test or was seen by a specialist, even if the doctor issued one or more referrals. *See, e.g.*, *Giraud v. Feder*, No. 20-CV-1124, 2021 WL 1535751, at \*4 (D. Conn. Apr. 19, 2021) (finding that plaintiff's allegation

that a doctor "failed to follow up to ensure that he received an MRI or further treatment" was sufficient "for purposes of initial review ... to evince deliberate indifference to serious medical needs"); *Williamson v. Naqvi*, No. 19-CV-4, 2019 WL 2718476, at \*6 (D. Conn. June 27, 2019) ("To the extent that Dr. Pillai provided no treatment in response to the plaintiff's complaint of chronic knee pain in July/August 2013 and thought an MRI was medically necessary [and ordered plaintiff to undergo x-rays and an MRI] due to the plaintiff's symptoms of chronic knee pain in February 2015, but failed to facilitate or arrange for the MRI, the plaintiff has stated a plausible claim of deliberate indifference to medical needs.") (citation omitted); *Madera v. Ezekwe*, No. 10-CV-4459, 2013 WL 6231799, at \*16 (E.D.N.Y. Dec. 2, 2013) (concluding that doctors' failure "to follow up on missed appointments and ... to schedule new appointments" after issuing an outpatient referral, viewed in the context of a broader pattern of delays in treatment, could lead a reasonable jury to conclude doctors were deliberately indifferent to plaintiff's medical needs); *Price*, 697 F. Supp. 2d at 362 (finding that a nine-month delay in arranging kidney transplant test and several months' delay in conducting scheduled x-ray exam both adequately stated a claim for deliberate indifference) (citation omitted).

Defendants seek to distinguish this case from *Lloyd* in several ways, none of which is persuasive. First, Defendants argue that in *Lloyd*, the court found that plaintiff plausibly alleged that the doctors did nothing to improve the plaintiff's situation other than re-submitting the MRI requests, whereas here, Plaintiff's allegations demonstrate that Dr. Beaudouin provided a range of care during the period in which Plaintiff should have been seen by a urologist.[9] Defs. Mem. at 14–15. But the facts of *Lloyd* are not quite as described: between the date on which Lloyd's doctors first requested an MRI and the date on which the MRI was performed, Lloyd received physical therapy, his doctors issued requests for different medical tests, and he was seen by specialists at hospitals after referrals were issued by BOP medical staff. *See Lloyd*, 570 F. Supp. 2d at 562–64. In short, Defendants' argument does not hold water.

Defendants' second purported basis for distinguishing *Lloyd* overlaps with their second overarching argument in favor of dismissal of Plaintiff's *Bivens* claims. Defendants argue that, in *Lloyd*, the plaintiff had plausibly alleged that "prison doctors were engaging in a blame shifting process, which resulted in the unreasonable delays," but here, Plaintiff has not pled any similar facts. Defs. Mem. at 15 (quoting *Lloyd*,

570 F. Supp. 2d at 568). To much the same effect, Defendants also argue that Plaintiff does not plausibly allege that the Individual Federal Defendants were responsible for the fact that he did not timely see a urologist or oncologist, and thus they cannot be held liable for any alleged delay in treatment. *See id.* at 18–20.

**\*9** But in *Lloyd* and similar cases, liability is often founded not directly on the delay itself, but on a doctor's failure to take action above and beyond merely issuing and re-issuing a referral. *See* 🚩 *Lloyd, 570 F. Supp. 2d at 561* ("Given the seriousness of [plaintiff's] injuries and his repeated complaints of severe pain, a reasonable jury could infer that the doctors acted with deliberate indifference by failing to take steps to ensure that [plaintiff] was given an MRI and other medical care in a more timely manner."). In *Lloyd*, the court's statement that plaintiff alleged a "blame shifting process" was clearly not the basis on which the court determined that Plaintiff's claims of deliberate indifference survived the motion to dismiss. Instead, the *Lloyd* court was quite clear that liability against the doctors was premised on their failure to "follow up on their MRI requests, thereby failing to remedy [plaintiff's] medical issues." 🚩 *Id.* at 568.

The conduct for which Plaintiff seeks to hold Dr. Beaudouin liable is failing to ensure that he was seen by a qualified specialist given the severity of his condition and the likelihood of serious, negative consequences if he did not receive immediate care from a urologist; put differently, liability is premised on Dr. Beaudouin's decision passively to write referrals knowing full well that prior referrals had not been acted on and that the "course of treatment" in which he was engaged was insufficient given Plaintiff's serious medical needs. In these circumstances and at this stage of the case, the fact that the delays in Plaintiff being taken to see a urologist may have been attributable to decisions by or the inaction of others is not fatal to Plaintiff's claim. *Cf.* 🚩 *Johnson v. Bowers, 884 F.2d 1053, 1056–57 (8th Cir. 1989)* (rejecting defendants' argument that blame did not rest with them for delay in prisoner having surgery and holding that medical staff was "required to expeditiously arrange for surgical correction ... by a qualified surgical specialist" and that "[t]he responsibility for securing medical care for prisoner's needs rests with the prison authorities"); *Norman v. Mount Vernon Hosp., No. 17-CV-9174, 2020 WL 4432063, at \*9 (S.D.N.Y. July 31, 2020)* ("Although referral to a specialist does not always constitute sufficient care, cases finding that referral was inadequate involved defendants who saw or received

complaints from injured plaintiffs over a period of time and failed to provide medical aid for an injury."). Plaintiff's allegations that Dr. Beaudouin's actually knew that Plaintiff had not been seen by a urologist or received necessary care despite his worsening condition and despite clear signs that Plaintiff had cancer are sufficient to survive Defendants' motion to dismiss. *See* 🚩 *Singletary v. Russo, 377 F. Supp. 3d 175, 193 (E.D.N.Y. 2019)* (dismissing claim against a doctor who was unaware of delay in plaintiff seeing a specialist after issuing a referral because, unlike in *Lloyd* and *Price*, the doctor did not have "actual or constructive notice of the immediate medical needs of the respective plaintiffs"). [10]

**\*10** Accordingly, because Dr. Beaudouin was aware of Plaintiff's repeated complaints of hematuria and accompanying pain over the course of many months and was aware that Plaintiff had not yet seen a urologist despite Dr. Beaudouin's repeated referrals, the Court concludes that a jury could infer deliberate indifference from Dr. Beaudouin's failure to take affirmative actions to obtain appropriate medical care for Plaintiff. *See* 🚩 *Hathaway, 37 F.3d at 68.*

### ii. P.A. Singh

P.A. Singh was less intimately involved in Plaintiff's care than Dr. Beaudouin, and he also does not appear to have been involved in issuing any referrals to a urologist. Nevertheless, Plaintiff's claim for inadequate medical treatment against P.A. Singh survives his motion to dismiss.

Plaintiff's allegations raise an inference that P.A. Singh was aware of Plaintiff's ongoing medical issues, specifically his longstanding complaints of hematuria and accompanying pain, and that Plaintiff had not yet received a definitive diagnosis or treatment plan for his condition. P.A. Singh reportedly told Plaintiff that he was not suffering from an emergency on account of his hematuria because he had been urinating blood for seven months; P.A. Singh also told Plaintiff that P.A. Singh had consulted with MCC doctors — which Defendants concede included Dr. Beaudouin, *see* Defs. Mem. at 17 — concerning Plaintiff's condition. *See* Compl. ¶¶ 69, 71. Further, Plaintiff alleged that he complained directly to P.A. Singh of worsening symptoms, including spreading and intensifying pain and numbness, and P.A. Singh responded in a callous manner, *see id.* ¶¶ 69, 96, demonstrating that he did not take seriously Plaintiff's complaints, *see* 🚩 *Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996)* (concluding that

an allegation concerning a defendant's "abusive response" to plaintiff's request "further supports permitting the claim against [the defendant] to survive a motion to dismiss"). Given P.A. Singh's awareness of Plaintiff's continuing medical needs and worsening condition, his awareness that Plaintiff had not been examined by a specialist, and his callous dismissal of Plaintiff's complaints, Plaintiff has alleged adequately that P.A. Singh was deliberately indifferent to Plaintiff's serious medical needs. *See Adams v. Beaudouin, No. 09-CV-2136, 2011 WL 240714, at \*8–9 (E.D.N.Y. Jan. 24, 2011)* (concluding that, on motion for summary judgment, additional discovery would be needed to determine whether any defendants disregarded a risk to plaintiff's health where the record indicated that they each had some knowledge of plaintiff's treatment and medical issues).

### iii. P.A. Kang

The sole factual allegation concerning P.A. Kang states that, on September 21, 2019, Plaintiff was seen by P.A. Kang for gross hematuria, continued blood in his urine, and persistent pain. Compl. ¶ 60. Plaintiff alleges that, on the same day on which he was seen by P.A. Kang, a urinalysis was performed, and Dr. Beaudouin authored yet another referral to a urologist. *Id.* Based on these allegations, Plaintiff has not pled that P.A. Kang was deliberately indifferent to Plaintiff's serious medical needs.

Although it is hard to believe that P.A. Kang was unaware of the delays in Plaintiff's treatment and his longstanding complaints — if not by virtue of her role in the day-to-day care of inmates at MCC then by the entries in Plaintiff's medical file, which had to have been voluminous by that point — Plaintiff does not plead any facts that raise an inference that P.A. Kang was or should have been aware of any delays in Plaintiff seeing a urologist. *See Feliz v. City of New York, No. 18-CV-5023, 2019 WL 6831552, at \*6 (S.D.N.Y. Aug. 5, 2019)* (recommending dismissal of deliberate indifference claim where plaintiff failed to plead any facts suggesting doctor's awareness of ongoing delays in treatment at the time she treated him). Similarly, Plaintiff does not allege that P.A. Kang herself should have engaged in any different course of conduct; instead, Plaintiff's allegations suggest that P.A. Kang elevated Plaintiff's medical concerns to Dr. Beaudouin, which resulted in a urinalysis and referral to a specialist. Compl. ¶ 60; *see also Laurent v. Borecky, No. 17-CV-3300, 2018 WL 2973386, at \*3 (E.D.N.Y. June 12, 2018)* (dismissing claim against doctor when plaintiff failed

to identify a "particular failure," admitted that the doctor ordered the requested test, and plaintiff's complaint amounted to dissatisfaction about whether the doctor was doing all he could). Alleging a single instance of competent treatment, albeit during the months-long period of neglect by others alleged by Plaintiff, does not state a claim for deliberate indifference. *See Green v. Shaw, No. 17-CV-913, 2019 WL 1427448, at \*8 (D. Conn. Mar. 29, 2019)* ("[T]he evidence of record shows that each Defendant only interacted with [plaintiff] once—itself strong evidence that the Defendants were not deliberately indifferent."). Accordingly, the claims against P.A. Kang are dismissed.

### C. Qualified Immunity

**\*11** Finally, Defendants assert that the Individual Federal Defendants are entitled to qualified immunity on Plaintiff's *Bivens* claims. *See* Defs. Mem. at 20–22. The doctrine of qualified immunity "entitles public officials to freedom from suit for acts undertaken in their official capacity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Martinez v. Simonetti, 202 F.3d 625, 633–34 (2d Cir. 2000)* (cleaned up). A detainee's right to be free from deliberate indifference to serious medical needs is a well-established federal right; even so, "qualified immunity is still available to an official if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Hathaway, 37 F.3d at 67* (cleaned up).

Because the Court has concluded that Plaintiff's claims for deliberate indifference survive as to Dr. Beaudouin and P.A. Singh, they are not entitled to qualified immunity at this stage. *See Hathaway, 37 F.3d at 69* ("Assuming that [defendant] was deliberately indifferent to [plaintiff's] serious medical needs, he is not entitled to qualified immunity because it would not be objectively reasonable for him to believe his conduct did not violate [plaintiff's] rights."); *Burgess v. Goord, No. 98-CV-2077, 1999 WL 33458, at \*6 (S.D.N.Y. Jan. 26, 1999)* (concluding that defendants were not entitled to qualified immunity because court had "already held that plaintiff has adequately pled that such actions were not objectively reasonable by upholding plaintiff's claim of deliberate indifference") (citation omitted). Accordingly,

Defendants Beaudouin's and Singh's motion to dismiss based on qualified immunity is denied.

### III. FTCA Claims

On the same facts supporting his *Bivens* claims, Plaintiff also asserts FTCA claims against the United States for negligence, medical malpractice, and negligent hiring, supervision, and retention. The United States proffers a host of arguments in favor of dismissal of some or all of Plaintiff's FTCA claims. It argues first that Plaintiff's FTCA claims must be dismissed in their entirety because Plaintiff failed to exhaust his administrative remedies before filing his complaint. *See* Defs. Mem. at 23–26. It next argues that several of Plaintiff's FTCA claims — including his claim for negligent hiring — must be dismissed for failure to exhaust; alternatively, the United States asserts that Plaintiff's negligent hiring cause of action fails to state a claim. *Id.* at 27–30, 35–37. Finally, the Government argues that Plaintiff's FTCA claims for conduct that occurred while he was in the custody of the GEO Group are barred by the FTCA's independent contractor exception. *Id.* at 30–33.

Plaintiff's FTCA claims survive the Government's wholesale challenge on failure-to-exhaust grounds, but the Court agrees that Plaintiff's FTCA claims must be trimmed.

### A. Applicable Law

The FTCA represents a "limited waiver by the United States of its sovereign immunity," allowing for tort suits against the United States under certain circumstances. *Millares Guiraldes de Tineo*, 137 F.3d at 719.

> Under the FTCA, a private citizen may sue for injuries caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting 28 U.S.C. § 1346(b)(1)).

The FTCA requires, however, that, before initiating an action in court, (1) a plaintiff must have presented the claim to the appropriate Federal agency, and (2) the plaintiff's

claim must have been finally denied, meaning that either the agency denied the claim in writing or failed to decide the claim within six months of it being filed. 28 U.S.C. § 2675(a). This administrative exhaustion requirement "is jurisdictional and cannot be waived." *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) (citation omitted). Pursuant to Department of Justice regulations, a claimant may amend a properly presented claim "at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. § 2675(a)" to treat a claim as final after six months without a final agency disposition. 28 C.F.R. § 14.2(c). The filing of an amendment restarts the agency's time to respond to the claim. *Id.* ("Upon the timely filing of an amendment to a pending claim, the agency shall have six months in which to make a final disposition of the claim as amended and the claimant's option under 28 U.S.C. § 2675(a) shall not accrue until six months after the filing of an amendment.").

**\*12** Because the FTCA's exhaustion requirement "serves to ease court congestion and to permit expeditious settlement without costly and time-consuming litigation, the claimant must provide the agency with enough information to permit it to conduct an investigation and to estimate the claim's worth." *Schwartz v. United States*, No. 19-CV-7846, 2020 WL 5578505, at \*3 (S.D.N.Y. Sept. 17, 2020) (cleaned up); *see also* *Collins v. United States*, 996 F.3d 102, 111 (2d Cir. 2021). The FTCA "does not require formal pleadings or that a valid legal claim be alleged"; instead, a plaintiff's administrative claim must include "only the basic elements of notice of accident and injury and a sum certain representing damages." *Mejia v. United States*, No. 13-CV-1789, 2016 WL 4579084, at \*5 (S.D.N.Y. Aug. 31, 2016) (cleaned up).

### B. Administrative Exhaustion and Plaintiff's Later-Filed SF-95

The United States argues that Plaintiff failed to satisfy the administrative exhaustion requirement as to any of his FTCA claims because he failed to wait the requisite six months after filing his second SF-95,[11] which operated as an amendment to his original claim. *See* Defs. Mem. at 23–26. In response, Plaintiff argues that his second-filed SF-95 was not an amendment under 28 C.F.R. § 14.2(c) but a "supplement"; even if the Court were to deem it an amendment, Plaintiff argues, he still satisfied the presentment requirements of 28 U.S.C. § 2675(a), and, therefore, dismissal is unwarranted,

especially given the severe and pressing medical issues he faces. *See* Pl. Opp. at 29–36. Upon close review of Plaintiff's two SF-95s, the Court concludes that the second SF-95 was neither an amendment within the meaning of 28 C.F.R. § 14.2(c) nor a supplement, as Plaintiff argues. Instead, the two SF-95s represent distinct, standalone administrative claims, for each of which Plaintiff had to comply with the presentment requirements of section 2675(a).

Plaintiff's first SF-95 was filed on or around December 16, 2019. *See* Dkt. 67-1. Plaintiff claimed damages of $50 million, and stated the basis of his claim as follows:

> Through an ongoing series of acts and non-acts the Bureau of Prisons did not furnish me with necessary, and timely medical care for my pain and suffering, and that lack of care has consequently led to my paralysis, and a worsened cancer disease. This occurred while I was an inmate *at the Metropolitan Correction Center*, 150 Park Row, NY, NY during the period from at least in *March, 2019, to the present.*

*Id.* at 3 (emphasis added). Plaintiff's claim is defined in terms of the medical care he was provided while he was incarcerated at MCC, which included the period between March 2019 and the date of the claim.

Plaintiff's second SF-95 was filed on or around May 5, 2020. *See* Dkt. 67-2. The cover sheet appended to the claim form refers to the "Standard Form 95 and Claim Supplement" attached; there was no reference to Plaintiff's December 2019 SF-95, nor was there any indication that Plaintiff then had a claim outstanding with BOP. *Id.* at 2. Plaintiff's second SF-95 claims $20 million in damages. *Id.* at 3. The attached claim supplement stated the basis of Plaintiff's claim, in relevant part, as follows:

> [The c]laim arises out of the care and treatment rendered to RICHARD MARTINEZ, *while incarcerated at Queens Detention Facility a/k/a Queens Private Detention Facility*, ... which is operated by The Geo

Group, Inc., from July 26, 2018 through November 13, 2019, and more particularly, in the medical care and treatment rendered to him thereat by their agents, servants and/or employees.

**\*13** *Id.* at 5. Plaintiff's retainer agreement with his then-counsel, also appended to the SF-95, similarly states that his claim arose from personal injuries sustained as a result of the negligence of "Queens Private Detention Facility / The Geo Group, Inc." *Id.* at 9.

On this record, the Court disagrees with the Government that Plaintiff's second SF-95 operated as an amendment to his first SF-95. Unlike in the cases cited by the United States, Plaintiff's later-filed SF-95 made no mention of a pending administrative claim and made no attempt to correct any information set forth in the original claim. *See* 🔖 *Wright v. City of Santa Cruz*, No. 13-CV-1230, 2014 WL 3058470, at \*5 (N.D. Cal. July 3, 2014) (concluding that a second SF-95, which appears to have been a hand-edited version of the original SF-95 with an additional addendum attached, constituted an amendment under 28 C.F.R. § 14.2(c)). Plaintiff's second SF-95 "did not change the substance of [Plaintiff's] previously filed medical malpractice" claim, nor did it have "any prejudicial impact on [the Government's] ability to properly investigate his pending tort claims or to determine whether it should settle them." *Rosario-Gonzalez v. United States*, 544 F. App'x 5, 7 (1st Cir. 2013).

Critically, Plaintiff's two SF-95s (although not artfully worded and apparently drafted based on less-than-complete records regarding when Plaintiff was transferred from QDF to MCC) appear to pertain to different time periods during which Plaintiff was in the custody of different facilities and was receiving medical care from different providers. Accordingly, notwithstanding the fact that Plaintiff's injuries and the allegedly negligent conduct by medical professionals at each facility overlap, the Court understands Plaintiff's first SF-95 to assert a claim for the negligence of those at MCC in the amount of $50 million, while Plaintiff's second SF-95 asserts a claim for the negligence of those at QDF in the amount of $20 million. *See* 🔖 *Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1200–01 (11th Cir. 2008) (deeming three separate SF-95s to constitute three distinct claims on behalf of three different claimants, all arising out of the

same injury). Plaintiff's later-filed SF-95 neither amended nor supplemented his December 2019 administrative claim; instead, it raised a standalone claim against the United States for the conduct of its contractor, QDF. Applying section 14.2(c) here would be "tantamount to erecting a barrier of technicalities and sacrificing the entitlement of a claimant to his or her cause of action against the government without a corresponding showing that doing so would promote the efficient investigation of a claim by the agency." *Rosario-Gonzalez*, 544 F. App'x at 8 (cleaned up).

The Court thus agrees with Plaintiff that "the later filed [document] in no way altered or changed Mr. Martinez's original claims." Pl. Opp. at 32. The Court disagrees, however, with Plaintiff's contention that "[t]he May 5, 2020 [document] merely clarified the relevant dates," "provided some additional detail in medical terminology," and "reduce[d] the value of the claim." *Id.* Plaintiff's assertion that the "GEO Group is an independent contractor for whom the presentment requirements of Section 2675(a) are not required" is also unavailing. *Id.* at 33 n.5. At the time Plaintiff filed his initial administrative claim and his complaint in this action, he plainly believed that he could assert an FTCA claim against the United States based on the GEO Group's alleged negligence: his second administrative claim was dedicated exclusively to the care and treatment of Plaintiff while he was incarcerated at QDF, and his complaint asserts multiple FTCA claims arising in part out of negligence and medical malpractice that occurred during his incarceration at that facility. That Plaintiff now concedes that the United States cannot be held liable for the GEO Group's alleged conduct or omissions does not in any way factor into the Court's analysis of whether the second-filed SF-95 constituted an amendment, supplement, or distinct claim.

**\*14** Because the Court construes Plaintiff's second SF-95 as a separate administrative claim, Plaintiff was required to comply with the administrative exhaustion requirements of 28 U.S.C. § 2675(a) with respect to each of his two administrative claims. *See* ⚑*Dalrymple v. United States*, 460 F.3d 1318, 1325 (11th Cir. 2006) ("The FTCA requires that each claim and each claimant meet the prerequisites for maintaining a suit against the government."); *cf.* ⚑*Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983) (requiring claimant to present government with definite damages amount as to each claim where claims are aggregated for purposes of the FTCA). Because Plaintiff complied with the administrative exhaustion requirements with respect to

the claim asserted in the first SF-95 but not the second, the United States' motion to dismiss is granted with respect to any claims arising out of Plaintiff's second SF-95 against the GEO Group. [12]

## C. Administrative Exhaustion and Claims Not Alleged in Plaintiff's SF-95s

The United States also seek dismissal of Plaintiff's FTCA cause of action alleging negligent hiring, supervision, and retention of BOP staff because Plaintiff did not include notice of or allegations supporting this cause of action in his administrative claims. [13] *See* Defs. Mem. at 27–28. In response, Plaintiff contends that he did not have to delineate specifically each cause of action because the BOP had the necessary information in its possession and his administrative claim provided the Government with enough information to investigate the mark. Pl. Opp. at 36–38. Plaintiff's argument misses the mark. Because Plaintiff did not explicitly assert the negligent hiring cause of action and because the allegations asserted in his administrative claim would not have given rise to an investigation into negligent hiring, supervision, or retention, Plaintiff failed to exhaust his FTCA hiring claim.

Plaintiff's properly exhausted administrative claim asserts only that the United States "did not furnish [Plaintiff] with necessary[ ] and timely medical care." Dkt. 67-1 at 3. In similar cases in which plaintiffs have alleged analogous medical malpractice, courts in this district have readily dismissed claims based on negligent hiring or supervision. *See, e.g.*, *Lassic v. United States*, No. 14-CV-9959, 2015 WL 5472946, at \*4 (S.D.N.Y. Sept. 16, 2015), *aff'd*, 668 F. App'x 395 (2d Cir. 2016); *Downs v. United States*, No. 06-CV-396, 2009 WL 2611226, at \*3 (N.D.N.Y. Aug. 24, 2009); *see also Schwartz*, 2020 WL 5578505, at \*3 ("Analogous cases have similarly held that when a notice of claim asserts one cause of action, but fails to assert a different cause of action comprised of unique elements, such notice does not meet the FTCA's exhaustion requirement for the latter claim.") (citation omitted).

**\*15** Plaintiff's reliance on cases such as ⚑*Johnson ex rel. Johnson v. United States*, 788 F.2d 845, 849 (2d Cir. 1986), is misplaced. In circumstances in which the allegations in an administrative claim would necessarily result in an investigation touching on facts pertinent to a negligent hiring claim, the failure to include a specific cause of action for

negligent hiring in the administrative claim is not fatal. *See id.* (arising in the context of a claim stemming from a sexual assault). Here, however, there is no reason to believe that that the investigation prompted by Plaintiff's administrative claim would inspire BOP to investigate whether there was negligence involved in hiring or supervising the employees who are implicated in the claim; instead, based on Plaintiff's allegations, BOP's investigation would begin and end with the care, or lack thereof, provided to Plaintiff during the period in which he was in BOP custody. *See Downs,* 2009 WL 2611226, at *3.

Accordingly, Plaintiff's FTCA claim for negligent hiring, supervision, or retention is dismissed for failure to exhaust. [14]

### CONCLUSION

For the foregoing reasons, Federal Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is respectfully directed to close the open motion at Dkt. 65. The Clerk of Court is further directed to terminate P.A. Kang and Warden of MCC as defendants.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4224955

### Footnotes

1   Plaintiff has also sued the Warden of MCC and John/Jane Does Nos. 1–10, alleged to be personnel employed by BOP or MCC who worked in administrative or other capacities at MCC.

2   Plaintiff voluntarily dismissed the Kingsbrook Jewish Medical Center on August 6, 2021. *See* Dkt. 89.

3   The facts are based on the allegations contained in Plaintiff's complaint, unless otherwise stated. For purposes of Defendants' motion, the Court accepts all well-pled, non-conclusory factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to Plaintiff. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014); *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

4   Plaintiff's standalone claim against the Individual Federal Defendants for cruel and unusual punishment under the Eighth Amendment is dismissed. During the period in which he alleges deliberate indifference, Plaintiff was a pretrial detainee. *See United States v. Martinez*, No. 18-CR-526-5, Dkt. 331 (Judgment as to Mr. Martinez in the criminal action dated November 5, 2020). During that period, Plaintiff had not yet been convicted of a crime and was not being punished; accordingly, the proper avenue for Plaintiff to assert a deliberate indifference claim is the Fifth Amendment's Due Process Clause, not the Eighth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (holding that a pretrial detainee cannot bring a claim under the Cruel and Unusual Punishments Clause and that claims must be brought pursuant to the Due Process Clause); *Laurent v. Edwin*, No. 17-CV-3300, 2021 WL 1152962, at *10 (E.D.N.Y. Mar. 5, 2021) (same). It is for perhaps that reason that Plaintiff abandoned his Eighth Amendment claim by failing to oppose Defendants' arguments in support of dismissal in their brief. *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014).

5   On December 3, 2020, Plaintiff informed the Court by letter that it did not intend to complete service on the Warden of the MCC. *See* Dkt. 49 at 2 n.2. A review of the docket confirms that, in the intervening months, Plaintiff has not served the Warden, nor sought any extension of time within which to serve the

Warden. Accordingly, the Warden of the MCC is dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m). *See* Fed. R. Civ. P. 4(m).

6   On this motion to dismiss, the Court may not and does not consider Plaintiff's assertion that discovery has revealed that Dr. Beaudouin ordered the September 2018 urinalysis, the results of which he did not review until May 2019. *See* Pl. Opp. at 5 n.2; *see also* 🚩 *Roth*, 489 F.3d at 509.

7   While Plaintiff's allegations regarding the delay in reviewing test results alone does not adequately allege deliberate indifference, that shockingly long delay is powerful circumstantial evidence that, combined with other evidence, may prove that Dr. Beaudouin was deliberately indifferent to Plaintiff's care.

8   To the extent Plaintiff argues that Dr. Beaudouin is liable for deliberate indifference on account of the two-day delay in November 2019 between Plaintiff being physically unable to get out of bed and Plaintiff being sent to the hospital, Plaintiff fails to allege that Dr. Beaudouin was aware of Plaintiff's paralysis at that time or that Dr. Beaudouin was in any way responsible for the delay. Plaintiff instead alleges only that "medical staff ... were advised" of his condition on or around November 10, 2019, and that he was evaluated by Dr. Beaudouin on November 12, 2019, the day on which Plaintiff was transferred to the hospital for emergency tests and treatment. Compl. ¶¶ 73–74. This delay can, however, be considered as part of a "pattern of delays" Plaintiff experienced in receiving adequate treatment that raises an inference of deliberate indifference. *See Madera v. Ezekwe*, No. 10-CV-4459, 2013 WL 6231799, at *13 (E.D.N.Y. Dec. 2, 2013) (citing *Abdush Shahid v. Coughlin*, 933 F. Supp. 168, 182 (N.D.N.Y. 1996)).

9   The Court notes that the actual care provided was not impressive, even to a layperson. According to the Complaint, on May 31, 2019, in response to a complaint that Plaintiff had been experiencing blood in his urine for nine months, Dr. Beaudouin prescribed antibiotics. Compl. ¶ 48. Antibiotics presumably would have been an effective treatment if Plaintiff had actually *had* a urinary tract infection, a diagnosis that could have been confirmed fairly quickly if Dr. Beaudouin had ordered *and reviewed* a urinalysis. While Dr. Beaudouin had Plaintiff transferred to an emergency room more than two months later to rule out cancer (the Court cannot conceive why a doctor would believe an emergency room visit was the most efficacious way to get the Plaintiff diagnosed), Plaintiff was returned to MCC without cancer having been ruled out and with the emergency room doctor advising Plaintiff to follow up with a urologist. *Id.* ¶¶ 55–56. *Two months later,* with Plaintiff still complaining of pain and blood in his urine, Dr. Beaudouin's "treatment" consisted of a prescription for Flomax (a drug used to treat men with enlarged prostates) and Tylenol (an over-the-counter pain medication). *Id.* ¶ 66. The notion that those facts somehow undercut a claim of deliberate indifference would be laughable if the entire case were not so tragic.

10   The Court notes that several courts have permitted a plaintiff's claim of deliberate indifference to proceed past the motion to dismiss stage even without allegations that the defendant was *personally* responsible for a delay in treatment, as opposed to the delay being caused an external force. *See* 🚩 *Brown v. Coughlin*, 758 F. Supp. 876, 882–83 (S.D.N.Y. 1991) ("Although he fails to attribute specific acts to specific officials, the allegations clearly set out a pattern from which one might infer at least deliberate unconcern for [plaintiff's] apparent suffering. This unconcern could be attributable to the hospitals and the institutions alike.").

The Court also notes that Defendants' argument — that because Dr. Beaudouin did not personally delay taking Plaintiff to the urologist he cannot be liable — taken literally would essentially immunize BOP medical staff from claims of deliberate indifference whenever the claim arises from the failure to obtain specialized medical care for a detainee. BOP medical staff does not transport detainees to outside doctors; corrections staff does. But in appropriate circumstances, as here, BOP medical staff can insist that a medical situation is sufficiently serious that a detainee must be transported for specialized examination and care. While further

development of the facts may show that Dr. Beaudouin took all steps within his power to get Plaintiff examined by a specialist, evidence that he wrote referrals and ineffective prescriptions are unlikely to suffice.

11    An "SF-95," or Claim for Damage, Injury, or Death, is the form used to present claims against the United States under the FTCA for, *inter alia*, personal injury caused by a federal employee's negligence or wrongful act or omission occurring within the scope of the employee's federal employment.

12    As noted, Plaintiff concedes that the GEO Group is an independent contractor of the United States and thus "does not oppose dismissal of claims against the United States for actions taken by the G[EO] Group." Pl. Opp. at 4 n.1; *see also* *Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997) (per curiam) ("[A]s a general rule, sovereign immunity precludes suits against the United States for injuries caused by its independent contractors."). Accordingly, even had the Court deemed Plaintiff to have administratively exhausted his claims pertaining to the care he received while at QDF, the Court would dismiss the portion of Plaintiff's FTCA claims against the United States predicated on his treatment at QDF, a GEO Group facility.

13    The United States also sought dismissal of Plaintiff's FTCA claims for medical malpractice and negligence predicated on the Government's alleged failure to respond to requests for Plaintiff's medical records and on Plaintiff having been negligently and recklessly chained to his Bellevue Hospital bed in November 2019. *See* Defs. Mem. at 27–30. Although Plaintiff opposed the Government's arguments seeking dismissal of other portions of his FTCA claims, Plaintiff's opposition does not respond to these arguments. Accordingly, the Court deems these claims to have been abandoned. *See* *Romeo & Juliette Laser Hair Removal*, 2014 WL 4723299, at *7. The complete absence of any facts supporting these allegations in either of Plaintiff's SF-95s would similarly warrant dismissal. *See, e.g.*, *Cabrera v. United States*, No. 18-CV-7270, 2020 WL 5992929, at *11 (S.D.N.Y. Oct. 9, 2020) (deeming plaintiff's claim of right knee injury unexhausted and dismissing claim for lack of subject-matter jurisdiction where SF-95 alleged only injury to neck, back, and right knee).

14    Because the Court concludes that Plaintiff has not exhausted his negligent hiring claim, the Court need not assess the Government's alternative argument that Plaintiff failed to state a claim for relief as to this cause of action. Were the Court to consider the issue, however, it would determine that Plaintiff's allegations fall woefully short of stating a cause of action for negligent hiring because of, *inter alia*, the total absence of factual allegations that any of the Individual Federal Defendants had a propensity to engage in the alleged tortious conduct or that BOP was or should have been aware of such a propensity; Plaintiff's reference to allegations concerning the Individual Federal Defendants' conduct in connection with his own claims does not, as a matter of law, satisfy his burden. *See* *Doe v. Alsaud*, 12 F. Supp. 3d 674, 682–83 (S.D.N.Y. 2014) (requiring "specific allegations of the employee's *past wrongdoing* to provide a basis from which to infer the employer's knowledge" (emphasis added)).

---

**End of Document**                                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by  Bowling v. U.S.,   E.D.Ky.,   October 26, 2012

2007 WL 2071674
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

Henry WOODING, Plaintiff,
v.
UNITED STATES of America, Defendant.

Civil Action No. 05-1681.
|
July 13, 2007.

*OPINION and ORDER OF COURT*

AMBROSE, Chief District Judge.

**\*1** The Defendant United States of America ("the Government") has filed a Motion for Summary Judgment. (Docket No. [51] ) with respect to the remaining issue of misrepresentation. Because I have already issued an Opinion and Order addressing two Motions for Summary Judgment (see Docket No. [40] ) and a Memorandum Opinion on a Motion for Reconsideration (see Docket No. [48] ), I will limit my discussion to the salient facts. [1]

Plaintiff Henry L. Wooding ("Wooding") filed an administrative tort claim with the Department of Veterans Affairs ("DVA") pursuant to the provisions of the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., on May 7, 2003. In that claim, Wooding explained that he had undergone spinal surgery and that his abdominal peritoneum had been breached during such surgery. [2] He referenced a "breach of the proper standards of medical care" and "medical negligence" in the claim. On March 11, 2005, Wooding's counsel sent a letter to the VA agency wherein he sought to amend that claim. In the letter, counsel for Wooding explained that the physician who had performed the surgery had misrepresented his experience and credentials. On February 1, 2006, the VA issued a denial letter, referencing only the negligence cause of action. Wooding thereafter commenced this action. I have granted summary judgment in favor of the Government on Wooding's claim for malpractice and

Wooding is no longer pursuing his claim of informed consent. The only remaining claim is one for misrepresentation.

The Government contends that I have no jurisdiction over Wooding's misrepresentation cause of action because it was not timely filed at the administrative level. Section 2401(b) of the FTCA governs the timing of filing claims at the administrative level. This section provides, in relevant part, that:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...

28 U.S.C. § 2401(b). According to the Government, Wooding's "claim" of misrepresentation would have expired sometime by the end of Summer of 2003 (Wooding apparently learned of the physician's alleged misrepresentation sometime during the Summer of 2001). Because the claim was not amended until 2005-long after the two year statute of limitations ran-the Government reasons, it is entitled to the entry of summary judgment in its favor.

I reject the Government's contention. The contention rests upon a misreading of the word "claim." Under the Government's theory, "claim" is equivalent to "cause of action" or "legal theory." Yet the word "claim" as used in the statute of limitations provision relied upon by the Government is defined in the supporting regulations in a different manner:

> [a] For purposes of the provisions of 28 U.S.C. § 2401(b), 2672, and 2675, *a claim shall be deemed to have been presented when a Federal agency receives from a claimant,* his duly authorized agent or legal representative, *an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain* for injury to loss of property, personal injury, or death alleged to have occurred by reason of the incident;

and the title or legal capacity of the person signing, and is accompanied by evidence of this authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian, or other representative.

**\*2** 28 C.F.R. § 14.2(a) (emphasis added). Thus, the Regulations define "claim" broadly, and as consisting (generally) of a presentation by the claimant to the appropriate Federal agency of an executed Standard Form 95 and a demand of a sum certain. The term "claim" is used in a manner akin to "demand" or "complaint," rather than as something as narrow as a "legal theory" or "cause of action." *See* 🚩 *Murrey v. United States,* 73 F.3d 1448, 1451 (7th Cir.1996) (stating that " 'claim' as used throughout the civil rules is short for 'claim for relief,' Fed.R.Civ.P. 8(a), whereas 'claim' in the Tort Claims Act may carry its ordinary-language meaning of demand. (The tort claimant is required to demand money damages in a 'sum certain.' 28 C.F.R. § 14.2(a); 🚩 *Manko v. United States,* 830 F.2d 831, 840 (8th Cir.1987).) A 'claim' under the civil rules is embedded in a complaint, which also contains a demand for relief. The free-standing 'claim' to which the Tort Claims Act refers is the counterpart of the complaint, rather than of the claim, under the civil rules."); *see also, Nelson v. United States,* 541 F.Supp. 816, 818 (M.D.N.C.1982) (construing the word "claim" as used in 28 U.S.C. § 2675(a)-which is explicitly referenced in § 14.2(c)- by noting that "[t]he 'claim' required by Section 2675(a) is not the equivalent of a 'legal cause of action' which the plaintiff's attorney may articulate at trial.").

In light of the definition of "claim" as set forth in the regulation, and as Judge Posner understood that definition as explained in *Murrey,* the Government's contention that Wooding was required to file one claim for malpractice and one claim for misrepresentation (and presumably another for informed consent) is unpersuasive. Rather, § 2401(b) and § 14.2(a) required Wooding to submit one claim with respect to the "incident." [3] There is no dispute that Wooding complied with 28 U.S.C. § 2401(b) when he filed his Standard Form 95 within two years of the surgery. He presented it to the appropriate Federal agency. He demanded a sum certain. He briefly described the incident and he signed the form as claimant. He was not required to include particular legal theories. Neither the statute, nor the regulations define "claim" in this manner. *See* 🚩 *Murrey,* 73 F.3d at 1452

(stating that "Standard Form 95 resembles a civil complaint in not requiring a statement of legal theories, but differs in requiring a detailed statement of facts. It is in this respect more demanding, more 'formal' if you will, than the civil rules-a throwback, perhaps, to the era of 'fact pleading' that preceded the adoption of those rules. But as no statement of legal theories is required, only facts plus a demand for money, the claim encompasses any cause of action fairly implicit in the facts.").

To the extent that Wooding was required to plead *facts* which would have put the Government on notice of the alleged misrepresentation, I find that he did so by means of the March 2005 letter from counsel. The letter clearly sets forth facts indicating that Wooding believed that the physician who performed the surgery had not fully disclosed his credentials. Wooding's "claim" was amended in this manner by virtue of 28 C.F.R. § 14.2(c), which provides, in relevant part, that:

> **\*3** A claim presented in compliance with paragraph (a) of this section may be amended by the claimant at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. § 2675(c) ....

28 C.F.R. § 14.2(c). There is no dispute that the letter from Wooding's counsel was submitted prior to final agency action. Accordingly, I find that § 14.2(c) permitted Wooding to amend his claim by submitting additional facts which put or should have put the Government on notice of the physician's alleged misrepresentation.

In so holding, I note that the Government has not identified a single case, nor has independent research revealed one, where a claimant who had timely submitted a Standard Form 95 with respect to a particular incident, and who had submitted, prior to final agency action, an amendment pursuant to § 14.2(c) of that Form setting forth additional facts relating to that incident, was not permitted to pursue a particular legal theory which would have arisen from those additional facts. Indeed, the cases proffered by the Government are not persuasive. First, they do not address the meaning of the word "claim" as used in § 2401(b) and § 14.2. As stated above, "claim" in the statute and regulation is not the equivalent of a "legal theory" or "cause of action." Second, the majority of those cases discuss the concept of "relation back"-a doctrine not

argued by Wooding here. Third, and most critically, the cases involve attempts to inject new legal theories asserted by new claimants. This is a vital distinction, not because of a new legal theory but because individuals who had not timely filed a Standard Form 95, and thus who had never complied with § 2401(b) as a claimant, were attempting to assert causes of action. *See* Withrow v. United States, Civ. No. 5-152, 2005 WL 2403730 at *4 (E.D.Ky. Sept. 28, 2005) (considering "the issue of whether an amended administrative claim filed with the appropriate agency after the expiration of the statute of limitations relates back to a timely filed administrative claim," where an amendment was made *after* final agency action-and thus could not have been pursuant to § 14.2(c)-and finding that such a claim would not relate back, because to permit otherwise would allow "persons not parties to the original claim, like the Withrow children and Mrs. Withrow individually, [to] simply be added to the amended claim after the expiration of the limitations period and, in effect, completely avoid the statute's requirement."); Manko v. United States, 830 F.2d 831 (8th Cir.1987) (finding that a district court had properly denied the claimant's attempt to file an amended complaint in the *district court*-not at the administrative level-to add his wife as a co-plaintiff and include her claim of loss of consortium because her claim was barred under § 2401(b) because, though she *had filed her own claim* at the administrative level rather than being added by virtue of an amendment to her husband's claim, the claim had not been filed in a timely manner); and Lee v. United States, 980 F.2d 1337,1339-40 (10th Cir.1992) (affirming a district court's opinion and order for "substantially the same reasons set forth in the district court's Memorandum Opinion and Order," wherein the district court rejected the notion that § 14.2(c) could be used to amend an administrative claim more than two years after the incident for which compensation was sought, and observing that "[t]he regulation makes no mention of amending the complaint to add *new parties.... Allowing the plaintiffs to amend the complaint that would add two new parties* three years after the claim accrued would defeat" the purpose" of presenting claims to the United States for prompt resolution) (emphasis added).

 **\*4** I recognize that the FTCA constitutes a waiver of sovereign immunity. I further recognize that such waivers must be strictly construed. *See* United States v. Bein, 214 F.3d 408, 412 (3d Cir.2000) (citations omitted). Nevertheless, the purpose of requiring an administrative filing under the FTCA is "to ease court congestion and to avoid unnecessary litigation, while making it possible for the Government to

expedite the fair settlement of tort claims asserted against the United States." S.Rep. No. 1327, 89th Congress, 2d Sess. 2 (1966), reprinted in 1966 U.S.Code Cong. & Ad. News 2515, 2516. Though the Opinion was later vacated and a hearing en banc granted, I nevertheless find persuasive the Fourth Circuit Court's comment in Drew v. United States, 217 F.3d 193, 199 (4th Cir.2000), vacated, reh'g en ban. granted (Sept. 8, 2000), aff'd without opinion, 231 F.3d 927 (4th Cir.2000): [4]

> [t]he presentment requirement of the FTCA confers upon the Government an advantage most prospective tort defendants lack: an opportunity for informal fact-gathering and deliberate reflection.... In recognition of this freedom from litigation by ambush on which Congress has conditioned the sovereign's waiver of immunity, it is incumbent upon the courts to encourage the sovereign's agents to proceed as its lawmakers have evidently intended. Liability in a given situation cannot be thoroughly and thoughtfully assessed without accurate and complete information; the Government must therefore be charged with the duty to reasonably pursue the relevant facts, rather than being permitted to fall back on a few typed sentences appearing on a pre-printed form.

 Drew, 217 F.3d at 199. Thus, the Government's suggestion that it is somehow meaningful that the VA's denial letter did not reference misrepresentation is not persuasive. Wooding gave the VA notice of the facts and circumstances surrounding the alleged misrepresentation well before final agency action. The Government was under a duty to "reasonably pursue the relevant facts." Wooding should not be held accountable for its failure to do so. Further, the Government did not deny a misrepresentation claim at the administrative level on the basis of untimeliness. Indeed, it simply made no mention of the claim at all.

In short, I find that the Government has not discharged its burden of demonstrating that it is entitled to the entry of summary judgment. It has argued that "claim," as that term is used in the relevant statute of limitation and the supporting regulation, is the equivalent of a "legal theory" or "cause of action." I disagree with its position in this regard. I find the more appropriate definition to be akin to "complaint" or "demand." Wooding unquestionably submitted a Standard Form 95 making a demand or complaint with respect to the incident in question-the surgery and its attendant circumstances. That Form was filed within two years as required under the relevant statute of limitations. Though the

original Form did not include a recitation of facts relating to the alleged misrepresentation, Wooding timely amended this demand or complaint pursuant to § 14.2(c), prior to final agency action. Consequently, I find that I do have jurisdiction over Wooding's current cause of action for misrepresentation.

----------

*ORDER OF COURT*

**\*5** AND NOW, this **13th** day of July, 2007, after careful consideration, and for the reasons set forth in the accompanying Opinion, the Motion for Summary Judgment (Docket No. [51] is DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2071674

# Footnotes

1     The standard of review governing motions for summary judgment, which is referenced in my earlier Opinion, is applicable here.

2     Surgery was performed on June 13, 2001.

3     I understand the "incident," as referenced in the regulation, here to be the injuries associated with the surgery in general. Significantly, the Government does not argue that there are two separate "incidents" here- one incident involving the surgery itself and one incident involving the conversations about the physician's experience and credentials.

4     On rehearing, the Fourth Circuit Court was equally divided, but affirmed the judgment without written opinion.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 17729301
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Luis MENDEZ, Plaintiff,

v.

Brian SCHENK, et al., Defendants.

9:21-CV-1090 (BKS/TWD)

|

Signed December 16, 2022

**Attorneys and Law Firms**

LUIS MENDEZ, Plaintiff, pro se, 05357-509, SANDSTONE FCI, Inmate Mail/Parcels, P.O. BOX 1000, SANDSTONE, MN 55072.

**DECISION AND ORDER**

BRENDA K. SANNES, Chief United States District Judge

**I. INTRODUCTION**

 **\*1**  In October, 2021, the Clerk received a pro se civil rights complaint for filing from plaintiff Luis Mendez asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"). Dkt. No. 1. Thereafter, plaintiff paid the filing fee for this action and submitted an updated pleading. *See* Dkt. No. 11 ("Compl."); Docket Sheet. By Decision and Order entered on January 19, 2022, the Court reviewed the updated pleading pursuant to 28 U.S.C. § 1915A(b), and found that it failed to state a claim upon which relief may be granted. Dkt. No. 12 ("January 2022 Order"). [1]  In light of plaintiff's pro se status, he was afforded an opportunity to submit an amended complaint if he wished to proceed with this action. *Id.* at 22-24. Plaintiff was specifically advised that his failure to comply with the January 2022 Order within thirty days would result in dismissal of this action. *Id.*

Following extensions of plaintiff's amended pleading deadline and the return of certain mail as undeliverable, the Court issued a Decision and Order on April 20, 2022, which dismissed the action without prejudice pursuant to 28 U.S.C.§ 1915A(b)(1), Rule 41(b) of the Federal Rules of Civil Procedure, and Northern District of New York Local Rule 41.2(b), and directed the Clerk to close this case. Dkt. No. 22 ("April 2022 Order"). That same day, judgment was entered

dismissing this action. Dkt. No. 23 ("Judgment"). Both the April 2022 Order and the Judgement were returned to the Court as undeliverable. *See* Dkt. No. 24.

On September 8, 2022, the Court received a letter from plaintiff's friend or relative, which provided a new address for plaintiff, and requested an update on this case. Dkt. No. 25. In light of this submission, the Clerk sent a copy of the April 2022 Order and the Judgement to plaintiff at this new address. Shortly thereafter, plaintiff filed a letter request that this action be re-opened. *See* Dkt. No. 26.

By Decision and Order entered on October 5, 2022, the Court granted plaintiff's request to vacate the Judgment and afforded him a final opportunity to file an amended complaint within thirty days. Dkt. No. 27 ("October 2022 Order"). [2]  Presently before the Court is plaintiff's amended complaint. Dkt. No. 28 ("Am. Compl.").

**II. SUFFICIENCY OF THE AMENDED COMPLAINT**

 **A. The Complaint and January 2022 Order**
In his original complaint, plaintiff alleged that on December 29, 2020, while he was incarcerated at Cayuga County Jail as a federal pretrial detainee, he ingested "metal wire[,]" which was "cooked into" "a ground beef type meat" that was served to him for dinner. Compl. at 4-5. Plaintiff further alleged that he suffered injuries that were not properly addressed by officials at Cayuga County Jail, and the doctor who evaluated him outside of the facility several weeks after this alleged incident. *Id.* at 5-10.

 **\*2**  The complaint was construed to assert medical indifference and retaliation claims against each of the named defendants in their individual and official capacities. *See* January 2022 Order at 7.

As noted, following review of the complaint pursuant to 28 U.S.C. § 1915A(b), plaintiff's Section 1983 claims were dismissed for failure to state a claim upon which relief may be granted. *See* January 2022 Order at 7-23.

 **B. Overview of the Amended Complaint**
The allegations in the amended complaint are similar to, albeit less detailed than, the allegations in the original complaint. *Compare* Compl. *with* Am. Compl. Indeed, there are only two material differences between the original and

amended complaint. First, unlike the original complaint, which named only employees of Cayuga County Jail and a treating physician as defendants, the caption of the amended complaint names the United States of America as the only defendant, and the body of the pleading asserts ⚑ Section 1983 claims against only Cayuga County Jail. *See generally*, Am. Compl. Second, the amended complaint alleges that Corrections Sergeant Marvintino (named as a defendant in the original complaint) told plaintiff shortly after he ingested metal that arrangements would be made for his transport to a hospital, but thereafter advised plaintiff that "the hospitals were closed and no medical was present[.]" Am. Compl. at 1-2. As a result, plaintiff alleges that he experienced a delay in medical treatment. *Id.* at 2. [3]

Liberally construed, the Court construes the amended complaint to assert a ⚑ Section 1983 medical indifference claim against Cayuga County under the Due Process Clause of the Fifth Amendment, [4] and a medical negligence claim against the United States of America pursuant to the Federal Tort Claims Act ("FTCA").

The amended complaint seeks money damages. Am. Compl. at 2-3. For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### C. Analysis

**\*3** Because plaintiff is proceeding in forma pauperis and is an inmate suing one or more government employees, his amended complaint must be reviewed in accordance with 28 U.S.C. § 1915A(b). The legal standard governing the review of a pleading pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the January 2022 Order and it will not be restated in this Decision and Order. *See* January 2022 Order at 2-3.

### 1. United States of America

Insofar as the amended complaint names the United States of America as a defendant and asserts a medical negligence claim under the FTCA, [5] the government's waiver of sovereign immunity is for torts committed by its employees "under circumstances where the United States, if a private person, would be liable to the [plaintiff] in accordance with the law of the place where the act or omission occurred." ⚑ 28 U.S.C. § 1346(b)(1). The amended complaint is

devoid of any allegations which plausibly suggest that any federal employee subjected plaintiff to wrongdoing. Rather, plaintiff's claims are based on alleged wrongdoing at a county jail.

Furthermore, even assuming the federal government or one of its agencies contracted with Cayuga County for the provision of housing and safekeeping of federal prisoners or detainees, the Supreme Court long ago made clear that the definition of "federal agency" in the FTCA "does not include any contractor with the United States." ⚑ *Logue v. United States*, 412 U.S. 521, 526 (1973); *see also Carno*, 2019 WL 2287966, at \*10 (dismissing FTCA claim against a federal agency based on allegations of wrongdoing at a county correctional facility in light of *Logue*, and collecting similar cases). Thus, plaintiff cannot proceed with an FTCA claim against the federal government based on alleged wrongdoing by Cayuga County and its employees. [6]

**\*4** Accordingly, plaintiff's FTCA claim against the United States of America is dismissed pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 2. Cayuga County

Because the original complaint asserted ⚑ Section 1983 claims against various Cayuga County Jail employees in their official capacity, the Court construed the pleading to assert a municipal liability claim against Cayuga County, as the real party in interest. *See* January 2022 Order at 8. After doing so, the Court stated as follows with respect to the legal standard governing a municipal liability claim:

> Municipal liability is limited under ⚑ Section 1983 by *Monell v. Dep't of Soc. Servs. of City of New York*. In *Monell*, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." ⚑ *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). Thus, to successfully state a claim for *Monell* liability, a plaintiff must "make factual allegations that support a plausible inference that the [alleged] constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or

the act of a person with policy making authority for the municipality." *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008)). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see also Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 (2010) ("[I]n *Monell* the Court held that 'a municipality cannot be held liable' solely for the acts of others, e.g., 'solely because it employs a tortfeasor.' " (quoting *Monell*, 436 U.S. at 691)).

January 2022 Order at 9-10.

In dismissing plaintiff's municipal liability claim, the Court noted that the original complaint did not "include any allegations which plausibly suggest that any of the alleged wrongdoing carried out by any official occurred pursuant to a policy or custom of the county or jail." *See* January 2022 Order at 10.

As noted above, the amended complaint differs from the original complaint in that plaintiff now alleges that at some point after he ingested metal material and was told by Corrections Sergeant Marvintino that arrangements would be made for his transport to a hospital, Corrections Sergeant Marvintino thereafter advised plaintiff that he could not receive emergency medical treatment because "the hospitals were closed and no medical was present[.]" Am. Compl. at 1-2. At this stage of the proceeding, it is at least plausible to infer from these allegations (and the allegations regarding plaintiff's injuries and pain) that plaintiff (1) was suffering from an objectively serious medical condition after allegedly ingesting a "metal object", and (2) did not receive emergency medical treatment because Cayuga County Jail did not have protocols in place to ensure the availability of such treatment (either through seeing a provider at the facility, or being transported to an outside hospital). In drawing these inferences, the Court reiterates that the extent of the delay in medical treatment that plaintiff experienced is unclear, and may have been less than twelve hours. Nonetheless, at this early stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's medical indifference claim against Cayuga

County based on a delay in medical treatment survives sua sponte review and requires a response. In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion. [7]

### III. CONCLUSION

**\*5 WHEREFORE**, it is hereby

**ORDERED** that the amended complaint is accepted for filing and is the operative pleading; and it is further

**ORDERED** that the Clerk is directed to add Cayuga County to the docket as a defendant; and it is further

**ORDERED** that plaintiff's Section 1983 medical indifference claim against Cayuga County **SURVIVES** sua sponte review and requires a response; and it is further

**ORDERED** that all remaining federal claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service, the Clerk shall issue a summons and forward it, along with a copy of the amended complaint, to the United States Marshal for service upon Cayuga County. The Clerk shall forward a copy of the summons and amended complaint by mail to the Cayuga County Attorney's Office, together with a copy of this Decision and Order; and it is further

**ORDERED** that upon the completion of service, a response to plaintiff's amended complaint be filed by Cayuga County, or its counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is**

**also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff, along with a copy of the Local Rules of Practice for this District.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 17729301

# Footnotes

1    The procedural history of this case leading up to the January 2022 Order was discussed at length in that Order, and will not be restated herein.

2    The full procedural history of this case following the January 2022 Order was discussed at length in the October 2022 Order. *See* October 2022 Order at 1-3.

3    The nature of the alleged delay is unclear. According to plaintiff, he received x-rays at Cayuga County Jail two days after the alleged incident, and was evaluated by a physician at a hospital "[a] month later." Am. Compl. at 2. However, documents attached to the original complaint show that plaintiff was taken for abdominal radiographs the morning after he allegedly swallowed metal material, and again a few days later. Dkt. No. 2 at 1-2. In addition, plaintiff alleges in the original complaint that he spoke to a nurse the day after the alleged incident, and again less than two weeks later. *See* Compl. at 7.

4    In *Darnell v. Pineiro,* 849 F.3d 17 (2d Cir. 2017), the Second Circuit made clear that the standard governing conditions-of-confinement claims, which encompass claims for medical indifference, is the same whether brought by a state or federal pretrial detainee. *Id.* at 21 n.3 ("This case implicates the Due Process Clause of the Fourteenth Amendment because it involves state pretrial detainees who are seeking to vindicate their constitutional rights.... However, the analysis in this decision should be equally applicable to claims brought by federal pretrial detainees pursuant to the Due Process Clause of the Fifth Amendment.").

5    Neither *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971) and its progeny nor Section 1983 allow claims for monetary damages against the United States, federal agencies, or federal agents in their official capacities. *See Bivens,* 403 U.S. at 410; *Chapman v. Doe (One),* No. 9:19-CV-1257 (GTS/CFH), 2019 WL 6493971, at *6-7 (N.D.N.Y. Dec. 3, 2019) (noting that *Bivens* does not "allow claims for monetary damages against the United States, federal agencies, or federal agents in their official capacities"); *Carno v. United States,* No. 17-CV-7998, 2019 WL 2287966, at *6 (S.D.N.Y. May 28, 2019) ("Under the Eleventh Amendment to the U.S. Constitution, the United States, as a sovereign, is immune from suits raising Constitutional violations." (citing U.S. Const. Amend. XI)).

6    Although exhaustion is an affirmative defense and need not be expressly plead in a complaint, it also bears mentioning that the FTCA requires a claimant to "present the claim to the appropriate federal agency ... within two years of the date the claim accrued" before filing suit. *Phillips v. Generations Family Health Ctr.,* 723

F.3d 144, 147 (2d Cir. 2013) (citing 28 U.S.C. § 2675(a)). "The claimant can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a decision within six months after the claim was filed)." *Id.* (citing 28 U.S.C. § 2675(a)). "In other words, the FTCA requires a plaintiff to exhaust all administrative remedies before filing suit in federal court." *Chapman v. Doe (One),* No. 9:19-CV-1257 (GTS/CFH), 2019 WL 6493971, at *6-7 (N.D.N.Y. Dec. 3, 2019) (citing *Celestine v. Mount Vernon Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005)). Here, the amended complaint is devoid of allegations which plausibly suggest that plaintiff filed an administrative claim with any federal agency before commencing this action.

7    The amended complaint lacks allegations which plausibly suggest that either of the corrections officials who responded to plaintiff's complaints of pain after ingesting a piece of metal (1) caused the delay in treatment, and (2) did so out of deliberate indifference to plaintiff's serious medical needs. To the contrary, the allegations in the amended complaint plausibly suggest that after plaintiff ingested the "metal object" (1) Corrections Officer Cowen responded to his request for assistance and contacted a superior officer, Corrections Sergeant Marvintino, and (2) Corrections Sergeant Marvintino documented plaintiff's injuries and attempted to secure his transport to an outside hospital. *See* Am. Compl. at 1-2. Furthermore, plaintiff has not alleged that any prison officials were responsible for preparing his food, had previously threatened him in any respect, or had reason to know that there might be a "metal object" in his food (even though plaintiff was not aware of this fact), and the allegations in the original complaint indicate that plaintiff refused a medical procedure on March 22, 2021, before Nurse Brittany witnessed (and documented) him spitting up blood. *See* Compl. at 8-9. Thus, even assuming plaintiff was suffering from an objectively serious medical condition after allegedly ingesting metal, the Court has no basis to plausibly infer from the allegations in the amended complaint that any officials working at the jail acted with deliberate indifference to his serious medical needs. *See, e.g., Gray v. Metro. Det. Ctr.,* No. 09-CV-4520, 2011 WL 2847430, at *10 (E.D.N.Y. July 15, 2011) (dismissing medical indifference claim under *Bivens* based on corrections officials "(1) serving [the inmate] food containing glass fragments; and (2) delaying the provision of medical care, resulting in severe pain and the loss of a tooth[,]" noting that the plaintiff failed to allege that these officials "personally put glass in his food or had any reason to know that his food was contaminated when it was served[,]" or "had any personal involvement in plaintiff's medical care or his failure to obtain an x-ray or other medical treatment"). Of course, plaintiff is free to seek leave to amend his pleading if he believes otherwise.

---

**End of Document**                                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 172 of 396

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

2019 WL 6493971
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Darrell CHAPMAN, also known as
Darrell Bishop Chapman, Plaintiff,
v.
John DOE (ONE), et al., Defendants.

9:19-CV-1257 (GTS/CFH)
|
Signed 12/03/2019

**Attorneys and Law Firms**

DARRELL CHAPMAN, 43749, Plaintiff, pro se, Albany County Correctional Facility, 840 Albany Shaker Road, Albany, NY 12211.

**DECISION AND ORDER**

GLENN T. SUDDABY, Chief United States District Judge

**I. INTRODUCTION**

 *1 The Clerk has sent to the Court for review a pro se civil rights Complaint filed by plaintiff Darrell Chapman ("Plaintiff") pursuant to 42 U.S.C. § 1983 and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346. Dkt. No. 1 ("Compl."). Plaintiff, who is presently confined at Albany County Correctional Facility ("Albany County C.F."), paid the full filing fee of $400.00.

**II. SUFFICIENCY OF THE COMPLAINT**

**A. Standard of Review**

Under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

When reviewing a complaint, the court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading that sets forth a claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. Rule Civ. Proc. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

 *2 While pro se parties are held to less stringent pleading standards, the Second Circuit has held that "district courts may dismiss a frivolous complaint sua sponte even when the plaintiff has paid the required filing fee." *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). Indeed, "district courts are especially likely to be exposed to frivolous actions and, thus, have [a] need for inherent authority to dismiss such actions quickly in order to preserve scarce judicial resources." *Id.* at 364. A cause of action is properly deemed frivolous "where it lacks an

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 173 of 396

arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

**B. Summary of the Complaint**

The incidents that form the foundation for the Complaint occurred while Plaintiff was confined, as a pretrial detainee, at Albany County C.F. *See* Compl. at 4, 5. The following facts are set forth as alleged by Plaintiff in his Complaint.

On September 27, 2019, Plaintiff was a passenger in a prison van operated by defendants John Doe #1 and John Doe #2, employees of Albany County C.F. Compl. at 5. Plaintiff, and seven other detainees, were being transported from Albany C.F. to Court. *Id.* While en route to Court, Plaintiff observed Defendants driving at unsafe speeds, while operating cell phones, and "tailgating." *Id.* Before the return trip to Albany County C.F., Plaintiff asked Defendants to fasten his seatbelt. *Id.* Plaintiff, who was shackled at the ankles and handcuff with a waist chain, was unable to fasten his own seatbelt. Compl. at 6. Defendants refused and told Plaintiff to "sit back and be quiet." *Id.* Plaintiff again observed John Doe #1 was driving at unsafe speeds, handling his cell phone, and changing lanes in an unsafe manner. *Id.* Plaintiff yelled to Defendants to "slow down," but was told to "shut the hell up." *Id.*

While traveling to Albany County C.F., the van was involved in a collision with another motor vehicle when John Doe #1 "excellerated [sic] in an effort to cut [a] car off and prevent the car from being in front of the van and slowing it down[.]" Compl. at 6. The impact caused Plaintiff to be "violently tossed from his seat head first into a metal security gate covering the window[.]" *Id.*

Several hours after the accident, Plaintiff was transported to the hospital. Compl. at 6. When Plaintiff arrived at the hospital, John Doe #1 and John Doe #2 refused to remove his restraints to allow the medical staff to examine Plaintiff. *Id.* at 7. The medical staff monitored Plaintiff's blood pressure and heart rate. *Id.*

For five days after the accident, Plaintiff completed "sick call requests" complaining of severe back pain, neck pain, pain in his foot/ankle, and headaches. Compl. at 7. On October 3, 2019, Plaintiff was seen by Defendant Jane Doe, an employee of the Albany County medical staff. *Id.* Plaintiff told Jane Doe that he believed he had a "concussion from hitting [his] head during the crash." *Id.* Plaintiff asked for X-rays, CAT scans and/or MRI films. *Id.* Jane Doe ordered X-rays and prescribed

Motrin. Compl. at 7. Jane Doe denied Plaintiff's request for a back brace, a second mattress, and an appointment with a doctor. *Id.* at 8.

Construing the Complaint liberally [1], Plaintiff asserts the following claims: (1) deliberate indifference claims against John Doe #1 and John Doe #2 related to the motor vehicle accident; (2) deliberate medical indifference claims against John Doe #1, John Doe #2, and Jane Doe; and (3) failure-to-protect claims against Albany County C.F.; and (4) claims, pursuant to the FTCA, against the United States Marshal Service ("USMS"). *See* Compl. at 9-10. Plaintiff seeks monetary damages. *See id.* at 11-12.

**\*3** For a more complete statement of Plaintiff's claims, reference is made to the Complaint.

**C. Nature of Action**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990); *see also Myers v. Wollowitz,* No. 95-CV-0272, 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that "[ Section] 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). " Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993).

The Court will construe the allegations in the Complaint with the utmost leniency. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

## III. ANALYSIS

**A. Section 1983 Claims**

**1. Fourteenth Amendment Claims**

Because Plaintiff was confined as a pretrial detainee, his deliberate indifference claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See* *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell,* 849 F.3d at 29. Such a claim is typically analyzed under a two-pronged standard. First, the pretrial detainee must satisfy the "objective prong" showing that the conditions were "sufficiently serious" as to constitute objective deprivations of constitutional rights. *Id.* at 29. To satisfy the objective prong, " 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.' " *Id.* (quoting *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972)). The objective prong of the deliberate indifference claim is the same as a convicted prisoner under the Eighth Amendment. *Darnell,* 849 F.3d at 30.

Second, the pretrial detainee must satisfy the "subjective prong" by showing that the officer acted with deliberate indifference to the challenged conditions. *Darnell,* 849 F.3d at 29. As to the "mens rea" prong, a pretrial detainee must allege facts showing that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35.

In *Bruno v. City of Schenectady,* 2018 WL 1357377 (2d Cir. 2018), the Second Circuit, applied *Darnell* to a deliberate medical indifference claim and held, "an official does not act in a deliberately indifferent manner toward an arrestee unless the official 'acted *intentionally* to impose the alleged condition, or *recklessly* failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should

have known, that the condition posed an excessive risk to health or safety.' " *Id.* (emphasis supplied).

### a. Claims Against John Doe #1 and John Doe #2

**\*4** Plaintiff claims that John Doe #1 and John Doe #2 were deliberately indifferent to his safety and medical needs. *See* Compl. at 9.

"[M]otor-vehicle accidents, by themselves, do not implicate the Constitution's protections, and 'allegations of a public official driving too fast for the road conditions are grounded in negligence' and are therefore not actionable under Section 1983." *Cuffee v. City of New York,* No. 15CV8916, 2017 WL 1232747, at \*7 (S.D.N.Y. Mar. 3, 2017), *adopted,* 2017 WL 1134768 (S.D.N.Y. Mar. 27, 2017). Moreover, "the failure to provide a seatbelt is not, in itself, 'sufficiently serious' to constitute an Eighth [or Fourteenth] Amendment violation." *Jabbar v. Fischer,* 683 F.3d 54, 58 (2d Cir. 2012). "[A]n in-custody plaintiff injured during transport may, however, state a deliberate-indifference claim if he or she alleges facts in addition to the absence of seatbelts and reckless driving, that, taken as a whole, suggest that the plaintiff was exposed to conditions posing an unreasonable risk of serious harm, and that the defendants were aware of those conditions." *Cuffee,* 2017 WL 1232737, at \*7.

Here, the Complaint contains facts plausibly suggesting that John Doe #1 and John Doe #2 were deliberately indifferent to an excessive risk to Plaintiff's safety. *See* *Torres v. Amato,* 22 F.Supp.3d 166, 174 (N.D.N.Y. 2014) ("[E]vidence of the defendant's refusal to secure the plaintiff's seatbelt, combined with the defendant's reckless driving [may be] sufficient for a jury to 'conclude that there was a substantial risk of harm to the plaintiff and that the defendant knew of and disregarded the substantial risk of harm.' ") (citing *Rogers v. Boatright,* 709 F.3d 403 (5th Cir. 2013)); *see also Cuffee,* 2017 WL 1232737, at \*8 (denying motion to dismiss where the plaintiff plead that the officer drove recklessly, at an excessive speed, with knowledge that the plaintiff was not wearing a seatbelt).

Thus, the Court finds that Plaintiff's Fourteenth Amendment deliberate indifference claims against John Doe #1 and John Doe #2, related to Plaintiff's safety, survive sua sponte review and require a response. In so ruling, the Court expresses no

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 175 of 396

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

A different conclusion is reached however, with respect to Plaintiff's medical claims against John Doe #1 and John Doe #2. While Plaintiff alleges that John Doe #1 and John Doe #2 refused to remove his restraints, he does not allege how the restraints impeded any examination or treatment, nor does he allege that he suffered any injury as a result. *See Shell v. Brzezniak*, 365 F.Supp.2d 362, 378 (W.D.N.Y. 2005) (dismissing the plaintiff's Eighth Amendment claim against officer because decision to refuse to allow medical staff to remove handcuffs did not pose an excessive risk to the plaintiff's health or safety). Accordingly, Plaintiff's Fourteenth Amendment medical indifference claims against John Doe #1 and John Doe #2 are dismissed, without prejudice, pursuant to 28 U.S.C. § 1915A for failure to state a claim.

**b. Claims Against Jane Doe**

**\*5** Even assuming that Plaintiff suffered from a serious medical need, Plaintiff does not set forth facts to infer that Jane Doe acted with a culpable state of mind. Plaintiff admits that Jane Doe ordered X-rays and prescribed medication for his headaches, neck pain, and back pain. *See* Compl. at 7. Plaintiff claims that Jane Doe denied his request for a second mattress, back brace, to see a doctor, and CAT scan/MRI films. *See id.* at 7-8. These allegations amount to a disagreement with the nature of treatment and not a violation of Plaintiff's constitutional rights. *See Wright v. Conway*, No. 05-CV-6723, 584 F.Supp.2d 604, 607 (W.D.N.Y. Nov. 5, 2008) ("[the plaintiff's] complaints demonstrate no more than his personal dissatisfaction with the level of care that he received, and these claims must therefore be dismissed.");

*see Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F.Supp.2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g. the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") (citation omitted).

Even if Jane Doe's decisions surrounding Plaintiff's treatment implicate medical malpractice or negligence, the issues do not give rise to a Fourteenth Amendment violation.

*See Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (holding that "something more than mere negligence" and "mere medical malpractice" is necessary to establish deliberate indifference in the Fourteenth Amendment context) (citation omitted).

For these reasons, Plaintiff's medical indifference claims against Jane Doe are dismissed without prejudice pursuant to 28 U.S.C. § 1915A for failure to state a claim. [2]

**2. Sovereign Immunity**

Plaintiff asserts Section 1983 claims against Albany County C.F. and the USMS for failure to protect him from Does' deliberate indifference. *See* Compl. at 10. The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana*, 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through 42 U.S.C. § 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 93-CV-1298 (RSP/GJD), 1996 WL 156764 at \*2 (N.D.N.Y. 1996). Actions for damages against a state official in his or her official capacity are essentially actions against the state. *See Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989).

**\*6** Plaintiff's claims for monetary damages against Albany County C.F. are dismissed, with prejudice, pursuant to 28 U.S.C. § 1915A as Plaintiff seeks relief from a defendant

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 176 of 396

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

immune from suit under section 1983. *See Richardson v. Nassau Cty.,* 277 F.Supp.2d 196, 204 (E.D.N.Y. 2003); *see also Simmons v. Gowanda Corr. Facility,* No. 13-CV-0647, 2013 WL 3340646, at *2 (W.D.N.Y. July 1, 2013) ("the New York State Department of Corrections and [the named correctional facility] enjoy the same Eleventh Amendment immunity from suit in federal court as enjoyed by the state itself") (quoting *Posr. v. Court Officer Shield No. 207,* 180 F.3d 409, 411 (2d Cir. 1999)).

Moreover, the United States has sovereign immunity. *U.S. Dep't of Energy v. Ohio,* 503 U.S. 607, 615 (1992). Therefore, to the extent that the Complaint could be construed to include a Section 1983 claim against the USMS, that claim is dismissed with prejudice. *Toomer v. Cty. of Nassau,* No. 07-CV-01495, 2009 WL 1269946, at *10 (E.D.N.Y. May 5, 2009); *see also Queen v. U.S. Bureau of Prisons,* No. CIV-09-883, 2010 WL 455175, at *2 (W.D. Okla. Feb. 2, 2010) (holding that the USMS enjoy sovereign immunity from a 1983 action) (citation omitted).

**B. FTCA**

Plaintiff asserts claims, pursuant to the FTCA, alleging that the USMS failed to protect him from Does' deliberate indifference. *See* Compl. at 10. The FTCA constitutes a waiver of the Government's sovereign immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the laws of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The statute of limitations for actions brought pursuant to the FTCA is set forth in 28 U.S.C. § 2401(b), which provides that:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the

claim by the agency to which it was presented.

28 U.S.C. § 2401(b). The only proper defendant to an action under the FTCA is the United States. *See Watts v. U.S. Federal Bureau of Prisons,* No. 9:07-CV-773, 2009 WL 81285, at *4 & n. 1 (N.D.N.Y. Sep. 30, 2008) (Peebles, M.J.) (citing cases), *adopted,* 2009 WL 81285, at *1 (N.D.N.Y. Jan. 9, 2009) (Hurd, J.). Tort claims, such as claims of medical malpractice, are actionable under the FTCA. *United States v. Kubrick,* 444 U.S. 111 (1979).

It is clear that "[u]nder the FTCA, before a claimant can file suit, he or she must first present the claim to the appropriate federal agency ... within two years of the date the claim accrued." *Phillips v. Generations Family Health Ctr.,* 723 F.3d 144, 147 (2d Cir. 2013) (citing 28 U.S.C. § 2675(a)). "The claimant can only initiate his or her lawsuit once the claim has been denied by the agency (or if the agency has failed to make a decision within six months after the claim was filed)." *Id.* (citing 28 U.S.C. § 2675(a)). In other words, the FTCA requires a plaintiff to exhaust all administrative remedies before filing suit in federal court. *Celestine v. Mount Vernon Health Ctr.,* 403 F.3d 76, 82 (2d Cir. 2005).

**\*7** Here, the Complaint lacks facts suggesting that Plaintiff filed an administrative claim with the USMS or any other federal agency and therefore, no cause of action exists based on the statements in Plaintiff's Complaint. Accordingly, Plaintiff's FTCA claims against the USMS are dismissed, without prejudice. *See Toomer,* 2009 WL 1269946, at *12 (dismissing the plaintiff's claims against the USMS (or the United States as liberally construed) due to failure to exhaust under the FTCA).

In light of Plaintiff's status as a pro se litigant, the Court has also considered whether the Complaint states claims cognizable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971). *Bivens* actions, although not precisely parallel to actions pursuant to 42 U.S.C. § 1983 against state actors, are the analog to such actions; and the constitutional standard of review is the same for either type of action. *Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir. 1995) (per curiam). Thus, federal courts have

Chapman v. Doe (One), Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 177 of 396

"typically incorporated § 1983 law into *Bivens* actions." *Tavarez, 54 F.3d at 110*.

However, claims for monetary damages under *Bivens* may not be brought against the United States, federal agencies, or federal agents in their official capacities. *See Bivens, 403 U.S. at 410; Petrazzoulo v. U.S. Marshals Serv., 999 F. Supp. 401, 406 (W.D.N.Y. 1998)* (dismissing *Bivens* claim against the USMS, a federal agency); *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir. 1994)* (holding that a *Bivens* action "must be brought against the federal officers involved in their individual capacities[.]").

Consequently, Plaintiff's *Bivens* claim for monetary damages against the USMS is dismissed with prejudice.

### C. Service Issues

Because Plaintiff has paid the filing fee, he is responsible for serving the summonses and Complaint on Defendants. However, despite finding that a response to the Complaint is required, there is an impediment to service. The only remaining defendants are John Doe defendants whose identities are not presently known. Under normal circumstances, when a pro se plaintiff includes Doe defendants, together with named defendants, the Complaint is served upon the named defendants and the plaintiff pursues discovery to identify the Doe defendants. In this case, however, Plaintiff has not identified *any* defendant by name.

In light of the foregoing, the Clerk of Court shall send a copy of the Complaint and this Decision and Order to the Office of the County Attorney for Albany County. Pursuant to *Valentin v. Dinkins, 121 F.3d 72 (2d. Cir. 1997)* (per curiam), the Court requests that the County Attorney's Office attempt to ascertain the full name of the defendants.[3] The County Attorney's Office is also requested, to the extent that it is able to identify the defendants, to provide the address where the defendants can currently be served. The County Attorney need not undertake to defend or indemnify these individuals at this juncture. This order merely provides a means by which Plaintiff may name and properly serve the defendants as instructed by the Second Circuit in *Valentin*.

## IV. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that the following claims are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Section 1983 claims against Albany County Correctional Facility and the USMS; and (2) *Bivens* claims against the USMS; and it is further

**\*8 ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915A for failure to state a claim upon which relief may be granted: (1) Fourteenth Amendment medical claims against John Doe #1, John Doe #2, and Jane Doe; and (2) FTCA claims against the USMS[4]; and it is further

**ORDERED** that Albany County C.F., the USMS, and Jane Doe are **DISMISSED** as defendants herein; and it is further

**ORDERED** that the Fourteenth Amendment deliberate indifference claim, related to Plaintiff's safety, against John Doe #1 and John Doe #2 survive the Court's sua sponte review under 28 U.S.C. § 1915A and require a response; and it is further

**ORDERED** that the Office of the County Attorney for Albany County is hereby requested to produce the information specified above, to the extent that it can, regarding the identity of the defendants within thirty (30) days of the filing date of this Decision and Order. The information should be sent to the Clerk of the Court for the Northern District of New York along with a copy of this Decision and Order, as well as to Plaintiff at his address of record. Once this information is provided, the Clerk shall return this file to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

### All Citations

Not Reported in Fed. Supp., 2019 WL 6493971

## Footnotes

1   The Court is mindful of the Second Circuit's instruction that a pleading by a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that it suggests. *See, e.g.,* ⚑ *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts" that a pro se plaintiff's pleadings must be construed liberally); ⚑ *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, [plaintiff] has raised. In so doing, the court's imagination should be limited only by [plaintiff's] factual allegations, not by the legal claims set out in his pleadings."); ⚑ *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [a pro se litigant's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.").

2   To the extent that the Complaint could be read to include a Fourteenth Amendment claim against the "Medical Staff," *see* Compl. at 10, that claim is dismissed for failure to state a claim upon which relief may be granted. Only "persons" may act under the color of state law, a defendant in a ⚑ § 1983 action must qualify as a "person." The use of the term, "Medical Staff" as a name for alleged defendants, without naming specific staff members, is not adequate to state a claim against a "person" as required in ⚑ § 1983 actions. *See Martin v. UConn Health Care,* 99-CV-2158, 2000 WL 303262, at *1-2 (D. Conn. Feb. 9, 2000); *Ferguson v. Morgan,* No. 90 Civ. 6318, 1991 WL 115759, at *1 (S.D.N.Y. June 20, 1991) (holding that Otisville Correctional Facility medical staff not a person under ⚑ § 1983).

3   In ⚑ *Valentin,* 121 F.3d at 75-75, the Second Circuit held that district courts must assist pro se incarcerated litigants with their inquiry into the identities of unknown defendants.

4   If Plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

---

**End of Document** 　　　　　　　　　　　　　　　　　© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Carno v. United States, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 179 of 396

2019 WL 2287966

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Alexander CARNO, Plaintiff,

v.

The UNITED STATES of America, Federal Bureau
of Prisons, Westchester County Jail, Correct
Care Solutions Inc., Warden or Superintendent
or Sheriff of Westchester County Jail, Medical
Director or Ceo of Correct Care Solutions, Acting
Director of Federal Bureau of Prisons, Defendants.

17 cv 7998 (NSR)
|
Signed 05/28/2019

**Attorneys and Law Firms**

Alexander P. Carno, White Deer, PA, pro se.

Charles Salim Jacob, Peter Max Aronoff, United States
Attorney's Office, New York, NY, for Defendants the United
States of America, Federal Bureau of Prisons, Acting Director
of Federal Bureau of Prisons.

Paul Andrew Sanders, Barclay Damon LLP, Rochester, NY,
Jonathan H. Bard, Barclay Damon, LLP, Albany, NY, for
Defendants Correct Care Solutions, Inc., Medical Director or
CEO of Correct Care Solutions.

Paul Andrew Sanders, Barclay Damon LLP, Rochester, NY,
Irma Wheatfield Cosgriff, Westchester County Attorney's
Office, White Plains, NY, Jonathan H. Bard, Barclay Damon,
LLP, Albany, NY, for Defendant County of Westchester.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Alexander Carno ("Plaintiff") brings an
action against the United States of America ("United
States" or "Government"), Federal Bureau of Prisons
("BOP"), and Acting Director of Federal Bureau of
Prisons, (together, "Federal Defendants"); Correct Care
Solutions Inc. and Medical Director or CEO of Correct
Care Solutions, Inc. (together "Correct Care Defendants"),
Westchester County Jail and Warden or Superintendent or

Sheriff of Westchester County Jail, (together, "Westchester
Defendants"), (collectively, "Defendants"), pursuant to 🚩42
U.S.C. § 1983, *Monell v. Dept'of Soc. Serv. of the City of N.Y.*,
and the Federal Tort Claims Act ("FTCA"), 🚩28 U.S.C. §§
1346 and 🚩2671 *et seq.* (*See* Complaint, ECF No. 2.)

Before the Court are three motions to dismiss, filed by
Westchester Defendants, Correct Care Defendants, and
Federal Defendants, respectively. (*See* ECF Nos. 59, 68, 75.)

For the following reasons, the Motions to Dismiss
are GRANTED. The Federal Defendants' Motion is
dismissed *with prejudice*, while Westchester and Correct
Care Defendants' Motions are dismissed *without prejudice*.
Plaintiff is granted leave to amend his Complaint. [1]

**BACKGROUND**

The following facts, taken from the Complaint, are presumed
true for the purpose of deciding this motion. On October 9,
2015, Plaintiff was arrested in White Plains, New York for
sex trafficking. Plaintiff was held in default of $ 10,000 bail,
which he quickly made, and was thus free for over a month.
On November 23, 2015, Plaintiff was arrested again, this time
by the Federal Bureau of Investigations ("FBI"). The FBI
charged Plaintiff for sex trafficking. Following this arrest,
Plaintiff was held without bail and sent to Westchester County
Jail in Valhalla, New York.

Plaintiff was booked into the Westchester County Jail and
was originally placed in the 1 West block of the facility.
Two months after arrival, Plaintiff was transferred to the 3
West block of the facility, where he resided at the time of the
incident that is the subject of his Complaint.

On April 9, 2016, Plaintiff was talking to another inmate in
the 3 West block of the facility. During Plaintiff's conversation
with the other inmate, he sat on a radiator with both his hands
and his buttocks touching the radiator. There was no sign that
cautioned the radiator being hot, and at no point did any of the
correctional officers order Plaintiff not to sit on the radiator.

**\*2** After approximately five minutes of sitting on the
radiator, Plaintiff suddenly realized that the part of his pants
that had been in contact with the radiator was wet. Upon
realizing that his pants were wet, Plaintiff returned to his cell
and removed his pants to see what the cause of the moisture

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 180 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

was. Plaintiff discovered that his skin had been burned by the radiator, and his buttocks were bleeding profusely.

At 9:45pm that night, Plaintiff flagged down a correctional officer who was making his rounds. Plaintiff informed the officer that he had a medical emergency and told him that "he had burned his ass." The officer told Plaintiff he would call for medical attention immediately. Plaintiff remained in his cell and did not hear from the Officer for almost an hour. At 10:30pm, the same officer whom Plaintiff had alerted, was making his rounds again. Plaintiff flagged him down again and asked if medical would see him. Plaintiff was still bleeding profusely from the burn. The officer told Plaintiff that medical was busy elsewhere in the facility with an emergency. He then shut down the 3 West block for the night without providing Plaintiff medical attention.

At 11:00pm, a different correctional officer came to the 3 West block to make rounds. Plaintiff now informed this officer of his medical emergency. The officer did not believe that Plaintiff was burned and bleeding, so Plaintiff removed his pants to show the officer. The officer was disgusted by the sight of the burn and told Plaintiff that he would get him medical help. Plaintiff remained in his cell for another two and a half hours. Finally, at 1:30am, the corrections officer returned to retrieve Plaintiff and bring him to the medical department of the facility.

At the medical department, the on-call nurse took a picture of the burns and sent them to an on-call provider, Correct Care Solutions, to determine the correct course of action for the injury. The nurse talked on the phone with Correct Care Solutions and discussed the injury for a few minutes. After getting off the phone, the nurse bandaged Plaintiff, and sent him to his cell with Tylenol to get him through the night. But Plaintiff's burns were so severe that Tylenol allegedly could not minimize the excruciating pain that Plaintiff felt throughout the night.

At 8:00am the next morning, an officer got Plaintiff from his cell and returned him to the medical department. Plaintiff was taken to Correct Care Solutions where it was determined that Plaintiff would need to be taken to the Westchester Medical Center Hospital for further evaluation and treatment. During Plaintiff's transport to hospital he had to sit "upon hard cold steel in a van, not an ambulance."

Once Plaintiff arrived at the emergency room of Westchester Medical Center, he was diagnosed with having third degree

burns on his buttocks. Plaintiff was admitted into the Westchester Medical Center burn unit. Plaintiff remained in the burn unit for 27 days. During these 27 days Plaintiff underwent surgery, along with various neurological and dermatological treatments. Following these treatments, Westchester Medical Center informed Westchester County Jail, and Correct Care Solutions that Plaintiff needed continuing neurological and skin treatment. On October 16, 2017, Plaintiff filed the instant Complaint against Federal Defendants, Correct Care Defendants, and Westchester Defendants. Plaintiff seeks $ 1,000,000.00 in damages.

**Additional Facts Pertinent to** Fed. R. Civ. P. 12(b)(1)

**\*3** Westchester County Jail contracts with the United States Marshall Service ("USMS") to hold federal prisoners along with the local county prisoners. The contractual agreement between Westchester County Jail and USMS states: "The Local Government agrees to accept and provide for the secure custody, care and safekeeping of federal prisoners in accordance with state and local law, standards, policies, procedures, or court orders applicable to the operations of the facility."

The Court is permitted to assess this contract without converting any of the motions to dismiss to a motion for summary judgment, as it is for the limited purpose of assessing proper subject matter jurisdiction pursuant Fed.R.Civ.P. 12(b)(1). Zappia v. Emirate, 215 F.3d 247 ("[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing.").

## LEGAL STANDARDS

**Motion to Dismiss Pursuant to** Fed.R.Civ.P. 12(b)(6) **and 12(b)(1)**

Under Rule 12(b)(6), the inquiry for motions to dismiss is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. The Court must take all material

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 181 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Id.* at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

For motions brought under Rule 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction ... when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.,* 752 F.3d 239, 243 (2d Cir. 2014). "[T]he court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir. 2000). Though a court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, [it] may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Sch.,* 386 F.3d 107, 110 (2d Cir. 2004).

**\*4** "*Pro se* complaints are held to less stringent standards than those drafted by lawyers, even following *Twombly* and *Iqbal.*" *Thomas v. Westchester,* No. 12–CV–6718 (CS), 2013 WL 3357171 (S.D.N.Y. July 3, 2013). The court should read *pro se* complaints " 'to raise the strongest arguments that they suggest,' " *Kevilly v. New York,* 410 F. App'x 371, 374 (2d Cir. 2010) (summary order) (quoting *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir. 2006)); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) ("even after *Twombly,* though, we remain obligated to construe a pro se complaint

liberally.") "However, even pro se plaintiffs asserting civil rights claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a right to relief above the speculative level." *Jackson v. N.Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (quoting *Twombly,* 550 U.S. at 555) (internal quotation marks omitted). Dismissal is justified, therefore, where "the complaint lacks an allegation regarding an element necessary to obtain relief," and therefore, the "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College,* 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations omitted).

## Section 1983 Actions

Section 1983 provides, in relevant part, that:"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979); *see* *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir. 2004). To state a claim under § 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York,* No. 09 Civ. 5446, 2013 WL 1803896, at \*2 (S.D.N.Y. April 25, 2013); *see* *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir. 2010).

Therefore, a Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his federal statutory rights, or his constitutional rights or privileges. *See* *Annis v. Cnty. of Westchester,* 136 F.3d 239, 245 (2d Cir. 1998); *Quinn v. Nassau Cnty. Police Dep't,* 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) (noting that Section 1983 "furnishes a cause of action for

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 182 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

the violation of federal rights created by the Constitution") (citation omitted).

### *Monell* Liability

A municipality, like Defendant Westchester County, may be sued under § 1983 only "when execution of [the] government's policy or custom ... inflicts the injury." *Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Such a claim is commonly referred to as a *Monell* claim. A plaintiff asserting a *Monell* claim against a municipal entity must "show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). Courts in this Circuit apply a two-prong test for § 1983 claims brought against a municipal entity. *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused [the plaintiff's] injuries beyond merely employing the misbehaving officer." *Id.* (internal citation omitted). Second, the plaintiff must establish a " 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation.' " *Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 439 (S.D.N.Y. 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

**\*5** A complaint must include more than broad or vague allegations to support a *Monell* claim. "[T]he simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993); *see also Davis v. City of New York*, No. 07-CV-1395(RPP), 2008 WL 2511734, at \*6 (S.D.N.Y. June 19, 2008) (holding that "conclusory allegations that a municipality failed to train and supervise its employees" are insufficient to state a *Monell* claim absent supporting factual allegations). Similarly, it is not enough to allege simply that a municipal policy or custom exists. *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995).

Additionally, a municipality may not be held liable under § 1983 on a *respondeat superior* theory solely because the municipality employs an individual who violated the law. *Monell*, 436 U.S. at 692. For an unofficial policy or custom

to invite *Monell* liability, the practice, custom or usage must be so widespread and so persistent that it has the force of law. *See Lauro v. City of New York*, 39 F. Supp. 2d 351, 366 (S.D.N.Y. 1999), *rev'd on other grounds*, 219 F.3d 202 (2d Cir. 2000).

### Eighth Amendment and Medical Indifference

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. Therefore, the Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions." *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 2463, 183 L.Ed. 2d 407 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1189, 161 L.Ed. 2d 1 (2005)). The right emanates from the basic precept of justice that punishment for crime should be graduated and proportioned to [the] offense. *Roper*, 543 U.S. at 560 (citations and internal quotations omitted). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Id.*

In order to assert an Eighth Amendment claim for medical indifference, plaintiff must plead facts to establish that defendant acted with "deliberate indifference to serious medical needs." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)); *see also Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). It is well-established that "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, [and that] not every lapse in prison medical care will rise to the level of a constitutional violation." *Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003). "Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eight Amendment violation." *Salahuddin v. Goord*, 467 F.3d 279 (2d Cir. 2006) (internal quotations omitted).

Medical deliberate indifference claims under Eighth Amendment of the U.S. Constitution and Section 1983 require courts to engage in a two-part inquiry, one objective and the other subjective. The subjective inquiry focuses on the defendant's motive and the objective inquiry on the

conduct's effect. *Chance, 143 F.3d at 702*. "First, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the defendant must act with a sufficiently culpable state of mind." *Id.* A "sufficiently serious" medical need is a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)*. A prison official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety ..." *Chance, 143 F.3d at 702* (citing *Farmer v. Brennan, 511 U.S. 825, 837 (1994)*).

**\*6** Deliberate indifference also requires the prisoner to "prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance, 143 F.3d at 702*. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once proscribed." *Estelle, 429 U.S. 97, 104 (1976)*.

**Federal Tort Claims Act**

Under the Eleventh Amendment to the U.S. Constitution, the United States, as a sovereign, is immune from suits raising Constitutional violations. U.S. Const. Amend. XI. ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.") At the same time, the Supreme Court has held that Congress can abrogate state sovereign immunity through legislation such as the FTCA. The FTCA creates a statutory exception to the United States' general sovereign immunity and provides that the United States may be subject to suit for injuries suffered by federal prisoners confined in federal facilities, provided that they suffer at the behest of federal employees. *United States v. Muniz, 1963, 374 U.S. 150, 83 S.Ct. 1850 (1963)*.

At the same time, the FTCA does not waive the government's sovereign immunity *carte blanche*. For example, it does not waive immunity for tort claims against agencies or individuals in their official capacity. *See* 28 U.S.C 2679 (a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.") Additionally,

FTCA Section 2671 states that any contractor of the United States is excluded from being considered an employee. "Thus, as a general rule, sovereign immunity precludes suits against the United States for injuries caused by independent contractors" *Logue v. United States, 412 U.S. 521, 93 S. Ct. 2215 (1973)*.

## DISCUSSION

Separate motions to dismiss have been filed by the Federal Defendants, Correct Care Defendants, and Westchester Defendants. The Court generally addresses each separately.

**Federal Defendants**

Federal Defendants move to dismiss the claims against them on several grounds. First, they argue that the United States, as a sovereign, is immune from any constitutional claims alleged against them. (Federal Defendants Motion, ("Fed. Def. Mem."), ECF No. 76, at 5.) Next, they argue that the BOP and Acting Director are improper defendants in any FTCA action. (*Id.* at 6.) Third, they argue that the independent contractor exemption bars Plaintiff's FTCA claims against the United States for any negligent acts done by non-federal employees. (*Id.*) Last, they argue that the "discretionary function exemption" bars any FTCA claims relating to the decision by the federal government to contract with Westchester County. (*Id.* at 9.) The Court agrees with each.

*Non-FTCA Constitutional Claims*
*Against United States and its Agents*

Federal Defendants correctly note that "[T]he United States, as sovereign, is immune from suit save as it consents to be sued." *Lehman v. Nakshian, 453 U.S. 156, 160 (1981)*; *F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994)* ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). Thus, to establish subject matter jurisdiction, a plaintiff must identify an applicable waiver of the sovereign immunity. *De Masi v. Schumer, 608 F. Supp. 2d 516, 524 (S.D.N.Y. 2009)* (citing *Makarova, 201 F.3d at 113*).

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 184 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

**\*7** Plaintiff here has not done so. Apart from checking a box on his Complaint indicating that he alleges a "violation of [his] federal constitutional rights" he does not note any statute that implicates the United States' liability. Hence, any general constitutional torts he is attempting to allege are barred by sovereign immunity.

Similarly, to the extent Plaintiff alleges constitutional tort claims against the BOP and Acting Director of the BOP in his official capacity, the Court must dismiss them. Tort suits against government officials are considered suits against the United States and are similarly barred by sovereign immunity.

Accordingly, the United States, BOP, and acting Director of the BOP in his official capacity are all immune from Plaintiff's constitutional tort claims. *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("By definition, federal law, not state law, provides the sources of liability for a claim alleging the deprivation of a federal constitutional right ... the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims.").

Pursuant to the Court's duty to construe *pro se* plaintiffs' claims liberally the Court reads Plaintiff's complaint as attempting to raise tort claims against Federal Defendants however possible. It therefore next assesses whether Plaintiff has cognizably pleaded tort claims against the United States or its federal agencies pursuant to the Federal Tort Claims Act ("FTCA").

### FTCA Claims Against BOP and Acting Director of BOP

Federal Defendants argue that the BOP and Acting Director of the BOP are improper defendants for any FTCA action. (Fed. Def. Mem. at 6.) They argue that the FTCA does not waive the government's immunity for tort claims against agencies or individuals in their official capacity. 28 U.S.C 2679 (a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable ...").

The case law supports this. *See Point-Dujour v. U.S. Postal Serv.*,

If the plaintiff chooses to re-file, he should note that both the United

States Postal Service and Amadu Haruna are improper defendants to this action. In enacting the FTCA, the United States explicitly waived its sovereign immunity with respect to certain common law tort claims. *However, this waiver of immunity does not apply to suits brought pursuant to the FTCA against federal agencies....* Accordingly, the Postal Service may not be sued directly on claims brought under the FTCA.

No. 02 CIV. 6840, 2003 WL 1745290, at \*3 (S.D.N.Y. Mar. 31, 2003) (emphasis added). The clear consensus is that official government agencies are immune from general FTCA liability. *See also Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (dismissing FTCA claims as a matter of law against Air Force Exchange Service, a federal agency under the Air Force and Army, and instead permitting those claims to be asserted against the United States). Accordingly, all FTCA claims alleged against BOP and its Acting Director are dismissed as a matter of law. To the extent Plaintiff is attempting to raise FTCA claims, they may only be raised against the United States. However, for the following reasons, those claims are still improper.

### Independent Contractor Exemption

In order for the United States to be liable for torts, the FTCA requires that those torts be committed by *federal employees*. Hence, Federal Defendants next argue that Plaintiff does not make any allegations regarding acts or omissions by federal employees, but rather seeks to hold Federal Defendants liable for the acts of Westchester County employees and Westchester's County's contracted medical providers. (Fed. Def. Mem. at 6.) As such, they argue that the FTCA's independent contractor exemption prohibits such liability.

**\*8** The FTCA defines federal employees as follows:

"Employee of the government" includes (1) officers or employees of any federal agency, members of the military or naval forces of the United

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 185 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

States, members of the National Guard while engaged in training or duty under section 115, 316, 502, 503, 504, or 505 of title 32, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation, and (2) any officer or employee of a Federal public defender organization, except when such officer or employee performs professional services in the course of providing representation under section 3006A of title 18.

28 U.S.C § 2680 (a). In *Logue,* the Supreme Court explained that while the definition of "federal agency" in the FTCA includes "the executive departments, the military departments, and independent establishments of the United States," it "does not include any contractor with the United States." 412 U.S. at 526. It also explained, based on an in-depth review of the statute's legislative history, that Congress crafted this waiver intentionally, contemplating that the United States would not be liable for conduct by a third-party with whom it merely contracted and where that third-party contractor was managing a facility's day-to-day operations. *Id.* at 529.

Following *Logue,* numerous courts across the country assessed FTCA claims brought against the federal government for various constitutional torts that occurred to incarcerated inmates, whether pre-trial detainees, convicts, or immigrant detainees. Where those courts found contracts delegating the day-to-day operations and management of "housing, safekeeping, and subsistence of federal prisoners" or detainees to local service providers, the employees of those services were not deemed "federal employees" under the FTCA, notwithstanding that the federal government still had broad oversight on those facilities. *See e.g. Johnson v. United States,* No. 5-cv-40, 2006 WL 572312 (E.D. Va. Mar. 7, 2006) (finding no liability for federal government where contract between U.S. Marshals Service and Virginia jail provider delegated to Virginia jail provider the responsibility for "housing, safekeeping, and subsistence of federal prisoners"); *Henry v. United States,* No. 10-CV-4718, 2013 WL 5972671 (E.D.N.Y. Nov. 5, 2013) (finding no liability for federal

government where contract between U.S. Marshals Service and County Correctional Facility provided that facility would "accept and provide for the secure custody, safekeeping, housing, subsistence and care of federal detainees"); *see also Acosta v. U.S. Marshals Serv.,* 445 F.3d 509 (1st Cir. 2006).

The Supreme Court in *Logue* and its progeny reason that when liability stems from a local facility's negligence, and the local facility merely had an arm's length contract with the federal government, liability more appropriately rests with that local facility. This is because, while the federal government may have certain compliance requirements, the local facility is functionally in charge of the day-to-day operations and supervises employees directly, rather than the federal government. *See* Logue, 412 U.S. at 525.

**\*9** Here, the contract between USMS and Westchester County provides for "the housing, safekeeping, and subsistence of federal prisoners." (*See* Charles Jacob Dec. Ex A, ("Contract"), ECF No. 77-1.) Further, while the initial contract required the Local Government to notify USMS as soon as possible when medical emergencies arose that required "removal of a prisoner from the facility" as well as "prior authorization" from USMS, the contract was modified in 2007 so that:

> The Local Government shall accept and provide for the secure custody, care and safekeeping of federal prisoners in accordance with state and local laws, standards, polices, procedures, or court orders applicable to the operations of the Medical Center.

(*See id.*) Hence, in 2015, when Plaintiff suffered his medical emergency, the newer provisions were in effect. These provisions put the onus and responsibility for prisoner medical care in the hands of the Local Government, abdicating any previous duties that were on USMS.

The renewed contract is just the type of contract contemplated by *Logue* and its progeny, in that it directs Westchester County to manage and supervise federal prisoners on a day-to-day basis, and only requires the County to meet federal compliance standards. Accordingly, Westchester County is

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 186 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

deemed an independent contractor with the United States, for which the independent contractor exemption applies. Therefore, the United States may not be liable for acts taken by employees of Westchester County.

*Discretionary Function Exemption*

Federal Defendants lastly argue that Plaintiff also cannot bring an FTCA claim against the United States for USMS's decision to contract with Westchester County. (Fed. Def. Mem. at 9.) They explain that while the FTCA permits actions for damages against the United States for injuries caused by the tortious conduct of United States employees or agents, the FTCA also includes a section that expressly limits the immunity waiver in certain circumstances. *See* 28 U.S.C. § 2680 (titled "Exceptions"). This section excepts "[a]ny claim ... based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved was abused." 28 U.S.C. § 2680(a).

The Court agrees with Federal Defendants. The Second Circuit has explained that the purpose of the discretionary function exception in the FTCA is to protect separation of powers and to "protect certain governmental activities from exposure to suit by private individuals." *In re World Trade Center Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008) (citation omitted). It also explained that the exception specifically protects the federal government from liability when it partakes in legal activity, but a private individual commits a tort in the scope of that activity. *Id.*

Assessing the discretionary function exception is a two-part inquiry. *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). First, the challenged actions "must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation," and second, "the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing *Gaubert*, 499 U.S. at 322-23).

Here, the first part of the inquiry is met. While USMS has a statutory duty to "provide for the safe-keeping of any person arrested ... pending commitment to an institution" it "may

contract ... for the imprisonment, subsistence, care and proper employment" of federal prisoners. 18 U.S.C. §§ 4086, 4002. The United States has discretion because it is statutorily permitted to *decide* whether it will personally provide for arrestees' safe-keeping or sub-contract that responsibility.

**\*10** Turning to the second part of the inquiry, this prong is also met. The Government has to weigh the public policy concerns regarding safety and medical care for prisoners before deciding whether or not to subcontract with a non-federal facility to house detainees. Numerous courts have found such a decision to qualify as a public policy concern that would be covered by the FTCA discretionary function exception. *See e.g., Toomer v. Cty. of Nassau*, No. 07-CV-01495, 2009 WL 1269946 (E.D.N.Y. May 5, 2009) (explaining that when United States had to contract with Virginia Peninsula Regional jail, it "had to weigh concerns of expense, administration, payment, access to premises, and a veritable plethora of factors," all of which are policy considerations); *Johnson*, 2006 WL 572312, at *5 ("it is clear that the USMS must carefully balance competing policy factors prior to entering a contract for the housing and care of federal prisoners"); *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813–14, 104 S. Ct. 2755, 2764 (1984) (explaining that discretionary function "plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals"); *Williams v. United States*, 50 F.3d 299, 310 (4th Cir. 1995) (finding that "decision to hire an independent contractor to render services for the United States is precisely the type of decision that the [discretionary function] exception is designed to shield from liability.")

With that, the Court finds that the Discretionary Function exemption bars any claims by Plaintiff relating to the United States' decision to contract with Westchester County.

Accordingly, the Court finds that there is no legal basis for the United States, BOP, and Acting Director of the BOP to be liable for any of the constitutional tortious conduct of which Plaintiff complains. The claims against these three actors are therefore dismissed with prejudice, and these defendants may be terminated from the docket.

**Correct Care Solutions, LLC**

Case 9:21-cv-00949-MAD-ML Document 51 Filed 02/09/23 Page 187 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

The Court next addresses the arguments raised by Correct Care Solutions, LLC [2] and the Director/CEO of Correct Care Solutions ("Correct Care Defendants"). Correct Care Defendants raise two principal arguments in support of their Motion to Dismiss the Complaint. First, they argue that the Complaint lacks any allegations supporting the individual involvement of the Medical Director/CEO of Correct Care. (Correct Care Mem, ECF No. 70, at 9.) Second, they argue that Plaintiff fails to properly allege a *Monell* claim against Correct Care.

*Director/CEO of Correct Care*

The Court begins by assessing the pleading sufficiency of Plaintiff's claims against the Medical Director/CEO of Correct Care. In that vein, the Court notes that Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). Therefore, in addition to alleging a constitutional violation, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).

While it is typically the practice of this Court to first assess whether Plaintiff has alleged a plausible constitutional violation, and then to assess whether he has alleged enough facts to support 1983 liability against individual defendants, here the allegations against the individually named defendants are so sparse that they are facially defective.

Correct Care Defendants argue that Plaintiff has not only failed to sufficiently allege involvement of the Medical Director/ CEO of Correct Care, they argue that Plaintiff fails to allege sufficient allegations to support the claims of *any* of the named individual defendants. They note that the only statements related to individually named defendants are the descriptions of who these individuals are. For example, in the "Defendant Information" section, Plaintiff alleges that the Warden / Superintendent / Sherriff is the "commander and leader of Westchester County Jail" and that the Medical Director is the "CEO of Correct Care Solutions." (Compl. at 3.)

**\*11** The Court agrees with Correct Care Defendants. Upon reviewing the Complaint and Plaintiff's opposition, (Pl. Opp.,

ECF No. 58), it cannot find a single sentence supporting the individual involvement of either the Director/CEO of Correct Care or the Sheriff of Westchester County Jail. The only reference to these individuals is their description in the "Defendants" section of the Complaint. As Correct Care Defendants note, "[t]he mere linkage to the alleged unlawful conduct through the prison chain of command is insufficient to show personal involvement, and the doctrine of *respondent superior* is unavailable to hold supervisory officials liable." *Jenkin v. Trachtman*, 2017 U.S. Dist. LEXIS 211572, at\* 12 (N.D.N.Y. Dec. 21, 2017); *Johnson v. Sposato*, No. 15-CV-3654, 2015 WL 6550566, at \*3 (E.D.N.Y. Sept. 22, 2015) (dismissing a plaintiff's claims against the defendants because the complaint did "not include any factual allegations sufficient to demonstrate personal involvement" by those defendants); *Mann v. Daniels*, No. 10-CV-7540, 2011 WL 2421285, at \*2 (S.D.N.Y. June 9, 2011) (holding that the plaintiff did not plausibly allege that the defendants were personally involved because the complaint did not include facts about any "specific wrongdoing sufficient to constitute personal involvement").

Plaintiff does not allege that he ever interacted with either of the individually named Defendants during his entire medical ordeal, or ever, and does not explicitly or implicitly allege what, if any, decisions those individuals made regarding his treatment. The Court therefore dismisses the Section 1983 claims asserted against both of them. At this juncture, however, these claims are dismissed without prejudice, and Plaintiff may amend his Complaint to cure his pleading deficiencies if he is able to provide plausible facts supporting the precise actions that these two individuals took that contributed towards his injuries.

**Correct Care and Westchester County**
The Court next turns to Plaintiff's inadequate medical care claims as alleged against Correct Care, LLC and Westchester County. These claims depend on a single threshold question: did defendants' actions violate Plaintiff's constitutional rights? If they did not, then none of the defendants can be liable to Plaintiff, whether through § 1983 or *Monell* vis-à-vis a policy or custom. If there was a constitutional violation, then the Court may assess proper liability.

In that vein, the Court turns to the legal standard. Correct Care Defendants note that "[a] pretrial detainee's unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the

Cruel and Unusual Punishments Clause of the Eighth Amendment." (*Id.* at 6) (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). Correct Care Defendants are correct. But as the Second Circuit recently explained:

> In *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), the Supreme Court held that the state has a constitutional obligation to provide medical care to persons it is punishing by incarceration. When the state is deliberately indifferent to the medical needs of a person it has taken into custody, it violates the Eighth Amendment's prohibition on cruel and unusual punishment. *Id.* at 104. The Supreme Court subsequently extended the protections for prisoners established in *Estelle* to civil detainees under the Due Process Clause of the Fourteenth Amendment, reasoning that persons in civil detention deserve at least as much protection as those who are criminally incarcerated.

*Small v. Orange County et al.*, No. 17-3506-pr, (2d. Cir. May 24, 2019). In other words, while the Fourteenth Amendment controls due to Plaintiff's status as a pre-trial detainee, the Supreme Court has read the Eighth Amendment's protections into the Fourteenth Amendment's protections for conditions of confinement for all individuals taken into state custody. The standard is the same regardless of which amendment's prism the court looks through.

The Court proceeds with assessing the plausibility of the constitutional violation. As stated earlier, medical deliberate indifference claims under Eighth Amendment require courts to engage in a two-part inquiry, one objective and the other subjective. The subjective inquiry focuses on the defendant's motive and the objective inquiry on the conduct's effect. *Chance, 143 F.3d at 702.* Put simply, "[f]irst, the alleged deprivation must be, in objective terms, sufficiently serious. Second, the defendant must act with a sufficiently culpable state of mind." *Id.* A "sufficiently serious" medical need is a "condition of urgency, one that may produce death,

degeneration, or extreme pain." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).

**\*12** Here, the Court finds it unquestionable that Plaintiff's injury satisfies the objective prong of being sufficiently serious. Plaintiff repeatedly alleges that he was burned and bleeding out his rear end, so much so that the second corrections officer was "sickened at the sight of the skin and bleeding almost to the point of nausea." (Compl. ¶¶ 14, 20, 21.) Plaintiff adds that he suffered excruciating pain during the night before he went to the emergency room. (*Id.* ¶ 25.) Plaintiff also alleges that when he reached Westchester Medical Center Emergency Department the next day, they made the diagnosis and determination that plaintiff had "suffered significant third-degree burns" and would need to be admitted to the burn unit immediately. (*Id.* ¶ 29.) Plaintiff then received emergency surgery from the burn unit as well as neurological and dermatology care. (*Id.* ¶¶ 31-32.) Plaintiff remained in the hospital receiving treatment for twenty-seven days. (*Id.* ¶ 32.) He alleges that his treatment included continuing neurological treatment and grafting his skin, post-surgery. (*Id.* ¶ 34.) In his opposing brief, he adds that he is disabled and in a wheelchair.

The classic understanding of deliberate indifference is connected with "unnecessary and wanton infliction of pain, or other conduct that shocks the conscience." *Hathaway v. Coughlin*, 99 F.3d 550 (2d Cir. 1996). Here, Plaintiff describes experiencing a "life threatening emergency" and having "trauma surgery" that left him with a "permanent disability" and "dependence on a wheelchair." (*See* Pl. Opp., ECF No. 58, at 2.) Taken as true, Plaintiff's injury satisfies any plain standard for being objectively painful and serious. The Court need not further dwell on this prong.

The Second prong for satisfying deliberate indifference is subjective. A prison official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety ..." *Chance, 143 F.3d at 702* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference also requires the prisoner to "prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance, 143 F.3d at 702.* Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once proscribed." *Estelle, 429 U.S. 97, 104 (1976).* Again, the standard is the same

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 189 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

put through the Eighth Amendment or the Fourteenth Amendment's due process clause. For a pretrial detainee to claim unconstitutional conditions of confinement sufficient to color an 🚩 § 1983 claim for unconstitutional condition of confinement, he must demonstrate that "officers acted with deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted).

Here, Plaintiff runs into trouble. While the Complaint indicates that there were three individuals involved in his treatment, there are simply no allegations that the *named individual defendants*—the Warden or Superintendent of Westchester County Jail, the Medical Director or CEO of Correct Care Solutions, or the Acting Director of the BOP—even participated in Plaintiff's treatment, let alone demonstrated deliberate indifference towards Plaintiff. Absent any facts about their involvement, the Court cannot assess whether they even knew about Plaintiff's incident, let alone whether they engaged in conduct that was negligent or reckless. Moreover, as Westchester Defendants point out, Plaintiff does not specify the length of the delay or state whether his condition worsened as a result of any such delay. (*See* Westchester Mem., ECF No. 65, at 11.) This is critical for Plaintiff's claim to survive because while Plaintiff's injury is unquestionably serious, his injury was not caused exclusively by the alleged delay in his treatment, but was predominantly caused by his act of sitting on the radiator. In any event, for Plaintiff to plausibly allege that he suffered a constitutional violation, he must state *what injury was caused by the inadequate or delayed treatment* and *why that delay amounted to deliberate indifference by the appropriate party.* Plaintiff's claim is close, as he does mention that he suffered excruciating physical pain throughout the night, which he claims was inadequately treated by Tylenol he received. But absent any allegations that the person who provided that medicine made an egregious error or that such pain could have been avoided if he was treated sooner, etc., Plaintiff's complaint is deficient.

### Monell Liability against Correct Care or Westchester

**\*13** Setting aside for a moment whether Plaintiff has properly pleaded his constitutional violation, Plaintiff attempts to impute liability for the alleged constitutional violation against both Westchester County and against Correct Care. As Correct Care Defendants note, liability

under 🚩 § 1983 against either Westchester County or Correct Care needs to arise through the criteria set out in *Monell v. Dep't of Soc. Servs.* because 🚩 § 1983 does not invite counties and organizations to assume liability vicariously for the conduct of rogue individuals.

To plead a *Monell* claim, "a plaintiff must allege (1) the existence of a formal policy which is officially endorsed by the municipality [or organization], or (2) a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or (3) that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses." ⚠ *Iacovangelo v. Corr. Med. Care, Inc.*, 624 Fed. Appx. 10, 13-14 (2d Cir. N.Y. 2015).

Here, whether or not Plaintiff can cure his pleadings to reflect deliberate indifference and thus a constitutional violation by any *individual* involved in his treatment, he has not pleaded anywhere in his complaint that there was any *policy* or *custom* related to how inmates with burns were treated. No other custom or policy related to Plaintiff's experience is alleged regarding exposed equipment, such as radiators, etc. In other words, Plaintiff does not allege that there was any widespread practice that raises to the level of having the force of law. Similarly, he does not make any allegation regarding deliberately indifferent conduct taken by any individual County *official, supervisor* or *policy maker* – or any such individual on behalf of Correct Care.

The short of the Court's analysis here is that there are simply not enough facts in Plaintiff's Complaint at present for Plaintiff to hold the County or Correct Care, as a whole, liable for the arguable constitutional violations he suffered due to the acts of the *individuals* he discusses in his complaint.

Accordingly, Plaintiff's *Monell* and 🚩 § 1983 claims against Westchester County and Correct Care are denied, without prejudice.

### Failure to Warn – Westchester County

Plaintiff's Complaint loosely raises claims related to general common law negligence and or OSHA. (*See* Compl. ¶¶ 38-39.) "Defendant Westchester County Jail, was charged and had the duty to keep the Plaintiff safe and in a safe facility. Defendant, Westchester County Jail, failed to provide

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 190 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

a facility compliant with OSHA standards.") Plaintiff also makes the related claims:

- Defendant, Westchester county Jail, failed to inform the plaintiff that the radiator might cause injury and failed to place or have signage present informing him of a dangerous of hazardous possible outcome from sitting upon them or touching a radiator in 3 West.

- Westchester County Jail failed to provide a safe environment for the Plaintiff to live within and be secure safety.

- Westchester County Jail failed to cover its radiators.

- Westchester County Jail failed to turn radiators off in accordance with the need for facilities climate control and conditions warranting no heat at that time of the year.

(Compl. ¶¶ 40-43.)

Plaintiff's main issue with these claims is that while prisoners have a constitutional right not to be subjected to conditions of confinement that violate contemporary standards of decency, which includes not being subjected to deliberate medical indifference, *Salahuddin v. Goord*, 467 F.3d 279, there is no constitutional right for prisoners to be forewarned about all the uncomfortable conditions of incarceration.

**\*14**  Plaintiff's claim that he should have been warned not to sit on a hot radiator for five minutes does not rise to the level of a constitutional violation because, at best, it sounds of negligence, for which he could also be contributorily negligent. And more importantly, constitutional violations arise from conduct that is much more egregious than mere negligence, as it must deprive an inmate of the "minimal civilized measure of life's necessities" and/or expose inmates to a "substantial risk of serious harm." *Johnson v. New York City*, 10-cv-6193, 2011 U.S. Dist. LEXIS 47679, at *12-13 (S.D.N.Y. April 29, 2011).

The conclusory allegation that Westchester County jail was negligent and violates OSHA is neither pleaded with sufficient plausible detail, nor sounds like a due process violation based on an infringement of contemporary standards of decency. There is no question that jails could do better to manage their exposed equipment and better control their internal temperatures each season. But nothing about how Plaintiff describes the jail's failure to place signs and warn him about exposed machinery, sounds like deliberately indifferent/reckless conduct that lead to an excessive risk of

pain. There are simply no facts suggesting that Westchester County had a more than negligent state of mind, and even if they were, the Court would have to factor Plaintiff's own risky decision to sit on the radiator. Accordingly, the Court finds that these claims fail under both 12(b)(6) and 12(b)(1).

*Westchester County and Warden*
*or Superintendent or Sheriff*

For the reasons this Court has already stated, the *Monell* claims against Westchester County are denied without prejudice for the same reasons that they are denied against Correct Care. Similarly, the claims against the Warden / Superintendent / Sherriff are denied without prejudice for the same reasons that they are denied against the Medical Director/ CEO of Correct Care – an utter lack of demonstrating personal involvement sufficient to color a plausible 🏴 § 1983 claim.

## CONCLUSION

For the foregoing reasons, the Federal Defendants' motion to dismiss is GRANTED *with prejudice.* Correct Care and Westchester County's Motions to Dismiss are GRANTED *without prejudice.* Plaintiff is directed to file an amended Complaint, addressing pleading deficiencies related to his 🏴 § 1983 and *Monell* claims related to the delayed/ inadequate treatment, including adding any necessary details, parties, and individual conduct, by June 28, 2019. This is an opportunity for Plaintiff to cure his pending causes of action, not an opportunity for Plaintiff to add new causes of action. Failure to timely amend may result in dismissal of Plaintiff's action.

The Clerk of Court is respectfully requested to terminate the pending motions at ECF Nos. 59, 68, 75. The Clerk of the Court is also directed to terminate the following defendants: The United States of America, the Federal Bureau of Prisons, and the Acting Director of the Federal Bureau of Prisons. The Clerk of the Court is further directed to correct the caption and replace "Correct Care Solutions, Inc." with "Correct Care Solutions, LLC." Finally, the Clerk of the Court is directed to mail a copy of this decision to the Plaintiff at his last address listed on ECF and to file proof of service on the docket.

SO ORDERED.

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 191 of 396

Carno v. United States, Not Reported in Fed. Supp. (2019)

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2287966

## Footnotes

1   The Court notes that Plaintiff attempted to file an amended complaint on July 25, 2018. (*See* ECF Nos. 49, 49-1.) This proposed amended complaint contained additional defendants: John Does 1-5 and a Jane Doe 1. (*Id.*) It also contained more detailed allegations about the individual conduct of these John Doe Defendants.

The Court denied Plaintiff's proposed amended complaint at that juncture because the pending motions to dismiss had already been filed. (*See* ECF No. 54.) Now that the Court has ruled on these motions, Plaintiff is permitted to file an amended complaint, in similar form, addressing the individual conduct of all the relevant parties and also addressing any other deficiencies described in this Opinion.

2   Plaintiff incorrectly names this entity as "Correct Care Solutions, Inc." This Court will simply refer to the entity as "Correct Care" hereonafter.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**2022 WL 17415123**
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

PDO MAX, INC.; and Rejuvn8, LLC, Plaintiffs,

v.

Louis MALCMACHER, DDS, Defendant.

5:21-CV-1274 (GTS/ML)

|

Signed December 5, 2022

**Attorneys and Law Firms**

TERRY J. KIRWAN, JR., ESQ., KIRWAN LAW FIRM, PC, Counsel for Plaintiffs, AXA Tower I, 15th Floor, 100 Madison Street, Syracuse, NY 13202.

PETER T. SHAPIRO, ESQ., LEWIS BRISBOIS BISGAARD & SMITH LLP, Counsel for Defendant, 77 Water Street, Suite 2100, New York, NY 10005.

## DECISION and ORDER

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this defamation action filed by PDO Max, Inc. and Rejuvn8, LLC ("Plaintiffs"), against Louis Malcmacher ("Defendant"), is Defendant's motion to dismiss Plaintiffs' Complaint for lack of personal jurisdiction pursuant to 🔖 Fed. R. Civ. P. 12(b)(2). (Dkt. No. 7.) For the reasons set forth below, Defendant's motion is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiffs' Complaint

Generally, in their Complaint, Plaintiffs allege that, during three presentations that Defendant conducted between about May 11, 2021, and about October 5, 2021, Defendant (a Ohio resident who, upon information and belief, transacts business in New York State) misrepresented the facial esthetics product of Plaintiff PDO Max (which is a New York State entity that conducts business in Ohio),[1] and that those misrepresentations were published on the internet by non-party American Academy of Facial Esthetics ("AAFE") (with which Defendant is affiliated), in violation of a Mutual Nondisclosure Agreement ("MDA") executed

between Defendant and Plaintiff Rejuvn8 (which is also a New York State entity conducting business in Ohio) on or about January 16, 2017. (Dkt. No. 1, Attach. 2.) Generally, based on these factual allegations, the Complaint asserts the following five claims: (1) defamation; (2) injurious falsehood; (3) prima facie tort; (4) tortious interference with prospected business relations; and (5) breach of contract. (Dkt. No. 1, Attach. 2.) Generally, the first four claims arise out of the alleged misrepresentations made by Defendant during the aforementioned presentations, and the fifth claim arises out of an alleged violation of the MDA between the parties. (Id.)

### B. Parties' Briefing on Defendant's Motion

#### 1. Defendant's Memorandum of Law

Generally, in his motion to dismiss all five claims of the Complaint, Defendant asserts two arguments. (Dkt. No. 7, Attach. 4.) First, Defendant argues that the Court does not have specific personal jurisdiction over him because he does not have minimum contacts with New York State given that (a) he is an Ohio resident who only "upon information and belief" transacts business in New York State, and (b) his alleged defamatory comments did not occur in, and were not purposefully directed at, New York State. (Id.)

Second, Defendant argues that the Court does not have general jurisdiction over him because he has not engaged in a continuous and systematic course of doing business in New York State, given that (a) he has never resided in New York State, (b) he does not own real property in New York State, (c) he was not in New York State when he made the presentations alleged in the Complaint, and (d) no evidence exists that the AAFE (which again is a non-party to this action) targeted, or intended to target, New York State residents when it posted Defendant's presentations. (Id.) Additionally, Defendant argues that the conduct, actions, and contacts of the AAFE, a non-party to this action, cannot be imputed onto him for purposes of jurisdiction. (Dkt. No. 1, Attach. 3.)

#### 2. Plaintiffs' Opposition Memorandum of Law

**\*2** Generally, in response to Defendant's motion, Plaintiffs assert three arguments. (Dkt. No. 11, Attach. 1.) First, Plaintiffs argue that New York State's Long Arm Statute,

C.P.L.R. § 302, gives the Court personal jurisdiction over Defendant because (a) New York State caselaw recognizes that the statute covers defamatory statements that are made outside of New York State and that target people within the State, and (b) here (as set forth in the affidavit of a representative of Plaintiffs who has "transacted business with Defendant for several years"), Defendant made the defamatory statements in a recorded training seminar (concerning the use of "PDO threads") that was then sold to people within New York State at an approximate cost of $2,000 per training participant (and otherwise made available for purchase within New York State). (*Id.*)

Second, and more specifically, Plaintiffs argue that they have made a prima facie showing that the Court has personal jurisdiction over Defendant by adducing the above-referenced affidavit, which establishes that (a) Defendant engages in commerce in New York State including the sale of PDO threads, (b) Defendant's organization, AAFE, engages in substantial business activity in New York State, including providing training seminars concerning the use of PDO threads, and (c) in particular, Defendant's organization, AAFE, records such seminars and sells them to participants in training seminars held in New York State (again, at an approximate cost of $2,000 per training participant). (*Id.*)

Third, Plaintiffs argue that the exercise of personal jurisdiction over Defendant under C.P.L.R. § 302 would not violate his due process rights (by offending traditional notions of fair play and substantial justice), because Plaintiffs have adduced evidence that Defendant (a) made defamatory statements during training seminars, and (b) through his organization, AAFE, sold recordings of those training seminars in New York State. (*Id.*)

### 3. Defendant's Reply Memorandum of Law

Generally, in his reply, Defendant asserts two arguments. (Dkt. No. 12.) First, Defendant argues that, although he is "affiliated" with AAFE, he has scant personal contacts with New York State, and the alleged activities of AAFE (which Plaintiffs have not sued) are not sufficient to predicate personal jurisdiction over him in New York State. (*Id.*)

Second, Plaintiffs have not shown that the Court has personal jurisdiction over Defendant with regard to Plaintiffs' tort claims, because (a) C.P.L.R. § 302(a)(1) takes an intentionally narrow approach to exercising long-arm jurisdiction over

defamation cases (giving those cases separate treatment as compared to other torts in order to prevent disproportionate restrictions on freedom of expression), and (b) Plaintiffs may not evade this narrow jurisdictional treatment by recasting their defamation claim as something other than defamation (as they do in their duplicative companion tort claims for prima facie tort, injurious falsehood, and tortious interference with prospected business relations). (*Id.*)

Third, and relatedly, the Court lacks personal jurisdiction over Defendant with regard to Plaintiffs' defamation claim because (a) his relationship with AAFE is too "diluted," and not sufficiently "purposeful," to support jurisdiction (particularly given that his contacts with New York State are not to be judged according to AAFE's activities there, but assessed individually), and (b) the three webinars he presented in 2021 had no relationship to his previous dealings with Rejuvn8 in 2017. (*Id.*)

Fourth, Plaintiffs have not shown that the Court has personal jurisdiction over Defendant with regard to Plaintiffs' breach-of-contract claim (for allegedly violating a non-disclosure agreement) because (a) the contract was not negotiated, signed, or performed in New York State, and (b) the choice-of-law provision in the NDA, which elects New York State, is only a factor that the Court should consider in evaluating jurisdiction. (*Id.*)

**\*3** Fifth, and relatedly, Defendant argues that the Court's exercise of personal jurisdiction over Defendant would not comport with due process, because the burdens he would face in traveling to, and litigating in, New York State outweigh Plaintiffs' interests in obtaining convenient and effective relief. (*Id.*)

## II. GOVERNING LEGAL STANDARD

Rule 12(b)(2) of the Federal Rules of Civil Procedure authorizes motions to dismiss on the basis of lack of personal jurisdiction over a defendant. "On a Rule 12(b)(2) motion ... the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566-67 (2d Cir. 1996). "When a defendant moves to dismiss a complaint under Rule 12(b)(2) for want of personal jurisdiction, courts must perform a two-part analysis." *Harris v. Ware*, 04-CV-1120, 2005 WL 503935, at \*1 (E.D.N.Y. Mar.

4, 2005); *accord,* *Eades v. Kennedy, PC Law Offices,* 799 F.3d 161, 167-68 (2d Cir. 2015). "First, personal jurisdiction over a defendant must be established under the law of the state where the federal court sits." *Harris,* 2005 WL 503935, at *1 (citing *Bank Brussels Lamber v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 [2d Cir. 1999]); *accord,* *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 242 (2d Cir. 2007) (holding that the alleged defamatory remarks of the operator of a website that rates moving companies was not a business transaction for the purposes of jurisdiction under New York State's long-arm statute).

"Second, if jurisdiction is established under the governing statute, courts must determine whether the exercise of jurisdiction under the relevant state law would violate the defendant's due process rights." *Id.* (citation omitted); *accord, Best Van Lines, Inc.,* 480 F.3d at 242-43. Due process requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945). "In reviewing a Rule 12(b)(2) motion, 'a court may consider documents beyond the pleadings in determining whether personal jurisdiction exists.' " *SPV OSUS Ltd. v. UBS AG,* 114 F. Supp. 3d 161, 167 (S.D.N.Y. 2015) (quoting *Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC,* 11-CV-0420, 2012 WL 204102, at *2 [S.D.N.Y. Jan. 24, 2012]).

"In deciding a pretrial motion to dismiss for lack of personal jurisdiction, a district court has considerable procedural leeway." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981). "Where ... the issue of personal jurisdiction 'is decided ... without discovery, the plaintiff need show only a prima facie case' of jurisdiction on a motion under Rule 12(b)(2)." *Bonkowski v. HP Hood LLC,* 2016 WL 4536868, at *1 (E.D.N.Y. Aug. 30, 2016) (quoting *Volkswagenwerk Akiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 [2d Cir. 1984]); *see* *Troma Entm't, Inc. v. Centennial Pictures, Inc.,* 729 F.3d 215, 217 (2d Cir. 2013). Plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on Sept. 11, 2001,* 714

F.3d 659, 673 (2d Cir. 2013) (citing *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 163 [2d Cir. 2010]); *see* *Troma,* 729 F.3d at 217 (noting that, to survive a motion to dismiss for lack of personal jurisdiction, the allegations in the complaint, when taken as true, must be "legally sufficient allegations of jurisdiction.").

**\*4** In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the pleadings and affidavits are to be construed in the light most favorable to plaintiff, and all doubts are to be resolved in plaintiff's favor. *Bonkowski,* 2016 WL 4536868, at *1. Plaintiff's allegations must provide "factual specificity necessary to confer jurisdiction." *Jazini by Jazini v. Nissan Motor Co.,* 148 F.3d 181, 185 (2d Cir. 1998). Conclusory statements, without supporting facts, are insufficient. *Jazini by Jazini,* 148 F.3d at 185. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citing *Papasan v. Allain,* 478 U.S. 265, 286 [1986]). Moreover, "where a defendant 'rebuts [a plaintiff's] unsupported allegations with direct highly specific, testimonial evidence regarding a fact essential to jurisdiction—and plaintiff[ ] do[es] not counter that evidence —the allegation may be deemed refuted.' " *Leroi, Inc. v. Tran Source Logistics, Inc.,* 15-CV-0565, 2016 WL 4997228, at *4 (N.D.N.Y. Sept. 19, 2016) (Suddaby, C.J.).

"It is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Leon v. Schukler,* 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014) (citing *In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 208 [2d Cir. 2003]). Thus, jurisdictional discovery is appropriate when the party has made a "colorable basis for personal jurisdiction, which could be established with further development of the factual record." *Leon,* 992 F. Supp. 2d at 194. However, "[w]here [a plaintiff does] not establish a prima facie case that the district court has jurisdiction over the defendant, the district court does not err in denying jurisdictional discovery." *Chirag v. MT Marida Marguerite Schiffahrts,* 604 F. App'x 16, 18-19 (2d Cir. 2015) (citing *Jaznini by Jazini,* 148 F.3d at 186 [2d Cir. 1998]).

## III. ANALYSIS

As stated above in Part II of this Decision, personal jurisdiction over a defendant must be established under the law of the state where the federal court sits. Here, Plaintiffs must establish that Defendant should be subject to personal jurisdiction under New York State law. New York State exercises personal jurisdiction over non-residents in two distinct ways. A court can find either general jurisdiction pursuant to N.Y. C.P.L.R. § 301 or specific jurisdiction pursuant to C.P.L.R. § 302. *Bartosiewicz v. Nelsen,* 20-CV-6513, 2021 WL 4451445, at *3 (W.D.N.Y. Sept. 29, 2021). "General, all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity. Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that aris[e] out of or relat[e] to the [entity's] contacts with the forum." *Gucci Am., Inc. v. Weixing Li,* 768 F.3d 122, 134 (2d Cir. 2014); *Bartosiewicz,* 2021 WL 4451445, at *3 (internal citation and quotation marks omitted).

### A. Whether the Court Has *General* Personal Jurisdiction Over Defendant Under N.Y. C.P.L.R. § 301

After carefully considering the matter, the Court answers the question in the negative for the reasons stated in Defendant's memoranda of law. *See, supra,* Parts I.B.1. and I.B.3. of this Decision and Order. To those reasons, the Court adds the following analysis.

As stated above in Part II of this Decision and Order, an entity is subject to general personal jurisdiction if that entity has engaged in such a continuous and systematic course of business in New York State that the finding of jurisdiction, and being subject to New York State law is proper. *Car-Freshner Corp. v. Scented Promotions, LLC,* 19-CV-1158, 2021 WL 1062574, at *5 (N.D.N.Y. Mar. 19, 2021) (Suddaby, C.J.) (quoting *DeLorenzo v. Viceroy Hotel Grp.,* 757 F. App'x 6, 8 [2d Cir. 201]); *Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir. 1983). Due process requires that a foreign entity be subject to general jurisdiction only if its contacts are so "continuous and systematic, that it is 'essentially at home' in the state claiming jurisdiction." *Car-Freshner Corp.,* 2021 WL 1062574, at *5 (citation and quotation marks omitted). "In general, a corporation is at home, and subject to general jurisdiction, only in a state that is the company's formal place of incorporation or its principal place of business." *Id.* (citation and quotation marks omitted).

**\*5** Defendant argues that he should not be subject to general personal jurisdiction because his contacts with New York State are minimal and fall well below being "continuous and systematic." Even when viewed with the utmost of special liberality, Plaintiffs' opposition memorandum of law does not seem to refute this argument and/or rely on the Court's general personal jurisdiction over Defendant. Rather, Plaintiffs seem to rely only on the Court's specific personal jurisdiction over Defendant.

### B. Whether the Court Has *Specific* Personal Jurisdiction Over Defendant Under N.Y. C.P.L.R. § 302(a)

After carefully considering the matter, the Court answers the question in the affirmative for the reasons stated in Plaintiffs' opposition memorandum of law. *See, supra,* Part I.B.2. of this Decision and Order. To those reasons, the Court adds the following analysis.

Under C.P.L.R. § 302(a), there are four ways in which a plaintiff can establish the existence of specific personal jurisdiction over a non-domiciliary:

> (1) where the non-domiciliary transacts any business within the state or contracts anywhere to supply goods or services in the state; (2) where the non-domiciliary commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; (3) where the non-domiciliary commits a tortious act without the state that causes injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or (4) the non-domiciliary owns, uses,

or possesses any real property situated within the state. N.Y.C.P.L.R. § 302(a).

Under C.P.L.R. § 302(a)(1) specifically, a plaintiff must establish that (a) the defendant transacted business within the state, and (b) the claim asserted arises from that business activity. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 732 F.3d 161, 168 (2d Cir. 2013). "[C]ourts have explained that section 302 'is a single act statute and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.'" *Chloe,* 616 F.3d at 170 (quoting *Kreutter v. McFadden Oil Corp.,* 527 N.Y.S.2d 195 [N.Y. 1988]). "[J]urisdiction under [Section] 302(a)(1) is not determined by the quantity of a defendant's contacts with New York, but by the quality of those contacts when viewed in the totality of the circumstances." *Strauss v. Credit Lyonnais, S.A.,* 175 F. Supp. 3d 3, 22 (E.D.N.Y. 2016) (citing *Fischbarg v. Doucet,* 9 N.Y.3d 375, 380 [2007]).

As to whether the defendant transacted business in the state, the defendant "must purposefully 'avail itself of the privilege of conducting activities within the forum State.'" *Berkshire Capital Grp., LLC v. Palmet Ventures, LLC,* 307 F. App'x 479, 481 (2d Cir. 2008) (quoting *Fischbarg,* 9 N.Y.3d at 380). In assessing whether the defendant has sufficient contacts with the forum, the Court must look "to the totality of Defendants' contacts with the forum," rather than assessing whether there is a single event of sufficient strength. *Chloe,* 616 F.3d at 164 (citing *Grand River Enters. Six Nations, Ltd. v. Pryor,* 425 F.3d 158, 166 [2d Cir. 2005]).

**\*6** As to whether the claim arises from the defendant's business activity, "section 301(a)(1) does not require a causal link between the defendant's New York business activity and a plaintiff's injury. Instead, it requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim.'" *Licci ex rel. Licci,* 732 F.3d at 168-69 (quoting *Licci v. Lebanese*

*Canadian Bank, SAL,* 20 N.Y.3d 327, 341 [N.Y. 2012]). Notably, whether a plaintiff's claim arises from its New York State contacts depends upon "the nature and elements of the particular cause of action pleaded," and, "where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute." *Licci ex rel. Licci,* 732 F.3d at 169.

Defendant is correct that New York State's long arm statute treats defamation cases differently than it does other causes of action. Sections 302(a)(2) and (3) of the N.Y. C.P.L.R. permit jurisdiction over tortious acts committed inside and outside of New York State that cause injuries in the state. However, as indicated above, these Sections explicitly "except" from their scope causes of action for defamation.

These defamation exceptions create what the Second Circuit has called a "gap" between the jurisdiction conferred by N.Y. C.P.L.R. § 302(a) and the full extent of jurisdiction permissible under the U.S. Constitution. *Best Van Lines, Inc.,* 480 F.3d at 245. However, as the Second Circuit has recognized, the intent of these defamation exceptions (which were aimed chiefly at protecting the freedom of the press enjoyed by out-of-state newspapers) was not to exclude jurisdiction over all out-of-state defendants. *Id.* Rather, under New York State law, when a person uses defamatory remarks outside of the state that cause injury to a plaintiff within the state, personal jurisdiction is allowable under N.Y. C.P.L.R. § 302(a)(1), which has no such exemption for defamation claims. *Id.* at 246.

Having said that, New York State courts do not interpret "transact[ing] business" to include merely sending defamatory utterances into New York State. *Id.* at 248; *see, e.g., Kim v. Dvorak,* 658 N.Y.S.2d 502 (N.Y. App. Div., 3d Dep't 1997) (finding that sending four allegedly defamatory letters by the defendant to health care professionals in New York State did not constitute transactions of business for purpose of establishing personal jurisdiction); *Pontarelli v. Shapero,* 231 A.D.2d 407, 410-11 (N.Y. App. Div., 1st Dep't 1996) (finding that sending two allegedly defamatory letters and one fax into New York State did not constitute transactions of business for purpose of establishing personal jurisdiction).

Rather, personal jurisdiction has been found in cases where an out-of-state defendant's defamatory statements were

"projected into New York and targeted New Yorkers," and there was "something more" (in terms of contacts with New York State). 🚩 *Best Van Lines, Inc. v. Walker*, 490 F.3d at 249; *see, e.g.,* 🚩 *Sovik v. Healing Network,* 665 N.Y.S.2d 997, 999 (N.Y. App. Div., 4th Dep't 1997) (finding that one allegedly defamatory letter sent by out-of-state defendants was a sufficient basis for personal jurisdiction where the defendant drafted and distributed the letter in Buffalo, NY); 🚩 *Modica v. Westchester Rockland Newspapers, Inc.,* 283 N.Y.S.2d 939, 940-41 (N.Y. Sup. Ct. Westchester Cnty. 1967) (finding personal jurisdiction was proper where a newspaper containing allegedly defamatory statements was published in New York State for New York State readers).

In applying the "arises from" portion of the specific-personal-jurisdiction test, New York State courts have asked whether the defamatory act arose from a business transaction with New York State. *See, e.g.,* 🚩 *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,* 7 N.Y.3d 65, 73 (N.Y. 2006); *Realuyo v. Villa Abrille,* 01-CV-10158, 🚩 2003 WL 21537754, at *6 (S.D.N.Y. July 8, 2003); 🚩 *Talbot v. Johnson Newspaper Corp.,* 71 N.Y.2d 827 (N.Y. 1988) (holding that jurisdiction was improper over an out-of-state man who sent an allegedly defamatory letter to the president of a New York State university at which his child was a student because, although the daughter's attendance at the university qualified as purposeful activity, the cause of action for defamation did not arise out of that contact with New York State).

**\*7** In the age of the internet when individuals and companies can contact and impact a state without ever having step foot there physically, courts have had to analyze what degree of a virtual presence in a state constitutes a business transaction. Generally, posting defamatory material to a website accessible in New York State does not, without more, constitute a business transaction under New York's long-arm statute. *Best Van Lines, Inc.* at 249-51; *see, e.g., Competitive Techs., Inc. v. Pross*, 836 N.Y.S.2d 492 at *2-3 (N.Y. Sup. Ct., Suffolk Cnty. 2007) (holding that jurisdiction was improper when defamatory statements posted on a Yahoo.com message board were found to not be connected with a business transaction). A website's level of interactivity may be useful in evaluating whether a defendant transacted any business in New York State and purposefully availed himself of the privilege of conducting business, and protection under New York State law. *Id.* at 252.

## 1. Whether Defendant Transacts Business in New York State

Despite Defendant's contention that he does not transact business in New York State, Plaintiffs have put forth evidence to the contrary. As indicated above in Part II of this Decision and Order, at this stage in the action, Plaintiffs need only provide "an averment of facts" to establish a prima facie case. In their Verified Complaint (which in federal court has the effect of an affidavit), Plaintiffs have stated that Defendant "transacts business within the State of New York and contracts to supply goods and services within the State of New York," specifically in the field of facial esthetics. (Dkt. No. 1, Attach. 2, at ¶ 4.) Moreover, in a declaration submitted in opposition to Defendant's motion, Plaintiffs have sworn, "Defendant engages in substantial commerce in the State of New York, including but not limited to, the sale of PDO threads." (Dkt. No. 11, Attach. 2, at ¶ 4.) Plaintiffs have also sworn that, "[o]n or before January 16, 2017, Defendant executed a Mutual Nondisclosure Agreement with REJUVN8," and that "[w]e also sold Defendant certain training methods concerning the use of PDO threads." (*Id.* at ¶ 5.) Finally, Plaintiffs have also sworn as follows:

> Defendant's organization, American Academy of Fascial Esthetics engaged in substantial business activity in the State of New York, including but not limited to providing training seminars concerning the use of PDO threads. I understand that these training sessions are conducted within the State of New York at an approximate cost of Two Thousand Dollars ($2,000.00) per participant. I also understand that recordings of the seminars are available for purchase within New York State.

(*Id.*) When viewed in the light most favorable to Plaintiffs, the cited MDA and stated information regarding facial esthetic related business in New York State satisfy Plaintiffs' prima facie burden.

In a declaration submitted in support of his reply memorandum of law, Defendant disputes some of these facts.

For example, he disputes that any training sessions were conducted in New York State, and that the MDA is related to the alleged defamation. (Dkt. No. 12, Attach. 1, at ¶¶ 2, 6.) However, Defendant does not rebut in any detail Plaintiffs' explanation of the NDA, and explain why it in fact "has nothing to do with the primary conduct at issue in this case." (*See generally* Dkt. No. 12, Attach. 1.) Nor does he deny purchasing from Plaintiffs "certain training methods concerning the use of PDO threads." (*Id.*)

These failures are fatal to Defendant's motion. The business-transactions prong of the test for specific personal jurisdiction may be met by either the MDA with a New York State business or the purchasing of PDO-thread training methods from Plaintiffs. This is because either fact constitutes the "something more" that is required by New York State courts under 🔖 *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 249 (2d Cir. 2007).

**\*8** Even if Defendant's purchase of PDO-thread training methods from Plaintiffs did not qualify as a sufficient business transaction, the Court would find (at least based on the current record) that the MDA is sufficiently related to the alleged defamatory remarks in this action. In Plaintiffs' declaration, Giovanna McCarthy swears that the MDA between REJUVN8 and Defendant was in "contemplat[ion]" of the sale of PDO threads. (Dkt. No. 11, Attach. 2, at ¶ 6.) Defendant's alleged defamatory remarks were about PDO threads and targeted to the facial esthetic's professional community. This distinguishes the present case from *Talbot v. Johnson Newspaper Corp.,* cited by Defendant, where the New York State Supreme Court, Appellate Division, held that the attendance of one of the Defendant's at St. Lawrence University was too attenuated to the alleged defamatory remarks made by the father of that student. *See generally* 🔖 *Talbot,* 123 A.D.2d at 147. Simply stated, each of two transactions alone is sufficient to find that Defendant conducted business in New York State. *See, e.g.,* 🔖 *Deutsche Bank,* 7 N.Y.3d at 71 (finding jurisdiction over an investment program manager from Montana who initiated a negotiation with a New York State plaintiff via instant messaging, resulting in a large sale of bonds); *see also* 🔖 *Parke–Bernet Galleries, Inc. v. Franklin,* 26 N.Y.2d 13, 17 (N.Y. 1970) (finding personal jurisdiction over out-of-state defendant who participated in a single live auction in New York State via telephone); 🔖 *Fischbarg v. Doucet,* 38 A.D.3d 270, 272, 832 N.Y.S.2d 164, 166 (N.Y. App. Div., 1st

Dep't 2007) (finding personal jurisdiction over out-of-state defendants who solicited services from the plaintiff, a New York State lawyer, via e-mail and fax). Further, the NDA's choice of law provision, which selects New York, further convinces the Court that the Defendant purposely availed himself of the privilege of doing business in New York State.

Finally, a third ground exists on which to base a finding of Defendant's transaction of business in New York State: the fact that Plaintiffs have adduced sworn testimony that he is affiliated with AAFE (which projected the defamatory statements into New York State at an alleged cost of $2,000 per training-seminar participant), and Defendant has admitted that affiliation, without explaining it further. If Defendant merely participates in a few training sessions for AAFE then it might not be reasonable to conflate AAFE's activities with his. However, if Defendant plays a more-significant role in AAFE (such as a stakeholder, a regular independent contractor, or certainly an officer) then it could be reasonable to associate the potential business transactions of AAFE with those of Defendant. In any event, given that Defendant has two sufficient business transactions with New York State to satisfy the first part of the test for personal jurisdiction, the Court need not rely on this ground at this time.

### 2. Whether the Alleged Defamatory Statements Arise from the Business Transactions

As stated above, New York State courts have narrowly construed personal jurisdiction as it pertains to defamatory remarks by out-of-state persons. This narrow view requires that the defamatory remarks arise from business transactions that occurred within New York State. Here, Plaintiffs' submissions show a contractual relationship between the parties relating to "a novel product intended for the medical cosmetic industry" (in contemplation of business with Defendant for the sale of PDO threads), and that Defendant purchased PDO thread training methods from Plaintiffs (which were New York State entities). The three incidents of alleged defamation by Defendant consisted of his statements that Plaintiffs' PDO threads were not FDA-compliant. The statements were projected into New York State by Defendant's affiliate at an alleged cost of about $2,000 per training-seminar participant. There is an articulable nexus between the transaction for training methods, the NDA, and the alleged defamation. Under these circumstances, the Court finds that the alleged defamatory statements arose from business transactions in New York State for purposes of the

second prong of New York State's test for specific personal jurisdiction.

### 3. Whether Personal Jurisdiction Exists Regarding All Other Causes of Action

The Court finds that Defendant has sufficient minimum contacts with New York State to subject it to jurisdiction for the remaining causes of action in this matter. As detailed above, because of the contractual relationship between the parties and the purchase of PDO thread training methods by Defendant from Plaintiffs (not to mention Defendant's "affiliation" with AAFE), Plaintiffs have met their prima facie burden for personal jurisdiction with regard to all of their claims.

### C. Due Process

**\*9** As stated earlier, if a court determines that personal jurisdiction is appropriate under New York's long-arm statute, then the court must also consider whether the exercise of that jurisdiction would comport with constitutional due process. "This analysis has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Chloe, 616 F.3d at 164*. For the minimum-contacts inquiry, the court must determine "whether the defendant has sufficient contacts with the forum to justify the court's exercise of personal jurisdiction," which involves looking to "the totality of the Defendant's contacts with the forum state." *Id.* Of note, the requirement of New York's long-arm statute that the defendant purposefully avail himself of the privilege of conducting activities in New York, indicates that a finding of personal jurisdiction typically leads to a finding that sufficient minimum contacts exists because the two tests are essentially the same. *See Chloe, 616 F.3d at 171* ("We conclude that assertion of personal jurisdiction over Ubaldelli comports with due process for the same reasons that it satisfies New York's long-arm statute"); *D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 105 (2d Cir. 2006)* ("[T]he constitutional requirements of personal jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302[a] meets due process requirements."). This finding is especially applicable to defamation causes where New York courts have construe contacts with New York State more narrowly than other types of litigation." *Deutsche Bank, 7 N.Y.3d at 71.*

For the reasonableness inquiry, the Court must determine whether the exercise of personal jurisdiction "comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloe, 616 F.3d at 164*. In determining whether jurisdiction is reasonable, the Court must consider the following factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Id. at 164-65* (citing *Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 133-14 [1987]*). "[T]he exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry," although "it may be defeated where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id. at 165* (quoting *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 [1985]*).

Here, the Court has determined that personal jurisdiction is appropriate; therefore, a due process analysis must be conducted. After carefully considering the matter, the Court finds that subjecting Defendant to personal jurisdiction comports with constitutional due process. In applying to this case New York State personal-jurisdiction standard governing defamation claims, the Court has subjected Plaintiffs' claims to a demand that is stricter that the demands required by the U.S. Constitution. The Court has found sufficient minimal contacts, specifically, the contractual relationship between the parties and their business transaction for PDO thread training methods. Further, with regard to Plaintiffs' non-defamation causes of action, the Court likewise finds that the two business transactions noted above comport with the constitutional requirement for minimal contacts.

In weighing the aforementioned factors for reasonableness, the Court finds that subjecting Defendant to personal jurisdiction comports with the notions of fair play and substantial justice. Defendant's concerns about the burden of defending himself in New York State are noted, but they do not outweigh the interests of the forum state in adjudicating business dealings with New York State entities, Plaintiffs' interests in convenient and effective relief, obtaining an efficient resolution to the controversy; and the policy interests

of the states in furthering substantive social policies. The Court believes Defendant purposely availed himself of the opportunity to do business in New York, as evidence by his contractual relationship and purchase of PDO-thread training methods. Defendant's contacts with New York State should have made his being subject to its laws predictable, especially in light of the fact he chose New York State as the forum in which to resolve issues under the NDA.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Defendant's motion to dismiss for lack of personal jurisdiction under ⚑ Fed. R. Civ. P. 12(b)(2) (Dkt. No. 7) is **DENIED**.

**All Citations**

Slip Copy, 2022 WL 17415123

## Footnotes

1    According to the Complaint, Plaintiff PDO Max is "a specification manufacturer and distributor of Polydioxanone (PDO) threads across the country. PDO threads are inserted into the skin and provide a non-surgical alternative to reapproximate tissue." (Dkt. No. 1, Attach. 2, at ¶ 7.)

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 1720269
Only the Westlaw citation is currently available.
United States District Court, S.D. Illinois.

Deon BAILEY, #14067-029, Plaintiff,

v.

C/O BAUER, Nathan Minard (Inmate), U.S.
Department of Justice/Federal Bureau of Prisons,
K. Schneider, and S. Wilson, Defendants.

Case No. 20-cv-802-NJR
|
Signed 04/30/2021

**Attorneys and Law Firms**

Deon Bailey, Bruceton Mills, WV, Pro Se.

Nathan Minard, Greenville, IL, Pro Se.

## MEMORANDUM AND ORDER

ROSENSTENGEL, Chief Judge:

**\*1** Plaintiff Deon Bailey, a federal inmate, brings this action for alleged violations of his constitutional rights by persons acting under the color of federal authority, in connection with a fellow inmate's attack on him. (Doc. 1). *See* Bivens *v. Six Unknown Named Agents*, 403 U.S. 388 (1971). He also seeks relief pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b); 28 U.S.C. § 2671, *et seq.* Bailey filed this action while he was incarcerated at FCI-Greenville ("Greenville"); he is now confined at USP Hazelton in Bruceton Mills, West Virginia. (Doc. 12).

This case is now before the Court for a preliminary review of the Complaint pursuant to 28 U.S.C. § 1915A, which requires the Court to screen prisoner Complaints to filter out non-meritorious claims. 28 U.S.C. § 1915A(a). Any portion of a Complaint that is legally frivolous, malicious, fails to state a claim for relief, or requests money damages from an immune defendant must be dismissed. 28 U.S.C. § 1915A(b). At this juncture, the factual allegations are liberally construed. *See* Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 821 (7th Cir. 2009).

## THE COMPLAINT

Bailey makes the following allegations in the Complaint: On April 29, 2019, while he was confined in the SHU (Special Housing Unit) at Greenville, he informed officials that he "could not go to the compound" because of his fear that he could be attacked. (Doc. 1, pp. 14, 21). Rumors had been spread that he owed money to a gang. Officials never verified any threat to Bailey's life and threatened him with an incident report if he refused to go out.

On June 25, 2020, Bailey went out to the compound. At about 5:34 p.m. inmate Defendant Nathan Minard ran up the stairs, entered Bailey's cell (#208), and physically attacked Bailey after Defendant Officer Bauer negligently unlocked a door for Minard which allowed him to access Bailey's cell.[1] (Doc. 1, pp. 8-9, 11, 14). Minard bit Bailey's thumb, injured the tendon in his left pinky finger, squeezed his genitals, slammed his head against the sink, reopening a laceration from a June 21, 2020 injury, and slammed his back on the toilet. (Doc. 1, pp. 14, 16-17). The bite exposed Bailey to infections such as hepatitis, and the close contact exposed him to COVID-19.[2] (Doc. 1, pp. 14, 16, 20).

Defendant Officer S. Wilson wrote an incident report which Bailey asserts inaccurately describes the attack as a fight. (Doc. 1, p. 12). Bailey told prison staff that he owed money to Minard for drugs and tried unsuccessfully to have his brother send payment to Minard. Bailey then paid an insufficient amount so Minard assaulted him.

Bailey asserts that the Department of Justice ("DOJ"), Federal Bureau of Prisons ("BOP"), and Defendant Wilson were negligent in failing to protect him from the attack. (Doc. 1, pp. 15-16, 18). Bailey had provided documentation to the DOJ and BOP regarding his risk of suffering an attack based on his cooperation in a murder investigation and informed them that his case was available on the law library computer. (Doc. 1, pp. 15-16). Wilson failed to read this documentation. (Doc. 1, p. 18). Wilson's inaccurate incident report on the attack by Minard placed Bailey in further danger because Minard received a copy of the report which made Bailey out to be a snitch, and Minard showed the report to other nearby inmates. Bailey continued to be housed in the same area as Minard and the inmates who viewed the incident report.

**\*2** The DOJ and BOP were also negligent for denying medical care for his injuries. Defendant PA-C Schneider

failed to provide pain medication for Bailey's back, finger, hernia, and genital pain caused by Minard's attack, and failed to schedule him for testing or assessment of his back injury or hernia. (Doc. 1, pp. 15, 17).

Further alleged negligence on the part of the DOJ and BOP included previously housing Bailey in a cell (#130) with an inoperative emergency distress button, which prevented Bailey from summoning help when he suffered the head laceration on June 21, 2020. (Doc. 1, pp. 14, 17). Counselor Mr. Seely was negligent for not permitting Bailey to make a legal call to press charges against Minard. (Doc. 1, p. 18). DHO Officer Mr. Pucket was negligent for failing to notify Bailey of his rights at the July 22, 2020 hearing on his incident report and for construing the incident as a fight rather than an assault on Bailey. (Doc. 1, pp. 17-18).

Bailey seeks money damages and injunctive relief requiring the BOP to provide medical care and pain medication. (Doc. 1, pp. 19-20).

### PRELIMINARY DISMISSALS

All claims against Defendant Minard are dismissed from the action. Bailey cannot maintain a federal civil rights action or a Federal Tort Claim against a fellow inmate because Minard is not a federal employee (his prison work assignment does not count) or a person who acted under the color of federal authority. *See* Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971); 28 U.S.C.A. § 2679(b)(1) (FTCA claim may be brought against government employee acting within the scope of his/her employment).

Bailey's purported claims against Counselor Seely and DHO Officer Pucket are also dismissed. First, Bailey did not list these individuals as Defendants in the case caption (Doc. 1, p. 1), thus the Clerk did not include them among the parties. The Court will not treat parties not listed in the caption as defendants. *See* FED. R. CIV. P. 10(a) (noting that the title of the complaint "must name all the parties"); Myles v. United States, 416 F.3d 551, 551–52 (7th Cir. 2005) (to be properly considered a party a defendant must be "specif[ied] in the caption"). Bailey listed Pucket and Seely several pages later (Doc. 1, p. 4), but the claims he asserts against them do not survive preliminary review under Section 1915A. Seely merely prevented Bailey from making a phone call seeking to press criminal charges against Minard; this does not violate

any constitutional right or the FTCA. It is not clear what "rights" Pucket failed to advise Bailey of in the context of the disciplinary hearing, and Bailey's disagreement with Pucket's conclusions regarding the incident does not amount to a constitutional claim or an FTCA matter. Bailey thus fails to state cognizable claims against Seely and Pucket, and these claims will not be considered further.

### DISCUSSION

Based on the allegations in the First Amended Complaint, the Court designates the following claims in this *pro se* action:

> **Count 1: Eighth Amendment claim against Bauer and Wilson for failing to protect Plaintiff from Minard's attack.**

> **Count 2: Federal Tort Claim against the DOJ/BOP for negligently allowing the attack on Plaintiff, for exposing him to COVID-19, and for housing him in Cell #130 with an inoperative emergency distress button.**

> **\*3   Count 3: Eighth Amendment deliberate indifference claim against Schneider for failing to provide Plaintiff with pain treatment or follow-up care for the injuries inflicted by Minard.**

> **Count 4: Federal Tort Claim against the DOJ/BOP for medical malpractice and/or negligence for failing to provide Plaintiff with pain treatment or follow-up care for the injuries inflicted by Minard.**

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the** *Twombly* **pleading standard.** [3]

### Count 1

"[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833-34 (1994) (internal citations omitted); *see also* Pinkston v. Madry, 440 F.3d 879, 889

(7th Cir. 2006). To prevail on an Eighth Amendment claim for failure to protect, a plaintiff must show that he complained to prison officials about a specific, impending, and substantial threat to his safety, and that the official(s) failed to take action to mitigate the threat of harm. *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996); *see also* Gevas v. McLaughlin, 798 F.3d 475, 480-81 (7th Cir. 2015) ("Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger."). The prison official's knowledge of the threat and deliberate indifference to the danger are essential elements of the constitutional claim.

In this case, Bailey fails to show any link between the alleged threat he conveyed to prison officials and Minard's attack on him. Bailey's request for protection in April 2019—that was allegedly ignored—was grounded on the likelihood that fellow inmates could find information on his cooperation with prosecutors in his criminal case and would then target him as a snitch. That is indeed a safety concern, but Bailey's own account of Minard's attack on him has no connection to the information regarding Bailey's cooperation (and the attack occurred more than a year after officials allegedly refused to protect Bailey). The Complaint states that Minard's attack was prompted by Bailey's failure to pay a drug debt. Nowhere does Bailey state that he asked any Greenville official for protection from Minard before the attack occurred; instead, the Complaint indicates that Bailey disclosed the drug payment issue only during the investigation following the attack. For Eighth Amendment liability to arise, a defendant had to know about a specific risk to the plaintiff and must have failed to act to mitigate that risk. Because Bailey does not allege that he sought protection from Minard related to the drug transaction, his deliberate indifference claim against Bauer fails.

**\*4** The Eighth Amendment claims against Wilson also will be dismissed. Bailey asserts that Wilson ignored the information regarding his cooperation in the criminal case, but Wilson's lack of action on that matter had no causal relationship to Minard's June 2020 attack on Bailey over the drug debt.

Wilson's allegedly inaccurate incident report regarding Minard's attack, which Minard received and shared with other inmates to paint Bailey as a "snitch," may have placed Bailey in danger of another assault. Bailey does not claim, however, that any assault occurred afterward. Approximately six months after the incident report, Bailey was transferred away from Greenville, which presumably separated him from Minard. (Doc. 12). Because the Complaint does not allege that Bailey suffered any harm (physical or psychological) on account of Wilson's actions or failure to act, Count 1 shall be dismissed against Wilson for failure to state a claim upon which relief may be granted.

### Count 2

The Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671-2680, provides jurisdiction for suits against the United States arising from torts committed by federal officials. *See* 28 U.S.C.A. § 2679(b)(1) (FTCA claim may be brought against the United States "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment"). Before bringing such a claim in court, a plaintiff is required to first present the claim to the federal agency responsible for the injury. 28 U.S.C. § 2675(a). Bailey appears to have done so (Doc. 1, p. 9), but it is not clear whether he received final administrative adjudication of the claim before bringing this suit.

The United States of America is the only proper defendant in an action under the FTCA. *See* 28 U.S.C. § 2679(b); FDIC v. Meyer, 510 U.S. 471 (1994). Bailey did not name the United States, per se, as a defendant, but named the DOJ/BOP. The Court will substitute the United States as a defendant for any viable FTCA claims. *See* FED. R. CIV. P. 21.

Even though Bailey's Eighth Amendment claim in Count 1 does not survive threshold review under Section 1915A, his negligence claim under the FTCA relating to this attack is not subject to dismissal at this time. Bailey alleges that Bauer negligently allowed Minard to access his cell block on Minard's pretense that he was going to retrieve an MP3 player, when prison rules prohibited allowing more than 20-30 inmates out of their cells at the same time. (Doc. 1, pp. 14, 16-17). Bailey states this rule was prompted by the COVID-19 pandemic and suggests Bauer should have known Minard was lying about the MP3 player. Further factual development will be necessary to determine whether Bailey was harmed due to negligent acts or omissions, so this portion of Count 2 may proceed.

Bailey further claims Bauer negligently exposed him to the risk of infection with COVID-19 by allowing Minard to access his cell, and that the attack may have exposed him to hepatitis or other infectious diseases Minard may have carried. This portion of the FTCA claim may also proceed at this time. *See Thomas v. Illinois*, 697 F.3d 612, 614-15 (7th Cir. 2012) (nominal and punitive damages are available due to "hazard, or probabilistic harm" even in absence of physical or psychological harm).

**\*5** Finally, Bailey claims negligence related to the separate issue of his placement in Cell #130 at the Greenville SHU, where the emergency distress button was inoperative. Bailey gives no details on how he came to sustain the head laceration in that cell on June 21, 2020, but he suggests that he was harmed by his inability to summon help for the injury because the cell lacked a working emergency call button, and Greenville officials should not have housed him there. (Doc. 1, pp. 14, 17). Giving liberal construction to the Complaint, this portion of Bailey's FTCA claim may also proceed.

Count 2 will proceed against the United States only and is dismissed as to Wilson and Bauer.

### Count 3

Prison medical providers violate the Eighth Amendment's prohibition against cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *See Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017). To state such a claim, a prisoner must plead facts and allegations suggesting that (1) he suffered from an objectively serious medical condition, and (2) the defendant acted with deliberate indifference to his medical needs. *Id. See also Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Delaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain," *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012), and chronic and substantial pain can itself amount to an objectively serious condition. *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997). Notably, a defendant's inadvertent error, negligence, misdiagnosis, or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation. *See Duckworth v.*

*Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008); *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003) (courts will not take sides in disagreements with medical personnel's judgments or techniques). Further, the Eighth Amendment does not give prisoners entitlement to "demand specific care" or "the best care possible," but only requires "reasonable measures to meet a substantial risk of serious harm." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Bailey's description of the injuries inflicted on him by Minard, particularly his back, head, hernia, and hand pain and the tendon injury to his finger, indicate at this stage that he had one or more objectively serious medical conditions. He alleges that Schneider failed to provide him with any pain medication and did not refer him for follow-up care for the tendon injury or his hernia. (Doc. 1, pp. 27-29). Those failures could amount to deliberate indifference, thus Count 3 may proceed against Schneider.

### Count 4

As noted under Count 3, medical negligence or malpractice does not violate the Eighth Amendment. Nonetheless, such claims are cognizable under the FTCA. Bailey may therefore proceed in Count 4 against the United States on his claim for inadequate medical care for his injuries resulting from Minard's attack.

Bailey also seeks to pursue claims that he was never given a COVID-19 test and that he was not provided an asthma pump. (Doc. 1, p. 20). Unfortunately, however, he does not present sufficient facts to indicate that those alleged omissions amounted to negligence, so those aspects of his claim are dismissed without prejudice at this time.

### MOTION FOR COUNSEL

Bailey's motion for recruitment of counsel (Doc. 9) is **DENIED** at this time without prejudice. There is no constitutional or statutory right to counsel in federal civil cases. *Romanelli v. Suliene*, 615 F.3d 847, 851 (7th Cir. 2010); *see also Johnson v. Doughty*, 433 F.3d 1001, 1006 (7th Cir. 2006). In determining whether to recruit counsel, the Court considers two factors. *See Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007). First, Bailey's

motion fails to demonstrate that he has made a reasonable attempt to obtain counsel, as he only contacted the federal defender, whose responsibilities do not include providing representation in civil cases. (Doc. 9, p. 1). Second, at this early stage, it appears that Bailey is competent to litigate the case himself. *See* 🚩*Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013); 🚩*Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010). Bailey's education includes some college. He notes limitations on law library access because of COVID-19 restrictions. Nonetheless, his Complaint competently sets forth the relevant facts and his legal claims. Although the motion is denied at this juncture, Bailey may renew his request for counsel if necessary, as the case progresses. If he does so, he should attach copies of correspondence from at least 3 lawyers or law firms whom he has contacted in an effort to secure legal representation (or at a minimum the names and addresses of attorneys he has contacted), in order to demonstrate a reasonable attempt to seek counsel.

## DISPOSITION

**\*6** The Clerk is **DIRECTED** to add the **UNITED STATES of AMERICA** as a Defendant for the FTCA claims (Counts 2 and 4) and terminate the United States Department of Justice/ Federal Bureau of Prisons as a party to this action.

**IT IS HEREBY ORDERED** that **COUNT 1** is dismissed without prejudice. Defendants **BAUER and WILSON** are **DISMISSED** from this action without prejudice. Defendant **MINARD** is **DISMISSED** from this action **with prejudice**.

**IT IS FURTHER ORDERED** that **COUNTS 2, 3,** and **4** survive preliminary review pursuant to 28 U.S.C. § 1915A and shall proceed for further consideration.

The Clerk of Court is **DIRECTED** to complete, on Plaintiff's behalf, summonses and forms USM-285 for service of process on Defendants **UNITED STATES** and **SCHNEIDER**; the Clerk shall issue the completed summonses. The United States Marshal **SHALL** serve Defendants **UNITED STATES** and **SCHNEIDER** pursuant to Rule 4(e) of the Federal Rules of Civil Procedure. All costs of service shall be advanced by the United States, and the Clerk shall provide all necessary materials and copies to the United States Marshals Service.

In addition, pursuant to Federal Rule of Civil Procedure 4(i), the Clerk shall (1) personally deliver to or send by registered or certified mail addressed to the civil-process clerk at the office of the United States Attorney for the Southern District of Illinois a copy of the summonses, the Complaint, and this Memorandum and Order; and (2) send by registered or certified mail to the Attorney General of the United States at Washington, D.C., a copy of the summons, the Complaint, and this Memorandum and Order.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 🚩42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order**.

Bailey is **ADVISED** that if judgment is rendered against him and the judgment includes the payment of costs under 🚩28 U.S.C. § 1915, he will be required to pay the full amount of the costs, notwithstanding that his application to proceed *in forma pauperis* has been granted. *See* 🚩28 U.S.C. § 1915(f) (2)(A).

Bailey is **REMINDED** that he is under a continuing obligation to keep the Clerk of Court and the opposing parties informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

Finally, based on the allegations in the Complaint, the Clerk of Court is **DIRECTED** to **ENTER** the standard qualified protective order pursuant to the Health Insurance Portability and Accountability Act.

**IT IS SO ORDERED.**

## All Citations

Slip Copy, 2021 WL 1720269

## Footnotes

1    Minard's movements were captured on surveillance video. (Doc. 1, pp. 14, 17).

2    Bailey does not assert that he contracted COVID-19 or another infection at any time after the incident.

3    *See* 🚩 *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face.").

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2022 WL 1472872
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Larry Sanford WALKER, Plaintiff

v.

UNITED STATES of America, et al., Defendants

Civil No. 3:21-cv-1881
|
Signed 05/10/2022

**Attorneys and Law Firms**

Larry Sanford Walker, Minersville, PA, Pro Se.

Michael Butler, United States Attorney's Office, Harrisburg, PA, for Defendants United States, E. Bradley.

## **MEMORANDUM**

Robert D. Mariani, United States District Judge

**\*1** Plaintiff Larry Sanford Walker ("Walker"), an inmate who was housed at all relevant times at the United States Penitentiary, Canaan, Pennsylvania ("USP-Canaan"), is pursuing claims in this action pursuant to Bivens[1] and the Federal Tort Claims Act. (Doc. 1). Named as Defendants are the United States of America, Warden E. Bradley, and two unknown prison officials. Presently pending before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 16). For the reasons set forth below, the Court will grant the motion. The Court will also dismiss the action against the two unknown prison officials pursuant to Federal Rule of Civil Procedure 4(m).

### I. **Allegations of the Complaint**

Walker sets forth an FTCA negligence against the United States, and an Eighth Amendment constitutional claim under Bivens against Warden Bradley and two unknown prison officials for allegedly failing to follow COVID-19 safety protocols. (Doc. 1, pp. 2-3, 11).

Walker alleges that USP-Canaan staff placed his housing unit, Unit F2, under strict quarantine from November 23, 2020 through February 2021, in order to mitigate the risk of spreading COVID-19. (*Id.* at p. 5). He alleges that inmates could not leave or enter Unit F2. (*Id.* at pp. 5-6). During this quarantine, prison staff moved through the housing unit and administered COVID-19 tests to all inmates in Unit F2. (*Id.*). On December 18, 2020, Walker's test was negative. (*Id.* at p. 6). Only prisoners with negative tests remained in the housing unit. (*Id.*). On January 9, 2021, Walker tested positive for COVID-19. (*Id.* at p. 5). As a result of contracting COVID-19, Walker alleges that he suffered from migraine headaches, fatigue, insomnia, shortness of breath, uncertain smell and taste, post-traumatic stress disorder, anxiety, difficulty concentrating, impaired memory, depression, and social withdrawal. (*Id.* at pp. 6, 9-10).

Walker contends that Defendants caused his exposure to COVID-19 through negligence and deliberate indifference. He asserts that the heating, ventilation, and air conditioning ("HVAC") system in Unit F2 was ineffective, and that Defendants failed to upgrade or replace the system. (*Id.* at pp. 8, 11). He alleges that Defendants hired incompetent prison officials who did not use, or incorrectly used, personal protective equipment ("PPE") and that Defendants failed to train, educate, and enforce rules on proper use of PPE. (*Id.* at p. 11). He alleges that Defendants failed to implement and enforce aggressive policies for COVID-19 testing, screening, and contact tracing. (*Id.*). Walker asserts that the housing at USP-Canaan did not allow for effective social distancing. (*Id.* at p. 12). Finally, he alleges that the prison did not provide N-95 face masks, gloves, or hand sanitizer, and instead, inmates received a new cloth face mask once a month. (*Id.*; Doc. 1-2, p. 2).

### II. **Legal Standard**

A complaint must be dismissed under Fed. R. Civ. P. 12(b) (6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

**\*2** "Though a complaint 'does not need detailed factual allegations, ... a formulaic recitation of the elements of a cause of action will not do.' " DelRio-Mocci v. Connolly Prop. Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Twombly,

[550 U.S. at 555, 127 S.Ct. 1955](). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." [*Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013)]() (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." [*Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013)]() (internal citations and quotation marks omitted).

> [*Twombly*]() and [*Iqbal*]() require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

[*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013)]().

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." [*Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937]() (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." [*Id.*]()

However, even "if a complaint is subject to [Rule 12(b)(6)]() dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."

[*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008)]().

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

[*Id.*]()

## III. Discussion

### A. Negligence Claim under the FTCA

By virtue of the FTCA, Congress has consented to liability for money damages suits against the United States for injury or loss of property "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." [28 U.S.C. § 1346(b)(1)](). The FTCA allows recovery for damages for personal injuries sustained during confinement in a federal prison by reason of the negligence of a government employee.

[28 U.S.C. § 2674](); [*United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)]().

In considering an FTCA claim, the law of the place where an act or omission occurs is to be applied. [28 U.S.C. § 1346(b)](). Because USP-Canaan is in Pennsylvania, Pennsylvania law applies. Under Pennsylvania law, a plaintiff must prove the following elements to establish a prima facie claim for negligence: "(1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant breached that duty; (3) such breach caused the harm in question; and (4) the plaintiff incurred actual loss or damage." [*Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 910 A.2d 20, 27 (Pa. 2006)](). In cases that involve federal prisoners, it has been recognized that the government's duty of care is one of ordinary diligence, meaning that the United States must "exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him." *See* [18]()

U.S.C. § 4042; *Turner v. Miller,* 679 F.Supp. 441, 443 (M.D. Pa. 1987). The applicable law with respect to the burden and quantum of proof under the FTCA remains that of the state in which the alleged tortious conduct occurred. *Hossic v. United States,* 682 F. Supp. 23, 25 (M.D. Pa. 1987). Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence. *Baum v. United States,* 541 F. Supp. 1349, 1351 (M.D. Pa. 1982). [2]

**\*3** The United States argues that Walker cannot make the requisite showing to establish a prima facie negligence claim. (Doc. 21, pp. 9-12). Specifically, the United States argues that Walker failed to adequately allege a causal connection between his alleged injuries and the employees' alleged breach of duty. (*Id.*). The Court concludes that Walker failed to carry his burden of proof on two of the four elements of a negligence claim under Pennsylvania law.

With respect to the first and second prongs, prison officials owe federal inmates a duty of care to protect them from unreasonable risks. 18 U.S.C. § 4042(a)(2), (3) (requiring the BOP to provide for the "protection" and "safekeeping" of inmates in its care). Assuming *arguendo* that the United States breached that duty, Defendants argue that Walker failed to establish a causal link.

As to the third and fourth elements, Walker fails to show a causal connection between the conduct of prison staff and his COVID-19 infection. As a precaution, Walker was in quarantine from November 2020 to February 2021, with limited movement inside the housing unit and inmates were not permitted to enter or leave the housing unit. (Doc. 1, p. 5). Prison officials tested inmates for COVID-19 and only inmates who tested negative for the virus were allowed to stay on the housing unit. (*Id.*). Walker alleges that "[s]ometime in December 2020 and January 2021" he contracted COVID-19, and "[u]pon information and belief", unidentified prison officials transmitted COVID-19 to the housing block, causing Walker to contract the virus. (*Id.* at pp. 5-6). Walker merely surmises that unknown prison staff may have transmitted the virus. He indicates that he contracted COVID-19 at some point over a one-month period. Without knowing when he was exposed to the virus, Walker is unable to identify the individuals who exposed him to COVID-19 and fails to precisely identify the actions or inactions that resulted in his exposure to the virus. The BOP is required only to protect a prisoner from danger that is known or can reasonably be apprehended, not to ensure the prisoner's safety. *Hossic,*

682 F.Supp. at 25. USP-Canaan is a high security facility. *See* https://www.bop.gov/coronavirus, last viewed May 10, 2022. At this time, there are no inmates that are infected with COVID-19. *Id.* 374 inmates and 161 staff members have recovered from COVID-19. *Id.* It is clear from the complaint that USP-Canaan took COVID-19 seriously and took reasonable steps to address the COVID-19 pandemic within the constraints of appropriate institutional security concerns. In sum, the Court finds that the conduct of BOP officials did not proximately cause Walker's infection of COVID-19. Based on the foregoing, the Court will dismiss Walker's FTCA claim.

## B. A *Bivens* Remedy is not Available for Walker's Conditions of Confinement Claim

Defendants next move to dismiss the conditions of confinement claim on the basis that there is no *Bivens* remedy available for this Eighth Amendment claim. (Doc. 21, pp. 13-21). In so moving, they rely on the Supreme Court's pronouncement in *Ziglar v. Abbasi,* 582 U.S. ——, 137 S. Ct. 1843, 198 L.Ed.2d 290 (2017), that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar,* 137 S. Ct. at 1857 (quoting *Iqbal,* 556 U.S. at 675, 129 S.Ct. 1937).

By way of background, in *Bivens,* the Supreme Court concluded that, even absent statutory authorization, it would enforce a damages remedy allowing individuals to be compensated after experiencing Fourth Amendment violations of the prohibition against unreasonable searches and seizures. *Bivens,* 403 U.S. at 397, 91 S.Ct. 1999. The Court extended *Bivens* to include a Fifth Amendment Due Process damages remedy to an administrative assistant claiming that a Congressman discriminated against her based on gender. *Davis v. Passman,* 442 U.S. 228, 249-49, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The Court extended *Bivens* yet again in 1980, concluding that the Eighth Amendment's prohibition on cruel and unusual punishment provided a prisoner a cause of action for damages against prison officials who failed to treat his asthma. *Carlson v. Green,* 446 U.S. 14, 19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). "These three cases—*Bivens, Davis,* and *Carlson*— represent the only instances in which the Court has approved

of an implied damages remedy under the Constitution itself."

*Ziglar*, 137 S. Ct. at 1855.

**\*4** In *Ziglar*, the Supreme Court set forth a two-part test to determine whether a *Bivens* claim may proceed. *Ziglar*, 137 S. Ct. at 1857 (quoting *Iqbal*, 556 U.S. at 675, 129 S.Ct. 1937). Initially, courts must determine whether the case presents a new *Bivens* context; "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by th[e] [Supreme] Court, then the context is new." *Id.* at 1859. "A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 1859-60. If the case presents a new context, a court must consider whether any alternative remedies exist. *Id.* at 1859-60. Even absent alternative remedies, a court must also consider whether special factors counsel against extending the *Bivens* remedy. *Id.*

In the matter *sub judice*, Walker alleges that Defendants exhibited deliberate indifference towards his conditions of confinement, causing the spread of COVID-19. There is no question that Walker's Eighth Amendment conditions of confinement claim presents a new context because it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Ziglar*, 137 S. Ct. at 1859.[3] The Supreme Court has never extended *Bivens* to claims against federal prison officials regarding conditions of confinement. Of the three cases in which the Supreme Court has recognized *Bivens* claims—*Ziglar*, *Davis*, and *Carlson*—, *Carlson* is the only case that involves an Eighth Amendment claim. However, Walker's claims are markedly different from the Eighth Amendment inadequate medical care claim in *Carlson*. *See Mammana v. Barben*, 856 F. App'x 411 (3d Cir. 2021) (nonprecedential) (rejecting inmate's argument that *Carlson* gives footing to an Eighth

Amendment conditions-of-confinement claim against federal officials); *Bistrian v. Levi*, 912 F.3d 79, 94 (3d Cir. 2018) (holding that although *Davis* and *Carlson* extended *Bivens* to the Fifth and Eighth Amendments, respectively, they only addressed gender discrimination and inadequate medical care claims, and "even if there are 'significant parallels to one of the Court's previous *Bivens* cases,' 'a modest extension is still an extension.' " (quoting *Ziglar*, 137 S. Ct. at 1864)); *see also Hernandez v. Mesa*, 589 U.S. ——, 140 S. Ct. 735, 743, 206 L.Ed.2d 29 (2020) ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized."); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (The Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants" beyond alleged violations by federal actors of the Fourth Amendment, Fifth Amendment Due Process Clause, or Eighth Amendment Cruel and Unusual Punishments Clause).

Next, the Court considers whether any alternative remedies exist and whether special factors counsel against extending the *Bivens* remedy. *Ziglar*, 137 S. Ct. at 1859-60. Defendants argue that the BOP's Administrative Remedy Program provides an alternative process. (Doc. 21, p. 18). The Supreme Court has found that "administrative review mechanisms" can provide "meaningful redress"—even if they do not "fully remedy the constitutional violation." *Malesko*, 534 U.S. at 68, 122 S.Ct. 515. The Court concludes that the BOP's Administrative Remedy Program provides an alternative process. Significantly, the fact that Walker may have been unsuccessful in utilizing the administrative process does not mean that such a process does not exist as an alternative remedy. *Malesko*, 534 U.S. at 69, 122 S.Ct. 515 (noting that "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability"). "[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not." *Ziglar*, 137 S. Ct. at 1863.

**\*5** Defendants also rely on special factors including the separation-of-powers concerns raised by Congress' repeated

legislative action on safeguarding the rights of federal prisoners without providing a damages remedy against federal actors. (Doc. 21, pp. 19-21). They also cite to prison administration and the burdens and costs associated with pursuing such lawsuits as special factors precluding the extension of *Bivens.* (*Id.*).

Based on the foregoing, the Court concludes, as many courts have concluded, [4] that extending *Bivens* to Walker's Eighth Amendment conditions of confinement claim would be contrary to law. Accordingly, Defendants' motion to dismiss this claim will be granted.

### C. Lack of Personal Involvement of Defendant Bradley

Defendants seek to dismiss the claims against Defendant Bradley based on a lack of personal involvement. (Doc. 21, pp. 21-23).

Individual liability will be imposed under Section 1983 only if the state actor played an "affirmative part" in the alleged misconduct. *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)). Liability "cannot be predicated solely on the operation of respondeat superior." *Id.* In other words, defendants in Section 1983 civil rights actions "must have personal involvement in the alleged wrongs ... shown through allegations of personal direction or of actual knowledge and acquiescence." *Atkinson v. Taylor*, 316 F.3d 257, 271 (3d Cir. 2003); *Rode*, 845 F.2d at 1207-08. A plaintiff must establish the particulars of conduct, time, place, and the person responsible. *Evancho*, 423 F.3d at 354; *Rode*, 845 F.2d at 1207-08. When a plaintiff merely hypothesizes that an individual defendant may have had knowledge of, or personal involvement in, the deprivation of his or her rights, individual liability will not follow. *Atkinson*, 316 F.3d at 271; *Rode*, 845 F.2d at 1207-08. A claim of a constitutional deprivation cannot be premised merely on the fact that the named defendant was the prison warden, or a prison supervisor, when the incidents set forth in the complaint occurred. *See Rode*, 845 F.2d at 1207.

Walker asserts that he contracted COVID-19 due to lax mitigation practices at USP-Canaan. However, he does not

allege facts to support an inference that Defendant Bradley was responsible for these practices or the conditions that led to his infection. He alleges that the prison failed to follow appropriate COVID-19 safety protocols, but he does not allege facts concerning the involvement, if any, of Defendant Bradley in these practices. Instead, he states that unknown prison officials exposed him to COVID-19. Thus, the Court can only construe Walker's pleadings as asserting claims against Warden Bradley under a theory of *respondeat superior*.

**\*6** With respect to Defendant Bradley's supervisory role as Warden, "there are two theories of supervisory liability, one under which supervisors can be liable if they established and maintained a policy, practice or custom which directly caused the constitutional harm, and another under which they can be liable if they participated in violating plaintiff's rights, directed others to violate them, or, as the persons in charge, had knowledge of and acquiesced in their subordinates' violations." *Santiago v. Warminster Twp.*, 629 F.3d 121, 129 n.5 (3d Cir. 2010) (quotation and alteration marks omitted). The complaint fails to allege that Defendant Bradley established and maintained a policy, practice or custom which directly caused the constitutional harm, or that he participated in violating Walker's rights, directed others to violate them, or acquiesced in any unconstitutional conduct by their subordinates.

Based on the above, Defendants' motion to dismiss the claims against Warden Bradley will be granted based on a lack of personal involvement.

### D. Eighth Amendment Claim

Assuming *arguendo* that Walker may proceed on his Eighth Amendment claim, Defendants seek dismissal of the complaint on the basis that Walker has not pled a plausible Eighth Amendment claim against them.

In order to succeed on a claim as to one's conditions of confinement, a plaintiff must establish that: "(1) he was incarcerated under conditions imposing a substantial risk of serious harm, (2) the defendant-official was deliberately indifferent to that substantial risk to his health and safety, and (3) the defendant-official's deliberate indifference caused him harm." *See Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2015), *abrogated in party on other grounds by Mack v. Yost*, 968 F.3d 311 (3d Cir. 2020). "[T]he Constitution does

not mandate comfortable prisons." *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Therefore, conditions of imprisonment violate the Eighth Amendment only if they, "alone or in combination ... deprive inmates of the minimal civilized measures of life's necessities." *See id.* at 347, 101 S.Ct. 2392. Such necessities include "adequate food, clothing, shelter, and medical care." *See Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, "extreme deprivations are required to make out a conditions-of-confinement claim." *See Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Mammana v. Fed. Bureau of Prisons,* 934 F.3d 368, 372 (3d Cir. 2019) (quoting *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) and *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392).

The COVID-19 pandemic constitutes a substantial risk of harm to inmates. However, Walker has failed to allege facts suggesting that Defendants demonstrated deliberate indifference to the risk posed by COVID-19. Walker has failed to establish that the conditions at USP-Canaan amount to unconstitutional punishment. He alleges that prison officials failed to properly wear PPE, failed to upgrade an HVAC system, failed to offer N-95 masks, gloves, and hand sanitizer for purchase, the COVID-19 policies were not substantial in screening and contact tracing, and prison cells did not accommodate social distancing. (Doc. 1, pp. 11-12). As previously recognized, "the prison setting raises unique concerns regarding the spread of the COVID-19 virus since, by their very nature, prisons are confined spaces unsuited for social distancing." *Rodriguez-Francisco v. White,* No. 1:20-CV-1076, 2020 WL 4260766, at *3 (M.D. Pa. July 24, 2020). However, the "inability to practice social distancing is not, in and of itself, sufficiently serious to implicate a violation of the Eighth Amendment." *Id.*

**\*7** While the Court understands Walker's legitimate concerns regarding the COVID-19 pandemic, it agrees with the numerous courts throughout the nation that have concluded that similar allegations do not support a plausible inference that officials have demonstrated deliberate indifference to inmates' Eighth Amendment rights. *See, e.g., Swain v. Junior,* 958 F.3d 1081, 1089 (11th Cir. 2020) (granting defendants' motion to stay the district court's grant of a preliminary injunction on the basis that, *inter alia,* the plaintiff's had not demonstrated that defendants were deliberately indifferent to the risk posed by COVID-19 because the correctional facility had "implemented many measures to curb the spread of the virus"); *Bevins v. Kauffman,* No. 1:20-cv-02012, 2021 WL 322168, at *5 (M.D. Pa. Feb. 1, 2021); *Wilkins v. Wolf,* No. 1:20-cv-2450, 2021 WL 1578250, at *6-7 (M.D. Pa. Apr. 22, 2021) (finding that inmate-plaintiff had failed to state an Eighth Amendment claim regarding an alleged inadequate response to the COVID-19 pandemic); *Wylie v. Bonner,* No. 2:20-cv-2593-TLP-tmp, 2021 WL 261280, at *4-6 (W.D. Tenn. Jan. 26, 2021) (finding that inmate-plaintiff had failed to state an Eighth Amendment conditions of confinement claim because he failed to allege that staff knew of and disregarded the risks posed by COVID-19); *Shokr v. LeBlanc,* No. 20-488, 2020 WL 8093228, at * (M.D. La. Dec. 14, 2020) (concluding that the inmate-plaintiff had failed to state a plausible Eighth Amendment claim because measures were being taken to combat the COVID-19 virus); *Kesling v. Tewalt,* 476 F. Supp. 3d 1077, 1086-88 (D. Idaho 2020) (concluding that inmate-plaintiff's amended complaint failed to set forth a plausible Eighth Amendment claim when prison officials had developed and instituted policies to curb the spread of COVID-19); *McKissic v. Barr,* No. 1:20-cv-526, 2020 WL 3496432, at *6 (W.D. Mich. June 29, 2020) (concluding that inmate-plaintiff failed to state an Eighth Amendment claim where defendants had taken "significant measures ... to secure prisoner safety and prevent infection" and the plaintiff's "speculation about the mere possibility that he will become infected does not rise to the level of an Eighth Amendment violation"). Indeed, "the Eighth Amendment does not require perfection on the part of prison officials." *See Wylie,* 2021 WL 261280, at *6.

The Court is sympathetic to the fact that Walker contracted COVID-19. Walker's complaint, however, is devoid of allegations that he experienced any serious symptoms upon contracting COVID-19. From the complaint, as pled, the Court "cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, [Defendants] here acted unreasonably by 'doing their best.' " *See Swain v. Junior,* 961 F.3d 1276, 1289 (11th Cir. 2020). Therefore, the Court will grant

Defendants' motion to dismiss for failure to state a plausible Eighth Amendment claim.

## IV. Leave to Amend

When a complaint fails to present a prima facie case of liability, district courts must generally grant leave to amend before dismissing the complaint. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). Specifically, the Third Circuit Court of Appeals has admonished that when a complaint is subject to dismissal for failure to state a claim, courts should liberally grant leave to amend "unless such an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 245 (citing *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004)). The federal rules allow for liberal amendments in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citations and internal quotations omitted). Walker's claims are factually and legally flawed; thus, the Court concludes that granting leave to amend would be futile.

## V. Federal Rule of Civil Procedure 4(m)

Rule 4(m) sets forth the following time frame a plaintiff has to serve a defendant with the summons and copy of the complaint:

> If a defendant is not served within 90 days after the complaint is filed, the court -- on motion or on its own after notice to the plaintiff -- must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m). The unknown prison officials were named in the complaint that was filed on November 4, 2021 and, to date, have not been identified or served in this case. The Court must engage in a two-step process in determining whether to dismiss the unidentified, non-served

Defendants or grant Walker additional time to effect service. "First, the district court should determine whether good cause exists for an extension of time. If good cause is present, the district court must extend time for service and the inquiry is ended. If, however, good cause does not exist, the court may in its discretion decide whether to dismiss the case without prejudice or extend time for service." *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1305 (3d Cir. 1995). Good cause requires good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance with the time specified in the rules. *MCI Telecomm. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1097 (3d Cir. 1995). In determining whether good cause exists, a court's "primary focus is on the plaintiff's reasons for not complying with the time limit in the first place." *Id.* Although prejudice is a factor to be considered, the absence of prejudice to the opposing party alone does not constitute good cause to excuse late service. *Id.*

**\*8** In the present matter, Walker failed to establish good cause. After the expiration of the ninety-day time period set forth in Rule 4(m), the Court notified Walker that the action against the unknown prison officials was subject to dismissal and directed him to show cause why the action against these Defendants should not be dismissed pursuant to Rule 4(m). (Doc. 26). Walker failed to respond to the Rule 4 show cause order, and his *pro se* status is not good cause to excuse his failure to timely identify or serve the unknown Defendants. *Veal v. United States*, 84 F. App'x 253, 256 (3d Cir. 2004). Based upon the lack of any reasonable explanation for his failure to adhere to the requirements of Rule 4, the Court finds that Walker failed to establish good cause.

If a plaintiff cannot show good cause for his failure to serve the defendant within ninety days, a district court may either dismiss the defendant, or exercise its discretion to order that service be made within a specific time. *Petrucelli*, 46 F.3d at 1305; *see also* FED. R. CIV. P. 4(m). It is Walker's responsibility to properly identify all defendants, and provide accurate mailing addresses for the defendants, in a timely fashion. (*See* Doc. 11 ¶ 7) (advising Walker that failure to properly name a defendant, or provide an accurate mailing address for a defendant, may result in dismissal of the claims against that defendant pursuant to Federal Rule of Civil Procedure 4(m)).

In light of Walker's lack of good faith effort to identify or serve the unknown prison officials, despite this Court's warning of the possible consequences, including dismissal, the Court concludes that dismissal is appropriate under the present circumstances. Accordingly, the non-identified, non-served Defendants will be dismissed from this action.

## VI. Conclusion

For the reasons set forth above, the Court will grant Defendants' motion (Doc. 16) to dismiss. The Court will also dismiss the action against the two unknown prison officials pursuant to Federal Rule of Civil Procedure 4(m).

A separate Order shall issue.

**All Citations**

Slip Copy, 2022 WL 1472872

## Footnotes

1   *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2   Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1284 (Pa. 1978).

3   Walker's claims "bear little resemblance" to "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma," the contexts previously recognized by the Supreme Court. *Ziglar*, 137 S. Ct. at 1860.

4   *See, e.g., Mammana v. Barben*, 856 Fed.Appx. 411 (3d Cir. 2021) (footnote omitted) (plaintiff alleging Eighth Amendment violation for confinement for four days "in a chilled room with constant lighting, no bedding, and only paper-like clothing" did not state a *Bivens* claim, with the Third Circuit noting plaintiff "asks for a new implied cause of action to sue federal prison officials for unconstitutional conditions of confinement, a step never taken by the Supreme Court nor any circuit court"); *Hill v. Lappin*, 561 F.Supp.3d 481 (M.D. Pa. 2021) (noting that "courts began to appreciate *Abbasi's* watershed scope, [and] the better-reasoned authority has declined to recognize a *Bivens* remedy for Eighth Amendment conditions-of-confinement ... claims.").

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 6724586
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Nathan T. PULLINS, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

Case # 1:18-cv-01303-DB
|
Filed 12/11/2019

**Attorneys and Law Firms**

Kenneth R. Hiller, Mary Ellen Gill, Law Offices of Kenneth Hiller, Amherst, NY, for Plaintiff.

Francis D. Tankard, James Cole Potter, Office of the General Counsel Social Security Administration, Kansas City, MO, Sixtina Fernandez, Social Security Administration Office of General Counsel, New York, NY, for Defendant.

MEMORANDUM DECISION AND ORDER

DON D. BUSH, UNITED STATES MAGISTRATE JUDGE

**INTRODUCTION**

\*1  Plaintiff Nathan T. Pullins ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") that denied his application for Supplemental Security Income ("SSI") under Title XVI. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 16).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 8, 15. Plaintiff also filed a reply. *See* ECF No. 18. For the reasons set forth below, Plaintiff's motion (ECF No. 8) is **DENIED**, and the Commissioner's motion (ECF No. 15) is **GRANTED**.

**BACKGROUND**

On December 19, 2014, Plaintiff protectively filed his application for SSI benefits, pursuant to Title XVI of the Act, alleging a disability beginning on February 16, 2014 (the disability onset date), due to: gout, hypertension, chronic kidney disease, diabetes, depression, and anxiety. Transcript ("Tr.") 76-82, 176, 210. Plaintiff's claim was denied initially on February 25, 2015 (Tr. 85-107), after which he requested an administrative hearing. Plaintiff's hearing was held via video on July 25, 2017. Tr. 24, 35-72. Administrative Law Judge David Begley (the "ALJ") presided over the hearing from Alexandria, Virginia. Tr. 24. Plaintiff appeared and testified at the hearing in Buffalo, New York and was represented by Jonathan Emdin, an attorney. *Id.* Kristin Panella, an impartial vocational expert ("VE"), also appeared and testified at the hearing. *Id.* The ALJ issued an unfavorable decision on September 20, 2017, finding Plaintiff not disabled. Tr. 34. On September 20, 2018, the Appeals Council denied Plaintiff's request for further review. Tr. 1-8. The ALJ's decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

**LEGAL STANDARD**

**I. District Court Review**

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

**II. The Sequential Evaluation Process**

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 216 of 396

Pullins v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

of the Act. *See Parker v.* 🔖 *City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 🔖 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. 🔖 *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

**\*2** At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). 🔖 *Id.* § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id.* § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See* 🔖 *id.* § 404.1520(e)-🔖 (f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 🔖 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. 🔖 *Id.* § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See* 🔖 *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

**ADMINISTRATIVE LAW JUDGE'S FINDINGS**

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in his September 20, 2017 decision:

1. The claimant has not engaged in substantial gainful activity since December 19, 2014, the application date (20 CF'R 416.971 *et seq.*);

2. The claimant has the following severe impairments: hypertension and diabetes mellitus (20 CF'R 416.920(c));

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 🔖 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926);

4. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c); [1]

5. The claimant has no past relevant work (20 CFR 416.965);

6. The claimant was born on November 9, 1951 and was 63 years old, which is defined as an individual closely approaching retirement age, on the date the application was filed (20 CFR 416.963);

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964);

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968);

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a));

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 19, 2014, the date the application was filed (20 CFR 416.920(g)).

Tr. at 24-30.

Accordingly, the ALJ determined that, based on the application for supplemental security income, protectively

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 217 of 396

Pullins v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

filed on December 19, 2014, Plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act. Tr. 30.

## ANALYSIS

**\*3** Plaintiff asserts two points of error: (1) The ALJ failed to explain how he arrived at the RFC finding; he did not explain the RFC in functional terms; and the RFC was not supported by any competent medical opinion evidence; and (2) the ALJ did not perform a proper evaluation of Plaintiff's credibility. *See* ECF No. 8-1 at 1. The Commissioner argues in response that the objective evidence does not support Plaintiff's allegations; none of Plaintiff's medical providers have identified any limitations that could be considered disabling; and the record supports the ALJ's finding that Plaintiff retained the capacity to perform medium work. The Court agrees.

As explained in further detail below, this appeal is much ado about nothing. Plaintiff's hemoglobin A1C ("HA1C") tests showed that his Type 2 diabetes was well controlled and often near normal lab value range. *See, e.g.*, Tr. 279-80, 304, 321, 332, 452, 454. There were no other noted medical complications associated with diabetes such as neuropathy (Tr. 330) or retinopathy (Tr. 329, 316, 428) in any of the medical records. His vision bilaterally was reported as 20/25. Tr. 436. His hypertension, although often uncontrolled, did not result in any functional impairments noted in the records (Tr. 405, 440), other than as a possible contributing factor (along with prior cocaine use) to his kidney disease as noted by his estimated glomerular filtration rate ("eGFR"). [2] Tr. 333. However, records also reflect lab values above 60, which would be interpreted as possible kidney disease. Tr. 322. Moreover, lab values for microalbumin were normal. Tr. 391, 393, 275. Records reflecting Plaintiff's self-reported history of gout most often note no flare ups. Tr. 324, 301.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

## I. Substantial Evidence Supports the ALJ's RFC Finding.

Plaintiff asserts error with respect to the ALJ's articulation of his reasons for reaching his RFC determination. Plaintiff claims that the ALJ failed to link his RFC with the evidence on which it relied, insisting the ALJ was required to include a "narrative discussion" in support of each conclusion reached. *See* ECF No. 8-1 at 6-7. That argument overstates the ALJ's obligation. "An ALJ's failure to express a claimant's RFC in a function-by-function analysis does not necessarily mandate remand so long as the RFC is otherwise supported by substantial evidence." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 313 (W.D.N.Y. 2013) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) ("We decline to adopt a *per se* rule.... Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed."). That standard was met in this case.

**\*4** As Plaintiff notes, SSR 96-8p addresses the ALJ's need to justify each conclusion reached (*see* ECF No. 8-1 at 6-7); however, that does not mean an ALJ must cite specific medical evidence in the record to justify every part of the RFC determination. So long as an ALJ adequately explains the underlying evidentiary basis for his RFC determination, as he did in this case, he has satisfied the demands of SSR 96-8p. Thus, Plaintiff's "narrative discussion" argument fails.

The remainder of Plaintiff's argument concerns the absence of medical-opinion evidence and the ALJ's alleged duty to further develop the record. *See* ECF No. 8-1 at 6, 8-11. The underlying premise of Plaintiff's argument—that an ALJ must rely upon a medical opinion to formulate the RFC—is incorrect. It was not error for the ALJ to reach an RFC finding that did not coincide with a medical opinion. Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at \*3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec.

1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Moreover, the Second Circuit has rejected the notion that it is *per se* error for an ALJ to determine RFC without relying on a medical opinion. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (a medical source statement or formal opinion is not required when "the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]."). The Second Circuit reached a similar conclusion in *Corbiere v. Berryhill*, 760 F. App'x 54, 56 (2d Cir. 2019) (summary order). The court rejected the argument that the ALJ's RFC finding was deficient, even in the absence of a supporting medical-source opinion. *See also Johnson v. Colvin*, 669 F. App'x 44 (2d Cir. 2016) (finding that substantial evidence supported the ALJ's RFC for light work, despite the lack of a supportive functional assessment from a physician).

Further, despite Plaintiff's assertions to the contrary (*see* ECF No. 8-1 at 8-11), an ALJ's duty to develop the record is not limitless. Most basically, an ALJ need not further develop the record "when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.' " *See Janes v. Berryhill*, 710 F.App'x 33, 34 (2d Cir. Jan. 30, 2018) (summary order (quoting *Perez*, 77 F.3d at 48); *see also Swiatek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. Jan. 8, 2015) (summary order) (although an ALJ has a duty to develop the record, where there are no obvious gaps and the ALJ possesses a complete medical history, he is under no obligation to seek a treating-source opinion (citations omitted)); *Pope v. Barnhart*, 57 F. App'x 897, 899 (2d Cir. 2003) (summary order) ("[a]n ALJ has an independent duty to resolve ambiguities and inconsistencies ... [but] where the inconsistencies do not appear resolvable, the ALJ may decide based on the available evidence").

Plaintiff testified that he could not work due to his prostate problems. However, his Prostate-Specific Antigen ("PSA") test was 1.4, and his digital rectal exam was normal.[3] Tr. 318. He noted that Viagra worked well for him (Tr. 428), and he denied urinary symptoms (Tr. 404). He routinely denied depression and hopelessness. Tr. 428. He does his own housework, as well as his own cooking and laundry. Tr. 48-49. He also does odd jobs around the neighborhood (Tr. 43) and frequents the library (Tr. 48). He is able to attend church and

socializes with friends and family. Tr. 51, 53. He testified he can walk four or five blocks before stopping. Tr. 56. He also testified that he could lift up to 50 pounds. Tr. 57. Then, incredulously, he testified (upon his attorney's prodding) that he would have difficulty even lifting a gallon of milk. Tr. 61. Additionally, although he testified that he has to urinate every thirty minutes, nothing in his medical records note problems with frequent urination. Tr. 404.

**\*5** The medical records notwithstanding, there is ample evidence in the record from Plaintiff's own testimony to support the RFC reached. The record in this case simply does not contain sufficient evidence on which a finding of disability could be based. Plaintiff seeks to shift the burden of producing such evidence to the Commissioner, but Plaintiff himself is required to provide such evidence. Consistent with the regulations and case law, the ALJ considered the entire evidentiary record when formulating Plaintiff's RFC. *See Davis v. Colvin*, No. 15-CV-6695P, 2017 WL 745866, at \*11 (W.D.N.Y. Feb. 27, 2017). The ALJ's RFC finding satisfies the deferential substantial-evidence test, as does his ultimate decision.

## II. The ALJ Properly Analyzed the Consistency of Plaintiff's Complaints.

Plaintiff also argues that the ALJ did not set forth his reasons for discrediting Plaintiff's subjective statements about his symptoms. *See* ECF No. at 11-13. Plaintiff is incorrect. Throughout his decision, the ALJ explained why Plaintiff's subjective statements were not entirely consistent with the evidence as a whole. In reaching his conclusion, the ALJ relied upon the objective evidence of record, the effectiveness of treatment in addressing Plaintiff's physical symptoms, other inconsistencies, and the medical opinion evidence of record. Substantial evidence supports the ALJ's findings.

Although an ALJ must consider Plaintiff's statements about his symptoms, the ALJ need not accept subjective complaints without question. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The Second Circuit recognizes that "[i]t is the function of the [Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *See Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983), *abrogated on other grounds.* A reviewing court should give great deference to the ALJ's judgment, because the ALJ heard the witness testify and observed his demeanor. *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995);

*Serra v. Sullivan*, 762 F. Supp. 1030, 1034 (W.D.N.Y. 1991). Furthermore, it is the role of the ALJ to resolve conflicts in the record. ⚑ *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

Plaintiff contends the ALJ made only a conclusory statement that Plaintiff's allegations were not entirely consistent with the evidence of record, without pointing to any supporting evidence. *See* ECF No. 8-1 at 12-13 (citing Tr. 28). While the ALJ did not cite the specific evidence that supported his finding immediately thereafter, he discussed it in other parts of the decision (Tr. 26-29). Nothing more was required. *See* ⚑ *Cichocki*, 729 F.3d at 178 n.3 (remand is not required "so long as the record 'permits us to glean the rationale of an ALJ's decision' ") (quoting *Mongeur v. Heckler*, 772 F.2d 1033, 1040 (2d Cir. 1983)); *O'Connor v. Astrue*, No. 07-CV-141, 2009 WL 3273887, at *4 (W.D.N.Y. Oct. 9, 2009) (a reviewing court will consider the ALJ's decision in its entirety).

Most importantly, however, the ALJ found that the objective evidence of record simply did not support Plaintiff's allegations of disabling limitations. For example, Plaintiff alleged he was disabled due in part to gout. Tr. 26-28, 210. He even testified that gout forced him to stop working in 2014. Tr. 42. However, as the ALJ observed, the medical records indicated nothing more substantial than notations of gout "by report," and did not provide any evidence of recent flare-ups or specific treatment to address any such symptoms. Tr. 26-27, 437, 441, 445, 448. Further, in August 2016, Plaintiff reported that gout presented "no issues" at that time. Tr. 436. As the ALJ noted, although Plaintiff testified to more severe gout-related symptoms, the medical record belied those claims. Tr. 27-28, 58-59. Despite Plaintiff's testimony as to his complaints of gout, his brief does not even mention gout among his allegedly disabling conditions.

 **\*6** Plaintiff's claim of chronic kidney disease was equally unsupported by objective evidence. The ALJ recognized that Plaintiff had been diagnosed with moderate kidney disease. Tr. 26-27, 434, 438, 442. However, the record fails to document any functional limitations due to kidney disease that would more than minimally impair Plaintiff's capacity to perform work-related tasks. To meet his burden of proof, Plaintiff must establish such functional limitations, not mere diagnoses. *See* 20 C.F.R. § 416.945(e). Records also reflect that Plaintiff was exercising and planned to start senior classes. Tr. 423, 428. He also self-reported that there were

no problems with his hypertension. Tr. 436. Plaintiff's short summary of treatment records also does not identify treatment for his kidney impairment. *See* ECF No. 8-1 at 2-3.

Plaintiff listed depression and anxiety among his disabling impairments, but the record does no more to support his allegations of mental disability than it does with respect to his alleged physical impairments. During the relevant period, Plaintiff repeatedly denied depression, and the record does not reflect any treatment by a mental health professional during the period for which Plaintiff now seeks SSI. Tr. 27, 432, 436, 440, 444, 447. Although Plaintiff's brief indicates that he received mental health treatment "from at least 2010 through the relevant time period," it also admits without explanation that he was discharged from care on April 15, 2014, some eight months prior to the start of the period under question in this appeal. *See* ECF No. 8-1 at 2 (citing Tr. 379). Plaintiff's brief fails to identify any abnormal findings relating to his mental condition during the relevant period.

Based on the foregoing, the objective evidence simply did not support the disabling level of limitations Plaintiff alleged. *See* 20 C.F.R. § 416.929(c)(2) (agency will consider "objective medical evidence" when evaluating symptoms); *Forbes v. Colvin*, No. 13-CV-207 MAT, 2015 WL 4411511, at *7 (W.D.N.Y. July 20, 2015) (ALJ properly found that claimant's subjective complaints were not fully credible based upon objective medical evidence); *Razo v. Astrue*, No. 04 CIV. 1348 PAC DF, 2008 WL 2971670, at *6 (S.D.N.Y. July 31, 2008) (stating that "where a claimant's complaints are 'out of proportion to the objective clinical findings,' it is permissible for the ALJ to find the claimant less than fully credible").

Thus, the absence of compelling objective evidence undermines the consistency of Plaintiff's claims. As the SSA regulations make clear, even when a claimant's testimony is fully accepted, his subjective claims alone are insufficient to prove disability. *See* 20 C.F.R. § 416.929(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence ... would lead to a conclusion that you are disabled."). Given the lack of other evidence, particularly the absence of "medical signs and laboratory findings" in support of Plaintiff's allegations, the ALJ properly assessed Plaintiff's subjective complaints.

To the extent that Plaintiff argues his Global Assessment of Functioning ("GAF") scores establish that he experienced "moderate" mental-health symptoms during the relevant period, Plaintiff's argument is unpersuasive. *See* ECF No. 8-1 at 2. GAF scores are designed to consider factors outside those used in disability determinations. *See Wilson v. Berryhill*, No. 16-CV-00664V(F), 2018 WL 4211322, at *2 (W.D.N.Y. Sept. 4, 2018) (noting the GAF is a "multiaxial scale is used to assess an individual's mental and physical condition on five axes, each of which refers to a different class of information"). Furthermore, the Social Security Administration has limited the manner in which such scores are used. *See Mainella v. Colvin*, No. 13-CV-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (explaining that the Administration issued a bulletin dated July 31, 2013, limiting use of GAF scores because the scores are so general that they are not useful without additional supporting description and detail) (internal citations and quotations omitted).

 **\*7**  With respect to Plaintiff's hypertension and diabetes, as discussed above, the ALJ acknowledged those impairments were severe, but also cited evidence that they did not lead to disabling functional limitations. Tr. 26, 29. Recent records show that even when Plaintiff's blood pressure was somewhat elevated, it did not lead to significant functional limitations. In August 2016, Plaintiff explicitly denied any problems related to hypertension. Tr. 29, 436. In March 2017, Plaintiff's provider set a goal of blood pressure readings under 140/90. Tr. 442. In subsequent months, Plaintiff met that goal, recording readings of 130/88 in both May and June of 2017. Tr. 534, 571. Additionally, Plaintiff did not testify to any hypertension-related symptoms at his July 2017 hearing. Moreover, the medical records are silent as to any commonly-known consequences of hypertension such as headaches or visual disturbances

Similarly, the ALJ recognized that Plaintiff's diabetes has not caused any functional limitations that could warrant a disability finding. Tr. 28-29. In February 2013, nearly two years prior to when he filed for SSI, Plaintiff's HA1C was stable at 6.5, [4] and his provider noted that he was "doing well with his diabetes management." Tr. 29, 279-80. In subsequent months, Plaintiff's HA1C was consistently in the 6.0 to 6.5 range. Tr. 29, 304, 321, 332, 452, 454. An August 2016 treatment note reported his HA1C as 6.5; found no worrisome results after his diabetic foot exam; characterized his condition as "without complications," and indicated that Plaintiff had merely "been on the edge of diabetes." Tr. 436, 438. At his hearing, Plaintiff confirmed that he did not take

any medication for treatment of his diabetes. Tr. 56. The ALJ may properly consider that a claimant does not take prescription medication. *See Tappan v. Halter*, 10 Fed. App'x 30, 32 (2d Cir. May 31, 2001). In sum, although the evidence of record establishes that Plaintiff has been diagnosed with hypertension and diabetes, neither of those conditions led to significant functional limitations during the period for which he now seeks SSI. Plaintiff's brief does not point to any evidence that would compel a different conclusion.

The ALJ also considered Plaintiff's daily activities as a factor undermining his claims of disabling impairment. Tr. 28. For example, Plaintiff testified that he frequently used public transportation and shopped in stores; cooked his own meals; did his own housekeeping; had no difficulties with personal care; and visited family and friends, including attending weekly church services. Tr. 45, 48-53. "The law is clear that the ALJ may consider a claimant's purported activities of daily living for the purposes of a credibility determination." *Coger v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 427, 436 (W.D.N.Y. 2018) (quotation and alterations omitted); *see also Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (ALJ may rely on such activities to show that a claimant's allegation that she was disabled was not credible); *Wolfe v. Comm'r of Soc. Sec.*, 272 F.App'x 21, 22 (2d Cir. 2008) (ALJ properly discounted claimant's credibility based on her statements that she attended church, shopped, and attended weekly football games).

In addition to the above-mentioned activities, Plaintiff admitted that he looked for a job during the period he now claims to have been unable to work. Tr. 42. It is well settled that actively seeking work is inconsistent with disability. *See, e.g., Felix v. Astrue*, No. 11-CV-3697, 2012 WL 3043203, *10 (E.D.N.Y. July 24, 2012) (seeking employment indicates that a claimant is ready, willing and able to work during that time). Plaintiff alleges that he does not sleep well because he wakes frequently to use the bathroom at night, but he also admitted this had been an issue for about ten years, indicating that he had been able to hold his previous job(s) despite that alleged impairment. Tr. 28, 50-51.

 **\*8**  Finally, the ALJ properly weighed and considered the one medical opinion found in the record, a State agency consulting examiner who reviewed Plaintiff's claim in February 2015. Tr. 29, 77-78. The ALJ explained that he gave the opinion little weight because the opinion was inconsistent with the objective medical evidence. Tr. 29. An ALJ is responsible for weighing opinion evidence, resolving disagreements among

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 221 of 396

Pullins v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

providers, if any, and giving good reasons for the weight assigned. See 20 C.F.R. § 416.927.

Based on the foregoing, the Court finds there is substantial support for the ALJ's conclusions that Plaintiff's subjective allegations and claims of disabling limitations were not entirely consistent with the evidence as a whole. Common sense would dictate such, and the Court finds this appeal is frivolous and a waste of judicial resources.

### CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 8) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 15) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


**All Citations**

Not Reported in Fed. Supp., 2019 WL 6724586


### Footnotes

1    Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he or she is determined to also be able to do sedentary and light work. 20 CFR 416.967(c).

2    eGFR is a measure of kidney function. In adults, the normal eGFR number is more than 90. An eGFR below 60 for three months or more or an eGFR above 60 with kidney damage (marked by high levels of albumin in the urine) indicates chronic kidney disease. eGFR declines with age, even in people without kidney disease. *A to Z Health Guide: Estimated Glomerular Filtration Rate (eGFR)*, National Kidney Foundation, https://www.kidney.org/atoz/content/gfr (last visited December 6, 2019).

3    Prostate-specific antigen, or PSA, is a protein produced by normal, as well as malignant, cells of the prostate gland. The PSA test measures the level of PSA in a man's blood. PSA is often elevated in men with prostate cancer. African American men have a higher risk of prostate cancer. There is no specific normal or abnormal level of PSA in the blood, and levels may vary over time in the same man, but most doctors consider PSA levels of 4.0 ng/mL and lower as normal. However, recent studies have shown that some men with PSA levels below 4.0 ng/mL have prostate cancer and that many men with higher levels do not have prostate cancer. In general, however, the higher a man's PSA level, the more likely it is that he has prostate cancer. Men with prostate symptoms often undergo PSA testing along with a digital rectal exam to determine the nature of the problem. *PSA Fact Sheet*, National Cancer Institute at the National Institutes of Health, https://www.cancer.gov/types/prostate/psa-fact-sheet (last visited December 6, 2019).

4    "The target A1c level for people with diabetes is usually less than 7%. The higher the hemoglobin A1c, the higher your risk of having complications related to diabetes." *See* https://www.webmd.com/diabetes/guide/glycated-hemoglobin-test-hba1c (last visited December 3, 2019).


End of Document                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 4548078

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Torrell SAXON, Petitioner,

v.

UNITED STATES of America, Respondent.

12 Cr. 320 (ER)

|

Signed 08/05/2020

**Attorneys and Law Firms**

Michael Gerber, Southern District of New York, Douglas Benjamin Bloom, U.S. Attorney's Office, White Plains, NY, Rebecca Gabrielle Mermelstein, U.S. Attorney's Office, New York, NY, for Respondent.

### ORDER

Ramos, D.J.:

**\*1** On June 9, 2020, Torrell Saxon filed a *pro se* motion for compassionate release in response to the COVID-19 pandemic. Doc. 60. On June 17, 2020, the Government opposed his motion arguing, *inter alia*, that he had not exhausted his administrative remedies with the Bureau of Prisons ("BOP"). Doc. 62. Because Saxon had provided no proof of exhaustion of his claim, the Court denied his motion without prejudice on June 18, 2020. Doc. 63. On July 10, 2020, over a month after he submitted his first compassionate release motion, the Court received a submission from Saxon titled "Reply to Government's Response," which argued that he was unable to exhaust his administrative remedies. Doc. 64. On July 13, 2020, the Court agreed to waive the exhaustion requirement and considered the reply Saxon's renewed motion. [1] Doc. 65. On July 17, 2020, the Government again opposed. Doc. 66. For the reasons set forth below, the Court denies Saxon's renewed motion for compassionate release.

### I. Background

On March 25, 2012, Saxon, now 42, was arrested in Middletown, New York for a home invasion robbery during which he shot at one of the inhabitants. Doc. 55 at 1. On December 21, 2012, following a proffer at which he admitted

to going to the home to sell oxycodone, Saxon pleaded guilty to a two-count superseding information charging distribution and possession with the intent to distribute oxycodone, alprazolam, and clonazepam. *Id.* at 2-4. On May 30, 2013, the Court found that the Government had proven by a preponderance of the evidence at *a Fatico* hearing that Saxon had been in possession of and discharged a firearm, and sentenced him to an aggregate term of 120 months' incarceration. Docs. 55 at 4-6.

Saxon is currently incarcerated at Federal Correctional Institution Hazelton ("FCI Hazelton") and is set to be released on February 12, 2021. [2] As of August 2, 2020, BOP reports that FCI Hazelton has zero inmates and three staff members who tested positive for COVID-19, two staff members who have recovered from COVID-19 infection, and no inmate or staff deaths as a result of the virus. [3]

Saxon now seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act. [4] Docs. 60, 64, 67; *U.S. v. Ebbers*, 432 F. Supp. 3d 421, 422-23 (S.D.N.Y. 2020). Across his submissions, Saxon argues that he is a smoker who has a "long history" of breathing problems, keratoconus, hypertrophy of the nasal turbinates, bilateral nasal polyps, hypertension, hyperthyroidism, and kidney disease, putting him at a high risk for complications from contracting COVID-19. Docs. 60 at 4; 64 at 3-4, 6; 64-1 at 5. Saxon also challenges his sentence under the Equal Protection Clause of the Fourteenth Amendment, arguing that he is entitled to placement in a BOP residential reentry center ("RRC") because he is within six months of his release date. Doc. 64 at 6-7. He argues that staff "is denying New York State prisoners halfway hous[ing] because NYC is ... a 'Hot Zone' and the halfway houses are closed." Doc. 60 at 3.

### II. Standard

#### A. Compassionate Release

**\*2** A court may not "modify a term of imprisonment once it has been imposed except pursuant to statute." *U.S. v. Roberts*, No. 18 Crim. 528-5 (JMF), 2020 WL 1700032, at \*1 (S.D.N.Y. Apr. 8, 2020) (citation omitted). Under § 3582(c)(1)(A)(i), a court may reduce a prisoner's sentence when it finds that there are "extraordinary and compelling reasons" warranting a reduction.

The policy statement in U.S. Sentencing Guidelines § 1B1.13 guides the Court's discretion in applying this standard. In relevant part, the Guidelines place three conditions on a determination of early release:

> (1) Extraordinary and compelling reasons warrant the reduction; ...

> (2) The defendant is not a danger to the safety of any other person or to the community ... and

> (3) The reduction is consistent with this policy statement.

*Id.* The Guidelines include as an "extraordinary and compelling reason" the existence of "a serious physical or medical condition ... that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* cmt. 1(A)(ii)(I).

When determining whether a prisoner is a danger to the community, § 1B1.13 refers to 18 U.S.C. § 3142(g), which in turn lists the following factors to be considered:

> (1) the nature and circumstances of the offense charged ...;

> (2) the weight of the evidence against the person;

> (3) the history and characteristics of the person ...; and

> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

If the sentencing court finds that "extraordinary and compelling reasons" exist, it "may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Section 3553(a) provides that the Court should consider, *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant."

**B. Equal Protection**

The Equal Protection Clause directs that " 'all persons similarly situated should be treated alike.' " *Lanning v. City of Glens Falls*, 908 F.3d 19, 29 (2d Cir. 2018) (*City*

*of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). For a prisoner to assert an Equal Protection claim, he "must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" and that "the disparity in treatment ... was not reasonably related to any legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citations omitted); *Lee v. Governor of the State of New York*, 87 F.3d 55, 60 (2d Cir. 1996) ("Because prisoners either in the aggregate or specified by offense are not a suspect class, the 1994 Act and Executive Order will be upheld if they are rationally related to a legitimate state interest.").

**III. Discussion**

**A. Compassionate Release**

Saxon fails to put forth extraordinary and compelling reasons for a sentence reduction. Of the several medical conditions Saxon alleges, only chronic kidney disease would put him at increased risk from contracting COVID-19 according to the Centers for Disease Control and Prevention ("CDC"). [5] However, Saxon provides no documentary support that he has been diagnosed with chronic kidney disease. Saxon affixes bloodwork results from July 31, 2019 showing that his Glomerular Filtration Rate [6] ("eGFR") was measured once at over 60. Doc. 64-1 at 2. The results themselves explain that a GFR *under* 60 "suggests a chronic kidney disease if found over a 3 month period." *Id.* His documentation evidences neither circumstance.

**\*3** Of the other conditions Saxon alleges, smoking and hypertension are listed by the CDC as conditions that "might" put people at an increased risk from COVID-19 infection. CDC Website. While it appears from Saxon's submissions that he is a smoker, he provides scattershot evidence of hypertension. Docs. 64 at 3; 67 at 7; 67-1 at 37. Saxon attaches approximately 14 blood pressure readings spanning from 2013 to 2020, none of which reflect a diagnosis. Docs. 60-1 at 16-40; 64-1 at 9-21; 67-1 at 13-38. Indeed, the most recent record he provides, which is from February 9, 2020, shows that his blood pressure was 119/78, which is below the threshold for high blood pressure. [7] Docs. 64-1 at 9; 66 at 2; 67-1 at 6. Moreover, even if he does have hypertension, being a smoker and having high blood pressure are common conditions and do not rise to the level of extraordinary and compelling circumstances warranting release. *U.S. v. Mata*, No. 11 Crim. 435 (VM), 2020 WL 3619537, at \*1

(S.D.N.Y. July 2, 2020) (denying compassionate release to 47 year old inmate with a history of hypertension and smoking, as well as other health concerns).

In addition, Saxon refers in his initial submission and renewed motion to a "long history" of breathing problems such as shortness of breath, wheezing, and chest pains. Docs. 60 at 4; 64 at 3. The documentation he provides shows that he has hypertrophy of the nasal turbinates and a history nasal polyps, both of which can obstruct breathing. [8] Doc. 60-1 at 20, 30. The exhibits also show that he may have sleep apnea. Doc. 60-1 at 40. However, none of these conditions are listed by the CDC as exacerbating COVID-19 infection. CDC Website. Nor are the remaining conditions Saxon cites— hyperthyroidism and keratoconus [9]—known comorbidities with COVID-19. CDC Website. In sum, none of the conditions he alleges make him particularly vulnerable from COVID-19 such that compassionate release is mandated. Woody, 2020 WL 2989206, at *3 (denying compassionate release where inmate "does not report any health issues that would make him particularly vulnerable to COVID-19.").

Moreover, even if Saxon had shown extraordinary and compelling reasons supporting his early release, any sentence reduction would be inconsistent with the factors enumerated in § 3553(a). While the Court has no reason to doubt Saxon's assertions that he has completed his programming and has served his sentence without incident, and commends him for these achievements, they do not change the seriousness of the underlying offense in this case. Doc. 67 at 6. Saxon was arrested for a home invasion during which he shot at one of the inhabitants and then pleaded guilty to the distribution and possession of several controlled substances. Doc. 55 at 1, 3-4. U.S. v. Gordon, 126 F. App'x 12, 13-14 (2d Cir. 2005) (quoting U.S. v. Reese, 33 F.3d 166, 174 (2d Cir. 1994)) ("A sentencing court may rely on 'hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.' "). These circumstances justify his 120-month sentence.

**B. Equal Protection**

Saxon's Equal Protection claim is also unconvincing. As noted, his sentence is rational under the sentencing framework. Wright v. Lindsay, No. 09 Civ. 4226 (KAM) (LB), 2010 WL 625360, at *7 (E.D.N.Y. Feb. 18, 2010) (rejecting prisoner's Equal Protection claim in part because shorter RRC placement than desired was "reasonably related to legitimate penal interests"). Saxon also provides no evidence to suggest that BOP has not placed him in an RRC "because of purposeful discrimination against him." Id. (rejecting prisoner's Equal Protection claim also because decisionmakers lacked discriminatory motive). In fact, he notes that the reason he cannot yet obtain an RRC placement is because New York is a " 'Hot Zone' " for COVID-19 exposure. Doc. 60 at 3. This is a rational, non-discriminatory reason not to place him in an RRC at this time, especially when it has been reported that "halfway houses are uniquely positioned to be vectors for the virus" because "[r]esidents arrive from prisons across the country, then share rooms, bathrooms, and dining areas." [10]

**\*4** Accordingly, Saxon's request for compassionate release is denied on all grounds raised.

**IV. Conclusion**
For all of these reasons, Saxon's motion is denied. The Clerk is respectfully directed to terminate the motion, Doc. 67.

Chambers will mail a copy of this Order to Torrell Saxon, #66770054, FCI Hazelton, P.O. Box 5000, Bruceton Mills, W.V. 26525.

It is SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 4548078

---

# Footnotes

1    On July 27, 2020, the Court received an additional submission from Saxon in which he makes substantially the same arguments for his early release. Doc. 67.

2    *Find an Inmate*, BOP, https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited August 4, 2020).

3    *COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited Aug. 4, 2020). The Government, and local reporting, however, indicate that at least one inmate had tested positive for coronavirus as of July 8, 2020. Doc. 66 at 2; Josh Croup, *FCI Hazelton reports 2 cases of COVID-19*, WDTV, https://www.wdtv.com/2020/07/08/fci-hazelton-reports-2-cases-of-covid-19/ (July 8, 2020). It seems the resolution of that case is not reflected in the BOP statistics, as there is no inmate recovery or death listed.

4    Saxon also moves under the CARES Act but that statute "did not create any new rights or judicial remedies for prisoners under Section 3624(c)(2)[,]" the provision governing pre-release custody of prisoners. *U.S. v. Woody*, —— F. Supp. 3d ——, 2020 WL 2989206, at *2 (S.D.N.Y. May 29, 2020); *U.S. v. Ogarro*, No. 18 Crim. 373-9 (RJS), 2020 WL 1876300, at *6 (S.D.N.Y. Apr. 14, 2020) (noting the Court lacks authority under the CARES Act to amend a prisoner's sentence). Therefore, the Court denies Saxon's motion as to that claim.

5    *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (July 30, 2020) ("CDC Website").

6    "GFR is Glomerular Filtration Rate and it is a key indicator of renal function. eGFR is estimated GFR and is a mathematically derived entity based on a patient's serum creatinine level, age, sex and race." *About eGFR*, The Renal Assoc., https://renal.org/information-resources/the-uk-eckd-guide/about-egfr/ (last visited Aug. 4, 2020). The Renal Association emphasizes that values around 60 should not be "over-interpreted" and the importance of repeat testing. *Id.*

7    *High Blood Pressure*, Am. Heart Assoc., https://www.heart.org/en/health-topics/high-blood-pressure (last visited Aug. 4, 2020).

8    *Turbinate Hypertrophy*, UCI Health, http://www.ucihealth.org/medical-services/ear-nose-throat-ent/nose-sinus-disorders/turbinate-hypertrophy (last visited Aug. 4, 2020); Dr. Loretta Lanphier, *Nasal Polyps*, OAW Health, https://oawhealth.com/condition/nasal-polyps/ (last visited Aug. 4, 2020).

9    Keratoconus is a condition of the eye that distorts vision. *Keratoconus*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/keratoconus/symptoms-causes/syc-20351352 (last visited Aug. 4, 2020).

10    Liliana Segura, *As Coronavirus Spreads in Federal Prisons, Cases in Halfway Houses are Being Undercounted*, The Intercept, https://theintercept.com/2020/05/28/coronavirus-federal-prison-halfway-houses/ (May 28, 2020); *see also* Joseph Neff, *Photos Show No Social Distancing in Federal Halfway House*, The Marshall Project, https://www.themarshallproject.org/2020/05/15/photos-show-no-social-distancing-in-federal-halfway-house (May 15, 2020).

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3115940

NOT FOR PUBLICATION
United States District Court, D. New Hampshire.

Darren BRADY, Plaintiff

v.

WEEKS MEDICAL CENTER
and John Ford, M.D., Defendants

Case No. 19-cv-655-SM
|
Signed 07/22/2021

**Attorneys and Law Firms**

Darren Brady, Whitefield, NH, Pro Se.

Beth G. Catenza, Sulloway & Hollis PLLC, Concord, NH. Marrielle B. Van Rossum, Devine, Millimet & Branch, Manchester, NH, for Defendants.

**ORDER**

Steven J. McAuliffe, United States District Judge

**\*1** Pro se plaintiff, Darren Brady, brings this action seeking damages for alleged violations of state and federal law. Specifically, he claims that the defendants, Weeks Medical Center ("WMC") and Dr. John Ford, refused to provide him with required medical treatment when he presented to the WMC Emergency Department complaining of back pain. Moreover, says defendants' wrongful conduct was motivated by a racially discriminatory animus. He advances claims under the Emergency Medical Treatment and Active Labor Act, Title VI of the Civil Rights Act of 1964, and New Hampshire's Law Against Discrimination. He also brings common law claims for medical malpractice.

Defendants move for summary judgment on all remaining claims in Brady's complaint, asserting that there are no genuinely disputed material facts and saying they are entitled to judgment as a matter of law. For the reasons discussed, that motion is granted.

**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted). Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit." Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).

When objecting to a motion for summary judgment, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." Perez v. Lorraine Enters., 769 F.3d 23, 29–30 (1st Cir. 2014). In other words, "a laundry list of possibilities and hypotheticals" and "[s]peculation about mere possibilities, without more, is not enough to stave off summary judgment." Tobin v. Fed. Express Corp., 775 F.3d 448, 451–52 (1st Cir. 2014). See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**Background**

On June 2, 2018, shortly after 8:00 p.m., Brady presented to the WMC Emergency Department, complaining of lower back pain. Based on prior experience with similar discomfort, he assumed it was a recurrence of sciatica. Other than pain radiating from his back and into his leg, Brady had no other complaints or medical issues.

After checking in at reception, Brady was taken to an examination room. There, a triage nurse took his medical history and vital signs, including blood pressure, pulse, temperature, and oxygen saturation rate. All were normal. At his deposition, Brady testified that he felt the nurse did her job appropriately and he had no complaints with the manner or scope of her examination.

**\*2** Once the triage nurse completed her initial interview and examination, she informed Dr. Ford that Brady was ready

for him. Dr. Ford entered the examination room and Brady described the severity and location of his pain. Dr. Ford believed that the more Brady explained his situation, the more he began to contradict himself by giving varying descriptions of the location of his pain.

> I remember entering the examination room after the triage nurse completed her assessment. Mr. Brady was unaccompanied, and I recall that he was lying on his stomach on the stretcher, which is unusual for someone with back pain. I began speaking with Mr. Brady about his back pain to understand the location and quality of the pain. Mr. Brady gave me varying descriptions. First, he described the back pain as radiating down to his knee, but then he said it was radiating into his groin. In a third version, Mr. Brady said that the pain radiated down to his foot. I recall asking Mr. Brady about these inconsistencies, and trying to do so nicely.

John E. Ford, M.D., Answers to Interrogatories (document no. 26-7) at 14.

As the interaction between the two men continued, Brady became increasingly animated, agitated, and loud. See, e.g., Deposition of Darren Brady (document no. 26-4) at 70 ("[Dr. Ford] said I was making too much noise, and I'm overreacting. I'm — I shouldn't be screaming... and because I was screaming and making a fuss about it, that I was overreacting"); id. at 72 (testifying that he wanted Dr. Ford to "do something to take away me screaming and yelling."); see also John E. Ford, M.D., Answers to Interrogatories at 14 ("I could not complete taking Mr. Brady's history or begin a physical examination because Mr. Brady became angry and began swearing."). The parties disagree as to whether Dr. Ford simply refused to treat Brady, see Brady Deposition at 82 ("They told me I had to leave. He said I wasn't experiencing any pain. They said you got to leave."), or whether Brady terminated his interaction with Dr. Ford, see, e.g., Weeks Medical Center ED Report (document no. 26-3) at 2 ("[Mr. Brady] became angry and stated he would go to LRH for

better care and did not allow further history to be obtained or exam."); see also Ambulatory Assessment (document no. 26-3) at 6, 7, & 8 (noting that Brady was discharged from the hospital "AMA" - that is, against medical advice).

All agree that Brady left the examination room and, as he was making his way back to the waiting area, he fell to the ground. One witness reported that Brady was "very loud and thrashing on the floor." Statement of Triage Nurse Rebecca Shanks (document no. 26-6) at 1. Nurse Shanks further recounted that, "Dr. Ford went to the ED waiting room and tried to talk to the patient, with no success. After the patient wouldn't talk to Dr. Ford, and continued to be loud, the Lancaster Police Department was notified to come for assistance." Id. See also Statement of Security Officer Richard Gilson (document no. 26-6) at 2 ("I heard him yelling and cursing out the doctor, saying he was leaving. Doctor Ford came out of the ER and asked the person to return so he could treat him, the person yelled he did not want to stay at Weeks and was leaving. He wanted to make a phone call, went to the ER waiting room, grabbed the phone, [and] flopped on the floor, yelling on the floor. After that he stayed on the floor.... He was cursing and yelling so loud he was intimidating other people in the waiting room and they left.").

**\*3** Eventually, an officer escorted Brady to the exit where he apparently fell to the ground again. See id. ("The police officer asked him to leave the building.... When he got outside, he flopped onto the sidewalk and started yelling and screaming again."). A family member recorded a portion of those events, which Brady published to the internet. See https://www.youtube.com/watch?v=rh0RDY_pS8s. That video shows Brady alternating between shouting obscenities at the officer and rolling around on the ground, moaning in apparent pain. Brady also appears to be directing the person producing the video to make certain that she captures particular aspects of the scene.

Brady testified that although he was in significant pain, he was never "in fear of [his] life," noting that "I've had this situation before in Littleton so I already know it's not life-or-death situation." Brady Deposition at 56. When asked what led him to conclude that racial animus affected the way defendants treated him, Brady testified that:

> So to answer your question is – is that without the proper information that know if he has – him or the hospital has called the cops on past patients seeking help, I don't have the information. Going by what the townspeople say – and going by my own observations, no patient, white, Jewish,

Chinese, the hospital's never called the cops on anyone. So why do I believe that the incident is based upon my race is because it's never happened before in that hospital.

\* \* \*

Another reason I believe it was my race, maybe they think black people handle pain better. I don't know what was going on in his mind. Maybe he think black people lying. He believes the pain wasn't shooting down to my leg. I can't answer that question.

Brady Deposition at 78-80. Later in his deposition, Brady was again asked why he believed Dr. Ford's allegedly skeptical attitude toward him was motivated by racial animus.

> I don't know. I don't know. Like again I said he could have wanted to go eat. He could have had a phone call. He could have had more patients that he felt needed his help more. I don't know per se if it was because my skin color, but what I do feel is me being black had something to do with it.

Id. at 133. When asked whether Dr. Ford used any derogatory language with him, Brady said, "No. It just seemed like it was a debate. Seemed like he just wanted to debate whether or not the pain was coming from my back down to my lower thighs and stuff." Id. at 81. [1]

There is no evidence that WMC or Dr. Ford failed to comply with any of the hospital's procedures in dealing with Brady, nor is there any evidence (other than Brady's testimony about his "beliefs") that he was treated differently than any other patient under similar (albeit fairly unusual) circumstances.

After Brady left WMC, his girlfriend drove him to another local hospital, where he was observed to be in "mild to moderate distress" with "some left lower sciatic and buttock tenderness." Littleton Regional Healthcare Emergency Department Report (document no. 26-5) at 2. Again, all his vital signs were normal. He was given Toradol (a non-narcotic pain reliever and anti-inflammatory) and Flexeril (a muscle relaxant used to treat spasms) and discharged.

Brady subsequently filed this action. Discovery closed approximately six months ago and the date by which Brady was to have disclosed expert medical witnesses passed more than eight months ago. See Order on Preliminary Pretrial Conference (document no. 11). Brady did not disclose any expert witnesses. Nor did he depose any of the relevant witnesses. Nor did he respond to at least two orders issued by the magistrate judge. By order dated April 27, 2021 (document no. 31), Brady was directed to show cause why this action should not be dismissed due to his failure to prosecute or otherwise comply with the orders of the court. Brady filed a non-responsive reply (document no. 37), in which he complained of judicial corruption and stated that "the reason to allow my case to move forward is simply cause of the face of justice." Id.

**\*4** Parenthetically, the court notes that while Brady is pro se, he is no stranger to state and federal civil litigation. He is, therefore, generally familiar with the rules of court, as well as the requirements of pretrial discovery and motion practice. [2]

**Discussion**

Brady's claims can be divided into two broad categories: those relating to the quality of medical treatment he received and those related to racial discrimination.

I. Medical Treatment.
Turning first to the claim against Weeks Medical Center under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, the undisputed record evidence reveals that Brady's claim fails as a matter of law.

Broadly speaking, EMTALA imposes two requirements on covered hospitals. "First, it requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. Second, it requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1190 (1st Cir. 1995) (emphasis supplied; citations omitted). So, to prevail on his EMTALA claim against WMC, Brady must establish that:

(1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an <u>appropriate screening</u> in order to <u>determine if she had an emergency medical condition,</u> or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) <u>without first stabilizing</u> the emergency medical condition.

Id. (citing Miller v. Medical Ctr. of Sw. La., 22 F.3d 626, 628 (5th Cir. 1994); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir. 1990) (emphasis supplied)). An "emergency medical condition" is:

a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in —

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

**\*5** (iii) serious dysfunction of any bodily organ or part.

42 U.S.C. § 1395dd(e)(1)(A). "The term 'to stabilize' means, with respect to an emergency medical condition described in paragraph (1)(A), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A).

WMC does not dispute that the first two elements of Brady's EMTALA claim are present. That is, WMC is a participating hospital and Brady arrived at its emergency department seeking treatment. As to the third element of Brady's claim, however, WMC asserts that he cannot, as a matter of law, carry his burden of proof.

In many (if not most) EMTALA cases, expert medical testimony is required to prove a violation of the statute – that is, a plaintiff must provide expert testimony that the screening provided was inappropriate, that the plaintiff suffered from an emergency condition, and/or that the defendant failed to properly stabilize an emergency condition prior to discharge or transfer. Expert testimony is also frequently required to establish a plaintiff's damages (i.e., that the plaintiff's original injury that brought him or her to the hospital was exacerbated by the hospital's misconduct).

Given the facts presented in this case, expert medical testimony is plainly required. Absent such expert testimony, Brady cannot demonstrate to a lay jury that the medical screening he received was "inappropriate." Nor can he show that he was suffering from an "emergency medical condition," since it's entirely unclear whether back pain of the sort Brady described meets the statutory definition. See 42 U.S.C. § 1395dd(e)(1)(A). Nor can he demonstrate that he was improperly discharged or turned away without necessary and proper "stabilization" (or even that such "stabilization" was required, given his condition). See Cruz-Vazquez v. Mennonite Gen. Hosp., Inc., 613 F.3d 54, 56–57 (1st Cir. 2010) (discussing the need for expert medical testimony in EMTALA cases); Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 36–37 (1st Cir. 2001) (same); see generally Alvarez-Torres v. Ryder Mem'l Hosp., Inc., 582 F.3d 47, 51–52 (1st Cir. 2009) ("The duty to stabilize under EMTALA does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient.") (citation and internal punctuation omitted).

The same is true with respect to Brady's common law medical malpractice claims against both WMC and Dr. Ford: absent expert medical testimony, those claims cannot proceed. See N.H. Rev. Stat. Ann. ("RSA") 507-E:2 (requiring, in any case seeking compensation for medical injury, expert medical testimony: (1) as to the standard of reasonable medical practice in the particular field or specialty at issue; (2) that the medical care provider failed to act in accordance with that standard; and (3) that, as a proximate result, the plaintiff suffered injuries); see also Smith v. HCA Health Servs. of

New Hampshire, Inc., 159 N.H. 158, 161, 977 A.2d 534 (2009); Goudreault v. Kleeman, 158 N.H. 236, 245, 965 A.2d 1040 (2009).

## II. Racial Discrimination.

**\*6** Brady also claims he was the victim of racial discrimination in violation of both state and federal law.

See Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq., and New Hampshire's Law Against Discrimination, RSA ch. 354-A. Those claims also fail as a matter of law.

Title VI provides that "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Generally speaking, then, Brady must show that "defendant[s] treated members of one race differently and less favorably than members of another race and that the defendant[s] did so with a racially discriminatory purpose." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 980 F.3d 157, 195–96 (1st Cir. 2020) (citing Washington v. Davis, 426 U.S. 229, 239-40, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Alexander v. Sandoval, 532 U.S. 275, 280, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); and Goodman v. Bowdoin Coll., 380 F.3d 33, 43 (1st Cir. 2004)).

Initially, Brady must make out a prima facie case showing that defendants acted with a racially discriminatory animus and that there was a causal connection between that discriminatory animus and defendants' treatment of him. See generally Doe v. Brown Univ., No. CV 17-191-JJM-LDA, 505 F.Supp.3d 65, 2020 WL 5729427, at \*9 (D.R.I. Sept. 24, 2020) (discussing the elements of the burden-shifting analysis employed in discrimination cases) (citing Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 602–03, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); Sandoval, 532 U.S. at 280, 121 S.Ct. 1511; and Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media, —— U.S. ——, 140 S. Ct. 1009, 1014-15, 206 L.Ed.2d 356 (2020)); see also Cornelius-Millan v. Caribbean Univ., Inc., 261 F. Supp. 3d 143, 150 (D.P.R. 2016) (explaining why and how courts have applied

the McDonnell Douglas burden-shifting framework to claims under Title VI); Rashdan v. Geissberger, 764 F.3d 1179, 1182 (9th Cir. 2014) (joining the other circuit courts of appeals that have applied the McDonnell Douglas burden-shifting framework to disparate treatment claims under Title VI). If Brady were to make out a prima facie case of discrimination, defendants would then have to respond with a racially neutral explanation for their conduct. If defendants did so, the burden would revert to Brady to demonstrate that defendants' explanation is merely a pretext for racial discrimination.

To prevail on his claim under New Hampshire's Law Against Discrimination, Brady must demonstrate that one or both defendants intentionally discriminated against him on the basis of his race. See RSA 354-A:17; see also Franklin Lodge of Elks v. Marcoux, 149 N.H. 581, 590, 825 A.2d 480, 488 (2003) ("The plain language of this provision, standing alone, suggests that a complainant must show intentional misconduct in order to prevail.").

In short, then, to prevail on either of his racial discrimination claims, Brady must be able to demonstrate that the defendants' discrimination against him was intentional and that his race (African American) was a motivating factor in (if not the "but-for" cause for) their allegedly deficient medical treatment of him and/or their decision to contact the police when he became disruptive. Such evidence is, however, entirely lacking.

**\*7** Brady bases his discrimination claims solely upon his personal experience, perceptions, beliefs, and "what the townspeople say." See generally Brady Deposition at 78-81. He concedes that Dr. Ford never used any racially-charged or disparaging language, and he has not pointed to any evidence suggesting that anyone else at the hospital did so. He also admits that he was "screaming," "yelling," and disruptive. For their part, defendants have offered legitimate, non-discriminatory explanations for their conduct. First, they say that Brady became so angry and unruly that Dr. Ford could not complete his examination of him. Next, they explain that hospital security (and eventually the local police) were contacted because Brady was causing a loud disturbance in the Emergency Department waiting area – an explanation supported by, among other things, the video Brady uploaded to the Internet, which shows him being loud, abusive, and profane. Consequently, even if Brady had been able to establish a prima facie case of discrimination, he has failed to rebut defendants' legitimate, non-discriminatory explanations for their conduct.

#### Conclusion

The court need not belabor the point. Brady cannot prevail on his medical claims because, under the circumstances presented, they require the testimony of a medical expert and Brady has disclosed none. He cannot prevail on his racial discrimination claims because he has failed to point to any admissible evidence even hinting that defendants' actions were motivated by a racial animus and nothing in the record suggests any racial animus by anyone associated with the hospital.

For the foregoing reasons, as well as those set forth in defendants' memorandum of law, defendants' Motion for Summary Judgment (**document no. 26**) is granted. Plaintiff's Motion for Summary Judgment (**document no. 28**) is denied. All other pending motions are denied as moot.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3115940, 2021 DNH 114

---

### Footnotes

1    Although defendants' counsel only alludes to the issue during Brady's deposition, it is, perhaps, worth noting that Brady's interaction with Dr. Ford occurred during the height of New Hampshire's opioid crisis.

2    In this court alone, Brady has filed at least five civil actions (including this one) in the past three years. See Brady v. Whitefield Police Dept., No. 19-cv-147-JL; Brady v. Family Dollar, Inc., 19-cv-616-SM; Brady v. Roberts, 20-cv-208-PB; and Brady v. Roberts, 20-cv-209-SM.

He appears to have been equally busy in the state court system. See, e.g., Brady v. Weeks Medical Center, No. 214-2018-CV-00094 (N.H. Super. Ct., Coos Cnty., Feb. 21, 2019); Brady v. Holmander, No. 2018-0494, 2019 WL 2375376 (N.H. May 6, 2019); Brady v. Holmander, No. 2018-0351, 2019 WL 2373743 (N.H. May 3, 2019); Brady v. Family Dollar, Inc., No. 2018-0443, 2019 WL 1437224 (N.H. Mar. 29, 2019); Brady v. St. Pierre, No. 2018-0075, 2019 WL 1255555 (N.H. Feb. 22, 2019).

---

**End of Document**                                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1230334

United States District Court, D. New Hampshire.

Prealou J. ROBERTS, Plaintiff

v.

WENTWORTH–DOUGLASS HOSPITAL, PrimeCare Medical, Inc., and Tracy Warren, R.N., Defendants.

No. 09–cv–34–SM.
|
March 29, 2011.

**Attorneys and Law Firms**

Prealou J. Roberts, Manchester, NH, pro se.

Kenneth C. Bartholomew, Rath Young & Pignatelli PA, Concord, NH, for Defendant.

**ORDER**

STEVEN J. McAULIFFE, Chief Judge.

**\*1** Pro se plaintiff, Prealou Roberts, brings this action seeking damages for alleged violations of his constitutionally protected rights. *See generally* 42 U.S.C. § 1983. He also claims he was the victim of medical malpractice. Specifically, Roberts says that while he was a pretrial detainee housed at the Sullivan County Department of Corrections ("SCDOC"), defendants denied him adequate medical care and subjected him to unnecessary surgery.

Pending before the court are two dispositive motions: a motion to dismiss, filed by Wentworth–Douglass Hospital; and a motion for summary judgment, filed by PrimeCare Medical, Inc. ("PrimeCare") and Tracy Warren, R.N. For the reasons discussed below, those motions are granted.

**Background**

Because Roberts failed to object to either of the pending dispositive motions, the court must take as admitted the factual statement recited in Primecare's motion for summary judgment, as supported by the attached exhibits. *See* Local Rule 7.2(b)(2) ("All properly supported material facts set forth in the moving party's factual statement shall be deemed admitted unless properly opposed by the adverse party."). *See*

*also* *Cordi–Allen v. Halloran,* 470 F.3d 25, 28 (1st Cir.2006); *McCrory v. Spigel (In re Spigel),* 260 F.3d 27, 31 (1st Cir.2001). In particular, the court has drawn extensively from the unrebutted affidavit of Tracy Warren (document no. 53–2).

In 2006, Roberts was incarcerated at the SCDOC, as a pretrial detainee. [1] In May of that year, he complained of having coughed up blood and was referred out of the facility for a chest CT scan. A radiologist (who is not a party to this litigation) read the CT scan and arrived at the following differential diagnosis: splenic hematoma, hemangioma, sarcoid, lymphoma, or metastasis. She suggested that Roberts undergo clinical testing to confirm (or contradict) her impressions. Approximately three weeks later, Roberts was found unresponsive in his cell and transported to Wentworth–Douglass Hospital. He was eventually stabilized and discharged the following day.

On July 5, 2006, Roberts went to Wentworth–Douglass Hospital to consult with a surgeon about the lesions that were found on his spleen. The consulting surgeon's notes indicate that he suspected Roberts had lymphoma and recommended a laparoscopic splenectomy—a surgical procedure during which part or all of the spleen is removed. Those notes also indicate (though Roberts apparently denies) that the consulting physician discussed the procedure and its risks at length with Roberts and that Roberts consented to the procedure. Surgery was performed on August 4, 2006, and Roberts remained hospitalized until August 18.

Following his surgery and while recuperating at Wentworth–Douglass Hospital, Roberts was seen by a pulmonologist, who noted that Roberts had a vocal cord polyp and recommended that he see an Ear, Nose and Throat specialist. Accordingly, on November 20, 2006, Roberts was transported to see an ENT, for evaluation. An endoscopic examination revealed bilateral lesions on his vocal cords. And, on December 20, 2006, Roberts underwent surgery. The hospital's records include an informed consent form, apparently signed by Roberts, tending to establish that he was informed of the risks associated with the proposed procedure and that he consented to it.

**\*2** As construed by the Magistrate Judge, Roberts' complaint advances two types of claims:

(1) Fourteenth Amendment claims, premised upon the denial of adequate medical care, against Warren and PrimeCare Medical Services; and (2) state law negligence claims against PrimeCare Medical Services [and] Wentworth–Douglass Hospital.

Report and Recommendation (document no. 16) at 18. In essence, Roberts claims he was subjected to unnecessary surgical procedures-procedures he says were performed without his consent. On July 22, 2009, the court stayed Roberts' state law medical negligence claims against PrimeCare and Wentworth–Douglass and, pursuant to N.H.Rev.Stat. Ann. ("RSA") 519–B:4, referred the matter to the New Hampshire medical review panel. But, as described by the panel, Roberts' claims were dismissed after he repeatedly failed to comply with panel orders to provide relevant discovery and to disclose an expert witness (which is necessary, under New Hampshire law, to prove a medical negligence claim).

This issue has a significant history. Following a telephonic structuring conference, a structuring order issued November 10, 2009 which in part *ordered plaintiff's expert disclosure* by March 1, 2010 and completion of all discovery by June 1, 2010. A panel hearing was scheduled by the court for July 6, 2010. On or about January 8, 2010 WDH filed a Motion to Compel Discovery based on plaintiff's failure to properly respond to interrogatories served on him by WDH. On February 24, 2010 the undersigned conducted a telephonic hearing on that motion and issued an order dated March 1, 2010 which required the plaintiff to provide complete written answers to a number of interrogatories, excused him from answering others, and required plaintiff to execute and return certain authorizations requested by WDH. *The plaintiff was ordered to comply with this order by March 15, 2010, a date which was selected by the plaintiff.* (A copy of the March 1, 2010 order is attached.)

On or about April 14, 2010 WDH filed a Motion for Dismissal of Panel Proceeding again based on *plaintiff's multiple failures to comply with discovery orders including a failure to provide an expert disclosure,* incomplete interrogatory answers and a failure to provide the signed authorizations. The plaintiff again failed to object. That motion was joined by defendants PrimeCare Medical Inc. and Tracy Warren, RN. *A record hearing on this motion was held at the U.S. District Court on May 14, 2010 at which the plaintiff appeared and represented himself.* An order issued May 14, 2010 (copy attached) denying the motion to dismiss without prejudice and required the plaintiff to provide complete interrogatory answers and certain records by June 1, 2010, provide completed medical authorizations by May 20, 2010, and provide a complete expert disclosure by June 15, 2010. Paragraph 6 of that order noted (and the record of the hearing will verify) that *these dates were agreed to by the plaintiff and he was clearly advised by the undersigned as panel chair on several occasions that his failure to comply with this order would result in a dismissal of his action if requested by the defendants.*

**\*3** Based on WDH's renewed motion to dismiss and the amendment to which the plaintiff has not objected it appears that the *plaintiff has completely failed to comply with the order of March 14, 2010.*

*Roberts v. Wentworth–Douglass Hosp.,* Order of the Medical Review Panel (Oct. 14, 2010) (document no. 48–1) (emphasis supplied). Given plaintiff's repeated failure (or refusal) to comply with discovery orders, and pursuant to RSA 519–B:4 VII(a), the Medical Review Panel dismissed Roberts' claims, with prejudice.

Wentworth–Douglass Hospital now moves to dismiss Roberts' claims, pointing out that, as he did before the medical panel, Roberts has failed to timely disclose a medical expert. Accordingly, says Wentworth–Douglass, he cannot, as a matter of New Hampshire law, succeed on his state medical negligence claim, nor can he succeed on his constitutional claims. PrimeCare and Tracy Warren move for summary judgment, advancing the same argument: given his failure to disclose an expert medical witness, Roberts cannot prevail on any of his claims. As noted above, Roberts has not responded to either motion.

## Discussion

### I. *Roberts' Constitutional Claim.*

In order to prevail on a section 1983 claim for medical mistreatment, an inmate must show that prison officials demonstrated "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

Roberts v. Wentworth-Douglass Hospital, Not Reported in F.Supp.2d (2011)

2011 DNH 051

This test has both objective and subjective (state-of-mind) components. *See* DesRosiers v. Moran, 949 F.2d 15, 18 (1st Cir.1991). [2]

With regard to the objective component of the deliberate indifference test, the inmate must show that he or she has suffered a serious deprivation of a fundamental right or basic human need. *See* DesRosiers, 949 F.2d at 18. As the Supreme Court has observed, the Constitution "does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (citation and internal quotation marks omitted). And, in Farmer v. Brennan, 511 U.S. 825 (1994), Justice Souter explained the state-of-mind element of deliberate indifference in the context of an Eighth Amendment claim. *Id.* at 834–47. In short, a prison official is liable "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Id.* at 838.

Accordingly, an Eighth Amendment medical mistreatment claim cannot be premised upon a theory of simple negligence or even medical malpractice; a medical care provider's conduct must go beyond negligence in diagnosing or treating a prisoner's medical condition. *See* Estelle, 429 U.S. at 105–06. Similarly, a constitutional violation does not occur merely because a prisoner happens to disagree with a nurse's or a physician's decision regarding the proper course of medical treatment. *See, e.g.,* Ruiz–Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir.2007) ("[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation."); Watson v. Caton, 984 F.2d 537, 540 (1st Cir.1993) ("The courts have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment.").

**\*4** Instead, to violate the Eighth Amendment—that is, to constitute cruel and unusual punishment—the "care provided must have been so inadequate as to shock the conscience," Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir.2006) (citations and internal punctuation omitted), or "constitute 'an unnecessary and wanton infliction of pain,' or be 'repugnant to the conscience of mankind.' " Estelle, 429 U.S. at 105–06 (citations omitted).

Here, the medical treatment provided to Roberts was not so obviously outrageous or malicious that a trier-of-fact could reasonably conclude that it violated either the Eighth or Fourteenth Amendments. So, to prevail on his constitutional claims, Roberts must provide expert medical testimony. *See, e.g.,* Robinson v. Hager, 292 F.3d 560, 564 (8th Cir.2002); Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.1987). As this court recently observed:

> This court lacks the medical training and expertise necessary to determine, in the absence of expert opinion evidence, whether the medical judgment exercised by the defendant physicians fell below an acceptable standard of professional care, much less that the medical care provided to [plaintiff] was so substandard as to implicate the Eighth Amendment.

\* \* \*

> If [plaintiff] expects to prevail at trial on his constitutional and/or state tort claims in this case, he will need to present expert medical witness testimony.

Boudreau v. Englander, 09–cv–247–SM, 2010 DNH 088 (D.N.H. May 24, 2010). *See also* Smith v. Wrenn, 07–cv–408–SM, 2009 DNH 091 (D.N.H. June 23, 2009)Smith v. Wrenn, 07–cv–408–SM, 2009 DNH 091 (D.N.H. June 23, 2009) ("Absent expert medical testimony suggesting that defendants' treatment of Smith was so far below acceptable medical standards as to constitute an unnecessary and wanton infliction of pain or be repugnant to the conscience of mankind, Smith cannot prevail on his Eighth Amendment claim on the undisputed facts.").

So it is in this case. Roberts has failed to disclose an expert witness, the time for doing so has passed, and he has not sought an extension of that deadline—in fact, he has not even responded to defendants' pending motions. And, absent expert medical testimony suggesting that defendants' treatment of him was so far below acceptable medical standards as be to

repugnant to the conscience of mankind, or that it amounted to an unnecessary and wanton infliction of pain, Roberts cannot prevail on his constitutional claims. [3]

II. *Roberts' State Law Malpractice Claim.*

Under New Hampshire law, a plaintiff cannot prevail on a medical malpractice claim without expert testimony as to the applicable medical standard of care and causation.

> In any action for medical injury, the plaintiff shall have the burden of proving by affirmative evidence which *must include expert testimony* of a competent witness or witnesses:
>
> (a) The standard of reasonable professional practice in the medical care provider's profession or specialty thereof, if any, at the time the medical care in question was rendered; and
>
> **\*5** (b) That the medical care provider failed to act in accordance with such standard; and
>
> (c) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred.

RSA 507–E:2 I (emphasis supplied). Because Roberts has failed to disclosed a medical expert, he cannot, as a matter of law, prevail on his state law medical malpractice claims.

**Conclusion**

For the foregoing reasons, as well as those set forth in defendants' memoranda, the motion to dismiss filed by Wentworth–Douglass Hospital (document no. 52) and the motion for summary judgment filed by PrimeCare Medical, Inc. and Tracy Warren (document no. 53) are granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1230334, 2011 DNH 051

---

**Footnotes**

1    There is some confusion as to whether the events in question took place in 2006 or 2007. In his complaint, Roberts says it was 2007, but concedes that he is uncertain. *See* Complaint at 2. But, all events referenced in the affidavit of Tracy Warren (document no. 53–2) took place in 2006. The court need not resolve that potential dispute in order to address the pending motions.

2    At the time of his alleged injuries, Roberts says he was a pretrial detainee. Accordingly, the constitutional obligations defendants owed to him flow from the provisions of the Fourteenth, rather than the Eighth Amendment. That is, however, a distinction without a significant difference, as the standard by which defendants' conduct is measured is essentially the same under the Eighth and Fourteenth Amendments. *See, e.g.,* *Burrell v. Hampshire County,* 307 F.3d 1, 7 (1st Cir.2002) ( "Pretrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases."). *See also* *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983).

3    One can easily imagine countless scenarios in which a defendant's conduct might be so outrageous and so obviously undertaken either with intent to injure an inmate or with deliberate indifference to the inmate's well-being that expert medical testimony would not be necessary. This, however, is not one of those cases.

---

**Roberts v. Wentworth-Douglass Hospital, Not Reported in F.Supp.2d (2011)**

2011 DNH 051

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2012 WL 541089
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Matthew COULOUTE, Jr., Plaintiff,

v.

Amanda RYNCARZ and Stacey Blitsch, Defendants.

No. 11 CV 5986(HB).
|
Feb. 17, 2012.

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

**\*1** Before the Court is a motion to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Matthew Couloute, Jr. ("Plaintiff") filed this Complaint seeking damages against Amanda Ryncarz and Stacey Blitsch (collectively "Defendants") for engaging in tortious interference with prospective business relations when they allegedly posted comments about Plaintiff on an Internet website. For the following reasons, the motion to dismiss is granted and leave to amend the Complaint is denied.

**I. BACKGROUND**

The following is meant to provide context and has no bearing on the present motion: Plaintiff's relationship with Defendant Blitsch began in 2003 in California. They separated sometime after they moved to Atlanta and had a child together. Plaintiff moved to Florida with their son, and Defendant Blitsch followed. Plaintiff now resides in New Jersey. Plaintiff's relationship with Defendant Ryncarz began during Plaintiff's residency in Florida. After they separated, Plaintiff married a third woman not involved in this lawsuit. Both Defendants still reside in Florida.

The following facts are taken from Plaintiff's original Complaint and are assumed to be true for the purposes of this motion to dismiss. Since 2011, Plaintiff has practiced law out of his office in Manhattan. Compl. ¶¶ 7–8. Plaintiff alleges that between December 25, 2010, and May 2011, Defendants posted malicious statements about him on the

website www.liarscheatersrus.com. *Id.* ¶ 9. In particular, Plaintiff asserts that at least the following statements were made by Defendant Ryncarz on or shortly after December 25, 2010:

1. "[Mr. Couloute] lied and cheated all through his 40 years of life." *Id.* ¶ 10.

2. "[Mr. Couloute] [u]ses people/his son/women to get what he wants then dumps you when he's done with them. Has no long term friends. He rents or finances everything and owns absolutely nothing." *Id.*

3. A comment posted anonymously responding to earlier comments, including: "He is very very manipulating he's an attorney so he's great at lying and covering it up without batting an eye." [1] *Id.*

And by Defendant Blitsch on or shortly after January 4, 2011:

1. "[W]hat these ladies have said about his character is very true. I met him and dated briefly and I was taken in with the charm and instant "connection" he claimed we had ... [A]s soon as I started asking questions about other aspects of his life and figured out he wasn't comple[tely] honest he turned cold then disappeared. And of course another male is going to say Matt is a "solid dude" ... if you agree with lieing [sic] and manipulating any female you come in contact with I guess he could be considered that...." *Id.* ¶ 11.

2. A comment referring to Plaintiff's previous legal employer, United Football League: "I came across this site by accident by following a UFL news feed, so your friend Matt has more problems than these posts if in search for the league his name is associated with this site." *Id.* ¶ 12.

**\*2** Plaintiff alleges that Defendants made these statements knowing that Plaintiff was working in New York as an attorney and made them with the aim of interfering with Plaintiff's ability to market his legal skills. In doing so, Defendants "unfairly and maliciously damaged one of Mr. Couloute's most valuable asset [sic] as an attorney, his reputation for honesty and integrity." *Id.* ¶ 13. Plaintiff's proposed Amended Complaint includes the allegation that these statements defamed him, causing present and prospective clients to view Plaintiff in a negative and false light. Am. Compl. ¶ 13. Plaintiff states that due to these

postings, prospective clients are discouraged from contacting Plaintiff for legal services. *Id.* ¶ 14; *see also* Compl. ¶ 14.

Originally and on August 25, 2011, Plaintiff filed this Complaint alleging a single cause of action for tortious interference with prospective business relations. On September 14, 2011, Defendants filed the present motion to dismiss. On October 8, 2011, Plaintiff opposed the motion and requested leave to amend the Complaint to cure deficiencies elicited in Defendants' motion and to add a second cause of action for defamation. Defendants submitted the reply memorandum to their motion on October 18, 2011, where they argued that the Amended Complaint that Plaintiff sought to submit failed to adequately state a claim. On October 20, 2011, Plaintiff submitted a motion to amend and an accompanying memorandum arguing that the Court should accept the Amended Complaint without addressing the concerns Defendants raised regarding the new defamation claim. [2] The Defendants have not sought leave to respond to Plaintiff's most recent memorandum, nor has Plaintiff sought leave to respond to Defendants' arguments regarding the defamation claim. As such, the motion to dismiss and request for leave to amend the Complaint are considered fully briefed.

## II. DISCUSSION

### A. Adequacy of Pleadings and Leave to Amend

The Plaintiff's case may be dismissed to the extent that he "fail[s] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). To survive dismissal on this ground, Plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The Court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific task" that requires application of "judicial experience and common sense." *Id.* at 1950. Unless the Plaintiff's well-pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [Plaintiff's] complaint must be dismissed." *Twombly,* 550 U.S. at 570. Additionally, the court must draw all reasonable inferences in

the non-movant's favor, *Roth v. Jennings,* 489 F.3d 499, 503 (2d Cir.2007), but it "need not accord [l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.,* 503 F.3d 89, 95 (2d Cir.2007) (internal citation and quotation marks omitted).

**\*3** Leave to amend a pleading should be freely granted when justice so requires. Fed.R.Civ.P. 15(a)(2). "[A]bsent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility," the Court will grant leave to amend. *Monahan v. New York City Dept. of Corr.,* 214 F.3d 275 (2d Cir.2000). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss ...." *Lucente v. Inter'l Bus. Machs. Corp.,* 310 F.3d 243 (2d Cir.2002).

### B. Tortious Interference with Prospective Business Relations

Under New York law,[3] to establish a claim for tortious interference with prospective business relations, a plaintiff must establish: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair or improper means; and (4) injury to the business relationship." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 114 (2d Cir.2010).

#### i. Original Complaint

Plaintiff concedes that his original Complaint fails to specify a "relationship with a client that was interfered [with] by Defendants' wrongful conduct as alleged in the complaint."[4] Pl.'s Mem. Opp'n Mot. Dismiss ("Pl.'s Opp'n") 1. This shortcoming alone warrants dismissal of the Complaint. *See, e.g., DiFolco,* 622 F.3d at 115 ("[T]he complaint fails entirely to describe any third party with whom [Plaintiff] had prospective business relations to be interfered with ...."). Because of this admitted defect, I turn to Plaintiff's proposed Amended Complaint which seeks to satisfy the pleading requirements.

#### ii. Proposed Amended Complaint

Plaintiff alleges interference by Defendants with four attorney-client relationships and indicates that these instances are exemplary of Defendants' goal which Plaintiff posits as

sufficient to show interference with Plaintiff's legal practice generally. Am. Compl. ¶¶ 15–22. With respect to the four listed clients:

   a. Client 1, after having read Defendants' comments on or around March 2011, refused to continue his business relationship with Plaintiff;

   b. Client 2, after becoming aware of the comments on September 14, 2011, refused to continue his business relationship with Plaintiff;

   c. Clients 3 and 4, after reading the comments in middle to late 2011, refused to engage in business with Plaintiff;

*Id.* at ¶ 16. Plaintiff states that, based on Defendants' knowledge of Plaintiff's profession and the language used by Defendants (calling him a "liar" and a "cheater"), it was Defendants' intention to reach all of Plaintiff's current and prospective clients. *Id.* ¶¶ 17–18; *see also* Pl.'s Opp'n 3–4 (arguing that Defendants "must have known that Plaintiff had current clients"). Not only was the interference the Defendants' sole motive, the means by which Defendants interfered was improper because the comments were false and defamatory. Am. Compl. ¶ 19.

**\*4** Defendants maintain that the proposed Amended Complaint is still deficient. First, Plaintiff fails to allege that Defendants knew or could have known of a specific business relationship, to say nothing of a failure to make the required showing that it was that client relationship with which she sought to interfere. Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") 3 ("Plaintiff alleges *essentially the opposite*—that defendants were generally directing comments at everyone who might be a client."). Second, Plaintiff fails to demonstrate either that Defendants' sole purpose was to harm his business relations or that Defendants used wrongful means to interfere with those relations. *Id.* at 4–5. With respect to the question of Defendants' purpose in posting the comments, Defendants point to the context in which they were made; a website meant to "allow individuals who have been lied to and cheated on in their personal relationships to express themselves about their experience and to 'find support'...." *Id.* at 5.

For Plaintiffs tortious interference claim to survive, Plaintiff must allege that Defendants "directly interfered with the [identified] business relationship by directing some activities towards the third party and convinc[ing] the third party not to enter into a business relationship with the plaintiff."

*Zdenek Marek v. Old Navy (Apparel), Inc.,* 348 F.Supp.2d

275, 280 (S.D.N.Y.2004) (internal quotation marks omitted);

*see also* *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 768 (2d Cir.1995). Plaintiff fails to point to any client, current or prospective, about which Defendants had knowledge and to whom their comments were directed.

*See* *Old Navy,* 348 F.Supp.2d at 280 ("It is due to this utter failure to allege any knowledge on the part of defendants of any business relationships with which they allegedly interfered that plaintiff's claim must fail."). Plaintiff would have the Court infer from the Defendants' comments (accusing Plaintiff of being a "liar" and a "cheater") and the fact that Defendants "must have known that Plaintiff had current clients" that Defendants specifically targeted those clients. Am. Compl. ¶¶ 17–18; Pl.'s Opp'n 3–4. Plaintiff provides no cases to support the idea that potentially harmful statements posted on a website such as this one, coupled with the knowledge that the statements might be read by third parties, is sufficient to show that one or more relationships were intentionally interfered with by Defendants. In their search for a lawyer, the clients, as asserted by Plaintiff, were influenced by the comments in their decision not to retain Plaintiff's services. [5] Even though Plaintiff's reputation has suffered, I am unwilling to take the leap from generalized comments calling Plaintiff a "liar" and a "cheater"—on a website called "liarscheatersrus" no less—to actions directed at specific business relationships. *See* *Memnon v. Clifford Chance US, LLP,* 667 F.Supp.2d 334, 349 (S.D.N.Y.2009) ("[T]he wrongful conduct that is relevant [is] that which was directed not at the plaintiff, but at the third party with whom the plaintiff has or seeks to have a relationship."); *Dessert Beauty, Inc. v. Fox,* 568 F.Supp.2d 416, 429 (S.D.N.Y.2008) (posting statements on a website directed at the "public and customers at large [was] far too general to constitute a specific third party for purposes of a tortious interference claim" (internal quotation marks omitted)); *see also* *DiFolco,* 622 F.3d at 115 (describing "harm to ... career development, economic harm in the form of lost income and benefits, harm to her professional and personal reputation, and harm consisting of mental anguish and emotional distress" as "too conclusory, vague, and lacking in a factual basis to make out [plaintiff's] tortious interference claim"). To do otherwise would be to elevate conceivable, "defendant-unlawfully-harmed-me" accusations to the level of plausibility. *Iqbal,* 129 S.Ct. at 1949.

**\*5** Plaintiff's claim for tortious interference with prospective business relations is dismissed, and Plaintiff's request for

leave to amend the Complaint as to this claim is denied as futile.

## C. Defamation

A plaintiff asserting a claim for defamation is required to plead: "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) 'of and concerning' the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Albert v. Loksen,* 239 F.3d 256, 265–66 (2d Cir.2001) (footnotes omitted) (citing *Dillon v. City of New York,* 261 A.D.2d 34, 704 N.Y.S.2d 1, 5 (N.Y.App.Div.1999)). "In evaluating whether a cause of action for defamation is successfully pleaded, the words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Dillon,* 704 N.Y.S.2d at 5 (internal brackets omitted). "Courts will not strain to find defamation where none exists. Loose, figurative or hyperbolic statements, even if deprecating the plaintiff, are not actionable." *Id.* (internal quotation marks and citations omitted). And it is well-established that "[t]ruth provides a complete defense to defamation claims." *Dillon,* 704 N.Y.S.2d at 6 (citing, *inter alia,* *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306 (N.Y.1977)).

### i. Plaintiff's Proposed Amended Complaint

Plaintiff seeks leave to amend the Complaint to add an additional claim for defamation. Plaintiff states that Defendants' comments were "untrue and defamatory in that they falsely reported Plaintiff's professional character, actions and statements, and were made with an intent to harm Plaintiff professionally." Am. Compl. ¶ 25. The comments constitute *slander per se* "because they impugn Plaintiff's honesty, trustworthiness, dependability, and professional fitness and abilities by falsely charging [him] with conduct that would tend to injure [his] trade or business." *Id.* at ¶ 29, 397 N.Y.S.2d 943, 366 N.E.2d 1299.

### ii. Defendants' Statements are Hyperbolic Opinions

The key question here is whether, drawing all reasonable inferences in favor of Plaintiff, the comments contain assertions of fact or opinion. The New York Court of Appeals distilled the following three factors which courts are instructed to consider in determining whether a statement is one of fact or opinion:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal [to] readers or listeners that what is being read or heard is likely to be opinion, not fact.

*\*6* *Brian v. Richardson,* 87 N.Y.2d 46, 637 N.Y.S.2d 347, 660 N.E.2d 1126, 1129 (N.Y.1995) (internal quotation marks and citations omitted), *cited in* *Levin v. McPhee,* 119 F.3d 189, 196 (2d Cir.1997). The third factor "lends both depth and difficulty to the analysis" and is critical to determining whether the alleged defamatory statements consist of "assertions of facts [or] nonactionable expressions of opinion." *Id.* It is important for a court to "consider the content of the communications as a whole, as well as its tone and apparent purpose." *Id.* at 1129–30 (citation omitted). "Rather than sifting through a communication for the purpose of isolating and identifying assertions of fact, the court should look to the over-all context in which the assertions were made and determine on that basis whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff." *Id.* at 1130 (internal quotation marks omitted). Beyond the "immediate context in which the disputed words appear," the New York Court of Appeals requires courts to "take into consideration the larger context in which the statements were published, including the nature of the particular forum." *Id.*

Defendants argue that the comments are hyperbolic statements of opinion. *See* Defs.' Reply 8–10. With the possible exception of the statement that Plaintiff "rents or finances everything and owns absolutely nothing"—a statement clearly capable of being proven true or false—

the comments, even if viewed in isolation, are opinion. Defendants state that Plaintiff "lied and cheated all through his 40 years of life", and that, because Plaintiff is an attorney, "he's great at lying and covering it up without batting an eye." Comments such as these are clearly hyperbolic. And when viewed within the larger context of the website on which they were posted, there can be no doubt that a reasonable reader would understand the comments to be opinion. As Defendants note, liarscheatersrus.com is "specifically intended to provide a forum for people to air their grievances about dishonest romantic partners ." *Id.* at 9, 637 N.Y.S.2d 347, 660 N.E.2d 1126. The average reader would know that the comments are "emotionally charged rhetoric" and the "opinions of disappointed lovers." *Id.* Of course the Internet makes it more likely that a greater number of people will read comments such as these, and thereby amplify the impact they may have on a person, but this does not change the underlying nature of the comments themselves. *See* *Sandals Resorts Intern., Ltd. v. Google, Inc.,* 86 A.D.3d 32, 925 N.Y.S.2d 407, 415–16 (N.Y.App.Div.2011) (noting the Internet "encourage[es] a freewheeling, anything-goes writing style", and that "readers give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts" (internal quotation marks omitted)). Because I find that Defendants' comments are opinion, the Plaintiff's request for leave to amend the Complaint to add an additional claim for defamation is denied as futile. *See* Robert D. Sack, *Sack on Defamation* § 4:3.1 (4th ed. 2011) ("If a statement appears in a place usually devoted to, or in a manner usually thought of as representing personal viewpoints, it is also likely to be understood—and deemed by a court—to be nonactionable opinion.").

## III. CONCLUSION

**\*7** For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED, and the Plaintiffs request for leave to amend the Complaint is DENIED. The Clerk of the Court is directed to close the relevant motions and remove the matter from my docket.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 541089

## Footnotes

1    The comment in full reads: "This is the absolute truth about this man!! He will stop communication with you suddenly, then reach out years later as he did with me trying to sweet talk you and make you feel like you're the most special woman in the world that he's been looking for. He is very very manipulating he's an attorney so he's great at lying and covering it up without batting an eye. Our relationship didn't last long as I figured him out pretty quickly but for others, BE FOREWARNED, HE'S SCUM! RUN FAR A WAY!" Compl. ¶ 10.

2    Plaintiff submitted his October 20 memorandum twice, once categorizing it as a Motion to Amend/Correct the Complaint and a second time as a Reply Memorandum in support of that same motion. These memoranda are excerpts from Plaintiff's October 8th opposition memorandum, where the request for leave to amend was originally made.

3    The parties proceed under the assumption that New York law governs the conduct alleged in this case. The possible conflicts of law have not been raised and thus are not presently before the Court. *See* *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) ("The parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." (internal quotation marks omitted)).

4    Defendants point to three shortcomings in the Complaint: Plaintiff failed to (1) specify a specific business relationship that was harmed; (2) allege that any of Defendants' actions were specifically directed at the third parties; and (3) allege that Defendants acted with the sole purpose of harming Plaintiff or used wrongful means. Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Supp.") 6–9.

5    Defendants do not even raise the issue of whether Plaintiff satisfied the "but for" causation requirement in the claim. *See Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 78 (S.D.N.Y.1995) ("[A] plaintiff must allege that, but for defendant's conduct, his prospective business relations would have coalesced into an actual contract."). I am doubtful, though, that Plaintiff has even satisfied this requirement. While Plaintiff says that clients refused to enter into agreements or continue established business relationships with him after reading the comments, *see* Am. Compl. ¶ 16, "mere contentions that third parties canceled contracts ... because of the alleged defamatory remarks made by [Defendants], offered with no factual basis to support the allegations, [are] insufficient to state a cause of action for tortious interference with contractual relations." *M.J. & K. Co. v. Matthew Bender and Co.,* 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (N.Y.App.Div.1995); *see also Fine v. Dudley D. Doernberg & Co.,* 203 A.D.2d 419, 610 N.Y.S.2d 566, 567 (N.Y.App.Div.1994) ("The requirements for establishing liability for interference with prospective contractual relations are more demanding than those for interference with [the] performance of an existing contract." (internal quotation marks omitted)).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4460393
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

AMUSEMENT INDUSTRY, INC., et al., Plaintiffs,

v.

Moses STERN, aka Mark Stern, et al., Defendants.

No. 07 Civ. 11586(LAK)(GWG).
|
Signed Sept. 11, 2014.

*OPINION AND ORDER*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Amusement Industry, Inc., Practical Finance Co.,
Inc., Joshua Safrin, Avery Egert, and the Safrin Group,
LLC (collectively the "Moving Parties") have moved
to amend their pleadings pursuant to Fed.R.Civ.P. 15(a)(2)
and Fed.R.Civ.P. 21. The Moving Parties seek to assert
claims for "deceit" under New York Judiciary Law § 487
against Buchanan Ingersoll & Rooney, P.C. ("Buchanan")
and Stephen Friedman, who are currently parties, and to join
as new parties Hoffinger Stern & Ross LLP ("Hoffinger")
and Stephen Stern, who are or were attorneys appearing in
this case. The proposed claims for deceit are premised on
the alleged wrongful conduct of these attorneys during the
discovery phase of this litigation. Buchanan and Friedman
—whom we will refer to as "the Attorneys"—have filed
submissions opposing the motion. For the following reasons,
the motion to amend is denied.

I. *BACKGROUND*

A. *The Parties' Allegations in the Current Pleadings*
In April 2007, defendant Moses Stern, operating through an
entity called First Republic Group, Corp. ("FRG"), entered
into a contract with non-party Colonial Realty Limited
Partnership for the purchase of a real estate portfolio
consisting of eleven shopping centers. *See* Third Amended
Complaint, filed Apr. 27, 2010 (Docket # 405) ("3d Am.
Compl."), ¶¶ 2, 20. [1] As the closing date approached, Moses
Stern still had not obtained the required amount of financing
for the acquisition, so he authorized Steven Friedman, an

attorney at Buchanan, to help locate potential sources of
financing. *See id.* ¶¶ 2, 22. Defendants Joshua Safrin and
Avery Egert, "who were contributing money to facilitate the
acquisition of the Portfolio," also allegedly played a role in
securing the additional funds needed for the closing. *See id.*
¶ 2.

In June 2007, Friedman approached plaintiff Amusement
Industry, Inc. ("Amusement") and "offered Amusement the
opportunity to invest in the Portfolio." *Id.* ¶ 23. Friedman
"repeatedly represented to Amusement that he had been
retained by [Moses] Stern, Safrin, Egert, and the entity
designated to buy the Colonial Portfolio, which was FRG
Corp. and/or FRG LLC, to act as an attorney for them and
to serve as an agent for them to locate, negotiate and close
financing for the planned acquisition of the Portfolio." *Id*.
¶ 25. In reliance on Friedman's representations, on June
29, 2007, Amusement executed a Letter of Understanding
with Moses Stern in which Amusement agreed to provide
$13 million in financing in exchange for a 50 percent
equity and voting interest in the portfolio. *See id.* ¶¶ 29–
31. Amusement thereafter deposited the $13 million into an
escrow account pending finalization of the agreement. *See
id.* ¶¶ 2, 32–33. Over the course of the next two weeks,
Amusement attempted to negotiate the final agreement
with Moses Stern and the other defendants. *See id.* ¶
35. However, instead of finalizing the financing agreement
with Amusement, defendants unilaterally transferred the $13
million out of the escrow account and completed the purchase
of the portfolio "without [Amusement's] permission and
knowing that they did not have [its] permission." *Id.* ¶¶
3–4; see also *id.* ¶ 40. Specifically, Amusement alleges
that on July 3, 2007, defendant Ephraim Frenkel, who
was the principal of Land Title Associates Agency, LLC
("LTA"), "transferred Amusement's money from the account
into which Amusement had wired the funds into once
controlled by FRG ... [and] disbursed the $13 million in
accordance with instructions from Stern [and] FRG." *Id.* ¶
3. Defendants subsequently attempted to have Amusement
ratify the unauthorized use of its funds, but Amusement
refused. *See id.* ¶ 4.

**\*2** Joshua Safrin, who was alleged to have been involved
as one of the key investors in defendants' real estate scheme,
later contended that "he had no knowledge of any of
the representations or actions described in [Amusement's]
Complaint" and that he was "unaware of the existence
of the Colonial Transaction and the events that occurred
in connection with securing the necessary financing until

shortly before being served with process in late 2007." *See* Safrin Prop. Pl. ¶¶ 8–9. According to Safrin, "[Moses] Stern, Friedman, [and FRG] together with Frenkel, LTA, Buchanan, Steven Alevy/Bankers were an integral part of a conspiracy to defraud Safrin by, among other things, forging his signature on documents relating to the Colonial Transaction ... and by misappropriating Safrin's identity ... in order to secure financing for the Colonial Transaction. *Id.* ¶ 10. Safrin alleges that, when Friedman was negotiating with Amusement on Moses Stern's behalf, Friedman represented that "Safrin and/ or Egert were equity participants in the Colonial Transaction, when [he] knew that neither Safrin nor Egert had made any such commitment and that Egert was not authorized to make any such commitment on behalf of Safrin." *Id.* ¶ 39.

According to Safrin, Moses Stern was able to obtain "a commitment from Citigroup to provide senior and mezzanine financing in the amount of approximately $126 million for the purchase of the Portfolio" based on his "representation to Citigroup that Safrin was a sponsor/investor and would sign carve out and environmental guarantees." *Id.* ¶¶ 40–41. As part of the negotiations for this transaction, Citigroup required that certain financing and organizational documents be signed by Safrin. *Id.* ¶ 51. Thus, many documents pertaining to the financing agreement with Citigroup, as well as to the closing of the Colonial Transaction, purported to contain Safrin's signature. *See id.* ¶¶ 37, 84, 88, 105, 128, 133– 34. However, Safrin contends that he did not sign any documents relating to the negotiations with Citigroup or Amusement and that he was not even aware of the Colonial Transaction until much later. *See id.* ¶¶ 47, 50, 52, 90, 100, 125. Safrin alleges that certain defendants, including Stern, Buchanan, and Friedman, conspired to forge his signature on these documents. *See id.* ¶¶ 165–73; *see also id.* ¶ 87. Safrin has pointed to certain contemporaneous emails between Moses Stern, attorneys at Buchanan and others— referred to as the "wizzy bizzy" emails—in which these individuals discussed the need for Safrin's signature and exchanged various documents containing forgeries of Safrin's signature. *See id.* ¶¶ 84–91, 103–05. As explained by the Moving Parties, wizzy bizzy is "the anonymous email sender who took part in the forgery of Safrin's signatures on the Citigroup loan document." *See* Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 765) ("Mov.Reply"), at 5.

B. *The Alleged Discovery Misconduct*

**\*3**  On December 27, 2007, Amusement and a related company filed the original complaint in this action, seeking to recover $13 million in damages from Moses Stern, Joshua Safrin Ephraim Frenkel and other defendants. *See* Complaint, filed Dec. 27, 2007 (Docket # 1). Amusement raised "claims asserting a security interest in the real estate ... claims of tort resulting from the theft of the funds ... [and] claims related to the agreements reached between the parties and the unjust enrichment of the defendants." 3d Am. Compl. ¶ 5. Since the filing of the original complaint, this case became increasingly complex as other parties have been joined as third party defendants, including Stephen Friedman, Steven Alevy, Buchanan, and Bankers Capital Realty Advisors LLC. *See* Third Party Complaint, filed May 1, 2008 (Docket # 65). Later, Avery Egert and the Safrin Group, LLC were sued as fourth party defendants. *See* Fourth Party Complaint, filed Mar. 17, 2009 (Docket # 238). The various parties have asserted numerous counterclaims, cross-claims, and third party claims.

On March 12, 2008, plaintiffs issued a subpoena to Buchanan, which at that time was a non-party, requesting documents concerning its representation of Moses Stern in the underlying real estate transaction and about Stephen Friedman's financing negotiations with Amusement. *See* Prop. Compl. ¶ 61. Specifically, plaintiffs requested: "Documents sent by [Buchanan] to, and received by [Buchanan] from, Amusement, [Moses] Stern, [FRG], [and] Safrin ... concerning the loans and First Republic LLC's purchase of shopping centers from Colonial in 2007"; "Documents concerning monies received by [Buchanan] or by Friedman from Amusement, [Moses] Stern, [FRG], [and] Safrin ... during the period of April 1, 2007 through December 31, 2007 as to the loans and First Republic LLC's purchase of shopping centers from Colonial in 2007"; "Documents that contain information to induce Citigroup to make the loans"; and "Signature pages that contain a signature of Joshua Safrin, from Documents concerning business or loan transactions." *Id.* (emphasis removed). On March 7, 2008, defendant Safrin similarly issued subpoenas to Buchanan and to Friedman, seeking, "documents concerning Safrin," "documents concerning the negotiation and execution of the Loan Agreement between First Republic LLC and Citibank," "documents concerning the negotiation and execution of the Mezzanine Loan Agreement between [FRG] and Citibank," and "documents and communications concerning the closing of the sale of the Property Portfolio." *Id.* ¶ 62.

Before Buchanan and Friedman complied with the subpoenas, they were contacted by attorneys at Hoffinger about the proper scope of the document production. *See id.* ¶ 64. At that time, Hoffinger and Stephen Stern of that firm were representing Moses Stern in the litigation. *See* Notice of Appearance by Stephen Stern, filed Apr. 11, 2008 (Docket # 50). On April 1, 2008, Stephen Stern wrote a letter to Buchanan attorney John Leathers, stating, "[w]e have been instructed to advise [you that] our clients do NOT waive any privilege including, *inter* alia, the attorney client privilege with respect to any files, documents, communications, etc. in your custody, possession or control and as an outgrowth of your representation of any of our clients." Stephen Stern Letter to Hoffinger, dated Apr. 1, 2008 (annexed as Ex. 1 to Declaration of Jeffrey H. Zaiger in Support of Buchanan Ingersoll & Rooney PC's Opposition to Moving Parties' Joint Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 762) ("Zaiger Decl.")). There followed various communications among Stephen Stern, Leathers, and Friedman regarding Stephen Stern's review of the production and privilege log. *See* April 22 Email Chain, dated Apr. 22, 2008 (annexed as Ex. 2 to Zaiger Decl.). Over the next couple weeks, Stephen Stern searched through the responsive documents and discussed with several attorneys at Buchanan which subpoenaed documents should be withheld. *See* April 23 & 24 Email Chain, dated Apr. 24, 2008 (annexed as Exs. 3–4 to Zaiger Decl.); May 6 & 7 Email Chain, dated May 7, 2008 (annexed as Ex. 5 to Zaiger Decl.). These emails reflect that there was some disagreement between Stephen Stern and the Buchanan attorneys about the proper scope of the document request and about which documents should be withheld. *See generally id.*

 **\*4**  On May 8, 2008, Buchanan and Friedman produced documents and a privilege log in response to plaintiffs' and Safrin's subpoenas. Prop. Compl. ¶ 63. The Moving Parties allege, however, that Buchanan and Friedman "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and that they did so by listing "some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs." *Id.* The Moving Parties further contend that "[Hoffinger] and Attorney [Stephen] Stern communicated with [Buchanan] concerning the production and the privilege log," and Hoffinger and Stephen Stern "had asserted that, as counsel for [Moses] Stern[,] ... they had the 'right to review the documents and privilege log' prior to the production." *Id.*

¶ 64. Thus, it is alleged, "[Buchanan] permitted [Hoffinger] and Attorney [Stephen] Stern to participate in the document review process and on April 23, 2008, Attorney [Stephen] Stern went to [Buchanan's] offices to review the documents prepared for production and [Buchanan's] proposed privilege log." *Id.*

Based on this conduct, the Moving Parties allege in their proposed complaint that Buchanan, Hoffinger, Friedman, and Stephen Stern "engaged in an intentional pattern of deceit and collusion with the intent to deceive Plaintiffs and the United States District Court for the Southern District of New York." *Id.* ¶ 149. Specifically, Moving Parties assert that these individuals and entities "participated in the May 2008 Production and in the preparation of the May 2008 Privilege Log, which wrongfully omitted certain key documents from the production and improperly listed documents on the privilege log ... [and] did so with the intent to deceive Plaintiffs and the Court by attempting to conceal the true nature of [Moses] Stern's scheme and the involvement of Friedman in that scheme." *Id.* ¶ 150.

The Moving Parties assert that the documents that were improperly withheld include:

a. A June 29, 2007 3:18 p.m. email where Friedman forwarded to Stern an email that he had previously sent to Egert with the subject line: "Let's talk." Friedman then stated" in the body of the email: "Here are all the documents." Attached to the email were signature pages that Citigroup needed Safrin to sign for the Colonial deal to close including: (1) the Directorship Agreement; (2) the JSAE Colonial LLC Operating Agreement; (3) the FRGR Holdings LLC Operating Agreement; (4) the Guaranty; (5) the Environmental Indemnity; and (6) the Officer's Certificate.

b. A June 29, 2007 3:21 p.m. email that Friedman sent to Stern with the subject line: "Signature Examples." Friedman then stated in the body of the email: "Signature Examples." Attached to that email were five emails from Joseph Kelemer, an employee of The Safrin Group, attaching various examples of what purported to be Joshua Safrin's signature.

 **\*5**  c. A July 11, 2007 3:09 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy attaching an email from wizzy bizzy to Herrick Feinstein, LLP ("Herrick") attorney Dena Cohen

("Cohen") attaching Safrin's purported signature on Colonial deal-related documents.

d. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Cohen attaching Safrin's purported signature on Colonial deal-related documents.

e. A July 11, 2007 3:16 p.m. email where Stern forwarded to Friedman a July 11, 2007 email from wizzy bizzy to Stern attaching an email that wizzy bizzy had sent to Herrick attorney Stephen Fleissig attaching Safrin's purported signature on Colonial deal-related documents.

*Id.* ¶ 65. [2]

### C. *The Moving Parties Become Aware of the Discovery Misconduct*

On August 28, 2009, David Miller, counsel for Safrin and fourth party defendants Avery Egert and the Safrin Group, wrote a letter to Buchanan's counsel about certain documents that had been listed on the privilege log that Miller suspected were "not protected by the attorneyclient privilege." Miller Letter to Bayne, dated Aug. 28, 2009 (annexed as Ex. 7 to Zaiger Decl.), at 1. Miller noted that the privilege log contained "at least three documents concerning 'Safrin' " but that it was not at all clear about the nature and scope of such documents. *Id.* at 2. Accordingly, Miller requested that Buchanan "identify with specificity any documents pertaining to Joshua Safrin, Avery Egert and/or The Safrin Group that have been withheld on grounds of privilege and provide sufficient information so that [they] may determine whether good cause exists for seeking an order compelling the production of those documents." *Id.* Buchanan's counsel forwarded the letter to Stephen Stern in an email, writing, "[b]ecause the privilege belongs to your clients we wanted to bring you into this conversation promptly." August 28 Email to Stephen Stern, dated Aug. 28, 2009 (annexed as Ex. 8 to Zaiger Decl.).

On September 8, 2009, Buchanan's counsel responded to Miller's August 28 letter. *See* September 8 Letter to Miller, dated Sept. 8, 2009 (annexed as Ex. 9 to Zaiger Decl.) ("Bayne Letter"). Buchanan noted in the letter that it had "forwarded [the] correspondence to [Hoffinger] for consideration because the privilege ... belongs to their clients ... [and Buchanan] is simply a stake holder in this dispute." *Id.* at 1. Buchanan then asserted that the privilege

had properly been claimed for the withheld documents, arguing that "[Buchanan's] role in the Colonial Transaction was as legal counsel for [Moses] Stern and his affiliated entities. If you have reason to believe that [Buchanan] acted in some other capacity, then please provide us with the basis for your belief. Similarly, if you have evidence that [Buchanan] rendered purely commercial advice on any specific topic rather than legal advice, please provide us with your evidence." *Id.* at 2. Buchanan stated that it was refusing to "provide additional information about each of the thousands of documents on the privilege log," contending that this request "appears to be aimed more at diverting our time and spending our client's money than it does with any good faith discovery dispute." *Id.* at 2–3. Nevertheless, Buchanan conceded, "[i]f there are specific documents on the log about which you are interested in gaining more information to assess the claim of privilege, then please identify such documents ... and we will determine with [Hoffinger] whether there is more information that we can provide." *Id.* at 3. Additionally, Buchanan agreed to "review the specific entries identified in [the] letter mentioning 'Safrin' and will consult with [Hoffinger] concerning whether to continue to maintain the assertion of the privilege over them and will advise [Miller] of their decision." *Id.*

**\*6** On October 6, 2009, Buchanan's counsel wrote another letter to Miller, stating, "we have been authorized by [Hoffinger] to produce the documents bates stamped ... BIRFR0005909–20, which are attachments to a privileged email over which [Hoffinger] continues to assert the privilege.... We will produce these documents to all parties shortly." October 6 Letter to Miller, dated Oct. 6, 2009 (annexed as Ex. 10 to Zaiger Decl.) ("October 6 Letter"). On October 19, 2009, Buchanan followed through on this promise by producing these and other documents on a disc, and providing "a supplemental privilege log of documents from this production that [Moses] Stern's counsel has designated as being covered by the attorney client privilege." October 19 Letter from Bayne, dated Oct. 19, 2009 (annexed as Ex. 12 to Declaration of Thomas M. Wood in Support of Moving Parties' Reply in Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 767) ("Wood Supp. Decl.")). Among the documents produced in October 2009 were some of the documents the Moving Parties now assert had been improperly and deliberately withheld in the May 2008 production. Specifically, "[t]he attachments to the June 29, 2007 3:21 p.m. email from Stephen Friedman to [Moses] Stern ... were produced in October 2009 bates-numbered BIRFR0005909–0005920"

but "[t]he cover email, which had been identified [in the privilege log]," was not produced until July 2013. Bayne Decl. ¶ 4(b). Counsel for Safrin, Thomas Wood, asserts that when Buchanan made this production in October 2009, it should have "produce[d] the entire Signature Examples email with all of its attachments (BIRFR005908–5920) and redact[ed] the purportedly privileged communication on the email." Wood Supp. Decl. ¶ 15. Wood also asserts that because Buchanan "release[d] only the attachments ... without any metadata," this "ma[de] it impossible for the Moving Parties to determine that the released documents were attachments to the Signature Examples email and not just five separate emails with attachments." Wood Supp. Decl. ¶ 15. The Court notes that, notwithstanding this assertion, Buchanan's October 6 Letter to Miller specifically stated that Buchanan would be producing "documents bates stamped ... BIRFR0005909–20, which are attachments to a privileged email." October 6 Letter.

On May 31, 2012, after all of the parties except Buchanan had been deposed, Buchanan produced a revised privilege log and also produced "approximately 895 documents previously withheld as privileged or non-responsive." Wood Supp. Decl. ¶ 16. It was at this point that Buchanan produced most of the documents now at issue including "[t]he July 11, 2007 3:09 p.m. email from Mark Stern to Stephen Friedman," "[t]he July 11, 2007, 3:16 p.m. email from Mark Stern to Stephen Friedman attaching email to Dena Cohen," and "[t]he July 11, 2007 3:16 p.m. email from Mark Stern to Stephen Friedman attaching email to Stephen Fleissig." Bayne Decl. ¶¶ 4(c)-(e). Although the produced documents "were originally electronic documents consisting of emails with attachments," Buchanan "unilaterally and without explanation produced them in a format that stripped them of all metadata making it more burdensome and difficult, if not impossible, for the Moving Parties to use the information efficiently." Wood Supp. Decl. ¶ 16. From June 2012 until November 2012, Buchanan's counsel and Safrin's counsel engaged in various communications during which Safrin's counsel attempted to obtain "native files or tiffs with metadata and extracted text" of the aforementioned documents. See Metadata Emails (annexed as Ex. 13 to Wood Supp. Decl.), at 1.

**\*7** In a letter dated October 9, 2012, Safrin's counsel, Thomas Wood, wrote the following:

[Buchanan's] May 2012 production included approximately 895

documents that [Buchanan] withheld for over four years based on claims that the documents were either irrelevant or privileged.... [Buchanan] then produced documents that are not even arguably privileged and are critical to [Safrin's] claims and defenses.... [Buchanan's] decision to withhold documents identified by Bates Nos. BIRFR0004777–80, BIRFR0004794–4796, BIRFR0004830–4832, which are the emails from Mark Stern to Stephen Friedman forwarding emails sent from wizzy bizzy to Mark Stern containing signature pages with Safrin's forged signature, for over four years is incomprehensible. It is even more troubling in light of the fact that between August and October 2009, David Miller ... objected to [Buchanan's] assertion of privilege over documents identified in [Buchanan's] privilege log as involving 'Safrin' and asked [Buchanan] to review all the documents identified on its privilege log.... [Buchanan] claimed that Egert, The Safrin Group and Safrin were on a 'fishing expedition' and refused to review the documents or revise the privilege log.... By refusing to revise the log, [Buchanan's counsel] essentially concealed the nature of many of the documents identified on the privilege log and prevented Safrin from being able to properly assess [Buchanan's] assertion of privilege. The result is that Safrin had to wait two more years to receive critical emails that are in no way privileged.... The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery responses.

*Id.* at 8–9. In another letter dated November 16, 2012, Wood further contended:

[Buchanan] has an affirmative obligation under Federal Rules of Civil Procedure 26(e) to correct any erroneous assertions of privilege.... Contemporaneous communications in 2008 demonstrate it was [Buchanan] *not* Mark Stern or [Hoffinger] that reviewed the responsive documents, determined which documents to withhold as privileged, and prepared the privilege log with no apparent input from Stern or [Hoffinger].... It was [Buchanan's] in-house counsel that made the initial determination of which documents were subject to a valid claim of privilege and then certified that they had a reasonable basis for withholding the documents based on claims of privilege. Having done so, [Buchanan] remains responsible to supplement or correct those assertions.

*Id.* at 17–18. In the same letter, Wood asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading." *Id.* at 20. Wood continued, "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege. If [Buchanan] had identified [these] Email Messages ... on its May 2008 privilege log, Mr. Safrin would have challenged the assertion of privilege and discovered these critical communications." *Id.* In May 2013, Buchanan still had not produced the metadata or native copies of the documents, so the parties brought this issue to the attention of the Court. *See generally* Letters to the Honorable Gabriel W. Gorenstein, dated May 2013 (annexed as Exs. 15–16 to Wood Supp. Decl .).

**\*8** Meanwhile, Amusement, together with several other parties, filed a motion to compel Buchanan and other parties to produce certain documents pursuant to the crime-fraud exception to the attorney-client privilege. *See* Notice of Motion and Motion to Compel, filed June 6, 2012 (Docket # 649). On February 11, 2013, this Court granted the motion to compel and identified certain categories of documents that were to be produced. *See* Amusement Indus., Inc. v. Stern, 293 F.R.D. 420, 440–41 (S.D.N.Y.2013). In compliance with the order, in July 2013 Buchanan produced, among other documents, the "June 29, 2007 3:21 p.m. email from Stephen Friedman to Mark Stern," which was bates-numbered BIRFR0005908. Bayne Decl. ¶ 4(b). [3]

At the same time, Buchanan produced "[t]he June 29, 2008 3:18 p.m. email from Stephen Friedman to Mark Stern bates-numbered BIRFR0047204–0047227." *Id.* ¶ 4(a). When producing it, Buchanan's counsel explained that it had not previously been produced because it was "saved in a folder for a different client which is why it was not part of [Buchanan's] document production in this case." July 11 Baynes Email, dated July 11, 2013 (annexed as Ex. 18 to Wood Supp. Decl.), at 4. However, the Moving Parties allege, "when [Buchanan] produced the files for that deal, the email was missing form those files as well." *See* Mov. Reply at 8; see also Declaration of Craig H. Missakian in Support of Moving Parties' Memorandum in Further Support of Their Joint Motion to Amend Their Pleadings, filed June 16, 2014 (Docket # 766) ("Missakian Decl."), ¶¶ 3–5.

### D. *The Filing of the Instant Motion*

Soon after the July 2013 production, the Court approved an amended discovery schedule, which set the following deadlines: February 18, 2014, as the close of all fact discovery; July 11, 2014, as the close of all expert discovery; and August 15, 2014, as the date by which all premotion letters for dispositive motions must be filed. *See* Endorsed Letter, filed Aug. 20, 2013 (Docket # 708). On November 26, 2013, the Court granted the parties' request to stay discovery pending a mediation scheduled for February 4, 2014. See Endorsed Letter, Nov. 26, 2013 (Docket # 733). On December 11, 2013, Stephen Stern was permitted to withdraw as Moses Stern's counsel. *See* Stipulation and Order, filed Dec. 11, 2013 (Docket # 736). Meanwhile, the stay of discovery was extended to March 10, 2014. *See* Order, filed Jan. 28, 2014 (Docket # 737). After receiving notification that the parties failed to reach a settlement, the Court lifted the discovery stay on March 17, 2014. *See* Endorsed Letter, filed Mar. 17, 2014 (Docket # 739). On March 28, 2014, the Court approved a new discovery schedule setting the fact discovery deadline for June 30, 2014, expert discovery deadline for October 17, 2014, and the deadline for filing pre-motion letters for

dispositive motions for October 17, 2014. *See* Amended Schedules, filed Mar. 28, 2014 (Docket # 741) ("March 2014 Schedule").[4]

 **\*9**  On May 6, 2014, the Moving Parties sought permission to make the instant motion to amend the pleadings, which was granted. *See* Order, filed May 7, 2014 (Docket # 750). They filed their joint motion to amend their pleadings three days later. *See* Plaintiffs, Third–Party Plaintiff Joshua Safrin, Defendant Avery Egert and Fourth Party Defendant The Safrin Group, LLC's Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 755). In support of their motion, the Moving Parties have submitted legal memoranda, declarations, accompanying exhibits, and copies of the proposed amended pleadings.[5] Buchanan and Friedman have submitted legal memoranda as well as declarations and exhibits in opposition to the joint motion to amend.[6]

## II. *LAW GOVERNING MOTIONS TO AMEND*

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." Nonetheless, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, ... undue prejudice to the opposing party ... [or] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182 (1962); *accord Jin v. Metro. Life Ins. Co.,* 310 F.3d 84, 101 (2d Cir.2002). The Second Circuit has characterized Rule 15 as encompassing a "liberal" amendment policy. See, e.g., *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008). A motion to amend under Rule 15(a)(2) may be made at any stage of the litigation, see, e.g., *Laurent v. PricewaterhouseCoopers LLP,* 2012 WL 3614043, at *3 (S.D.N.Y. Aug. 15, 2012), and " '[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith,' " *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.,* 626 F.3d 699, 725 (2d Cir.2010) (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). Under Rule 15(a)(2), the "nonmovant bears the burden of showing prejudice, bad faith and futility of the amendment." *Grant v. Citibank (S.D.), N.A.,* 2010 WL 5187754, at *6 (S.D.N.Y. Dec. 6, 2010) (citations omitted).[7]

## III. *DISCUSSION*

As noted, the Moving Parties seek to add claims against current parties, Buchanan and Friedman, and non-parties, Stephen Stern and Hoffinger, for violation of section 487 of the New York Judiciary Law based on their claim that these parties wrongfully omitted key documents from their document production and instead improperly and misleadingly listed them on the privilege log. *See* Prop. Compl. ¶ 150. Section 487 provides that "[a]n attorney or counselor who ... [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is liable to "the party injured [for] treble damages, to be recovered in a civil action." N.Y. Jud. Law § 487(1); *accord Polanco v. NCO Portfolio Mgmt.,* Inc., 2014 WL 2483180, at *9 (S.D.N.Y. June 3, 2014) ("Section 487(1) ... allows for claims against attorneys who engage in acts of deceit or collusion that are directed at a court or that occur during the course of a pending judicial proceeding.") (internal quotation marks and citation omitted). The Attorneys have raised various grounds in opposition to the motion, including futility and prejudice. We focus our attention exclusively on the issue of delay and prejudice as it is sufficient to dispose of the motion.

 **\*10**  The Second Circuit has held that an amendment prejudices a non-moving party when, among other things, "the assertion of the new claim or defense would (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] (ii) significantly delay the resolution of the dispute." *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 284 (2d Cir.2000). Case law further explains that " '[o]ne of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action.' " *MHANY Mgmt. Inc. v. Cnty. of Nassau,* 843 F.Supp.2d 287, 341 (E.D.N.Y.2012) (quoting *H.L. Hayden Co. v. Siemens Med. Sys.,* 112 F.R.D. 417, 419 (S.D.N.Y.1986) (collecting cases)).

With these principles in mind, we believe several circumstances weigh against granting leave to amend. First, while not dispositive, the Moving Parties waited for a significant period after becoming aware of the Attorneys' wrongful discovery conduct before filing the instant motion to amend. While it is well-established that "delay, standing alone, is an insufficient basis to deny leave to amend," *U.S. for and on Behalf of Mar. Admin. v. Cont'l Ill. Nat'l Bank &*

*Trust Co. of Chi.,* 889 F.2d 1248, 1254 (2d Cir.1989) (citations omitted), a court "plainly has discretion ... to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice" the nonmovant, 🔖*Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990). In general, " '[t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.' " 🔖*Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 47 (2d Cir.1983) (quoting *Advocat v. Nexus Indus., Inc.,* 497 F.Supp. 328, 331 (D.Del.1980)).

While the alleged wrongful discovery conduct occurred in 2008, *see* Prop. Compl. ¶¶ 63–64, we measure the delay from the time the Moving Parties became aware of the facts that serve as the basis for their proposed claims, *see, e.g.,* 🔖*Bader v. Special Metals Corp.,* 985 F.Supp.2d 291, 304 (N.D.N.Y.2013) (denying motion to amend where "despite being aware, even before she commenced this action, of the protected activity she now seeks to add to her Complaint, Plaintiff failed to move to amend in a timely fashion"); 🔖*Suro v. United States,* 107 F.Supp.2d 206, 210 (E.D .N.Y.2010) (denying motion to amend where "Plaintiffs have long had notice of a potential claim against [the party that they wish to join]"). The Moving Parties explain that they "discovered [some of the wrongfully withheld] emails in May 2012, when [Buchanan] released documents from its privilege log" and that they then "took immediate steps to determine the extent of [Buchanan's] concealment." Mov. Reply at 33–34. They contend that "any 'delay' in bringing their claims is attributable to [Buchanan] and Friedman," because Buchanan refused "to do anything more until after the Court ruled on the crime-fraud motion" in February 2013. *Id.* at 34–35. They also note that they did not receive one of the documents— the "Let's talk" email, dated June 29, 2007, at 3:18 p.m.— until June 6, 2013. *Id.* at 34. Additionally, the Moving Parties suggest that they did not file the motion sooner because "[i]n late July [2013], the parties began discussing settlement and worked to find an acceptable mediator." *Id.* at 34.

**\*11** Notwithstanding these explanations for their conduct, we believe that the Moving Parties' delay in bringing the instant motion was to some extent unjustified. The Moving Parties implicitly admit that they were put on notice of the Attorneys' discovery misconduct in May 2012 when they received a number of the emails at issue. *See* Mov. Reply at 33–34. Moreover, it is clear from the documents submitted in support of the instant motion that the Moving Parties

were aware of the essentials of the offending conduct by at least November 2012, about 18 months before the motion to amend was eventually filed. In a series of communications between counsel for Safrin and Buchanan in Fall 2012, Safrin's counsel accused Buchanan of engaging in the same discovery misconduct alleged in the proposed claims. *See* Metadata Emails at 8–9 ("Safrin had to wait two more years to receive critical emails that are in no way privileged .... The law is quite clear that as a party to this case, [Buchanan] is responsible for its discovery response.").

On November 16, 2012, Safrin's counsel asserted that Buchanan "was obligated to provide sufficient information about the documents being withheld to allow the other parties to assess [Buchanan's] assertion of privilege" and that Buchanan's "description of BIRFR0004777 through BIRFR0004793 is more than incomplete; it is misleading," and that "[b]y providing inaccurate information, [Buchanan] concealed the true nature of the documents making it impossible for others to challenge the assertion of privilege." *Id.* at 20. These accusations track the allegations in the Moving Parties' proposed claims that Buchanan "intentionally withheld certain key documents from the May 2008 Production that should have been produced in response to the subpoenas" and "listed some, but not all, of those documents on the May 2008 Privilege Log knowing that no good faith basis existed to assert a privilege over the documents in a further effort to conceal the documents from Plaintiffs." Prop. Compl. ¶ 63.

Additionally, the Fall 2012 correspondence indicates that the Moving Parties realized the significance of these "critical" emails in that they knew the emails "contain[ed] signature pages with Safrin's forged signature." Metadata Emails at 9– 10. Thus, the letters suggest that, at that time, the Moving Parties believed not only that the Attorneys had concealed the emails but also that the Attorneys had acted intentionally to hide evidence that was damaging to themselves and their clients. Furthermore, by November 2012, the Moving Parties were aware of Hoffinger and Stephen Stern's role in the withholding of these documents as Buchanan's counsel had noted their involvement in a letter to Safrin's counsel as early as September 8, 2009. *See* Bayne Letter; *see* also Prop. Compl. ¶ 64 ("[Buchanan] permitted [Hoffinger] and Attorney Stern to participate in the document review process....").

Given the fact that the Moving Parties were aware of the essential elements of their proposed section 487 claims by

November 2012, we believe there was unjustified delay in bringing the instant motion. We do not give great weight to the Moving Parties's assertions regarding Buchanan's alleged refusal to produce the metadata or native files as the Moving Parties have not shown why this prevented them from understanding the scope of the conduct at issue. Also, while we do not believe that settlement discussions would necessarily justify delay, we note that they did not begin until July 2013 and thus they do not explain the failure to act during the previous eight month period when the Moving Parties had all the information they needed to bring the claim. Also, it is of no moment that the Moving Parties did not receive two of the documents at issue until July 2013 as the conduct amounting to deceit was represented in the documents released in the previous productions. Finally, even under the Moving Parties' view of the facts, they had all the emails as of July 2013 and yet took no action until May 2014. The stay of discovery was not put into effect until November 2013, and thus, four months elapsed during the critical fact discovery phase without any effort made to pursue these claims.

**\*12** But we need not dwell on the question of whether the Moving Parties acted with alacrity in bringing this motion. Even if the Moving Parties had been able to justify their delay, other circumstances would lead us to conclude that allowing the amendment would be prejudicial and inappropriate. We begin by noting this litigation is in its final stages. The initial scheduling order in March 2008 set October 1, 2008, as the deadline for the "completion of all discovery." *See* Scheduling Order, filed Mar. 5, 2008 (Docket # 41). It took the ensuing six years for the parties to actually complete— or nearly complete—the fact discovery in this case, during which discovery deadlines were repeatedly extended as more parties and claims were added to the case. As noted by Buchanan, the parties have taken 59 days of testimony from 39 witnesses. *See* Buchanan Mem. at 6. The Moving Parties did not seek to file the instant motion to amend until less than 60 days before fact discovery was set to close. Granting the instant motion to amend risks unduly delaying the case by requiring the Court to reopen fact discovery to allow the parties to take depositions and obtain documentary evidence concerning the Attorneys' alleged wrongful conduct. Courts have commonly denied motions to amend in such circumstances. *See, e.g.,* 🚩 *iMedicor, Inc v. Access Pharm., Inc.,* 290 F.R.D. 50, 53 (S.D.N.Y.2013) ("[A]ssertion of plaintiff's new claims would both require defendant to expend significant additional resources to conduct discovery and prepare for trial, and significantly delay resolution of the

dispute."); 🚩 *Suro,* 107 F.Supp.2d at 209–10 (allowing the amendment would require the court to "re-open discovery" which would "cause substantial and unnecessary delay in a case that already has been litigated for almost five years");

*accord* 🚩 *Equal Rights Ctr. v. Niles Bolton Assocs.,* 602 F.3d 597, 603–04 (4th Cir.2010) (non-moving party would be prejudiced by reopening of discovery where motion to amend was filed at the "close of a three-year long discovery process and on the eve of the deadline for dispositive motions");

🚩 *Mercantile Trust Co. Nat'l Ass'n v. Inland Marine Prods. Corp.,* 542 F.2d 1010, 1013 (8th Cir.1976) (non-moving party had already "completed extensive discovery based upon the numerous defenses previously asserted" and where "[n]ew theories of defense and a new counterclaim advanced at this late date would necessarily reopen much of the discovery").

The Moving Parties respond that the amendment "will not require the parties to expend additional resources or significantly delay resolution of the dispute because discovery pertinent to the claim is already in process." Mov. Mem. at 6. They assert that "[t]he parties have all but confirmed the deposition schedule for the witnesses most likely to have information regarding the Section 487 Claim" and that "Safrin has already served a request for production of documents on Buchanan and subpoenas duces tecum on Kaye Scholer, [Hoffinger], the Law Offices of Stephen R. Stern, and Attorney Stern requesting documents relevant to the proposed Section 487 Claim." *Id.* But these statements fall far short of assuring the Court that the amendments would not further prolong this already six-year-old case. The reality is that the proposed claims have nothing to do with the existing claims in this case, and thus, the Moving Parties are seeking to fold an entirely new litigation into the current one. The new claims alleging deceit by the Attorneys relate to the Attorneys' failure to produce particular documents in discovery during the course of the litigation of this case. Those actions are not factually similar in the least to the existing claims in this case, which revolve exclusively around a real estate transaction and the subsequent dealings between Amusement and the other parties to effectuate that transaction, all of which occurred in 2007. Additionally, the damages that resulted from these two courses of conduct have nothing to do with each other. Accordingly, the discovery to determine what the Attorneys and the proposed non-parties did and what damages resulted from such conduct will be entirely different from the discovery that has been pursued to date. There is no common ground between these two sets of claims other than some overlap in parties.

**\*13** Furthermore, given the prior history of this case, there will inevitably be motions to dismiss (aspects of which would require serious consideration based on the parties' briefing of the "futility" issue) and myriad discovery disputes regarding these collateral claims, all of which will likely cause further delays. Additionally, as the Moving Parties themselves concede, they "may seek leave to amend again to add [other Buchanan] attorneys as additional defendants to their respective Section 487 claims" depending on "the outcome of discovery" regarding the proposed claims. Mov. Mem. at 2 n. 1. Finally, there would be nothing to stop the proposed defendants from asserting claims of their own once joined to the case.

Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case. These courts have recognized that the addition of such collateral claims in amended pleadings can easily delay resolution of the case due to the need to engage in substantial additional discovery regarding the new factual contentions. *See Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (upholding denial of motion to amend where the plaintiff's "new claims concerned a different period of time and were derived from a different statute" given that "discovery had already been completed and [the defendant] had already filed a motion for summary judgment"); *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.,* 148 F.Supp.2d 321, 327 (S.D.N.Y .2001) ("Prejudice is particularly likely where the amendment raises new theories of recovery or would require additional discovery.") (citation omitted); *accord Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428–29 (7th Cir.1993) ("[T]he district judge acted within the bounds of reason in refusing to allow the suit to be expanded to take in ... an entirely new and separate claim.");

*Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990) (no abuse in discretion in district court's denial of motion to file amended complaint where "[t]he new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a late hour, an entirely new course of defense"); *Vonage Holdings Corp. v. SBC Internet Servs., Inc.,* 2007 WL 3169167, at \*3 (N.D.Tex. Oct. 30, 2007) (refusing motion to add new claims in patent dispute case because the new claims were "completely unrelated to the voice-compression technology that is at issue

in this litigation ... [and would] undoubtedly further delay the resolution of this case, require additional discovery, and further complicate an already complex case"); *Lover v. District of Columbia,* 248 F.R.D. 319, 322 (D.D.C.2008) ("Prejudice is likely if the amended complaint contains new complex and serious charges which would undoubtably require additional discovery for the defendants to rebut.") (internal quotation marks, brackets, and citation omitted); *see generally* 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 (3d ed. 2014) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial.").

**\*14** Prejudice is particularly likely to result where, as in this case, the moving party seeks to add collateral claims at a late stage in the litigation process. *See, e.g., In re Am. Int'l Grp., Inc. Sec. Litig.,* 2008 WL 2795141, at \*3 (S.D.N.Y. July 18, 2008) ("[A] proposed amendment causes undue prejudice if, at an advanced stage of litigation, the amendment concerns 'an entirely new set of operative facts of which it cannot be said that the original complaint provided fair notice.' ") (quoting *Ansam,* 760 F.2d at 446); *Seymour/Jones v. Lefebvre,* 1991 WL 165203, at \*1 (E.D.Pa. Aug. 22, 1991) (denying motion to amend on grounds of prejudice because proposed additional claims "concern only one of the three defendants, ... are entirely new and separate claims based on unrelated facts and events[,] ... [and] they would involve additional discovery at a point when the discovery period has almost expired"). We thus conclude that the potential for delay and resulting prejudice strongly favors denial of the motion to amend.

The cases the Moving Parties cite on the issue of prejudice do not change our view. *See* Mov. Mem. at 5–6; Mov. Reply at 36–37. These cases simply recognize that a motion to amend should not be denied on the ground that it would require the opposing party to "expend significant additional time and money" on additional discovery where circumstances otherwise suggest that granting the amendment would be fair, such as where the case is in an early stage of litigation. *Hahn v. Domy Rooms, Inc.,* 2008 WL 3874313, at \*3 (S.D.N.Y. Aug. 18, 2008) (granting motion to amend when the parties had "only exchanged initial disclosures" and where there was no allegation that plaintiff did not timely file motion to amend); see also *Block,* 988 F.2d at 351 (upholding district court's grant of motion to amend because the non-moving

Amusement Industry, Inc. v. Stern, Not Reported in F.Supp.3d (2014)

parties' allegations that "they were prejudiced solely because of the time, effort and money they expended in litigating this matter ... do not arise to ... 'substantial prejudice.' "); *Am. Med. Ass'n v. United Healthcare Corp.,* 2006 WL 3833440, at *6–7 (S.D.N.Y. Dec. 29, 2006) (no "undue prejudice" where "the parties have completed only preliminary discovery as to the 'proper parties in this action' and have not yet engaged in any significant discovery on the merits" and where the proposed claims "are based on 'substantially similar' allegations of misconduct" as the earlier claims);

*Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.,* 795 F.Supp. 639, 644 (S.D.N.Y.1992) (finding joinder of additional parties to be appropriate where "discovery relating to the counterclaims began only recently" because the case "would encompass essentially the same issues regardless of whether or not [the proposed parties] were added as counter-defendants"). Here, by contrast, the Court's concern is not simply that additional discovery would be required but that numerous depositions have already been taken, extensive document production has been made, the parties are at the final stage of the litigation, and the proposed claims have nothing to do with the claims currently being litigated. *Cf. Interpublic Grp. of Cos., Inc. v. Fratarcangelo,* 2002 WL 31720355, at *2 (S.D.N.Y. Dec. 4, 2002) ("Although the burden of undertaking additional discovery, standing alone, does not warrant a denial of a motion to amend a pleading on the grounds of prejudice, ... when that discovery addresses what is essentially a collateral matter-as it does in this action-denial is warranted.") (internal citation omitted); *see also*

*Grace v. Rosenstock,* 228 F.3d 40, 53–54 (2d Cir.2000) ("The court also has discretion to deny leave to amend ... where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.") (internal citations omitted); *Ansam,* 760 F.2d at 446 (upholding denial of motion to amend where the proposed claims "concerned a different period of time and were derived from a different statute" and where "discovery had already been completed and [defendant] had already filed a motion for summary judgment").

**\*15** Finally, the addition of the collateral claims regarding the alleged discovery misconduct would further muddle this already complex case. When parties move to add claims involving completely different factual allegations and legal theories from the underlying suit, courts may exercise their discretion to deny amendment "in order to avoid unnecessary complexity and confusion." *Robinson v.. Buffaloe & Assocs., PLC,* 2013 WL 4017045, at *2 (M.D.Tenn. Aug. 6, 2013); *see*

*also Harris v. Armstrong,* 2005 WL 756523, at *1 (D .Conn. Mar. 31, 2005) ("Underlying [Rule 15(a) ] is an assumption that the amended complaint will clarify or amplify the original cause of action. The proposed amendments would not serve these purposes but instead would add numerous unrelated parties and claims. Accordingly, the motion for leave to amend is denied."); *Trilithic, Inc. v. Wavetek U.S. Inc.,* 6 F.Supp.2d 803, 809 (S.D.Ind.1998) (denying motion to file supplemental pleading under Rule 15(d) because "the [proposed] breach of contract claim is so unrelated to the underlying patent infringement action that it constitutes extraneous matter that will likely protract and complicate the litigation"); *Triangle Indus., Inc. v. Kennecott Copper Corp.,* 402 F.Supp. 210, 212 (S.D.N.Y.1975) (rejecting addition of certain claims where they "raise[ ] the question [of] whether amendments (and supplementation) of the complaint would not add to the complications of an already over-complicated case to the extent that no jury could reasonably be expected to assimilate the facts or render and [sic] intelligent or just verdict"); *United States v. Eight Tracts of Land in Town of Brookhaven, Suffolk Cnty., State of N.Y.,* 270 F.Supp. 160, 164 (E.D.N.Y.1967) ("While amendments are as a general rule, freely granted as justice may require, they should be denied when their allowance prevents an equitable determination of the main suit and confuses the real issues involved."); *see generally* 6 Wright, Miller & Kane Fed. Prac. & Proc. Civ. § 1487 ("[I]f the court determines that ... the issues raised by the amendment are remote from the other issues in the case and might confuse or mislead the jury, leave to amend may be denied."). We do not think it appropriate to burden a jury with both unraveling the complexities of the original real estate transaction and judging the actions of attorneys in conducting document production during the course of the litigation.

In a case involving analogous circumstances, *Stiller v. Colangelo,* 221 F.R.D. 316 (D.Conn.2004), the court denied the plaintiff's motion to amend a complaint to add claims involving the defendant's "hand[ling] of this litigation since the filing of the Complaint" because it would prejudice the defendant by "add[ing] claims different in character and purpose from those articulated in the initial complaint" that would "require additional discovery ... and undue delay in the resolution of the case." 221 F.R.D. at 317. *Stiller* denied the motion also on grounds that the proposed claims were "sufficiently remote from the initial complaint ... [that] [t]he jury is likely to be confused when asked to consider both [the defendant's] behavior as [the plaintiff's] legal representative and his behavior as [the plaintiff's] legal adversary. Moreover, exposing the jury to allegations of wrongful conduct during

the course of this litigation could easily prejudice the jury against [the defendant]." *Id.* Here too the addition of the new claims would unnecessarily confuse a jury as it would be asked to simultaneously consider Buchanan and Friedman's alleged wrongful conduct both as negotiators representing Moses Stern in the underlying real estate transaction and as litigators responding to document subpoenas in the ensuing legal proceedings. Given the factual and legal dissimilarities between the underlying lawsuit and the proposed claims, any such claim is best brought as a separate suit and not as part of this case. [8]

*IV. CONCLUSION*

**\*16** For the foregoing reasons, the Moving Parties' motion to amend their pleadings (Docket # 755) is denied.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4460393

---

## Footnotes

1    *See also* Proposed Fourth Amended Complaint; Demand for Jury Trial (attached as Ex. A to Declaration of Mariana Aguilar in Support of Moving Parties' Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 759) ("Aguilar Decl.")) ("Prop.Compl."); Joshua Safrin's Fourth Amended Third–Party Complaint and Demand for Jury Trial (attached as Ex. A to Declaration of Thomas M. Wood IV in Support of Moving Parties' Notice of Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 758) ("Wood Decl.")) ("Safrin Prop. Pl.").

2    Buchanan's former counsel David Bayne explains in his declaration that all of these withheld documents were identified on the May 2008 privilege log except the email from June 29, 2007, at 3:18 p.m. *See* Declaration of David F. Bayne, filed May 30, 2014 (Docket # 763) ("Bayne Decl."), ¶ 5. According to Bayne, the email from June 29, 2007, at 3:18 p.m., was not included on the privilege log because it "was located in the wrong client folder." *Id.* ¶ 4(a).

3    This document was the cover email to the attachment documents that had been produced in October 2009.

4    Thus, fact discovery is now closed, with the exception of some residual matters. However, the expert discovery and pre-motion letter deadlines have been extended by several months.

5    *See* Moving Parties' Memorandum in Support of Their Joint Motion to Amend Their Pleadings, filed May 9, 2014 (Docket # 756) ("Mov.Mem."); Declaration of Michael C. Rakower in Support of Joint Motion to Amend Pleadings, filed May 9, 2014 (Docket # 757) ("Rakower Decl."); Avery Egert's Proposed Answer to Plaintiffs' Proposed Fourth Amended Complaint (annexed as Ex. 1 to Rakower Decl.); Wood Decl.; Safrin Prop. Pl.; Aguilar Decl.; Prop. Compl.; Mov. Reply; Missakian Decl.; Wood Supp. Decl.

6    *See* Buchanan Ingersoll & Rooney PC's Memorandum of Law in Opposition to Moving Parties' Motion to Amend Their Pleadings, filed May 30, 2014 (Docket # 761) ("Buchanan Mem."); Zaiger Decl.; Bayne Decl.; Memorandum of Stephen Friedman in Opposition to Motion to Amend, filed May 30, 2014 (Docket # 764) ("Friedman Mem.").

7    In circumstances where a scheduling order sets a deadline for amending a complaint, however, the more onerous "good cause" standard under Rule 16(b) applies. *See* ⚑ *Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 339–40 (2d Cir.2000); *accord* ⚑ *Grochowski v. Phoenix Constr.,* 318 F.3d 80, 86 (2d Cir.2003); *Lincoln v. Potter,* 418 F.Supp.2d 443, 453 (S.D.N.Y.2006) ("When a party moves to amend the pleadings

after the deadline to do so in the court's scheduling order has passed, he must satisfy the good cause requirement of Fed.R.Civ.P. 16(b)....”). That is, a court can properly “deny[ ] leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause.”

⚑ *Parker,* 204 F.3d at 340. The “primary consideration” in determining whether good cause has been shown “is whether the moving party can demonstrate diligence.” ⚑ *Kassner v. 2nd Avenue Delicatessen Inc,* 496 F.3d 229, 244 (2d Cir.2007). Here, the Moving Parties appear to concede that the Court's deadline to amend passed years before the filing of their motion and thus that the Rule 16's “good cause” standard applies. *See* Mov. Reply at 32. Nevertheless, we do not consider the applicability of the “good cause” standard because the motion fails under the more liberal Rule 15(a)(2) standard.

8    Nothing herein should be construed as addressing the question of whether the Moving Parties may move for sanctions in this litigation based on the conduct alleged in the proposed complaint—whether against parties or attorneys, including former attorneys. *See Hakim v. Leonhardt,* 126 F. App'x 25, 26 (2d Cir.2005) (“[A] court may hold an attorney responsible for discovery noncompliance even after he or she has been relieved as counsel.”) (citations omitted).

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 256 of 396

2019 WL 1397195
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Dontie S. MITCHELL, Plaintiff,

v.

Andrew M. CUOMO, Governor, Anthony Annucci,
Commissioner of Department of Corrections, John Miller,
Correction Lieutenant, R. Wood, Corrections Sergeant,
Robert J. Mahuta, Correction Officer, Napper, Correction
Officer, and Wells, Correction Officer, Defendants.

9:17-CV-0892 (TJM/DJS)
|
Signed 03/28/2019

**Attorneys and Law Firms**

Dontie S. Mitchell, Comstock, NY, pro se.

David A. Rosenberg, New York State Attorney General,
Albany, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C.
§ 1983 was referred to the Hon. Daniel J. Stewart, United
States Magistrate Judge, for a report and recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In
his Report-Recommendation and Order (Dkt. No. 95) ("Rep.
Rec. & Ord."), Magistrate Judge Stewart recommends that
Defendants' Motion to Dismiss (Dkt. No. 57) be granted in
part and denied in part, and that Plaintiff's Fifth, Sixth, and
Seventh Motions for Preliminary Injunctions (Dkt. Nos. 61,
70, and 74) be denied. In addition, Magistrate Judge Stewart
ordered, *inter alia*, that Plaintiff's Motion to Amend (Dkt. No.
61), and Plaintiff's Third Motion for Counsel (Dkt. No. 61), be
denied. Plaintiff objects to Magistrate Judge Stewart's orders
denying amendment and the appointment of counsel, and to
various recommendations as addressed below.

**II. STANDARDS OF REVIEW**

**a. Objection to Magistrate Judge Non-Dispositive
Order**

A district court judge reviewing an objection to a magistrate
judge's non-dispositive pretrial order, as is in issue with
Magistrate Judge Stewart's orders denying amendment and
the appointment of counsel, [1] may not modify or set aside
any part of that order unless it is clearly erroneous or contrary
to law. *See* FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)
(1)(A); *Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir.
2007) ("[T]he district court to whom the case is assigned
shall consider ... objections and shall modify or set aside any
portion of the magistrate judge's order found to be clearly
erroneous or contrary to law.")(quoting Fed. R. Civ. P. 72(a)).
An order is clearly erroneous if, based on all the evidence, a
reviewing court "is left with the definite and firm conviction
that a mistake has been committed." *In re Gordon*, 780 F.3d
156, 158 (2d Cir. 2015) (internal quotation marks omitted)
(quoting *United States v. Murphy*, 703 F.3d 182, 188
(2d Cir. 2012)). "An order is contrary to law when it fails
to apply or misapplies relevant statutes, case law, or rules
of procedure." *Lifeguard Licensing Corp. v. Ann Arbor T-
Shirt Co., LLC*, No. 15-CV-8459, 2017 WL 3142072, at
\*1 (S.D.N.Y. July 24, 2017)(citation and internal quotation
marks omitted).

**b. Objection to Magistrate Judge Recommendation**

**\*2** When objections to a magistrate judge's recommendation
on a dispositive matter are made, the district court makes
a "*de novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." 28 U.S.C. § 636(b)(1); *see United
States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) (The
Court must make a *de novo* determination to the extent that
a party makes specific objections to a magistrate's findings.).
When no objection is made to a report and recommendation,
or to a portion thereof, the Court subjects the report and
recommendation, or the portion to which no objection is
made, to only a clear error review. Fed. R. Civ. P. 72(b),
Advisory Committee Notes: 1983 Addition. In performing
such a review, "the court need only satisfy itself that there is
no clear error on the face of the record in order to accept the
recommendation." *Id.*

After reviewing the report and recommendation, the Court
may "accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 257 of 396

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b).

## III. DISCUSSION

### a. Motion to Amend

Magistrate Judge Stewart's decision to deny Plaintiff's motion to file a Second Amended Complaint, *see* Rep-Rec. & Ord., at 19-23, is not clearly erroneous or contrary to law. Proposed claims related to Plaintiff's confinement at Elmira C.F., Wende C.F., and Collins C.F. were already pled in this matter, severed from the action, and transferred to the Western District of New York. *See* Dkt. No. 13. It would be futile to amend to add these claims again. "[I]t is well established that leave to amend a [pleading] need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

It would also be futile to reassert claims identical to those in the Complaint and Amended Complaint that the Court previously found to have been insufficiently pled to withstand a motion under Federal Rule of Civil Procedure 12(b)(6). *See* Dkt. Nos. 13 & 24. "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." *Ramos v. Dep't of Correction*, No. 3:15-CV-1444 (VAB), 2017 WL 855897, at *3 (D. Conn. Mar. 3, 2017)(citing *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

Regarding Plaintiff's proposed claims related to his confinement at Great Meadow C.F. asserting his First Amendment right to (1) wear "cornrows;" (2) promote the Ujamaa Fraternal Dynasty ("UFD"), a non-profit organization which he founded as an alternative to gangs; and (3) receive daily mail without excessive delay, the Court previously denied Plaintiff's motion to amend to add these claims because Plaintiff was "attempting to add new defendants and claims that are completely unrelated to the central issues in the Amended Complaint." 01/29/18 Dec. & Ord., Dkt. No. 48, at 9. As the Court stated in its January 29, 2018 Decision and Order,

> Plaintiff's claims related to alleged violations of his First Amendment rights at Great Meadow C.F. in 2017

are wholly unrelated to the allegations set forth in his Amended Complaint that he was assaulted at Clinton C.F. in 2014, and that his First Amendment rights were violated at Clinton C.F. in 2014. *Compare* Dkt. No. 28-1 *with* Am. Compl. Thus, the new allegations against the new defendants do not pertain to the operative pleading. Indeed, the proposed new claims involve events which occurred, if at all, years after the alleged wrongdoing set forth in the Amended Complaint, and were allegedly perpetrated by individuals not named in the Amended Complaint.

*Id.* Magistrate Judge Stewart correctly concluded at "[t]he allegations in the Proposed Second Amended Complaint do not cure the deficiencies previously identified." Rep-Rec. & Ord. at 23. [2]

**\*3** Magistrate Judge Stewart's decision to rely on the Court's previous Decision, and on Fed. R. Civ. P. 15(d), [3] to deny Plaintiff's motion to amend to add First Amendment claims allegedly occurring at Great Meadow C.F. is not clearly erroneous or contrary to law. The proposed First Amendment claims are neither related to nor pertain to the allegations in the operative pleading, thus providing a basis to deny amendment under Rule 15(d). *See Girard v. Hickey*, No. 9:15-CV-0187, 2016 WL 915253, at *5 (N.D.N.Y. Mar. 4, 2016)(" 'Courts regularly deny motions to amend where the moving party seeks to add claims involving collateral matters, based on different factual allegations and distinct legal theories, from the claims already at issue in a case.' ")(quoting *Amusement Indus., Inc. v. Stern*, No. 07 Civ. 11586, 2014 WL 4460393, at *13 (S.D.N.Y. Sept. 11, 2014)(collecting cases)); *McKenzie v. Obertean*, No. 17-CV-441W, 2019 WL 441593, at *1 (W.D.N.Y. Feb. 5, 2019)(" 'A supplemental pleading is designed to cover matters that occur subsequent to the filing of the complaint, but pertain to the original pleadings. Thus, under Rule 15(d), a party may supplement the original pleading to include subsequent occurrences which are related to the claim presented in the original complaint, absent prejudice to the nonmoving party.' ")(quoting *Albrecht v. Long Island R.R.*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991)(citations omitted)); *Stepney v. Rochester Hous. Auth.*, No. 16-CV-6173-FPG, 2018 WL 3110225,

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 258 of 396

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

at *6 (W.D.N.Y. June 25, 2018)("[C]ourts may ... decline to permit supplemental pleadings if the new claims are not adequately 'related to the originally stated claims.' ") (quoting *Webster v. Himmelbach*, 271 F. Supp. 3d 458, 472 (W.D.N.Y. 2017), and citing Wright *et al.*, 6 Fed. Prac. & Proc. Civ. §§ 1510 and 1506 (3d ed.)(explaining that courts have denied supplemental pleadings when "the claim or defense asserted in the supplemental pleading bore little or no relationship to the original pleading" and that "refusal to allow the supplemental pleading is entirely justified when" the new "matters alleged have no relation to" original claim)); 🚩 *Beckett v. Inc. Vill. of Freeport*, No. CV 11-2163 LDW AKT, 2014 WL 1330557, at *6 (E.D.N.Y. Mar. 31, 2014)("Supplemental pleadings are 'limited to subsequent events related to the claim or defense presented in the original pleading.' ")(quoting 3 Moore Federal Practice § 15.30 (3d ed. 2010)); *see also Webster*, 271 F. Supp. 3d at 472–73 (W.D.N.Y. 2017)(Denying amendment under Rule 15(d) because "Plaintiff does not seek to bolster, amplify, or clarify the two claims alleged in his amended complaint; rather, he seeks to raise an entirely new constitutional claim under the First Amendment.").

Furthermore, denial of the motion to amend to add the First Amendment claims was proper because the addition of the claims would not promote the economic and speedy disposition of the controversy between the parties as framed in the operative pleading. *See* 🚩 *Grace v. Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (Leave to amend is properly denied "where the belated motion would unduly delay the course of proceedings by, for example, introducing new issues for discovery.")(internal citation omitted); *Girard*, 2016 WL 915253, at *6 ("In considering plaintiff's motion [to amend], the Court is mindful of the fact that discovery has not been completed. However, because this case presently includes multiple causes of action asserted against multiple defendants, the Court finds that the addition of numerous other defendants and unrelated claims arising at entirely distinct locations will necessarily prolong this action and impose additional expense on defendants. Moreover, the Court finds that adding these new claims would not aid in the efficient resolution of this action."); 🚩 *Andino v. Fischer*, 698 F. Supp. 2d 362, 374 (S.D.N.Y. 2010) (denying motion to supplement because "such a supplementation does not aid in the efficient resolution of the instant action" and would prejudice the existing defendants); *Stepney*, 2018 WL 3110225, at *6 ("[C]ourts may deny supplemental pleadings that would not 'promote the economic and speedy disposition

of the entire controversy between the parties.' ")(quoting Wright et al., 6 Fed. Prac. & Proc. Civ. § 1504 and citing *Sai v. Transp. Sec. Admin.*, 155 F. Supp. 3d 1 (D.D.C. 2016)). Magistrate Judge Stewart did not abuse his discretion in denying Plaintiff's motion to amend to add proposed First Amendment claims (including Plaintiff's proposed First Amendment claim against Gov. Cuomo). *See Girard*, 2016 WL 915253, at *2 (N.D.N.Y. Mar. 4, 2016)("The decision to grant or deny a motion to amend or supplement is committed to the sound discretion of the trial court, and the court's decision is not subject to review on appeal except for abuse of discretion.")(citing *Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007)). Because the statute of limitations does not appear to have run on Plaintiff's proposed First Amendment claims, Plaintiff is free to assert these claims in a separate action. For the reasons set forth above, Plaintiff's objection to Magistrate Judge Stewart's decision to deny Plaintiff's motion to amend is overruled.

### b. Motion for Appointment of Counsel.

**\*4** For the reasons discussed by Magistrate Judge Stewart at pages 25-26 of the Report-Recommendation and Order, his decision to deny without prejudice Plaintiff's third motion for the appointment of counsel is not clearly erroneous or contrary to law. Plaintiff's objection on this issue is overruled.

### c. Plaintiff's Fifth, Sixth, and Seventh Motions for Preliminary Injunctions

Plaintiff's objection to Magistrate Judge Stewart's recommendation to deny Plaintiff's Fifth, Sixth, and Seventh motions for preliminary injunctions is that "[his] current motions for preliminary injunctive relief are inextricably intertwined with and predicated upon [the] motion for leave to amend [the] Amended Complaint.... [The] motion to amend should have been granted, thereby establishing a basis for [the] current motions for preliminary injunctive relief." Obj., at p. 4. However, because the Court finds that Magistrate Judge Stewart properly denied the motion to amend, Plaintiff presents no meritorious reason to reject Magistrate Judge Stewart's recommendation to deny Plaintiff's Fifth, Sixth, and Seventh motions for preliminary injunctions. Furthermore, upon conducting a *de novo* review of these motions, the Court adopts Magistrate Judge Stewart's conclusions for the reason stated in the Report-Recommendation and Order at pages 23-25. Plaintiff's objection on this issue is overruled.

#### d. Recommendation on "Blanket Ban" to Social Media Printed Content

Magistrate Judge Stewart recommends dismissal of Plaintiff's claim that DOCCS promulgated a policy with a "blanket ban" on printed materials from social media, emails, and text messages. In this regard, Magistrate Judge Stewart wrote:

> While Plaintiff alleges that Directive 4422 imposes such a blanket ban, *see* Am. Compl. at ¶ 129, a review of the Directive fails to bear out his assertions. As Defendants' Motion makes clear, the Directive expressly allows inmates to receive printed material with correspondence. Defs.' Mem. of Law at p. 13 (citing Directive 4422). The Directive itself does not appear to contain the ban on social media materials alleged by Plaintiff and nothing in his opposition papers refutes Defendants' contention to the contrary or points to anything in the Directive specifically barring complete access to such materials. *See* Dkt. Nos. 61-1 & 61-2. Given the information now available, Plaintiff's conclusory allegation regarding this policy is insufficient to withstand the Motion to Dismiss. *Salgado v. NYS Dep't of Corr. & Cmty. Supervision*, 2016 WL 6311296, at \*10 (W.D.N.Y. Sept. 15, 2016), report and recommendation adopted, 2016 WL 6298517 (W.D.N.Y. Oct. 27, 2016); *Odom v. Poirier*, 2004 WL 2884409, at \*13 (S.D.N.Y. Dec. 10, 2004).

Rep.-Rec. & Ord., at 15-16.

In objecting to this recommendation, Plaintiff points to an allegation in the Amended Complaint that he did not receive social media materials sent to him "because they were third-party mail in violation of Directive #4422," Am. Compl. ¶ 140, and asserts in his objections that "in truth, the 'blanket ban' on social media materials, emails, and text messages is an unwritten policy and how directive #4422 is being applied

state-wide." Obj. at 3. Plaintiff's allegation in the Amended Complaint that he did not receive social media materials sent to him by a third-party does not establish that Directive 4422 imposes a blanket ban on social media printed content. Furthermore, his allegation in his objections of a unwritten policy in applying Directive 4422 is insufficient to modify the allegations contained in the Amended Complaint. Plaintiff is free to move to amend the Amended Complaint to include this allegation of an unwritten policy, but the absence of this allegation in the Amended Complaint provides a sufficient basis to adopt Magistrate Judge Stewart's recommendation on this issue. Accordingly, Plaintiff's objection in this regard is overruled.

#### e. Recommendation on constitutionality of Rule 105.14

**\*5** Magistrate Judge Stewart concluded that Plaintiff lacks standing to challenge the constitutionality of Rule 105.14 because Plaintiff fails to allege that he suffered any actual injury due to the application of this rule. *See* Rep. Rec. & Ord., at 18-19. While Magistrate Judge Stewart noted that Plaintiff was previously found not guilty of violating this rule, he concluded that Plaintiff lacked standing because " '[a] plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.' " Rep. Rec. & Ord., at 18 (quoting *Peck v. Baldwinsville Cent. Sch. Dist.*, 351 Fed. Appx. 477, 479 (2d Cir. 2009) (summary order) (in turn quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d at 344)). Plaintiff argues in his objections that "[b]ecause DOCCS denied my request to form a prison chapter of UFD, I can be disciplined for violating Prison Rule 105.14 and placed in solitary confinement for nine months if I continue to promote and organize UFD. Hence, I have standing to challenge the constitutionality of Prison Rule 105.14 as applied here." Obj., at 3. Plaintiff's allegation of possible future injury is insufficient to confer standing. As the Supreme Court has held:

> To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, ——, 130 S.Ct. 2743, 2752, 177 L.Ed.2d 461 (2010); *see also* [ *Summers v. Earth Island Institute*, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009)]; [ *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L.Ed.2d 351

(1992)]. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.,* at 565, n. 2, 112 S. Ct. 2130 (internal quotation marks omitted). Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient. *Whitmore,* 495 U.S., at 158, 110 S. Ct. 1717 (emphasis added; internal quotation marks omitted); *see also* *Defenders of Wildlife, supra,* at 565, n. 2, 567, n. 3, 112 S. Ct. 2130; *see* [*DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 345, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)]; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 190, 120 S. Ct. 693, 145 L.Ed.2d 610 (2000); *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L.Ed.2d 895 (1979).

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409, 133 S. Ct. 1138, 1147, 185 L.Ed. 2d 264 (2013)(emphases added in *Clapper*).

Plaintiff's possible future injury from the application of Rule 105.14 is not "*certainly* impending," and therefore insufficient to confer standing. Accordingly, Plaintiff's objection on this issue is overruled.

### f. Recommendations without Objections.

The Court has reviewed Magistrate Judge Stewart's recommendation to which no objections have been filed, and finds no clear error on the face of the record in relation thereto.

## IV. CONCLUSION

For the reasons discussed above, Plaintiff's objections to Magistrate Judge Stewart's orders denying Plaintiff's motion to amend [Dkt. No. 61], and for the appointment of counsel [Dkt. No. 61], are **OVERRULED**, and Magistrate Judge Stewart's orders in the regard are **AFFIRMED**.

Also for the reasons discussed above, the Court **ACCEPTS and ADOPTS** the recommendations in the Report-Recommendation and Order, Dkt. No. 95, for the reasons stated therein. Thus, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (Dkt. No. 57) is **GRANTED** in part and **DENIED** in part.

The motion is **GRANTED** (1) Insofar as it seeks dismissal of the claim asserting the existence of a blanket policy barring access to social media material, and (2) Insofar as it seeks dismissal of Plaintiff's claim related to the constitutionality of Rule 105.14, and these claims are **DISMISSED without prejudice.**

**\*6** The motion is **DENIED** (1) Insofar as Defendants Miller and Mahuta move to dismiss Plaintiff's Amended Complaint against them based upon qualified immunity; and (2) Insofar as Defendant Annucci seeks dismissal of Plaintiff's claims alleging that his First Amendment rights were violated by the arbitrary imposition of a mail watch,

and it is further,

**ORDERED** that Plaintiff's Fifth, Sixth, and Seventh Motions for Preliminary Injunctions (Dkt. Nos. 61, 70, and 74) are **DENIED**.

## IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1397195

## Footnotes

1      *See* 28 U.S.C. § 636(b)(1)(A)(enumerating dispositive matters subject to *de novo* review and not including motions to amend); *Franke v. ARUP Laboratories, Inc.,* 390 Fed. App'x 822, 828 (10th Cir. 2010) ("Mr. Franke's motion to amend was a nondispositive pretrial matter that the magistrate judge was authorized to decide pursuant to 28 U.S.C. § 636(b)(1)(A)."); *Hall v. Norfolk Southern Ry. Co.,* 469 F.3d 590, 595

Mitchell v. Cuomo, Not Reported in Fed. Supp. (2019)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 261 of 396

(7th Cir. 2006) ("The district judge correctly held that the magistrate judge's denial of Hall's motion to amend his complaint [to add a defendant] was nondispositive, subject only to review for clear error."); ⚑ *Pagano v. Frank*, 983 F.2d 343, 346 (1st Cir. 1993) ("Under ordinary circumstances a motion to amend a complaint is 'a pretrial matter not dispositive of a claim or defense of a party' within the purview of Fed. R. Civ. P. 72(a)."); *Palacio v. City of New York*, 489 F. Supp. 2d 335, 344 (S.D.N.Y. 2007)(reviewing magistrate judge's denial of the appointment of *pro bono* counsel under the clearly erroneous standard used for non-dispositive pre-trial orders)

2    For the reasons discussed in the text, Plaintiff's attempt to cure a deficiency in his proposed Second Amended Complaint through his objections, *see* Obj. at 2 ("Although I do not specifically state in my Proposed Second Amended Complaint that Superintendent Miller was personally involved in the denial of my request to form a prison chapter of UFD, I declare under penalty of perjury that he was."), is insufficient to reverse the decision to deny the motion to amend.

3    Rule 15(d) provides: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time." Fed. R. Civ. P. 15(d).

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by  Desio v. State Farm Mutual Automobile Insurance Company,  D.Nev., November 16, 2021

2014 WL 1330557
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Leonard BECKETT, Plaintiff,
v.
The INCORPORATED VILLAGE OF FREEPORT,
The Incorporated Village of Freeport Police Department,
Police Officer Timothy P. Seaman, The Incorporated
Village of Freeport, Police Officer William Luikart,
The Incorporated Village of Freeport Police Detective
Edward S. Martin, III, The Incorporated Village of
Freeport, Police Officer John Doe, The Incorporated
Village of Freeport, Individually and in their capacities as
Village of Freeport Police Officers, Police Officer Diane
Peress, The Incorporated Village of Freeport, Police
Officer Donetta Cumberbatch, The Incorporated Village
of Freeport, Nassau County, Nassau County Police
Department, Donald Meese, Nassau County Detective,
Diane Peress, Nassau County Police Officer, John Doe,
Nassau County Police Officer, Individually and in Their
Capacities as Nassau County Police Officers, Defendants.

No. CV 11–2163(LDW)(AKT).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Valerie A. Hawkins, Hempstead, NY, for Plaintiff.

John L. Marsigliano, Chesney & Nicholas, LLP, Baldwin, NY,
Sal F. Deluca, Simmons Jannace, LLP, Syosset, NY, Liora M.
Ben–Sorek, Mineola, NY, for Defendants.

### MEMORANDUM AND ORDER

A. KATHLEEN TOMLINSON, United States Magistrate
Judge.

**\*1** Plaintiff Leonard Beckett ("Plaintiff" or "Beckett")
brought this civil rights action claiming that his constitutional

rights were violated by the Defendants in connection with
their arresting him on February 6, 2010. Specifically, Plaintiff
asserts that he was walking along the street in Freeport, New
York at approximately 7:50 p.m. on February 6, 2010 when
an individual slowed down his vehicle in the street and then
exited the vehicle and pursued the Plaintiff. Second Amended
Complaint ("SAC") ¶¶ 28–29 [DE 34]. Plaintiff maintains
that he was wrongfully pursued on foot by several individuals,
was unreasonably seized and detained, and was assaulted and
battered. SAC ¶¶ 33–34.

Before the Court is Plaintiff Beckett's motion to amend the
Complaint for a third time to include facts which he states
occurred after the filing of the SAC and which stem from
his recent acquittal on burglary and petit larceny charges.
This motion is brought pursuant to Federal Rules of Civil
Procedure 15(a), 15(d) and 21. DE 54. In particular, Plaintiff's
counsel points out that shortly after filing the SAC on
February 8, 2013, Plaintiff went on trial for a 2007 burglary
which took place at 11 Weberfield Avenue in the Village of
Freeport. Plaintiff was acquitted of all charges arising from
the burglary on June 17, 2013. On August 23, 2013, Plaintiff
moved to amend to supplement his pleading to include these
"transactions, occurrences, and events" which post-date the
SAC. Plaintiff purportedly does not seek to add any new
causes of action.

Nassau County, the Nassau County Police Department,
and Detective Donald Meese (collectively, the "County
Defendants") oppose Plaintiff's third motion to amend,
contending that Plaintiff's acquittal on the burglary charges
has no connection to the instant action. The Nassau County
Defendants maintain that the motion should be denied by the
Court as a futility.

The Village of Freeport and the Freeport Police Department
(collectively, the "Village Defendants") and the individual
Freeport Police Officer defendants are represented by
separate counsel. The Village Defendants have also filed
opposition to Plaintiff's motion, arguing that there is no
basis to amend to add these new factual allegations. Finally,
individual Freeport Police Officers Timothy P. Seaman,
William Luikart, Thomas D. Seaman, Donetta Cumberbatch,
and Detective Edward S. Martin (the "Freeport Police Officer
Defendants") also oppose the motion for leave to amend,
proffering that Plaintiff's effort to insert new facts constitutes
a misguided attempt to restart the discovery process for
his eventual assertion of a malicious prosecution claim
concerning the 2007 burglary.

For the reasons that follow, Plaintiff's motion for leave to file a Third Amended Complaint is DENIED.

## I. *BACKGROUND*

### A. The Allegations

Plaintiff filed his original Complaint on May 4, 2011. DE 1. Before Defendants answered, Plaintiff filed an Amended Complaint on August 20, 2011. DE 2. In an Order dated January 25, 2013, this Court granted, in part, and denied, in part, Plaintiff's motion to file a SAC. DE 33. Pertinent to the matter presently before the Court, Plaintiff in that motion sought leave to add a malicious prosecution claim for the 2007 Weberfield Burglary. *Id.* at 46. However, the Court found that the claim was not ripe at that time, holding that:

> **\*2** It is axiomatic that ... a claim for malicious prosecution does not arise until the underlying charges are dismissed in the plaintiff's favor. According to the [Proposed SAC], Plaintiff remains incarcerated on the Weberfield Burglary charges. Consequently, a malicious prosecution claim in connection with the Weberfield Burglary charges cannot stand and Plaintiff is DENIED leave to amend to add a malicious prosecution claim at this time.

*Id.* (internal citations omitted). In accordance with the directives set forth in the Court's January 25, 2013 Order, Plaintiff filed the SAC on February 8, 2013. *See generally* SAC.

The SAC alleges that on February 6, 2010, Police Officer Timothy Seaman ("Officer Seaman") received a radio report of a robbery at a liquor store in the Village of Freeport (the "Liquor Store Robbery"). SAC ¶¶ 20–23. The alleged perpetrator was described as a black male wearing a black jacket. *Id.* ¶ 24. Police Officer Seaman, who was in plain clothes and driving an unmarked vehicle, observed Plaintiff Beckett wearing a red and white jacket over a black jacket. *Id.* ¶¶ 22, 27. Officer Seamen alleged that as he slowed down his vehicle, Beckett began to run southbound. *Id.* ¶ 28. After

getting out of the car, Officer Seaman pursued Beckett on foot. *Id.* ¶ 29. Beckett asserts that Seaman did not identify himself as a police officer. *Id.* After a chase, Beckett was apprehended by Officer Seaman with the assistance of other Freeport Police Officers and was arrested. *Id .* ¶ 32.

At the Village police station, Plaintiff found himself, "bruised, battered, bleeding from the mouth, and drifting in and out of consciousness." SAC ¶ 64. Plaintiff "spat his blood into a cup" and the cup was then "recovered by defendant Nassau County Police Detective Donald Meese and held as evidence along with Beckett's clothing." *Id.* ¶ 39. Detective Meese then forwarded the evidence to the Nassau County Medical Examiner's Office for DNA analysis. *Id.*

Plaintiff has set forth numerous claims arising out of his arrest in connection with the Liquor Store Robbery. The civil rights claims under 🚩 42 U.S.C. § 1983 are based on Defendants' alleged unlawful search and seizure, unreasonable detention, assault, battery, use of excessive force, brutality, and unlawful punishment, all in violation of Plaintiff's rights protected under the Fourth and Fourteenth Amendments to the Constitution. Plaintiff also sets forth state law causes of action, including violations of the New York State Constitution, false arrest, false imprisonment, assault, and battery.

Beckett was incarcerated after having been convicted upon a plea of guilty to the Liquor Store Robbery. SAC ¶ 46. He was sentenced to five years in prison and five years post-release supervision. *Id.* On October 8, 2011, however, the New York State Supreme Court, Appellate Division, Second Department ("Second Department") reversed Beckett's conviction on the grounds that the Freeport police had unlawfully pursued and seized Plaintiff, rendering all evidence against him "fruit of the poisonous tree." *Id.* ¶ 49. In reaching that decision, the Appellate Division held that "the pursuit of the defendant and his seizure were unlawful" and "[c]onsequently, the physical evidence, identification testimony, and the defendant's statement to law enforcement officials should have been suppressed as 'fruit of the poisonous tree.' " 🚩 *People v. Beckett,* 88 A.D.3d 898, 899–900, 931 N.Y.S.2d 126 (2d Dep't 2011) (internal citations omitted).

**\*3** On November 18, 2011, the Liquor Store Robbery charges against Plaintiff were dismissed. SAC ¶ 51. However, while Plaintiff was in custody at the Village Police

Department, "[d]efendants collected the blood that Beckett expelled from his mouth and subjected it to DNA analysis by the New York State police." *Id.* ¶ 52, 931 N.Y.S.2d 126. The blood taken from Plaintiff was "allegedly found to match DNA that was recovered on February 14, 2007 from 11 Weberfield Avenue in the defendant Village, the scene of an alleged burglary. ¶ 53. In light of this evidence, Plaintiff alleges, Nassau County Police Detective Michelle A. Clifford filed a felony complaint against the Plaintiff. SAC ¶ 54.

On June 20, 2011, a grand jury sitting in Nassau County "handed down a sealed indictment that charged Beckett with one count of burglary in the second degree in violation of New York State Penal Law § 140.25(2) and one count of petit larceny in violation of New York State Penal Law § 155.25." SAC ¶ 55. Plaintiff's bail was originally set at $100,000 in cash by a Nassau County court. *Id.* ¶ 56, 931 N.Y.S.2d 126. However, since Plaintiff "lacked the means to post bail in the said amount," he remained incarcerated in the Nassau County Correctional Facility until bail was reduced to $5,000 cash in July of 2012. *Id.* After posting bail, Plaintiff was released from custody July 14, 2012 following nineteen months of incarceration. *Id.*

### B. Acquittal of Weberfield Burglary Charges

On June 17, 2013, a Nassau County jury acquitted the Plaintiff on the burglary and petit larceny charges from the 2007 Weberfield Burglary. DE 50 at 1. Two days later, on June 19, 2013, Plaintiff's counsel filed a letter notifying the Court of the acquittal and requesting leave to amend a third time, explaining that

> [t]he reason for this request is that all New York state court criminal proceedings against Mr. Beckett have finally terminated. On June 17, 2013, a jury acquitted Mr. Beckett of all of the charges pending against him pursuant to Nassau County Court Indictment No. 376–12.

> As a result of the acquittal, Mr. Beckett wants to amend his complaint in this action to allege that the unlawful and malicious acts and/or omissions of the defendants resulted in the said state court prosecution. In response to Mr. Beckett's prior motion to amend his complaint to include the claims arising from the aforementioned state court prosecution, Your Honor ruled that these claims were not ripe for adjudication.

> It is respectfully submitted that, with the termination of the state court proceeding in favor of Mr. Beckett, these claims are now ripe for adjudication. Therefore, Mr. Beckett would like to include those claims in this action and litigate all of his claims against the defendants in this action.

*Id.* at 1–2, 931 N.Y.S.2d 126. Plaintiff's counsel also argues that she has put the Court and all defendants on notice that the state criminal proceedings would have a bearing on the instant civil action throughout the pendency of the instant federal civil rights action. *Id.* at 2. Counsel stated that she has, moreover, requested the Court to "delay the prosecution of this action to await the outcome of the criminal proceeding" at multiple points during the pendency of this litigation, most recently on May 10, 2013. *Id.*

**\*4** On July 18, 2013, the parties participated in a Telephone Status Conference before this Court. *See* DE 53. The Court addressed Plaintiff's request for leave to amend the SAC, which the Court noted, is uniformly opposed by the Defendants. *Id.* ¶ 1, 931 N.Y.S.2d 126. The Court ultimately granted Plaintiff leave to file the requested motion and set a briefing schedule with the parties. *Id.* ¶ 2, 931 N.Y.S.2d 126.

In her motion, Plaintiff's counsel argues that: (1) Plaintiff acted promptly in notifying the Court and Defendants of his desire to amend; (2) the amended pleading is not futile; (3) the amendments will not require Defendants to expend additional resources in discovery or trial preparation; and (4) granting leave to amend to add the new allegations would serve judicial economy. *See* Memorandum of Law in Support of Motion to Amend Complaint ("Pl.'s Mem.") at 2–6 [DE 54–2].

In opposition, the County Defendants argue that Plaintiff's proposed amendments are futile because no "nexus" exists between the DNA retrieved by the Village Police after the February 2010 Liquor Store Robbery and the DNA used in the June 2013 prosecution of Plaintiff for the 2007 Weberfield Burglary. *See* Memorandum of Law in Opposition to Plaintiff's Motion to Amend His Complaint a Third Time ("County Defs.' Opp.") at 6–7 [DE 59]. Moreover, the County Defendants assert that Plaintiff has set forth no facts that Detective Meese or any other individually named County Defendant was involved in the "allegedly prolonged incarceration" or the prosecution for the 2007 Weberfield Burglary. *Id.* at 7, 931 N.Y.S.2d 126.

Counsel for the Village Defendants also opposes the motion, arguing that the proposed Third Amended Complaint ("TAC") is futile for reasons similar to those raised by the County Defendants. *See* TAC annexed as Ex. "A" to the Declaration of Valerie A. Hawkins in Support of Motion to Amend Complaint ("Hawkins Decl.") [DE 54–3]. Further, the Village Defendants claim that the amendments are an attempt by Plaintiff to "lay the foundation" for a future malicious prosecution claim concerning the Weberfield Burglary. *See* Village Defendants' Memorandum of Law in Opposition ("Village Defs.' Opp.") at 6–9 [DE 56–9]. Finally, the Freeport Police Officer Defendants argue in their opposition that: (1) the proposed TAC is futile because no contemplated malicious prosecution claim stemming from the 2007 Weberfield Burglary can be asserted against the Village Police Officer Defendants; (2) Plaintiff cannot amend a Notice of Claim in federal court, and, thus, the Supplemental Notice of Claim is deficient; and, in any event, (3) the Supplemental Notice of Claim is a futility. *See* Freeport Police Officer Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Amend ("Freeport Police Officers' Opp.") at 9–13.

## II. *LEGAL STANDARD*

### A. Federal Rule of Civil Procedure 16(b)(4)—"Good Cause"

To the extent that Plaintiff seeks leave to amend the Complaint pursuant to Rule 15(a), he must demonstrate "good cause" since the current motion comes after the deadline to amend pleadings has expired. According to Rule 16(b), the court must enter a scheduling order setting deadlines for subsequent proceedings in the case, including "the time to join other parties [and] amend the pleadings ." FED. R. CIV. P. 16(b). "By limiting the time for amendments, the rule is designed to offer a measure of certainty in pretrial proceedings, ensuring that at some point both the parties and the pleadings will be fixed." *See Parker v. Columbia Pictures Industries,* 204 F.3d at 339–40 (2d Cir.2000) (internal quotations omitted); *accord Ricciardi v. Kimco Facilities Servs. Corp.,* No. 10 Civ. 5371, 2012 WL 6761533, at *1 (E.D.N.Y. Jun. 12, 2012). In certain cases, however, the Court may determine that a deadline "cannot reasonably be met despite the diligence of the party seeking the extension." *Parker,* 204 F.3d at 339 (internal quotations omitted). "In such cases, where the moving party has demonstrated good cause, the court may grant leave to amend the scheduling order to extend the deadline." *Id.; see 246 Sears Road Realty Corp. v. Exxon Mobil Corp.,* No.

99 Civ. 889, 2012 WL 4174862, at *9 (E.D.N.Y. Sept.18, 2012). "[I]n allowing modifications of scheduling orders only for good cause, [Rule 16(b) ] provides the district courts discretion to ensure that limits on time to amend pleadings do not result in prejudice or hardship to either side." *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 243–44 (2d Cir.2007); *Erdogan v. Nassau County,* No. 10 Civ. 5837, 2014 WL 1236679, at *5 (E.D.N.Y. Mar.25, 2014).

**\*5** "Good cause in this context depends on the diligence of the moving party, and, to satisfy the standard, the movant must demonstrate that it is has been diligent in its effort to meet the Court's deadlines." *Sokol Holdings, Inc. v. BMD Munai, Inc.,* No. 05 Civ. 3749, 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009) (internal citations and quotations omitted); *see Enzymotec Ltd. V. NBTY, Inc.,* 754 F.Supp.2d 527, 536 (E.D.N.Y.2011). "In other words, the party must show that, despite its having exercised diligence, the applicable deadline could not have been reasonably met." *Sokol,* 2009 WL 2524611 at *7 (citing *Rent–A–Center Inc. v. 47 Mamaroneck Ave. Corp.,* 215 F.R.D. 100, 104 (S.D.N.Y.2003)); *Erdogan,* 2014 WL 1236679, at *4. In determining whether the good cause standard is met, "the primary consideration is whether the moving party can demonstrate diligence[,]" but that is not the only consideration. *Kassner,* 496 F.3d at 244. "The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Id.; see Ritchie Risk Limited Strategies Trading (Ireland), Ltd. v. Coventry First LLC,* 282 F.R.D. 76, 79 n. 2 (S.D.N.Y.2012).

### B. Federal Rule of Civil Procedure 15(a)—Motion to Amend

Once Plaintiff has established "good cause" to modify the scheduling order under Rule 16(b)(4), Plaintiff must then satisfy the requirements of Rule 15(a) to be granted leave to amend. Rule 15(a) of the Federal Rules of Civil Procedure provides that in cases where a party cannot amend as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *Accord Lucente v. Int'l Bus. Machs. Corp.,* 310 F.3d 243, 258 (2d Cir.2002); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991); *Barber v. Hornbeck Offshore Operators, LLC,* No.

11 Civ. 5520, 2014 WL 1010993, at *5 (E.D.N.Y. Mar. 17, 2014); *M.E.S., Inc. v. Liberty Mut. Sur. Group,* No. 10 Civ. 2798, 2014 WL 46622, at *8 (E.D.N.Y. Jan.6, 2014). A court "should freely give leave when justice so requires" and such leave is in the court's discretion. *See* FED. R. CIV. P. 15(a); *see also Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538, 130 S.Ct. 2485, 2489, 177 L.Ed.2d 48 (2010) (Rule 15(a) "gives a district court discretion to decide whether to grant a motion to amend a pleading before trial."); *Grace v. Rosenstock,* 228 F.3d 40, 56 (2d Cir.2000); *MHANY Mgmt. v. County of Nassau,* 843 F.Supp.2d 287, 340 (E.D.N.Y.2012) (noting that "it is ultimately within the sound discretion of the court whether to grant leave to amend").

Notwithstanding the foregoing principles, leave to amend may be denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Williams v. Citigroup Inc.,* 659 F.3d 208, 213–14 (2d Cir.2011) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *SCS Comm'cn, Inc. v. Herrick Co.,* 360 F.3d 329, 345 (2d Cir.2004) ("[U]nder Rule 15(a), leave to amend a pleading may *only* be given when factors such as undue delay or undue prejudice to the opposing party are absent.") (emphasis in original). " 'The party opposing the motion for leave to amend has the burden of establishing that an amendment would be prejudicial.' " *Pasternack v. Lab. Corp. of Am.,* 892 F.Supp.2d 540, 529 (S.D.N.Y.2012) (quoting *Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994)); *accord Allstate Ins. Co. v. Elzanaty,* 916 F.Supp.2d 273, 304 (E.D.N.Y.2013). The opposing party likewise bears the burden of establishing that an amendment would be futile. *See Cummings–Fowler v. Suffolk Community Coll.,* 282 F.R.D. 292, 296 (E.D.N.Y.2012) (citing *Blaskiewicz v. County of Suffolk,* 29 F.Supp.2d 134, 137–38 (E.D.N.Y.1998)).

**B. Federal Rule of Civil Procedure 15(d)-Motion to Supplement Pleadings**

**\*6** Federal Rule of Civil Procedure 15(d) provides that on motion, "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the

pleading to be supplemented." The same standard for motions to amend under Rule 15(a) applies to motions to supplement under Rule 15(d). *See Salazar v. Bowne Realty Assocs., LLC,* 796 F.Supp.2d 378, 383 (E.D.N.Y.2011); *Petrello v. White,* No. 01 Civ. 3082, 2011 WL 4793172, at *4 (E.D.N.Y. Feb. 23, 2011). Supplemental pleadings are "limited to subsequent events related to the claim or defense presented in the original pleading." 3 MOORE FEDERAL PRACTICE § 15.30 (3d ed.2010); *see Fair Housing in Huntington Committee v. Town of Huntington, N.Y.,* No. 02 Civ. 2787, 2010 WL 4791787, at *7 (E.D.N.Y. Nov. 18, 2010). Significantly, a party seeking to supplement pleadings under Rule 15(d) is not required to demonstrate "good cause" under Rule 16(b)(4) since this latter provision pertains solely to motions to *amend*—not motions to *supplement* pleadings. *See Watson v. Wright,* No. 08 Civ. 960, 2011 WL 1118608, at *5 (W.D.N.Y. Jan. 11, 2011) *adopted by* 2011 WL 1099981 (W.D.N.Y. Mar 24, 2011) ("Unlike motions to amend ... Rule 16's plain language does not require courts to set a deadline for filing a motion to supplement and the parties in this case did not set such a deadline in their Scheduling Order.") (internal citation and quotations omitted).

**III. DISCUSSION**

**A. Good Cause**

To the extent that Plaintiff seeks leave to amend under Rule 15(a), the Court finds that Plaintiff has demonstrated "good cause" to modify the scheduling order pursuant to Rule 16(b)(4). In the present matter, the final deadline to join parties or amend the pleadings expired on March 19, 2012. *See* Feb. 9, 2012 Electronic Order. In that Electronic Order, the Court stated that:

> The Court will grant an extension of the deadline for the joinder of parties and amendment of pleadings set forth in the Case Management and Scheduling Order. If counsel wishes to amend the Complaint, she must do so by stipulation or by formal motion pursuant to the Federal Rules of Civil Procedure. The stipulation or motion is due by March 19, 2012.

*Id.* Here, Plaintiff's counsel accurately represents that she notified the Court of her intention to amend and file the proposed TAC just two days following Plaintiff's acquittal on the charges stemming from the 2007 Weberfield Burglary. *See* DE 50. In her June 19, 2013 letter, Plaintiff's counsel reported that Plaintiff was acquitted by a Nassau County jury on June 17, 2013. *Id.* at 1. Furthermore, Plaintiff's counsel specifically cited this Court's January 25, 2013 Order in which the Court denied Plaintiff leave to amend a malicious prosecution claim arising from the Weberfield Burglary since it had not yet been adjudicated. *Id.;* DE 33 at 46. The Court reasoned, in light of the pending state prosecution, that any malicious prosecution claim arising from the Weberfield Burglary was not ripe for adjudication. *See* DE 33 at 46. However, following the June 17, 2013 acquittal on these charges, Plaintiff's counsel maintained that "with the termination of the state court proceeding in favor of Mr. Beckett, these claims are now ripe for adjudication." DE 50 at 2.

**\*7** Approximately one month after Plaintiff filed the June 19, 2013 letter, the Court presided over a Status Conference where a briefing schedule for the motion to amend was established and entered. *See* DE 53 ¶ 2. Plaintiff's counsel ultimately filed her initial moving papers on August 23, 2013. *See* DE 54. In light of the multiple times Plaintiff brought the circumstances of her client's criminal prosecution to the attention of the Court, and considering the diligence of Plaintiff's counsel in advising the Court of her anticipated motion to amend only two days following her client's acquittal, the Court finds that Plaintiff has demonstrated good cause warranting the modification of the March 19, 2012 deadline to amend pleadings. *See Sokol,* 2009 WL 2524611 at \*7 (citing 🚩*Rent–A–Center Inc.,* 215 F.R.D. at 104); 🚩*Erdogan,* 2014 WL 1236679, at \*7 (finding that "the applicable deadline could not have reasonably been met and Plaintiff acted with diligence under Rule 16(b)").

**B. Undue Delay and Prejudice**

Preliminarily, the Court points out that Plaintiff's motion papers do not clearly articulate whether the instant motion is brought solely under Rule 15(a) or pursuant to both Rule 15(a) and 15(d). For example, Plaintiff's counsel refers to the "new causes of action" and, at the same time, asks for leave "to allege the facts that have transpired since" the filing of the SAC to "develop his claims." *See* Pl.'s Mem. at 3; *see also* Plaintiff's Reply Memorandum of Law in Support of Motion to Amend Complaint ("Pl.'s Reply Mem.") at

5. According to counsel, Plaintiff "has not advanced any malicious prosecution or retaliation claims against any of the defendants" but rather "seeks to set forth the transactions, occurrences, and events that happened after he filed his second amended complaint in this action." Pl.'s Reply Mem. at 2–3. However, in her June 19, 2013 letter, Plaintiff's counsel states that she seeks to amend the action "to allege that the unlawful and malicious acts and/or omissions of the defendants resulted in the said state court prosecution" for the Weberfield Burglary. DE 50 at 1. Despite the seeming dissonance of these representations, it appears that Plaintiff is seeking leave under Rule 15(a) to assert a malicious prosecution claim arising out of the Weberfield Burglary *and* to supplement the pleading under Rule 15(d) with facts that arose after the February 8, 2013 SAC was filed. As such, the Court will construe the motion under both Rule 15(a) and Rule 15(d).

Since courts apply the same factors when assessing motions to amend under Rule 15(a) and motions to supplement under Rule 15(d), the Court will simultaneously analyze whether Plaintiff should be granted leave to amend under these provisions. *See Riverhead Park Corp. v. Cardinale,* 881 F.Supp.2d 376, 379 (E.D.N.Y.2012) ("Where, as here, the Plaintiffs seek to add related claims against the same defendants, the analysis under Rule 15(a) and Rule 15(d) is the same.") (internal citations omitted). "A court should deny leave to amend or to serve a supplemental pleading only upon undue delay, bad faith or dilatory motive on the part of the [moving party], ... undue prejudice to the [nonmoving party,] ... [or] futility." *Cummings–Fowler,* 282 F.R.D. at 296 (internal citations and quotations omitted); 🚩*Williams,* 659 F.3d at 213–14. "The party opposing the motion bears the burden of establishing that an amendment would be prejudicial or futile." *Cummings–Fowler,* 282 F.R.D. at 296 (internal citation omitted). "Ultimately, it is within the sound discretion of the court whether to grant leave to amend." *Id.* (internal citation and quotations omitted).

**\*8** Here, the Court finds no undue delay in the filing of Plaintiff's motion for leave to amend the pleading a third time. The claims and events sought to be added in the proposed TAC had not yet occurred and were not yet cognizable at the time the SAC was filed on February 8, 2013. *See* TAC. The steadfastness of Plaintiff's counsel in pursuing civil rights claims originating from the Weberfield Burglary is borne out by her multiple attempts at amending the pleading. In its January 25, 2013 Order, this Court held that any malicious prosecution claim arising out of the 2007 Weberfield Burglary

was not yet ripe for review because that criminal matter was still pending in state court. *See* DE 33 at 46. As soon as those charges were terminated on June 17, 2013, Plaintiff's counsel wasted no time notifying the Court of those developments and renewing her request to amend the SAC in her letter of June 19, 2013. DE 50. Given this timeline, the Court finds that Plaintiff did not unduly delay bringing the instant motion.

However, the Court disagrees with Plaintiff's representation that "[t]his action remains in its early stages" and, as such, will not unduly prejudice the Defendants. *See* Pl.'s Mem. at 5–6. Judge Wexler has twice placed the parties on notice of jury selection in this action. First, on July 31, 2013, the parties were advised that jury selection was set for June 2, 2014. *See* Jul. 31, 2013 Electronic Order. Again, on January 28, 2014, Judge Wexler reminded the parties that the new jury selection date of June 2, 2014 remained in effect and there would be no adjournments. *See* Jan. 28, 2014 Electronic Order. As acknowledged by Plaintiff's counsel,

> [t]his matter was scheduled for jury selection on June 10, 2013; however, jury selection did not commence as Beckett was actually engaged in jury selection and trial in the Nassau County Court on the aforementioned burglary and petite (*sic* ) larceny charges against him.

Hawkins Decl. ¶ 22; *see also* DE 53 ¶ 3.

The Court also points out that discovery was closed on September 28, 2012, when Judge Wexler originally marked this case ready for trial. *See* DE 32. Plaintiff's counsel alludes to a possible fourth amended pleading (potentially adding a claim of malicious prosecution arising from the burglary acquittal) which would undoubtedly delay the resolution of this action further in contravention of Judge Wexler's directives. As the County Defendants argue, Plaintiff's supplemental pleading "foreshadows a future request—a fourth amended complaint—to add new claims (malicious prosecution)" at this late stage of the litigation. County Defs.' Opp. at 5–6. The Freeport Police Officer Defendants submit that Plaintiff's instant motion is prejudicial to them on grounds similar to those asserted by the County Defendants. *See* Freeport Police Officers' Opp. at 9. The Freeport Police Officers argue that the TAC constitutes "nothing more than an

attempt to 're-start' the case to obtain long waived discovery." *Id.* According to Plaintiff's counsel, Defendants will not be required to "expend additional resources to conduct discovery and prepare for trial and would not significantly delay the resolution of this dispute." Pl.'s Mem. at 5–6. However, this conclusory statement is not reflective of the facts presently before the Court. As set forth by counsel, Plaintiff "should be permitted to amend and supplement his complaint to allege the facts that have transpired since he filed his second amended complaint" and he should further ***"be permitted to complete discovery to develop his claims against the defendants."*** Pl.'s Reply Mem. at 5 (emphasis added). As gleaned from the declarations of Plaintiff's counsel, discovery does, in fact, remain to be completed in this action. *See* Hawkins Decl. ¶¶ 23–24. Plaintiff's counsel points out that:

> **\*9** 23. The original parties in this action, Beckett and the Village defendants, have served and responded to interrogatories and document requests. The Village defendants deposed Beckett on April 9 and 10, 2013. Counsel for the County defendants was present at the deposition.

> 24. Beckett and the County defendants have served interrogatories and document requests; however, they have not been responded to the same.

*Id.* Given that discovery is concededly incomplete with respect to the current claims, permitting a further amendment to allow Plaintiff to explore allegations of malicious prosecution concerning the Weberfield Burglary will substantially extend the time this matter is litigated. Moreover, the 2007 Weberfield Burglary concerns a completely different incident from the one at issue in this litigation—the 2010 Liquor Store Robbery. As such, the Court finds that granting leave for a third time would, contrary to counsel's assertions, "significantly delay" resolution of this action.

Finally, the Court notes that finding the TAC prejudicial does not foreclose Plaintiff's ability to bring a separate lawsuit in connection with the Weberfield Burglary. Plaintiff, in conjunction with the instant pleading, filed a Second Supplemental Notice of Claim, dated September 13, 2013, which included, *inter alia,* a claim of malicious prosecution against all Defendants. *See* Second Supplemental Notice of Claim annexed to the Declaration of Deputy County Attorney Liora Ben–Sorek, Esq. ("Ben–Sorek Decl.") as Ex. "D" [DE 58–4]. In its January 25, 2013 Order, the Court found Plaintiff's filing of the Supplemental Notice of Claim

appropriate. DE 33 at 17. Here, too, the Court finds that the filing of the Second Supplemental Notice of Claim was appropriate. As previously explained by this Court, "several courts, without directly addressing the issue, have permitted plaintiffs to serve additional notices of claim which include facts that developed after the original notice was filed." DE 33 at 17 (citing *Rotundo v. Vill. of Yorkville,* No. 09 Civ. 1262, 2011 WL 838892, at *3 (N.D.N .Y. March 4, 2011); *Rivera v. Comm. Sch. Dist. Nine,* No. 00 Civ. 8208, 2002 WL 1461407, at *2 (S.D.N.Y. July 8, 2002); *Blue Water Envtl., Inc. v. Inc. Vill. of Bayville, New York,* 12 Misc.3d 1169(A), 820 N.Y.S.2d 841 (N.Y. Sup.Ct. Nassau Co.2006)). Since Plaintiff filed the Second Supplemental Notice of Claim within the ninety day statute of limitations set forth in General Municipal Law § 50–e(1), Plaintiff is not precluded from bringing an independent action for malicious prosecution arising out of the June 17, 2013 acquittal on the Weberfield Burglary charges.

### C. Whether Supplemental Facts in the TAC Connect to the SAC Under Rule 15(d)

Plaintiff contends that the proposed TAC would "buttress judicial economy." Pl.'s Mem. at 6 (citing *State Farm Mut. Auto. Ins. Co. v. Grafman,* No. 04 Civ. 2609, 2007 WL 7704666 (E.D.N.Y. May 22, 2007)). As a general matter, Rule 15(d) "reflects a liberal policy favoring a merit-based resolution of the entire controversy between the parties." *Witkowich v. Gonzales,* 541 F.Supp.2d 572, 590 (S.D.N.Y.2008) (internal quotation marks and citations omitted); *Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted). However, this "liberal policy" under Rule 15(d) is predicated on whether "the supplemental facts connect [the supplemental pleading] to the original." *Id.* (internal citations and quotations omitted). Here, the central dispute is whether the 2007 Weberfield Burglary is connected to the 2010 Liquor Store Robbery for which this case was originally brought. Under Rule 15(d), "[t]he threshold consideration for the district court is whether the supplemental facts connect [the supplemental pleading] to the original pleading." *Fair Housing in Huntington Committee,* 2010 WL 4791787, at *9 (internal citation and quotations omitted); *LaBarbera v. Audax Const. Corp.,* No. 02 Civ. 582, —— F.Supp.2d ——, 2013 WL 5295493, at *8 (E.D.N.Y.2013) ( "Rule 15(d) allows a party to supplement the complaint in order to present subsequent material that is related to the claims presented in the original complaint."). "If there is a relationship, then leave to supplement should be freely permitted absent undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility." *Fair Housing in Huntington Committee,* 2010 WL 4791787, at *9 (internal citation and quotations omitted).

**\*10** The Court finds that Plaintiff has failed to meet the threshold requirement establishing a connection between the claims in the operative pleading (SAC) and the new facts asserted in the proposed supplemental pleading (TAC) concerning the Weberfield Burglary. The County Defendants argue that "Plaintiff's proposed amendment[ ] attempts to link the DNA recovered at [Freeport Police Department] on February 6, 2010 with his continued incarceration on burglary charges (until July 2012) and the prosecution on those burglary charges which were resolved in June 2013." County Defs.' Opp. at 6. The County Defendants maintain that "neither Beckett's 2011 indictment on charges of burglary (stemming from a 2007 crime), nor his June 2013 trial were based at all upon the DNA retrieved at [Freeport Police Department] in February 2010." *Id.* at 7. In support of this position, the County Defendants have annexed the Affidavit of Assistant District Attorney Anthony Perri ("ADA Perri") to the Declaration of Deputy County Attorney Liora Ben–Sorek, Esq. filed in support of their opposition to Plaintiff's motion. *See* Ben–Sorek Decl., Ex. "E" ("Perri Aff."). ADA Perri explains that:

2. In June 2013, I was assigned to prosecute the case captioned: *People of the State of New York v. Leonard Beckett;* Indictment # 376N–12, in which the defendant was charged with having committed burglary in the second degree in violation of New York State Penal Law § 140.25(2).

3. The burglary at issue occurred on February 14, 2007 in Freeport, County of Nassau, State of New York.

4. The DNA left at the burglary scene was compared with a buccal sample taken from defendant Beckett, which he was required to give as a result of a prior conviction for endangering the welfare of a minor from May 16, 2003. Beckett's indictment on the burglary charge was, in part, based upon a comparison of those samples. The forensic evidence left at the crime scene and DNA obtained from the aforementioned mandatory buccal swabbing were the only DNA evidence utilized in connection with Beckett's indictment.

5. On or about February 27, 2013, another buccal swab was taken from Beckett pursuant to a discovery order signed by Acting New York Supreme Court Justice Hon. Alan L. Honorof under ⚑ New York State Criminal Procedure Law § 240.40. The February 27, 2013 buccal sample also matched the same DNA previously analyzed from the burglary scene.

6. Trial on the burglary charge was conducted in June 2013. The only DNA evidence presented during the trial was from the buccal sample taken in February 2013 and that which was recovered from the scene of the 2007 burglary.

*Id.* ¶¶ 2–6. Given this record, the County Defendants submit that "there is no nexus between the Defendants in this case and the actions sought to be alleged in the new pleading." County Defs.' Opp. at 7.

Similarly, the Village Defendants refer to ADA Perri's affidavit and argue that "the indictment of the plaintiff for that [Weberfield] burglary that resulted in his acquittal was based in part upon comparison of DNA that was left at the scene of the 2007 burglary in Freeport, New York with DNA obtained from the plaintiff from a buccal swab sample that plaintiff was required to give the Nassau County District Attorney as a result of his prior conviction in 2003 for endangering the welfare of a minor." Village Defs.' Opp. at 7. As such, the Village Defendants contend, the "DNA left at the scene of the burglary in 2007 was not obtained from his blood obtained on February 6, 2010 after his arrest for the robbery committed at the Freeport Wine & Liquor Store." *Id.* at 8. The Freeport Police Officer Defendants likewise state "it is undisputed that plaintiff's DNA from the 2010 robbery was not used in connection with plaintiff's prosecution for the 2007 burglary." Freeport Police Officers' Opp. at 11.

**\*11** In reply, Plaintiff argues that the "illegally obtained evidence was the foundation for both the 2010 robbery charges and the 2011 burglary charges against which Beckett had to defend himself." *See* Reply Declaration of Valerie A. Hawkins, Esq. in Support of Motion to Amend Complaint ("Hawkins Reply Decl."). In tying these two charges together, Plaintiff attempts to develop linkage between the SAC and the TAC which is necessary to add new allegations in a supplemental pleading under Rule 15(d). Citing a March 9, 2010 internal Nassau County Police Department memorandum from Sergeant Michael Cole of the Forensic Evidence Bureau to Defendant Meese, Plaintiff contends that Defendant Meese was "informed of a match between

Beckett's DNA and the DNA found at the scene of the alleged robbery." Hawkins Reply Decl., Ex. "A." In that March 9, 2010 memorandum, submitted for the first time in reply, Sergeant Cole wrote that:

> The evidence submitted to the **Forensic Evidence Bureau** for ***DNA*** analysis (10CR0010747, L10000698,)defendants gloves, jacket, cup and victims buccal swab kit have been accepted by the ***Medical Examiner / Department of Forensic Genetics*** for *immediate* analysis. The evidence has been transferred to the ***ME/DoFG.*** Should you need clarification or have any questions please, contact the Evidence Assessment Section at Ext. 7800.

*Id.* (emphasis in original). In citing this inter-departmental memorandum, Plaintiff concludes that the County Defendants had custody of the evidence secured from the 2010 Liquor Store Robbery arrest and later matched it with the earlier 2007 Weberfield Burglary. Hawkins Reply Decl. ¶ 5. Plaintiff submits that the County Defendants were "informed of a match between Beckett's DNA found at the scene of the alleged 2007 burglary" on May 28, 2010 as reflected in Detective Buokowski's case notes for the Office of the Medical Examiner. Pl.'s Reply. at 3; *see* Nassau County Office of the Medical Examiner Dep't of Forensic Genetics Case Contact Form, annexed as Exhibit "B" ("Forensic Notes") to the Hawkins Reply Decl. [DE 61–3]. As such, the assertion that "the illegal arrest by Beckett by the defendants had nothing to do with the 2011 burglary prosecution is false." Pl.'s Reply at 3. The inter-departmental memorandum and Forensic Notes are particularly troubling, according to Plaintiff's counsel, because all evidence from the pursuit and seizure of Plaintiff's person following the 2010 Liquor Store Robbery were declared unlawful by the Appellate Division in

⚑ *Beckett,* 88 A.D.3d at 931, 931 N.Y.S.2d 667, by the time Plaintiff's burglary trial commenced in 2013. Hawkins Reply Decl. ¶ 4. As such, the DNA sample, which Plaintiff claims was seized during the February 2010 arrest, also lays the foundation for his motion to supplement and, counsel argues, the Court should allow Plaintiff to "develop his claims against the defendants." Pl.'s Reply Mem. at 5.

Based on a review of the record, the Court is not persuaded by Plaintiff's conclusion that the Weberfield Burglary is connected to the claims in the SAC for purposes of amending under Rule 15(d). Although Plaintiff's counsel refers to the evidentiary decision of Justice Honorof which was issued on June 22, 2012 in connection with the Weberfield Burglary prosecution, counsel neglects to cite a critical segment of that decision, specifically, that the court denied Plaintiff's motion to suppress DNA evidence. *See* Hawkins Reply Decl., Ex. "C." The issue before Justice Honorof was not unlike the one currently before the Court, namely, whether the DNA used by the prosecution against the Plaintiff on the Weberfield Burglary constituted the same sample that was suppressed by the Appellate Division. *Id.* at 1, 931 N.Y.S.2d 667. In the Weberfield Burglary prosecution, Plaintiff moved to suppress the DNA as "fruit of the poisonous tree" whereas the state argued that "the DNA to which the DNA in this case was matched was not the DNA obtained which was ultimately suppressed, but rather came from the defendant's 'convicted defendant specimen', lawfully taken and maintained by the New York State DNA Index System after plea in that matter." *Id.* (internal citation omitted). However, Justice Honorof held that

> **\*12**  [t]he defendant's motion to suppress the instant DNA evidence is denied. Though the DNA in the initial robbery case was illegally obtained, the defendant's subsequent plea and the DNA sample was legally obtained pursuant to a voluntary plea. As the Second Department held in *People v. King,* 232 AD3d 111, 117 "once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to use of that sample", lv. denied 91 NY3d 875 (1997).

*Id.* The County Defendants asserted in their opposition papers that "[a]s part of pre-trial discovery in the burglary prosecution, Nassau County Acting Supreme Court Justice Hon. Alan Honorof ordered Beckett to provide a buccal sample." County Defs.' Opp. at 4. As referenced in the County defendants' opposition and in the affidavit of ADA Perri, "[t]hat sample was taken on or about February 27, 2013 and matched the DNA found at the burglary scene." *Id.* In contrast to the arguments set forth by the Defendants, Plaintiff has set forth only conclusory, circular arguments proffering that the DNA sample used by the state to prosecute the Weberfield Burglary was unlawfully obtained. Moreover, as seen above, Plaintiff's contentions are predicated on

an incomplete recitation of the facts from the underlying burglary proceeding. Given this record, the Court finds that the facts to be added in Plaintiff's supplemental pleading are not connected to the civil rights claims stemming from the 2010 Liquor Store Robbery.

This case is distinguishable from *Witkowich,* 541 F.Supp.2d at 590, where, for example, the court *sua sponte* granted plaintiffs leave to supplement a retaliation claim pursuant to Rule 15(d) because plaintiff's new allegations in opposing defendants' summary judgment motion were "closely related to those raised" in the pleading. The court reasoned that the supplemental allegations involved the "same subject matter," "many of the same people," and events which took place around the same time as the original discrimination claim. *Witkowich,* 541 F.Supp.2d at 590. By contrast here, the series of events Plaintiff seeks to bring within the supplemented pleading (1) arise from totally different charges, (2) took place three years prior to the 2010 Liquor Store Robbery at issue, (3) involve different parties, and, (4) unlike the interconnectedness of a discrimination and retaliation claim, are not closely related but rather, represent two entirely different transactions.

Similarly, the facts in the present matter are dissimilar to those presented to the court in *Alexandre v. Town of Hempstead,* 275 F.R.D. 94, 98 (E.D.N.Y.2011) in which plaintiff's motion to supplement was granted pursuant to Rule 15(d). There, the plaintiff did not seek to add any new causes of action, but rather to add further facts to his original cause of action. As a result, the court found that only limited additional discovery would be necessary. *Alexandre,* 275 F.R.D. at 98; *see also Andino v. Fischer,* 698 F.Supp.2d 362, 374 (S.D.N.Y.2010) (denying motion to supplement under Rule 15(d)). Here, by contrast, the Plaintiff is admittedly using the unrelated acquittal of charges from the Weberfield Burglary to explore a potential new claim, not yet realized, against the Defendants. Unlike *Alexandre* and *Andino,* Plaintiff does not show how the contemplated malicious prosecution claim stemming from the Weberfield Burglary would connect to the original claims such that there is no undue prejudice or delay in the resolution of this action.

### D. Futility

**\*13**  Assuming Plaintiff also seeks to set forth a new claim of malicious prosecution, the Court must assess whether

that new cause of action would be a futility under Rule 15(a). In addition to causing undue prejudice, the Court finds that the purported new claim, namely, malicious prosecution for the Weberfield Burglary, fails to state a plausible claim upon which relief can be granted. "An amendment is futile if the claim would be unable to withstand a Rule 12(b)(6) motion to dismiss ... and the court applies the same analysis in determining futility as it does in deciding Rule 12(b)(6) motions." *Wade v. Rosenthal,* No. 11 Civ. 5672, 2012 WL 3764291, at *1 (E.D.N.Y. Aug. 29, 2012) (internal citations and quotations omitted). "As a result, mere labels, conclusions, and a 'formulaic recitation of the elements of a cause of action' do not suffice to state a plausible claim." *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,555 (2007)). All Defendants in this action contend that any putative malicious prosecution claim originating from the burglary charges would be unsustainable. The County Defendants argue the general principle that a plaintiff must allege personal involvement of a defendant in a 🚩Section 1983 lawsuit. County Defs.' Opp. at 7. Here, the County Defendants maintain, "Plaintiff makes no direct allegation that Detective Meese or any of the other individual defendants caused Plaintiff's allegedly prolonged incarceration or was in any way involved in the prosecution against him of the burglary charges." *Id.*

The Freeport Police Officer Defendants contend that, as an initial matter, Plaintiff's counsel concedes that no new claim is being asserted in the TAC. Freeport Police Officers' Opp. at 9. As such, they argue that Plaintiff's counsel has "chosen to waste the time of the defendants and this court with the instant motion." *Id.* Assuming that Plaintiff *is* setting forth such a claim, the Freeport Police Officer Defendants assert that any such malicious prosecution claim would be futile against them because they "undisputedly had no role in commencing or continuing the prosecution of plaintiff in connection with the 2007 burglary." *Id.* at 10. Further, the Freeport Police Officer Defendants submit that Plaintiff cannot establish the "requisite element of malice" necessary to set forth a *prima facie* malicious prosecution claim against any of the Defendants. *Id.*

The Village Defendants likewise oppose the motion, arguing that a malicious prosecution claim associated with the Weberfield Burglary is futile because (1) contrary to Plaintiff, the DNA evidence used in the burglary trial was not unlawfully obtained, and (2) Plaintiff's counsel acknowledged at trial that the blood obtained at the scene of the burglary was, concededly, from the Plaintiff. Village Defs.' Opp. at 7–8.

A claim for malicious prosecution under New York law requires the plaintiff to prove: (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in the plaintiff's favor; (3) a lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's action. *Anilao,* 774 F.Supp.2d at 504. "The absence of probable cause is, therefore, 'an essential element of a claim for malicious prosecution.' " 🚩*Perez v. City of New York,* No. 01 Civ. 5384, 2007 WL 14486, at *11 (E.D.N.Y.2007) (quoting 🚩*McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006)); 🚩*Gem Financial Service, Inc. v. City of New York,* No. 13 Civ. 1686, 2014 WL 1010408, at *9 (E.D.N.Y. Mar. 17, 2014) (listing the elements of a *prima facie* malicious prosecution claim). Furthermore, "[a]n indictment by a grand jury creates a presumption of probable cause." 🚩*Perez,* 2007 WL 14486, at *11. "The presumption may be overcome only by evidence establishing that the [defendants] have not made a complete and full statement of facts either to the Grand Jury or to the [prosecutor], that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith...." *Colon v. City of New York,* 60 N.Y.2d 78, 82–83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983); *accord Faison v. Maccarone,* No. 11 Civ. 137, 2012 WL 681812, at *7 n. 11 (E.D.N.Y. Mar. 1, 2012) (holding that a plaintiff may only overcome the presumption by establishing that the indictment was procured by fraud, perjury, suppression of evidence or other police conduct undertaken in bad faith); 🚩*Perez,* 2007 WL 14486, at *11. A plaintiff must allege specific facts that rebut the presumption of probable cause which arises from a grand jury indictment. *Rhodes v. Tevens,* No. 07 Civ. 471 S, 2012 WL 777421, at *9 (W.D.N.Y. Mar.7, 2012).

**\*14** Here, to the extent that Plaintiff is attempting to set forth a malicious prosecution claim arising out of the Weberfield Burglary, the claim is not plausible. Preliminarily, the Court notes that such a claim suffers from some of the same infirmities identified in Plaintiff's assertion of a malicious prosecution claim stemming from the 2010 Liquor Store Robbery. As explained in the Court's January 25, 2013 Order:

> The [Proposed SAC] alleges that "[o]n May 5, 2010, a Nassau County grand jury handed down an indictment that charged Beckett" with various counts of robbery, assault, criminal possession of a weapon, and resisting arrest.

Therefore, a presumption arises that Defendants acted with probable cause and Plaintiff must allege wrongdoing by the Defendants with respect to the grand jury proceedings. Plaintiff has not done so. Thus, the claim is unsustainable.

Notably, the Liquor Store Robbery malicious prosecution claim would also be subject to dismissal on other grounds. First, Plaintiff does not allege which Defendants were responsible for initiating or continuing the criminal prosecution. Nor does Plaintiff plead malice, which requires allegations of wrong or improper motive.

DE 33 at 45–46 (internal citations omitted). The Court finds that any putative malicious prosecution claim originating from the Weberfield Burglary is similarly deficient. In her proposed TAC, Plaintiff has not clearly set forth which of the defendants she seeks to recover against under a theory of malicious prosecution for the Weberfield Burglary. Moreover, Plaintiff has again failed to plead any facts which show a lack of probable cause or actual malice. As described in the affidavit of ADA Perri, the Weberfield Burglary prosecution was initiated pursuant to Indictment # 376N–12 in the *People of the State of New York v. Leonard Beckett,* charging Plaintiff with burglary in the second degree in violation of New York State Penal Law § 140.25(2). *See* Ben–Sorek Decl., Ex. "E" ¶ 2. Plaintiff has not rebutted the "presumption of probable cause" created by this grand jury indictment and, as such, fails to state a claim for relief that is plausible on its face. *See Hendrix v. City of New York,* No. 12 Civ. 5011, 2013 WL 6835168, at *8 (E.D.N.Y. Dec.20, 2013) (quoting *Twombly,* 550 U.S. at 547); *Brown v. City of New York,* No. 08 Civ. 5095, 2013 WL 5329356, at *1 (E.D.N.Y. Sept. 20, 2013) ("A grand jury indictment creates a rebuttable presumption of probable cause, which is fatal to a claim of malicious prosecution.") (citing *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003)).

As noted above, Plaintiff cannot show that "his indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Hendrix,* 2013 WL 6835168, at *8. Plaintiff's attempt to link the unlawfully seized DNA evidence from the 2010 Liquor Store Robbery with the 2007 Weberfield Burglary prosecution is mere conjecture unsupported by a plausible basis in fact. The DNA sample left at the scene of the 2007 Weberfield Burglary was compared with a buccal sample taken from the Plaintiff as a result of prior conviction for endangering the welfare of a minor. *See* Ben Sorek Decl., Ex.

"E" ¶ 4. As ADA Perri noted, Plaintiff's indictment on the Weberfield Burglary charges was "in part" predicated upon a comparison of the foregoing two DNA samples. *Id.* These were the only two items used in connection with Plaintiff's indictment.

**\*15** Moreover, in addition to the lack of probable cause, Plaintiff fails to show any malice by any of the Defendants. Actual malice under New York law "means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Stanbury v. Wertman,* No. 09 Civ. 4638, 2012 WL 183849, at *8 (S.D.N.Y. Jan. 24, 2012) (quoting *Rounseville v. Zahl,* 13 F.3d 625, 630 (2d Cir.1994)). "However, it is also the case that 'New York courts recognize that actual malice can rarely be established through direct evidence and thus may be proven though circumstantial evidence.' " *Id.* (quoting *Rounseville,* 13 F.3d at 630). "Further, New York law considers the lack of probable cause and the presence of malice closely related," *Rounseville,* 13 F.3d at 631, and "[a] lack of probable cause generally creates an inference of malice." *Id.* at *9 (citing *Boyd v. City of New York,* 336 F.3d 72, 78 (2d Cir.2003); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996)). Here, the Court finds that Plaintiff has not set forth any facts in the TAC to suggest that any of the Defendants were motivated by actual malice. This conclusion is further supported by the lack of probable cause reflected in the TAC. The prosecution of the Weberfield Burglary was based on a lawful indictment. Moreover, a buccal swab of Plaintiff's DNA evidence was ordered to be produced in pre-trial discovery by a state court judge, the results of which confirmed a match with the specimen recovered at the Weberfield Burglary.

Finally, the Court notes that, although not pleaded in the TAC, Plaintiff has again set forth state law causes of action for intentional infliction of emotional distress, negligence, false arrest, false imprisonment, assault, battery, and *prima facie* tort in the Second Supplemental Notice of Claim. *See* Ben–Sorek Decl., Ex. "D" ¶ 18. To the extent Plaintiff attempts to re-plead these allegations, the Court reminds Plaintiff of its decision in the Order of January 25, 2013 finding these claims futile. DE 33 at 18–19. As such, any of the foregoing putative state law claims would also constitute a futility.

## IV. *CONCLUSION*

For all of the foregoing reasons, the Court DENIES Plaintiff's motion to amend the Complaint for a third time. The parties are directed to appear for an in-person status conference before this Court on April 24, 2014 at 12 p.m.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1330557

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,
v.
P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

*1 Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase,[1] T. LaValley, R. Paquette–Monthie,[2] and Eric Gutwein[3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5.)

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7.) According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8.)

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays attributable to Brooks before service of process occurred, (Dkt No. 7 at 7–10; Dkt. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he [could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court,

Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted.[4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error.[5] *See id.*

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when] they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals,[6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton-to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of

restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants were dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint.[7]

#### A. *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at \*6–7, even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

#### B. *Leave to Amend*

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the court's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See* ⚠️*Jolley v. Meacham,* 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original complaint."); 🚩*Smith v. Yonkers Police Dep't,* 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); *Jones v. Fischer,* No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

## V. *Conclusion*

**\*4  WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED** that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

**ORDERED** that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

**ORDERED** that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 🚩28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to 🚩Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013,

this court converted the 🚩 Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior 🚩 Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

## BACKGROUND

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5).[1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (Id.).

**\*5** C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (Id.; Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase[2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O.

Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette–Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the 🚩 Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein[3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie,[4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary charges at Coxsackie; and (4) he was denied due process in

connection with the adjudication of the disciplinary charges at Coxsackie. [5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and plaintiff was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know-or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶ ¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the defendants violated plaintiff's various constitutional rights, as he alleges.

### DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValley with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 U.S. 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 U.S. 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the

Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See* *Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies are available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. [7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g.,* *Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

### B. Analysis

**\*9** Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValle, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, and had no recollection of receiving any such letter, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValle. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was

transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16). [8]

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes. [9]

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia,* to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14). [10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8–9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia,* June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

**\*10**  There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2). [11]  In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-*i.e.,* Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

Under applicable regulations, [12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-*i.e.,* within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension suggests the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g.,* 🔖 *Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

**\*11**  It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g.* 🔖 *Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing 🔖 *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance

he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July 14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

 **\*12** Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"- the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP

in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response"**) (emphasis added); 701.5(d)(1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards. [15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated June 26th is backdated because it purports to be an appeal of the grievance plaintiff states that he filed on approximately the same date and it references events, including plaintiff's misconduct charge at Coxsackie on July 7, 2013 (Paquette–Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June 26th. As noted above, the documents submitted by plaintiff indicate that his submission was not received in the office of the IGP Director in Albany until early September 2011. The court concludes that no reasonable fact finder could conclude that plaintiff filed an initial grievance with respect to the conduct of defendants Chase and LaValley until August 26, 2011, which is considerably longer than 21 or 45 days after the relevant "occurrences"-the adjudication of the misbehavior report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or

plaintiff's transfer out of Clinton, which occurred on or about June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the court concludes that these claims against defendants Carr and LaValley may be dismissed, on summary judgment, because of plaintiff's failure to exhaust his administrative remedies by filing a timely initial grievance.

### III. Eighth Amendment Claims

 **\*13**  Plaintiff alleges that defendant Rock violated his Eighth Amendment rights in two ways on June 15, 2011, by inflicting cruel and unusual punishment when she hit him in the head with the bathroom door, and by refusing to allow him to get immediate medical treatment for his purported injuries. As discussed above, C.O. Rock denies that she opened the bathroom door or caused it to hit plaintiff in the head, and she alleges that plaintiff did not request medical care or appear to require it. Plaintiff was seen, at his request, two days later by the Clinton medical staff, who found no evidence of bruising or swelling on plaintiff's head and treated him with Ibuprofen and a bag of ice.

Notwithstanding these factual disputes, the court concludes that, even accepting plaintiff's version of the relevant events, no reasonable fact finder could conclude that his Eighth Amendment rights were violated by defendant Rock. Accordingly, for the following reasons, this court recommends dismissal of those claims.

### A. Excessive Force

#### 1. Applicable Law

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be

" 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " ' 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Analysis

 **\*14**  In connection with defendants' summary judgment motion, plaintiff and C.O. Rock present very different versions of the events of June 15th. Plaintiff alleges that, on the day before the incident, C.O. Rock threatened to "put her size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant Rock denies ever threatening plaintiff (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five

minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial 🚩Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of 🚩Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a 🚩Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010) (citing 🚩*Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a 🚩§ 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's

cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6 (S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013).

### B. Denial of Medical Care

#### 1. Applicable Law

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 🚩*Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. 🚩*Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. 🚩*Id.* at 184 (citing, *inter alia,* 🚩*Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting ⚠️*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." 🚩*Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." 🚩*Id.* at 185. The standard for determining

when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia,* *Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

**2. Analysis**

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff two days later. (Compl., Dkt. No. 1 at 5). [16] In connection with defendants' initial Rule 12(b)(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b) (6) Mot. at 22–23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

> "Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in Smith also observed, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with due to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) . [17] He also challenges the quality of his medical care after leaving Clinton. [18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of the overwhelming documentary medical evidence to the contrary. [19]

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at \*2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered

a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical effects or demonstrable physical injury" that resulted from what was in any case-at most—a two delay in treatment). [20]

## IV. Retaliation

**\*18** Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff

can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim.[21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary

proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not

personally involved in any adverse action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValley, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in Clinton and at DOCCS—presumably in the central office-in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

### 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more selfserving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant

Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated.[22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on his prison disciplinary charge,[23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b)(6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

**\*22**  The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g., Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at \* 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants

made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims)[24]; *Jeffreys v. City of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g., Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response

to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValle Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany- much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValle's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValle Decl. ¶¶ 8–13; Pl.'s Reply to LaValle Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValle conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValle's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValle Decl. ¶¶ 13–15; Pl.'s Reply to LaValle Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein

Defendants' initial Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because he "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40).[25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she was initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42– 15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1).[26]

**\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15). Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–

Monthie that she issued the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at * 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at * 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff-*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

**\*25** The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–Monthie at Coxsackie, and during the disciplinary hearing, plaintiff acknowledged that he had telephonic contact with his wife from other DOCCS facilities before he was transferred to Coxsackie, at the number listed under his aunt's name on his emergency contact list. [27] (Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the disciplinary charges because he believed that he should not be charged with misconduct by Coxsackie officials for calls he made to his wife from other institutions. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff also asserted that the exception for "correspondence" in the order of protection should be interpreted to include telephonic contact, notwithstanding the explicit, prior prohibition in the order against communications by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45, 49). Plaintiff claimed that his wife, who was willing to speak with him by phone, and the District Attorney and Judge who caused the order of protection to be entered, would agree that telephonic contact was permissible, notwithstanding the clear language of the order of protection. [28] (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

The court finds that, although plaintiff made several frivolous arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl,* 20 F.3d at 534–35. Accordingly, I would recommend that summary judgment be granted in favor of the Coxsackie defendants on plaintiff's retaliation claim, based, *inter alia,* on *Mt. Healthy* and its progeny.

## V. Due Process

### A. Legal Standards

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes

atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

**\*26** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g., Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

### B. Analysis

The complaint alleges that, in conducting the disciplinary hearing at Coxsackie and finding plaintiff guilty, defendant Gutwein was motivated by a desire to retaliate against plaintiff for his complaint against defendant Rock at Clinton. Plaintiff also alleges that Hearing Officer Gutwein also improperly denied plaintiff's requests to call key witnesses or obtain documents that would have established his innocence. (Dkt. No. 1 at 7). In plaintiff's prior motion to amend his complaint, which this court denied (Dkt. No. 38 at 7, 9–10), he attempted to supplement his due process claim by

alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

**\*27** The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. ⚑ *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which plaintiff impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

**\*28** Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55). [29]

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See* ⚑ *Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing. [30]

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. ⚠️ *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing ⚑ *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia,* ⚑ *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " ⚑ *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior denial of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position is that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id* .)

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie

for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at \*6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

### 3. Sufficiency of the Evidence
**\*30** As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99). [35]

### 4. Hearing Officer Bias
"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." 🚩 *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." 🚩 *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); 🚩 *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." 🚩 *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact.

*Francis v.. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

**\*31  RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

---

### Footnotes

1    Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3).

2    While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonth ie. (Dkt. No. 42, Attach.12.)

3    Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.)

4    Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.)

5    "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149049, at \*6.

6    Brooks writes "I'am adding defendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .)

7    Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see* 🚩 *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend.

1    Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header.

2    Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste.**" The court will use this defendant's correct name.

3    The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein.

4    The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette– Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action.

5    To avoid dismissal of his due process claims under 🚩 *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). *See* 🚩 *Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006).

6    *See* 🚩 *Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); 🚩 *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); 🚩 *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); 🚩 *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

7    *See, e.g., Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); 🚩 *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

8    According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8).

9    As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g.,* 🚩 *Goodson v. Silver,* 9:09–CV–494 (GTS/DRH), 2012 WL 4449937 at *9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted 🚩 *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies

the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/DEP), 2007 WL 2693526, at *9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases).

10    The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff.

11    Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5).

12    *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence).

13    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord,* Murray v. Palmer, 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010).

14    N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

> An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.

(emphasis supplied).

15    Absent an extension, which would require the written consent of the grievant, N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(3) (I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g.,* Goodson v. Silver, 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance

process is contemplated-to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

16      In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42–10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in the head. *Farmer v. Brennan,* 511 U .S. at 844; *Salahuddin v. Goord,* 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

17      Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

18      Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

19      *See also Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

20      *See also Brown v. White,* 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos,* 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon,* 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

21      Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where

the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

22    *See, e.g.,* *Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23    *See* *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

24    The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at *4.

25    Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

26    Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

27    Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28    The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

29    Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

30    *See Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

31    On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not do so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script, and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. 🚩 *Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing 🚩 *Ponte v. Real,* 471 U.S. at 497).

32    Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

33    Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

34    The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

35    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1292232
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Emanuel M. BROOKS Jr., Plaintiff,
v.
P. ROCK et al., Defendants.

No. 9:11–cv–1171 (GLS/ATB).
|
Signed March 28, 2014.

**Attorneys and Law Firms**

Emanuel M. Brooks Jr., Marcy, NY, pro se.

Hon. Eric T. Schneiderman, Stephen M. Kerwin, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

*MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff *pro se* Emanuel M. Brooks Jr. commenced this action against defendants P. Rock, P. Chase,[1] T. LaValley, R. Paquette–Monthie,[2] and Eric Gutwein[3] alleging a host of civil rights violations pursuant to 42 U.S.C. § 1983. (*See generally* Compl., Dkt. No. 1.) Following the dismissal of some claims, (Dkt. No. 17), defendants moved for summary judgment dismissing the complaint in its entirety. (Dkt. No. 42). Brooks also moved for preliminary injunctions and the appointment of counsel. (Dkt.Nos.54, 58.) In a Report–Recommendation (R & R) dated January 17, 2014, Magistrate Judge Andrew T. Baxter recommended that defendants' motion be granted, and that Brooks' motions be denied. (Dkt. No. 60.) Pending is Brooks' "Motion of Appeal and Objection to [Decision]," which, as explained below, is liberally construed as both an objection to the R & R and request for leave to amend. (Dkt. No. 62.) For the reasons that follow, the R & R is adopted in its entirety, and leave to amend is denied.

### II. *Background*

Brooks, an inmate in the custody of the New York Department of Corrections and Community Supervision (DOCCS), was housed at Clinton Correctional Facility for the first time period relevant to his complaint. (Dkt. No. 42, Attach. 5 at 4; Compl. at 5.) While at Clinton, Brooks contends that Rock opened a door, which hit him extremely hard in the forehead, refused him speedy medical attention for his head injury, and falsely charged him with misbehavior. (Compl. at 5.) Chase, who found Brooks not guilty of the charges lodged by Rock, (Defs.' Statement of Material Facts (SMF) ¶ 39, Dkt. No. 42, Attach. 16), allegedly threatened Brooks that he was "going to get [him] at the next [correctional facility]," (Compl. at 5.)

Thereafter, Brooks was transferred to Coxsackie Correctional Facility. (Dkt. No. 42, Attach. 5 at 4.) Brooks claims that LaValley arranged for his transfer to Coxsackie, despite his request to be transferred to Sing Sing Correctional Facility, in retaliation for filing a grievance regarding Rock. (Compl. at 6.) While at Coxsackie, Brooks was cited for misbehavior by Paquette–Monthie, (Dkt. No. 42, Attach. 13 at 8); Brooks claims that the misbehavior report was filed in retaliation for his complaint about Rock while at Clinton, (Compl. at 7). According to Brooks, Gutwein, who presided at Brooks' disciplinary hearing on the Coxsackie misbehavior report, (Dkt. No. 42, Attach. 14 ¶ 5), improperly denied Brooks' requests to produce certain witnesses and evidence, found him guilty of the charged conduct, and sentenced him to six months in the special housing unit along with six months loss of good time, (Compl. at 7–8.)

This action was filed on September 30, 2011. (*See generally* Compl.) In October 2012, following several delays attributable to Brooks before service of process occurred, (Dkt Nos. 7 at 7–10; Dkt. Nos. 9, 12, 13, 15, 16, 17), defendants moved to dismiss pursuant to Rule 12(b)(6), (Dkt. No. 31). In response, Brooks sought leave to amend. (Dkt. No. 36.) The court converted defendants' motion to dismiss to a motion seeking summary judgment and denied Brooks' motion for leave to amend for failure to comply with the Local Rules of Practice, but explained that "[i]f, after resolution of the summary judgment motion, [he] still wish[ed] to amend his complaint, he [could do so] in the proper form." (Dkt. No. 38 at 9–10.) In May 2013, defendants filed their motion for summary judgment consistent with the court's conversion of their earlier-filed motion to dismiss. (Dkt. No. 42.) Before that motion for summary judgment was considered by the court,

Brooks filed the aforementioned motions for appointment of counsel and preliminary injunctions. (Dkt.Nos.54, 58.)

**\*2** In a January 17, 2014 R & R, Judge Baxter recommended that defendants' motion for summary judgment be granted.[4] (Dkt. No. 60 at 60.) As pertinent here, Judge Baxter determined that: (1) issues of fact precluded summary judgment regarding Brooks' exhaustion of administrative remedies with respect to his claims against Rock; (2) Brooks failed to exhaust his administrative remedies with respect to his claims against Chase and LaValley; and (3) despite his failure to exhaust with respect to Chase and LaValley, all claims, against all defendants, were subject to dismissal on the merits. (*Id.* at 7.)

### III. *Standard of Review*

Before entering final judgment, this court routinely reviews all report and recommendation orders in cases it has referred to a magistrate judge. If a party has objected to specific elements of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*6–7 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, or only a vague or general objection has been filed, this court reviews the findings and recommendations of the magistrate judge for clear error.[5] *See id.*

### IV. *Discussion*

As an initial matter, the court must make sense of Brooks' submission, which he has titled "Motion of Appeal and Objection to [Decision]." (Dkt. No. 62.) The only references made to the R & R in that filing concern Brooks' contention that defendants "[l]ied in the summary [j]udg[ ]ment [when they all testified and stated that ... plaintiff never file[d] a grievance or at[tempted] to exhaus[t] his [administrative remedies]." (*Id.* at 1–2, 10.) The balance of Brooks' submission contains allegations, made for the first time, that defendants, DOCCS, and potentially other unnamed individuals,[6] failed and/or refused to protect him from a conspiracy-related to an incident that occurred on December 2, 2013 at Clinton-to murder him "in further [retaliation]." (*Id.* at 2–13.) In light of the new allegations, Brooks requests a "Motion of discover," "Motion for permanent order of

restrain," "Motion for chain of custody," and a "Tellephone an commer emergency Confrence." (*Id.* at 8, 9.) Bearing in mind Brooks' *pro se* status, the court treats his assertion that defendants were dishonest regarding his exhaustion of administrative remedies as an objection to the R & R, and it considers the remainder of Brooks' submission as a motion seeking leave to amend his complaint.[7]

#### A. *Objection*

While it appears that Brooks' objection is specific, and, thus, is deserving of *de novo* review, *see Almonte,* 2006 WL 149049, at \*6–7, even if the court accepts as true his allegation that defendants "lied" in support of their argument that he failed to exhaust his administrative remedies, (Dkt. No. 62 at 1–2, 10), that fact would not impact Judge Baxter's ultimate recommendation of dismissal. Indeed, despite the finding that Brooks failed to exhaust with respect to some of his claims, the R & R recommends dismissal of all claims on the merits, (Dkt. No. 60 at 7, 60), a reality that Brooks overlooks entirely. Nonetheless, the court has carefully reviewed the R & R for clear error and finds none. As such, the R & R is adopted in its entirety.

#### B. *Leave to Amend*

**\*3** Defendants argue that leave to amend should be denied because: (1) the new allegations "have absolutely nothing to do with the incidents in [Brooks' c]omplaint, or the named defendants"; (2) Brooks failed to submit a proposed amended pleading in compliance with Local Rule 7.1(a)(4); and (3) a late amendment "would prejudice the right of the current defendants to a speedy conclusion of this action." (Dkt. No. 63 at 2.) The court agrees that Brooks should not be granted leave to amend.

At the outset, the court is cognizant of the fact that Brooks has had no prior opportunity to file an amended pleading. This is so despite the fact that this action has been pending for well over two years. Indeed, the posture of this case is somewhat peculiar in that the summons and complaint were not served upon defendants until nearly one year after commencement. (Dkt.Nos.17–20, 23–25.) The wheels of justice have churned at an admirable pace since; nonetheless, given the natural progression of this litigation, a significant amount of time has elapsed. Before filing an answer, defendants moved to dismiss, and later, after the court's conversion of that motion, augmented the record and filed a summary judgment motion. (Dkt.Nos.31, 38, 42.) The court is also mindful that discovery has not commenced.

Brooks was previously informed that if, after resolution of the summary judgment motion, he still wished to amend his complaint, he had to do so by making "a motion to amend in the proper form." (Dkt. No. 38 at 10.) Despite the explicit nature of the court's prior order, Brooks' latest request, which is based on facts that did not occur until December 2013, (Dkt. No. 62 at 5, 6), is not in proper form. *See* N.D.N.Y. L.R. 7.1(a)(4) (requiring, among other things, that a party seeking leave to amend "must attach an unsigned copy of the proposed amended pleading to its motion papers").

More fundamentally, however, Brooks' latest allegations are not sufficiently related to his underlying claims to warrant amendment under Fed.R.Civ.P. 15. *See* Jolley v. Meachum, 210 F.3d 354, 2000 WL 427276, at *1 (2d Cir.2000) ( "As for the claims that were unknown to [the plaintiff] at the time he filed his original complaint, we agree with the district court's determination that these claims were not sufficiently related to [the plaintiff]'s original claim, and therefore they could not be added to his original complaint."); Smith v. Yonkers Police Dep't, 152 F.3d 920, 1998 WL 433005, at *1 (2d Cir.1998) (holding that the district court did not abuse its discretion in denying a motion to amend made five years after commencement of the action that sought to allege "a claim wholly unrelated to [the original pleading]"); Jones v. Fischer, No. 9:11–cv–774, 2013 WL 4039377, at *2 n. 6 (N.D.N.Y. Aug. 7, 2013) (explaining that new factual allegations, raised for the first time along with objections, would be disregarded where those "allegations have nothing whatsoever to do with claims that were asserted in [operative pleading]"). Indeed, the only link between the new allegations that DOCCS has failed to protect Brooks from a murder conspiracy and defendants is his wispy assertion that defendants are participating in that failure or refusal to protect Brooks "in *further* [retaliation]." (Dkt. No. 62 at 3 (emphasis added).) Liberally read, this suggests that defendants' new alleged failure to protect Brooks is because of the same grievances that were at the center of his original retaliation claims. The highly tenuous relationship between the new and original allegations is insufficient to serve as a basis for leave to amend, particularly when coupled with the significant lapse of time between the facts alleged in the complaint, which occurred in 2011, (Compl. at 5, 12–20), and Brooks' claim about an incident that occurred in December 2013, (Dkt. No. 62 at 5–6). *See* Robles v. Khahaifa, No. 09CV718, 2012 WL 2401574, at *10 (W.D.N.Y. June 25, 2012). Accordingly, leave to amend is denied.

### V. *Conclusion*

**\*4  WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Andrew T. Baxter's ReportRecommendation (Dkt. No. 60) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED;** and it is further

**ORDERED** that Brooks' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that Brooks' motion for the appointment of counsel (Dkt. No. 58) is **DENIED;** and it is further

**ORDERED** that Brooks' motions for preliminary injunctions (Dkt.Nos.54, 58) are **DENIED** as moot; and it is further

**ORDERED** that Brooks' motion for leave to amend his complaint (Dkt. No. 62) is **DENIED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this MemorandumDecision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

Presently before the court is the defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 42). This matter was referred for Report and Recommendation on May 22, 2013 by Chief U.S. District Judge Gary L. Sharpe, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

On October 31, 2012, defendants filed a motion to dismiss plaintiff's civil rights action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 31). Plaintiff responded (Dkt. No. 36) and defendants filed a reply (Dkt. No. 37). By Decision and Order dated March 29, 2013,

this court converted the 🚩 Rule 12(b)(6) motion to one for summary judgment, and provided the parties with an opportunity to file supplemental papers. (Dkt. No 38). On May 20, 2013, defendants filed a complete motion for summary judgment (Dkt.Nos.42, 43), but also continued to rely on papers submitted in connection with the prior 🚩 Rule 12(b)(6) motion. Plaintiff has opposed the motion for summary judgment (Dkt. No. 52); he has also filed two motions for preliminary injunctions, one of which included a motion for appointment of counsel (Dkt.Nos.54, 58), to which defendants have responded (Dkt.Nos.57, 59).

For the reasons set forth below, this court recommends that defendants' motion for summary judgment be granted on most of the grounds raised therein, and that plaintiff's complaint be dismissed in its entirety. In light of this recommendation, this court also recommends that plaintiff's motion for appointment of counsel be denied and his motions for preliminary injunctions be found moot.

## BACKGROUND

On and before June 15, 2011, plaintiff was confined by the New York Department of Corrections and Community Supervision ("DOCCS") at the Clinton Correctional Facility ("Clinton") in Danemora, in the northeastern corner of New York. Plaintiff alleges that, on that date, Correction Officer ("C.O.") P. Rock "bust open" the door to the bathroom that plaintiff was using, causing the door to hit him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5).[1] Although plaintiff was injured, defendant Rock refused to take plaintiff for immediate medical attention; and plaintiff did not receive any medical care until two days later. (*Id.*).

**\*5** C.O. Rock prepared a misbehavior report, charging plaintiff with smoking in the bathroom, a copy of which was served on plaintiff at 7:00 a.m. on June 16th. (*Id.;* Dkt. No. 36 at 67). Plaintiff attached to his complaint a letter, dated June 15th, addressed to Superintendent LaValley, complaining about C.O. Rock's conduct earlier that day. (Dkt. No. 1 at 12). Plaintiff claims that he also filed a formal grievance with respect to the incident involving defendant Rock and later submitted appeals when he received no response to his initial grievance. (Compl., Dkt. No. 1 at 3–4, 13–20).

Lt. Chase[2] conducted a disciplinary hearing and found plaintiff not guilty on the misbehavior report filed by C.O.

Rock. Plaintiff alleges that defendant Chase stated that, although he could not "get me at this facility [,] ... he was going to get me at the next one." (Compl., Dkt. No. 1 at 5). Plaintiff further alleges that, although he had requested a transfer to the Sing Sing Correctional Facility ("Sing Sing"), Supt. LaValley had plaintiff promptly transferred to Coxsackie Correctional Facility (Coxsackie), in retaliation for the complaint against C.O. Rock, which plaintiff submitted to defendant LaValley. (Compl., Dkt. No. 1 at 6, 7; Dkt. No. 36 at 40).

On July 7, 2011, shortly after his arrival at Coxsackie, Counselor PaquetteMonthie issued plaintiff a misbehavior report for placing telephone calls to his wife from other facilities, in violation of an order of protection issued in connection with an earlier prosecution of plaintiff. (Compl., Dkt. No. 1 at 7; Dkt. No. 31–2 at 2). Plaintiff alleges that defendant Paquette–Monthie wrote the misbehavior report in retaliation for plaintiff's complaint about C.O. Rock at Clinton. (Compl., Dkt. No. 1 at 7). In exhibits attached to his response to the 🚩 Rule 12(b)(6) motion, plaintiff claimed that Counselor Paquette–Monthie told him that she initiated the disciplinary charges against him at Coxsackie because he filed a complaint against a friend of hers at Clinton Annex. (Dkt. No. 36 at 31, 37, 40).

Defendant Eric Gutwein[3] presided over plaintiff's disciplinary hearing at Coxsackie. (Disc. Hrg. Tr. at 1, Dkt. No. 42–15). Plaintiff alleges that Hearing Officer Gutwein, participating in the retaliatory conspiracy against plaintiff because of his complaints at Clinton, denied plaintiff's many requests for witnesses and additional evidence, found plaintiff guilty of the charges, and sentenced him to six months in the Special Housing Unit ("SHU") and a six-month loss of good time. (Compl., Dkt. No. 1 at 7–8).

Liberally construed, plaintiff's complaint alleges that his constitutional rights under the First, Eighth, and Fourteenth Amendments were violated because (1) he was subjected to cruel and unusual punishment by defendant Rock when she allegedly hit him in the head with the bathroom door; (2) he was improperly denied prompt medical care by defendant Rock; (3) he was retaliated against for filing complaints and grievances by defendants Rock, Chase, LaValley, Paquette–Monthie,[4] and Gutwein in connection with the initiation and adjudication of disciplinary charges at Clinton, his transfer to Coxsackie, and the initiation and adjudication of disciplinary charges at Coxsackie; and (4) he was denied due process in

connection with the adjudication of the disciplinary charges at Coxsackie. [5] Plaintiff demands damages, as well as injunctive relief, including the termination of the defendants by DOCCS, a formal apology from the defendants, a transfer to the prison of his choice, and protection from further retaliation at DOCCS. (Compl., Dkt. No. 1 at 10–11).

**\*6** Defendants have challenged each of plaintiff's claims and have filed numerous declarations contesting many of plaintiff's factual allegations. In moving for summary judgment with respect to the claims against defendants Rock, Chase, and LaValley, defendants contend that plaintiff failed to exhaust his administrative remedies because, *inter alia,* he never filed a formal grievance with respect to any of these defendants at Clinton. (Defs.' Mem. of Law at 14–16, Dkt. No. 42–17).

Defendant Rock denies that she hit the plaintiff with a bathroom door on June 15, 2011, and she alleges that plaintiff did not request medical attention on that date, nor did he appear to require medical attention. (Rock Decl. ¶¶ 8–12, Dkt. No. 42–2). Plaintiff was seen by the medical staff at Clinton on June 17th and complained of a headache relating to being hit on the head by a mess hall door two days earlier. There was no evidence of a bump, swelling, or bruising, and plaintiff was treated with Ibuprofen and given a bag of ice. (Michalek Decl. ¶ 5, Dkt. No. 42–9). C.O. Rock was unaware of any complaint or grievance filed against her by plaintiff, and denies knowing defendant Paquette–Monthie or causing her to issue a misbehavior report against plaintiff at Coxsackie. (Rock Decl. ¶¶ 14–17).

Defendant Chase, who found plaintiff not guilty on the disciplinary charges filed by C.O. Rock, denies ever threatening plaintiff, and had no knowledge that he filed any complaint or grievance against defendant Rock. Lt. Chase asserts that he did nothing to cause defendant Paquette–Monthie–whom he does not know-or anyone else, to retaliate against plaintiff. (Chase Decl. ¶¶ 7–14, Dkt. No. 42–3). Clinton Supt. LaValley also denies knowing defendant Paquette–Monthie or doing anything to induce her to file a misbehavior report against plaintiff at Coxsackie. Defendant LaValley asserts that he had no involvement in plaintiff's transfer to Coxsackie; that transfer was handled by the DOCCS Deputy Superintendent for Programs pursuant to a prior request by plaintiff for an "area of preference" transfer. (LaValley Decl. ¶¶ 7–15, Dkt. No. 42–4).

DOCCS Counselor Paquette–Monthie filed a misbehavior report against plaintiff at Coxsackie after learning, through her intake interview of plaintiff and information in his file, that he had been contacting his wife by telephone. Such contact violated an order-of-protection issued against plaintiff and contravened prior direct orders from the staff at Sing Sing that plaintiff should stop calling his wife. Defendant Paquette–Monthie denies knowing defendants Rock, Chase, or LaValley at Clinton, and states that she did not file the misbehavior report for retaliatory purposes. (Paquette–Monthie Decl. ¶ ¶ 6–15, Dkt. No. 42–12).

Defendant Gutwein, who presided over the disciplinary hearing at Coxsackie also denied knowing defendant Rock, or knowing that she had been the target of a prior complaint by plaintiff. Defendant Gutwein claims that he made his documented decisions regarding the evidence allowed at the hearing, the ultimate determination of plaintiff's guilt, and the punishment imposed, based on the merits, and not because of any retaliatory motive. (Gutwein Decl. ¶¶ 5–34, Dkt. No. 42–14).

**\*7** The court concludes that there are material issues of fact as to whether plaintiff exhausted his administrative remedies relating to his claims against defendant Rock, but no issues of fact as to whether he failed to properly exhaust claims with respect to defendants Chase and LaValley. However, this court recommends dismissal of all of plaintiff's claims on the merits, because no rational fact finder could conclude that the defendants violated plaintiff's various constitutional rights, as he alleges.

### DISCUSSION

### I. Summary Judgment
Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## II. Exhaustion of Administrative Remedies

Defendants contend that, notwithstanding plaintiff's claims to the contrary, he failed to initiate the grievance process, in a timely and proper manner, with respect to his complaints against defendants Rock, Chase, and LaValley of Clinton Correctional Facility. Defense counsel argues that, even if plaintiff had filed a timely grievance with respect to these defendants, he failed to exhaust his administrative remedies by not pursuing an appeal to the Central Office Review Committee (CORC). (Defs.' Mem. of Law at 14–16).

The court concludes that there are issues of fact material to whether plaintiff has exhausted his administrative remedies with respect to the claims against defendant Rock, which may not be resolved on summary judgment. However, no reasonable fact finder could conclude that the plaintiff filed timely grievances relating to his claims against defendants Chase regarding the disciplinary charges initiated at Clinton, or against defendant LaValley with respect to plaintiff's transfer from Clinton to Coxsackie. Accordingly I will recommend that those claims be dismissed on summary judgment based, *inter alia,* on plaintiff's failure to exhaust administrative remedies.

### A. Applicable Law

**\*8** The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

The Supreme Court held that, in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano,* it also decided four related cases, clarifying the law in the

Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused. [6] Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See* *Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies are available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.* Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. [7] Although the Second Circuit has not explicitly held that *Hemphill* remains good law, it has applied the three-part inquiry in post-*Woodford* cases. *See, e.g.,* *Messa v. Goord,* 652 F.3d 305, 309 (2d Cir.2011); *Davis v. State of New York,* 311 F. App'x 397, 399 (2d Cir.2009).

### B. Analysis

 **\*9** Defense counsel attempts to rebut plaintiff's allegation that he filed a timely initial grievance with respect to his claims against defendants Rock, Chase, and LaValley, purported copies of which are attached to the complaint. (Defs.' Mem. of Law at 14–16). Clinton Superintendent LaValley declared that his office had no record of receiving any letter from plaintiff raising the allegations contained in the complaint in this action, and had no recollection of receiving any such letter, including those attached to the complaint. (LaValley Decl. ¶ 5–6). Tara Brousseau, the Inmate Grievance Program ("IGP") Supervisor at Clinton, found no documentation in her files indicating that plaintiff ever submitted a formal grievance at Clinton regarding plaintiff's allegations against defendants Rock, Chase, and LaValley. (Brousseau Decl. ¶¶ 8–11, Dkt. No. 42–6). Defense counsel contends that the documentation provided by plaintiff in his complaint contained no "acknowledg[ ]ment from any recipient that his document was received in a timely manner so as to comply with DOCCS grievance procedures." (Defs.' Mem. of Law at 14). Counsel also points out inconsistencies in plaintiff's claims regarding the submission of his initial grievance, including the fact that the "Affidavit of Service," attached to his complaint (Dkt. No. 1 at 18) swears that he placed a grievance regarding defendant Rock in a mailbox at Clinton on June 26, 2011–two days after plaintiff was transferred out of that facility, according to DOCCS transfer records. (Defs.' Mem. of Law at 16). [8]

In his response to defendants' summary judgment motion, plaintiff has filed additional documentation regarding some of his complaints to DOCCS about the alleged violations of his constitutional rights by defendant Rock at Clinton. (Dkt. No. 52–11 at 4, 7, 13, 21). The newly-disclosed records include a memorandum, purportedly signed by Supt. LaValley, acknowledging receipt of a communication from plaintiff on June 17, 2011–two days after plaintiff claims he submitted his original letter of complaint about defendant Rock to the Clinton Superintendent (Dkt. No. 52–11 at 4–5). In the absence of any reply from defendants questioning the authenticity of the memorandum, this would seem to confirm plaintiff's allegation that he sent the letter dated June 15th to defendant LaValley, even if that complaint about defendant Rock would not qualify as a formal grievance for exhaustion purposes. [9]

Plaintiff also filed a July 18, 2011 memorandum from N. Ratliff, then the IGP Supervisor at Clinton, acknowledging receipt, from plaintiff, of a "complaint dated 7/14/11/6/24/11," which would appear to refer, in part, to plaintiff's "Affidavit of Service," notarized July 14, 2011 and addressed, *inter alia,* to Ratliff, regarding a grievance about defendant Rock. (Dkt. No. 52–11 at 7, 14). [10] Plaintiff's papers in opposition to the summary judgment motions include two slightly different complaints directed to N. Ratliff and the Inmate Grievance Committee regarding defendant Rock, each dated June 26, 2011. (Dkt. No. 52–11 at 8–9, 15–16). Given that N. Ratliff's memorandum reference a "complaint" dated, *inter alia,* June 24–the day plaintiff was th moved out of Clinton-it is not entirely clear which version of plaintiff's "complaint" Ratliff received or how and when she received it. However, a rational fact finder could conclude that, contrary to the assertion by Tara Brousseau, a complaint against defendant Rock from plaintiff was received at Clinton, notwithstanding the uncertainty regarding the dates. The memorandum from N. Ratliff returned plaintiff's "complaint" because he was no longer housed at Clinton and because an inmate is supposed to file grievances in the facility where he is confined, even if it relates to conduct at another institution. Neither party has submitted any information as to whether plaintiff thereafter submitted a grievance regarding the earlier events at Clinton to officials at the DOCCS institutions to which he was transferred or that he sought an extension of the deadline for submitting an initial grievance.

**\*10** There are some discrepancies in plaintiff's various claims about his submission(s), to DOCCS, of a grievance about the alleged violations of his rights at Clinton. In some statements, including his recent response to the declaration of Tara Brousseau, plaintiff claims that he submitted a grievance about defendant Rock to the IGP supervisor at Clinton on June 15, 2011, and that the letter that he sent to Supt. LaValley on the same date was a copy of the grievance. (Dkt. No. 52–9 at 2). [11] In other statements, including his "Affidavit of Service," plaintiff asserts that he filed an initial grievance at Clinton on or about June 26, 2011, which is also the date on several versions of the complaints against defendant Rock that plaintiff filed with his complaint and his response to the summary judgment motion. (Dkt. No. 52–11 at 8–9, 14–18). However, there are also discrepancies between the documents recently filed by plaintiff and some of the statements of DOCCS witnesses regarding plaintiff's submission of complaints-i.e., Supt. LaValley's claim that his office never received any of the letters attached to plaintiff's complaint and Tara Brousseau's declaration that Clinton IGP never received a grievance from plaintiff about defendant Rock.

Under applicable regulations, [12] an inmate must file a formal grievance within 21 days of an alleged occurrence, although he may make a request for additional time within 45 days of the occurrence, which may be granted in the discretion of the IGP supervisor upon a showing of mitigating circumstances. If the plaintiff properly submitted an initial grievance on June 15, June 24, or June 26, 2011, it would have timely-i.e., within 21 days of the alleged incident involving defendant Rock. If the first grievance was submitted around July 14, 2011, it would have been beyond the 21–day deadline, but within the 45–day period during which the plaintiff could have requested additional time to file, based upon mitigating circumstances. Even if, after his transfer from Clinton, plaintiff filed his initial grievance with the wrong facility, and he did not explicitly ask for additional time to file it properly, the failure of the IGP Supervisor to advise plaintiff of his ability to ask for an extension suggests the possibility that the grievance procedures were not made reasonably available to plaintiff. *See, e.g.,* 🔖 *Mandell v. Goord,* 9:06–CV–1478 (GTS/DEP), 2009 WL 3123029, at \*10–11 (N.D.N.Y. Sept. 29, 2009) (where DOCCS officials tersely rejected plaintiff's grievance as untimely, without advising the plaintiff that he should request an exception to the time limit from the IGP supervisor based on mitigating circumstances, or that additional information regarding his delay in filing the

grievance was needed, it is arguable that material questions of fact exist as to whether administrative remedies were available to the plaintiff or whether the defendants should be estopped by their conduct from relying on the non-exhaustion defense).

**\*11** It is entirely possible that a finder of fact tasked with weighing the relative credibility of plaintiff and the DOCCS witnesses might conclude, in the face of the inconclusive documentary evidence, that plaintiff did not properly submit a timely initial grievance regarding defendant Rock's alleged violation of plaintiff's rights at Clinton. However, given that the court should not make credibility determinations in connection with a summary judgment motion, and that the defendants have the ultimate burden of proving that plaintiff did not exhaust his administrative remedies, there appears to be a material issue of fact as to whether plaintiff filed a timely initial grievance about defendant Rock or whether his failure to do so should be excused under *Hemphill* standards.

Defendants contend that, even if plaintiff properly filed a timely initial grievance against defendant Rock that was ignored by DOCCS officials, he failed to exhaust his administrative remedies because he never filed an appeal with CORC. (Defs.' Mem. of Law at 15). The Assistant Director of the DOCCS IGP program states, in his declaration, that he found no evidence in the CORC files indicating that plaintiff ever filed a grievance appeal with CORC concerning the alleged events at Clinton Annex. (Hale Decl. ¶¶ 8–11, Dkt. No. 42–7).

Courts have consistently held that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement. *See e.g.* 🔖 *Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004) (plaintiff's allegations that his grievances were misplaced or destroyed by corrections officers ultimately does not relieve him of the requirement to appeal those claims to the next level once it became clear that no response was forthcoming) (citing 🔖 *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S.D.N.Y.2002) (same). "If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA." *Croswell v. McCoy,* 01–CV–547, 2003 WL 962534, at \*4 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.). [13]

Plaintiff, however, has submitted documentation indicating that, after receiving no response to the initial grievance

he claimed to have filed, he submitted "appeals" to the Superintendent at Clinton and to the IGP Supervisor and the Director of the IGP in Albany. A copy of plaintiff's purported "appeal" to Supt. LaValley, dated July 26, 2011, was attached to his complaint (Dkt. No. 1 at 13), although he has filed no additional documents acknowledging receipt of this "appeal." Copies of a further "appeal" addressed to the Director of the IGP in Albany and an IGP supervisor, part of which is dated "6–26–11" and part of which was dated 8–26–11," were also appended to the complaint (Dkt. No. 1 at 14–17), along with the "Affidavit of Service" notarized on July 14, 2011 (Dkt. No. 1 at 18). Plaintiff submitted, with his response to the summary judgment motion, a letter dated September 6, 2011, from the offices of the Director of IGP in Albany (Karen Bellamy), acknowledging receipt of correspondence from plaintiff dated July 14, 2011. (Dkt. No. 52–11 at 13). As noted earlier, plaintiff's "Affidavit of Service" notarized on July 14th has receipt stamps indicating that DOCCS received a copy of it on September 1, 2011. The letter from Karen Bellamy's office returns plaintiff's correspondence, advising him that "you must submit your grievance or appeal directly to IGRC at the facility." (Dkt. No. 52–11 at 13).

**\*12** Plaintiff's response to the summary judgment motion also attaches a memorandum from the IGP Supervisor at Upstate dated September 14, 2011, acknowledging receipt of "complaints/letters of appeal ... with written dates of 6/26/2011 and 7/27/2011." (Dkt. No. 52–11 at 21). As noted above, one of plaintiff's alleged grievance appeals is dated June 26, 2011; there does not appear to be any submission from plaintiff dated July 27, 2011 in the record. The letter from Upstate, where plaintiff was confined at the time, returned plaintiff's documents as "untimely" because they related to alleged occurrences on "6/14/11 [and] 6/15/11"- the dates of the incident with defendant Rock at Clinton. (*Id.*). The Upstate IGP Supervisor relied on the regulations summarized in note 12 above, which require an initial complaint to be filed within 21 days of the alleged occurrence unless an extension request is made within 45 days of the occurrence and is granted by the IGP supervisor. (*Id.*).

While the documentation with respect to plaintiff's alleged "appeals" is far from conclusive, it supports his claim that, when he received no response to his purported initial grievance, he properly mailed an "appeal" to the Superintendent of the facility where the grievance was allegedly ignored. [14] When his appeal to the Superintendent was also allegedly ignored, plaintiff attempted to file an appeal with CORC by sending it to the Director of IGP

in Albany. When the Director's Office advised plaintiff that his complaint or appeal needed to be filed with the IGRC at the facility where he was confined, plaintiff apparently did so. However, the IGP supervisor at Upstate treated his submission as an original complaint-not an appeal that should be forwarded to CORC-and found that it was untimely based on the deadlines applicable to initial complaints.

While the applicable regulations set time limits for filing appeals based on receipt of the written decision at an earlier stage, they do not set definitive deadlines for filing appeals when no response is ever received. See N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(1) (an appeal to the Superintendent must be filed within seven calendar days **after the receipt of the IGRC's written response"**) (emphasis added); 701.5(d)(1)(I) (an appeal to CORC must be submitted, through the grievance clerk, **"within seven calendar days after receipt of the superintendent's written response")** (emphasis added); 701.6(h)(2) (quoted in note 14 above). Plaintiff's "appeals" could not, as a matter of law, be deemed untimely; or at least, the uncertainty with respect to the deadlines might excuse a late appeal under the *Hemphill* standards. [15] The court concludes that there are issues of fact that are material to the question of whether plaintiff properly pursued the administrative appeals necessary to exhaust his claims with respect to defendant Rock.

The various documents filed by plaintiff do not reflect that he made any written complaints about retaliation in connection with the adjudication of his disciplinary charges at Clinton by defendant Chase, or his transfer to Coxsackie, for which plaintiff blames defendant LaValley, until his submission to IGP in Albany—part of which was dated "6–26–11" and part of which was dated "8–26–2011." (Dkt. No. 52–11 at 17–20). It is clear that the portion of the submission dated June 26th is backdated because it purports to be an appeal of the grievance plaintiff states that he filed on approximately the same date and it references events, including plaintiff's misconduct charge at Coxsackie on July 7, 2013 (Paquette–Monthie Decl. ¶¶ 6–7, 11–12), which occurred well after June 26th. As noted above, the documents submitted by plaintiff indicate that his submission was not received in the office of the IGP Director in Albany until early September 2011. The court concludes that no reasonable fact finder could conclude that plaintiff filed an initial grievance with respect to the conduct of defendants Chase and LaValley until August 26, 2011, which is considerably longer than 21 or 45 days after the relevant "occurrences"-the adjudication of the misbehavior report at Clinton on June 22, 2011 (Chase Decl. ¶ 5) or

plaintiff's transfer out of Clinton, which occurred on or about June 24, 2011 (LaValley Decl. ¶ 7 & Ex. B). Accordingly, the court concludes that these claims against defendants Carr and LaValley may be dismissed, on summary judgment, because of plaintiff's failure to exhaust his administrative remedies by filing a timely initial grievance.

### III. Eighth Amendment Claims

**\*13** Plaintiff alleges that defendant Rock violated his Eighth Amendment rights in two ways on June 15, 2011, by inflicting cruel and unusual punishment when she hit him in the head with the bathroom door, and by refusing to allow him to get immediate medical treatment for his purported injuries. As discussed above, C.O. Rock denies that she opened the bathroom door or caused it to hit plaintiff in the head, and she alleges that plaintiff did not request medical care or appear to require it. Plaintiff was seen, at his request, two days later by the Clinton medical staff, who found no evidence of bruising or swelling on plaintiff's head and treated him with Ibuprofen and a bag of ice.

Notwithstanding these factual disputes, the court concludes that, even accepting plaintiff's version of the relevant events, no reasonable fact finder could conclude that his Eighth Amendment rights were violated by defendant Rock. Accordingly, for the following reasons, this court recommends dismissal of those claims.

### A. Excessive Force

#### 1. Applicable Law

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. Hudson v. McMillian, 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 428 U.S. 153, 173 (1976); Sims v. Artuz, 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be

" 'inconsistent with the contemporary standards of decency.' " Whitely v. Albers, 475 U.S. 312, 327 (1986) (citation omitted); Hudson, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " Sims, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." Id. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " Id. (quoting Hudson, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir.2003).

#### 2. Analysis

**\*14** In connection with defendants' summary judgment motion, plaintiff and C.O. Rock present very different versions of the events of June 15th. Plaintiff alleges that, on the day before the incident, C.O. Rock threatened to "put her size 7 shoe up my Muslim ass." (Compl ., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7, Dkt. No. 52–6). Defendant Rock denies ever threatening plaintiff (Rock Decl. ¶ 13). Defendant Rock alleges that, on June 15th, plaintiff had been in the bathroom for approximately 15 minutes, and that other inmates needed to use the bathroom. (Rock Decl. ¶ 6). Plaintiff states that he obtained permission from C.O. Rock to use the bathroom and had been in the room for only five

minutes. (Pl.'s Reply to Rock Decl. ¶ 9). Plaintiff claims that C.O. Rock "bust open" the door to the single male bathroom in the mess hall, hitting him extremely hard in the forehead. (Compl., Dkt. No. 1 at 5; Pl.'s Reply to Rock Decl. ¶ 7). C.O. Rock states that she knocked on the door and directed plaintiff to come out; she denies that she opened the door or hit plaintiff with the door. (Rock Decl. ¶¶ 6, 8–9).

In support of defendants' initial 🚩Rule 12(b)(6) motion, counsel contended that plaintiff's allegations regarding the June 15, 2011 incident in the Clinton mess hall established, at worst, that defendant Rock was negligent in causing a bathroom door to strike plaintiff in the head. (Defs.' Mem. in Support of 🚩Rule 12(b)(6) Mot. at 13, Dkt. No. 31–4). A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. (*Id.,* citing *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a 🚩Section 1983 claim)). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v. Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010) (citing 🚩*Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a 🚩§ 1983 excessive force action cannot be founded on mere negligence) (collecting cases)).

The court concludes that, even under plaintiff's version of the relevant events, a reasonable fact finder could not conclude that defendant Rock used force against plaintiff maliciously and sadistically, to cause harm. Whether plaintiff was in the bathroom for five minutes or 15 minutes, C.O. Rock had a good-faith penological basis to investigate why plaintiff had stayed in the bathroom long enough to deny access to other inmates who needed to use the facilities. Because plaintiff was on the other side of the bathroom door, defendant Rock could not have known that he was positioned in such a way that the door would hurt plaintiff if she opened it forcefully. While "busting open" the door may have created some risk that the person inside might be hit by the door, this is, at most, negligence that clearly does not rise to the level of wanton or malicious conduct. *See, e.g., White v. Drake,* 9:10–CV–1034 (GTS/DRH), 2011 WL 4478921, at *1, 9 (N.D.N.Y. Sept. 26, 2011) (the allegation that defendant kicked plaintiff's

cell door from the outside while plaintiff was inside his cell, causing injury to plaintiff nose and jaw, are insufficient to establish an intentional or malicious effort to injure plaintiff, as necessary to state an excessive force claim under the Eighth Amendment); *Bilan v. Davis,* 11 Civ. 5509, 2013 WL 3940562, at *6 (S.D.N.Y. July 31, 2013) (an officer struck plaintiff only after the conflict between the officers and a non-party inmate spilled over to where plaintiff was standing; in the absence of allegations that the force used against him was intentional and wanton, plaintiff's excessive force claim must fail) (Rept. & Recommendation), *adopted,* 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013)).

## B. Denial of Medical Care

### 1. Applicable Law

**\*15** In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." 🚩*Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. 🚩*Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. 🚩*Id.* at 184 (citing, *inter alia,* 🚩*Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting ⚠️*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." 🚩*Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." 🚩*Id.* at 185. The standard for determining

when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236 (citing, *inter alia,* *Chance v. Armstrong,* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*16** A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment, support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)). Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Thus, any claims of medical malpractice, or disagreement with treatment are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (table).

**2. Analysis**

While plaintiff claims that defendant Rock violated his Eighth Amendment rights by failing to allow him to obtain immediate medical care after the incident on June 15th, he acknowledges that he was seen by the prison medical staff two days later. (Compl., Dkt. No. 1 at 5). [16] In connection with defendants' initial Rule 12(b)(6) motion, counsel argued, *inter alia,* that plaintiff failed to allege that the brief delay in his treatment caused any significant harm to him, thus failing to satisfy the objective prong of the deliberate indifference standard. (Mem. in Support of Rule 12(b) (6) Mot. at 22–23). It is clear from the parties' submissions relating to defendants' summary judgment motion that C.O. Rock and plaintiff disagree as to whether he requested and/or required medical attention on June 15th. However, no reasonable fact finder could conclude, based on the irrefutable facts, that the brief delay in plaintiff's treatment significantly increased the risk of serious adverse health consequences to him, as required to establish a deliberate indifference claim.

*Evans v. Manos* cogently summarizes how a prison inmate's claim for a delay in medical treatment should be evaluated under the Eighth Amendment:

> "Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where 'the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "

*Evans v. Manos,* 336 F.Supp.2d 255, 262 (W.D.N.Y.2004) (citations omitted). The Second Circuit has not resolved whether actual adverse medical effects are required, as a threshold matter, to state a viable Eighth Amendment claim relating to delayed medical care; but has indicated that a plaintiff must at least show that the delay significantly increased the risk for medical injury or similar serious adverse consequences. *Smith v. Carpenter,* 316 F.3d at 188–89, n. 14, n. 15. The Court in *Smith* also observed that, in the post-trial context, that, "although demonstrable adverse medical effects may not be required under the Eighth Amendment, the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter,* 316 F.3d at 188.

**\*17** As noted, when plaintiff was examined by the Clinton medical staff on June 17th, they observed no visible bump, swelling, or bruising on his head, and he was treated with only Ibuprofen and a bag of ice. (Michalek Decl. ¶ 5; 6/17/11 Ambulatory Health Record ("AHR"), Dkt. No. 43 at 4). Plaintiff claims he did have a visible bruise and swelling, which is why the medical staff gave him ice. (Pl.'s Reply to Michalek Decl. ¶ 5). Subsequent medical records document only a few complaints by plaintiff of the lingering headaches, dizziness, shaking, and smelling odors, which he attributed to the blow to the head he allegedly received at Clinton on June 15, 2011. (Michalek Decl. ¶¶ 6, 11; 7/18/11 AHR, Dkt. No. 43 at 6; 8/16/11 AHR, Dkt. No. 43 at 9). The medical staff found no follow-up treatment was necessary with respect to his complaints about a head injury, other than dispensing Tylenol to plaintiff on August 16, 2011. (*Id.*).

Plaintiff apparently contests the accuracy of subsequent medical records at several DOCCS facilities, which reflect no evidence of any significant long-term effects of the alleged incident on June 15th, claiming that "he has expressed to medical staff in each facility of all the ongoing pain and suffering he has been force [sic] to live with due to all of the injuries he sustained from past and present incident...." (Pl.'s Reply to Michalek Decl. ¶ 6) .[17] He also challenges the quality of his medical care after leaving Clinton.[18] As noted above, differences of opinion between a prisoner and prison officials regarding appropriate medical treatment do not, as a matter of law, constitute deliberate indifference. Moreover, Plaintiff's conclusory claims of serious ongoing health problems that he attributes to the June 15th incident at Clinton do not create an issue of fact in the face of the overwhelming documentary medical evidence to the contrary.[19]

In any event, plaintiff still has offered no evidence to rebut defendants' well—documented position that the two-day delay before plaintiff saw the medical staff at Clinton about his very subjective and relatively minor medical complaints did not involve a significant risk of degeneration of his medical condition or require him to endure extreme pain. *Bellotto v. County of Orange,* 248 F. App'x at 236. Thus, the court concludes that no reasonable fact finder could conclude that plaintiff can establish the objective element of a deliberate indifference claim. *See, e.g., Vansertima v. Department of Corrections,* 10 CV 3214, 2012 WL 4503412, at *2, 6 (E.D.N.Y. Sept. 28, 2012) (plaintiff allegedly suffered

a nose bleed and an injury to his head "causing sever[e] pain" as a result of hitting his face on the seat in front of him when the prison bus in which he was riding stopped suddenly; given that plaintiff was seen by the medical staff within one or two days after the incident and his subsequent complaints involved relatively infrequent nose bleeds and intermittent headaches, plaintiff cannot show any "adverse medical effects or demonstrable physical injury" that resulted from what was in any case-at most—a two delay in treatment).[20]

## IV. Retaliation

**\*18** Plaintiff's theory is that, in response to plaintiff's complaint against defendant Rock for hitting plaintiff with a bathroom door and then denying him medical care, five DOCCS employees from two separate and geographically distant prisons conspired to retaliate against him in various ways. This court recommends the dismissal of plaintiff's retaliation/conspiracy claims against each defendant, based on the lack of a causal connection between plaintiff's protected conduct and any "adverse action" taken against him, the absence of "personal involvement," and/or, as previously discussed, plaintiff's failure to exhaust his administrative remedies.

### A. Applicable Law

#### 1. Retaliation

In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff

can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim.[21] *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n. 11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n. 7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

**\*19** A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary

proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### 2. Personal Involvement

For retaliation claims, as for other section 1983 claims, a plaintiff "must show some tangible connection between the constitutional violation alleged and [a] particular defendant." *Toole v. Connell,* 9:04–CV–724 (LEK/DEP), 2008 WL 4186334, at *6 (N.D.N.Y. Sept. 10, 2008). Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* 556 U.S. 662 (2009).

### B. Analysis

Defense counsel argues that the retaliation claims should be dismissed because there was no causal connection between plaintiff's protected conduct and the alleged adverse actions against him, and because some defendants were not

personally involved in any adverse action against plaintiff. Those arguments require a close examination of the record regarding each defendant. *Toole v. Connell,* 2008 WL 4186334, at *6 (analysis of retaliation claims requires careful, case-specific, consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two).

### 1. Defendant Rock

**\*20** To the extent plaintiff alleges that defendant Rock retaliated against him by filing a false misbehavior report because he submitted a complaint to Supt. LaValley about the June 15, 2011 incident in the Clinton mess hall, plaintiff clearly cannot establish the required causal connection between his protected conduct and C.O. Rock's alleged adverse action. Plaintiff's initial complaint to Supt. LaValley (Dkt. No. 52–11 at 5), explicitly refers to the misbehavior report written by defendant Rock, and so was clearly written after the correction officer made clear to plaintiff that she intended to initiate disciplinary action against him. The letter which purportedly confirms that Supt. LaValley's office received plaintiff's letter of complaint states that the communication was not received until June 17, 2011 (Dkt. No. 52–11 at 4), after plaintiff was served with the misbehavior report, on June 16th at 7:00 a.m. (Dkt. No. 36 at 67). Clearly, plaintiff's complaint to the Superintendent about C.O. Rock could not have been "a substantial or motivating factor" that caused her to issue the misbehavior report, as would be necessary to support a retaliation claim. *Bennett v. Goord,* 343 F.3d at 137.

Plaintiff also alleges that, because of the complaint he wrote against defendant Rock, she caused others to retaliate against him-defendant Chase, in connection with the June 22, 2011 adjudication of the disciplinary charges she filed at Clinton; Supt. LaValley, in connection with plaintiff's transfer to Coxsackie on June 24th; defendant Paquette–Monthie, in connection with the misbehavior report she filed against plaintiff at Coxsackie on July 7, 2011; and defendant Gutwein, in connection with the adjudication of the disciplinary charges at Coxsackie later in July 2011. As discussed elsewhere herein, plaintiff's retaliation claims with respect to the adjudication of the misbehavior report at Clinton (on which plaintiff was acquitted), and his transfer from Clinton (which plaintiff initiated), clearly lack merit and should also be dismissed because plaintiff did not exhaust his administrative remedies.

Plaintiff's retaliation claim with respect to the misbehavior report at Coxsackie are also not viable. Although he did not make this allegation in his original complaint, plaintiff claimed, in response to the defendants' initial Rule 12(b)(6) motion and their later summary judgment motion, that C.O. Rock bragged to him, on June 14, 2011, that she would not suffer any consequences if plaintiff 'wr[o]te her up" because she had "family" in Clinton and at DOCCS—presumably in the central office-in Albany. (Dkt. No. 36 at 29; Dkt. No. 52 at 6). However, plaintiff does not otherwise counter defendant Rock's sworn declaration that she was not aware of any complaint plaintiff wrote about her conduct on June 15th, which plaintiff admits was never investigated by DOCCS (Dkt. No. 52–11 at 6, 19). (Rock Decl. ¶¶ 13–14). And, for the reasons set forth below, no reasonable fact finder could conclude that plaintiff can overcome C.O. Rock's sworn statements that she did not know, or communicate with, defendant Paquette–Monthie, or otherwise direct anyone at Coxsackie to pursue a false misbehavior report against plaintiff. (Rock Decl. ¶¶ 14–17).

### 2. Defendant Chase

**\*21** As noted above, plaintiff failed to exhaust his administrative remedies with respect to any retaliation claims relating to Lt. Chase's adjudication of the disciplinary charges at Clinton or plaintiff's transfer from Clinton. In any event, defendant Chase's acquittal of defendant on the misbehavior report clearly is not an "adverse action" which could support a retaliation charge.

The complaint alleges that, when he could not "get" plaintiff at Clinton, C.O. Chase threatened to "get," *i.e.,* retaliate against, plaintiff at the next facility. In response to the defendants' Rule 12(b)(6) motion and/or the instant summary judgment motion, plaintiff attributed further damaging admissions to Lt. Chase: first, that he talked about the order of protection against plaintiff, which was the impetus for the later disciplinary charges at Coxsackie (Dkt. No. 36 at 30; Pl.'s Reply to Chase Decl. ¶¶ 6–7, 9–10, Dkt. No. 52–7); and second, that he threatened to block plaintiff's transfer to Coxsackie (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 113, Dkt. No. 52 at 9; Pl.'s Reply to Chase Decl. ¶ 12).

Plaintiff's claims about Lt. Chase's admissions, which became more selfserving from the time plaintiff filed the initial complaint to the times he was defending his complaint against substantive defense motions, are, in the court's view, inherently implausible. It seems unlikely that defendant

Chase would retaliate against an inmate based on a complaint against another officer in which he was not implicated.[22] Lt. Chase acquitted plaintiff of disciplinary charges that he was smoking in the bathroom at Clinton because C.O. Rock did not actually see plaintiff smoking; she only smelled cigarette smoke on his person and in the room as he was leaving. (Chase Decl. ¶ 7; Dkt. No. 52–11 at 1–3). Given that the circumstantial evidence presented by C.O. Rock probably constituted "some" "reliable evidence" sufficient to uphold a conviction on a prison disciplinary charge,[23] it seems highly likely that defendant Chase would have convicted plaintiff had he truly wanted to retaliate against him for his complaints against defendant Rock. Moreover, if, as plaintiff suggests in response to the Rule 12(b)(6) motion, Lt. Chase knew about plaintiff's violations of the order of protection and intended to extract revenge against plaintiff, he could have initiated additional disciplinary charges before plaintiff was transferred. If Lt. Chase had the power and the retaliatory motivation to block plaintiff's transfer from Clinton to Coxsackie, then why did that transfer actually take place?

In his sworn declaration, Lt. Chase states that he never threatened plaintiff; he had no knowledge of any complaints by plaintiff against C.O. Rock; and he had no knowledge as to why or when plaintiff was to be transferred out of Clinton (where Lt. Chase worked). Defendant Chase further alleges that he did not personally know, or have any contact with defendant Paquette–Monthie; he never gave any direction to anyone else regarding a misbehavior report issued to plaintiff at Coxsackie; and he did not otherwise take any action to retaliate against plaintiff. (Chase Decl. ¶¶ 8–14).

**\*22** The only support for plaintiff's allegation that Lt. Chase harbored a retaliatory motive because of plaintiff's complaints against C.O. Rock and played some role in the later filing of disciplinary charges against plaintiff in a different prison are the purported admissions which plaintiff attributes to defendant Chase. As noted, those supposed admissions are inherently implausible and have become increasingly elaborate and self serving as this case has progressed. Plaintiff's unsupported and highly improbable claims about Lt. Chase's admissions are not sufficient to overcome defendant Chase's sworn declaration, and no reasonable fact finder could conclude that he retaliated against the plaintiff. *See, e.g ., Allah v. Greiner,* 03 Civ. 3789, 2006 WL 357824, at * 1, 3, 5–6, 7, 9 (S.D.N.Y. Feb. 15, 2006) (prisoner's allegations that virtually all of the defendants

made specific admissions that they retaliated against him, were implausible and discredited by the defendants' sworn affidavits, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims)[24] ; *Jeffreys v. City of New York,* 426 F.3d at 554 ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.") (citation omitted)).

### 3. Defendant LaValley

The complaint alleges that plaintiff sent Clinton Superintendent LaValley an initial complaint about defendant Rock; but that, rather than investigate, defendant LaValley worked with C.O. Rock and Lt. Chase to retaliate against plaintiff. Plaintiff also appears to allege that defendant LaValley caused him to be transferred to Coxsackie, where he would be subjected to further retaliation by Counselor PaquetteMonthie. (Dkt. No. 1 at 6). In response to the defendants' summary judgment motion, plaintiff filed a letter apparently acknowledging receipt, by Supt. LaValley's office, of plaintiff's initial complaint, which, according to the letter, was "referred to Captain D. Holdridge for review and appropriate action ." (Dkt. No. 52–11 at 4).

As discussed above, plaintiff failed to administratively exhaust any retaliation claim involving the adjudication of the disciplinary charges at Clinton or his transfer from Clinton. Furthermore, plaintiff's claims that defendants Rock and Chase retaliated against him in connection with the misbehavior report at Clinton are devoid of merit for the reasons set forth above. In any event, if defendant LaValley failed to follow up on plaintiff's complaint about C.O. Rock or he delegated responsibility for addressing the complaint to a subordinate, he would not have been "personally involved" in any violation of plaintiff's rights by defendant Rock. *See, e.g., Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y .2006) (the failure of a supervisory official to respond to a letter of complaint is insufficient to create personal responsibility); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response

to the prisoners to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official).

**\*23** With respect to plaintiff's transfer out of Clinton, plaintiff admittedly initiated the process by requesting an "area of preference" transfer. (LaValley Decl. ¶ 7 & Ex. A, Dkt. No. 42–5 at 2; Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶ 115). Plaintiff complains, however, that he should have been transferred from Clinton, in far Northern New York, to Sing Sing, near plaintiff's family in Westchester County, rather than to Coxsackie, which is south of Albany-much closer to Westchester County than Clinton, but not as close as Sing Sing. (Pl.'s Reply to Defs.' Rule 7.1(a)(3) Stmt. ¶¶ 115–16). While "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights[,]" "[a] prisoner has no liberty interest in remaining at a particular correctional facility...." *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir.1998). In any event, Supt. LaValley's declaration states, and plaintiff has not rebutted, that he had no personal involvement in plaintiff's transfer to Coxsackie, because transfers of prisoners from Clinton were overseen, in the normal course of business, by the Deputy Superintendent for Programs. (LaValley Decl. ¶¶ 8–13; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8).

Finally, to the extent the complaint suggests that defendant LaValley conspired with others at Coxsackie to retaliate against him, plaintiff provides no evidence whatsoever to counter Supt. LaValley's declaration that he did not know Counselor Paquette–Monthie, and that he did nothing to retaliate against plaintiff in connection with the filing of disciplinary charges against him at that separate facility. (LaValley Decl. ¶¶ 13–15; Pl.'s Reply to LaValley Decl., Dkt. No. 52–8). Based on the authority cited above, it is clear that a claim of retaliation based on mere speculation by an inmate that a particular defendant was somehow involved in allegedly retaliatory action by others at a separate facility cannot survive summary judgment. In any event, as discussed below, plaintiff's claims of retaliation against the Coxsackie defendants are subject to dismissal on other grounds.

### 4. Defendants Paquette–Monthie and Gutwein

Defendants' initial ⚑ Rule 12(b)(6) motion plaintiff's retaliation claims against Counselor Paquette–Monthie and Hearing Officer Gutwein argued that plaintiff did not plead any specific facts to support his bald speculation that the Clinton defendants enlisted the Coxsackie defendants to pursue retaliatory disciplinary charges against him. (Defs.' Mem. in Support of ⚑ Rule 12(b)(6) Mot. at 12). Plaintiff responded to this motion with the self-serving claim that defendant Paquette–Monthie told him that she issued the misbehavior report against him because he "filed a complaint against her friend at Clinton Annex." (Dkt. No. 36 at 31, 37, 40).[25] During the July 2011 disciplinary hearing, plaintiff tried to cross-examine defendant Paquette–Monthie about her allegedly biased and vengeful motivation for filing the misbehavior report against him, and asked questions about statements she supposedly made during prior interviews of plaintiff; but, he never made any reference to the counselor's alleged statement that she was initiated the charges because plaintiff had filed a complaint against a friend of hers. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, Dkt. No. 42–15). Nor did plaintiff claim that Counselor Paquette–Monthie made this admission in the various complaints and grievance "appeals" he purportedly submitted in August 2011 (Dkt. No. 52–11 at 6, 17–20, 22–23, 27–28), or in his original complaint filed in this action in September 2011 (Dkt. No. 1).[26]

**\*24** In her sworn declaration, defendant Paquette–Monthie states that she did not personally know, and never had any contact with, defendants Rock and Chase at Clinton. She insists that she issued the misbehavior report against plaintiff, not to retaliate against him, but in good faith, based on the evidence. (Paquette–Monthie Decl. ¶¶ 11–15). Defendant Gutwein similarly denies any effort to retaliate against plaintiff, and swears that he was not directed by anyone to find plaintiff guilty of the disciplinary charges against him at Coxsackie. Hearing Officer Gutwein also states that he did not know C.O. Rock from Clinton, and was unaware of any complaint or grievance plaintiff may have filed against her. (Gutwein Decl. ¶¶ 24–33).

Based on the authority cited in note 22 above, it is unlikely that defendants Paquette–Monthie and Gutwein would be motivated to retaliate against plaintiff for a complaint or grievance in which they were not implicated, particularly when the target of the complaint worked at a separate and geographically distant correctional facility. The sworn declarations establishing that the Clinton and Coxsackie defendants did not know each other or have any contact, utterly refute plaintiff's speculation that they colluded to initiate false disciplinary charges against him. The only support plaintiff offers for the implausible conspiracy theory underlying the retaliation claim against the Coxsackie defendants is the alleged admission of Counselor Paquette–

Monthie that she issued the misbehavior report because plaintiff had complained about a friend of hers at Clinton Annex. Given that plaintiff did not offer this self-serving alleged admission while confronting Counselor Paquette–Monthie at the disciplinary hearing, or in his grievance appeals which referenced the Coxsackie defendants, or even in his initial complaint in this action, the court finds that the purported admission does not create an issue of fact that could lead any reasonable fact finder to conclude that defendants Paquette–Monthie and Gutwein conspired to retaliate against plaintiff. *See, e.g., Allah v. Greiner,* 2006 WL 357824, at * 1, 3, 5–6, 7, 9; *Jeffreys v. City of New York,* 426 F.3d at 554.

In any event, the court concludes that plaintiff's retaliation claims against defendants Paquette–Monthie and Gutwein would be subject to dismissal because they would have taken the same actions with respect to the misbehavior report against plaintiff even if they had known of complaints or grievances filed by plaintiff against defendant Rock. See, e.g., *Lowrance v. Achtyl,* 20 F.3d 529, 534–35 (2d Cir.1994) (defendants met their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because the plaintiff had admitted to engaging in the misconduct that formed the basis of the misbehavior report; plaintiff's retaliation claim was properly dismissed under *Mt. Healthy* and its progeny); *Smith v. Woods,* 2006 WL 1133247, at * 10 (the record evidence establishes that the hearing officer could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by plaintiff-*i.e.,* based upon the evidence as presented to him at plaintiff's disciplinary hearing decision).

 **\*25** The basis of the disciplinary charge against plaintiff was that he violated an order of protection that precluded him from, *inter alia,* all communications and contact, including by "telephone[,]" with his wife and daughters, "except for visits to state correctional facility and correspondence." (Gutwein Decl. ¶ 6 & Ex. A, Dkt. No. 14–15 at 3). Based on the order of protection, plaintiff had been directed to stop calling his wife by DOCCS staff at Sing Sing, and was not allowed to add his wife to his authorized call list (Dkt. No. 42–15 at 4–5); but plaintiff apparently circumvented that limitation by listing, under the name of an aunt, the telephone number at the home where his wife came to reside. (Disc. Hrg. Tr. at 2, 7, 9, 21–22, 56–58).

During his initial interview with Counselor Paquette–Monthie at Coxsackie, and during the disciplinary hearing, plaintiff acknowledged that he had telephonic contact with his wife from other DOCCS facilities before he was transferred to Coxsackie, at the number listed under his aunt's name on his emergency contact list. [27] (Disc. Hrg. Tr. at 7, 9, 12, 18, 19–20). He disputed the disciplinary charges because he believed that he should not be charged with misconduct by Coxsackie officials for calls he made to his wife from other institutions. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 52–53, 56). Plaintiff also asserted that the exception for "correspondence" in the order of protection should be interpreted to include telephonic contact, notwithstanding the explicit, prior prohibition in the order against communications by telephone. (Disc. Hrg. Tr. at 17, 18, 20, 23, 44–45, 49). Plaintiff claimed that his wife, who was willing to speak with him by phone, and the District Attorney and Judge who caused the order of protection to be entered, would agree that telephonic contact was permissible, notwithstanding the clear language of the order of protection. [28] (Disc. Hrg. Tr. at 6–7, 23, 39, 57–58, 61).

The court finds that, although plaintiff made several frivolous arguments that he should be found not guilty, "he admitted to engaging in the conduct that formed the basis of the misbehavior report." *Lowrance v. Achtyl,* 20 F.3d at 534–35. Accordingly, I would recommend that summary judgment be granted in favor of the Coxsackie defendants on plaintiff's retaliation claim, based, *inter alia,* on *Mt. Healthy* and its progeny.

## V. Due Process

### A. Legal Standards
To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes

atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

**\*26** The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia,* *Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (*citing, inter alia,* *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See, e.g.,* *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation); *Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred). To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429 (W.D.N.Y.2008) (citing, *inter alia, Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

### B. Analysis

The complaint alleges that, in conducting the disciplinary hearing at Coxsackie and finding plaintiff guilty, defendant Gutwein was motivated by a desire to retaliate against plaintiff for his complaint against defendant Rock at Clinton. Plaintiff also alleges that Hearing Officer Gutwein also improperly denied plaintiff's requests to call key witnesses or obtain documents that would have established his innocence. (Dkt. No. 1 at 7). In plaintiff's prior motion to amend his complaint, which this court denied (Dkt. No. 38 at 7, 9– 10), he attempted to supplement his due process claim by alleging that (1) the misbehavior report was deficient because it did not specify the institution from which plaintiff made the offending phone calls to his wife (Dkt. No. 36 at 34); (2) defendant Gutwein improperly disallowed certain questions plaintiff wanted hearing witnesses to answer (Dkt. No. 36 at 33); and (3) plaintiff's assistant was not allowed to contact certain witnesses on his behalf (Dkt. No. 36 at 36). Although not technically part of the complaint, the court will address these allegations.

Defendants, apparently conceding that the disciplinary sanctions imposed on plaintiff at Coxsackie implicated a liberty interest, argue that the plaintiff was afforded all of the process to which he was due at the hearing conducted by defendant Gutwein. (Defs.' Mem. in Support of Rule 12(b)(6) Mot. at 16–20). The court agrees that, based on the record of the disciplinary hearing, no reasonable fact finder could conclude that plaintiff's due process rights were violated or that the outcome of the proceeding would have been any different if he had been allowed to call and question the witnesses and present the documents that he requested.

### 1. Misbehavior Report

**\*27** The July 7, 2011 misbehavior report charged plaintiff with violating prison rules 107.20 (False Statements or Information); 106 .10 (Refusing Direct Order); and 121.12 (Phone Program Violation) for making telephone calls to his wife in violation of an order of protection and contrary to direct orders from an officer at Sing Sing, which he managed to do by misleadingly listing his aunt's name as an emergency contact, but at an address and phone number where his wife resided. (Dkt. No. 42–15 at 2). Plaintiff alleges that defendant Paquette–Monthie's misbehavior report provided inadequate notice of the charges because it did not specify the facility from which he made telephone calls to his wife.

The notice required by due process serves to "compel 'the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citation omitted)). However, the Constitution does not demand notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct. *Sira v. Morton,* 380 F.3d at 72.

Counselor Paquette–Monthie's misbehavior report was based on plaintiff's admissions that he had previously been calling his wife, and the report noted the date in 2009 when plaintiff changed his emergency contact information so he could reach his wife by phone, despite prior orders that he not do so. (Dkt. No. 42–15 at 2). The misbehavior report includes considerable factual detail, and the charges contained therein could certainly not be considered impermissibly vague or conclusory. *Taylor v. Rodriguez,* 238 F.3d at 193 (due process requires more than a conclusory charge). The fact that the misbehavior report did not specify the institution(s) from which plaintiff impermissibly called his wife did not impede him from establishing that he made no such calls from Coxsackie and pursuing the defense, albeit a frivolous one, that he could not be charged at Coxsackie for conduct committed at prior facilities. (Disc. Hrg. Tr. at 14, 19–20, 26, 35, 44, 46, 53, 56).

### 2. Witnesses and Exhibits

During the hearing, plaintiff requested the following witnesses on his behalf: defendant Paquette–Monthie; her supervisor; plaintiff's wife; the District Attorney and the judge who were involved with the Order of Protection; plaintiff's wife's lawyer; plaintiff's criminal defense lawyer; and a staff member from the Office of Mental Health. (Gutwein Decl. ¶ 8; Disc. Hrg. Tr. at 4–8). The hearing officer called only Counselor Paquette–Monthie and Supervising Counselor Chenel to testify, and both were questioned extensively by plaintiff, although defendant Gutwein screened many of plaintiff's questions. (Gutwein Decl. ¶¶ 9–10; Disc. Hrg. at 8–43, 43–61).

**\*28** Plaintiff, in his motion to amend the complaint, alleged that Hearing Officer Gutwein "would not allow me to question witnesses with questions that proved I was being ret[a]liated for no reasons but for[ ] filing a complaint against the coun[s]elor['s] friend C.O. P. Rock." (Dkt. No. 36 at 33). Hearing Officer Gutwein allowed the witnesses to answer some, but not all questions by which plaintiff tried to establish that Counselor Paquette–Monthie filed the misbehavior report against him because of her "bias" and motive for "revenge." But, plaintiff never sought to ask any question as to whether the counselor initiated the charges because plaintiff had filed a prior complaint against C.O. Rock or any other friend at Clinton. (Disc. Hrg. Tr. at 15, 27, 28, 33–34, 38, 40, 42–43, 54, 55).[29]

The mere fact that plaintiff's questions for witnesses had to be filtered through the hearing officer did not violate due process. *See Baxter v. Palmigiano,* 425 U.S. 308, 322–23 & n. 5 (1976) (inmates are not entitled to the right to confront and crossexamine witnesses at a disciplinary hearing). The plaintiff's tone during the entire disciplinary hearing was argumentative, and many of his proposed questions reflected a dogged, but unfocused effort to induce Counselor Paquette–Monthie to admit she was, for whatever reason, biased against the plaintiff. During the disciplinary hearing, defendant Paquette–Monthie clearly testified that she initiated the charges against plaintiff because of the perceived seriousness of his misconduct, and "was not playing any dirty politics ... behind the scenes." (Disc. Hrg. Tr. at 26, 28). The hearing officer reasonably denied many of the plaintiff's other questions about the counselor's alleged bias because they were repetitive and bordered on harassment. In any event, it is clear from defendant Paquette–Monthie's declaration (¶¶ 12–17, Dkt. No. 42–12), that if plaintiff had actually tried to ask her at the hearing whether she was retaliating against him at the behest of C.O. Rock or others from Clinton, she would have flatly denied it. Thus, plaintiff cannot establish prejudice, because even if defendant Gutwein had disallowed such questions (which, again, plaintiff never asked), allowing Counselor Paquette–Monthie to answer would have not favored plaintiff or changed the outcome of the hearing.[30]

Plaintiff's request to call his wife and a number of people involved in the prior case that resulted in the order of protection, was premised on his claim that these witnesses would put the order in "context" and clarify that plaintiff was, in fact, allowed to speak with his wife by telephone. (Disc. Hrg. Tr. at 6–7, 22, 23, 39, 57–58, 61). Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence). An inmate's due process rights are violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte v. Real,* 471 U.S. at 497.

**\*29** Hearing Officer Gutwein denied plaintiff's request to call his wife as a witness, because to do so would violate the order of protection. Defendant Gutwein also declined to call the other witnesses involved with the prior order of protection because their testimony would not be relevant. (Disc. Hrg. Tr. at 61–63; Dkt. No. 42–15 at 95–96). [31] As noted above, the order of protection explicitly precluded plaintiff from having telephonic or other communications with his wife, and created an exception that allowed only prison visits and "correspondence." (Dkt. No. 42–15 at 3). Given the clarity of the order of protection, and the prior order of a DOCCS official that plaintiff refrain from telephone contact with his wife, calling other witnesses to "explain" or put into "context" the order of protection would have been unnecessary and irrelevant. Accordingly, Hearing Officer Gutwein did not violate plaintiff's due process rights by refusing to call these witnesses. [32]

Plaintiff requested that his medical and mental health records be produced at the hearing, claiming they would indicate that his wife was listed as his emergency contact and that, therefore, he had permission from DOCCS staff at Clinton to call his wife. [33] (Disc. Hrg. Tr. at 7, 59). In fact, plaintiff's position that his emergency contact information contained the address and phone number where his wife could be reached was repeatedly placed on the record during the hearing, and was accepted by the witnesses and the hearing officer. (Disc. Hrg. Tr. at 9, 12, 18–19, 29, 36, 37, 56–57, 60, 72–73). However, the DOCCS witnesses and hearing officer documented that the name plaintiff associated with that emergency contact information was that of his aunt, not his wife, and viewed this as evidence that plaintiff was misleading DOCCS staff so he could make calls to his wife, despite orders to the contrary. (*Id* .)

Plaintiff, while apparently conceding that he used his wife's address and phone number, but not her name, in his emergency contact information (Disc. Hrg. Tr. at 7; Dkt. No. 36 at 35), argued that he disclosed, to Counselor Paquette–Monthie at Coxsackie, that his aunt subsequently moved from that residence and his wife moved in. (Disc. Hrg. at 12–13, 37, 56–57, 60). However, plaintiff was charged, not with misleading defendant Paquette–Monthie at Coxsackie, but with misleading staff at other DOCCS facilities by listing his wife's contact information under his aunt's name. (Disc. Hrg. Tr. at 2; Inmate Misbehavior Report, Dkt. No. 48–15 at 2). Plaintiff's position on this point is a variation on his frivolous defense that he could not be charged at Coxsackie

for misconduct he previously committed at a prior institution. (Disc. Hrg. Tr. at 37). Accordingly, when Hearing Officer Gutwein ruled that documentary or testimonial evidence from DOCCS health units about plaintiff's emergency contact information was not relevant (Disc. Hrg. Tr. at 10; Dkt. No. 42–15 at 94–95), he was pursuing a legitimate correctional goal of avoiding redundant and irrelevant evidence, and did not violate plaintiff's due process rights. *See, e.g., Clyde v. Bellnier,* 9:08–CV–909 (JKS), 2010 WL 1489897, at \*6 (N.D.N.Y. April 13, 2010) (no due process violation arose when the hearing officer failed to provide documents that did not exist or that were not relevant to the defense). [34]

### 3. Sufficiency of the Evidence

**\*30** As discussed in section IV B 4. above, plaintiff essentially admitted all of the conduct which formed the basis of the disciplinary charges against him, and his "defenses" were frivolous. The testimony of Counselor Paquette–Monthie (*see, e.g.,* Disc. Hrg. Tr. at 9, 18–19, 21–22) and Supervising Counselor Chenel (*see, e.g.,* Disc. Hrg. Tr. at 46, 49, 56–57, 59–60), along with the supporting documents (Dkt. No. 42–15 at 2–14), provided far more support for defendant Gutwein's guilty finding than the "some" "reliable evidence" standard requires to satisfy due process. (Disc. Hrg. Tr. at 72–73; Dkt. No. 42–15 at 98–99). [35]

### 4. Hearing Officer Bias

"An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." ⚐ *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." ⚐ *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); ⚐ *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." ⚐ *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact.

*Francis v.. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

The unsupported allegations that defendant Gutwein conspired with the other defendants to retaliate against plaintiff in connection with the disciplinary proceedings at Coxsackie (discussed above) are insufficient to establish that he was a biased hearing officer. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 460–61 (S.D.N.Y.2006) (in order to defeat a motion for summary judgment, a plaintiff-inmate must "be armed with [something] more than conclusory allegations of bias and prejudgment" of the disciplinary hearing officer) (quoting *Francis v. Coughlin,* 891 F.2d at 47). The transcript of the disciplinary hearing demonstrates that Hearing Officer Gutwein displayed great patience in dealing with plaintiff's argumentative demeanor and his persistence in pursuing frivolous lines of witness questioning. Given the weight of the evidence supporting plaintiff's guilt and the fact that defendant Gutwein's various rulings regarding witnesses and documentary evidence clearly comported with due process, no reasonable fact finder could conclude that he was an unconstitutionally biased hearing officer.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 42) be **GRANTED** on the grounds stated herein, and that plaintiff's complaint be **DISMISSED** in its entirety; and it is further

**\*31 RECOMMENDED,** that plaintiff's motions for preliminary injunctions (Dkt. Nos.54, 58) be **DENIED AS MOOT;** and it is further

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 58) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed Jan. 17, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1292232

---

## Footnotes

1     Brooks named "P. Chaste" in his complaint, (Compl. at 1, 2), but it is apparent that the proper spelling of that individual's name is Chase, (Dkt. No. 42, Attach.3).

2     While the complaint names "R. Paquette" and "Monthie" as separate defendants, (Compl. at 1, 2), they are one in the same: Roberta PaquetteMonth ie. (Dkt. No. 42, Attach.12).

3     Brooks named "Eric Mutuein" as a defendant in his complaint. (Compl. at 1, 2.) It is clear, however, that he intended to name Eric Gutwein as a party defendant. (Dkt. No. 42, Attach.14.)

4     Notably, Judge Baxter considered new facts that were first submitted by Brooks in his motion seeking leave to amend even though they were "not technically part of the complaint." (Dkt. No. 60 at 51–60.)

5     "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Almonte,* 2006 W L 149049, at \*6.

6    Brooks writes "I'am adding defendant to my existing prior civil suit," yet he seems to assert new wrongdoing only on the part of DOCCS for "fail[ing] to protect and refus[ing] to put [him] in midstate A.P.P.U. under federal [p]rotection." (Dkt. No. 62 at 3.) Elsewhere, Brooks refers to "new defendants added." (*Id.* at 5 .)

7    Buried within his submission, Brooks "request[s] to fill Amendent Complaint have discovery In new defendants added." (Dkt. No. 62 at 5.) Construing this statement liberally, as the court must, *see* 🚩 *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006), it can safely be assumed that Brooks seeks leave to amend.

1    Because plaintiff's complaint does not have consecutive pagination or consistent paragraph numbering, the court will refer to the page numbers assigned by the CM–ECF system in the document header.

2    Plaintiff incorrectly refers to defendant Peter **Chase** as "P. **Chaste.**" The court will use this defendant's correct name.

3    The complaint lists the hearing officer as Eric Mutuein (Compl., Dkt. No. 1 at 2), but this court will use his correct name herein.

4    The complaint names as defendants R. Paquette, Counselor and Monthie, "Councelor [sic] Supervisor." As noted, the counselor who initiated the disciplinary charges against plaintiff is named Roberta Paquette–Monthie. Ms. Paquette–Monthie's supervisor, who testified at plaintiff's disciplinary hearing, but was not at work the day the misbehavior report was issued, is Supervising Correction Counselor Chenel. (Disc. Hrg. Tr. at 8, 52). Supervising Correction Counselor Chenel has not been served in this action.

5    To avoid dismissal of his due process claims under 🚩 *Heck v. Humphrey,* 512 U.S. 477 (1994), plaintiff filed a *Peralta* waiver relinquishing any due process claims with respect to his loss of good time. (Dkt.Nos.7, 9, 12, 13, 15–17). *See* 🚩 *Peralta v. Vasquez,* 467 F.3d 98, 105–106 (2d Cir.2006).

6    *See* 🚩 *Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justifying plaintiff's failure to exhaust); 🚩 *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); 🚩 *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); 🚩 *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

7    *See, e.g., Newman v. Duncan,* 04–CV–395 (TJM/DRH), 2007 WL 2847304, at * 2 n. 4 (N.D.N.Y. Sept. 26, 2007); 🚩 *Shariff v. Coombe,* 655 F.Supp.2d 274, 285–86 n. 7 (S.D.N.Y.2009).

8    According to DOCCS records, plaintiff was moved from Clinton Annex to Downstate Correctional Facility on June 24, 2011; then to Coxsackie on June 27, 2011; and on to Upstate Correctional Facility on July 22, 2011. (LaValley Decl. ¶ 11 & Ex. B, Dkt. No. 42–5 at 4; Brousseau Decl. ¶ 8).

9    As plaintiff appears to acknowledge, a letter of complaint to the facility superintendent would not qualify as a formal grievance required to exhaust administrative remedies, unless the informal complaint produced a resolution favoring the inmate. *See, e.g.,* 🚩 *Goodson v. Silver,* 9:09–CV–494 (GTS/DRH), 2012 WL 4449937 at *9 & n. 20 (N.D.N.Y. Sept. 25, 2012) (district courts have interpreted 🚩 *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001), to mean that an inmate's efforts to resolve a matter through informal channels satisfies

the exhaustion requirement only if the efforts resulted in the matter being concluded in the inmate's favor) (collecting cases); *Shomo v. Goord,* 9:04–CV–707 (LEK/DEP), 2007 WL 2693526, at *9 (N.D.N.Y. Sept. 11, 2007) (courts have repeatedly held that complaint letters to the DOCCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements) (collecting cases).

10    The copy of the July 14th Affidavit of Service has two receipt stamps from DOCCS-one dated 9/1/2011 and the other of which has the date obscured. It appears that a copy of the Affidavit of Service was sent to other DOCCS officials in Albany in September 2011. In the absence of a reply from defendants questioning the authenticity of the document, and construing the facts in favor of the non-movant, as I must, the court will assume that N. Ratliff at Clinton received a copy of the Affidavit of Service at some time between July 14, when the affidavit was notarized, and July 18, 2011, when N. Ratliff sent the confirming memorandum to plaintiff.

11    Nothing on the face of plaintiff's June 15, 2011 letter to Supt. LaValley indicates that a copy was submitted to grievance officials. (Dkt. No. 52–11 at 5).

12    *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a) ("[a]n inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence"), 701.6(g)(1)(b) ("[t]he IGP supervisor may grant an exception to the time limit for filing a grievance based on mitigating circumstances[;] ... [a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence).

13    The New York regulations specifically state that if a grievance is not decided within the time limits provided, the inmate may appeal to the next step. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.6(g)(1)(ii)(2). In *Pacheco v. Drown,* 9:06–CV–20 (GTS/GHL), 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan. 11, 2010), U.S. District Judge Glenn Suddaby held that the failure by the IGRC or the Superintendent to timely respond to a grievance or first level appeal may be appealed to the next level(s), including the CORC, in order to properly complete the grievance process. *Accord,* Murray v. Palmer, 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, *2 & nn. 4, 6 (N.D.N.Y. Mar. 31, 2010).

14    N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(h)(2) provides:

> An inmate transferred to another facility may continue an appeal of any grievance. If the grievant wishes to appeal, **he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed** within seven calendar days after receipt. The IGP supervisor will refer it to the facility grievance clerk for processing.

(emphasis supplied).

15    Absent an extension, which would require the written consent of the grievant, N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.6(g)(1) (b)(ii)(2), the IGRC is required, during the first step of the grievance process, to schedule a hearing within 16 calendar days after receipt of the grievance. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii). At the second step of the process, the Superintendent is supposed to render a decision within 20 calendar days from the receipt of an appeal. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(c)(3) (I), (ii). Arguably, if an inmate has not consented to an extension and the IGRC has not scheduled a hearing within 16 days, or a superintendent has not rendered a decision within 20 days, the inmate would then have only seven days to appeal to the next level, unless he requested an extension supported by mitigating circumstances. *See, e.g.,* Goodson v. Silver, 2012 WL 4449937, at *6 (discussing how to calculate the deadline for filing an appeal to CORC in a case where the Superintendent failed to respond to a harassment grievance). However, a number of contingencies, other than an inmate-approved extension, could alter such deadlines. In this case, the plaintiff was transferred from Clinton less than 16 days after the "occurrence" which was the subject of the alleged grievance. When an inmate's confinement status precludes his timely appearance at an IGRC hearing, an unspecified delay in the resolution of the first stage of the grievance

process is contemplated-to determine whether the inmate wants to postpone his hearing or have it proceed in his absence. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(b)(2)(ii)(a). If a grievance against a DOCCS employee is determined by a superintendent to be a "harassment" grievance, the process and the deadlines change. *See* N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.8. Given the uncertainty of the deadlines for filing appeals when an inmate, particularly one who is transferred to another facility, receives no response to a grievance, this court cannot conclude, in the context of a summary judgment motion, that plaintiff's appeals were untimely for exhaustion purposes or that any untimeliness should not be excused under *Hemphill* and its progeny.

16    In support of the summary judgment motion, defendants document that plaintiff could have sought and obtained medical attention prior to June 17th by taking advantage of sick call procedures from his cell. (Devlin–Varin Decl., Dkt. No. 42–10). Plaintiff responded, in conclusory fashion, that prior efforts to get medical attention were thwarted by the Clinton staff. (Pl.'s Reply to Devlin–Varin Decl. ¶¶ 5, 6, Dkt. No. 52–5; Pl.'s Reply to Michalek Decl. ¶ 4, Dkt. No. 52–4). In any event, because plaintiff could seek prompt, necessary medical treatment once he returned to his cell, C.O. Rock would not have been subjectively aware that her failure to send plaintiff for immediate medical attention would subject him to a risk of serious harm from a prolonged delay in care, even if she had known that the bathroom door had struck plaintiff in the head. *Farmer v. Brennan,* 511 U .S. at 844; *Salahuddin v. Goord,* 467 F.3d at 281. Thus, no reasonable fact finder would conclude that plaintiff could establish the subjective prong of the deliberate indifference standard.

17    Plaintiff has also filed copies of sick call requests that he purportedly submitted in August and September 2011, complaining of ongoing symptoms relating to the alleged blow to his head on June 15, 2011 at Clinton and a 2009 assault in Sing Sing. (Dkt. No. 52–11 at 45–51).

18    Plaintiff has filed documents relating to complaints and grievances regarding his medical care between September and November 2011. (Dkt. No. 52–11 at 52–54).

19    *See also Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).

20    *See also Brown v. White,* 2010 WL 985184, at *9–10 (inmate who suffered from chronic, but not acute, lower back pain and occasional headaches and dizziness during a three-month delay in requested medication and other treatment did not suffer a serious deprivation of medical care); *Evans v. Manos,* 336 F.Supp.2d at 260 (W.D.N.Y.2004) (subjective claims of pain, unaccompanied by substantial medical complications are not sufficient to create a factual issue as to whether he was suffering from a "serious," unmet medical need); *Hanrahan v. Menon,* 9:07–CV–610 (FJS/ATB), 2010 WL 6427650, at *8–9 (N.D.N.Y. Dec. 15, 2010) (plaintiff's complaints of primarily subjective mental health symptoms do not rise to the level that would make the two-month delay in plaintiff's medication a serious deprivation) (ReportRecommendation), *adopted,* 2011 WL 1213171 (N.D.N.Y. Mar. 31, 2011), *aff'd,* 470 F. App'x 32 (2d Cir. May 18, 2012).

21    Conclusory allegations, lacking any factual foundation, are also insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g.,* *Jackson v. County of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (citing *Gallop v. Cheney,* 642 F.3d 364, 369 (2d Cir.2011) (finding allegations of conspiracy "baseless" where

the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002). Plaintiffs alleging a civil rights conspiracy must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

22    *See, e.g.,* *Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

23    *See* *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) and other cases cited below with respect to the due process standards applying to disciplinary proceedings.

24    The district court in *Allah v. Greiner* found that plaintiff's allegations were sufficient to create issues of fact with regard to the prisoner's claim of retaliation against one defendant because the defendant (Totten) had a plausible motive to retaliate against the plaintiff for a grievance specifically naming Totten and because Totten's explanation for the allegedly retaliatory act was internally inconsistent and in conflict with other evidence. *Id.* at *4.

25    Plaintiff speculated that Counselor Paquette–Monthie previously worked in the sex offender program at Clinton Annex, and presumably met C.O. Rock while at Clinton. (Dkt. No. 36 at 36, 37).

26    Plaintiff attached, to his response to the Rule 12(b)(6) motion, documents purportedly submitted in state court proceedings in October 2011, one of which referenced Counselor Paquette–Monthie's alleged statement that she filed the misbehavior report against plaintiff because he filed a complaint against a friend of hers. (Dkt. No. 36 at 19). Even if this document is authentic and was not backdated, as some of plaintiff's submissions clearly are, it is apparent from the record that plaintiff belatedly claimed that Counselor Paquette–Monthie made this admission in furtherance of self-serving legal tactics, well after the disciplinary hearing at Coxsackie and after plaintiff filed his complaint in this action.

27    Defendant Paquette–Monthie and her supervisor testified at the disciplinary hearing that DOCCS phone records confirmed that plaintiff had, indeed, made calls to the number at which plaintiff admitted his wife could be reached. (Disc. Hrg. Tr. at 19, 59–60; Dkt. No. 42–15 at 6–13). Plaintiff was allowed to inspect those phone records during the hearing. (Disc. Hrg. Tr. at 67, 69).

28    The Order of Protection was apparently modified, on October 28, 2011, after the disciplinary hearing, to allow telephonic contact. (Dkt. No. 36 at 66). However, this reinforces that the Order of Protection in place at the time of the telephonic contact that resulted in the misbehavior report against plaintiff clearly did not authorize contact by phone.

29    Plaintiff asked Supervising Counselor Chenel, with respect to the misbehavior report against him, "was there any complaint initially by any outside services ... or was there anything written from another facility, uh,—retaliate or anything like that?" Hearing Officer rephrased the questions: "to you knowledge was there any outside contact with regard to the Order of Protection being violated?" and Supervising Counselor Chenel answered "No." (Disc. Hrg. Tr. at 54).

30    *See Clark v. Dannheim,* 590 F.Supp.2d at 429–31 (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases). Toward the end of the hearing, plaintiff requested that witnesses Paquette–Monthie and Chenel be recalled for further questioning; but he would not explain what new questions he wanted to ask these witnesses. (Disc. Hrg. Tr. at 63–66). Hearing Officer Gutwein denied plaintiff's request to recall these witnesses because plaintiff failed to articulate any additional information that they could provide that would not be redundant of their lengthy, prior testimony. (Disc. Hrg. Tr. at 66, 71–72; Dkt. No. 42–15 at 93). Defendant Gutwein's stated reasons for not recalling these witnesses were reasonably related to a correctional goal and did not, based on the authority cited below, violate due process. In any event, because plaintiff never articulated how recalling these two witnesses would have helped him or changed the outcome of the disciplinary hearing, he cannot establish that he was prejudiced by the hearing officer's ruling.

31    On July 20, 2011, Hearing Officer Gutwein provided plaintiff with copies of form 2176 explaining, in writing, the reasons for his refusal to call each witness. Plaintiff demanded that the hearing officer state on the record his reasons for refusing to call the District Attorney involved with the prior order of protection, and defendant Gutwein did not do so. (Disc. Hrg. Tr. at 62–63). On July 21, 2011, when the hearing resumed, plaintiff complained that he could not read script, and the hearing officer orally explained his reasons to deny plaintiff's new request to recall witnesses Paquette–Monthie and Chenel on the record, apparently because the 2176 forms prepared that morning were handwritten in script. (Disc. Hrg. Tr. at 70–72). Once he announced his problems with reading script, plaintiff did not renew his request that the hearing officer orally explain the reasons for not calling the District Attorney, which were written in script on form 2176 the day before. (*Id.*). In his prior rulings on various questions plaintiff posed to the witnesses, the hearing officer made clear that the various persons involved in the prior order of protection had nothing relevant to offer with respect to the pending charges. (*See, e.g.,* Disc. Hrg. Tr. at 23, 40, 49). In any event, as long as a hearing officer articulates a reason for not calling a witness that is logically related to correctional goals, due process does not require that he do so during the hearing, even if state law requires a contemporaneous finding. 🚩*Duffy v. Selsky,* 95 CIV. 0474, 1996 WL 407225, at * 10 (S.D.N.Y. Jul. 18, 1996) (the Supreme Court has held that the proffer of the explanation for not calling a witness need not be contemporaneous with the hearing) (citing 🚩*Ponte v. Real,* 471 U.S. at 497).

32    Given that these witnesses had no relevant information to offer, plaintiff's complaint that his assistant was not allowed to interview these witnesses also fails to support a due process claim.

33    Plaintiff initially requested witnesses from the health units, but he did not persist in that request after Counselor Paquette–Monthie and Supervising Counselor Chenel testified. (Disc. Hrg. Tr. at 7, 61). Hearing Officer Gutwein nonetheless prepared copies of form 2176 explaining that these witnesses would not be called because the proposed testimony would not be relevant. (Dkt. No. 42–15 at 94–95).

34    The court notes that Hearing Officer Gutwein provided plaintiff with copies of requested documents discussed during the hearing, and once adjourned the hearing so plaintiff could get a copy of a document he claimed he needed to continue questioning a witness. (Disc. Hrg. Tr. at 31, 66–71).

35    The hearing office stated the basis for his finding on the disciplinary charges both in writing and on the record at the hearing. (*Id.*).

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by *Wang v. Paterson,*   S.D.N.Y.,   December 18, 2008

2007 WL 496371

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Andre SMITH, Plaintiff

v.

Glenn GOORD, et al., Defendant.

No. 04-CV-6432.

|

Feb. 12, 2007.

**Attorneys and Law Firms**

Andre Smith, Auburn, NY, pro se.

Tamara B. Christie, NYS Office of the Attorney General, Rochester, NY, for Defendant.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge.

**\*1** This is an action brought pursuant to 42 U.S.C. § 1983 in which the plaintiff, a prison inmate proceeding *pro se,* contends that defendants violated his constitutional rights by, *inter alia,* denying him Muslim religious services and by physically assaulting him. Now before the Court are plaintiff's Objections [# 65] to a Report and Recommendation [# 64] by the Honorable Marian W. Payson, United States Magistrate Judge, which denied plaintiff's motion [# 39] to file a supplemental complaint, and granted in part and denied in part plaintiff's application [# 57] to amend his complaint. For the reasons that follow, plaintiff's objections are denied, and Magistrate Judge Payson's Report and Recommendation [# 64] is affirmed and adopted in all respects.

BACKGROUND

The facts of plaintiff's claims are set forth in the Report and Recommendation and need not be repeated in their entirety here. It is sufficient to note that plaintiff began this lawsuit by alleging that certain officials with the New York State Department of Correctional Services ("DOCS") and certain employees at Lakeview Correctional Facility ("Lakeview") violated his constitutional rights by assaulting him and by failing to provide Muslim religious services at Lakeview. Plaintiff now seeks to supplement that complaint by alleging that, after he was transferred to Southport Correctional Facility ("Southport"), approximately one year after commencing this action, he was retaliated against by corrections staff there. Additionally, plaintiff seeks to amend his complaint to add new claims (and new defendants) relating to the alleged assaults and denial of Muslim religious services at Lakeview.

The instant objections involve only that portion of the Report and Recommendation which denied plaintiff's application to supplement his complaint by adding the Southport claims. As to that ruling, the Magistrate Judge denied the application, finding that "judicial economy would [not] be served by combining the original and supplemental claims into a single proceeding." (Report and Recommendation [# 64] p. 6). The Magistrate Judge further stated, in relevant part:

> Other than Commissioner Goord, there is no overlap between the named defendants in both complaints; the events at issue in both complaints are separated by more than a year; and, there is no suggestion that the original defendants were involved in the alleged retaliatory actions taken against Smith in a different facility over a year later. Indeed, the allegations are to the contrary.

\* \* \*

> Considering these allegations, I find no basis to conclude that any efficiencies would be gained by consolidating these claims for trial. Nor do I find that Smith's right to relief based upon the allegations in the supplemental complaint 'aris[es] out of the same transaction, occurrence, or series of transactions or occurences' at issue in the original complaint or that it gives rise to 'any question of law or fact common to [the] defendants' in both complaints.

**\*2** (Report and Recommendation [# 64] p. 6) (citing Fed.R.Civ.P. 20(a); *Davis v. State of New York,* 1999 WL 1390247 at \*5 (W.D.N.Y.1999); *Klos v. Haskell,* 835 F.Supp. 710, 716 (W.D.N.Y.1993) *aff'd* 48 F.3d 81 (2d Cir.1995)).

In his objections, plaintiff contends that this ruling was erroneous because both his original complaint and his

proposed supplemental complaint include allegations against Glenn Goord, former Commissioner of DOCS:

> [Plaintiff] successfully connects the actions of a named defendant (Goord) in the original complaint with the actions of a named defendant (Goord) in the supplemental complaint. The plaintiff proves that the supplemental complaint gives rise to a question of law and fact common to a defendant (Goord) in both complaints.

> * * *

> These complaints are adequately related, because they show that defendant Commissioner Goord has tacitly authorized the practice of mistreating Muslim prisoners and their religion, based on the fact that he has routinely and intentionally failed to act on prior prisoner complaints regarding the mistreatment of Muslim prisoners and their right to practice their religion, which had the effect of inviting the abuses and constitutional violations that the plaintiff mentioned in the supplemental complaint....

(Pl. Objections [# 65] p. 3).

## ANALYSIS

The general principles of law involved when a district court is asked to rule upon objections to a decision by a magistrate judge are well settled:

🚩 28 U.S.C. § 636(b)(1)(A) provides that "a judge may designate a magistrate to hear and determine any pretrial matter pending before the court," except for certain enumerated dispositive motions. See also Fed.R.Civ.P. 72(b) (referring to dispositive motions as those "dispositive of a claim or defense of a party"). Although a magistrate may hear dispositive pretrial motions, he may only submit proposed findings of fact and recommendations for disposition of the matter. The district court must make de novo determinations as to those matters to which the party has objected. 🚩 § 636(b)(1)(B)-(C); Fed.R.Civ.P. 72(b). The court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 🚩 § 636(b)(1)(C); see also Fed.R.Civ.P. 72(b). A magistrate, however, may issue orders regarding nondispositive pretrial matters. The district court reviews

such orders under the "clearly erroneous or contrary to law" standard. 🚩 § 636(b)(1)(A); Fed.R.Civ.P. 72(a).

🚩 *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990).

As for motions to amend pleadings, courts in this Circuit treat such motions as nondispositive when reviewing a decision by a magistrate judge to which an objection has been made. *See, e.g., Rubin v. Valicenti Advisory Services, Inc.,* No. 03-CV-6201 L, 2007 WL 196680 at *2 (W.D.N.Y. Jan. 26, 2007)* ("Although the Court of Appeals for the Second Circuit has not ruled on whether a motion to amend a pleading is properly classified as dispositive or nondispositive, 'the weight of authority within this Circuit classifies a motion to amend a [pleading] as a non-dispositive pre-trial motion, and holds that a magistrate's order should be reviewed under the 'clearly erroneous standard.' ") (*quoting Palmer v. Monroe County Sheriff,* 378 F.Supp.2d 284, 289 (W.D.N.Y.2005)). A finding is clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." 🚩 *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948).

**\*3** Rule 15(d) states, in relevant part, that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." The standard for evaluating a motion to supplement under Rule 15(d) is well settled:

> An application for leave to file a supplemental pleading is addressed to the discretion of the court, and permission should be freely granted where such supplementation will promote the economic and speedy disposition of the controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any other party.

🚩 *Bornholdt v. Brady,* 869 F.2d 57, 68 (2d Cir.1989) (citations omitted).

In the instant case, plaintiff contends that the proposed supplemental claims are sufficiently related to the original claims, based primarily, if not exclusively, upon the fact that Goord is a common defendant. However, the presence of a common defendant is not, by itself, sufficient to satisfy Rule 15(d). *See, Albrecht v. Long Island R.R.,* 134 F.R.D. 40, 41 (E.D.N.Y.1991) ("Plaintiff asserts that the two accidents are related since the alleged injuries, medical experts, and defendant are the same. However, these similarities are essentially superficial, and based on the papers before the Court it is clear that the two accidents are distinct and unrelated. In point of fact, they each occurred at different stations, and apart from the common ownership by defendant, plaintiff does not dispute that the stations are separate and unrelated."). Here, the Court agrees with Magistrate Judge Payson's finding, that plaintiff's proposed supplemental claims, involving events at Southport, are not sufficiently related to the original claims, involving events at Lakeview one year earlier, and that adding the new claims would not promote the economical and speedy disposition of the controversy. Consequently, the Court finds that the Magistrate's ruling was not clearly erroneous, and moreover, the Court would reach the same result applying a *de novo* standard of review.

CONCLUSION

Plaintiff's objections [# 65] are denied, and Magistrate Judge Payson's Report and Recommendation [# 64] is affirmed and adopted in all respects.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 496371

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,

v.

Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action pursuant to ⚑ 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's complaint alleges defendants violated his constitutional rights while he was an inmate at Green Haven Correctional Facility. [1] Plaintiff's complaint was dismissed *sua sponte* by Judge Thomas P. Griesa on June 26, 1995 pursuant to ⚑ 28 U.S.C. § 1915(d). On September 26, 1995, the Second Circuit Court of Appeals vacated the judgment and remanded the case to the district court for further proceedings.

The case was reassigned to Judge Barbara S. Jones on January 31, 1996. Defendants moved to dismiss the complaint pursuant to ⚑ Fed.R.Civ.P. 12(c) on November 25, 1996. Thereafter, the case was reassigned to Judge Jed S. Rakoff on February 26, 1997. On February 26, 1998, Judge Rakoff granted defendants' motion to dismiss, but vacated the judgment on April 10, 1998 in response to plaintiff's motion for reconsideration in which plaintiff claimed that he never received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was referred to me for general pretrial purposes and for a Report and Recommendation on any dispositive motion. Presently pending is defendants' renewed motion to dismiss. Plaintiff filed a reply on July 6, 1998. For the reasons discussed below, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the Green Haven Correctional Facility mess hall on March 14, 1995. (Complaint at 4.) He alleges that he was struck with a pipe and a fork while in the "pop room" between 6:00 p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends that the attack left him with 11 stitches in his head, chronic headaches, nightmares, and pain in his arm, shoulder, and back. (*Id.*) Plaintiff also states that Sergeant Ambrosino "failed to secure [the] area and separate" him from his attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz is that he "fail [sic] to qualify as warden." (Complaint at 4.) Plaintiff names Commissioner Coombes as a defendant, alleging Coombes "fail [sic] to appoint a qualified warden over security." (Amended Complaint at 5.) Plaintiff further alleges that Dr. Manion refused to give him pain medication. (Complaint at 5.) Plaintiff seeks to "prevent violent crimes" and demands $6,000,000 in damages. (Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing that: (1) the Eleventh Amendment bars suit against state defendants for money damages; (2) the plaintiff's allegations fail to state a claim for a constitutional violation; (3) the defendants are qualifiedly immune from damages; and (4) plaintiff must exhaust his administrative remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and 10 of the Federal Rules of Civil Procedure and dismiss the complaint without prejudice and with leave to amend. Federal Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive

answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see* *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

**\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.* [2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also* *Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See* *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See* *Salahuddin,* 861 F.2d at 42–42; *see also* *Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

## Footnotes

1    Plaintiff is presently incarcerated at Sullivan Correctional Facility.

2    Rule 10 states:

   (b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Payment Card Interchange Fee and Merchant
Discount Antitrust Litigation,   E.D.N.Y.,   October 26, 2022

2004 WL 3691343

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Michael DEVITO, Plaintiff,

v.

SMITHKLINE BEECHAM CORPORATION

d/b/a Glaxosmithkline, Defendant.

No. Civ.A. 02–CV–0745NPM.

|

Nov. 29, 2004.

**Attorneys and Law Firms**

De Lorenzo Law Firm, LLP, Schenectady, New York, for
Plaintiff, Scott Lieberman, of counsel.

Phillips Lytle, LLP, Buffalo, New York, for Defendant, Paul
B. Zuydhoek, of counsel.

King & Spalding, LLP, Atlanta, Georgia, for Defendant,
Chilton D. Varner, of counsel.

*MEMORANDUM–DECISION AND ORDER*

MCCURN, Senior J.

I. Preclusion Motion............................................................................................... 4

A. Standard for Admissibility of Expert Evidence............................................. 6

1. Deborah L. Sweeney............................................................................................ 9

a. Qualified?........................................................................................................... 9

2. Kevin W. George, M.D......................................................................................... 10

3. James T. O'Donnell.............................................................................................. 13

a. General Causation.............................................................................................. 14

i. Qualified?........................................................................................................... 14

ii. Reliability of Testimony?................................................................................. 17

b. Specific Causation.............................................................................................. 19

c. Warnings.............................................................................................................. 19

i. Qualified?........................................................................................................... 20

ii. Reliability of Testimony?................................................................................. 22

II. Summary Judgment Motion...................................................................................... 24

### Introduction

**\*1** "Between 1987 and 1997, the percentage of Americans being treated for depression more than tripled nationwide[.]" Shankar Vedantam, *Report Shows Big Rise in Treatment for Depression,* WASH. POST,, Jan. 9, 2002, at A01. In December 1996, plaintiff Michael DeVito became one of those Americans. At that time, his primary care physician prescribed Paxil, a selective serotonin reuptake inhibitor ("SSRI"). Mr. DeVito takes Paxil to this day, despite attempts through the years to discontinue. DeVito claims that he cannot discontinue taking Paxil because he has become "dependent" upon it. Affidavit of Robert E. Glanville (Oct. 20, 2003), exh. A thereto (Complaint) at 2, ¶ 9. More specifically, plaintiff alleges that he has been unable to stop taking Paxil due to what he characterizes as "withdrawal reactions" or "dependency/withdrawal syndrome," which according to plaintiff "includ[es], but [is] not limited to, dizziness, nausea, shaking, electrical-like shocks and horrible dreams." *Id.* at 2, ¶¶ 7 and 6.

In this lawsuit plaintiff alleges five causes of action against the manufacturer of Paxil, defendant Smithkline Beecham Corporation d/b/a Glaxo Smithkline ("Glaxo"): (1) fraud; (2) negligence; (3) strict liability; (4) breach of express warranty; and (5) breach of implied warranty. There is a great deal of overlap among these five causes of action. The thrust of plaintiff's complaint is that Glaxo failed to adequately warn of "Paxil's addictive qualities and dependency/withdrawal characteristics[.]" *Id.* at 6, ¶ 19; *see also id.* at 3, ¶ 11b); at 7, ¶ 25; and at 8, ¶ 33. [1]

Discovery is complete and Glaxo is now moving for summary judgment pursuant to Fed.R.Civ.P. 56. Pursuant to Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S .Ct. 2786 (1993), Glaxo is also moving to preclude the testimony of the three witnesses whom plaintiff is proffering as experts. The court will address Glaxo's motion to preclude first because if any or all of the proffered testimony is inadmissible, then that could significantly impact Glaxo's summary judgment motion in terms of the admissible proof before the court. *See Toole v. Toshin Co. Ltd .,* No. 00–CV–821S, 2004 WL 2202580, at \*4 (W.D.N.Y. Sept. 29, 2004) (granting defense motion to preclude testimony

of plaintiff's expert and declining to consider his report on summary judgment motion).

### I. Preclusion Motion

Each of the five causes of action which plaintiff alleges requires him to prove causation. "Under settled New York law, whether the action is pleaded in strict products liability, breach of warranty or negligence, the plaintiff in a products liability case bears the burden of establishing that a defect in the product as a substantial factor in causing the injury." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 434 (W.D.N.Y.2001) (internal quotation marks and citation omitted). Common law fraud likewise "requires a showing of proximate causation, such that the injury is the natural and probable consequence of the defrauder's misrepresentation or ... the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 580 (E.D.N.Y.2002) (internal quotation marks and citation omitted). To establish causation here, plaintiff DeVito "must offer admissible testimony regarding *both general causation," i.e.* that Paxil can cause the type of symptoms of which plaintiff complains when attempting to discontinue that drug, *"and specific causation," i.e.* that Paxil actually caused DeVito's alleged symptoms upon discontinuation of Paxil. *See Amorgianos v. National Railroad Passenger Corporation,* 303 F.3d 256, 268 (2d Cir.2002) (citation omitted) (emphasis added); *see also Blanchard v. Eli Lilly & Co.,* 207 F.Supp.2d 308, 314 (D . Vt.2002) (citations omitted) ("Plaintiffs ... must prove both general and specific causation in order to prevail on their claim, that is, that Prozac is capable of causing and in fact did cause the deaths in this case."). In the context of Paxil litigation, "the general causation question is limited to whether discontinuation from Paxil is *capable* of causing dizziness, agitation, anxiety, nausea, etc." *In re Paxil Litigation,* 218 F.R.D. 242, 249 (C.D.Cal.2003). Specific causation, on the other hand, focuses on whether a plaintiff can "prove that [his] symptoms came from Paxil, as opposed to, for example, the relapse of the underlying illness or the consumption or discontinuation of other drugs." *Id.*

**\*2** To establish causation, plaintiff DeVito seeks to offer the testimony of three "expert" witnesses: (1) Mr. John T.

O'Donnell, a pharmacist with a Master's Degree in nutrition; (2) Dr. Kevin W. George, a former psychiatrist of plaintiff's; and (3) Ms. Deborah Sweeney, plaintiff's treating nurse practitioner. Glaxo is seeking to "preclude ... [these] experts from offering any opinion that: (I) Paxil causes substance dependence, or is either addictive or habit-forming; or (ii) that plaintiff is addicted to Paxil or has developed substance dependence as a result of taking it." Memorandum of Law in Support of Glaxosmithkline's Motion to Preclude Plaintiff's Experts' Testimony Pursuant to Fed.R.Evid. 702 and *Daubert* ("Def. Preclude Memo.") at 4. In preparation for trial, each of these witnesses has been deposed and Mr. O'Donnell has provided an "expert" report on plaintiff's behalf. Apart from these witnesses, plaintiff proffers no other causation evidence.

To support his theory that Paxil is defective due to an inadequate warning, plaintiff is relying solely upon the deposition testimony and "expert" report of Mr. O'Donnell. Glaxo argues for the preclusion of "[h]is warnings 'opinions' " because O'Donnell is not qualified to testify on that issue and even if he were, "his opinions are neither reliable nor scientific." Def. Preclude Memo. at 24.

A. Standard for Admissibility of Expert Evidence

There is a two-part inquiry in deciding the admissibility of expert evidence. First, in accordance with Fed.R.Evid. 702, "[t]he court should admit specialized expert testimony if the witness is 'qualified as an expert by knowledge, skill, experience, training or education' and his testimony 'will assist the trier of fact to understand the evidence or to determine a fact in issue." *Nora Beverages, Inc. v. Perrier Group of America, Inc.,* 164 F.3d 736, 746 (2d Cir.1998) (quoting Fed.R.Evid. 702); *see also Kass v. West Bend Company,* No. 02–CV–3719, 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004) (citation omitted) ("As a threshold matter, the court must examine [the witness'] qualifications to testify about alternative ... designs.") Second, "in the form of an opinion or otherwise," the court must insure that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. In other words, whether an expert witness' "opinion is ultimately admissible depend on the reliability and relevance of the proffered testimony." *Kass,* 2004 WL 2475606, at *5.

In this regard, the Supreme Court has instructed the by now oft-cited rule that a district court must act as "a gatekeeper to

exclude invalid and unreliable expert testimony." *Bonton v. City of New York,* No. 03 Civ. 2833, 2004 WL 2453603, at *2 (S.D.N.Y. Nov. 3, 2004) (citation omitted). This gatekeeping obligation applies whether the proposed expert testimony is based upon scientific knowledge, "technical," or some other "specialized" knowledge. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999) (citing Fed.R.Evid. 702). As with other types of evidence, the court must also bear in mind that under Rule 403, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." Fed.R.Evid. 403. In *Daubert* the Supreme Court soundly reasoned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the *judge* in weighing possible prejudice against probative force under Rule 403 ... *exercises more control over experts* than over lay witnesses." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798 (quotation marks and citation omitted) (emphasis added). Finally, it should be noted that "[t]he proponent of expert evidence must establish admissibility under Rule 104(a) of the Federal Rules of Evidence by a preponderance of the proof." *Bonton,* 2004 WL 2453603, at *2 (citing *Bourjaily v. United States,* 483 U.S. 171, 175–76 (1987)). This burden is the same regardless of whether the issue is the "qualification[s] of a person to be a witness, ..., or the admissibility of the evidence" itself. Fed.R.Evid. 104(a). In the present case, this requires plaintiff Devito to prove by a preponderance of the evidence that each of the three witnesses whom he is proposing to call as an expert qualify as such; *and* that the proposed testimony of each is admissible.

**\*3** "In assessing expert qualifications, '[l]iberality and flexibility in evaluating qualifications should be the rule; the proposed expert should not be required to satisfy an overly narrow test of his own qualifications." *Kass,* 2004 WL 2475606, at *4 (quoting *Lappe v. American Honda Motor Co., Inc.,* 857 F.Supp. 222, 227 (N.D.N.Y.1994) *aff'd* 101 F.3d 682 (2d Cir.1996)). "So long as the expert stays within the 'reasonable confines of his subject area,' the expert can fairly be considered to possess the 'specialized knowledge' required by Rule 702." *Id.* (quoting *Lappe,* 857 F.Supp. at 227) (other citation omitted).

"In *Daubert,* the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or

technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Id.* (citing 📙 *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97). "These factors do not, however, constitute a 'definitive checklist or test.' " *Id.* (quoting 📙 *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796). "Rather, they are intended to be applied flexibly, depending on the particular circumstances of the particular case at issue." *Id.* (citing 📙 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

In *Kumho,* the Supreme Court recognized that "when evaluating the admissibility of non-scientific expert testimony, the standard under Rule 702 is a liberal and flexible one, and the factors outlined in *Daubert* are merely guidelines in aiding a court's reliability determination." *Houlihan v. Marriott International, Inc.,* No. 00 Civ. 7439, 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003) (citing 📙 *Kumho,* 526 U.S. at 151, 119 S.Ct. at 1175). "For example, in some cases, reliability concerns may focus on personal knowledge or experience rather than strict scientific methods." *Id.* (citation omitted). Regardless of which criteria a court applies to assess the admissibility of expert testimony, "the Supreme Court has made clear that the district court has a 'gatekeeping function' under Rule 702—is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " 📙 *Amorgianos,* 303 F.3d at 265 (quoting 📙 *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786) (other citation omitted). Finally, it should be noted that " 'the gatekeeping inquiry must be tied to the facts of a particular case[.]' " *Id.* at 266 (quoting 📙 *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. at 1175).

### 1. Deborah L. Sweeney

#### a. Qualified?

Glaxo's motion to preclude the testimony of Ms. Sweeney [2] requires little if any analysis. Glaxo is moving to preclude her testimony because it does not believe she is qualified to testify as an expert. Additionally, Glaxo contends that "her proposed opinion lacks a reliable scientific foundation." Def. Preclude Memo. at 26. Plaintiff did not bother to respond to this aspect of Glaxo's motion. This lack of response

amounts to a concession by plaintiff that the court should exclude Ms. Sweeney's testimony. *Cf. Green v. Doukas,* No. 97 CIV.8288CMGAY, 2001 WL 767069, at *8 (S.D.N.Y. June 22, 2001) (granting motion to preclude expert testimony because "plaintiff's failure to oppose the motion suggests ... it has merit[ ]"). Accordingly, the court grants Glaxo's motion to the extent it is seeking preclusion of Ms. Sweeney's testimony. *See Amaker v. Coombe,* No. 96 Civ. 1622, 2003 WL 21222534, at *6 (S.D .N.Y. May 27, 2003) (granting motion to preclude where plaintiff defaulted); *see also* ⚠️ *Martinez v. Sanders,* No. 02 Civ.5624, 2004 WL 1234041, at *3 (S.D.N.Y. June 3, 2004) (because plaintiff did not respond to motion, court granted same on "default" theory) (and cases cited therein).

### 2. Kevin W. George, M.D.

**\*4** Glaxo also seeks to preclude the testimony of Dr. Kevin George. Dr. George is a psychiatrist who saw Mr. DeVito in consultation twice—once on November 2, 2001 and again on December 13, 2001. Glanville Aff., exh. G thereto at 51 and 76.

Glaxo is not challenging Dr. George's qualifications, but rather the nature of his testimony. Glaxo is seeking to exclude Dr. George's testimony because he "has expressly disavowed all of the opinions that plaintiff ascribed to him in plaintiff's expert disclosure." Def. Preclude Memo. at 25. Further, even if Dr. George had not disavowed those opinions, Glaxo argues that his "proposed testimony [is] inadmissible because it lacks any reliable scientific foundation." *Id.*

Plaintiff's response focuses almost exclusively on Dr. George's qualifications, which are not in dispute. As to the opinions which plaintiff attributes to Dr. George, the sum total of plaintiff's response is that any alleged "shortcomings" in that testimony go to weight and credibility, and not to admissibility. Memorandum of Law in Opposition to Defendant's Motion to Preclude Plaintiff's Experts ("Pl. Opp'n to Preclude") at 5. The court disagrees. As will be seen, Dr. George's purported opinion testimony does not have simply a few "shortcomings." It has glaring holes in terms of reliability, not the least of which is Dr. George's unequivocal deposition testimony disavowing that he made the opinions which plaintiff claims he did.

In his expert disclosure plaintiff specifically identifies Dr. George as an "expert" whom he intends to call at the time

of trial. Glanville Aff., exh. E thereto at 1. According to plaintiff's expert disclosure, Dr. George will testify as follows:

> that in his opinion, within a degree of reasonable medical certainty, ... [1] the plaintiff is experiencing withdrawal reactions from the drug Paxil and that each time the plaintiff attempts to 'wean' himself off of the drug or to lower the dosage of the drug, the plaintiff experiences said withdrawal; 2) ... the plaintiff's withdrawal signs and symptoms are a result of the plaintiff ingesting Paxil; and 3) ... the plaintiff has sustained injury in that he has been unable to discontinue the use of Paxil and has been caused to suffer the signs and symptoms of the withdrawal syndrome associated with the use and attempted discontinuance of Paxil.

Glanville Aff., exh E thereto. Dr. George is confining his opinions to how Paxil allegedly *effected* plaintiff DeVito—not whether Paxil is *capable generally* of causing the symptoms of which DeVito complains. Therefore, although the plaintiff did not specify the purpose for which he is offering Dr. George's testimony, presumably it is being offered on the issue of specific causation.

As noted earlier, ordinarily once a court finds a witness qualified as an expert, the next issue is the admissibility of that witness' opinion testimony. Here, however, it appears that each of the opinions which plaintiff attributes to Dr. George have been expressly disavowed in his deposition. Dr. George was asked point blank whether he had formed any of the three opinions quoted above, and whether he was prepared to testify to same. Each time he answered no. *See* Glanville Aff., exh. G thereto at 88–91. Obviously, if Dr. George has not formed the opinions which plaintiff is ascribing to him, necessarily he has no foundation, scientific or otherwise, for same. Accordingly, the court excludes the opinion testimony outlined above which plaintiff is attributing to Dr. George.

**\*5** Even if Dr. George had not expressly disavowed the opinions set forth above, the court still must exclude his testimony. The crux of each of these opinions is that plaintiff

DeVito has "withdrawal reactions," or "withdrawal signs and symptoms" caused when he attempts to discontinue or taper below a certain dosage of Paxil. Glanville Aff., exh. E thereto. Dr. George's deposition testimony did not so state such. To be sure, Dr. George did testify that he used "Paxil withdrawal" as a *"label* to capture what [DeVito] was describing that he had been experiencing." *Id.,* exh. G thereto at 59 (emphasis added). When later in his deposition Dr. George was pressed as to whether or not he diagnosed plaintiff "as suffering from Paxil withdrawal [,]" he reiterated that he *"applied that label* to describe the symptoms that [DeVito] reported in relation to tapering Paxil." *Id.* at 102 (emphasis added).

There is an obvious difference between labeling a symptom which a patient describes and actually diagnosing that person. Significantly, Dr. George did *not* diagnosis plaintiff with Paxil withdrawal. Perhaps that is because "Paxil withdrawal is not a formal diagnosis within DMS–IV[.]" *Id.* at 94. ("The DSM–IV is the Diagnostic and Statistical Manual, the fourth revision of it, that psychiatrists generally base their diagnoses on." *Id.*) And, "[t]here is no criteria for diagnosing somebody with Paxil withdrawal." *Id.* at 60. For example, there are no "objective tests or assessments," aside from skin inspection for signs of sweating, "that could have been done to determine whether those reports [by DeVito] were genuine[.]" *Id.* at 62. So, Dr. George simply took plaintiff's description of his symptoms at "face value," and made no attempt to determine whether [DeVito's] report of those symptoms was genuine [.]" *Id.* at 62 and 79.

In light of the foregoing, even if Dr. George were inclined to testify that Paxil specifically caused the symptoms which plaintiff claims it did, there is no foundation for this testimony. What is particularly revealing in this regard is Dr. George's candor when asked: "Have you ever made any determination as to why Mr. DeVito's tapering off of Paxil may be taking longer than some of your other patients?" ' *Id.* at 100. Dr. George replied, "I had *no scientific way, ...,* of explaining why he was having such difficulty tapering off Paxil." *Id.* (emphasis added).

Further, plaintiff DeVito saw Dr. George in the latter's capacity as a treating psychiatrist. Thus, as is plain from Dr. George's deposition, he was concerned primarily with the symptoms of which plaintiff complained, not determining the underlying cause. *See* Munafo v. Metropolitan Transportation Authority, Nos. 98 CV–4572, 00–CV–0134, 2003 WL 21799913, at \*19 (E.D.N.Y. Jan. 22, 2003). Had Dr. George been focusing on the underlying cause, undoubtedly

he would have performed a differential diagnosis, which "typically includes a physical examination, clinical tests, and a thorough case history." *Zwillinger v. Garfield Slope Housing Corp.,* No. CV 94–4009, 1998 WL 623589, at \*19 (E.D.N.Y. Aug. 17, 1998) (citations omitted). But, Dr. George did not. Without a differential diagnosis, specific causation cannot be established. *See id.* ("To establish specific causation, other possible causes for the symptoms experienced by plaintiff should be excluded by performing a 'differential diagnosis.' ")

### 3. James T. O'Donnell

**\*6** Glaxo argues that the court must preclude O'Donnell's testimony for two reasons. First, he is not qualified as an expert as to the issues upon which he is being asked to opine— general and specific causation and the adequacy of the Paxil warnings. Second, even if he does qualify as an expert, Glaxo contends that the court should preclude his opinions because they lack the requisite scientific foundation and are otherwise unreliable. Plaintiff responds that O'Donnell's "experience and credentials are impressive [,]" whether the issue is his qualifications to testify as an expert on causation or as an expert on warnings. Pl. Preclude Memo. at 4. Plaintiff further responds that regardless of whether O'Donnell is opining on causation or warnings, any alleged "shortcomings" in that testimony go to "weight and credibility, and not [to] ... admissibility." *Id.* at 5 (citation omitted).

Plaintiff DeVito is offering O'Donnell's testimony on three separate issues, which require different areas of expertise. The court will examine O'Donnell's qualifications as to each.

### a. General Causation

Glaxo offers a host of reasons as to why O'Donnell "is not an 'expert' on scientific issues concerning general *or* specific causation" with respect to SSRIs or Paxil. Def. Preclude Memo. at 7 (emphasis added). All of these reasons have merit.

### i. Qualified?

This is not the first court to be confronted with the issue of whether Mr. O'Donnell is qualified to give an expert opinion here. In *Newton v. Roche Laboratories, Inc.,* 243 F.Supp.2d 672 (W.D.Tex.2002), the court found that he was *not* qualified to render an opinion on general causation. *Id.* at 679. There, the parents of a 16 year old girl claimed that Accutane, a prescription acne medication manufactured

by the defendant, caused or precipitated the onset of their daughter's schizophrenia. In much the same way plaintiff DeVito is offering O'Donnell's testimony here, the plaintiffs in *Newton* offered O'Donnell as an expert "to testify regarding general causation, *i.e.,* that Accutane is pharmacologically capable of causing schizophrenia." *Id.* at 677. After outlining a number of ways in which O'Donnell's qualifications were lacking, the court expressly found that he was not qualified to render such an opinion.

To support that conclusion, the *Newton* court relied upon O'Donnell's deposition testimony, which is substantially similar to his deposition testimony in this case. For example, O'Donnell testified in *Newton,* as he did here, that "he has never earned an M.D., a Ph.D., or any degree in pharmacology." *Id.* at 677; *see also* O'Donnell Dep'n at 24– 25 and 53. Yet, he "still holds himself out as a 'doctor' and a pharmacologist[.]" *Id.* As in *Newton,* "O'Donnell ... [continues to] grant[ ] himself the title of 'doctor' in reliance upon his Pharm.D degree, [which] he conceded in his deposition that in the majority of pharmacy schools, th[at] ... degree is 'an entry-level degree' that pharmacists must have to ... even practice pharmacy." *Id.* at 677 n. 2 (citation omitted); *see also* O'Donnell Dep'n at 24–25. In contrast, to obtain a degree in pharmacology usually three or four years of graduate school is required. O'Donnell Dep'n at 25– 26. O'Donnell did get a graduate degree, but it was not in pharmacology. O'Donnell's formal education consists of a four year degree in pharmacy and a Master's Degree in clinical nutrition. *Id.* at 27.

**\*7** In addition to questioning O'Donnell's background generally, the *Newton* court pointed out his "lack [of] appropriate pharmacological training relevant to the issues" therein, *i.e.* "Accutane, Vitamin A, schizophrenia, or psychosis[.]" *Id.* at 678. The same may be said here. There is no factual basis upon which this court can find that O'Donnell is an expert regarding SSRIs generally, not to mention Paxil or discontinuation of Paxil. Indeed, as his deposition testimony shows, O'Donnell's asserted expertise on these subjects is non-existent. *See id.* at 21, 24; 38–40; and 45.

Given that SSRIs are a fairly recently developed class of drugs, understandably they were not the subject of O'Donnell's course work as an undergraduate, or when getting his Master's Degree in nutrition. *Id.* at 21 and 24. Since that time, O'Donnell has done nothing to advance his own knowledge as to SSRIs generally or Paxil in particular. When directly asked if he had "done any clinical research

whatsoever relating to antidepressants," O'Donnell replied that he had not. *Id.* at 38. He responded the same way when asked if he had "done any scientific research concerning Paxil or SSRI antidepressants[.]" *Id.* at 39. Moreover, O'Donnell conceded that the first time he "review[ed] ... scientific literature in connection with Paxil discontinuation symptoms[ ]" was for this case. *Id.* at 40–41.

This is the sort of "litigation-drive expertise" which courts have eschewed. To illustrate, the court in *Mancuso,* 967 F.Supp. at 1443, reasoned that it could not "help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such be selective review of the relevant literature." This appears to be an apt description of what Mr. O'Donnell attempted to do in the present case.

The court stresses that it is no single factor which is dispositive of whether O'Donnell qualifies as an expert on the issue of general causation. Rather, it is the cumulative effect of the foregoing which convinces the court that O'Donnell lacks the lack of relevant "knowledge, skill, experience, training or education" to testify as an expert on the issue of general causation *vis-a-vis* the discontinuation of Paxil. As he admitted, O'Donnell is *not* a pharmacologist. Therefore, he cannot, as he does in his "expert report," opine to a "reasonable pharmacological certainty," that plaintiff is experiencing "withdrawal toxicity reactions from Paxil[.]" O'Donnell Rep. Clearly, allowing a pharmacist/nutritionist such as O'Donnell to testify in that way would run afoul of the rule that an expert must stay "within the reasonable confines of his subject area[.]" ' *Kass,* 2004 WL 2475606, at *2475606, at *4 (internal quotation marks and citations omitted). Simply put, the court agrees with the court's comment in *Newton* that "[p]laintiff's attempts to present O'Donnell as an expert pharmacologist [is] ... an extremely bold stretch." *Newton,* 243 F.Supp.2d at 279. [3]

ii. Reliability of Testimony?

**\*8** O'Donnell's lack of education, training and background as to Paxil becomes even more apparent when viewed in terms of the opinions which he has rendered in this case. That is so because a "court's evaluation of qualifications is not always entirely distinct from the court's evaluation of reliability." *Pearson v. Young,* No. CIV–99–1559–F, 2002 WL 32026157, at *3 (W.D.Okla. Jan. 17, 2002).

O'Donnell's opinion as to causation is that "DeVito is experiencing withdrawal toxicity reactions from Paxil, and indeed, each time he attempts to wean or lower the dosage, he again experiences such infinity [sic]." Glanville Aff., exh. E thereto. O'Donnell states that when plaintiff's dosage of Paxil is lowered, he suffers from the following "withdrawal signs and symptoms [:] anxiety, jitery [sic], agitation, nausea, drowsiness, generalized discomfort and vertigo[.]" O'Donnell Report 2. "For this opinion to be admissible, O'Donnell must have a *reliable scientific basis* to support not only (1) a casual relationship between" Paxil and the enumerated side-effects, "but also (2) his assertion that [Paxil] will produce these side-effects." *See Newton,* 243 F.Supp.2d at 679 (emphasis added). O'Donnell's report and deposition testimony are void of a scientific basis to support either of those assertions.

In terms of publications, O'Donnell testified that he was the editor of a non-peer reviewed book entitled "Drug Injury Liability, Analysis and Prevention." *Id.* at 98–99. That book contained a mere six sentences on SSRIs, including the two sentences on Paxil. *Id.* at 99. Given that minimal reference to SSRIs, it is not surprising that that book contains nothing about discontinuation symptoms. *See id.* It further appears that he has performed absolutely no research regarding Paxil, much less its discontinuation. *Id.* at 38–39. What is more, O'Donnell has done no scientific or clinical research of any kind for almost two decades. The last time he did any such research was in he "early '80s as part of a pharmacology lab sabbatical," where he was looking at vitamins and critical care drugs used in Intensive Care Units. *Id.* at 36.

In light of the foregoing, to allow plaintiff to rely upon Mr. O'Donnell's opinions as to general causation clearly would violate *Daubert'* s "requirement that the expert testify to scientific knowledge—conclusions support by good grounds for each step in the analysis[.]" ' *Amorgianos,* 303 F.3d at 267 (citations and quotation marks omitted).

b. Specific Causation

It stands to reason that if Mr. O'Donnell lacks (which he does) the qualifications to testify as to general causation, he lacks the qualifications to testify as to specific causation. His opinion as to specific causation suffers from the same infirmities, detailed above, as to general causation. Accordingly, the court finds that Mr. O'Donnell does not have the requisite qualifications to testify as to specific causation; and even if he did, his opinions in that regard are unreliable.

c. Warnings

**\*9** Glaxo contends that because O'Donnell "lacks any pertinent qualifications[,]" Def. Memo. at 14, he should not be allowed to testify that in his opinion the "lack of ... a precaution and warning about withdrawal risk and the need to taper [when discontinuing Paxil] renders the product defective due to an inadequate warning. *See* O'Donnell Report at 3. Plaintiff did not directly respond to this argument. Included in the list of highlighted credentials in plaintiff's memorandum of law is that Mr. O'Donnell "is currently involved in the teaching of New Drug Development and Regulations [.]" Pl. Opp'n Memo. at 2. However, plaintiff does not explain, or cite to any portion of O'Donnell's deposition explaining, how or why this position qualifies him to testify as an expert on warnings.

As with the other issues upon which plaintiff intends to offer O'Donnell's testimony, plaintiff baldly retorts that O'Donnell's "extensive experience qualifies as specialized knowledge gained through experience, training, or education[.]" Pl. Memo. at 4 (internal quotation marks and citations omitted). And, once again, he relies upon the argument that Glaxo's reasons to preclude O'Donnell's testimony regarding warnings should be saved for trial, *i.e.* they should be used to attack O'Donnell's credibility and the weight which the jury might give to his opinions regarding Paxil warnings.

i. Qualified?

O'Donnell "claim[s] to be an expert in drug labeling[.]" O'Donnell Dep'n at 90. Presumably he is including drug warnings within the province of this supposed expertise. In any event, to qualify as an expert it is not enough for a witness to simply declare that he is one. Federal Rule of Evidence 702 requires more. As plaintiff acknowledged, a witness must satisfy the court that he has a certain amount of "knowledge, skill, experience, training or education [ ]" in the relevant field before he can be deemed an expert. *See* 🔖 *Nora Beverages,* 164 F.3d at 746 (internal quotation marks and citation omitted). Close examination of O'Donnell's deposition testimony reveals that he is lacking in each of those areas when it comes to the subject of the adequacy of prescription drug warnings.

O'Donnell's claimed expertise admittedly is "through experience," not through formal education. O'Donnell Deposition at 90–92. His experience consists primarily of having attended continuing education ("CE") programs, where drug labeling was a topic. *Id.* Those CE programs were to satisfy his pharmaceutical and nutritionist CE requirements, however; and he was unable to elaborate on the substance of same. *See id.* Furthermore, O'Donnell has not consulted with any pharmaceutical company "concerning the labeling for any antidepressant[.]" *Id.* at 96. O'Donnell agrees "that the FDA [Food and Drug Administration] is the highest authority on how drugs are labeled in this country[,]" but he has also never consulted with them "concerning the labeling for any antidepressant. *Id.* For that matter, O'Donnell has not worked for or consulted with the FDA in any capacity. *See* Glanville Aff. at 9, ¶ 39. Thus, O'Donnell's experience in this area is extremely limited.

**\*10** Moreover, O'Donnell made two especially damaging concessions which seriously undermine the suggestion that he is an expert as to the adequacy of prescription drug warnings. O'Donnell readily agreed "that in assessing the adequacy of a label for a prescription drug, the expert rendering the opinion generally should be familiar with the clinical trials data on the drug as it relates to the side effect concerning which he is opining[.]" *Id.* at 192. Yet, O'Donnell frankly admitted that he had not reviewed any of the Paxil clinical trials data. *See id.* Similarly, O'Donnell conceded that "generally to reach a conclusion regarding the adequacy of a label for a prescription drug, the expert rendering the opinion should be familiar with at least a majority of the available medical literature on the drug as it relates to the side effect on which he is opining[.]" *Id.* at 193. Despite the foregoing, O'Donnell went on to testify that he has "not read the specific literature [ ]" relating to discontinuation symptoms of Paxil. *Id.* 193 and 45. In fact, he has only read "abstracts" of articles. *Id.* at 46–47. Finally, Mr. O'Donnell has not lectured on, or written anything (peer reviewed or not) about, "Paxil discontinuation symptoms apart from [his] export [sic] report in this case[.]" *Id.* at 45. As the foregoing clearly shows, Mr. O'Donnell does not "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field[,]" which here is the adequacy of prescription drug warnings and Paxil in particular. *See* 🔖 *Kumho Tire,* 526 U .S. at 152, 119 S.Ct. at 1176.

Mr. O'Donnell may qualify as an expert in the fields of pharmacy or nutrition, but that is not the purpose for which his testimony is being offered here. Instead, his testimony is being offered on the adequacy of Paxil warnings. O'Donnell has never been drafter or been asked to draft a warning for any antidepressant, let alone for Paxil. Likewise, he has not done

any research or written any publications on prescription drug warnings. Thus, whether judged in terms of his education or experience, does not rise to the level of "expertise ... that the jury would expect from a bona fide warnings expert." *See Robertson v. Norton,* 148 F.3d 905, 907 (8 th Cir.1998) (internal quotation marks omitted).

In sum, O'Donnell is being called upon to testify regarding the adequacy of the Paxil warning, an issue which clearly is outside the "reasonable confine [s] of his subject area[s,]" which are pharmacy and nutrition. *See Kass,* 2004 WL 2475606, at *4 (internal quotation marks and citations omitted). Therefore, because O'Donnell does *not* "possess the specialized knowledge required by Rule 702[,]" the court finds that he is not qualified as an expert on the issue of the adequacy of the Paxil warning. *See id.*


ii. Reliability of Testimony?

**\*11** Given the nature of the claims which plaintiff is alleging in this case, plainly there is a close relationship between excluding the causation opinion and excluding the warning opinions which are being offered by O'Donnell. *Miller v. Pfizer, Inc.,* 196 F.Supp.2d 1062 (D.Kan.2002), *aff'd on other grounds,* 356 F.3d 1326 (10 th Cir.2004), *cert. denied,* 125 S.Ct. 40 (Oct. 4, 2004), provides a good example of how a decision to preclude causation "expert" testimony impacts upon a decision to also preclude warning testimony. The plaintiff parents in *Miller* were suing the manufacturer of Zoloft, another SSRI, alleging that it caused their son to commit suicide. Similar to the present case, the plaintiffs in *Miller* asserted state law claims for strict liability for marketing defects and misrepresentations, and negligence for failure to test and warn. The court held that an "eminent" psychiatrist and neuropsychopharmocologist's proposed testimony regarding general causation, *i.e.* that Zoloft causes suicide, did not satisfy the *Daubert* criteria for admissibility because, in short, "he lack[ed] sufficient expertise on the issue of suicide." *Id.* at 1087 and 1088. The *Miller* court, as is this court, was then confronted with the issue of whether that same doctor could qualify as an expert who would opine "that Zoloft labels do not adequately warn against the danger of SSRI-induced suicide." *Id.* at 1088. After finding that the doctor was not an expert on that issue, the court soundly reasoned, "[i]f the jury will hear no evidence that [Paxil] causes [withdrawal symptoms/ addictive], it cannot possibly conclude that [Paxil] labels do not adequately warn against the danger that [Paxil]

causes [such condition.]" *Id.* at 1089. That reasoning applies with equal force here. Even if O'Donnell qualifies as a prescription drug warning expert, because neither O'Donnell nor Dr. George (plaintiff's only proof as to causation) qualify to testify about causation, the former's warning testimony "would essentially be irrelevant to any larger issues in the case." *See id.* Accordingly, there is no need to analyze whether O'Donnell's opinions as to warnings pass muster under *Daubert.*

In short, plaintiff DeVito has not sustained his burden of proving by a preponderance of the evidence that Mr. O'Donnell is qualified to render an opinion as to general causation, specific causation, or the adequacy of Paxil warnings. Even if O'Donnell could somehow be deemed to have the requisite "specialized knowledge" to testify as to any or all of those issues, "courts do not have to credit opinion evidence connected to data 'only by the *ipse dixit* of the expert." ' *Prohaska,* 138 F.Supp.2d at 438 (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. (1997)). That is all O'Donnell has to rely upon; simply because he offers an opinion which he claims to be valid, plaintiff assumes it is so. This court will not, however.

**\*12** For the reasons set forth above, the court grants in its entirety Glaxo's motion to preclude the testimony of Mr. O'Donnell; Dr. George; and Ms. Sweeney.


II. Summary Judgment Motion

The court assumes familiarity with the Supreme Court's trilogy of cases clarifying the governing legal standards on summary judgment motions, and sees no need to repeat those standards herein. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); and *Matsushita Elec. Industr. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)

It is an understatement to say that the wholesale exclusion of the testimony of O'Donnell, George and Sweeney significantly impacts plaintiff DeVito's case. As discussed at the outset causation is a necessary element of each of the five causes of action which plaintiff is alleging herein. Because plaintiff's only causation evidence has been excluded, it necessarily follows that Glaxo is entitled to summary judgment in its favor. *See Kass,* 2004 WL 2475606 (after granting motion to exclude testimony of plaintiff's

claimed expert regarding the feasibility of alternative designs, court granted defense summary judgment motion because plaintiff could not satisfy the critical element of a design defect cause of action); and *Zwillinger,* 1998 WL 623589 (where plaintiff claimed that her exposure to defendants' carpeting causes her to develop immunotoxicity syndrome, court granted summary judgment in defendants' favor after excluding the doctor's testimony, which was plaintiff's only causation evidence).

To conclude, the court hereby GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline, to preclude the testimony of James O'Donnell; Dr. Kevin George; and Ms. Deborah Sweeney. The court further GRANTS the motion by Smithkline Beecham Corporation d/b/a Glaxo Smithkline for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing all of plaintiff Michael DeVito's claims as against it.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3691343

---

## Footnotes

1    The present action, which has been referred to as a "tag-along action," is one of a number throughout the country wherein plaintiffs are alleging that Glaxo knew of the hazardous side effects of Paxil and either concealed, misrepresented or failed to warn of them. *See In re Paxil Products Liability Litigation,* 296 F.Supp.2d 1374 (Judicial Panel on Multidistrict Litigation 2003). In mid-February 2004, this court was advised that the Judicial Panel on Multidistrict Litigation ("the Panel") had conditionally transferred this action to the United States District Court fo the Central District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." Glaxo moved to vacate that conditional transfer as it pertained to the present case. When plaintiff did not respond, on June 15, 2004, the Panel vacated that conditional transfer as it relates to Mr. DeVito.

2    During her deposition Ms. Sweeney unequivocally testified, "I'm not a physician. I'm not a nurse practitioner." Glanville Aff ., exh H thereto at 123. She holds an associates' degree in nursing, a bachelor of science degree in health and human services, and a nurse practitioner's degree." *Id.* at 12, 17, 35–36. Thus, to refer to Ms. Sweeney as "Doctor Sweeney, as plaintiff does throughout his expert disclosure, is not only a misstatement but directly contradicts Sweeney's own testimony. Plaintiff's tendency to exaggerate or overstate certain things, as will be seen, is not limited to the qualifications of his experts.

3    O'Donnell's insistence on holding himself out as a pharmacologist, *see* O'Donnell Dep'n at 54, ignores at least one fundamental distinction between pharmacology and pharmacy—a distinction which is critical here. "Pharmacology can be fairly described as the study of the effect of drugs on living organisms. Pharmacy, on the other hand, is the profession of preparing and dispensing drugs." *Newton,* 243 F.Supp.2d at 677, n. 1. It is self-evident that there is a vast difference in the education, experience and skill necessary to obtain degrees in these two different fields.

   Apparently O'Donnell recognizes this distinction because in *Newton* he "admitted ... that from approximately 1982 to 1985, he intentionally and falsely advertised that he possessed a doctorate in pharmacology in an attempt to attract more interest from lawyers for his consulting expert business." *Id.* at 677, n .3 (citation omitted). He made that same admission in this deposition herein. O'Donnell Dep'n at 28–31. O'Donnell did change this advertisement because, in his words, it was "incorrect." *Id.* at 29. This court cannot overlook what at best appears to be a serious lapse in judgment, however.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 759684
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Chad S. WILLIAMS, Plaintiff,

v.

Roosevelt SMITH, Federal
Probation Officer, et al., Defendants.
Chad S. Williams, Plaintiff,

v.

Judge Payson, et al., Defendants.

16-CV-115
|
16-CV-723
|
Signed 02/11/2020

**Attorneys and Law Firms**

Chad S. Williams, Elmira, NY, pro se.

DECISION & ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT
JUDGE

## INTRODUCTION

**\*1**  The plaintiff, Chad S. Williams, has commenced multiple actions in this Court. Pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, on June 27, 2018, this Court screened the second amended complaint in 16-CV-115 ("the first action") and the second and fourth amended complaints filed by Williams in 16-CV-723 ("the second action"). Docket Item 30 ("the screening order").[1]  In connection with that lengthy screening order, this Court (1) granted Williams permission to proceed *in forma pauperis*, (2) consolidated the first and second actions, with the first action designated as the lead case, and (3) dismissed with prejudice most claims pleaded in both actions. *Id.* at 57-59. The Court also gave Williams permission to file an amended complaint only with respect to the claims against defendants Dr. Gillespie Wadsworth, Counselor Mrs. Wiggins, and Warden J.C. Holland (the "North Carolina defendants") that allegedly arose at the Butner Federal Medical Center ("Butner") in North Carolina. If Williams did not file an amended complaint as directed,

the United States Marshals Service was to serve the summons and second amended complaint in the first action. *Id.* at 59. The Court also denied several motions filed by Williams, including for the appointment of counsel, for the "seizure" of a county court judge who presided over a criminal matter involving Williams (as well as that judge's assets), for discovery, and for summary judgment. *Id.*

Following entry of the screening order, Williams filed a consolidated amended complaint against defendant Shellard and the North Carolina defendants. Docket Item 33. Williams also moved for a default judgment, Docket Item 31; for reconsideration of the screening order, Docket Item 34; to file an amended complaint, Docket Item 36; for a status report "directly from [the Court]," Docket Item 37; and for expedited intervention, Docket Item 38.

On October 16, 2018, Williams appeared in person at the Clerk's Office in Rochester, New York, and demanded the issuance of summonses for defendants Wadsworth, Wiggins, Holland, and Shellard despite the fact that the Court had not yet ordered service of the summons and operative pleading on anyone. Nonetheless, summonses were issued.

Williams subsequently moved for summary judgment, Docket Item 39; for "amended summary judgment," Docket Item 41; to amend his complaint, Docket Item 44; to appoint counsel, Docket Item 45; for "the Court [to] conduct the correct and proper procedure pertaining to the summons of [Williams's] complaint," Docket Item 49; for the defendants to be properly summonsed, Docket Item 50; for a response regarding the status of the assigned attorney general, Docket Item 51; for the issuance of subpoenas, Docket Item 52; for explanation, Docket Item 54; and for entry of default against the defendants, Docket Item 55.

The Court now addresses Williams's motions and screens the amended complaint under §§ 1915(e)(2)(B) and 1915A.[2] For the reasons that follow, the Court grants in part and denies in part Williams's second motion to amend, Docket Item 44; denies Williams's remaining motions, Docket Items 31, 34, 36, 37, 38, 39, 45, 49, 50, 51, 52, 54, and 55; severs Williams's claims against the North Carolina defendants; and transfers the claims against those defendants to the Eastern District of North Carolina.

## DISCUSSION

### A. Motions for Default Judgment and Entry of Default

**\*2** Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Entry of default under Rule 55(a) "is a mandatory prerequisite for entry of default judgment" under Rule 55(b). *U.S. v. Assorted Silver and Gold Bars and Coins Valued at Approximately $23,445.00*, No. 12-CV-6455-CJS-JWF, 2014 WL 2882444, at \*2 (W.D.N.Y. June 25, 2014).

Here, the Court has not yet directed service of the summons and complaint. *See* Fed. R. Civ. P. 4(c)(3). Because the defendants have not yet been served, they have not defaulted. Williams's motions for default judgment, Docket Item 31, and for entry of default, Docket Item 44, are therefore denied.

### B. Motion for Reconsideration

Williams appears to seek reconsideration of at least that part of the screening order dismissing his claim for return of thumb drives that he alleges were seized from his hotel room during his arrest on February 15, 2015. Docket Item 34 at 1.[3] The thumb drives allegedly contained the complete manuscripts for ten books that Williams had written. *Id.* The February 15 arrest led to a federal criminal prosecution against Williams charging him with possession of counterfeiting obligations. *See United States v. Williams*, 6:17-CR-6056-CJS.

At the time the screening order was entered, Williams had pleaded guilty to an information charging him with possession of counterfeiting obligations in violation of 18 U.S.C. § 472, and he was awaiting sentencing by the Honorable Charles J. Siragusa, United States District Judge for the Western District of New York. *See* Docket Item 30 at 3-4. On June 28, 2018, Williams was sentenced to time served and ordered to forfeit three cell phones, a laptop, and an Apple iPod. *Id.*; *Williams*, 6:17-CR-6056-CJS, Docket Items 109 (Minutes of Proceedings) and 110 (Judgment).

Because the criminal proceeding was still pending at the time it issued the screening order, this Court found that Williams's claim seeking return of the thumb drives was premature and that he could move for their return under Federal Rule of Criminal Procedure Rule 41(g). Docket Item 30 at

25-26. Williams now argues that Rule 41(g) does not apply because Judge Siragusa previously ordered the government to return the thumb drives but the government advised that it no longer had them. Docket Item 34 at 1, 3. He also argues that the criminal proceeding has ended and that the thumb drives were not the "seizure of property pertaining to the criminal case." *Id.* He seeks one million dollars for each book downloaded. *Id.* at 3.

Reconsideration of a prior order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Mgmt. Systs. Inc. Secs. Litig.*, 113 F.Supp. 2d 613, 614 (S.D.N.Y. 2000). "The standard for granting ... a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.... [A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Applying this standard, Williams's motion for reconsideration of the screening order is denied.

**\*3** Rule 41(g) "permits a person aggrieved by the government's unlawful seizure or deprivation of property to move for specific relief: the property's return." *Adeleke v. United States*, 355 F.3d 144, 149 (2d Cir. 2004). In *Adeleke*, the Second Circuit joined the unanimous conclusion of its sister circuits and held that Rule 41(g) "simply provides for the return of seized property, [it] does not waive the sovereign immunity of the United States with respect to actions for money damages relating to such property." *Id.* at 151 (collecting cases). The Second Circuit also stated that "although we continue to adhere to [*Mora v. United States*, 955 F.2d 156 (2d Cir. 1992)] and its progeny insofar as those cases recognize federal equitable jurisdiction to order the return of property pursuant to Rule 41(g) *even after the conclusion of criminal proceedings*, we here clarify that such equitable jurisdiction does not permit courts to order the United States to pay money damages when, for whatever reason, property is not available for Rule 41(g) return." *Adeleke*, 355 F.3d at 151 (emphasis added). Accordingly, as he was previously advised, if Williams seeks the return of

the thumb drives, he may file a motion under Rule 41(g) in the underlying criminal proceeding, 6:17-CR-06056-CJS. *See Rufu v. United States,* 20 F.3d 63, 65 (2d Cir. 1994). To the extent Williams seeks damages for the seizure of thumb drives that no longer exist or that cannot be found, *see* Docket Item 34 at 1, 3, that relief is unavailable, *see Adekele,* 355 F.3d at 151.

To the extent Williams's motion seeks reconsideration of any other parts of the screening order, it also is denied. The remaining parts of Williams's motion include little more than conclusory statements and allegations, none of which satisfy the strict standards for granting reconsideration. *See Shrader,* 70 F.3d at 257. In essence, Williams repeats the same claims and allegations made in his previous submissions and insists that the Court was incorrect when it dismissed those claims and allegations. Williams seeks to repeat his claims or use his motion as a substitute for an appeal, neither of which is appropriate in a motion for reconsideration. *See, e.g., McBeth v. Gabrielli Truck Sales, Ltd.,* 768 F.Supp.2d 392, 395 (E.D.N.Y. 2011) ("A motion for reconsideration is not a substitute for appeal[.] ... Nor is it a second bite at the apple for a party dissatisfied with the court's ruling." (quoting *Nasca v. County of Suffolk,* 2010 WL 3713186, at *3 (E.D.N.Y. 2010)) (internal quotation marks omitted)).

Accordingly, Williams's motion for reconsideration is denied.

### C. Motions to Amend Complaint

On July 26, 2018, with the permission of the Court, Williams filed an amended complaint against the North Carolina defendants. Docket Item 33. Less than a month later, however, Williams moved to file another amended complaint and attached his proposed second amended complaint. Docket Item 36. The proposed second amended complaint essentially repleads many of the same claims pled in the original pleadings and dismissed in the screening order. The Court will not reconsider these claims and their dismissal, and it will not screen them again. Accordingly, Williams's motion to amend the complaint, Docket Item 36, is denied. [4]

On June 27, 2019, Williams again moved to amend his complaint. Docket Item 44. This time, however, he alleged that in April 2019, he "was assaulted and nearly killed by the Monroe County Jail [ ('MCJ') ] Deputies, after writing [to this Court] in January of 2019 requesting that [the Court] intervene in [Williams's] incarceration at the MCJ and

have [him] relocated to another Facility." Docket Item 44 at 1. Williams added that defendant "Shellard was secretly orchestrating to have the MCJ deputies assault ... Williams due to the filing of civil action 16-CV-115." *Id.* at 2.

As this Court explained in its screening order, Williams's failure-to-protect claim against defendant Shellard may proceed to service. *See* Docket Item 30 at 38-42. Williams's new allegation that defendant Shellard "orchestrat[ed] to have" Williams assaulted in retaliation for Williams's filing a lawsuit contributes to his failure-to-protect claim and also raises a potential First Amendment retaliation claim against defendant Shellard. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004) ("[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " (quoting *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir. 2001))). Thus, Williams may amend his complaint to include these new allegations against defendant Shellard. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").

**\*4** Williams also claims that "the MCJ denied [Williams's] witnesses from testifying at his preliminary [parole] hearing" on January 8, 2019. *Id.* The Supreme Court has held that due process requires the following at a preliminary parole revocation hearing "notice of the alleged violations of probation or parole, an opportunity to appear and to present evidence in his own behalf, a conditional right to confront adverse witnesses, an independent decisionmaker, and a written report of the hearing." *Gagnon v. Scarpelli,* 411 U.S. 778, 786 (1973) (citing *Morrissey v. Brewer,* 408 U.S. 471, 486 (1972)). The right to present evidence includes the ability to "appear and speak [o]n his own behalf" and to "bring letters, documents, or individuals who can give relevant information to the hearing officer." *Morrissey,* 408 U.S. at 487. And "a number of previous plaintiffs have sustained section 1983 suits for the denial of due process in connection with preliminary parole revocation hearings." *Davis v. N.Y. State Div. of Parole,* No. 07 CIV. 5544 (NRB), 2008 WL 3891524, at *9 (S.D.N.Y. Aug. 20, 2008) (collecting cases). Thus, the Court finds that Williams has a potential due-process claim related to his preliminary parole hearing.

But Williams does not allege the personal involvement of defendant Shellard in this alleged deprivation, nor does he identify any new defendants that he seeks to add. *See Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977))). Thus, if Williams amends his complaint to include allegations regarding his preliminary parole revocation hearing, he must identify the role defendant Shellard played in that deprivation, identify another defendant or other defendants that he seeks to add, or both. Either way, Williams should state exactly what each defendant did in connection with the alleged violations of his constitutional rights.

In light of Williams's new allegations regarding the parole hearing and alleged assault that occurred in 2019, he may amend his complaint **within 30 days of the date of this order.** If Williams does not file a second amended complaint, his first amended complaint, Docket Item 33, shall be served upon defendant Shellard. If Williams does file an amended complaint, the Court will screen the new allegations before directing service. [5]

### D. Williams's Remaining Motions

As detailed above, Williams has filed numerous additional motions. His motions for a status report directly from this Court, Docket Item 36; for expedited intervention, Docket Item 38; for "the Court [to] conduct the correct and proper procedure pertaining to the summons of [Williams's] complaint," Docket Item 49; for the defendants to be properly summoned, Docket Item 50; for a response regarding the status of the assigned attorney general, Docket Item 51; and for explanation, Docket Item 54, have no basis in law or fact and are therefore denied. Williams is cautioned against filing motions of this ilk that have no basis in law or fact or are brought only to annoy and harass the Court or other parties. If Williams continues to file motions that are frivolous, are vexatious, have no foundation in law or fact, or are brought only to annoy or harass the Court or other parties, he will be sanctioned.

Williams also moved for summary judgment, Docket Item 39; for "amended summary judgment," Docket Item 41; to appoint counsel, Docket Item 45; and for the issuance of subpoenas, Docket Item 52. Those motions are denied as premature for the reasons explained in the screening order.

*See* Docket Item 30 at 51-55 (denying Williams's prior motions to appoint counsel, for discovery, and for summary judgment).

### E. The Amended Complaint Against the North Carolina Defendants

**\*5** The Court now turns to the claims against the North Carolina defendants raised in the amended complaint Williams filed with the Court's permission, Docket Item 33.

#### 1. Factual Allegations

During Williams's federal criminal proceeding before Judge Siragusa, he was found not competent to stand trial and, pursuant to 18 U.S.C. § 4241(d)(1), he was transferred to Butner for mental health treatment. *Williams*, 6:17-CR-06056-CJS, Docket Item 37. Williams alleges that while at Butner, he wrote repeatedly and submitted electronic communications to Dr. Wadsworth, Counselor Wiggins, and Warden Holland requesting a move to another cell because his cellmate was extremely ill, acted in a hostile manner, and would masturbate in front of him and female staff members daily. Docket Item 33 ¶¶ 15-20. Williams alleges that he was later injured by his cellmate when the cellmate kicked a chair out from under Williams, causing an unspecified injury to Williams's lower back and finger. *Id.* ¶ 15. Williams also alleges that he was "sexually violated and assaulted" by his cellmate when the cellmate masturbated openly in front of a nurse. *Id.* And Williams alleges that these three defendants had a duty to assist Williams when the sexual violations were brought to their attention. *Id.* ¶ 16-17, 20.

According to Williams, Dr. Wadsworth had been in contact with the prosecutor in his pending federal criminal proceeding and was told that Williams was "a bad guy." *Id.* ¶ 16. Williams says that after these discussions, Dr. Wadsworth displayed a "negative attitude" toward Williams and refused to assist him with his request to be moved to a different cell. *Id.* Likewise, Counselor Wiggins failed to address Williams's request to be moved to another cell even though she had the authority to move him. *Id.* ¶ 17.

Williams alleges that after his cell mate masturbated in front of a nurse, Williams used cleaning supplies to clean up the mess; but when Wiggins was told of this, she chastised Williams for using the cleaning supplies. *Id.* Then, when Williams mentioned his requests to be moved, Williams

says, Wiggins accused him of stalking her. *Id.* According to Williams, Wiggins said this only because of Williams's previous conviction in this district in 2001. In fact, Williams says, Wiggins requested that Williams be "locked up" due to a "communication form" that was submitted where Williams "[in] around about way, indicated, due to the facial features of Mrs. Wiggins, he did not understand how she could assume someone was stalking her." *Id.* Williams alleges, however, that the hearing officer released Williams from solitary confinement because he could not find "any form of a 'threat' " as Wiggins had indicated in her incident report. *Id.*

Williams further alleges that he wrote to Warden Holland with respect to both his requests to be moved and to stop the "retaliation" from Counselor Wiggins and Dr. Wadsworth due to the "countless" complaints and grievances he filed regarding their actions. *Id.* ¶ 20. Holland's negligence showed "evil intent," resulting in an Eighth Amendment violation. *Id.*

### 2. Severance and Transfer

The allegations against the North Carolina defendants involve incidents that allegedly occurred at Butner in North Carolina. Venue in civil actions brought against officers or employees of the United States in their individual capacities is governed by the general venue statute, 28 U.S.C. § 1391(b):

**\*6** A civil action may be brought in—

(1) a judicial district where any defendant resides, if all defendants are residents of the State in which the district is located;

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action. [6]

*See Ehlers v. C.I.A.*, No. 6:15-CV-387 (MAD/ATB), 2015 WL 3637431, at \*6-7 (N.D.N. Y, June 10, 2015) (citing *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 55 (2013)); *see also Stafford v. Briggs*, 444 U.S. 527, 542-43 (1980) (Section 1391(e)(1)

does not apply to suits against officers of the United States in their individual capacity).

Because the defendants are residents of North Carolina and New York, and because the events alleged occurred in two different districts, subparagraph (3) applies to these claims. Moreover, because defendant Shellard is subject to the personal jurisdiction of the Western District of New York, venue is appropriate here as to the claims against him. The fact that venue is appropriate in this district does not end the inquiry, however. The Court may sever the North Carolina claims from the claim against Shellard and either dismiss the severed claims or transfer them to Eastern District of North Carolina where Butner is located. *See* Fed. R. Civ. P. 22; 28 U.S.C. §§ 113(a), 1404(a).

#### a. Severance

Rule 21 of the Federal Rules of Civil Procedure provides that a court "[o]n motion or on its own, ... may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." When deciding whether to sever, courts consider: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *N. Jersey Media Grp., Inc. v. Fox News Network, LLC*, 312 F.R.D. 111, 114 (S.D.N.Y. 2015) (quoting *Oram v. SoulCycle LLC*, 979 F.Supp.2d 498, 502-03 (S.D.N.Y. 2013)). "Severance requires the presence of only one of these conditions," although courts "view severance as a procedural device to be employed only in exceptional circumstances." *Oram*, 979 F.Supp.2d at 503 (internal quotation marks and citations omitted). "Where the administration of justice would be materially advanced by severance and transfer, a court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against other defendants." *Cain v. N.Y. State Bd. of Elections*, 630 F.Supp. 221, 225-26 (E.D.N.Y. 1986) (citations omitted) (explaining that "[a] claim may be severed based upon lack of a significant relationship between defendants or solely for the purpose of facilitating transfer"). The decision whether to grant a motion for severance is committed to the sound discretion of the

court. *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1082 (1988).

**\*7** Based on a review of the above factors, the Court finds that severance of the claims against the North Carolina defendants is warranted. The claims against these defendants and Shellard have nothing to do with one another. They did not arise out of the same transaction or occurrence, and they do not involve common questions of law or fact. Further, entirely different witnesses and documentary proof would be required in each set of claims. Indeed, the only common denominator in the claims is the plaintiff himself, and it makes little sense to consider all of the plaintiff's claims together for that reason alone.

What is more, severance may be granted solely for the purpose of facilitating transfer. *See Cain*, 630 F. Supp. at 225-26. Here, the amended complaint alleges that defendants Wadsworth, Wiggins, and Holland work in North Carolina. *See* Docket Item 33 ¶¶ 2-4. [7] The events giving rise to the claims against them occurred in North Carolina. The evidence and witnesses are presumably in North Carolina. So it makes little sense to entertain those claims here. And although the *pro se* plaintiff may be inconvenienced by litigating his claim in North Carolina, that alone is not enough reason deny severance when other factors overwhelmingly favor severance.

The Court therefore severs the plaintiff's claims against defendant Shellard from his claims against the other defendants.

*b. Transfer*

Now that the Court has determined that severance is warranted, it must decide whether to dismiss the claims against the North Carolina defendants or to transfer them to the Eastern District of North Carolina. 28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district ... where it might have been brought." 28 U.S.C. § 1404(a). "Thus, '[s]ection 1404(a) proposes a two-part test. First, the transferee district must be one where jurisdiction over the defendant could have been obtained at the time suit was brought, regardless of defendant's consent.... Second, the transfer must be in the interest of justice and convenience of the parties and

witnesses.' " *In re CenturyLink, Inc. Sec. Litig.*, No. 13 Civ. 3839 (LTS), 2014 WL 1089116, at \*1 (S.D.N.Y. Mar. 18, 2014) (alterations in original) (quoting *Whitehaus Collection v. Barclay Products, Ltd.*, No. 11-cv-217, 2011 WL 4036097 (S.D.N.Y. Aug. 29, 2011)). A district court may transfer an action *sua sponte*. *See Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 79 n.17 (2d Cir. 1979) (observing that "[t]he broad language of 28 U.S.C. § 1404(a) would seem to permit a court to order transfer [s]ua sponte" (citation omitted)).

The claims against the North Carolina defendants initially could have been brought in the Eastern District of North Carolina. *See* 28 U.S.C. § 1391(b). Therefore, determining whether to transfer depends on:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Steck v. Santander Consumer USA Holdings Inc.*, No. 14-6942 (JPO), 2015 WL 3767445, at \*2 (S.D.N.Y. June 17, 2015) (quoting *Ritchie Capital Mgmt., L.L.C. v. U.S. Bank Nat. Ass'n*, No. 14 Civ. 8513 (PAE), 2015 WL 1611391, at \*4 (S.D.N.Y. Apr. 10, 2015)). A plaintiff's choice of forum "is significant and will not be disturbed, unless the balance of factors weigh heavily in favor of transfer." *Dwyer v. Gen. Motors Corp.*, 853 F.Supp. 690, 694 (S.D.N.Y. 1994) (citing *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F.Supp. 918, 936 (S.D.N.Y. 1989)).

**\*8** The only factors that weigh against transfer are the convenience of Williams and his relative means. All other factors—especially the convenience of the witnesses, the location of the relevant documents, the ease of access to

sources of proof, and the availability of subpoenas to compel the attendance of witnesses—weigh heavily in favor of transfer. Indeed, all the alleged operative facts occurred at Butner. Other than Williams's current location, his claims against Wadsworth, Wiggins, and Holland have no nexus to this district.

"Courts typically regard the convenience of the witnesses as the most important factor considering a § 1404(a) motion to transfer." *Jackson v. Avis Rent A Car Sys., LLC*, No. 14 Civ. 1658 (LLS), 2015 WL 1004299, at *3 (S.D.N.Y. Mar. 6, 2015) (quoting *Herbert Ltd. P'ship v. Elec. Arts Inc.*, 325 F.Supp.2d 282, 286 (S.D.N.Y. 2004)); *see also Valero Mktg. and Supply Co. v. Southcap Pipe Line Co.*, No. 06-CV-0623-MJR, 2007 WL 2229866, *2 (S.D. Ill. 2007) ("If, for instance, the convenience of the witnesses and the interest of justice point strongly in a contrary direction, the location and convenience of the parties is not controlling"). The Court "weighs more heavily the convenience of non-party witnesses than party witnesses." *McGraw-Hill Companies Inc. v. Jones*, No. 12–cv–7085 (AJN), 2014 WL 988607, at *7 (S.D.N.Y. Mar. 12, 2014). Based on Williams's allegations against the North Carolina defendants, there are presumably no witnesses to these claims who reside in this district or who are subject to the subpoena power of this Court. *See* Fed. R. Civ. 45(c)(1). And it is unlikely that any evidence will be found here.

The Court recognizes the burden that a transfer to North Carolina will have on Williams. *See Meteoro Amusement Corp. v. Six Flags*, 267 F. Supp. 2d 263, 279 (N.D. N.Y. 2003) ("[T]he relative financial hardship on the litigants and their respective abilities to prosecute or defend an action in a particular forum are legitimate factors to consider...."). That factor alone is not determinative, however, and all other considerations strongly favor transfer.

Because the factors addressed above strongly favor transfer, the Court finds that the claims against the North Carolina defendants should be transferred to the Eastern District of North Carolina. [8] A determination of whether these claims survive scrutiny under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A is best left to that court.

## CONCLUSION AND ORDER

In light of the above, it is hereby

ORDERED that Williams's motions for a default judgment, Docket Item 31; for reconsideration, Docket Item 34; to file an amended complaint, Docket Item 36; for a status report, Docket Item 37; for expedited intervention, Docket Item 38; for summary judgment, Docket Item 39; for "amended summary judgment," Docket Item 41; to appoint counsel, Docket Item 45; for "the Court [to] conduct the correct and proper procedure pertaining to the summons of [Williams's] complaint," Docket Item 49; for the defendants to be properly summonsed, Docket Item 50; for a response regarding the status of the assigned attorney general, Docket Item 51; for the issuance of subpoenas, Docket Item 52; for explanation, Docket Item 54; and for entry of default against the defendants, Docket Item 55, are DENIED; and it is further

**\*9** ORDERED that the claims in the consolidated amended complaint, Docket Item 33, against defendants Wadsworth, Wiggins, and Holland are severed and transferred to the Eastern District of North Carolina, and the determination of whether those claims survive review under 28 U.S.C. § 1915(e)(2)(B) and 1915A is deferred to that court; and it is further

ORDERED that Williams's second motion to amend his complaint, Docket Item 44, is GRANTED IN PART AND DENIED IN PART; Williams may amend his complaint against defendant Shellard **within 30 days of the date of this order** as outlined above, [9] but his request for subpoenas is denied; and it is further

ORDERED that the Clerk of the Court shall send to Williams with this order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Williams does not file a new amended complaint within 30 days of the date of this order, the Clerk of Court shall cause the United States Marshals Service to serve the summons and consolidated amended complaint, Docket Item 33, along with this order and the order entered June 27, 2018, Docket Item 30, upon defendant Shellard at the Monroe County Jail without Williams's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Williams's favor; if, however, Williams files another amended complaint, the Court will screen the new allegations before directing service; and it is further

ORDERED that this Court hereby certifies, pursuant to 🚩28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. 🚩*Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 759684

## Footnotes

1    Unless otherwise noted, all citations to docket items are to 16-CV-115.

2    The Court assumes familiarity with the screening order and all prior pleadings and motions in this matter.

3    Page references are to those generated by the Court's case management and electronic filing system.

4    Williams also filed a "supplemental complaint" unaccompanied by a motion to amend. Docket Item 43. Because Williams did not have permission from the Court to file this complaint, the Court will not consider it. *See* Fed. R. Civ. P. 15(a)(2).

5    Williams also requests subpoenas "[p]ursuant to Rule 45 of the Federal Rules of Civil Procedure." *Id.* at 3. That request is denied as premature.

6    Venue in actions brought against officers, employees, or agents of the United States acting in their official capacities is governed by 🚩§ 1391(e)(1):

> A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

7    The Court does not have any information regarding these defendants' residences, but given Butner's location, they most likely live in North Carolina.

8    A transfer under § 1404(a) is permissible notwithstanding the lack of personal jurisdiction over the defendant, provided the transfer is to a district where the action might have been brought. 🚩*United States v. Berkowitz*, 328 F.2d 358, 361 (3d Cir. 1964).

9    Williams is advised that an amended complaint is intended to ***completely replace*** the prior amended complaint and thus "renders [any prior complaint] of no legal effect." 🚩*International Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *see also* 🚩*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint must include all allegations against defendant Shellard so that the new amended complaint stands alone as the only complaint that he must answer in this action.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 355 of 396

Davis v. Cruise Operator, Inc., Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Coyoy v. CoreCivic, Inc.,   W.D.Tex.,   October 11, 2022

2017 WL 3057610
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Cathy DAVIS, Plaintiff,

v.

CRUISE OPERATOR, INC., d/b/a Bahamas
Paradise Cruise Line, LLC, Defendant.

Case No. 16-cv-62391-BLOOM/Valle
|
Signed 07/18/2017
|
Filed 07/19/2017

**Attorneys and Law Firms**

Tonya Jean Meister, Meister Law LLC, Miami, FL, for
Plaintiff.

Cathy Davis, Tucson, AZ, pro se.

Robert Matthew Oldershaw, Hamilton, Miller & Birthisel,
Miami, FL, for Defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BETH BLOOM, UNITED STATES DISTRICT JUDGE

**\*1**  **THIS CAUSE** is before the Court upon Defendant
Cruise Operator, Inc.'s ("Defendant") Motion for Summary
Judgment, ECF No. [36] (the "Motion"). The Court has
carefully reviewed the Motion, the record, all supporting
filings, [1] the exhibits attached thereto, and is otherwise
fully advised in the premises. For the reasons that follow,
Defendant's Motion is granted.

## I. BACKGROUND [2]
This case involves allegations of negligence against
Defendant arising from Plaintiff's contraction of Norwalk
Virus/Norovirus ("Norovirus") as a result of food
contamination and unsanitary conditions on board a cruise

ship. See ECF No. [5]. From October 9 through October
11, 2015, Plaintiff was a passenger on board the Grand
Celebration. See ECF No. [36-1] at 55, 56, and 79. [3] Prior to
boarding the ship, Plaintiff and her sister visited their mother
in Lake City, Florida where Plaintiff ate eggs, grits, toast and
coffee at her mother's house. Id. at 58-59. She then traveled
by car with her sister to meet her husband at their home in
DeBary, Florida before continuing to West Palm Beach to
board the cruise ship. Id. at 58. During the drive from Lake
City to DeBary, Plaintiff stopped at McDonald's where she
drank an iced tea. Id. at 57-58. Thereafter, while picking up
her husband, Plaintiff packed Powerade, ice, ham, bread, and
potato chips for the drive to West Palm Beach. Id. at 59-60.
During the drive, Plaintiff again stopped at McDonald's where
she purchased and drank another iced tea. Id. at 61-62. She
also stopped to refuel and, while doing so, she used the
"little mom and pop" gas station restroom. Id. at 61-63. After
checking into a hotel room for the night, Plaintiff ate at
Denny's with her husband and sister, but could not recall what
she ate. Id. at 67-68.

**\*2**  On the next day, Plaintiff checked in at the port and, in
doing so, she used a pen provided at the desk but did not
sanitize it. Id. at 82. She then checked into her room, walked
around the ship, took pictures, and went to the buffet where
she ate several types of fruit and salad. Id. at 82-83. After
eating, Plaintiff changed and visited the pool area where she
drank a rum and coke. Id. at 93.

On the following morning, Plaintiff had a breakfast consisting
of Jell-O, watermelon, kiwi, cantaloupe, and strawberry. Id.
at 99-100. Plaintiff and her husband then disembarked in
the Bahamas to participate in a shore excursion, but she could not
recall whether she used the handrail on the gangway during
the disembarkation process. Id. at 106. While travelling by
bus to the excursion, Plaintiff used the railings on the tour
bus but did not sanitize them before touching them. Id. at
111. Upon her arrival at the excursion, it was determined
that Plaintiff and her husband should not participate. Id. They
were placed on a different bus for their return to the ship and
Plaintiff recalled using the handrails on that bus. Id. at 110.
After returning to the ship, Plaintiff ate soup and Jell-O for
lunch, continuing to drink four liters of Powerade a day. Id.
at 113-114. Plaintiff felt nauseous as she ate. Id. at 114-116.
Later, Plaintiff and her husband walked around the ship and
she played the slot machines in the casino. Id. at 92.

On the next day, after returning to the Port of Palm Beach,
Plaintiff disembarked and traveled toward her house in

Davis v. Cruise Operator, Inc., Not Reported in Fed. Supp. (2017)

DeBary, stopping three times along the route. *Id.* at 127. She then travelled from DeBary to Daytona Beach for a "Sister Day" at Ormond by the Sea. *Id.* at 128. Plaintiff and her sister stayed the night in Ormond by the Sea and drank Gatorade and juice that night. *Id.* at 128-129. Plaintiff ate oatmeal on the following morning. *Id.* at 129-130. Although Plaintiff testified she was vomiting during this timeframe, she did not see a doctor. *Id.* at 135-137. Her symptoms of vomiting and diarrhea continued over the next two days until she collapsed on the morning of October 15, 2015. *Id.* Her husband then drove her to the emergency room where she remained hospitalized until October 21, 2015. *Id.* at 137 and 144. During her hospitalization, Plaintiff underwent laboratory tests, which were negative for Norovirus or other infection. *Id.* at 145; ECF No. [36-2].

Since Grand Celebration began its service on February 3, 2015, there has been no reports of Norovirus or other gastrointestinal illness. *See* ECF No. [36-3]. During this timeframe, approximately 30,500 passengers and crew members have sailed on the ship. *Id.* All crew members on board the Grand Celebration must abide by the hand-washing guidelines promulgated by the Centers for Disease Control and Prevention ("CDC"), including rubbing their hands together for twenty seconds with soap and water before preparing food. *Id.* To further ensure food safety, whole fruits for buffets undergo a micro-chlorine solution at a washing station before being placed on the buffet lines. *Id.* Defendant also sends a Gastrointestinal Illness Confirmation Report to the CDC's Maritime Illness and Death Reporting System ("MIDRS") after each sailing and no reports of gastrointestinal illness have been logged with the CDC's MIDRS since the vessel began sailing. *Id.* Every food outlet on the ship strictly adheres to the Food and Drug Administration's ("FDA") Hazard Analysis Critical Control Point ("HACCP") standards for food, temperature, and time control. *Id.* The United States Public Health Department ("USPHD") also performs two yearly inspections on the ship with the most recent pre-incident inspection occurring one month before Plaintiff's voyage, on September 5, 2015, scoring 98 out of 100 possible points. *Id.*

**\*3** In the Amended Complaint, Plaintiff sued Defendant for negligence arising from her alleged contraction of Norovirus while on the Grand Celebration. *See* ECF No. [5]. Plaintiff alleges that Defendant owed her a duty to serve uncontaminated food and to sanitize and disinfect the Grand Celebration to prevent an outbreak of Norovirus or other infectious disease. *Id.* The Amended Complaint alleges that

Defendant breached that duty by: (a) failing to properly sanitize and/or disinfect the ship; (b) serving contaminated food; (c) failing to serve uncontaminated food; (d) failing to practice safe and sanitary food practices; (e) failing to properly eradicate the virus thought to be Norovirus or some other virus-causing illness; (f) failing to take adequate steps to prevent an outbreak of Norovirus or other infectious diseases when it knew or should have known that such outbreaks occurred on prior voyages; (g) failing to warn passengers of the dangers and risks of Norovirus or other infectious diseases; (h) failing to timely diagnose Norovirus and or other infectious diseases; (i) failing to perform testing on ill passengers to confirm the type and nature of the virus; (j) failing to have adequate policies and procedures in place to manage and contain the outbreak and spread of Norovirus or other infectious diseases; (k) failing to provide a sanitary vessel and food to prevent outbreaks of infectious disease; and (l) failing to take adequate steps to contain the spread of Norovirus and/or other infectious diseases, which it knew or should have known could cause other dangerous medical conditions. *Id.* Defendant has since moved for summary judgment on all claims pled in the Amended Complaint. *See* ECF No. [36]. Although the Court has given Plaintiff ample opportunity to respond, Plaintiff has not done so to date and has not otherwise sought an extension of time to do so. The Motion is now ripe for adjudication.

## II. LEGAL STANDARD

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a).* The parties may support their positions by citation to the record, including, *inter alia,* depositions, documents, affidavits, or declarations. *See Fed. R. Civ. P. 56(c).* An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States,* 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson,* 477 U.S. at 247-48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *See Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 357 of 396

Davis v. Cruise Operator, Inc., Not Reported in Fed. Supp. (2017)

reasonably find for the [non-moving party]." *Anderson, 477 U.S. at 252.* The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.,* 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.,* 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff,* 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Ray v. Equifax Info. Servs., L.L.C.,* 327 Fed.Appx. 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.' " *Id.* (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver,* 549 F.3d at 1343. But even where an opposing party neglects to submit any alleged material facts in controversy, a court cannot grant summary judgment unless it is satisfied that all of the evidence on the record supports the uncontroverted material facts that the movant has proposed. *See Reese v. Herbert,* 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.,* 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

## III. DISCUSSION

In support of summary judgment, Defendant advances three arguments: (1) Plaintiff cannot prove that Defendant acted negligently, (2) Plaintiff cannot prove she contracted Norovirus, and (3) even if she can prove that she contracted this virus, she cannot prove she contracted it on the Grand Celebration. The Court agrees with all three.

### A. Negligence

**\*4** Federal maritime law governs torts occurring on navigable waters. *Everett v. Carnival Cruise Lines,* 912

F.2d 1355, 1358 (11th Cir. 1990); *Isbell v. Carnival Corp.,* 462 F. Supp. 2d 1232, 1236 (S.D. Fla. Nov. 20, 2006). "When neither a uniform statutory or judicially-created maritime rule provides an answer to a specific legal question, a court may apply state law, as long as application of the state law does not frustrate national interest in having uniformity in admiralty law." *Jackson v. Carnival Cruise Lines, Inc.,* 203 F. Supp. 2d 1367, 1373 (S.D. Fla. May 21, 2002). In a negligence action, a plaintiff must prove that the defendant owed a duty, the defendant breached that duty, the breach was the proximate cause of the injury, and the plaintiff suffered damages. *Isbell,* 462 F. Supp. 2d at 1236. These elements are each essential to the negligence claim and a plaintiff cannot resort to allegations to defeat summary judgment on any of the elements. *Id.*

Under maritime law, a shipowner owes its passengers the duty to exercise reasonable care under the circumstances. *Id.* The " 'benchmark against which a shipowner's behavior must be measured is ordinary reasonable care under the circumstances, a standard which requires, as a prerequisite to imposing liability, that the carrier have actual or constructive notice of the risk-creating condition.' " *Everett,* 912 F.2d at 1358 (quoting *Keefe v. Bahama Cruise Line,* 867 F.2d 1318, 1320-21 (11th Cir. 1989)) (rejecting argument that a ship owner should have known there was a risk of injury simply because it owned and operated the ship and finding that such a circular argument would defeat the limitation on shipowner liability explained in *Keefe*); *see also Isbell,* 462 F. Supp. 2d at 1237-38 (granting summary judgment in favor of cruise ship owner when the plaintiff did not provide any evidence of a dangerous condition on the excursion or any evidence that the defendant had constructive notice of the alleged danger).

It is undisputed that Defendant had neither actual nor constructive notice of an alleged dangerous condition on board the ship (i.e. the presence of Norovirus). Defendant has presented unrebutted evidence demonstrating that, since the Grand Celebration began its service on February 3, 2015, there have been no reports of Norovirus or other gastrointestinal illness on the ship. *See* ECF No. [36-3]. Defendant submits a Gastrointestinal Illness Confirmation Report to the CDC's MIDRS after each sailing, yet no reports of gastrointestinal illness have been logged since the vessel's maiden voyage. *Id.* In the Amended Complaint, Plaintiff alleges that Defendant "fail[ed] to take adequate steps to

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 358 of 396

Davis v. Cruise Operator, Inc., Not Reported in Fed. Supp. (2017)

prevent an outbreak of the Norovirus or other infectious diseases when it knew or should have known that such outbreaks occurred on prior voyages," "fail[ed] to warn passengers of the dangers and risks of the Norovirus or other infectious diseases," "fail[ed] to perform testing on ill passengers to confirm the type and nature of the virus," "fail[ed] to have adequate policies and procedures in place to manage and contain the outbreak and spread of Norovirus or other infectious diseases," and "fail[ed] to take adequate steps to contain the spread of the Norovirus and/or other infectious diseases, which it knew or should have known could cause other dangerous medical conditions." *See* ECF No. [5]. Each of these assume the existence of a prior Norovirus outbreak on board the ship. However, Plaintiff has not submitted any evidence to demonstrate that the Grand Celebration had any previous outbreaks of Norovirus or another gastrointestinal disease so as to trigger a duty to prevent subsequent outbreaks, to warn passengers of such outbreaks, or create policies that would contain the spread of the virus. In addition, these allegations presuppose that Norovirus was, in fact, present on the ship—another fact that Plaintiff failed to prove as further discussed below.

**\*5** The Amended Complaint also alleges that Defendant was negligent in several others respects—none of which are supported by the record. For example, Plaintiff alleges Defendant was negligent by "failing to properly sanitize and/ or disinfect the ship," "failing to practice safe and sanitary food practices," and "failing to provide a sanitary vessel and food to prevent outbreaks of infectious disease." *See* ECF No. [5]. Defendant, however, has presented undisputed evidence of its food safety and sanitary practices. For example, every food provider on the ship strictly adheres to the FDA's HACCP standards for food, temperature, and time control and the USPHD performs two yearly inspections on the Grand Celebration. *See* ECF No. [36-3]. One of those inspections occurred one month before Plaintiff's voyage and the ship received a score of 98 out of 100 possible points. *Id.* All crew members on board the Grand Celebration are also required to abide by the hand-washing guidelines promulgated by the CDC, including rubbing their hands together for twenty seconds with soap and water before preparing food, and all whole fruits available in the ship's buffet stations undergo a micro-chlorine solution at a washing station. *Id.* The Court finds that Defendant satisfied its initial burden on summary judgment to demonstrate that it followed appropriate sanitary and food safety standards, thereby shifting the burden to Plaintiff to come forward with evidence in support of her claims. Plaintiff has presented no evidence whatsoever,

requiring entry of summary judgment in favor of Defendant on these claims.

Finally, Plaintiff alleges that Defendant negligently "serv[ed] contaminated food" and "fail[ed] to serve uncontaminated food," but the record is devoid of any proof that the food Plaintiff consumed on board the Grand Celebration was indeed contaminated. In fact, Plaintiff has not come forward with any evidence, let alone medical evidence, to support her claim that she contracted Norovirus. Defendant submitted copies of Plaintiff's laboratory tests from her hospitalization at Central Florida Regional Hospital following her voyage on the Grand Celebration. *See* ECF No. [36-2]. The Discharge Summary Report indicates that Plaintiff was tested for Norovirus GI and Norovirus GII on October 16, 2015 and the results were negative. *Id.* at 7. The burden, therefore, shifted to Plaintiff to produce evidence, going beyond the pleadings, to suggest that a reasonable jury could find that she contracted this gastrointestinal disease. Despite this, Plaintiff failed to present any medical records, affidavits, or deposition testimony from any treating physicians or experts diagnosing her with this illness. *See Hubbert v. Carnival Corp.*, No. 12-23829-CIV, 2013 WL 4806908, *2 (S.D. Fla. Sept. 9, 2013)* (granting summary judgment in favor of cruise line when the plaintiffs "failed to provide the Court with any evidence, other than their own conclusory assertions, that they actually suffered any gastrointestinal illnesses").

### B. Proximate Cause

Even if the record contained such proof, Plaintiff has not submitted any evidence to demonstrate she contracted the virus while on board the Grand Celebration. *Id.* ("Even if Plaintiffs did suffer gastrointestinal illnesses during their cruise, however, to defeat Defendant's Motion, they must offer competent evidence that the actions or inaction of the Defendant caused their injuries"). "It is well settled that each element, including causation, is essential to Plaintiff's negligence claim for purposes of defeating summary judgment." *Isbell*, 462 F. Supp. 2d at 1238. Numerous courts within this district have granted summary judgment under maritime law when the plaintiff failed to prove the essential element of proximate cause. *See Hubbert*, 2013 WL 4806908 at *3 ("Because the record is devoid of any evidence that Defendant caused Plaintiff's alleged illnesses, Defendant is entitled to summary judgment"); *Isbell*, 462 F. Supp. 2d at 1238 (granting summary judgment in favor of the cruise line when there was no testimony or evidence, other than the plaintiff's personal opinion, that the damages resulted

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 359 of 396

Davis v. Cruise Operator, Inc., Not Reported in Fed. Supp. (2017)

from a snake bite during a shore excursion); *John Morrell & Co. v. Royal Caribbean Cruises, Ltd.*, 534 F. Supp. 2d 1345, 1353 (S.D. Fla. Feb. 8, 2008) (entering summary judgment for the defendant when the plaintiff did not offer any evidence to demonstrate that a warning would have impacted his decision to participate in the shore excursion); *Jackson v. Carnival Cruise Lines, Inc.*, 203 F. Supp. 2d 1367, 1378 (S.D. Fla. May 21, 2002) (granting summary judgment in favor of cruise line when there was no evidence to prove the plaintiff became ill as a result of the food and explaining that "the court will not make a cruise line an absolute guarantor of its passengers' safety").

 **\*6** Here, Plaintiff likewise failed to demonstrate a proximal connection between the food she consumed on the Grand Celebration and the alleged Norovirus infection. It is undisputed that in the days leading up to her vomiting and diarrhea, Plaintiff consumed food and beverages at numerous locations other than the Grand Celebration, such as McDonald's, Denny's, her mother's house, and even food she packed from her own house. In addition, Plaintiff admitted that she came into contact with numerous public surfaces and objects, such as hand rails, pens, table tops, hotel rooms, restrooms, etc. in the days leading up to her symptoms. There is no evidence linking Plaintiff's alleged gastrointestinal illness to her consumption of food on board the Grand Celebration as opposed to another possible source, such as the other food outlets or other public surfaces with which she came into contact. For example, there is no expert deposition testimony or affidavits connecting the timing of Plaintiff's food or beverage consumption on the Grand Celebration to the onset of her symptoms. Even in the absence of such expert testimony, there is no evidence that other passengers on board the same voyage on the Grand Celebration suffered from a gastrointestinal illness to create an issue of fact on proximate cause. Without any supporting evidence, Plaintiff's bare allegations amount to speculation and do not satisfy this necessary element of her claim. Because Plaintiff failed to offer any evidence whatsoever in support of proximate cause, the Court finds that her negligence claim fails on this basis as well. *Isbell*, 462 F. Supp. 2d at 12378 ("Plaintiff's failure to prove an essential element necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment").

### IV. CONCLUSION

For the reasons stated herein, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment, **ECF No. [36]**, is **GRANTED**. To the extent not otherwise disposed of, all pending motions are **DENIED** as moot. Final Judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida this 18th day of July, 2017.

### All Citations

Not Reported in Fed. Supp., 2017 WL 3057610

---

### Footnotes

1    Plaintiff did not file a Response in Opposition to Defendant's Motion. Her Response was originally due by June 8, 2017. Having failed to file anything by the deadline, the Court ordered Plaintiff to file her Response no later than June 19, 2017. *See* ECF No. [37]. In the Order, Plaintiff was warned that "[f]ailure to respond by the above deadline may result in Defendant's Motion being granted without further notice." *Id.* As of the date of this Order, Plaintiff has yet to file a Response to the Motion. The Court also notes that, according to Defendant's Certificate of Service, Defendants served Plaintiff with the Motion via U.S. mail and via e-mail. *See* ECF No. [36] at 18. In addition, the Clerk of Court separately delivered notice of these filings via U.S. mail at Plaintiff's address of record. Therefore, Plaintiff's failure to respond is not due to lack of notice. The Court also issued an Order Providing Instructions to *Pro Se* Litigants in which Plaintiff was informed that, if she wishes to oppose a motion, she must do so in writing within the time periods provided by the rules of procedure. *See* ECF No. [35] at 2. Plaintiff was amply aware of the requirement to file a timely response—a response that was due more than four weeks ago—and she chose to forego that opportunity.

**Davis v. Cruise Operator, Inc., Not Reported in Fed. Supp. (2017)**

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 360 of 396

2      Local Rule 56.1(b) provides that "[a]ll material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." *See* S.D. Fla. L.R. 56.1(b). To date, Plaintiff has not responded or otherwise controverted Defendant's Statement of Material Facts. Thus, to the extent that record evidence supports Defendant's Statement of Material Facts, these facts are deemed admitted and are undisputed.

3      The pinpoint citations refer to the page of the applicable deposition transcript, not the CM/ECF page number.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 361 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 1535386
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Segundo NARVAEZ, Plaintiff,

v.

CITY OF NEW YORK; Commissioner Joseph Ponte;
Stetven Wettenstein, Warden Manhattan Detention
Center; Clayton Augustus, Warden Brooklyn Detention
Center; Monica Windley, Warden North Infirmary
Command; Angelo Jamieson, Warden George
Motchan Detention Center; Achille Antonie, P.A.;
Lynn Devivo, PA.; Rony Joseph, P.A.; Brenda R.
Harris, M.D.; David Viera, P.A.; Rosemary Nwanne,
P.A.; Frantz Medard, M.D.; Myriam Blain, P.A.;
Francisco Peguero, P.A.; Ronald Schliftman; Vittorio
Harris; Anne Francois; Warden John Does; John Doe
Doctors; John Doe and Jane Doe Nurses, Defendants.

16 Civ. 1980 (GBD)
|
Signed April 17, 2017

**Attorneys and Law Firms**

Segundo Narvaez, Comstock, NY, pro se.

Alejandra Rosa Gil, Heidell, Pittoni, Murphy & Bach, Daryl
Paxson, Lord Day Lord, White Plains, NY, Charles Thomas
Gura, Marshall, Dennehey, Warner, Coleman and Goggin,
Rye Brook, NY, Andrew James Rauchberg, New York City
Law Department, New York, NY, for Defendants.

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge

**\*1** Plaintiff, currently in the custody of the New York
State Department of Corrections and Community Supervision
(DOCCS) at Washington Correctional Facility in Comstock,
New York, brings this *pro se* action under 🚩 42 U.S.C. §§
1983, 🚩 1985 and the Americans with Disabilities Act. [1] He
alleges that while he was in the custody of the New York City
Department of Correction (DOC), he contracted tuberculosis
(TB) and Hepatitis A. Plaintiff also asserts that his medical

and mental health care in DOC custody failed to satisfy a
constitutional minimum.

Plaintiff brings suit against the City of New York; DOC
Commissioner Joseph Ponte; the Wardens of the GMDC,
NIC, BKDC, and MDC; and eleven individual medical
care providers, including mental health practitioner Anne
Francois; seven physician's assistants (Achille Antoine;
David Viera; Myriam Blain; Francisco Peguero; Vittorio
Harris; Rony Joseph; Rosemary Nwanne; and Lynn Devivo);
and three doctors, Brenda Harris, M.D., Frantz Medard, M.D.,
and Ronald Schliftman, M.D. [2]

Defendants moved to dismiss the Complaint under 🚩 Federal
Rule of Civil Procedure 12(b)(6). For the reasons set forth
below, Defendants' motion to dismiss is DENIED as to
Plaintiff's 🚩 § 1983 due process claim against the City of
New York for deliberate indifference to a risk of harm from
the conditions of Plaintiff's confinement with TB-positive
inmates. Defendants' motion to dismiss is GRANTED as to
Plaintiff's remaining claims under 🚩 §§ 1983, 🚩 1985, and
the ADA.

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to 🚩 Rule 12(b)
(6), a complaint must plead "enough facts to state a claim
to relief that is plausible on its face." 🚩 *Brown v. Daikin
Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." 🚩 *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). While "the
plausibility standard is not akin to a probability requirement,"
*id.* (internal quotation marks omitted), the plaintiff must
"nudge[ ] [her] claims across the line from conceivable to
plausible...." 🚩 *Twombly*, 550 U.S. at 570. A court must take
"factual allegations [in the complaint] to be true and draw[ ]
all reasonable inferences in the plaintiff's favor." 🚩 *Harris v.
Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citation omitted). Legal
conclusions, conversely, do not benefit from a presumption of
truth. *See* 🚩 *Iqbal*, 556 U.S. at 678.

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 362 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

When the plaintiff is proceeding *pro se,* the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). Indeed, "if a *pro se* litigant pleads facts that would entitle him to relief, that petition should not be dismissed because the litigant did not correctly identify the statute or rule of law that provides the relief he seeks." *Thompson v. Choinski,* 525 F.3d 205, 209 (2d Cir. 2008). But "[e]ven in a *pro se* case ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis,* 618 F.3d at 170 (internal quotation marks omitted). Thus, although the Court is "obligated to draw the most favorable inferences" that the complaint supports, it "cannot invent factual allegations that [the plaintiff] has not pled." *Id.*

**\*2** In its analysis, the Court is generally limited to facts presented "within the four corners of the complaint" but may consider documents that plaintiff references in the complaint, or matters of which the Court may take judicial notice. *See Taylor v. Vt. Dep't of Educ.,* 313 F.3d 768, 776 (2d Cir. 2002); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).

On September 14, 2016, Defendants moved to dismiss the Complaint. (ECF No. 38.)[3] The Court repeatedly extended the time for Plaintiff to oppose the September 14 2016 motion —first until October 31, 2016, then until December 27, 2016, and finally until February 10, 2017. (ECF Nos. 49, 51, 54.) Plaintiff failed to file an opposition to the motion, and the Court therefore deemed the motion fully briefed. (ECF No. 55.)

*A pro se* litigant's failure to oppose Defendants' motion does not by itself merit dismissal of his complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183-84 (2d Cir. 2010); *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir. 2000). When presented with an unopposed motion, the Court must determine whether there are sufficient bases for granting the motion. *McCall,* 232 F.3d at 322-23 ("[A]lthough a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law.").

## BACKGROUND

The Court accepts Plaintiff's factual allegations as true for the purposes of this motion to dismiss under Rule 12(b)(6). *See Harris,* 572 F.3d at 71. The facts summarized in this section are from Plaintiff's Complaint and the documents that he has attached thereto.

### A. Infection with Tuberculosis

On July 12, 2013, Plaintiff Segundo Narvaez entered into DOC custody on Rikers Island. (Compl., ECF No. 1, at 24.) During intake, Plaintiff's purified protein derivative screening test for TB was negative, reflecting that he "had no active or dormant tuberculosis." (*Id.* at 12.) In addition, Plaintiff tested negative for Hepatitis A. (*Id.* at 16.)

Even though Plaintiff "did not have TB, [he] was housed with multiple inmates who had been tested and found to be positive with *active* tuberculosis." (*Id.* at 14) (emphasis added). The DOC housed these contagious inmates together with healthy pretrial detainees in facilities with "poor air ventilation." (*Id.* at 26.) For his first month in custody, the DOC housed Plaintiff in the Robert N. Davoren Center (RNDC), building four. (*Id.* at 24.) The DOC then relocated Plaintiff to the George Motchan Detention Center (GMDC), in building three, one main, B side. He was housed with inmate Ramirez who "was diagnosed with positive to tuberculosis [but] medical staff were not sure if he really had T.B." (*Id.*) Ramirez was retested and again "found to be positive to T.B.," but Ramirez "refused to take any medication or treatment." (*Id.*)

**\*3** In 2014, "the whole house (block cells)," including Ramirez, was relocated to the GMDC's one upper, B-side cells. (*Id.*) The DOC then also housed two more detainees who had tested positive for TB in the one upper, B-side cells. "Medical staff ... permitted those infected inmates [to be] mixed with the healthier inmates." (*Id.* at 25.) In February 2015, the DOC removed one of the TB positive inmates, identified as T. Belmejo, from the housing block because Belmejo was involved in an altercation.

In March 2015, the DOC relocated the "whole house" to the Brooklyn Detention Complex (BKDC), and "serological[ ] examinations were performed." (*Id.* at 25.) Inmates Ramirez and "Roys" again tested positive for TB and "showed

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 363 of 396

[Plaintiff] their medical results from the clinic, but they refused to take the treatment." (*Id.*) The DOC then transferred Plaintiff, together with these TB positive inmates, to the North Infirmary Command (NIC). On May 9, 2015, Plaintiff tested positive for TB. (*Id.* at 32.) He was "devastated" because he had been free of TB when he entered Rikers Island. (*Id.* at 25.)

Plaintiff alleges that medical personnel claimed that he "had not only tuberculosis ... but that it was active [even though] an X-Ray indicated [that he] did not have TB active. Nor did [he have] any symptoms associated with active TB. No sputum or bronchoscope was used to support or dissuade this false positive" that his TB was active. "[A]s a result of this false positive, which did not indicate [active] miliary tuberculosis, [Plaintiff] was forced into direct observed therapy (DOT) and poisoned with variants of isoniazid, rifampin, pyrazinamide." (*Id.* at 13.) Defendant Ronald Schliftman and Vittorio Harris at some point allegedly "determined through x-ray" that Plaintiff did not have active tuberculosis yet recommended that he take TB medication. (*Id.* at 11.)[4] Plaintiff had an allergic reaction to the medication, including a painful red rash on his face and body. (*Id.* at 13-14.) Plaintiff also experienced nausea, vomiting, headaches, and chest and joint pain. (*Id.* at 14.) He asserts that because of the medication, his optic nerve and liver are damaged, and his hearing is impaired. (*Id.*)

Plaintiff asserts that the "New York City Jails are infested with contagious diseases" and that they "do not follow the New York City Health Code [or] the New York State Sanitary Code." (Compl. at 8.) Plaintiff "is yet another victim." (*Id.*) He further asserts that "medical staff did not do their job by mixing healthy inmates together with the infected inmates and exposing [them to] that easily contagious disease (T.B.) .... It has been approximately two years and the problem hasn't been resolved." (*Id.* at 26.) He alleges that the DOC "should screen better the inmates and categorize[ ] the inmates according[ ] to whatever disease they were found to have." (*Id.* at 27.)

### B. Medical Treatment for Tuberculosis and Hepatitis A

**\*4** On June 29, 2015, the DOC relocated Plaintiff from NIC to MDC. (Compl. 1.1 at 8.) Plaintiff annexes to his Complaint grievances stating that medical staff at MDC failed to provide Plaintiff with his daily dose of TB medication on June 4, 2015, June 29, 2015, and July 2, 2015. (*Id.*) In the same grievance, he asserts that "since [he] was diagnosed with TB, [he has] not received adequate care." (*Id.*) In

another grievance, Plaintiff states that on July 27, 2015, he was not escorted to the location where he could receive his medication. (*Id.* 1.1 at 9.) In addition to Defendants' lapses in providing Plaintiff with doses of his prescribed medication for four days, Plaintiff states that medical personnel did not test his liver functioning every month. (*Id.* 1.1 at 16.) Medical personnel tested Plaintiff's liver function on May 21, 2015, and June 1, 2015. (Compl. 1.2 at 33-35.)

On July 6, 2015, Plaintiff learned that he had tested positive for Hepatitis A. (Compl. 1.1 at 11.) According to Plaintiff's grievance, doctors informed Plaintiff that he did not require any medication for Hepatitis A. (*Id.*)

### C. Mental Health Treatment

Plaintiff suffers from, among other things, post-traumatic stress disorder from working at the September 11, 2001 World Trade Center site. (Compl. at 15.) When he was at BKDC and GMDC, Plaintiff saw a Spanish-speaking therapist. (Compl. 1.2 at 33.)

After he was transferred to the NIC, on May 6, 2015, Plaintiff was scheduled to meet with mental health clinician Anne Francois, LMSW, who does not speak Spanish. (*Id.*) Plaintiff annexes to his Complaint a letter dated June 22, 2015, which states that:

> [T]he mental health person did not speak Spanish so she made an intercom communication telephone [call.] I spoke to someone in Spanish but it wasn't satisfactory to me because I d[idn't] know to whom I was speaking ... Besides, I feel more comfortable [with] a person to person communication. Furthermore, the telephone volume is too high and everyone is listening to your communication.

(Compl. 1.2 at 19.) Francois's May 6, 2015 treatment notes, which are annexed to the Complaint, state that Plaintiff told her that he "speak[s] English but [is] more comfortable talking about [his] feelings in Spanish." (Compl. 1.3 at 19.) Francois's May 29, 2015 treatment notes reflect that Plaintiff stated that he didn't "like the [telephone] translation service

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 364 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

because [he] felt that they didn't understand what [he] was saying to them or explain it correctly ... [He] had two workers before who spoke to [him] in Spanish." (*Id.* 1.3 at 5.) In Plaintiff's appeal of the response to his mental health services Complaint, Plaintiff writes that "there isn't anyone that speaks Spanish and I can communicate there in Spanish." (*Id.* 1.2 at 21.) He asserts that he was required to use an interpreter who "was not a translator in the field of mental health" and that the telephone interpreter service was merely a "time and cost saving devi[c]e." (Compl. at 20.)

### FAILURE TO STATE A CLAIM

Liberally construing the Complaint, Plaintiff asserts three claims against both the City of New York and the individual defendants, in their personal and official capacities. First, Plaintiff contends that he contracted TB and Hepatitis A because of the conditions of his confinement in DOC custody. Second, Plaintiff asserts that Defendants were deliberately indifferent to his serious medical needs in their treatment of these medical conditions.[5] Third, Plaintiff contends that for his mental health treatment Defendants provided only an interpreter by telephone rather than a Spanish-speaking mental health clinician, in violation of his rights under the Fourteenth Amendment and the Americans with Disabilities Act (ADA). Plaintiff also asserts a claim against the individual defendants under 42 U.S.C. § 1985 for conspiring to violate his civil rights.

### A. Conditions of Confinement: Tuberculosis

**\*5** According to public records, Plaintiff entered New York State DOCCS custody on September 8, 2015, to serve a sentence of ten years' incarceration.[6] The claims in Plaintiff's Complaint arose at the New York City DOC between July 2013 and August 2015, and the Court thus assumes for purposes of this motion that Plaintiff was a pretrial detainee for most or all of the events giving rise to his claims. As a pretrial detainee, Plaintiff's claims regarding the conditions of his confinement arise under the Due Process Clause of the Fourteenth Amendment.

To plead a Fourteenth Amendment claim for deliberate indifference to unconstitutional conditions of confinement, a pretrial detainee must allege that: (1) "the challenged conditions were sufficiently serious to constitute an objective deprivation of the right to due process"; and (2) the defendant

"acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."

*Darnell v. Pineiro*, No. 15-2870, 2017 WL 676521, at \*9, 14 (2d Cir. Feb. 21, 2017) (relying on *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and overruling *Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009), to the extent that *Caiozzo* determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is. under the Eighth Amendment).[7]

### 1. Objectively Serious Risk of Harm

The Court therefore first considers whether Plaintiff adequately pleads that the conditions of his confinement in DOC custody "were sufficiently serious to constitute an objective deprivation." *Darnell*, 2017 WL 676521, at \*9. Courts must analyze challenged conditions of confinement on a case-by-case basis. *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (holding that there is no "bright-line durational requirement" or "minimum level of grotesquerie required" for a conditions-of-confinement claim). Moreover, some conditions may rise to the level of a constitutional violation "in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seller*, 501 U.S. 294, 304 (1994); *Darnell,* 2017 WL 676521, at \* 11 (relying on *Wilson*, 501 U.S. at 304). For example, an overcrowded cell may exacerbate unsanitary conditions or infestation may compound inadequate nutrition. *Darnell*, 2017 WL 676521, at \* 10; *see also Willey*, 801 F.3d at 55 (holding that poor air circulation and being naked exacerbated unsanitary conditions in feces-smeared cell); *Wilson*, 501 U.S. at 304 (1994) (noting synergy between cold temperatures and failure to provide blankets).

**\*6** Here, Plaintiff alleges that the DOC housed him with at least three different inmates with active tuberculosis in a location with "poor air ventilation." (Compl. at 26.) Moreover, he remained with TB-infected inmates through three moves to different areas or housing facilities—notwithstanding that the inmates were retested and continued

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 365 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

to test TB-positive while he tested TB-negative. (*Id.* at 24-25.) Although the dates are not entirely clear, Plaintiff appears to allege that he remained housed with inmates with active TB for approximately 21 months—from one month after his intake in July 2013 until May 2015, when he tested positive for TB for the first time.

In their moving papers, Defendants have not argued that housing TB-negative detainees together with inmates with active TB does not put detainees at serious risk of harm. Indeed, Defendants describe the City as having a policy of "separating inmates with tuberculosis from inmates without tuberculosis." (Def. Mem. (ECF No. 40) at 28.) Courts analyzing prison policies regarding TB have cited to evidence explaining that TB "exists in both dormant and active stages. During the dormant stage, the individual is not infectious and exhibits no symptoms.... If the infection becomes active and established in the lungs, however, the individual becomes infectious." *DeGidio v. Pung*, 920 F.2d 525, 527-28 (8th Cir. 1990) ("Tuberculosis can spread to other individuals who share air for prolonged periods with an individual infected with an active case of pulmonary tuberculosis"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (noting that "plaintiff does not have active TB and is therefore not contagious"). "Active cases of tuberculosis are treated with INH and other antibiotics and must be isolated until no longer infectious—generally one to two weeks after treatment begins." *DeGidio*, 920 F.2d at 527. Plaintiff's allegation that during his pretrial detention, the DOC housed him with inmates with active TB who were not taking medication suffices at the pleading stage to allege that he faced an objectively serious risk of harm, that is, of contracting TB.

### 2. Deliberate Indifference of Individual Defendants

Defendants—relying on *Caiozzo* for the proposition that the standards that apply to a convicted prisoner's Eighth Amendment claim also apply to a pretrial detainee's Fourteenth Amendment claim—contend that Plaintiff has failed to plead the mental element of a deliberate indifference claim. (Def. Mem. at 9-10.) After Defendants filed their motion to dismiss, however, the Second Circuit explicitly overruled this aspect of *Caiozzo*, holding that pretrial detainees asserting deliberate indifference claims need not plead or prove that an individual defendant actually drew an inference that there was a serious risk of harm to the plaintiff.

*Darnell*, 2017 WL 676521, at *14. For a pretrial detainee's deliberate indifference claim under the Due Process Clause, the "mental element" or "*mens rea*" prong is instead defined objectively: "[T]he Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*[8]

Defendants characterize Plaintiff's placement with inmates who tested positive for TB as a "mistake" that would at most support an inference of negligence. (Def. Mem. at 20.) Even after *Darnell*, a pretrial detainee must plead that the "reckless or intentional action (or inaction) required to sustain a § 1983 deliberate indifference claim [is] the product of a voluntary act (or omission)." *Darnell*, 2017 WL 676521 at *15 n.16 (holding that "deliberate" is defined to mean acts that are "voluntary, not accidental"); *Castro*, 833 F.3d at 1070 (a pretrial detainee must show that the "defendant made an intentional decision"). Plaintiff alleges that inmates in his cell-block were repeatedly retested for TB, yet at least three times the DOC moved TB-positive and TB-negative inmates to be housed together. Allegations regarding these repeated decisions plausibly allege action that is more than accidental or negligent.

*7 Defendants also argue that Plaintiff does not state a claim against individual defendants because he fails to plead "which official placed him in inappropriate housing." (Def. Mem. at 21.) A § 1983 plaintiff must allege facts showing what each individual defendant personally did or failed to do that violated his rights. *See Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013). Plaintiff alleges generally that "medical staff did not do their job by mixing healthy inmates together with the infected inmates and exposing [them to] that easily contagious disease (T.B.)." (*Id.* at 26.) Plaintiff names as defendants individual medical care providers involved in testing him and treating him but does not allege facts suggesting that any particular individual played a role in housing him with TB-active detainees. Because Plaintiff does not plead facts suggesting what any of the individual defendants personally did or failed to do that caused him to be housed with TB-active inmates, Plaintiff fails to state a claim against Defendants Achille Antoine; David Viera; Myriam Blain; Francisco Peguero; Vittorio Harris; Rony Joseph; Rosemary Nwanne; Brenda

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 366 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

Harris, M.D., Frantz Medard, M.D., or Ronald Schliftman, M.D., based on the conditions of Plaintiff's confinement.

Plaintiff also fails to state a claim against the supervisory defendants in their individual capacities, including Wardens and Commissioner Joseph Ponte, for personally causing his confinement with TB-active inmates. Plaintiff's vague and conclusory allegation that "wardens are liable because their administrative care requires them to have jails clean" (Compl. at 9) is insufficient to allow an inference that these defendants personally caused the violation of his rights. *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). He therefore fails to state a personal capacity claim against any of the Wardens or the DOC Commissioner arising from his infection with TB.

Any claim against the supervisory defendants in their official capacities is redundant of Plaintiff's claims against the City of New York. *See Castanza v. Town of Brookhaven,* 700 F. Supp. 2d 277, 284 (E.D.N.Y. 2010) ("Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources."); *Emma v. Schenectady City Sch. Dist.,* 28 F. Supp. 2d 711, 725 (N.D.N.Y. 1998) ("[D]istrict courts have dismissed official-capacity claims against individuals as redundant or unnecessary where *Monell* claims were also asserted against the entity.").

Defendant's motion to dismiss Plaintiff's conditions-of-confinement claims against these supervisory defendants is granted.

### 3. City of New York

Defendants argue that Plaintiff has failed to plead that the City of New York, through its own customs or policies, violated his rights. "[M]unicipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible.' " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)). A municipality may be liable under § 1983 based on: (1) an officially promulgated policy sanctioned or ordered by the municipality, *see Pembaur,* 475 U.S. at 480; (2) a pervasive custom or practice of which the municipality is or should be aware, *see Praprotnik,* 485 U.S. 112, 130 (1988); *Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985); (3) a single act by a municipal employee who has final policymaking authority with respect to the area in question, *see McMillian v. Monroe Cnty.,* 520 U.S. 781 (1997); or (4) the municipality's failure to train its employees, where this rises to the level of deliberate indifference to the constitutional rights of others, *see City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

Plaintiff's TB-related claim appears to rely on three theories of liability: the City of New York failed to train its employees, failed to supervise its employees, and has sanctioned unconstitutional customs or practices. To support a claim that a municipality's failure to train or supervise amounted to deliberate indifference, a plaintiff must show: "(1) that 'a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation'; (2) that 'the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; and (3) that 'the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Nicholson v. Scoppetta,* 344 F.3d 154, 166-67 (2d Cir. 2003) (quoting *Walker v. City of New York,* 974 F.2d 293, 297-98 (2d Cir. 1992)). It will *not* "suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury." *City of Canton,* 489 U.S. 378 at 391. Instead, Plaintiff must plead facts suggesting "a likelihood that the failure to train or supervise will result in the officer making the wrong decision." *Walker,* 914 F.2d at 299.

**\*8** Plaintiff alleges that wardens of MDC, BKDC, NIC, and GMDC are liable for failing to have "properly trained and supervised staff." (Compl. at 9.) He states that if they "had done their supervising work, [he] would not have been injured." (*Id.*) Such conclusory assertions, with no supporting facts about the alleged deficiencies in the training program or supervision, are insufficient to state a deliberate indifference claim under a failure-to-train or failure-to-supervise theory.

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 367 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

Bare allegations that more (or better) training could have avoided plaintiff's injury are precisely the type of allegations that the Supreme Court has deemed insufficient. *See* ⚑ *City of* Canton, 489 U.S. 378 at 391.

The Court next considers whether Plaintiff adequately alleges that the City has a *de facto* custom or practice that is actionable under ⚑ § 1983. A plaintiff may be able to plead and prove "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.' " ⚑ *Praprotnik,* 485 U.S. at 127 (citing ⚑ *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-168 (1970)). The policy or custom requirement "is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." ⚑ *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007) (relying on ⚑ *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir. 2004)).

Defendants contend that the City cannot be liable for housing Plaintiff with inmates with active TB because Plaintiff's Complaint "can be interpreted as alleging that the City failed to follow its policy of separating inmates with tuberculosis from inmates without tuberculosis" and that "the City made a mistake when they improperly housed him with other inmates who had tested positive for tuberculosis." (Def. Mem. at 21.) But interpreting the Complaint in this manner would be inconsistent with the Court's duty on a motion to dismiss to construe the facts in the light most favorable to the plaintiff. ⚑ *Chavis,* 618 F.3d at 170. Moreover, while it is true that a plaintiff cannot show that the City has a custom or practice based on a single incident, a "series of decisions by a subordinate official" may "manifest[ ] a 'custom or usage' of which the supervisor must have been aware." ⚑ *Praprotnik,* 485 U.S. at 130. Thus, a plaintiff may state a claim of municipal liability where the plaintiff alleges facts sufficient to suggest that defendants' noncompliance with a policy is widespread and therefore "that a municipality's *actual* policies were different from the ones that had been announced." ⚑ *Praprotnik,* 485 U.S. at 131 (Brennan, J., *concurring*) (emphasis added); ⚑ *Davis v. City of N.Y.,* No. 86-CV-6345 (SWK), 1990 WL 165763, at *13 (S.D.N.Y. Oct. 22, 1990) ("[W]ide-spread refusals to comply with the

City's ... policies might tend to demonstrate either a municipal custom or that a municipality's actual policies differ from those it has promulgated.").

Here, Plaintiff alleges that the "New York City Jails are infested with contagious diseases," that Defendants "do not follow the New York City Health Code [or] the New York State Sanitary Code," and that he is "yet another victim." (Compl. at 8.) He alleges that the DOC continued to re-test detainees in his cell block for TB, finding that two or three inmates had active TB and finding him TB-negative, yet on three different occasions when they were moved, decided to continue to house them together. (*Id.* at 25.) He also alleges that these prisoners with active TB declined treatment (*id.*), which suggests that they may have been contagious.

**\*9** Plaintiff's allegations, that Defendants decided each time that he was moved to continue to house detainees with active TB in his cell block after re-testing them all for TB, suffice at this stage to plead a "series of decisions" of which a supervisor must have been aware, ⚑ *Praprotnik,* 485 U.S. at 130, or a widespread pattern or custom. *Compare* ⚑ *Davis v. City of N.Y.,* 228 F. Supp. N 327, 346 (S.D.N.Y 2002) (holding that the evidence did not support jury's verdict because "two incidents of unconstitutional conduct by low-level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a widespread or well-settled custom"), *aff'd,* 75 Fed.Appx. 827 (2d Cir. 2003), *with* ⚑ *Ferrari v. City of Suffolk,* 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) ("Three instances (including Plaintiff's own claim) might not suffice to overcome summary judgment. But [on a 12(b)(6) motion], they do permit a plausible inference of a widespread practice or informal custom"). Defendants' motion to dismiss Plaintiff's claim that the City of New York violated Plaintiff's rights under the Due Process Clause by repeatedly deciding to continue housing him with inmates with active-TB is denied.

### B. Conditions of Confinement: Hepatitis A

To state a claim of unconstitutional conditions of confinement, a plaintiff must allege facts sufficient to suggest "a causal relation between the harm [he] suffered and the defendant's action or inaction." ⚑ *Barnes v. Anderson,* 202 F.3d 150, 158 (2d Cir. 1999); ⚑ *Castro,* 833 F.3d at 1070 (a pretrial detainee must plead, among other things, that "the defendant caused the plaintiff's injuries").

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 368 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

Here, Plaintiff fails to plead facts showing that any action or inaction on the part of Defendants caused him to contract Hepatitis A. *See, e.g., Mabry v. N.Y. City Dep't of Corr.,* 465 Fed.Appx. 31, 32 (2d Cir. 2012). Plaintiff's bare allegations that the jail is not "clean" (Compl. at 9), or that Defendants did not take unspecified "precautions" (*id.* at 20) are insufficient to state a claim that any action or omission on the part of the City of New York or any individual Defendant caused his infection with Hepatitis A. In contrast to Plaintiff's claims that the City of New York caused his TB infection by continuing to house him with contagious inmates, Plaintiff has not alleged that Defendants made any departure from protocol that resulted in his Hepatitis A infection. The Court therefore grants Defendants' motion to dismiss Plaintiff's claims that Defendants are liable for his infection with Hepatitis A.

### C. Medical Care Claims

#### 1. Medication and Testing Delays

Plaintiff's allegations regarding his medical care are contradictory. He alleges both that Defendants were "not providing [him] with medical care once exposed to T.B" (Compl. at 16), and that he was "forced into direct observed therapy" and treated with various antituberculosis medications (*id.* at 13), in other words, that he was compelled to accept medication.

For pretrial detainees, the standards articulated in *Darnell* apply to *all types* of deliberate indifference claims, including claims for deliberate indifference to serious medical needs. *Darnell,* 2017 WL 676521, at *12 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment."); *see also Castro v. County of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*) (overruling *Clouthier v. County of Contra Costa,* 591 F.3d 1232 (9th Cir. 2010), which had held that a subjective test applied to due process claims for deliberate indifference to serious medical needs).

If a complaint alleges that defendants provided medical treatment, but the treatment was inadequate, the seriousness inquiry focuses on the alleged inadequacy. *See Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006). When the basis for a deliberate indifference claim is "a temporary delay or interruption in the provision of

otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.' " *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003).

**\*10** With respect to his treatment for TB, Plaintiff alleges that defendants caused him to miss doses of TB medication and failed to test him monthly for liver functioning. He annexes to his Complaint grievances stating that medical staff failed to provide Plaintiff his medication on June 4, 2015, June 29, 2015, and July 2, 2015. (Id. 1-1 at 8.) Plaintiff wrote a grievance stating that "since I was diagnosed with TB, I have not received adequate care." (*Id.*) In another grievance, Plaintiff stated that on July 27, 2015, he was not escorted to the location where he could receive his medication. (*Id.* 1-1 at 9.) Although TB is undoubtedly a serious medical condition, Plaintiff's allegations that he missed doses of medication on these few occasions are not objectively sufficiently serious to rise to the level of a constitutional violation.

Plaintiff also wrote in a grievance that medical personnel did not test his liver functioning each month after he tested TB-positive in May 2015. (*Id.* 1-1 at 16). He annexes to the Complaint medical records reflecting "liver profile" tests on May 19, 2015, and June 1, 2015. (*Id.* 1-1 at 32-33.) Notes from his June 10, 2015 appointment with Defendant Rony Joseph, P.A., state: "Liver function is normal. We continue to follow up liver function." (*Id.* at 21.) On August 5, 2015, Plaintiff filed a Complaint asserting, among other things, that "Corizon medical didn't call [him] for [his] blood test," which he was supposed to have on the first day of every month. (*Id.* 1-1 at 9.) The New York State DOCCS took custody of Plaintiff on September 8, 2015. The Court liberally construes Plaintiff's Complaint as asserting that medical staff failed to conduct liver tests in July and August 2015, after his normal liver tests at the end of June 2015. Without more, such allegations of a limited delay or interruption in treatment are insufficient to plead an objectively serious risk to Plaintiff's health rising to the level of a constitutional claim.

Plaintiff also alleges that DOC medical personnel informed him that no medication or treatment was necessary to treat the discovery of Hepatitis A antibodies in his blood. (Compl. 1.2 at 11.) Plaintiff has not alleged that doctors withheld some treatment that was available to him for Hepatitis A or that was medically necessary. He simply alleges that doctors informed him that no medication or treatment was indicated for his

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 369 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

condition. (*Id.*) Without further allegations suggesting that the treating physicians' proposed course of action posed a risk of harm to him that was in "objective terms, sufficiently serious," *Smith,* 316 F.3d at 185, Plaintiff fails to state a deliberate indifference claim based on the lack of medication or other active treatment for Hepatitis A. Defendants' motion to dismiss Plaintiff's claims under § 1983 based on a failure to provide adequate medical care is granted.

### 2. Compelled Medication

"Although the right of a prisoner to be free from unwanted medical treatment is protected under the Fourteenth Amendment, there are instances where a state's interest in providing a safe and secure prison environment outweighs the liberty interests of an individual." *Brown v. Ionescu,* No. 02-CV-1218 (LMM), 2004 WL 2101962, at *4 (S.D.N.Y. Sept. 21, 2004). Cases that have balanced these interests in favor of the government include instances where an inmate's refusal of treatment could impact the health of other inmates and prison personnel. *Brown,* 2004 WL 2101962, at *4. Thus, in *McCormick v. Stalder,* the Court held that a prison could, consistent with the Constitution, require an inmate who had tested positive for TB to be medicated as part of the treatment of his condition. 105 F.3d 1059, 1061-62 (5th Cir. 1997) ("In light of the contagious nature of TB, the prison had a legitimate interest in forcibly treating the prisoner to prevent the spread of an infectious disease for the benefit of both the prisoner himself as well as other prisoners and staff."); *see also Hasenmeier-McCarthy v. Rose,* 986 F. Supp. 464, 468 (S.D. Ohio 1998) (holding that "the critical need of the defendants to detect, control, and treat a highly contagious disease more than satisfies their burden under *Turner v. Safley*").

**\*11** Plaintiff does not specifically allege that Defendants compelled him to accept medical treatment, whether for latent or active tuberculosis. Plaintiff alleges that he was "forced into direct observed therapy (DOT) and poisoned with variants of Isoniazid, rifampin, pyrazinamide." (Compl. at 13.) But he also alleges that Defendant Antoine Achille recommended, rather than required, medication for TB: Achille "examine[d] [Plaintiff's] blood [and] determine[d that Plaintiff] was negative for [active] tuberculosis and recommended [that he] be put on tuberculosis medication." (*Id.* at 10.) Plaintiff was also aware that some

inmates had declined to take medication and does not suggest that this option was unavailable to him. (*Id.* at 25 ("Mr. Ramirez and Mr. Belmejo ... refused to take the treatment.").) Moreover, although Plaintiff alleges that he suffered some side effects from the medication, he nowhere suggests that he informed any Defendant of such side effects and was nevertheless required to continue with medications that caused the side effects.

Numerous courts, applying *Turner v. Safley,* have concluded that in some instances, the critical need to detect, control, and treat a highly contagious disease can justify an infringement on any constitutional right that a prisoner may have to refuse medication.[9] *See Brown,* 2004 WL 2101962; *McCormick,* 105 F.3d at 1061-62; *Hasenmeier-McCarthy,* 986 F. Supp. at 468. Indeed, Plaintiff himself argues that the DOC should "categorize the inmates according to whatever disease they were found to have ... [and] should make them take their medications or treatment constructively." (Compl. at 27.) Plaintiff's inconsistent and conflicting allegations are insufficient to state a claim that he has suffered any violation of his constitutional rights in connection with the TB medication that he received at DOC.

### D. Mental Health Treatment

Plaintiff alleges that he suffers from "stress, mental anguish, anxiety, mood disorder, and depression," as well as post-traumatic stress disorder attributable at least in part to his work on the September 11, 2001 World Trade Center site. (*Id.* at 15.) While in DOC custody, Plaintiff initially had mental health treatment with clinicians who spoke Spanish, but in May 2015, at the NIC, there were no Spanish-speaking clinicians. (*Id.* 1-3 at 7.) Plaintiff's allegation that the DOC is required to provide bilingual mental health counselors can be construed as either a claim that (1) the DOC was deliberately indifferent to his serious medical needs by providing constitutionally inadequate care; or (2) violated a right to privacy because medical information was conveyed to an interpreter outside the relationship between the medical provider and the patient. Plaintiff fails to adequately state a claim under either theory.

### 1. Class Action

As an initial matter, Plaintiff indicates that he seeks to assert this claim regarding bilingual mental health care on behalf of

Case 9:21-cv-00949-MAD-ML   Document 51   Filed 02/09/23   Page 370 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

similarly-situated inmates. He argues that because "this issue affects thousands of Hispanics, Plaintiff is entitled to class-action injunctive relief." (*Id.* at 20.) *A pro se* prisoner cannot prosecute a class action. *Rodriguez v. Eastman Kodak Co.,* 88 Fed.Appx. 470, 471 (2d Cir. 2004) ("[I]t is well established that *a pro se* class representative cannot adequately represent the interests of other class members.") (internal quotation marks omitted); *see also* 🔖 *Iannaccone v. Law,* 142 F.3d 553, 558 (2d Cir. 1998). The Court therefore denies Plaintiff's request that he proceed as representative of a class.

## 2. Deliberate Indifference to Mental Health Needs

"[P]sychiatric or mental health care is an integral part of medical care," and prison authorities must provide a prisoner with "reasonably necessary medical care (including psychiatric or mental health care) which would be available to him or her if not incarcerated." *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989); *Smith v. Grefinger,* 208 F.3d 203 (2d Cir. 2000) ("[P]rison officials must provide inmates with 'reasonably necessary medical care.'").

**\*12** Here, Plaintiff fails to allege that he suffered an interruption of mental health services that created an objectively serious risk of harm. As set forth previously, courts must "focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.' " 🔖 *Smith,* 316 F.3d at 185. The question is not whether Plaintiff's underlying mental health issues were serious but rather whether any interruption in care caused by the absence of Spanish-speaking clinicians posed a serious risk.

Plaintiff alleges that in May 2015, at the NIC, the "mental health person did not speak Spanish so she made a [telephone] call, [and he] spoke to someone in Spanish but it wasn't satisfactory to [him] because [he] d[idn't] know to whom [he] was speaking," and he feels "more comfortable [with] a person to person communication." (*Id.* 1-2 at 19.) [10] It thus appears from Plaintiff's Complaint and the documents that he annexes to it that no Spanish-speaking clinician was available to him but that an interpreter was available to him by telephone. (Compl. 1-3 at 7.)

The Court therefore understands Plaintiff to be alleging not that defendants denied him *any* mental health treatment,

but rather that during this period, the only mental health treatment available to him was through a non-Spanish-speaking clinician assisted by an interpreter by phone. The Second Circuit has not specifically addressed whether inmates enjoy a constitutional right to medically-qualified interpreters.

At least one district court in this Circuit recognized that an interpreter may be necessary for "instances of medical care in which communication between the patient and medical personnel are essential to the efficacy of the treatment in question." 🔖 *Clarkson v. Coughlin,* 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) (holding that disabled prisoners were entitled to an American Sign Language interpreter). The district court in *Clarkson* reasoned that an interpreter was necessary to obtain informed consent and was a corollary to the significant liberty interest in avoiding the unwanted administration of medical treatment. The district court noted that several class members had "experienced improper and possibly harmful treatment through the provision of medical treatment in the absence of qualified interpreters." 🔖 *Id.* at 1049 ("Plaintiffs' protected liberty interest is implicated by Defendants' failure to provide the necessary information through a qualified interpreter even though the plaintiff in question may have 'voluntarily' ingested the proffered medication."); *see also Morales v. Fischer,* 46 F. Supp. 3d 239, 253 (W.D.N.Y. 2014) (concluding that even if DOCCS had failed to provide a Spanish interpreter for one medical appointment, this did not violate Plaintiff's Eighth Amendment rights where "there is nothing to suggest—and Plaintiff does not assert—that he was overall unable to effectively express his concerns in that treatment session").

Here, Plaintiff has not alleged that his mental health session with social worker Anne Francois implicates any interest in consent to particular medical treatment or even that he cannot speak English. Rather, Plaintiff alleges that he was "more comfortable" speaking in Spanish about his feelings. (Compl. 1.3 at 19; Compl. 1.2 at 21). The reasoning in *Clarkson* therefore is inapposite here. Plaintiff's allegations that Defendants provided only a telephone interpreter for his mental health appointment with a social worker thus do not show that he faced an objectively serious risk of harm. Plaintiff therefore fails to state a claim that Defendants were deliberately indifferent to his serious mental health needs.

### 3. Confidentiality of Medical Information

**\*13** Plaintiff also fails to adequately plead that Defendants violated his right to privacy in his medical information. The Constitution does not provide prisoners with an unqualified right to complete confidentiality of medical records. *Cortes,* 114 F. Supp. 2d at 185. The Second Circuit has recognized that prisoners possess a right to maintain the confidentiality of certain previously undisclosed medical information, particularly where "disclosure [to other inmates] might lead to inmate-on-inmate violence." *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir. 1999) (recognizing a right to avoid disclosure of inmate's status as transsexual); *Doe v. City of New York,* 15 F.3d 264 (2d Cir. 2004) ("Individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition."). By contrast, "innocuous concerns" such as complaints of back and leg pain, "do not compel the same heightened confidentiality as information concerning an inmate's HIV positive status or transsexualism." *Cortes,* 114 F. Supp. 2d at 185. Even where a prisoner has some rights to medical confidentiality, prison officials can impinge on that right "to the extent that their actions are reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112.

In *Cortes,* where the inmate had "the luxury of determining whether he wanted a particular inmate or even a noninmate [staff counselor] to serve as his interpreter," the Court concluded that medical personnel had taken "reasonable steps to allow plaintiff to have the services of a translator while maintaining the confidentiality of his medical information." *Id.* at 186. Other district courts have likewise rejected privacy claims, in some cases even where inmates were used as translators. *See Franklin v. District of Columbia,* 163 F.3d 625, 638-39 (D.C. Cir. 1998) ("[P]risoners with limited proficiency in English do not have a privacy right, derived from the Constitution, to force the District to hire bilingual medical personnel so that the prisoners may communicate their medical information only to such employees.").

Here, using the telephone interpreter service for Plaintiff's meeting with a social worker for his post-traumatic stress disorder was a reasonable effort to allow plaintiff to have the services of an interpreter while maintaining the confidentiality of his medical information. He fails to plead facts showing that having only a telephone interpreter service impinged on any right to the confidentiality of sensitive medical information. Therefore, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 claims arising from his mental health care in DOC custody.

### E. Americans with Disabilities Act

To state a claim under Title II of the Americans with Disabilities Act (ADA), a prisoner must show: "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Clarkson,* 898 F. Supp. at 1037. Plaintiff alleges that his "mental issue" was a recognized disability and that Defendants "took no steps to protect [his] rights under the ADA." (Compl. at 21.) As Defendants point out, Plaintiff's allegations do not suggest that Defendants denied him participation in any program or service *because of* his mental health issues or any other disability. (Def. Mem. at 3.) Plaintiff's allegation that Defendants denied him mental health care with a Spanish-speaking counselor does not suggest that they denied him mental health care by reason of his disability. Plaintiff's allegations thus fail to state a claim under Title II of the ADA. Defendants' motion to dismiss Plaintiff's ADA claim is granted.

### F. Conspiracy under 42 U.S.C. §§ 1983 and 1985(3)

A plaintiff asserting a conspiracy claim under § 1983 must allege "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999).

**\*14** In order to state a claim under § 1985(3), a plaintiff must allege facts that plausibly show that there exists: (1) a conspiracy (2) for the purpose of depriving the plaintiff of the equal protection of the laws, or the equal privileges or immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to his person or property, or a deprivation of his right or privilege as a citizen of the United States." *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir. 1999). "[T]he [ § 1985(3) ] conspiracy must also be motivated

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 372 of 396

Narvaez v. City of New York, Not Reported in Fed. Supp. (2017)

by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (internal quotation marks and citation omitted). Vague and conclusory assertions of a conspiracy claim, either under 🚩 § 1983 or under 🚩 § 1985(3), will not suffice. *See, e.g.,* 🚩 *Webb v. Goord,* 340 F.3d 105, 110-11 (2d Cir. 2003); 🚩 *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir. 1997).

Plaintiff alleges that unspecified Defendants are liable under 🚩 § 1985 because they "transfer[red him], discontinued treatment, [and] ignore[d] it when [he] was positively diagnosed." (Compl. at 20.) He further asserts, without further factual elaboration, that "similarly situated inmates who spoke English were given medical care and not exposed to said diseases," (*id.* at 21), and that Defendants denied him medical care or exposed him to contagious diseases because he "was not of [defendants'] consanguinity and spoke only Spanish," (*id.* at 19). Plaintiff's allegations about a conspiracy are unsupported by any factual allegations and thus fail to state a claim on which relief can be granted. The Court therefore grants Defendants' motion to dismiss Plaintiff's claims of conspiracy under 🚩 §§ 1983 and 🚩 1985(3).

## CONCLUSION

Defendants' motion to dismiss is DENIED as to Plaintiff's 🚩 § 1983 due process claim against the City of New York for deliberate indifference to a risk of harm from the conditions of Plaintiff's confinement with TB-positive inmates. Defendants' motion to dismiss is GRANTED as to Plaintiff's remaining claims under 🚩 §§ 1983, 🚩 1985, and the ADA.

The Clerk of the Court is instructed to close the motion at ECF No. 38.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1535386

## Footnotes

1    By order dated May 11, 2016, the Court granted Plaintiff's request to proceed *in forma pauperis.*

2    Plaintiff also named as Defendants John and Jane Doe nurses but no Doe defendants were ever identified, and Plaintiff never filed an amended complaint substituting true names.

3    The September 14, 2016 Motion to Dismiss was filed on behalf of the City Of New York, Archille Antione, Clayton Augusnus, Myriam Blain, Anne Francois, Brenda Harris, Vittorio Harris, Angelo Jamieson, Rony Joseph, Frantz Medard, Rose Mary Nwanne, Francisco Peguero, David Viera, Steven Wettenstein, and Monica Windley. On April 13, 2017, Defendant Ronald Schlifman filed a separate motion to dismiss on substantially similar grounds. (ECF No. 59.)

4    Plaintiff also alleges that medical personnel "administer[ed] tuberculosis medication when [he] did not have tuberculosis and when [he] acquired it, discontinued [the medication] and did not provide alternative treatment." (Compl. at 10.) It is unclear if Plaintiff means that Defendants: (1) administered medication when he did not have *active* TB and failed to administer medication later when he had active TB; or (2) administered medication when he tested negative for TB and failed to administer medication later when he tested positive. As Defendants point out, there is no suggestion in the medical records that Plaintiff annexes to his Complaint that medical personnel administered TB medication before he tested positive for latent TB. (Def. Mem. at 13.) The Court therefore assumes for purpose of this motion that Plaintiff is alleging the former.

5    Plaintiff also mentions in passing that Defendant Lynn Devivo "determine[d] that [he] had 9-11-2001 lung problems and did not treat it." (Compl. at 10.) He also mentions respiratory issues in a grievance. (Compl. 1.2 at 25) ("I was being treated for my lung disease.").

6    http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130. "Courts in this district have taken judicial notice of information obtained from online inmate tracking services." *Tavares v. New York City Health & Hosps. Corp.,* No. 13-CV-3148 (PKC) (MHD), 2015 WL 158863, at *3 (S.D.N.Y. Jan. 13, 2015) (citing *Tribble v. City of N.Y.* No. 10-CV-8697(JMF), 2013 WL69229, at *1 n. 1 (S.D.N.Y. Jan. 3, 2013), and *Williams v. City of N.Y.,* No. 07-CV-3764 (RJS), 2008 WL 3247813, at *2 (S.D.N.Y. Aug. 7, 2008) (using DOCCS's tracking service)).

7    The Ninth Circuit recently held that in light of *Kingsley*, the elements of a pretrial detainee's deliberate indifference claim against an individual are: "(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable [individual] in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries." 🚩*Castro v. County of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*).

8    In contrast to a pretrial detainee, a convicted prisoner asserting claims under the Eighth Amendment must show that the defendant-official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that he] also dr[e]w the inference." *See* 🚩*Farmer v. Brennan,* 511 U.S. 825, 836-37 (1994).

9    Plaintiff has not asserted any objection on religious grounds to the medication.

10   This letter indicates that it was written by "Joe Jimenez," for Plaintiff Segundo Narvaez. (Compl. 1-2 at 19.) Most or all of the other grievances and letters appear to have been written by Plaintiff himself in English.

---

**End of Document**                                         © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 16571380
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

ADECCO USA, INC. and ADO Staffing, Inc., Plaintiffs,

v.

STAFFWORKS, INC., Anita Vitullo, Karen
Walser, Vicki Rodabaugh, Deborah Rohde,
Maurica Gloria, Brianna Flint, Tayler Fravel,
Karen Standford, and Shelly Kranz, Defendants.

6:20-CV-744 (MAD/TWD)
|
Signed November 1, 2022

**Attorneys and Law Firms**

COURTNEY C. WILLIAMS, ESQ., GORDON & REES
LLP, 4031 Aspen Grove Drive - Suite 290, Franklin,
Tennessee 37067, Attorneys for Plaintiffs.

JOHN TYLER MILLS, ESQ., GORDON & REES LLP, 1
Battery Park Plaza, 28th Floor, New York, New York 10004,
Attorneys for Plaintiffs.

TYLER L. MARTIN, ESQ., TYLER TARNEY, ESQ.,
GORDON REES SCULLY MANSUKHANI LLP, 41 South
High Street, Suite 2495, Columbus, Ohio 43215, Attorneys
for Plaintiffs.

PRESTON L. ZARLOCK, ESQ., JOSHUA S. GLASGOW,
ESQ., MARY JANE MORLEY, ESQ., PHILLIPS LYTLE
LLP, One Canalside, 125 Main Street, Buffalo, New York
12203, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, United States District Judge:

**I. INTRODUCTION**

**\*1** On July 2, 2020, Plaintiffs Adecco USA, Inc.
("Adecco") and ADO Staffing, Inc. (collectively, "Plaintiffs")
commenced this action alleging various violations of
state and federal laws against Defendants Staffworks,
Inc. ("Staffworks") and Anita Vitullo ("Vitullo"), as well
as Defendants Karen Walser, Vicki Rodabaugh, Deborah
Rohde, Maurica Gloria, Brianna Flint, Tayler Fravel,

Karen Standford, and Shelly Kranz (collectively, the
"Former Employees"). See Dkt. No. 1. Plaintiffs' second
amended complaint asserts six causes of action against
Defendants for breach of contract, tortious interference,
actual trade secret misappropriation, conversion, trademark
infringement, and unfair competition. See Dkt. No. 208 at
¶¶ 169-221. Defendants' second amended answer asserts
two counterclaims against Plaintiffs: (1) tortious interference
with contract; and (2) tortious interference with business
relationships/prospective economic advantage. See Dkt. No.
214 at 41-45.

On July 10, 2020, the Court denied Plaintiffs' motion for
a temporary restraining order, see Dkt. No. 14. Then, on
September 15, 2020, the Court granted Plaintiffs' motion for
a preliminary injunction in part. See Dkt. No. 71. A motion
for reconsideration of the Court's order on its motion for
a preliminary injunction was granted in part on November
30, 2020. See Dkt. No. 105. On June 23, 2021, the Court
granted Plaintiffs' motion to consolidate this action with
*Staffworks, Inc. et al. v. Adecco USA, Inc.*, No. 6:20-CV-747,
and denied Defendants' cross-motion to dismiss. See Dkt.
No. 142. Currently before the Court is Plaintiffs' motion to
dismiss Defendants' counterclaims. See Dkt. No. 218. [1]

For the reasons that follow, Plaintiffs' motion is denied.

**II. BACKGROUND** [2]

According to Defendants, Adecco is a global staffing
corporation that offers staffing services in the central and
southern New York state markets. See Dkt. No. 214 at 34.
Although each started at different times and held different
positions, the Former Employees all worked for Adecco
at some point and were required to sign an employment
agreement upon starting employment. See id. at 31-33. None
of the Former Employees were advised that they could consult
an attorney prior to signing and they were not permitted to
negotiate any terms of the form employment agreement. See
id.

**\*2** Defendant Vitullo is the president and sole shareholder
of Staffworks, a corporation that offers staffing services in
the central and southern New York state markets. See id. at
33. In March 2020, Defendants allege that Adecco began to
institute pay cuts and furloughs for many of its employees,
including some of the Former Employees. See id. at 35.
Shortly thereafter, Defendants allege that Adecco instituted

a restructuring plan that resulted in layoffs, terminations, and "a chaotic atmosphere" that rendered Adecco "unable to deliver the same caliber of services" as it had previously. *Id.* at 36-37. As examples of Adecco's alleged declining ability to provide adequate services, Defendants assert that Felix Schoeller North America, Inc. ("Felix Schoeller"), a corporate client of Adecco, "sought out staffing services from [other] companies ... because of poor service" and that Adecco associates[3] assigned to Boral Building Products, Inc. ("Boral"), another corporate client, "sought out assignment with Staffworks because they were treated poorly by Adecco employees and because Adecco failed to process their payroll paperwork." *Id.* at 37.

Between June and September 2020, each of the Former Employees obtained positions at Staffworks. *See id.* at 37-38. Defendants allege that Adecco and its employees thereafter "falsely stated to clients or potential clients of Staffworks, including but not limited to Pladis, Stateline Auto Auction, Boral, PSA Cleaning, United Auto Supply, and Kilian Manufacturing, that Defendants had sabotaged payroll, took illegal actions, and engaged in in other misconduct while working at Adecco." *Id.* at 38. Defendants also allege that Adecco "threatened litigation, which [it knew] to be baseless, against clients and potential clients of Staffworks, including but not limited to Felix Schoeller, Tessy Plastics Corp., Gatehouse Motel, and Kilian Manufacturing." *Id.* The second amended answer alleges ten specific examples of these alleged statements and threats:

a. In or about September 2020, Adecco employees Renee Johnson ("Johnson") and Trevor Clark ("Clark") falsely stated to Mike Lenzer and Jamela Vaughn of Pladis that Gloria and Flint sabotaged payroll before leaving Adecco and engaged in other unethical and illegal conduct relating to their work at Adecco.

b. In or about July 2020, Adecco employees Nicole May, Megan Molik, Johnson, and Clark, falsely stated to Paul Tharrett and Angela Mansfield of Boral that Gloria and Flint sabotaged the Boral payroll before leaving Adecco.

c. In or about June 2020, Adecco employees Johnson and Clark falsely stated to Aron Bristow of Stateline Auto Auction that Gloria and Flint had sabotaged the Stateline Auto Auction payroll while employed at Adecco.

d. On or about June 17, 2020, Adecco employees Johnson and Clark falsely stated to Scott Shaw of PSA Cleaning that Gloria and Flint had engaged in unethical and illegal conduct relating to their work at Adecco.

e. In or about June 2020, Adecco employee Laurlyn Bush ("Bush") falsely stated to Keith Flynn of Kilian Manufacturing that Walser had engaged in unethical and illegal conduct relating to her work at Adecco, and threatened that if he worked with Walser at Staffworks, Kilian Manufacturing would be sued.

f. In or about June 2020, Adecco employee Johnson threatened Tina Devey of Pactiv, stating that ... Pactiv would be subjected to litigation if Pactiv worked with Staffworks.

g. In or about July or August of 2020, Adecco employee Bush falsely stated to James Ranalli of United Auto Supply that Walser engaged in illegal conduct relating to her work at Adecco and warned that he should not do business with Walser at Staffworks.

h. On or about September 21, 2020, Adecco sent a letter through its attorneys to Felix Schoeller impliedly threatening legal action against the company because it did business with Staffworks.

i. On or about September 21, 2020, Adecco sent a letter through its attorneys to Tessy Plastics Corp. impliedly threatening legal action against the company because it did business with Staffworks.

*3 j. On or about September 21, 2020, Adecco sent a letter through its attorneys to Gatehouse Motel impliedly threatening legal action against the company because it did business with Staffworks.

*Id.* at 39-40. Defendants also allege that Adecco "falsely claimed the right to possess a Facebook page [Defendant] Gloria created in 2014 through her personal Facebook account." *Id.* at 40.

The second amended answer asserts that Adecco "made these false statements and threats out of malice" and intended those statements to induce one or more entities it knew to have current or prospective business relationships with Defendants to end those relationships or to not enter into new ones. *Id.* at 38. Defendants allege that they have "lost contracts and/or business opportunities with those clients and potential clients" and suffered damage to their "business reputation and ability to obtain future contracts and/or

business relationships" as a result of these actions. *Id.* at 40-41.

Defendants' first counterclaim is for tortious interference with contract. *See* Dkt. No. 214 at ¶¶ 86-97. Defendants allege that Adecco intentionally, maliciously, and illegally interfered with Staffworks' contractual relationships with various clients—specifically Boral, United Auto Supply, Felix Schoeller, Tessy Plastics Corp., and Gatehouse Motel—by (1) publishing false and defamatory statements, (2) making fraudulent misrepresentations to those entities that Defendants had sabotaged payroll, took illegal actions, and engaged in other misconduct while working at Adecco, and (3) threatening nine or more frivolous lawsuits. *See id.* at ¶¶ 87, 89, 90, 93. Defendants allege that Adecco had knowledge of the contractual relationships between Staffworks and these entities and made the these allegedly false statements to induce one or more of those entities to end or limit their business relationship with Staffworks. *See id.* at ¶¶ 88, 91. Defendants' second counterclaim is for tortious interference with business relationships/ prospective economic advantage. *See id.* at ¶¶ 98-109. There, Defendants allege that Adecco intentionally, maliciously, and illegally interfered with Staffworks' current and/or prospective business relationships with Pladis, Stateline Auto Auction, PSA Cleaning, and Kilian Manufacturing, in addition to the entities previously noted, via the same conduct listed in Defendants' first counterclaim.

Plaintiffs now move to dismiss Defendants' counterclaims, first arguing that any alleged statements made by its employees to Defendants' clients about the conduct of the Former Employees was protected under the fair reporting privilege, regardless of when the statements were made, because those statements were "nothing more than a fair report of the same allegations asserted by [Plaintiffs] in this litigation" to interested parties. *See* Dkt. No. 218-1 at 7. Second, Plaintiffs argue that any alleged threats by its employees and attorneys to file litigation against Defendants' clients "fail to plausibly allege a *prima facie* case of tortious interference under New York law and fail to plausibly overcome the *Noerr-Pennington* doctrine." *Id.* at 10. Third, Plaintiffs assert that any portion of Defendants' counterclaims related to the September 21, 2020 letters are barred by the absolute litigation privilege. *See id.* at 13-14. Finally, Plaintiffs argue that the remainder of Defendants' counterclaims "consist of vague and conclusory allegations of wrongful conduct" that are "insufficient to plausibly allege tortious interference with contractual or business

relationships." *Id.* at 14-15. In opposition, Defendants argue that they have pled all the necessary elements for both of their tortious interference claims and that none of the affirmative defenses raised by Plaintiffs insulate them from liability under the facts alleged in Defendants' counterclaims. *See* Dkt. No. 219.

### III. DISCUSSION

#### A. Standard of Review

**\*4** A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[.]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.* at 570.

**B. Fair Reporting Privilege**

Under Section 74 of the New York Civil Rights Law, "a civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published." N.Y. Civ. Rights Law § 74. Section 74's protections "include[ ] statements published not only by the media, but also by parties or their counsel." *Wexler v. Allegion (UK) Ltd.,* 374 F. Supp. 3d 302, 311 (S.D.N.Y. 2019). "A statement comes within the privilege and 'is deemed a fair and true report if it is substantially accurate, that is if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth.' " *Kinsey v. New York Times Co.,* 991 F.3d 171, 178 (2d Cir. 2021) (quotation omitted); *see also BYD Co. Ltd. v. VICE Media LLC,* No. 21-1097, 2022 WL 598973, *1 (2d Cir. Mar. 1, 2022), *cert. denied,* 2022 WL 4651855 (Oct. 3, 2022).

"A key test courts have adopted to resolve whether a report qualifies for the fair report privilege is whether 'the ordinary viewer or reader' can 'determine from the publication itself that the publication is reporting on [a judicial] proceeding.' " *Kinsey,* 991 F.3d at 178-79 (quotation omitted). "In other words, '[i]f the context in which the statement [is] made make[s] it impossible for the ordinary viewer [or reader] to determine whether [the publication] was reporting on a judicial proceeding, the absolute privilege does not apply.' " *Id.* at 179. "New York courts 'adopt a liberal interpretation of the fair and true report standard of [ Section] 74 so as to provide broad protection to news accounts of judicial proceedings.' " *Id.*

**\*5** "In addition, 'Section 74 applies only where the challenged report is "of" a proceeding.' " *Wexler,* 374 F. Supp.

3d at 311 (alterations omitted) (quoting *Fine v. ESPN, Inc.,* 11 F. Supp. 3d 209, 216 (N.D.N.Y. 2014)). "An overlap between the subject matter of the report and the subject matter of a proceeding does not suffice; the ordinary viewer or reader must be able to determine from the publication itself that the publication is reporting on the proceeding." *Fine,* 11 F. Supp. 3d at 216 (citations omitted). In other words, "there must be some perceptible 'connection between the challenged report and the ... proceeding.' " *Id.* (quotation omitted). " 'It is for the Court to determine as a matter of law if a publication is a "fair and true" report under section 74, unless the Court determines that an issue of fact remains.' " *Wexler,* 374 F. Supp. 3d at 312 (quotation omitted).

The Court cannot, at this early juncture, determine as a matter of law that the statements alleged in the second amended answer were privileged reports of a judicial proceeding. Initially, Plaintiffs' argument that its employees were merely "repeating the same positions that [Plaintiffs have] taken in this litigation to interested parties," Dkt. No. 218-1 at 9, is unavailing because, as noted above, a mere overlap between the subject matter of the alleged statements and the subject matter of this proceeding "does not suffice" to provide a plausible connection between the statements and this proceeding. *Fine,* 11 F. Supp. 3d at 216. Indeed, considering the second amended answer's allegations alone —as the Court must on a motion to dismiss—there is no indication that Plaintiffs' employees ever mentioned this judicial proceeding, to any extent, at the time they made the alleged statements to Defendants' clients.

In its reply, Plaintiffs additionally argue that, "[g]iven the timing and nature of the alleged statements, the only reasonable way to infer that these statements were plausibly defamatory is to view them in the context of the current litigation." Dkt. No. 220 at 6. In other words, Plaintiffs appear to be asking this Court to infer that Defendants' clients *must have known* that the alleged statements were reports of this litigation because—without the context provided by this litigation—the alleged statements would be nothing more than "vague" and "implausible" allegations. *Id.* at 6-7. [4] The Court disagrees. The second amended answer alleges, in short, that Plaintiffs' employees told Defendants' clients that Defendants Gloria and Flint "sabotaged payroll before leaving Adecco" and that Defendants Gloria, Flint, and Walser "engaged in other unethical and illegal conduct relating to their work" at Adecco. Dkt. No. 214 at 39-40. It is not clear to this Court how knowledge of this litigation is, in any way, required for these unambiguous statements to

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

potentially damage the relationship between Defendants and their clients. Contrary to Plaintiffs' arguments, Defendants do not have to establish the exact "unethical and illegal conduct" Plaintiffs' employees were thinking of when they made these statements because a general accusation of unethical and illegal conduct alone appears sufficient, by itself, to harm the contractual or business relationship between Defendants and their clients.

**\*6** In sum, the second amended answer alleges that Plaintiffs' employees made unsolicited and damaging claims about the Former Employees' conduct without ever connecting those statements to this litigation. Given that these allegations must be accepted as true and all reasonable inferences must be drawn in Defendants' favor, the Court cannot determine that, as a matter of law, the fair reporting privilege applies to these statements.

Accordingly, the Court denies Plaintiffs' motion to dismiss with respect to the fair reporting privilege.

## C. Threats of Litigation and the *Noerr-Pennington* Doctrine

"The First Amendment guarantees 'the right of the people ... to petition the Government for a redress of grievances.' " *Alfred Weissman Real Est., Inc. v. Big V Supermarkets, Inc.*, 268 A.D.2d 101, 106 (2d Dep't 2000) (quoting U.S. Const. amend. I). Thus, the Supreme Court has held, "under what has become known as the *Noerr-Pennington* doctrine, that citizens who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Id.* at 106-07. "Similarly, petitions made to the executive or judicial branches of government, *e.g.*, in the form of administrative or legal proceedings, are exempt from antitrust liability even though the parties seek ultimately to impede their competitors through these actions." *Id.* at 107. Although this doctrine initially arose in the antitrust field, the courts have expanded it to protect the "filing of litigation ... which has been applied to bar claims of tortious interference predicated on the commencement of litigation." *I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D.3d 206, 208 (1st Dep't 2005) (citations omitted). Courts have further extended *Noerr–Pennington* to encompass " 'concerted efforts incident to litigation, such as pre-litigation threat letters and settlement offers.' " *Singh v. NYCTL 2009-A Tr.*, 683 Fed. Appx. 76, 77 (2d Cir. 2017) (quoting *Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d

92, 100 (2d Cir. 2000)); *see also MMS Trading Co. Pty Ltd. v. Hutton Toys, LLC*, No. 20-CV-1360, 2021 WL 1193947, \*9-10 (E.D.N.Y. Mar. 29, 2021) (" '[C]ourts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation, such as prelitigation "threat letters" and "settlement offers' " ") (quotation omitted); *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (same) (quotation omitted).

"*Noerr-Pennington* protection is not absolute, however." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 686 (2d Cir. 2009). Under the " 'sham exception' to this doctrine, 'activity "ostensibly directed toward influencing governmental action" does not qualify for *Noerr* immunity if it "is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor." ' " *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014) (quotation omitted). "[T]o qualify as a 'sham,' a 'lawsuit must be objectively baseless' and must 'concea[l] an attempt to interfere directly with the business relationships of a competitor.' In other words, the plaintiff must have brought baseless claims in an attempt to thwart competition (*i.e.*, in bad faith)." *Id.* (quotation and quotation marks omitted).

" 'The *Noerr-Pennington* doctrine is generally raised as an affirmative defense.' " *MMS Trading Co. Pty Ltd.*, 2021 WL 1193947, at \*10 (quoting *360 Mortg. Grp., LLC v. Fortress Inv. Grp. LLC*, No. 19-CV-8760, 2020 WL 5259283, \*4 (S.D.N.Y. Sept. 3, 2020)). "Dismissal is appropriate based on an affirmative defense raised by a pre-answer motion to dismiss under Rule 12(b)(6) when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.' " *Id.* (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)). " '[P]ut another way, [a plaintiff] has no affirmative obligation to plead facts to show that the *Noerr-Pennington* doctrine does not apply, *i.e.*, that the sham exception applies.' " *Id.* (quoting *360 Mortg. Grp., LLC*, 2020 WL 5259283, at \*4).

**\*7** Here, the Court finds that it is not clear from the face of the second amended answer that the prelitigation threats to Defendants' clients were not a sham. The second amended answer alleges that these prelitigation threats were "baseless," "false," and made "out of malice" for the purpose of inducing "one or more of the entities to end its business relationships with Defendants or to not enter into one with

Defendants." Dkt. No. 214 at ¶¶ 77-78. At this early stage, these allegations are sufficient to overcome the *Noerr-Pennington* defense because, as noted above, Defendants do not have any affirmative obligation at this stage of the litigation to plead facts to establish that the sham exception applies. *See MMS Trading Co. Pty Ltd.*, 2021 WL 1193947, at *10. Plaintiffs contend that their prior success on their motion for a preliminary injunction and Defendants' motion to dismiss renders the sham exception unavailable to Defendants as a matter of law. *See* Dkt. No. 218-1 at 12-13. This argument is not persuasive. The Court's prior orders only establish a likelihood of success on the merits *as against Defendants*. These threats were made against *Defendants' clients*, who are not parties to this matter. The Court has not ruled on the viability of any claims Plaintiffs may have against those entities.

Accordingly, the Court denies Plaintiffs' motion to dismiss with respect to the *Noerr-Pennington* doctrine.

### D. The Litigation Privilege

It is well established under New York law that "absolute immunity from liability *for defamation* exists for oral or written statements made by attorneys in connection with a proceeding before a court 'when such words and writings are material and pertinent to the questions involved.' " *Front, Inc. v. Khalil*, 24 N.Y.3d 713, 718 (2015) (emphasis added) (quoting *Youmans v. Smith*, 153 N.Y. 214, 219 (1897)). However, it is not clear whether, under New York law, the litigation privilege can or should be extended to preclude tortious interference claims in addition to defamation claims.

Initially, contrary to Plaintiffs' argument, *Academy Orthotic & Prosthetic Associates IPA, Inc. v. Fitango Health, Inc.* ("*Academy Orthotic*"), does not explicitly hold that the litigation privilege applies to tortious interference claims. *See Academy Orthotic*, No. 19-CV-10203, 2020 WL 6135762 (S.D.N.Y. Oct. 16, 2020). In *Academy Orthotic*, the court first reasoned that, because the plaintiff's defamation and tortious interference claims were both supported by the same statements, "the success of [the] [p]laintiffs' tortious interference claims [was] predicated on the success of their defamation claims." *Id.* at *4. The court then held that the plaintiff's defamation claim failed because the defendants' statements were privileged and, therefore, the related tortious interference claim must also fail. *See id.* at *5. In other words, the court first dismissed the plaintiff's defamation claim under the litigation privilege, and then separately

dismissed the plaintiff's tortious interference claim because it could not survive without the defamation claim. This indirect method of applying the litigation privilege to tortious interference claims cannot be used in this case inasmuch as the tortious interference claims here are not predicated on separate defamation claims; there are in fact no defamation claims alleged by Defendants in this matter.

The Court has located two other cases discussing the applicability of the litigation privilege to tortious interference claims under New York law. The first case is *ExpertConnect, LLC v. Fowler*, where a district court concluded that "the litigation privilege can bar a tortious interference claim." *ExpertConnect, LLC v. Fowler*, No. 18 CIV. 4828, 2020 WL 3961004, *5 (S.D.N.Y. July 13, 2020) (citing *Front, Inc.*, 24 N.Y.3d at 718). The second case is *Chutko v. Ben-Ami*, where the New York Appellate Division held that the plaintiffs' "defamation and tortious interference with contract" claims were correctly dismissed because they "failed to show that the litigation ... was not brought in good faith" and the underlying attorney's statements were pertinent to that good faith litigation. *Chutko v. Ben-Ami*, 150 A.D.3d 582, 583-84 (1st Dep't 2017) (citing *Front, Inc.*, 24 N.Y.3d at 715). In both cases, the courts supported their holdings with only an unelaborated cite to *Front, Inc.*

**\*8** In this Court's estimation, *Front, Inc.* does not so clearly support the application of the litigation privilege to tortious interference claims. First, the focus of the New York Court of Appeals' decision in *Front, Inc.* was whether the litigation privilege should be extended to cover "statements made [by attorneys] prior to the commencement of an anticipated litigation." *See Front, Inc.*, 24 N.Y.3d at 720. In making that determination, the Court of Appeals never discussed the litigation privilege in the context of tortious interference claims. *See id.* at 715 ("If the statements are pertinent to a good faith anticipated litigation, no cause of action for *defamation* can be based on those statements") (emphasis added); *id.* at 718 ("[A]bsolute immunity from liability for *defamation* exists for oral or written statements made by attorneys in connection with a proceeding before a court 'when such words and writings are material and pertinent to the questions involved' ") (emphasis added). Second, a close reading of the underlying Appellate Division decision in *Front, Inc.* reveals that the Appellate Division never directly applied the litigation privilege to the plaintiff's tortious interference claim. *See Front, Inc. v. Khalil*, 103 A.D.3d 481,

483-84 (1st Dep't 2013). Rather, similar to *Academy Orthotic*, the Appellate Division applied the litigation privilege to the plaintiff's libel *per se* claim, which it dismissed. *See id.* at 483. The Appellate Division then separately concluded that, "absent the libel claims," the third-party complaint no longer adequately "allege[d] the 'malice' or use of 'improper or illegal means' [elements] required to state a cause of action for tortious interference with business relations." *Id.* at 484.

Absent some clear authority on this issue, the Court is reluctant to extend a well-established doctrine of New York law beyond the bounds previously set forth by New York courts. *See Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902, 908 (2d Cir. 1985) ("As a federal court sitting in diversity, we will not extend the application of this state law");

*see also Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 75 (2d Cir. 1986) ("[I]t is clear that under New York law litigation or the threat of litigation can give rise to a claim for tortious interference with contractual relations"). Thus, the Court concludes that the litigation privilege is not applicable to tortious interference claims.

Accordingly, the Court denies Plaintiffs' motion to dismiss with respect to the litigation privilege.

## E. Failure to State a Claim

### 1. Tortious Interference with Contract

"[U]nder New York law, '[t]ortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom.' " *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. Appx. 102, 104 (2d Cir. 2012) (quoting *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424 (1996)).

The second amended answer plausibly alleges a tortious interference with contract claim under New York law. The second amended answer alleges that Staffworks entered into valid enforceable contracts with various clients, including Boral, United Auto Supply, Felix Schoeller, Tessy Plastics Corp., and Gatehouse Motel. *See* Dkt. No. 214 at ¶ 87. The second amended answer further alleges that Plaintiffs had knowledge of the contractual relationships between Staffworks and these entities, *see id.* at ¶ 88,

and intentionally and maliciously interfered with those contractual relationships by, for example, (1) making fraudulent and false misrepresentations to those clients that Gloria, Flint, and Walser sabotaged payrolls or engaged in other unethical and illegal conduct before they left Adecco; and (2) threatening one or more frivolous lawsuits against those clients if they worked with the Former Employees or Staffworks, *see id.* at ¶¶ 80(a)-(j), 89-90, 93. Finally, the second amended answer alleges that as a result of this interference, Defendants have lost existing contracts with those clients and suffered damage to their business reputation and ability to obtain other future business. *See id.* at ¶ 96. Accepting these allegations as true and drawing all reasonable inferences in Defendants' favor, the Court finds that these allegations are sufficient to withstand Plaintiffs' motion to dismiss.

**\*9** Accordingly, Plaintiffs' motion to dismiss Defendants' first counterclaim for tortious interference with contract is denied.

### 2. Tortious Interference with Business Relationships/Prospective Economic Advantage

"In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994) (citation omitted); *see also PPX Enter., Inc. v. Audio Fidelity Enter., Inc.*, 818 F.2d 266, 269 (2d Cir. 1987). This claim may be pled as an alternative to a tortious interference with contract claim in the event that a court finds that the contract at issue is unenforceable. *See AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*, No. 02-CV-1363, 2003 WL 21203503, \*7 (S.D.N.Y. May 22, 2003).

"To establish tortious interference with business relations under New York law, 'the plaintiff must show that defendant's conduct was not "lawful" but "more culpable." ' " *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 566 (S.D.N.Y. 2020) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)). "Although 'as a general rule,' a defendant's conduct must amount to a 'crime or independent tort' to support liability for tortious interference with business relations, an exception to this rule 'has been

recognized where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs' or employs 'wrongful means.' " *Id.* (quoting 📑 *Carvel Corp.*, 3 N.Y.3d at 190, 192). "Even when a defendant's sole purpose was not to injure the plaintiff, New York courts have held that the use of 'wrongful means' can support a claim for tortious interference." *Id.* (citing 📑 *Carvel Corp.*, 3 N.Y.3d at 192). "Wrongful means 'include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure.' " *Id.* (quoting 📑 *Carvel Corp.*, 3 N.Y.3d at 191).

Defendants have adequately pled a claim for tortious interference with business relationships/prospective economic advantage under New York law. The second amended answer alleges that Staffworks developed current and prospective business relationships and opportunities with potential and existing clients to provide staffing services, including Boral, United Auto Supply, Felix Schoeller, Tessy Plastics Corp., Gatehouse Motel, Pladis, Stateline Auto Auction, PSA Cleaning, and Kilian Manufacturing. *See* Dkt. No. 214 at ¶ 99. The second amended answer further alleges that Plaintiffs knew of these current or prospective business relationships and intentionally and maliciously interfered with them though fraudulent and false misrepresentations concerning the conduct of the Former Employees and threatening one or more frivolous lawsuits. *See id.* at ¶¶ 80(a)-(j), 101-02, 105. It further asserts that Plaintiffs took these actions for the sole purpose of maliciously inflicting intentional harm on Defendants and to induce one or more of Defendants' clients to end their business relationships

with Defendants. *See id.* at ¶¶ 103, 106. Finally, the second amended answer asserts that Defendants suffered damage to their business reputation and ability to obtain other future business by virtue of Plaintiffs' wrongful interference with their business relationships. *See id.* at ¶¶ 107-08. Accepting these allegations as true and drawing all reasonable inferences in Defendants' favor, the Court finds that these allegations are sufficient to withstand Plaintiffs' motion to dismiss.

**\*10** Accordingly, Plaintiffs' motion to dismiss Defendants' second counterclaim for tortious interference with business relationships/prospective economic advantage is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion to dismiss (Dkt. No. 218) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 16571380

### Footnotes

1    Defendants appear to briefly argue that this motion is untimely. *See* Dkt. No. 219 at 9. The Court disagrees. This Court's text minute entry dated August 4, 2021, states that the Court directed Plaintiffs to file this motion as soon as possible after Defendants submitted their second amended answer. The second amended answer was filed on March 4, 2022, *see* Dkt. No. 214, and this motion was filed just twenty-one days later on March 25, 2022, *see* Dkt. No. 218. The fourteen day time period for responses to an amended pleading under Rule 15(a)(3) of the Federal Rules of Civil Procedure is not applicable where the Court has "order[ed] otherwise" under that rule. Fed. R. Civ. P. 15(a)(3).

2    For the purpose of deciding Plaintiffs' motion to dismiss, the Court draws the facts from Defendants' second amended answer.

3    Associates are the individuals who are assigned by staffing companies, such as Adecco or Staffworks, to work for clients on a temporary basis.

4    The Court declines to address Plaintiffs' argument that the common interest privilege might apply, as it was made for the first time in a footnote of its reply brief. *See* Dkt. No. 220 at 7 n.2. The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.

*See* *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument raised for the first time in a reply brief"); *see also* *Sacchi v. Verizon Online LLC*, No. 14-CV-423, 2015 WL 1729796, *1 n.1 (S.D.N.Y. Apr. 14, 2015) ("Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it") (citations omitted).

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1729796
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

John SACCHI, an individual, on behalf of
himself and all others similarly situated, Plaintiff,

v.

VERIZON ONLINE LLC and Does
1 through 100, inclusive, Defendants.

No. 14–CV–423 (RA).
|
Signed April 14, 2015.

OPINION & ORDER

RONNIE ABRAMS, District Judge.

**\*1** Plaintiff John Sacchi moves this Court to reconsider its February 23, 2015 Opinion and Order (the "February Order") granting Defendant Verizon Online LLC's ("Verizon") motion to stay and compel arbitration. In the alternative, Plaintiff requests that this Court certify an interlocutory appeal of the February Order pursuant to 28 U.S.C. § 1292(b). [1] Familiarity with the facts and with the February Order is assumed. For the reasons that follow, Plaintiff's motion to reconsider and request to seek interlocutory appeal are denied.

**I. Motion to Reconsider**

Local Civil Rule 6.3 allows a party to move for reconsideration as to "matters or controlling decisions which counsel believes the Court has overlooked." U.S. Dist. Ct. Rules S. & E.D.N.Y., Civ. R. 6.3. Reconsideration of a court's prior order is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Ferring B.V. v. Allergan, Inc.,* No. 12–CV–2650 (RWS), 2013 WL 4082930, at \*1 (S.D.N.Y. Aug.7, 2013) (quoting *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 605 (S.D.N.Y.2012)). Accordingly, the "standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). "A

party seeking reconsideration may neither repeat 'arguments already briefed, considered and decided,' nor 'advance new facts, issues or arguments not previously presented to the Court .' " *Ferring B.V.,* 2013 WL 4082930 at \*1 (quoting *Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990)). A motion to reconsider "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Schrader,* 70 F.3d at 257.

Plaintiff fails to identify any "controlling decisions" which the Court "overlooked" and instead reprises arguments previously made and addressed by the Court, seeking simply to relitigate the same issues. His motion to reconsider therefore fails.

Plaintiff first argues that this Court misread *Coiro v. Wachovia Bank, N.A.,* No. CIV. 11–3587, 2012 WL 628514 (D.N.J. Feb.27, 2012). In so doing, Plaintiff raises the very same argument he raised in his initial opposition to Verizon's motion, which has already been "briefed, considered and decided." *Ferring B.V.,* 2013 WL 4082930 at \*1. Relatedly, Plaintiff also cites to *Discover Bank v. Shea,* 362 N.J.Super. 200, 827 A.2d 358 (Ch. Div.2001), which he did not cite in his initial briefing but which the Court already explicitly addressed in the February Opinion. *See Sacchi v. Verizon Online LLC,* No. 14–CV–423 (RA), 2015 WL 765940, at \*7, \*7 n. 9.

Plaintiff also argues that the Court gave undue weight to *Mayer v. Verizon New Jersey, Inc.,* which Plaintiff contends is distinguishable from the instant case. *See* Order, *Mayer v. Verizon New Jersey, Inc.,* No. 13–3980–FSH (D.N.J. May 6, 2014), ECF No. 31. Again, however, the Court already addressed this precise issue in its February Order. *See Sacchi,* 2015 WL 765940 at \*7 n. 8. Plaintiff's additional citation to *Cohen v. Chase Bank, N.A.,* 679 F.Supp.2d 582, 592 n. 10 (D.N.J.2010) not only fails to advance his argument-the footnote cited merely quotes a Delaware statute-but this is yet another case that Plaintiff never mentioned in his initial briefing and which in any event this Court addressed in its February Order. *See Sacchi,* 2015 WL 765940, at \*7 n. 9. Moreover, not only were none of these cases "overlooked," none constitute "controlling" authority.

**\*2** Plaintiff makes one final argument, contending that the February Order will have an adverse impact on "consumers throughout New Jersey." Pl.'s Mem. at 5. True or not,

disagreement with an opinion's outcome is not grounds for reconsideration. *See R.F.M.A .S., Inc. v. Mimi So,* 640 F.Supp.2d 506, 512 (S.D.N.Y.2009) ("A party's fundamental disagreement with a court's legal analysis and conclusions as to a matter fully considered does not serve as sufficient ground to warrant reconsideration of the court's decision .")

Plaintiff's motion for reconsideration is thus denied.

### II. Interlocutory Appeal

In the alternative, Plaintiff requests that this Court revise the February Order to permit an immediate appeal pursuant to 28 U.S.C. § 1292(b). This request is also denied.

An appeal from an interlocutory order staying an action and directing the parties to arbitration may not be taken except as provided under 28 U.S.C. § 1292(b). 9 U.S.C. § 16(b). "Section 1292(b) provides for certification of an order for interlocutory appeal when the court determines: '(1) that such order involves a controlling question of law (2) as to which there is substantial ground for difference of opinion and (3) that an immediate appeal from [that] order may materially advance the ultimate termination of the litigation.' " *In re Facebook, Inc., IPO Sec. & Derivative Litig.,* 986 F.Supp.2d 524, 529 (S.D.N.Y.2014) (quoting 28 U.S.C. § 1292(b)) (alteration in original). "The proponents of an interlocutory appeal have the burden of showing that all three of the substantive criteria are met." *Id.* "Interlocutory appeals are presumptively disfavored," *Garber v. Office of the Comm'r of Baseball,* No. 12–CV–3704 (SAS), 2014 WL 4716068, at *1 (S.D.N.Y. Sept.22, 2014), and section 1292(b) is to be "strictly limited" because "only exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *In re Facebook,* 986 F.Supp.2d at 529–30 (quoting *McNeil v. Aguilos,* 820 F.Supp. 77, 79 (S.D.N.Y.1993) (alteration in original). "[E]ven when the elements of section 1292(b) are satisfied, the district court retains unfettered discretion to deny certification." *Garber,* 2014 WL 4716068, at *1 (internal quotation marks omitted).

Plaintiff recites the three statutory criteria of section 1292(b) but fails to even attempt to address how the February Order satisfies those criteria. There is no specification as to what the "controlling question of law" relevant to this case is, how "there is substantial ground for difference of opinion" regarding that question of law, or how an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Plaintiff instead merely

states that the Supreme Court's recent grant of certiorari in *DirecTV, Inc. v. Imburgia,* No. 14–462, 2015 WL 1280237 (U.S. Mar.23, 2015), "showcases the continuing efforts by both federal and state courts to fully implement" *AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011), and thus this area of law "remains highly volatile and of vast significance...." Reply at 2. This is insufficient to warrant an immediate appeal in this case.

**\*3** *Imburgia,* a case appealed from a California Court of Appeal decision, involves the interpretation of a specific arbitration clause in light of the Supreme Court's *Concepcion* decision. *See Imburgia v. DirecTV, Inc.,* 225 Cal.App.4th 338, 170 Cal.Rptr.3d 190 (Cal.Ct.App.2014). The arbitration clause in that case provides for a class waiver, but also states that "[i]f ... the law of your state would find this agreement to dispense with class arbitration procedures unenforceable, then this entire [arbitration agreement] is unenforceable." *Id.* at 193. The California Court of Appeal held that, pursuant to this contract language, because class action waiver is unenforceable under California law, the entire arbitration agreement was unenforceable. *Id.* at 198. In so holding, the court found that the contract language precluded consideration of the preemptive effect of the Federal Arbitration Act (the "FAA"), which, under *Concepcion,* would override state laws prohibiting class action waivers and render such provisions enforceable. *Id.* at 195–96. The Ninth Circuit Court of Appeals, in a separate case interpreting the same contract language, came to the opposite conclusion, holding that because the FAA, "which under *Concepcion* requires the enforcement of arbitration agreements that ban class procedures, *is* the law of California and every other state," the "law of your state" language "*already* incorporates" the preemptive effect of the FAA. *Murphy v. DirecTV, Inc.,* 724 F.3d 1218, 1226, 1228 (9th Cir.2013). Thus, the court concluded, because class waivers are enforceable under *Concepcion,* the arbitration agreement at issue in that particular contract was enforceable. *Id.* at 1228.

As the petition for a writ of certiorari states, the question presented to the Supreme Court is "[w]hether the California Court of Appeal erred by holding, in direct conflict with the Ninth Circuit, that a reference to state law in an arbitration agreement governed by the [FAA] requires the application of state law preempted by the [FAA]." Pet. for Writ of Cert.,

*Imburgia,* No. 14–462, 2014 WL 5359805, at *i; *see also* Br. in Opp. to Pet. for Writ of Cert., *Imburgia,* No. 14–462, 2015 WL 455815, at *i (stating the question presented as "[w]hether the Court of Appeal erred in finding that the parties could select state law to the exclusion of federal law to determine the enforceability of a class action waiver"). Plaintiff here does not suggest how this question relates to the instant case. Neither party ever raised this contract interpretation issue on Verizon's initial motion to compel, nor did the Court base its decision on any consideration of such an issue. Indeed, the arbitration clause at issue here makes no reference to state law whatsoever. The most analogous clause in the Amended Agreement provides that "[i]f for some reason the prohibition on class arbitrations ... cannot be enforced, then the agreement to arbitrate will not apply." Amended Agreement § 18.7. The agreement otherwise plainly provides that "[t]he Federal Arbitration Act applies to this agreement." *Id.* at § 18.1. In *Imburgia,* the California Court of Appeal found that an agreement with nearly identical language to that at issue here was "readily distinguishable" from the agreement at issue there because it did not "involve[ ] an arbitration agreement that specifically provides that the enforceability of the class action waiver is to be decided under state law." 🚩 *Imburgia,* 170 Cal.Rptr.3d at 196 (distinguishing 🚩 *Litman v. Cellco P'ship,* 655 F.3d 225, 231 n. 8 (3d Cir.2011)). For the same reason, it is difficult to see how the Supreme Court's decision in *Imburgia* would affect the outcome of the instant case, much less how it involves a question of law that would be "controlling" here. 28 U.S.C. § 1292(b). Indeed, Plaintiff himself recognizes that "any decision rendered by the United States Supreme Court in *DirecTV Inc. v. Imburgia* may not directly impact the dispositive issues here...." Reply at 2.

**\*4** It is also unclear why permitting immediate appeal here would "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Plaintiff does not address this statutory element in any way, though the implication raised in his reply brief is that the Supreme Court's decision in *Imburgia*-which will not be heard until the Court's next term commencing in October, Reply at 2 n. 1–may somehow overturn the February Order and "obviate [ ]" arbitration. Reply at 2. This is simply insufficient. *See, e.g., In re Goldman Sachs Grp., Inc. Sec. Litig.,* No. 10–CV3461 (PAC), 2014 WL 5002090, at *2 (S.D.N.Y. Oct.7, 2014) ("the mere possibility that a reversal of the Court's order would end the case is insufficient to meet this third element.... This onesided argument fails to take into account the (just as likely) possibility that certification will delay the action further."); 🚩 *Murray v. UBS Sec., LLC,* No. 12–CV–5914 (KPF), 2014 WL 1316472, at *7 (S.D.N.Y. Apr.1, 2014) ("it is safe to assume that the appeal process will take longer than the arbitration, thereby extending the time in which a final decision on the merits is rendered").

Furthermore, allowing certification of the February Order "would be inconsistent with the national policy favoring arbitration, and the Second Circuit's distaste for delaying the arbitral process through appellate review." 🚩 *Murray,* 2014 WL 1316472, at *8 (internal quotation marks and citations omitted). "This, too, militates in favor of denying Plaintiff's motion." *Id.; see also, e.g.,* 🚩 *Ryan, Beck & Co., LLC v. Fakih,* 275 F.Supp.2d 393, 398 (E.D.N.Y.2003) (denying motion for interlocutory appeal, noting that "the Second Circuit observed in *Salim Oleochemicals v. M/V Shropshire,* 278 F.3d 90, 93 (2d Cir.2002), [that] an important policy consideration is the 'proarbitration tilt' of ... the [FAA] ... [and that] [u]nnecessary delay of the arbitral process through appellate review is disfavored" (internal quotation marks omitted)).

Plaintiff's request for interlocutory appeal is thus denied.[2]

## CONCLUSION

Plaintiff's motion for reconsideration and request for interlocutory appeal are denied. The Clerk of Court is respectfully requested to close the motion pending at Docket No. 26.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1729796

# Footnotes

1    Plaintiff did not raise the issue of interlocutory appeal in his initial motion papers nor separately move for such relief. Instead, he raised it for the first time in his reply brief. "Generally, a court '[does] not consider issues raised in a reply brief for the first time because if a [party] raises a new argument in a reply brief [the opposing party] may not have an adequate opportunity to respond to it.' " *Evergreen Nat. Indem. Co. v. Capstone Bldg. Corp.,* No. CIV.A. 3–07–CV–1189 (JCH), 2008 WL 926520, at *2 (D.Conn. Mar.31, 2008) (quoting *U.S. v. Pepin,* 514 F.3d 193, 203 n. 13 (2d Cir.2008) (alterations in original). However, since Verizon was afforded the opportunity to file a surreply in response to Plaintiff's new argument, the Court will consider Plaintiffs request for interlocutory appeal as an alternative to his motion for reconsideration. *See Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.,* 611 F.Supp.2d 373, 375 (S.D.N.Y.2009) *aff'd,* 374 F. App'x 71 (2d Cir.2010) ("the Second Circuit has made it abundantly clear that a district court has *discretion* to consider a belatedly-raised argument").

2    In his reply brief, Plaintiff also reprises his arguments regarding the factual distinctions between this case and *Mayer,* as well as his contention that the February Order will result in "enormous" adverse effects. Reply at 2, 3. It is unclear if these contentions are meant to bolster his arguments for reconsideration or interlocutory appeal. If the former, those arguments fail for the reasons discussed above. If the latter, nowhere does Plaintiff articulate how these points of disagreement with the February Order meet the three elements of section 1292(b). Having failed to even attempt to meet his burden under the statute, and given the "presumptive[ ] disfavor[ ]" of interlocutory appeals, *Garber,* 2014 WL 4716068, at *1, particularly in the context of the "national policy favoring arbitration," *Murray,* 2014 WL 1316472, at *8, as well as the Court's "unfettered discretion to deny certification," *Garber,* 2014 WL 4716068, at *1, Plaintiff's request for interlocutory appeal is thus denied on these grounds, as well.

---

**End of Document**                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 22192
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Terre Haute Division.

James R. PRESSLEY, et al., Plaintiffs,
v.
UNITED STATES of America, et al., Defendants.

No. 2:21-cv-00202-JMS-MG
|
Signed January 3, 2023

**Attorneys and Law Firms**

James R. Pressley, Kernersville, NC, Pro Se.

Darryl Worthen, Terre Haute, IN, Pro Se.

Nijul Alexander, Terre Haute, IN, Pro Se.

Brandon Brown, Greenville, IL, Pro Se.

Keith Napier, Terre Haute, IN, Pro Se.

Amin Ricker, Tucson, AZ, Pro Se.

Jasen Dushane, Terre Haute, IN, Pro Se.

Anthony Strong, Belleville, IL, Pro Se.

Shakur Ali, Terre Haute, IN, Pro Se.

Shelese M. Woods, United States Attorney's Office,
Indianapolis, IN, for Defendant United States of America.

**ORDER ON MOTIONS TO DISMISS**

Jane Magnus-Stinson, Judge

*1 The Plaintiffs in this case, prisoners currently
incarcerated in Federal Bureau of Prisons (BOP) facilities,
brought suit after contracting COVID-19 at the United States
Penitentiary in Terre Haute, Indiana (USP Terre Haute) in
2020. They allege that the Defendants acted negligently and
with deliberate indifference to the risk of spreading the virus.
The Individual Defendants have moved to dismiss the claims
against them pursuant to Bivens v. Six Unknown Narcotics
Agents, 403 U.S. 388 (1971). The United States of America
has moved to dismiss the Federal Tort Claims Act ("FTCA")

claim against it. For the reasons below, the motion is **granted
in part and denied in part**.

**I.**

**Factual Background**

In deciding the motion, the Court accepts as true the
allegations in the Plaintiff's Amended Complaint. Dkt. 58.
They allege that large outbreaks of COVID-19 occurred at
USP Terre Haute in the fall of 2020 due to the prison's failure
to test staff for the infection, allowing ill staff to work without
masks, and failing to follow health and safety protocols
including proper quarantining. They further allege that they
were denied any medical treatment for their symptoms when
the contracted the virus.

**II.**

**Legal Standard**

**A. Standard on a Rule 12(b)(6) Motion**
To survive a motion to dismiss, a complaint need only
"contain sufficient factual matter, accepted as true, to 'state
a claim to relief that is plausible on its face.' " Ashcroft
v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic
v. Twombly, 550 U.S. 544, 570 (2007)). In reviewing the
sufficiency of a complaint, the Court must accept all well-
pled facts as true and draw all permissible inferences in the
plaintiff's favor. See Tucker v. City of Chicago, 907 F.3d 487,
491 (7th Cir. 2018).

**III.**

**The Individual Defendants' Motion to Dismiss**

**A. Plaintiffs Ricker and Pressley's Standing**
The Individual Defendants argue that Plaintiffs Pressley and
Ricker's claims against them must be dismissed because
Mr. Pressley and Mr. Ricker lack standing. The Individual
Defendants also point to 42 U.S.C. § 1997e(e)'s barring
a prisoner's claims "for mental or emotional injury suffered

while in custody without a prior showing of physical injury or the commission of a sexual act."

The U.S. Constitution authorizes federal courts to decide all cases and controversies that arise under federal law. U.S. Const. art. III, § 2. However, there are several limitations. One of them is standing. *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) ("One essential aspect of [Article III's case or controversy requirement] is that any person invoking the power of a federal court must demonstrate standing to do so."). The test for standing is whether the party "demonstrate[s] an injury in fact that is traceable to the defendant and is redressable by a court ruling." *Big Shoulders Capital LLC v. San Luis & Rio Grande Railroad, Inc.*, No. 19-3234, 13 F.4th 560, 568 (7th Cir. 2021).

Plaintiff Ricker concedes that he did not plead either that he was diagnosed with COVID-19 or suffered any COVID-19 symptoms, and that his standing to bring a *Bivens* claim is thus "impaired." Dkt. 106 at 8. Therefore, the Individual Defendants' motion to dismiss, dkt. [98], is **granted to the extent** Plaintiff Ricker's claims against the Individual Defendants are **dismissed**.

**\*2** On the other hand, Plaintiff **Pressley** alleged in the Amended Complaint that he suffered unspecified COVID-19 symptoms. The Individual Defendants argue that he has failed to adequately allege that he suffered a physical injury and therefore his claims must be dismissed. Dkt. 109 at 2-3. But the Seventh Circuit has held that the physical injury requirement is not a prerequisite to filing suit. *Smith v. Peters*, 631 F.3d 418, 421 (7th Cir. 2011) (quoting *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003)). The Individual Defendants' motion to dismiss, dkt. [98], is **denied to the extent** it seeks the dismissal of Plaintiff **Pressley's** claims against the Individual Defendants in the basis of standing. [1]

### B. Plaintiff Ali's Filing Fee

Finally, the Individual Defendants argue that Plaintiff Ali's claims must be dismissed because he has not paid the filing fee. The Court notes that Mr. Ali originally dismissed his claims in this action before paying the filing fee because the original complaint did not raise an FTCA claim. Dkt. 40. After the Court recruited counsel to represent the Plaintiffs, Mr. Ali rejoined the plaintiffs in the amended complaint. Dkt. 58. The Individual Defendants' motion to dismiss, dkt. [98], is **denied to the extent** it seeks the dismissal of Mr. Ali's claims.

However, Mr. Ali shall have **through February 3, 2023**, in which to pay the $402 filing fee. *See* dkt. 38 (denying Mr. Ali's motion for leave to proceed *in forma pauperis* because his trust account reflected that he had sufficient funds to pay the filing fee).

### C. *Bivens* Claims

There is no Congressional authority to award damages against federal officials who violate the Constitution while acting under color of federal law. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). Fifty years ago, the Supreme Court held in *Bivens* that district courts have the implied authority to award damages against federal officials for unreasonable searches and seizures in violation of the Fourth Amendment. 403 U.S. at 397.

That implied authority was subsequently extended twice: first to actions alleging gender discrimination in federal employment in violation of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 249 (1979), and second to actions alleging deliberate indifference to a prisoner's serious medical needs in violation of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 24 (1980). But these "three cases —*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 137 S. Ct. 1843 at 1855.

In the past **four** decades, the Court has declined to create any new contexts for *Bivens* claims. *Egbert v. Boule*, 142 S. Ct. 1793, 1799-1800 (2022) (listing cases). Expanding *Bivens* to a new context is now a "disfavored judicial activity." *Ziglar*, 137 S. Ct. at 1857.

To determine whether a *Bivens* remedy is available to a plaintiff suing a federal actor, the Court makes a two-step inquiry. First, it asks whether the claim presents a new *Bivens* context by determining whether "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Ziglar*, 137 S. Ct. at 1864.

Second, if the claim presents a new *Bivens* context, the Court then asks whether there are any special factors that counsel hesitation about granting the extension. *Egbert*, 142 S. Ct. at 1803. In applying the second factor, a district court "faces

only one question: whether there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1805 (cleaned up). Additionally, "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure.' " *Id.* at 1804 (quoting *Ziglar*, 137 S. Ct. at 1858). And this is true even if the individual plaintiff alleges he does not have access to the alternative remedy. *Id.* at 1807 ("[W]hether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts.").

**\*3** The Individual Defendants argue that the claims against them present a new *Bivens* context, and special factors counsel against expanding *Bivens* to that claim. The Plaintiffs concede that, under current legal precedent, their claims present a new *Bivens* context, and they do not argue either way whether any special factors counsel against expanding *Bivens* to their claims. Dkt. 106 at 9.

The Court finds that the availability of alternative remedies forecloses a *Bivens* action for the plaintiffs' claims. The Bureau of Prison's administrative remedy process, 28 C.F.R. § 542.10 *et seq.*, provides inmates with the ability to seek formal review of any complaint related to the conditions of their confinement. Additionally, in *Ziglar*, the Supreme Court recognized the availability of injunctive relief to address conditions-of-confinement claims. 137 S. Ct. at 1862. The Court therefore declines to extend a damages remedy for the plaintiffs' Eighth Amendment claims. The Individual Defendants' motion to dismiss, dkt. [98], is **granted to the extent** that claims against the Individual Defendants are **dismissed**, and the **clerk is directed** to terminate them as defendants on the docket. [2]

### IV.

### The **United States'** Motion to Dismiss

The Federal Tort Claims Act ("FTCA") provides that the **United States** is liable for money damages for personal injury caused by the negligent or wrongful act or omission of any employee of the **United States** while acting within the scope of his or her employment if a private person would be liable

to the claimant under the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1).

The **United States** argues that the Plaintiffs' FTCA claims should be dismissed because they are barred by Indiana state law and the FTCA's quarantine exception. Dkt. 101.

### A. Indiana COVID-19 Immunity Statute

Indiana Code § 34-30-32-6 provides immunity to certain civil actions arising from COVID-19. It **states** the following:

> Subject to the other provisions of this chapter, a person is immune from civil tort liability for damages arising from COVID-19:
>
> (1) on the premises owned or operated by the person;
>
> (2) on any premises on which the person or an employee or agent of the person provided property or services to another person; or
>
> (3) during an activity managed, organized, or sponsored by the person.

However, Chapter 32 Section 7 **states**: "This chapter does not grant immunity from civil tort liability to a person whose actions or omissions constitute gross negligence or willful or wanton misconduct (including fraud and intentionally tortious acts) as proven by clear and convincing evidence." Ind. Code Ann. § 34-30-32-7.

Thus, the **United States** will be liable in civil actions for damages arising from COVID-19 in Indiana only if its actions constitute gross negligence or willful or wanton misconduct. To constitute gross negligence, a plaintiff must prove the defendant consciously breached a duty owed with a reckless disregard of the consequences as affecting the life of another. *N. Indiana Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 466 (Ind. 2003). Whether a duty of care is owed is a question of law, and whether a particular act or omission is a breach of duty is a question of fact for the jury. *Id.*

**\*4** The Amended Complaint pleads sufficient facts for the trier of fact to ultimately determine that USP Terre Haute employees recklessly disregarded the consequences of their indifference for the health and life of the plaintiffs. The **United States** concedes that the Amended Complaint raises claims of gross negligence against Defendants Joslyn and Sutter for knowingly reporting to work with COVID-19.

Dkt. 110 at **4**. But they argue that the Plaintiffs' claims for negligence related to the lack of medical care they received are barred because there was no medication to treat COVID-19 in 2020. In support of this argument, the **United States** cites to a Harvard Medical Review article. *Id.* This sort of factual development outside the pleadings is inappropriate in a motion to dismiss. The **United States**' arguments as to the standard of care for COVID-19 symptoms in 2020 are better suited for summary judgment following the development of an evidentiary record.

**B. FTCA'S Quarantine Exception**

The FTCA exempts various claims from its broad waiver of sovereign immunity, including "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the **United States**." 28 U.S.C. § 2680(f). The **United States** argues that this exception applies to the handling of the COVID-19 pandemic in 2020. In support of this argument, the Defendant cites to several out-of-circuit cases regarding the quarantining of livestock by the USDA. *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445 (5th Cir. 2020) (USDA quarantined cattle for fever ticks); *Rey v. United States*, 484 F.2d **45**, **46-48** (5th Cir. 1973) (USDA quarantined hogs for cholera, some of which died after being vaccinated).

The **United States** acknowledges that there is scant caselaw applying the quarantine exception to humans. Dkt. 101 at 12.[3] The one case cited by the **United States** applying the exception to the COVID-19 pandemic was decided by the Eastern District of North Carolina. *Wallace v. United States Dep't of Just.*, No. 5:21-ct-3035-D, 2021 **WL** 2853692, at *1 (E.D.N.C. June 24, 2021), *aff'd*, No. 21-7017, 2022 **WL** 1024613 (4th Cir. Apr. 6, 2022).

The questions of whether—and if so, how—the quarantine exception applies to humans in the context of the COVID-19 pandemic has not been addressed by the Seventh Circuit. This Court is reluctant to rely on a single district court case outside the Seventh Circuit, or to conclude that the Plaintiffs' claims – raised by human beings - in this case are barred by an exception that has previously only been applied to livestock. The exception is an affirmative defense, and the application

of it to the Plaintiffs' claims is not clear enough to dismiss the claims without discovery. *Parrott v. United States*, 536 F.3d 629, 634–35 (7th Cir. 2008).

For these reasons, the **United States**' motion to dismiss, dkt. [100], is **denied**. However, the Plaintiff's FTCA claims are limited by state law to gross negligence.

## V.

### Conclusion

In summary, the Individual Defendants' motion to dismiss, dkt. [98], is **granted in part and denied in part**. The motion is **granted to the extent** it seeks to dismiss claims against them brought by Plaintiff Ricker for lack of standing. The motion is **denied to the extent** it seeks to dismiss claims against them brought by Plaintiffs **Pressley** and Ali on the basis of lack of standing and failure to pay the filing fee respectively. The motion is **granted to the extent** that all claims against the Individual Defendants are **dismissed**. The **clerk is directed** to terminate Defendants T. Taylor, Tracey Joslyn, A. Hill, and Sutter on the docket. No partial final judgment shall issue at this time.

The **United States**' motion to dismiss, dkt. [100], is **denied.** Accordingly, the Plaintiffs' FTCA claims shall proceed but are limited to gross negligence by Indiana law. The **United States** shall have **through January 17, 2023**, in which to answer the amended complaint.

 **\*5** Plaintiff Ali shall have **through February 3, 2023**, in which to pay the $402 filing fee. If Mr. Ali fails to timely pay the full filing fee, his claims may be dismissed without further notice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 22192

### Footnotes

1     The **United States** did not move to dismiss either Plaintiff Ricker's or Plaintiff **Pressley's** FTCA claims on the basis of standing, thus the claims shall proceed.

2     Although Defendant Hill did not appear or answer the complaint, all claims against him are dismissed under the same precedent that leads to the dismissal of the *Bivens* claims against the other Individual Defendants. Furthermore, under 28 U.S.C. § 1915A(b), the Court must dismiss any claim that is frivolous or malicious, fails to state a claim for relief, or seeks monetary relief against a defendant who is immune from such relief. Because the Plaintiffs have conceded that their claims against the Individual Defendants present a new *Bivens* context, there is no indication that they would be able to state a viable claim against Defendant Hill.

3     Despite the dearth of caselaw, the Court is disturbed by the **United States**' resort to analogizing inmates to livestock.

---

**End of Document**            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by    Pressley v. United States,    S.D.Ind.,    January 3, 2023

2021 WL 2853692
Only the Westlaw citation is currently available.
United States District Court, E.D. North Carolina,
Western Division.

Walter W. WALLACE IV, Plaintiff,

v.

UNITED STATES DEPARTMENT
OF JUSTICE, et al., Defendants.

No. 5:21-CT-3035-D
|
Signed 06/24/2021

**Attorneys and Law Firms**

Walter W. Wallace, IV, Butner, NC, Pro Se.

**ORDER**

JAMES C. DEVER III, United States District Judge

*1 On January 27, 2021, Walter W. Wallace IV ("Wallace"), a federal inmate proceeding pro se and in forma pauperis, filed this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–80, and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). See [D.E. 1, 2, 8]. Wallace has submitted the declarations of two other inmates and exhibits in support of his complaint [D.E. 1-2, 1-3, 1-4], and has supplemented his complaint with his own declaration [D.E. 12]. Wallace moves for a temporary restraining order or preliminary injunction [D.E. 4, 11], to seal the case [D.E. 4], for "[d]iscovery [p]ursuant to Fed. R. Civ. P. 56(d)" [D.E. 5], and for assignment of the action to Magistrate Judge Kimberly A. Swank [D.E. 6]. As explained below, the court dismisses the complaint and denies Wallace's motions.

I.

Courts must review complaints in civil actions in which prisoners seek relief from a governmental entity or officer and dismiss a complaint if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. §§ 1915A(a), (b)(1). A frivolous case "lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). Legally frivolous claims are "based on an indisputably meritless legal theory and include claims of infringement of a legal interest which clearly does not exist." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (quotations omitted). Factually frivolous claims lack an "arguable basis" in fact. Neitzke, 490 U.S. at 325.

The standard used to evaluate the sufficiency of the pleading is flexible, "and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (quotation omitted). Erickson, however, does not undermine the "requirement that a pleading contain 'more than labels and conclusions.' " Giarratano v. Johnson, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)); see Ashcroft v. Iqbal, 556 U.S. 662, 677–83 (2009); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255–56 (4th Cir. 2009); Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009).

The court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006). Accordingly, a federal court must determine if a valid basis for its jurisdiction exists and "dismiss the action if no such ground appears." In re Bulldog Trucking, Inc., 147 F.3d 347, 352 (4th Cir. 1998); see Fed. R. Civ. P. 12(h)(3). A party's failure to establish subject-matter jurisdiction may be raised at any time by any party or by the court. See Arbaugh, 546 U.S. at 506–07.

Wallace is incarcerated at the Federal Correctional Institution in Butner, North Carolina ("Butner"). See Compl. [D.E. 1] 2; Pl. Decl. [D.E. 12] ¶ 2. On April 1, 2020, defendant Lyn, a Butner warden, issued "a lock down order that ... immediately ceased and desisted inmate movement especially, dormitory to dormitory movement.... [in] an acknowledgment of the

risk posed by the [corona]virus." [D.E. 1-1] ¶ 35.b; see Furr Decl. [D.E. 1-2] ¶ 3; Evans Decl. [D.E. 1-3] ¶ 3. However, on May 13, 2020, for twenty to thirty minutes, Butner staff "failed to secure the corridor of a quarantine dormitory that had confirmed and/or suspected cases of SARS-n-CoV-2 .... [which] ultimately allowed prisoner[ ]s that were in close contact with confirmed and/or suspected cases of SARS-n-CoV-2 to enter and interact with prisoner[ ]s in a non-active dormitory." [D.E. 1-1] ¶ 4; see Furr Decl. [D.E. 1-2] ¶ 5; Evans Decl. [D.E. 1-3] ¶ 5; Pl. Decl. [D.E. 12] ¶ 4. The inmates' temporary ability to travel between the two dormitories violated "the Federal Bureau of Prisons General Post-Orders, Guidelines, Policy Memoranda, Training Manual, Captain's Orders, Operation Memorandum, or Covid-19 Action Plan." [D.E. 1-1] ¶ 7; see Pl. Decl. [D.E. 12] ¶ 5. Several inmates notified an associate warden, who "made an announcement for all ... inmates to return to their housing unit[ ]" and "conducted an emergency count to assure all inmates were in their proper assigned unit." Furr Decl. [D.E. 1-2] ¶¶ 7–9; see Evans Decl. [D.E. 1-3] ¶¶ 7-8.

**\*2** "Consequently, [o]n May 22, 2020, [Wallace] tested positive for SARS-n-CoV-2[.]" [D.E. 1-1] ¶ 5; see Pl. Decl. [D.E. 12] ¶ 7. Wallace's asthma "worsen[ed] to the point that a Bureau of Prisons Physician Assistant ... had to prescribe[ ] Albuterol Solution for a nebulizer and the equipment for a nebulizer for shortness of breath." [D.E. 1-1] ¶ 36(a)(2); see Pl. Decl. [D.E. 12] ¶ 9. "More recently, Mr. Wallace was prescribed a course of Prednisone twice for very serious breathing issues. Also, Mr. Wallace has been scheduled to see [a] pulmonologist." Pl. Decl. [D.E. 12] ¶ 9. Additionally, Wallace "did not want to go to sleep because of being afraid that [he] wouldn't wake up." [D.E. 1-1] ¶ 36(a)(6). Wallace also cites other potential long-term effects from the illness which "might in the future require both psychiatric care and prescription drugs for a long period of time." Id. ¶ 36(a)(4).

Wallace names as defendants the United States Department of Justice, [1] Bureau of Prisons Director Michael Carvajal, Wardens Thomas Scarantino and TamaraLyn, Associate Warden Richard Engel, and Correctional Officer Bowers. See Compl. at 3-5; cf. [D.E. 1-1] ¶¶ 11-14 (also naming the Bureau of Prisons as a defendant). Wallace seeks $2.8 million in compensatory and punitive damages. See Compl. at 9.

## II.

### A.

Under the FTCA, the United States waives sovereign immunity for "the negligent or wrongfull act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1); see Millbrook v. United States, 569 U.S. 50, 51 (2013); Levin v. United States, 568 U.S. 503, 506 (2013); Blanco Ayala v. United States, 982 F.3d 209, 214 (4th Cir. 2020); Anderson v. United States, 669 F.3d 161, 164 (4th Cir. 2011); Kerns v. United States, 585 F.3d 187, 194 (4th Cir. 2009). A prisoner "can sue under the [FTCA] to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150, 150 (1963); see Millbrook, 569 U.S. at 52. A plaintiff must "show that an unequivocal waiver of sovereign immunity exists." Welch v. United States, 409 F.3d 646, 651 (4th Cir. 2005). "If the plaintiff fails to meet this burden, then the claim must be dismissed." Id.; see Blanco Ayala, 982 F.3d at 214; Anderson, 669 F.3d at 164.

Unfortunately for Wallace, 28 U.S.C. § 2680(f) "immunizes the Government from suit for damages proximately caused by the decision whether to impose a quarantine and any actions undertaken by the Government to carry out the purposes of the quarantine. The Government retains this immunity even if it acts negligently in carrying out the quarantine." Cascabel Cattle Co. v. United States, No. B-17-61, 2018 WL 5850575, at \*14 (S.D. Tex. Sept. 5, 2018) (unpublished), report and recommendation adopted, 2018 WL 5811007 (S.D. Tex. Nov. 6, 2018) (unpublished), aff'd, 955 F.3d 445 (5th Cir. 2020); see Saxton v. United States, 456 F.2d 1105, 1106 (8th Cir. 1972) (per curiam); cf. Berryman v. Mullen, No. 1:16CV47, 2018 WL 1247878, at \*3 (N.D. W. Va. Mar. 9, 2018) (unpublished). Thus, the court dismisses the claim.

### B.

To establish a prima facie claim that prison conditions violate the Eighth Amendment, a plaintiff must show "(1) that the deprivation of a basic human need was objectively

sufficiently serious, and (2) that <u>subjectively</u> the officials acted with a sufficiently culpable state of mind." *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013) (quotation and alterations omitted); *see Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Scinto v. Stansberry*, 841 F.3d 219, 225–26 (4th Cir. 2016); *Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997); *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). The objective prong requires the prisoner to show that "the deprivation of [a] basic human need was objectively sufficiently serious." *Strickler*, 989 F.2d at 1379 (emphasis and quotation omitted); *see Scinto*, 841 F.3d at 225. "Only an extreme deprivation, that is, a serious or significant physical or emotional injury resulting from the challenged conditions, or substantial risk thereof, will satisfy the objective component of an Eighth Amendment claim challenging the conditions of confinement." *De'lonta*, 708 F.3d at 525 (quotation omitted); *see Scinto*, 841 F.3d at 225.

**\*3** The subjective prong requires the prisoner to show that the prison official acted with deliberate indifference to the inmate's health or safety. *See, e.g.*, *Farmer*, 511 U.S. at 834–35; *Scinto*, 841 F.3d at 225; *De'lonta*, 708 F.3d at 525; *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998); *Strickler*, 989 F.2d at 1379. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause...." *Whitley v. Albers*, 475 U.S. 312, 319 (1986), abrogated on other grounds by *Wilkins v. Gaddy*, 559 U.S. 34 (2010); *see Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991). Deliberate indifference "sets a particularly high bar to recovery." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). "The Eighth Amendment does not require FBOP officials to take all conceivable steps to prevent the spread of COVID-19, provided their response to the virus remains reasonable." *Hallinan v. Scarantino*, 466 F. Supp. 3d 587, 607 (E.D.N.C. 2020).

Wallace has failed to state a constitutional claim. "Isolated incidents of failure to follow quarantine policy are not sufficient, in this context, to establish an Eighth Amendment violation." *Id.* at 606 n.7 (citations omitted). To the extent Wallace relies on "Post-Orders, Guidelines, Policy Memoranda, Training Manual, Captain's Orders, Operation Memorandum, or Covid-19 Action Plan[,]" [D.E. 1-1] ¶ 17, as demonstrating deliberate indifference on the part of prison officials, a violation of a prison policy that does not result in a constitutional violation does not create a viable *Bivens* claim.

*See, e.g.*, *Danser v. Stansberry*, 772 F.3d 340, 348 (4th Cir. 2014); *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (unpublished). Thus, the court dismisses the claim.

### III.

Wallace moves for a temporary restraining order or preliminary injunction ordering defendants "and any other Bureau of Prisons official/person[nel] in their official capacities ... to Cease and Desist any and all retaliatory conduct in light of this filing of Civil lawsuit." [D.E. 4] 1; *see* [D.E. 11] 1, 3–6. The court has considered the motions under the governing standard. *See, e.g.*, Fed. R. Civ. P. 65(a), (b); *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–45 (2018) (per curiam); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), vacated, 559 U.S. 1089 (2010), reissued in relevant part, 607 F.3d 355 (4th Cir. 2010) (per curiam). Wallace has not plausibly alleged that he is likely to succeed on the merits, that he is likely to suffer irreparable harm absent injunctive relief, that the balance of equities tips in his favor, or that an injunction is in the public interest. Thus, the court denies the motion.

As for Wallace's motion to seal the case [D.E. 4], the court has considered the motion to seal under the governing standard. *See, e.g.*, *Doe v. Pub. Citizen*, 749 F.3d 246, 272–73 (4th Cir. 2014). The court denies the motion to seal. The court denies as moot Wallace's motion for assignment of the action to Magistrate Judge Swank [D.E. 6], cf. E.D.N.C. Civ. R. 72.2(b)(1), and denies as moot Wallace's motion for discovery.

### IV.

In sum, the court DISMISSES the action in part for lack of jurisdiction and in part for failure to state a claim under 28

U.S.C. § 1915(e)(2)(B), and DENIES the pending motions [D.E. 4, 5, 6, 11]. The clerk shall close the case.

SO ORDERED. This 24th day of June 2021.

**All Citations**

Slip Copy, 2021 WL 2853692

## Footnotes

1    The United States is the only proper party in an FTCA action. See ⚑ 28 U.S.C. § 2674; ⚑ Iodice v. United States, 289 F.3d 270, 273 n.1 (4th Cir. 2002).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML    Document 51    Filed 02/09/23    Page 396 of 396

**Wallace v. United States Department of Justice, Not Reported in Fed. Rptr. (2022)**

2022 WL 1024613
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

Walter W. WALLACE, IV, Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT OF
JUSTICE; Michael Carvajal; Thomas
Scarantino; Dr. Tamara S. Lyn; Richard Engel;
Officer Bowers, Defendants - Appellees.

No. 21-7017
|
Submitted: March 15, 2022
|
Decided: April 6, 2022

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:21-ct-03035-D)

**Attorneys and Law Firms**

Walter W. Wallace, IV, Appellant Pro Se.

Before WILKINSON, QUATTLEBAUM, and RUSHING, Circuit Judges.

**Opinion**

Affirmed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

**\*1**  Walter W. Wallace, IV, appeals the district court's order denying relief on his complaint filed pursuant to the Federal Tort Claims Act, 🚩28 U.S.C. §§ 1346(b)(1), 🚩2671-🚩2680, and 🚩*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). We have reviewed the record and find no reversible error. Accordingly, we affirm the district court's order. *Wallace v. U.S. Dep't of Just.*, No. 5:21-ct-03035-D (E.D.N.C. June 24, 2021). We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 1024613

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.