UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JOSHUA G. STEGEMANN,

                              Plaintiff,

                                                        9:21-CV-0949
v.                                                      (MAD/ML)

UNITED STATES OF AMERICA,

                              Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

JOSHUA G. STEGEMANN
    *Pro Se* Plaintiff
Butner Low Federal Corr. Inst.
Post Office Box 999
Butner, North Carolina 27509

CARLA B. FREEDMAN                                     EMER M. STACK, ESQ.
United States Attorney                                Assistant United States
    Counsel for Defendant                             Attorney
100 South Clinton Street, Suite 9000
Syracuse, New York 13261


MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

        Currently before the Court, in this civil rights action filed by Joshua G. Stegemann

("Plaintiff") against the United States of America ("Defendant"), is Defendant's motion to

dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for

summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 88.)  For the reasons set forth

below, I recommend that Defendant's motion to dismiss for lack of subject matter jurisdiction be

granted.

I.      **RELEVANT BACKGROUND**

A.      **Plaintiff's Claims**

At this procedural posture, Plaintiff asserts one claim of negligence pursuant to the Federal Tort Claim Act ("FTCA") against Defendant regarding Plaintiff's contraction of COVID-19 at Federal Correctional Institution ("FCI") Ray Brook in December 2020.  (Dkt. Nos. 9, 56.)

B.      **Parties' Briefing on Defendant's Motion**

1.      **Defendant's Motion to Dismiss and for Summary Judgment**

Generally, in support of its motion to dismiss and for summary Judgment, Defendant asserts the following three arguments: (1) the Court lacks subject matter jurisdiction over Plaintiff's FTCA claim because the challenged conduct falls within FTCA's discretionary function exception; (2) in the alternative, the quarantine exception to the FTCA deprives the Court of subject matter jurisdiction; and (3) the United States is otherwise entitled to summary judgment on Plaintiff's negligence claim because there is no evidence in the record to establish that Defendant's officials breached a duty of care owed to Plaintiff or that such breach caused his claimed injury of a COVID-19 infection.  (Dkt. No. 88, Attach. 1 at 16-27.)

More specifically, with respect to its first argument, Defendant asserts that the Bureau of Prisons' ("BOP") Phased Action Plan contained guidance with best practices and general principles directed to individual facilities—like FCI Ray Brook where Plaintiff was housed—to consider in formulating their responses to COVID-19.  (Dkt. No. 88, Attach. 1 at 17-24.)  In addition, Defendant argues that numerous federal courts have held that the discretionary function exception barred FTCA claims stemming from BOP's response to the COVID-19 pandemic. (*Id*.)

With respect to its third argument, Defendant asserts that nothing in the record establishes that Defendant owed a legal duty to Plaintiff to engage in particular testing or quarantining procedures. (Dkt. No. 88, Attach. 1 at 25-27.) Moreover, Defendant argues that the record lacks any evidence about how FCI Ray Brook employees' purported breach of a duty allegedly caused Plaintiff's COVID-19 infection. (*Id*.)

### 2.    Plaintiff's Opposition

Generally, in opposition to Defendant's motion, Plaintiff asserts the following three arguments: (1) Defendant was mandated to test and quarantine newly arriving prisoners before co-mingling those new prisoners with those already confined at FCI Ray Brook and thus, the discretionary function does not apply; (2) Defendant's attempt to resurrect the quarantine exception defense is foreclosed by its failure to object to this aspect of the undersigned's report and recommendation; and (3) Defendant's failure to ensure that the hold-over prisoners tested negative for COVID-19 before it accepted them from the United States Marshals Service in accordance with BOP's mandates caused Plaintiff's COVID-19 infection and subsequent injuries. (Dkt. No. 92 at 3-8.)

In asserting that the discretionary function exception is not applicable, Plaintiff also argues that an Eighth Amendment claim is not cognizable under the FTCA and his allegations—that Defendant failed to comply with mandates to test and quarantine incoming prisoners which therefore exposed Plaintiff to the deadly COVID-19 infection—rose to the level of an Eighth Amendment violation. (Dkt. No. 92 at 6-7.)

### 3.    Defendant's Reply in Further Support

Generally, in further support of its motion to dismiss and for summary judgment, Defendant asserts the following three arguments: (1) Plaintiff's response to Defendant's

statement of material facts is defective because it contains (a) admissions that are followed by additional statements or arguments, (b) denials of fact that are not supported by citations to the record, and (c) responses that do not clearly contain an admission or denial; (2) Plaintiff's reliance on evidence and witnesses not disclosed—more specifically his use of affidavits from Gregory Thomas, Robert Brown, Dushawn Gardner, and Kyle Kerr, who were not identified as witnesses—in discovery is improper and any such evidence should be stricken; and (3) Plaintiff failed to identify a genuine issue of material fact warranting denial of Defendant's motion to dismiss and for summary judgment because (a) the discretionary function applies and the presence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion, (b) Plaintiff's newly asserted Eighth Amendment claim should be disregarded, the only remaining claim is for negligence under the FTCA, (c) the quarantine exception defense should apply and Defendant is not foreclosed from asserting it on summary judgment merely because the Court previously rejected the argument without prejudice at the motion to dismiss stage, and (d) Defendant is entitled to summary judgment on Plaintiff's negligence claim where, as here, no reasonable factfinder could conclude that Defendant was negligent.  (Dkt. No. 94 at 3-12.)

### 4.    Plaintiff's Surreply in Further Opposition

Generally, in his surreply, Plaintiff argues that Defendant has not been prejudiced by the late disclosure of his witnesses.  (Dkt. No. 96.)  More specifically, Plaintiff argues that pursuant to Fed. R. Civ. P. 26 he is exempt from the initial disclosure requirements and he has not intended to gain a tactical advantage.  (*Id*.)  Plaintiff argues that instead, he has been moved around to five different BOP facilities since June 2023, and was merely trying his best to respond to Defendant's voluminous summary judgment motion.  (*Id*.)  Plaintiff argues that Mr. Kerr's

affidavit was previously filed in this case and, in any event, each of the affiant witnesses remain in the custody of BOP and are readily available to Defendant. (*Id.*)

**C.    Defendant's Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendant in their Statement of Material Facts (Dkt. No. 88, Attach. 38) and not denied by Plaintiff in his response (Dkt. No. 92 at 10-18.)

<u>Background</u>

1.    Plaintiff is a 46-year-old inmate in the custody of the Bureau of Prisons, serving an aggregate 360-month term of imprisonment, to be followed by a life term of supervised release, for his convictions of possession of cocaine, heroin, and oxycodone with intent to distribute, as well as possession of firearms and ammunition by a convicted felon.

2.    Plaintiff commenced this lawsuit by filing a complaint on August 23, 2021, followed by an Amended Complaint on December 9, 2021.

3.    Plaintiff's only remaining claim, arising under the Federal Tort Claims Act, is one of negligence, based on an allegation that the BOP caused him to contract COVID-19 in December 2020.

<u>Covid-19 Response by BOP and FCI Ray Brook</u>

4.    During the COVID-19 pandemic, BOP issued guidance based on information received from the Centers for Disease Control and Prevention ("CDC"), the Occupational Safety and Health Administration ("OSHA"), and other relevant agencies and organizations for BOP's 122 facilities to implement.

5.      The BOP issued a multi-phase national approach to the COVID-19 pandemic, called the "Action Plan," which was issued to all BOP institutions.[1]

6.      In January 2020, the BOP became aware of the first identified COVID-19 cases in the United States and took steps to prevent its introduction and spread in BOP institutions.[2]

7.      The BOP's Action Plan occurred over "phases," which reflected BOP's modifications and adjustments in its response to the pandemic as circumstances changed, and at the guidance and direction of worldwide health authorities.[3]

<u>Phase One Action Plan</u>

8.      In January 2020, BOP began Phase One of its Action Plan for COVID-19.[4]

9.      Phase One activities included, among other things, seeking guidance from the BOP's Health Services Division regarding the COVID-19 disease and its symptoms, where in the United States infections were occurring, and the best practices to mitigate its transmission.[5]

10.      In Phase One, an agency task force was established to begin strategic planning for COVID-19 BOP-wide, which included building on the BOP's existing procedures for pandemics, such as implementing its pre-approved Pandemic Influenza Plan.[6]

---

[1]      Plaintiff disputes this fact because he asserts that FCI Ray Brook failed to comply with the Action Plan.  (Dkt. No. 92 at 10-11.)  However, that does not contradict the fact asserted here.

[2]      *See*, *supra*, note 1.

[3]      *See*, *supra*, note 1.

[4]      *See*, *supra*, note 1.

[5]      *See*, *supra*, note 1.

[6]      *See*, *supra*, note 1.

11.     BOP coordinated its COVID-19 efforts with subject-matter experts both internal and external to the agency, including implementing guidance and directives from the WHO, the CDC, the Office of Personnel Management ("OPM"), the Department of Justice ("DOJ"), and the Office of the Vice President.[7]

Phase Two Action Plan

12.     On March 13, 2020, BOP implemented Phase Two of its Action Plan.[8]

13.     Phase Two outlined guidance for certain restrictions across all BOP facilities over a 30-day period, to be reevaluated upon the conclusion of that time.  The restrictions included suspending the following activities for an initial period of 30 days, with certain limited exceptions: social visits, legal visits, inmate facility transfers, official staff travel, staff training, contractor access, volunteer visits, and tours.[9]

14.     The Phase Two Action Plan advised continued screening of inmates for COVID-19.  In addition, the Phase Two Action Plan advised that all newly arriving inmates be screened for COVID-19 symptoms and "exposure risk factors."[10]

15.     The Phase Two Action Plan also advised that asymptomatic inmates with exposure risk factors be quarantined, and symptomatic inmates with exposure risk factors be isolated and evaluated for possible COVID-19 testing by local BOP medical providers.[11]

---

[7]     *See*, *supra*, note 1.

[8]     *See*, *supra*, note 1.

[9]     *See*, *supra*, note 1.

[10]     *See*, *supra*, note 1.

[11]     *See*, *supra*, note 1.

16.     The Phase Two Action Plan also outlined practices for screening of staff for COVID-19, including undergoing "enhanced health screening" in areas of "sustained community transmission," as determined by the CDC and at medical referral centers.  The enhanced screening measures included self-reporting by any staff of symptoms consistent with COVID-19, as well as any known or suspected COVID-19 exposure*,* and further checking of staff temperature upon entry into any BOP facility.[12]

17.     The Phase Two Action Plan advised that facilities should implement "modified operations" to maximize social distancing within BOP facilities, as much as was practicable.  For example, the Phase Two Action Plan suggested staggered meal and recreation times to limit congregate gatherings.[13]

18.     Phase Two Action Plan also included guidance for quarantine and isolation procedures for known or potential cases of COVID-19.[14]

<u>Phase Three Action Plan</u>

19.     On March 18, 2020, BOP implemented Phase Three of its COVID-19 Action Plan, which provided for telework for employees at BOP locations that perform administrative services (i.e., non-prison locations).[15]

<u>Phase Four Action Plan</u>

20.     On March 26, 2020, BOP implemented Phase Four of its Action Plan.

---

[12]     *See*, *supra*, note 1.

[13]     *See*, *supra*, note 1.

[14]     *See*, *supra*, note 1.

[15]     *See*, *supra*, note 1.

21.    In Phase Four, the BOP revised its preventative measures for all institutions, and updated its quarantine and isolation procedures to require that all newly admitted inmates to the BOP, whether in areas of sustained community transmission or not, to be assessed using a screening tool and temperature check.

22.    Under Phase Four, all new arrivals to any BOP institution—even those who were asymptomatic—were to be placed in quarantine for a minimum of 14 days or until cleared by medical staff.[16]

23.    Under Phase Four, symptomatic inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation.[17]

### Phase Five Action Plan

24.    On March 31, 2020, the BOP implemented Phase Five of its Action Plan, which took effect on April 1, 2020, identifying the following steps to be taken:

    a.    For a 14-day period, inmates in every institution would be secured in their assigned cells/quarters to decrease the spread of the virus.

---

[16]    Plaintiff asserts that he agrees with the fact asserted but disputes whether "FCI-Ray Brook[] compli[ed] with this stricture." (Dkt. No. 92 at 11.) Plaintiff's attempt to place this asserted fact in context is inappropriate. *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials . . . improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make").

[17]    *See*, *supra*, 16.

b.  During that time, to the extent practicable, inmates should still have access to programs and services offered under normal operating procedures, such as mental health treatment and education.

c.  The BOP was coordinating with the United States Marshals Service ("USMS") to significantly decrease incoming movement during that time.

d.  Limited group gathering would be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System ("TRULINCS") access.[18]

<u>Phase Six Action Plan</u>

25.    On April 13, 2020, the BOP implemented Phase Six of its Action Plan, which reiterated its previously disseminated guidance and extended its Phase Five Action Plan until May 18, 2020.[19]

<u>Phase Seven Action Plan</u>

26.    On May 18, 2020, the BOP implemented Phase Seven of its Action Plan, which reiterated previously disseminated guidance and extended all measures from Phase Six.[20]

<u>Phase Eight Action Plan</u>

27.    On July 1, 2020, the BOP implemented Phase Eight of its Action Plan, which reiterated previously disseminated guidance and extended all measures from Phase Seven.[21]

---

[18]    *See*, *supra*, 16.

[19]    *See*, *supra*, 16.

[20]    *See*, *supra*, 16.

[21]    *See*, *supra*, 16.

28.     Phase Eight advised BOP facilities to designate specific quarantine and isolation areas with capacity numbers commensurate with anticipated levels and frequency of incoming inmates.[22]

29.     Phase Eight advised that new intakes were to be screened for symptoms and tested upon arrival with a COVID-19 test.[23]

30.     Phase Eight advised that inmates who tested negative and were asymptomatic were placed on quarantine for at least 14 days, or if they developed symptoms during that time, they were tested and moved to isolation immediately.[24]

31.     Phase Eight outlined a full test-in/test-out, 14-day quarantine before inmates were transferred between institutions, pursuant to which inmates who developed symptoms or tested positive were not allowed to travel until they met the CDC test-based criteria for release from isolation.

Phase Nine Action Plan

32.     On August 5, 2020, the BOP implemented Phase Nine of its Action Plan, which extended previously disseminated guidelines and outlined new directions for managing the COVID-19 pandemic.[25]

---

[22]     *See*, *supra*, 16.

[23]     *See*, *supra*, 16.

[24]     *See*, *supra*, 16.

[25]     Plaintiff again appears to agree with the fact asserted but "[d]isagree[s] insofar as FCI-Ray Brook failed to comply with these mandatory requirements."  (Dkt. No. 92 at 12.)  As set forth in note 16, Plaintiff's attempt to place the fact asserted in context is inappropriate.

33.     Phase Nine recommended that gathering in groups be limited, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.[26]

34.     According to Phase Nine, BOP limited the movement of inmates and detainees among its facilities.  While movement did increase during this phase, every institution designated its own quarantine location for incoming inmates to prevent or limit the spread of COVID-19.[27]

35.     The Phase Nine Action Plan directed that every newly admitted inmate— including inmates transferring between BOP institutions—would be screened and tested for COVID-19 exposure and symptoms.  The newly admitted inmates were placed in a 14-day quarantine and had to test negative before being released to the general prison population.  Symptomatic or positive inmates were to be placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation.[28]

36.     On August 31, 2020, Phase Nine was modified to provide that social visiting would resume at BOP institutions no later than Saturday, October 3, 2020, in accordance with guidelines to protect the health and safety of all inmates, staff, and visitors.[29]

37.     On November 1, 2020, the BOP advised that it would remain under the Phase Nine Action plan as modified on August 31, 2020, until further notice.[30]

---

[26]     *See*, *supra*, note 25.

[27]     *See*, *supra*, note 25.

[28]     *See*, *supra*, note 25.

[29]     *See*, *supra*, note 25.

[30]     Plaintiff's response states that he agrees in part and disagrees in part but is unclear which part of the fact asserted he agrees to and which he disagrees with.  *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response shall mirror the movant's Statement of Material Facts by *admitting and/or denying* each of the movant's assertions in matching numbered paragraphs.") (emphasis

38.    A printout from BOP's public website, entitled "BOP Modified Operations" dated November 25, 2020—which was attached to Plaintiff's response in opposition to Defendant's previous motion to dismiss—reflects the current operations at BOP as of that date, based on the guidance set forth in Phase Nine.[31]

BOP's COVID-19 Pandemic Response Plan

39.    On or about August 31, 2020, the BOP published its COVID-19 Pandemic Response Plan, version 1.0.  The Pandemic Response Plan was divided into eleven modules based on guidance from the CDC, the WHO, and the DOJ.  Each module was intended to provide an outline of directions for BOP facilities to follow.  The modules included:

a.   Infection Prevention and Control Measures;

b.   Personal Protective Equipment;

c.   Screening and Testing;

d.   Inmate Isolation and Quarantine;

e.   Surveillance;

f.   Inmate Movement;

g.   Non-COVID Routine Medical and Dental Services;

h.   Inmate Programming and Services;

i.   Inmate Visitation;

---

added); *Willis v. Cnty. of Onondaga*, 14-CV-1306, 2016 WL 7116126, at *5 n.10 (N.D.N.Y. Dec. 6, 2016) ("This partial denial is ineffective . . . [because] it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3)."); *In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("[A] response contending to neither admit or deny an allegation does not create a genuine issue of fact.").  Moreover, Plaintiff again appears to improperly attempt to place the fact in context by stating that "FCI-Ray Brook did not comply with those mandatory requirements during that time frame."  (Dkt. No. 92 at 12.)

[31]    *See*, *supra*, note 30.

> j.   Volunteer and Contract Staff Management; and
>
> k.   BOP Employee Management.

40.    The Pandemic Response Plan also included a detailed appendix covering a wide variety of topics, including a cleaning/disinfection schedule, information on cloth face coverings, and a quarantine checklist.

<u>Steps Taken by FCI Ray Brook to Address COVID-19</u>

41.    Since March 2020, FCI Ray Brook was obliged to consider BOP's Phased Action Plans and COVID-19 Pandemic Response Plan to inform its decisions regarding implementing COVID-19 management procedures best suited to the unique circumstances present at FCI Ray Brook.

42.    From March 2020 through at least the early part of 2021, BOP staff, contractors, and visitors to FCI Ray Brook were to be screened for fever and signs or symptoms of COVID-19 in the lobby prior to entering the institution.  Additionally, all staff members were required to social distance, to the extent possible, and wear a face covering at all times except when alone in an office.

43.    Since March 2020, FCI Ray Brook made efforts to educate the inmate population (through town hall meetings, bulletins on TRULINCS, and signage throughout the institution) about (a) the signs, symptoms, and transmission of COVID-19, (b) the importance of hand-washing, mask-wearing, and social distancing, (c) the rationale for mass testing when such testing was necessary, and (d) the COVID-19 vaccine.[32]

---

[32]    Plaintiff disputes this fact and cites to portions of the record reflecting that FCI Ray Brook did not comply with BOP mandated COVID-precautions.  (Dkt. No. 92 at 13.)  However, Plaintiff fails to identify any portion of the record that disputes this fact asserted related to FCI Ray Brook's educational efforts.  (*Id*.; *but see* Dkt. No. 92 at 22 [affidavit of Robert Brown

44.     Inmates were instructed to report any symptoms of COVID-19 to Health Services

or any other staff member immediately so Health Services could evaluate them and proceed

accordingly.[33]

<u>Operations at FCI Ray Brook in the Summer/Fall 2020</u>

45.     In July 2020, the BOP had most recently issued Phase Eight of its Action Plan,

and so there was limited movement between institutions.

46.     To the extent FCI Ray Brook received new inmates in or around summer of 2020,

they were to be placed in quarantine for at least 14 days prior to being released to general

population.

47.     Inmates departing FCI Ray Brook were to be kept in quarantine for at least 14

days (except when an inmate was granted compassionate release by his sentencing court

effective immediately).

48.     FCI Ray Brook dedicated at least one of their housing units specifically for

inmates on quarantine.  Depending on need, one or all of Mohawk-A, Mohawk-B, and Ausable

units were used as quarantine at various times.[34]

---

attesting that while housed in Ausable Cellblock while positive with COVID-19 he was not
provided "information on [his] illness."].)

[33]     Plaintiff disputes this fact and cites to portions of the record indicating that inmates
housed in the Ausable Cellblock (where it appears that COVID-19 positive inmates were
housed) were told that if they reported symptoms, they would remain in the Ausable Cellblock
indefinitely.  (Dkt. No. 92 at 13, ¶ 44 [citing Dkt. No. 92 at 20-24; Dkt. No. 9 at ¶ 7].)  However,
BOP's alleged response to a report of symptoms—keeping symptomatic inmates separate from
the general population—does not refute the asserted fact that inmates were instructed to report
symptoms.

[34]     Plaintiff's attempt to place this fact in context is inappropriate.  Thus, the undersigned
deems it admitted.  *See*, *supra*, note 16.

49.     At least some of the inmates in quarantine were asymptomatic and being monitored.

50.     Inmates in quarantine were single-celled, meaning that only one inmate was assigned to each cell.  At least every other day, quarantined inmates received 20 minutes outside their cell.  This was conducted one cell at a time.  Quarantined inmates were not permitted to interact with each other.  They were required to wear a surgical mask whenever they might be less than six feet from any staff or other inmate (generally speaking, anytime they were out of their cell).

51.     The quarantine units were cleaned regularly.

52.     Any inmate who tested positive or showed symptoms of COVID-19 was placed into isolation or quarantine.[35]

53.     FCI Ray Brook dedicated one side of Saranac Unit closest to Health Services specifically for inmates on isolation.

54.     Inmates on isolation were not allowed out of their cells except for showers, which were conducted one cell at a time.

55.     The inmate orderly assigned to Health Services sanitized the isolation side of Saranac Unit on at least a daily basis.[36]

---

[35]     Plaintiff disputes this fact and cites to his response at ¶ 44.  (Dkt. No. 92 at 14.)  However, Plaintiff's response at ¶ 44 relates to the alleged response that prisoners experienced when reporting symptoms of COVID-19.  (Dkt. No. 92 at 13.)  As a result, it does not undermine the fact as asserted by Defendant.

[36]     Plaintiff fails to admit or deny this fact asserted.  (Dkt. No. 92 at 14.)  As a result, the undersigned deems the fact asserted as admitted.  *See In re Horowitz*, No. 14-36884, 2016 WL 1039581, at *1 n.2 (Bankr. S.D.N.Y. Mar. 15, 2016) ("[A] response contending to neither admit or deny an allegation does not create a genuine issue of fact.")

56.     Staff were required to wear, at a minimum, an N-95 mask, gown, eye protection, and gloves when coming into contact with inmates on isolation.[37]

57.     Isolated inmates were required to wear a surgical mask at all times outside of their cell and the shower.

58.     Inmates on isolation were seen by someone in Health Services at least once per day, if not more.[38]

59.     Outside of quarantine and isolation, inmates in general population were also largely confined to their cells during this time.

60.     Inmates were allowed out of their cells in small groups (i.e. one range at a time) into the common areas of the housing unit for two hours every day, in order to access showers, phones, the Trust Fund Limited Inmate Computer System ("TRULINCS"), and the Electronic Law Library.[39]

61.     Inmates were required to wear a mask and practice social distancing while going to and from the dining hall.[40]

62.     All staff and inmates were given three cloth face masks, which they were required to wear when social distancing was not possible (generally anytime the inmates were out of their cells).

---

[37]     The citations contained in Plaintiff's denial do not support his assertion that "Staff/guards rarely wore a mask, let alone any of the other required PPE." (Dkt. No. 92 at 14.) Moreover, even accepting Plaintiff's additional factual assertion in his denial as true, it does not dispute this fact which relates to the requirements imposed on staff.

[38]     Plaintiff inappropriately attempts to place this fact in context. *See*, *supra*, note 16.

[39]     Plaintiff fails to identify a portion of the record that creates a material issue of fact with respect to this assertion.

[40]     Plaintiff inappropriately attempts to place this fact in context. *See*, *supra*, note 16.

63.    Strict cleaning and disinfecting protocols were in place, with both housing unit orderlies and inmates participating in efforts to clean and disinfect areas throughout the institution.

<u>Operations at FCI Ray Brook in Winter 2020/2021</u>

64.    In December 2020, the BOP had most recently issued Phase Nine of its Action Plan, and as such, there was still to be limited inmate movement between BOP facilities.

65.    When FCI Ray Brook received new inmates, they were to be tested for COVID-19 immediately upon arrival and placed into quarantine, as a precaution, for at least 14 days, at which time they were to be tested again.

66.    Inmates had to test negative for COVID-19 before being released to general population.

67.    Inmates leaving FCI Ray Brook were also to be quarantined for at least 14 days prior to departure, and were to be tested upon entry into quarantine and before departing the institution.

68.    During the time period relevant to the Complaint, all inmates (whether coming from the USMS as pretrial or holdover inmates, from other BOP institutions, or from the outside) were to be tested upon arrival in the Receiving and Discharge Department as part of the intake process.

69.    During the time period relevant to the Complaint, even if a COVID-19 test showed negative results, all inmates were to spend a period of time in quarantine before being released to the general population.

70.    Other inmates, such as Plaintiff, are not typically present in the Receiving and Discharge Department unless they are entering or exiting the institution themselves (e.g. on an outside medical trip, a writ, etc.).

71.    Plaintiff claims that he observed, with his "own human eyeballs," that certain inmates arrived at FCI Ray Brook without being tested for COVID-19 or quarantined, and denies that he simply heard such claims from other inmates.

72.    Plaintiff and other inmates did not observe, and could not observe, each instance of testing inmates for COVID-19 that occurred at FCI Ray Brook in the time frame relevant to the Complaint.

73.    In the winter of 2020/2021, Mohawk-A, Mohawk-B, and Ausable Units were still being used as quarantine units, as necessary.

74.    Inmates in quarantine continued to be single-celled and prohibited from interacting with each other, with the majority of their day being confined to their cells except for at least every other day the inmates in quarantine were permitted 20 minutes to shower and use the phone.

75.    Quarantined inmates were required to wear a surgical mask whenever they might possibly be less than six feet from any staff or other inmate, and both inmates and unit orderlies participated in efforts to clean and disinfect.

76.    In winter of 2020/2021, the Health Services side of Saranac unit was still dedicated specifically to inmates on isolation.

77.    Ausable unit was used as an isolation unit for a short time in December and January, as well.

78.     Inmates in isolation included inmates who tested positive or showed symptoms of COVID-19.

79.     Inmates in isolation were not allowed out of their cells except for showers, which were done one cell at a time.[41]

80.     The parties dispute the regularity with which cells were sanitized and the inmate orderly assigned to Health Services sanitized the housing unit.

81.     Staff were required to wear, at a minimum, an N-95 mask, gown, eye protection, and gloves when coming into contact with inmates on isolation.

82.     Inmates in isolation were required to wear a surgical mask at all times outside of their cell or the shower.

83.     In general population, inmates were allowed out of their cells from 6:00 a.m., to 9:15 p.m. (except during normal nationwide count times), during which time inmates had access to showers, phones, TRULINCS, and the Electronic Law Library.

84.     Inmates were expected to report to their regular work assignments.  Any inmate movement throughout the institution occurred one housing unit at a time.

85.     Inmates were allowed to go in small groups (no more than 20 at a time) to the commissary once per week.

86.     All programming (education, drug programming, psychology groups, etc.) was running normally.

87.     All meals were "grab and go" at the dining hall.  Social distancing was required at all times and masks were mandatory whenever a six-foot distance could not be maintained.

---

[41]     Plaintiff's citations to the record do not dispute this fact asserted.  Thus, it is deemed admitted.

88.     Unit Orderlies and inmates participated in efforts to clear and disinfect throughout the institution.

<u>Plaintiff's Housing Quarters and COVID-19</u>

89.     Plaintiff arrived at FCI Ray Brook on August 11, 2020.

90.     Plaintiff was placed into quarantine in Mohawk-A.

91.     On September 2, 2020, Plaintiff was moved to general population in Delaware-B unit for two days, and then on September 4, 2020, he was placed into general population in Niagara-B Unit.

92.     On December 17, 2020, an inmate in Niagara-B (who had been housed in Niagara-B since August 27, 2020) tested positive for COVID-19.

93.     That inmate who tested positive for COVID-19 was placed into isolation.

94.     As a result, all of the inmates in Niagara-B (including Plaintiff) were placed in a precautionary 14-day quarantine.

95.     Additionally, Plaintiff—and all of the other inmates in Niagara-B—were tested for COVID-19 on December 18, 2020.

96.     Plaintiff's test results came back positive on December 23, 2020.

97.     Because Plaintiff tested positive for COVID-19, Plaintiff was relocated to the Ausable unit.

98.     During his time in isolation, Plaintiff's oxygen saturation, pulse, and temperature never showed any clinical significance.[42]

---

[42]     Plaintiff's citations to the record do not conflict with this fact as asserted.  Although Plaintiff may have experienced other symptoms of COVID-19, he does not point to any portion of the record indicating that his oxygen saturation, pulse, or temperature read outside the normal ranges during his time in isolation or quarantine.

99.     Plaintiff was released back into general population in Delaware-B unit on January 6, 2021.

100.    Plaintiff subsequently received the COVID-19 vaccination on April 8, 2021, and May 5, 2021.

101.    Even if FCI Ray Brook adhered perfectly to the Action Plan and the Modules, it was still possible for COVID-19 to come into the prison through a false negative test result, or from an employee or visitor during the virus's incubation period when a person may be contagious but asymptomatic.

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions to Dismiss for Lack of Subject Matter Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978).  Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it.  *Makarova v. United States.*, 201 F.3d 110, 113 (2d Cir. 2000).  A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction.  *Makarova*, 201 F.3d at 113.  The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence.  *Id.* (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)).  When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved, and inferences drawn in favor of the plaintiff.  *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing *Makarova*, 201 F.3d at 113).

Where a defendant proffers evidence beyond the pleadings in challenging subject-matter jurisdiction, that defendant is said to have made a fact-based challenge.  *Carter v. HealthPort*

*Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). "A court reviewing a Rule 12(b)(1) motion . . . can look to evidence outside the pleadings, including affidavits, to resolve disputed *jurisdictional* facts." *Glob. Art Exhibitions, Inc. v. Kuhn & Bulow Italia* Versicherungsmakler *GmbH*, 20-CV-1395, 2022 WL 2159823, at *3 (S.D.N.Y. June 15, 2022) (emphasis added) (citing *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

**B.    Legal Standards Governing the Discretionary Exception to FTCA Claims**

Under the FTCA, the United States has consented to be sued under certain conditions, but has expressly declined to be sued "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved [was] abused." 28 U.S.C.A. § 2680(a).   This "discretionary function exception"

> is a form of retained sovereign immunity.  As a result, the FTCA's waiver of federal sovereign immunity does not encompass actions based upon the performance of, or failure to perform, discretionary functions.  Because the FTCA is structured as a grant of subject matter jurisdiction to the federal courts, a finding that the discretionary function exception applies is tantamount to holding that the court lacks jurisdiction.[43]  The exception applies only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis.

*Reichhart v. U.S.*, 408 F. App'x 441, 443 (2d Cir.2011) (citations and internal quotation marks omitted).

In determining whether the allegedly negligent acts "involved an element of judgment or choice,"

---

[43]    *See also*, *Molchatsky v. United States*, 713 F.3d 159, 161–163 (2d Cir. 2013) (indicating that if the discretionary function exception applies, the Court lacks subject matter jurisdiction.).

> it is the nature of the conduct, rather than the status of the actor that governs whether the exception applies.  The requirement of judgment or choice is not satisfied if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive.

*United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citations and internal quotation marks omitted); *see also Berkovitz v. United States*, 486 U.S. 531, 544 (1991) ("When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply.").  The aforementioned reference to "statute, regulation or policy" includes internal "agency guidelines."  *Gaubert*, 499 U.S. at 322.

> Furthermore, even assuming the challenged conduct involves an element of judgment, it [must then be] decided whether that judgment is of the kind that the discretionary function exception was designed to shield.  Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.

*Gaubert*, 499 U.S. at 322-323 (citations and internal quotation marks omitted).  Where the alleged "type of negligence" arises from factors such as inattentiveness, laziness, absentmindedness or other such "conduct unrelated to any plausible policy objectives," it is not shielded by the discretionary function exception.  *Coulthurst v. United States.*, 214 F.3d 106, 110-111 (2d Cir.2000); *see also Coulthurst*, 214 F.3d at 109 ("Such negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy.").

"Plaintiff bears the initial burden to state a claim that is not barred by the discretionary function exception."  *Molchatsky*, 713 F.3d at 162 (citing *Gaubert*, 499 U.S. at 324-25 (1991)).

### III.    ANALYSIS

Because Defendant has moved for dismissal under Fed. R. Civ. P. 12(b)(1) and 56, the Court must first assess whether it has jurisdiction over Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) before turning to the question of whether Plaintiff is entitled to summary judgment relief. *See Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 414-15 (S.D.N.Y. 2012) ("When presented with a motion under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has subject matter jurisdiction necessary to consider the merits of the action.").

After carefully considering the matter, I recommend that Defendant's motion to dismiss based on the discretionary function exception be granted for the reasons stated in its memoranda of law.  (Dkt. No. 88, Attach. 1 at 16-24; Dkt. No. 94 at 7-9.)  The following is intended to supplement, not supplant, those reasons.

First, the Court must identify the conduct at issue.  The crux of Plaintiff's negligence claim is that employees at FCI Ray Brook failed to adhere to the Bureau of Prisons ("BOP") Phased COVID-19 Action Plan.  (Dkt. No. 9 at ¶ 7 [alleging that FCI Ray Brook took in prisoners from local jails and holding facilities without testing for COVID-19 or properly quarantining those new inmates before releasing them to the general population]; Dkt. No. 42 at 8-9 [arguing that officials at FCI Ray Book had a duty to test and quarantine newly arriving inmates to prevent the spread of COVID-19].)

Federal statutory law entrusts BOP with the responsibility to "provide suitable quarters" and for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States[.]"  *See* 18 U.S.C. § 4042(a)(2).  Although this statutory law

requires BOP to provide a general duty of care to manage and safekeep its prisoners, courts have consistently held that BOP retains discretion with respect to how it fulfills that general duty of care. *See, e.g., Rinaldi v. United States*, 904 F.3d 257, 273-74 (3d Cir. 2018) (concluding that 18 U.S.C. § 4042 affords BOP discretion in deciding suitable housing assignments for inmates); *Ruiz v. United States*, 664 F. App'x 130, 133 (3d Cir. 2016) (unpublished) (stating that "this statute leaves the implementation of these duties to the discretion of BOP officials . . ."); *Thrower v. United States*, 528 F. App'x 108, 111 (3d Cir. 2013) (unpublished) (stating the same) (citations omitted); *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) (unpublished) (stating the same); *Calix v. Pope*, 18-CV-3980, 2022 WL 4539511, at *6 (E.D.N.Y. Sept. 28, 2022) (the "BOP's decisions regarding prisoner housing are discretionary."); *Chen v. United States*, 09-CV-2306, 2011 WL 2039433, at *7 (E.D.N.Y. May 24, 2011) (noting that 18 U.S.C. § 4042(a)(2)-(3) "does not direct the manner by which the BOP must fulfill [its] duty" to provide "suitable quarters," "the safekeeping of" prisoners, and "the protection" of all federal inmates).

After reviewing the entirety of BOP's Phased Action plan, the undersigned concludes that although it "occasionally uses the word 'must,' its overall tone is advisory rather than mandatory." *Head v. Rakowski*, 22-CV-0566, 2024 WL 4043069, at *4 (D. Md. Sept. 3, 2024); *see Holbrook v. United States*, 673 F.3d 341, 348 (4th Cir. 2012) (quoting *Miller v. United States,* 163 F.3d 591, 595 (9th Cir. 1998)) ("The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion.").

As set forth by Defendant, Plaintiff's allegations relate specifically to Phases Two and Nine of BOP's Phased Action Plan. (Dkt. No. 88, Attach. 1 at 17-18; Dkt. No. 42 at 7

[Plaintiff's opposition to Defendant's motion to dismiss argued that his FTCA negligence claim is not barred by the discretionary function exception because Defendant's actions were inconsistent with (1) a BOP memorandum of March 13, 2020, titled "CORONAVIRUS (COVID-19) PHASE TWO ACTION PLAN", and (2) a BOP modified operations memorandum of November 25, 2020]; Dkt. No. 56 at 6-7 [identifying the documents Plaintiff relied on in asserting that the discretionary function exception is inapplicable].)  Moreover, Plaintiff was diagnosed with COVID-19 on December 23, 2020, which was during Phase Nine of BOP's Phased Action Plan.  (Dkt. No. 88, Attach. 2 at ¶¶ 49, 60; Dkt. No. 88, Attachs. 11, 12.)

Phase Two was rife with discretionary language.  (*See generally* Dkt. No. 88, Attach. 4.) More specifically, Phase Two contained guiding language such as the following:

> Generally, inmate internal movement will be suspended for 30 days, at which time the suspension will be reevaluated.  Exceptions to this suspension may include, but are not limited to, transfers related to forensic studies, writs, Interstate Agreements on Detainers (IAD), medical or mental health reasons, and RRC placements.  The BOP may also move inmates to better manage the detention bedspace.

(Dkt. No. 88, Attach. 4 at 3.)

Further, Phase Nine refers to itself as an "extension of previously disseminated *guidance*."  (Dkt. No. 88, Attach. 11 at 4 [emphasis added].)  As Defendant identifies, although Phase Nine contains mandatory language when outlining procedures for the intake of inmates— "[a]ll inmates entering an institution will require enhanced intake procedures"—it thereafter contains a bullet point list replete with suggested actions.  (*Id*. at 9.)  More specifically, Phase Nine suggests:

> - Institutions are to designate specific quarantine and isolation areas in advance with capacity numbers commensurate with anticipated levels and frequency of incoming inmates.  Ideally, inmates should be quarantined or isolated in single-cells, if possible.  When cohorting is necessary, the best practice is to keep cohorted inmates together and not add to the cohort when new intakes arrive.

- All new intakes should be screened for COVID-19 on arrival, to include a symptom screen, temperature check, and an approved viral PCR test.

(*Id.*)

Moreover, as Defendant asserts, other relevant BOP documents confirm the discretion inherent in the testing and quarantine measures that Plaintiff challenges in Phase Two and Phase Nine. (Dkt. No. 88, Attach. 1 at 21-22.)

The undersigned also finds persuasive the "growing chorus of federal courts [that] have held . . . the discretionary function exception barred FTCA claims stemming from the BOP's response to the COVID-19 pandemic, with many of them specifically considering the Phase Two and Phase Nine Action Plans when arriving at that conclusion." (Dkt. No. 88, Attach. 1 at 22-23 [collecting cases].)

Hence, I conclude that the acts alleged to be negligent were discretionary, in that they involved an "element of judgment or choice" and were not compelled by statute or regulation. *Reichhart*, 408 F. App'x at 443.

Second, I find that the judgment or choice is the kind that the discretionary function exception to the FTCA was designed to protect. The BOP's Phased Action Plan afforded BOP "employees discretion in the development, implementation, and management of health and safety protocols concerning COVID-19 at its correctional institutions . . . and, thus, were presumptively grounded in policy when those employees exercised that discretion." *Brown v. United States*, 22-CV-0404, 2024 WL 1159249, at *10 (M.D. Pa. Mar. 18, 2024) (citing *Johnson v. United States*, 22-CV-1647, 2023 WL 7635083, at *5 (D. Md. Nov. 14, 2023) (concluding the same and explaining, among other things, that BOP decisions surrounding "whether to bus inmates from the MCC to SCP-Schuylkill during the pandemic, what levels of occupancy to have in particular units within SCP-Schuylkill during the pandemic, whether and when to

designate [plaintiff] to either SCI-Schuylkill or FCI-Schuylkill during a COVID-19 outbreak[,]

whether to consolidate two separate living quarters within SCP-Schuylkill during the

pandemic[,]" whether to provide certain personal protective equipment to staff, and "whether

staff would be called upon to work in the same time frame that they had COVID-19

symptoms[,]" were all discretionary decisions not mandated by federal statute, CDC guidance,

the "BOP Response Plan[,]" or "Internal COVID-19 Memoranda")).

Moreover, courts have consistently held that the BOP's development, implementation,

and management of protocols taken to safeguard the health and safety of those confined to and

working in its correctional institutions during the COVID-19 pandemic, is grounded in policy

considerations that are appropriately left to the discretion of prison officials and administrators.

*Brown*, 2024 WL 1159249, at *10 (citing *Santiago v. United States*, 21-CV-0436, 2022 WL

790805, at *3 (W.D. Va. Mar. 14, 2022) (concluding that "the BOP's handling of COVID-19"

and the "development and implementation of safety protocols" that it put into place were "based

on considerations of public policy" and explaining that "[t]he BOP must balance its duty to

protect inmates from COVID-19 with its duty to protect inmates from each other, to safeguard

staff, and to the protect the public"); *Murillo v. United States Dep't of Just.*, 21-CV-0425, 2022

WL 16745333, at *10 (D. Ariz. Nov. 7, 2022) (concluding that BOP decisions regarding the

implementation of any particular infectious disease measure for COVID-19 in any particular

institution were "unquestionably based on considerations of public policy")).

Thus, I find that Defendant has met its burden of demonstrating that the FTCA's

discretionary function exception applies to Plaintiff's negligence claim. As a result, I

recommend that Defendant's motion to dismiss based on lack of subject matter jurisdiction be granted.[44]

  **ACCORDINGLY**, it is

  **RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 9) be **<u>DISMISSED</u> <u>without prejudice</u>** for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1); and it is further

  **ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[45]

  **NOTICE**: Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[46]  Such

---

[44]   A lack of subject matter jurisdiction precludes a court from addressing issues to the merits.  *See 2741 Bros. Deli Grocery Inc. v. United States Dep't of Agric., Food and Nutrition Serv.*, 22-CV-9317, 2024 WL 4188312, at *3 n.3 (S.D.N.Y. Sept. 13, 2024) ("lack of subject-matter jurisdiction generally precludes a court from addressing merits issues."); *Gioia v. Patterson, Belknap, Webb & Tyler*, 23-CV-8163, 23-CV-8164, 24-CV-1912, 24-CV-2259, 2024 WL 1704697, at *10 n.9 (E.D.N.Y. Apr. 19, 2024) ("Given the lack of subject matter jurisdiction, the Court does not reach whether res judicata or collateral estoppel would preclude adjudication of Gioia's present claims, or whether Gioia's failure to respond to the Court's orders merits dismissal under Fed. R. civ. P. 41(b)); *Rimini v. J.P. Morgan Chase & Co.*, 21-CV-7209, 2022 WL 4585651, at *1 (S.D.N.Y. Sept. 29, 2022) ("Lacking jurisdiction, the Court is without authority to consider the merits of Defendant's motion to dismiss and for a filing injunction, which are therefore denied without prejudice as moot.").  As, a result, the undersigned does not consider the remainder of Defendant's arguments.  Should the assigned District Judge reject the undersigned's recommendation—that the action be dismissed for lack of subject matter jurisdiction based on the discretionary function exception—it is requested that Defendant's motion be returned for consideration of the remaining arguments.

[45]   The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[46]   If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a

objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 29, 2024
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

607 F.Supp.3d 421
United States District Court, S.D. New York.

GLOBAL ART EXHIBITIONS, INC., Plaintiff,
v.
KUHN & BÜLOW ITALIA
VERSICHERUNGSMAKLER GMBH, ERGO
Versicherungs AG, Mannheimer Versicherung AG,
Basler Sachversicherungs-AG, Helvetia Schweizerische
Versicherungsgesellschaft in Liechtenstein AG, and
Gothaer Allgemeine Versicherung AG, Defendants.

20-CV-1395 (KMW)
|
Signed June 15, 2022

**Synopsis**
**Background:** Privately held company that sold and exhibited
works of fine art brought action against five "all-risk" insurers
from Germany and Liechtenstein and insurance broker,
alleging breach of contract covering several works of art it
arranged to send to an exhibition in Genoa, Italy, which were
seized by Italian authorities upon suspicion the works were
forgeries. Defendants moved to dismiss for lack of subject
matter jurisdiction, on basis of forum non conveniens, and for
failure to state a claim.

**Holdings:** The District Court, Kimba M. Wood, J., held that:

[1] under New York conflict-of-law rules, German law, rather
than New York law, applied to action;

[2] contractual precondition to payment in all-risk policies,
which made payment pursuant to its confiscation clause
contingent on insured first recovering its confiscated works of
art, did not render privately held company's breach of contract
claim unripe for resolution;

[3] "doubt" prong of policies' postponement clause did
not render company's breach of contract claim unripe for
resolution;

[4] provision in policies' postponement clause which
permitted insurers to delay reimbursement of insured's legal
costs if official or criminal proceedings were in progress
against policyholder or insured "on account of the claim

incident" did not render privately held company's breach of
contract claim unripe for resolution;

[5] when deciding motion to dismiss on forum non
conveniens grounds, company was entitled to higher degree
of deference due to its choice of "home" forum;

[6] Germany was adequate alternative forum for action; but

[7] private interests weighed against dismissal of action on
forum non conveniens grounds; and

[8] public interests weighed against dismissal of action on
forum non conveniens grounds.

Motion denied.

**Procedural Posture(s):** Motion to Dismiss for Forum Non
Conveniens; Motion to Dismiss for Failure to State a Claim;
Motion to Dismiss for Lack of Subject Matter Jurisdiction.

West Headnotes (33)

**[1]** **Federal Courts** 🡒 Dismissal or other
disposition

A case is properly dismissed for lack of
subject matter jurisdiction when the district court
lacks the statutory or constitutional power to
adjudicate it. Fed. R. Civ. P. 12(b)(1).

2 Cases that cite this headnote

**[2]** **Federal Courts** 🡒 Weight and sufficiency

On motion to dismiss for lack of subject matter
jurisdiction the plaintiff, as the party asserting
jurisdiction, has the burden to prove subject-
matter jurisdiction by a preponderance of the
evidence. Fed. R. Civ. P. 12(b)(1).

2 Cases that cite this headnote

**[3]** **Federal Courts** 🡒 Evidence; Affidavits
**Federal Courts** 🡒 Presumptions and burden
of proof

A court reviewing a motion to dismiss for
lack of subject matter jurisdiction takes all

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 33 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts. Fed. R. Civ. P. 12(b)(1).

2 Cases that cite this headnote

**[4]    Federal Courts 🔑 Evidence; Affidavits**

In determining questions of foreign law on motion to dismiss for lack of subject matter jurisdiction, a court may consider any relevant materials, whether or not submitted by a party or admissible pursuant to the Federal Rules of Evidence. Fed. R. Civ. P. 12(b)(1), 44.1.

1 Case that cites this headnote

**[5]    Federal Courts 🔑 Ripeness; Prematurity**

**Federal Courts 🔑 Prudential concerns**

Constitutional ripeness, unlike prudential ripeness, is jurisdictional issue properly analyzed pursuant to motion to dismiss for lack of subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[6]    Contracts 🔑 Agreements relating to actions and other proceedings in general**

**Contracts 🔑 Intention of Parties**

When applying the conflict-of-law rules of New York, courts will generally enforce choice-of-law clauses and contracts should be interpreted so as to effectuate the parties' intent.

**[7]    Insurance 🔑 Particular Applications of Rules**

**Insurance 🔑 Property insurance**

Under New York conflict-of-law rules, German law, rather than New York law, applied to action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were

seized by Italian authorities upon suspicion the works were forgeries; applicable German rules of contract interpretation were similar to New York's rules, as disputes regarding the meaning of contracts were resolved under German law by determining the objective interpretation of disputed provisions, based on the wording and accompanying circumstances of agreement, taking into account the custom of trade and principle of good faith and intentions of the parties.

1 Case that cites this headnote
More cases on this issue

**[8]    Federal Courts 🔑 Contracts**

Under New York law, an unmet precondition to performance can render a breach of contract claim unripe and suitable for dismissal on a motion to dismiss for lack of subject matter jurisdiction. U.S. Const. art. 3, § 2, cl. 1; Fed. R. Civ. P. 12(b)(1).

**[9]    Federal Courts 🔑 Ripeness; Prematurity**

Constitutional ripeness is question of district court's authority to hear case pursuant to Article III. U.S. Const. art. 3, § 2, cl. 1.

**[10]    Federal Courts 🔑 Trade, Business, and Finance**

Under German law, contractual precondition to payment in "all-risk" policies, which made payment pursuant to its confiscation clause contingent on insured first recovering confiscated works of art, did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries, as insurers had present obligation to pay company; policy itself did not dictate the time by which covered legal costs had to be paid, company alleged it was in dire need of

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.    2

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 34 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

funds to finance its legal expenses, and it could be reasonably inferred that company took care to demand partial payment under policy to increase its prospects of timely access to legal funds. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

**[11]**  **Federal Courts** 🔑 Trade, Business, and Finance

Under German law, "doubt" prong of "all-risk" policies' postponement clause, which permitted insurers to delay reimbursement of insured's legal costs if there was "doubt about policyholder's or the insured party's entitlement to receive payment," did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries, despite contention that policy exclusion for loss or damage caused by "natural state and properties" of insured works resulted in requisite "doubt" warranting postponement; phrase "natural state and properties" did not refer to authenticity or authorship of item but, rather, referred to item's physical properties. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

**[12]**  **Federal Courts** 🔑 Trade, Business, and Finance

Under German law, "doubt" prong of "all-risk" policies' postponement clause, which permitted insurers to delay reimbursement of insured's legal costs if there was "doubt about policyholder's or the insured party's entitlement to receive payment," did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy,

which were seized by Italian authorities upon suspicion the works were forgeries, despite contention that policy exclusion for loss or damage caused by "intentional behavior on the part of the policyholder" resulted in requisite "doubt" warranting postponement; art exhibition organizer, rather than company, was policyholder, it was implausible that organizer approved or consciously accepted its actions would cause it to incur legal costs due to criminal prosecution of its chief corporate officers, and conduct alleged did not support claim that conduct was intentional, because if purported fraud in obscuring inauthenticity of artwork had remained successfully hidden, they would have prevented the insured event from occurring, and company would never had incurred legal costs at issue. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

**[13]**  **Federal Courts** 🔑 Trade, Business, and Finance

Under German law, provision in "all-risk" policies' postponement clause which permitted insurers to delay reimbursement of insured's legal costs if official or criminal proceedings were in progress against policyholder or insured "on account of the claim incident" did not render privately held company's breach of contract claim unripe for resolution in its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; term "official proceedings" was limited to proceedings initiated by a government body, not a civil claim such as the one brought by palace which hosted exhibition against the exhibition organizer. U.S. Const. art. 3, § 2, cl. 1.

More cases on this issue

**[14]**  **Federal Courts** 🔑 Discretion in general

The doctrine of "forum non conveniens" is a discretionary device permitting a court in rare

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 35 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bulow Italia..., 607 F.Supp.3d 421...

instances to dismiss a claim, even if the court is a permissible venue with proper jurisdiction over the claim.

**[15]**    **Federal Courts**  👉  Parties' choice of forum; forum-shopping

**Federal Courts**  👉  Public and private interests; balancing interests

**Federal Courts**  👉  Availability and adequacy

When exercising its discretion and determining whether to dismiss action on forum non conveniens grounds a court: (1) determines the degree of deference properly accorded the plaintiff's choice of forum; (2) considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) balances the private and public interests implicated in the choice of forum.

1 Case that cites this headnote

**[16]**    **Federal Courts**  👉  Weight and sufficiency

A defendant generally bears a heavy burden when it seeks to invoke doctrine of forum non conveniens.

**[17]**    **Federal Courts**  👉  Convenience of parties and witnesses; location of evidence

Dismissal on forum non conveniens grounds is warranted only if chosen forum is shown to be genuinely inconvenient and selected forum significantly preferable.

**[18]**    **Federal Courts**  👉  Evidence; Affidavits

Court deciding motion to dismiss on forum non conveniens grounds may consider pleadings as well as affidavits from both moving and opposing parties.

**[19]**    **Federal Courts**  👉  Parties' choice of forum; forum-shopping

Privately held company that sold and exhibited works of fine art was entitled to higher degree of deference for its choice of Southern District of New York as forum when determining whether to dismiss, on basis of forum non conveniens in Germany, its action against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; company's principal place of business was in Manhattan, within the geographic jurisdiction of its chosen forum, company hired Italian art exhibition organizer to arrange insurance coverage for works of art to be exhibited in Italy, and it was organizer that placed company's insurance policy with German broker.

More cases on this issue

**[20]**    **Federal Courts**  👉  Parties' choice of forum; forum-shopping

When deciding motion to dismiss on forum non conveniens grounds, courts give a high degree of deference to the plaintiff's choice of forum.

1 Case that cites this headnote

**[21]**    **Federal Courts**  👉  Parties' choice of forum; forum-shopping

On motion to dismiss on forum non conveniens grounds, a court will increase or decrease the level of deference owed to plaintiff's choice of forum depending upon: (1) whether the lawsuit was brought in the forum for legitimate reasons, such as the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice; and (2) whether considerations of convenience favor the conduct of the lawsuit in the United States.

**[22]**    **Federal Courts**  👉  Parties' choice of forum; forum-shopping

Great deference is given to plaintiff's choice of forum, for purposes of forum non conveniens analysis, when plaintiff sues in his or her home forum.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 36 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

2 Cases that cite this headnote

**[23]**    **Federal Courts** 🔑 Parties' choice of forum;
forum-shopping

On motion to dismiss on forum non conveniens
grounds, courts afford less deference to
a plaintiff's choice of forum when the
plaintiff sought out business relationships in
the alternative forum and, therefore, could
reasonably expect to litigate there.

1 Case that cites this headnote

**[24]**    **Federal Courts** 🔑 Availability and adequacy
**Federal Courts** 🔑 Amenability to process

An alternative forum is "adequate," for purposes
of forum non conveniens analysis, if the
defendants are amenable to service of process
there, and if it permits litigation of the subject
matter of the dispute.

**[25]**    **Federal Courts** 🔑 Availability and adequacy
**Federal Courts** 🔑 Amenability to process

Germany was adequate alternative forum for
action brought by privately held company that
sold and exhibited works of fine art against
five "all-risk" insurers from Germany and
Liechtenstein and insurance broker, alleging
breach of contract covering several works of art
it arranged to send to an exhibition in Genoa,
Italy, which were seized by Italian authorities
upon suspicion the works were forgeries, thereby
weighing in favor of dismissal of action on
forum non conveniens grounds; all defendants
were either German entities subject to service
of process in Germany or had indicated their
willingness to submit to jurisdiction of German
court, and German courts permitted litigation of
breach of contract claims such as one company
raised against insurers.

More cases on this issue

**[26]**    **Federal Courts** 🔑 Availability and adequacy

Alternative forum is sufficient, for purposes
of forum non conveniens analysis, even if its
procedures and causes of action differ from those
in plaintiff's chosen forum, unless remedies in
foreign forum are tantamount to no remedy at all.

1 Case that cites this headnote

**[27]**    **Federal Courts** 🔑 Presumptions and burden
of proof

On motion to dismiss on forum non conveniens
grounds, the defendant bears the burden of
establishing that the balance of private and public
interest factors tilts heavily in favor of the
alternative forum.

**[28]**    **Federal Courts** 🔑 Public and private
interests; balancing interests

On motion to dismiss for forum non conveniens,
balancing the private interests implicated by
choice of forum entails a comparison between
the hardships defendant would suffer through the
retention of jurisdiction and the hardships the
plaintiff would suffer as the result of dismissal
and the obligation to bring suit in another
country.

**[29]**    **Federal Courts** 🔑 Convenience of parties
and witnesses; location of evidence
**Federal Courts** 🔑 Public and private
interests; balancing interests

Private interest factors to consider in determining
whether to dismiss action on forum non
conveniens grounds include: (1) relative ease
of access to sources of proof; (2) availability
of compulsory process to force attendance
of unwilling witnesses; (3) cost of obtaining
attendance of willing witnesses; and (4) all other
practical problems that make trial of case easy,
expeditious, and inexpensive.

1 Case that cites this headnote

**[30]**    **Federal Courts** 🔑 Convenience of parties
and witnesses; location of evidence

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 37 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

Federal Courts ⚖ Public and private interests; balancing interests

Private interests weighed against dismissal, on forum non conveniens grounds, of action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; sources of proof were distributed across Germany, Italy and the United States, German courts would not have greater ability than American court to secure evidence from non-parties in Italy through use of compulsory process, cost of obtaining testimony from willing witnesses was fairly minor factor, and defendants seemed to have substantially more resources than company with which to bear the inconveniences of distant litigation.

1 Case that cites this headnote
More cases on this issue

[31]     Federal Courts ⚖ Burden placed on court and public

Federal Courts ⚖ Public and private interests; balancing interests

On motion to dismiss on forum non conveniens grounds, relevant public interests implicated by choice of forum include: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home and unfairness of burdening citizens in unrelated forum with jury duty; and (3) and avoidance of unnecessary problems in conflict of laws, or in application of foreign law.

7 Cases that cite this headnote

[32]     Federal Courts ⚖ Burden placed on court and public

Federal Courts ⚖ Public and private interests; balancing interests

Public interests implicated by choice of Southern District of New York as forum weighed against dismissal, on forum non conveniens grounds, of action brought by privately held company that sold and exhibited works of fine art against five "all-risk" insurers from Germany and Liechtenstein and insurance broker, alleging breach of contract covering several works of art it arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion the works were forgeries; although Southern District of New York was one of nation's busiest dockets, its administration was very efficient, New York had stronger local interest in controversy, and need to apply foreign law weighed only slightly in favor of dismissal.

7 Cases that cite this headnote
More cases on this issue

[33]     Federal Courts ⚖ Public and private interests; balancing interests

When assessing relevant public interests implicated by choice of forum and deciding motion to dismiss on forum non conveniens grounds, courts must guard against excessive reluctance to undertake task of deciding foreign law, a chore federal courts must often perform.

**Attorneys and Law Firms**

*426 Benjamin Yehuda Kaufman, Mark C. Rifkin, Wolf Haldenstein Adler Freeman & Herz LLP, New York, NY, for Plaintiff.

Andreas Albert Frischknecht, Theodore Robert DeBonis, Andrew Taylor Grant, Chaffetz Lindsey LLP, New York, NY, for Defendants Mannheimer Versicherung AG, ERGO Versicherungs AG, Gothaer Allgemeine Versicherung AG, Helvetia Schweizerische Versicherungs-gesellschaft in Liechtenstein AG, Basler Sachversicherungs-AG.

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

Plaintiff Global Art Exhibitions, Inc. ("Global Art") brought this action against five insurers from Germany and Lichtenstein ("Insurer Defendants") and insurance broker

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 38 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

Kuhn & Bülow Italia Versicherungsmakler GmbH. It alleges breach of an insurance contract covering several works of art that Global Art arranged to send to an exhibition in Genoa, Italy, which were seized by Italian authorities upon suspicion that the works were forgeries. Global Art contends that Insurer Defendants were obligated to make payments pursuant to the insurance policy's coverage of legal expenses in connection with confiscation of the insured works of art.

Insurer Defendants moved to dismiss. (ECF No. 64.) The Court's prior Opinion and Order resolved the motion's assertion that the Court lacked personal jurisdiction, and withheld consideration of the remaining grounds for the motion to dismiss until such time as Insurer Defendants came into compliance with New York Insurance Law § 1213(c). (ECF No. 93.) They have now done so. In accordance with the Order at ECF No. 118, this Opinion and Order resolves Insurer Defendants' remaining grounds for their motion to dismiss: lack of subject-matter jurisdiction, *forum non* **\*427** *conveniens*, and failure to state a claim upon which relief can be granted. For the following reasons, the remainder of the motion is DENIED.

### BACKGROUND

The Court's November 16, 2021 Opinion described many of the facts of the case:

> Plaintiff Global Art is a privately held Delaware company that sells and exhibits works of fine art and has its principal place of business in New York, New York. (First Amended Complaint ("FAC") ¶¶ 16, 34, ECF No. 55.) An Italian art exhibition organizer, MondoMostre Skira s.r.l ("Skira"), requested the assistance of Global Art as Skira organized an exhibition to be held at the Palazzo Ducale in Genoa, Italy. (*Id.* ¶¶ 2, 36.) Global Art arranged for the lending of at least twelve works by the Italian painter Amedeo Modigliani and French painter Moïse Kisling. (*Id.* ¶¶ 34, 36–37.) [1] Two of these works are owned by Global Art, which also arranged for the loan of the works owned by others. (*Id.*)

> Defendant Kuhn & Bülow Italia Versicherungsmakler GmbH ("Kuhn & Bülow") is a German insurance broker upon which Skira called to arrange for insurance to cover works lent for the Genoa exhibition. (*Id.* ¶ 38.) Kuhn & Bülow coordinated the creation of Policy No. EP 1032, an "all-risk" insurance policy that, in pertinent part, covered the twelve Modigliani and Kisling works shown in the

> Genoa exhibition that were lent by or through Global Art. (*Id.* ¶ 40.) The five other defendants in this case ("Insurer Defendants") are insurance firms based in Germany or Liechtenstein that each insured a specified percentage of the policy covering the works displayed in Genoa. (*See id.* ¶ 46.)

> Global Art or the relevant owner received individual "Certificates of Insurance" specifying the coverage for the twelve works in question. These certificates state that the insurance policy is a so-called "nail-to-nail" policy, which provides coverage up to the value of the work from almost any conceivable form of loss, depreciation, damage, or theft occurring between the departure of the work from its place of origin and its return after the exhibition. (*See, e.g.*, *id.*, Ex. C §§ 1–4.) Notably, section 5 of the "Written Agreements" appended to each certificate is a clause specifying that if the work were to be confiscated, the insurers would reimburse up to €500,000 for court and legal fees required to regain possession of the work. (*See, e.g.*, *id.*, Ex. C § 5.) The other owners whose works were lent through Global Art assigned to Global Art the right to pursue "defense costs and related damages" under the policy. (*Id.* ¶ 35.) Skira paid the premiums for the policy in full. (*Id.* ¶ 72.)

> The exhibition did not go smoothly. Acting upon allegations of inauthenticity, Italian authorities seized twenty-one works from the exhibition, including twelve lent by or through Global Art. (*Id.* ¶¶ 3, 53–54.) Legal proceedings in Italy relating to the seized artwork have been ongoing since at least mid-2018 (Frischknecht Decl., Ex. B, ECF No. 82) and remain pending (FAC ¶ 58). Global Art has repeatedly demanded the return of the twelve seized Modigliani and Kisling works, but they remain in the custody of Italian officials. (*Id.* ¶ 60.)

 **\*428** *Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, No. 20-CV-1395, 2021 WL 5531678, at \*1–2 (S.D.N.Y. Nov. 16, 2021) (Wood, J.). [2]

In March 2018, Global Art made its first request for payment of legal costs pursuant to the confiscation clauses contained in the Written Agreements appended to the Certificates of Insurance and in the Kuhn & Bülow Terms and Conditions of Art Insurance 2016 (collectively, the "Policy"). (*See* Galimberti Decl., Ex. B, ECF No. 67-2.) Global Art made repeated demands for payment over the course of more than two years; Insurer Defendants have yet to make any such payment. (FAC ¶¶ 5–7.)

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 39 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

Global Art then brought this case, alleging Insurer Defendants breached their contractual obligations by failing to advance court costs and legal fees necessary for Global Art to regain possession of the confiscated works of art. (*Id.* ¶ 71.) Insurer Defendants moved to dismiss, asserting that the Court lacked personal jurisdiction over them, that Global Art's claim is not ripe, that the case should be dismissed under the doctrine of *forum non conveniens* in favor of a German court, and that the complaint failed to state a claim upon which relief could be granted. (ECF No. 64.) This Court's November 16, 2021 Opinion decided the question of personal jurisdiction, dismissing the claims based on insurance coverage of three non-U.S.-based works of art for lack of personal jurisdiction. (Op. at 11, ECF No. 93.) The Court held in abeyance the other asserted grounds for the motion to dismiss until Insurer Defendants came into compliance with New York Insurance Law § 1213(c). (*Id.* at 6.) Insurer Defendants posted the security necessary to comply with the New York Insurance Law in January, making it now appropriate to resolve the balance of the motion to dismiss. (ECF No. 105.)

### DISCUSSION

The Court has yet to adjudicate two primary grounds for Insurer Defendants' motion to dismiss. First, Insurer Defendants moved to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, rooted in the contention that Plaintiff lacks standing because its claim is not ripe. Insurer Defendants argue that they have no present obligation to pay under the contract's provision of confiscation coverage, either because (a) successful recovery of the works of art is a precondition that must be satisfied before an obligation to pay arises, or (b) Insurer Defendants are entitled to postpone insurance payments if there is "doubt" about an insured's entitlement to the payment or there are "official or criminal proceedings" against the policyholder or insured party as a result of the claim incident. Second, Insurer Defendants moved to dismiss under the doctrine of *forum non conveniens*. As explained below, neither line of argument has merit. [3]

#### *429 I. Ripeness

[1]  [2]  [3]  [4]  [5] Insurer Defendants' arguments based on ripeness implicate the Court's subject-matter jurisdiction. They therefore present a threshold question that is properly adjudicated in a Rule 12(b)(1) motion. *See Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 330

(S.D.N.Y. 2014) (Castel, J.) (citing *Auerbach v. Bd. of Educ.*, 136 F.3d 104, 108–09 (2d Cir. 1998)). [4] "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff, as the party asserting jurisdiction, has the burden to prove subject-matter jurisdiction by a preponderance of the evidence. *Landau v. Eisenberg*, 922 F.3d 495, 497 (2d Cir. 2019). A court reviewing a Rule 12(b)(1) motion takes all uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts. *See Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). In determining questions of foreign law, a court may consider any relevant materials, whether or not submitted by a party or admissible pursuant to the Federal Rules of Evidence. *See Kashef v. BNP Paribas SA*, 442 F. Supp. 3d 809, 824 (S.D.N.Y. 2020) (Nathan, J.) (citing Fed. R. Civ. P. 44.1).

#### A. Precondition to Payment Obligation

[6] Insurer Defendants argue that they have no present obligation to pay Plaintiff pursuant to the Policy—and that such an obligation will not arise unless and until Plaintiff recovers the confiscated works of art. As a matter of contract interpretation, the first question to resolve is under which law the meaning of this contract is determined. When applying the conflict-of-law rules of New York, "courts will generally enforce choice-of-law clauses and ... contracts should be interpreted so as to effectuate the parties' intent." *See Ministers & Missionaries Benefit Bd. v. Snow*, 26 N.Y.3d 466, 25 N.Y.S.3d 21, 45 N.E.3d 917, 919 (2015). The Kuhn & Bülow Terms and Conditions of Art Insurance ("K&B Terms" or "Kuhn & Bülow Terms and Conditions") contain a valid choice-of-law clause selecting German law. [5]

[7] Accordingly, German law governs in this action. The applicable German rules of contract interpretation are quite similar to those that might prevail under New York law. Insurer Defendants' German-law **430 expert states, and Plaintiff does not contest, that disputes regarding the meaning of contracts are resolved under German law by determining the objective interpretation of the disputed provisions[,] ... based on the wording and accompanying circumstances of the agreement, taking into account the custom of trade and the principle of good faith ... [and] the intentions of the parties." (First Schöne Decl. ¶ 13, ECF No. 69.)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 40 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

**[8]** **[9]** The second question is whether, under German law, the Policy makes payment pursuant to its confiscation clause contingent on the insured party first recovering its confiscated works of art. An unmet precondition to performance can render a breach of contract claim unripe and suitable for dismissal on a Rule 12(b)(1) motion. *See MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 356 (S.D.N.Y. 2014) (Scheindlin, J.) ("When there is a contractual condition that has not been met, the insured's claim against the insurer is barred and is not ripe for adjudication."). [6] Insurer Defendants' arguments that such a condition exists are unpersuasive.

Insurer Defendants assert that the text of the Policy creates a precondition that an insured party successfully recover confiscated works of art before payment becomes due on reimbursement of related legal costs. The Written Agreements attached to the Certificates of Insurance associated with each of the covered works of art provide, "In the case of confiscation, the insurers will reimburse up to EUR 500.000,00 for costs – e. g. court and lawyer fees – which the lender might have to bear in order to resume possession of the objects of art." (FAC, Exs. C–F, H–L ("Written Agreements") § 5, ECF Nos. 55-3, 55-4, 55-5, 55-6, 55-8, 55-9, 55-10, 55-11, 55-12.) The Written Agreements expressly incorporate the Kuhn & Bülow Terms and Conditions. (*See* FAC at 2–3.) That document states that "[t]he risks of seizure, confiscation, deprivation of possession or other interventions on high authority of or in connection with insured items of art are included in insurance cover." (K&B Terms § 8(j)(1), ECF No. 55-1.) It also has its own provision regarding costs relating to confiscation: "The insurers shall reimburse costs for [two categories of costs] in order to return the insured items of art to the **\*431** power of control or the disposition of the policyholder or of the insured party." (*Id.* § 8(j)(2).) The two categories of covered costs are (1) "bonds, securities or guarantees which the policyholder/the insured party must provide" and (2) "experts, specialists, lawyers and legal costs, inasmuch as their services were required." (*Id.*) The second category is the one at issue in this case.

Insurer Defendants emphasize that the Policy covers legal costs "in order to return the insured items of art" and includes lawyers' work only "inasmuch as their services were required." (*See* Mem. at 8, ECF No. 65; Reply at 2, ECF No. 81.) Insurer Defendants' briefing does not make entirely clear why this language should be read to condition Plaintiff's entitlement to payment on it first successfully recovering

the works confiscated by Italian authorities. Implicitly, they suggest that a service may be considered "required" for a certain outcome only if that outcome actually occurs. (*See* Mem. at 8–9.) The meaning of the word "required" does not support this interpretation. *See* Require, *New Oxford American Dictionary* 1483 (3d ed. 2010) (defining "require" as "need for a particular purpose" or "cause to be necessary"). Indeed, Plaintiff alleges explicitly that the legal services for which it seeks reimbursement are "*necessary* to protect and retrieve these [confiscated] works of art." (FAC ¶ 9 (emphasis added).) [7]

Because the Policy itself does not dictate the time by which covered legal costs must be paid, the due date of payment is determined according to the standard rules of German insurance law. The parties agree that section 14 of the German Insurance Contract Act (*Versicherungsvertragsgesetz*, or "VVG") governs the time of performance of insurance payments, so long as it is not displaced by specific contractual terms. (*See* Third Schöne Decl. ¶ 9, ECF No. 117-1; Siefarth Aff. ¶ 6, ECF No. 116-1.) The statute describes two paths to triggering an obligation to pay pursuant to an insurance contract. The due date for payment is the earlier of (1) "when enquiries necessary to establish the occurrence of the insured event and the extent of the insurer's liability have been concluded," or (2) one month after notification to the insurer of the insured event, if the insured party "demands part payment in the amount which the insurer will at least be expected to pay." *Versicherungsvertragsgesetz* ("VVG") § 14. [8]

**[10]** Plaintiff's allegations are sufficient at this stage of litigation to show that payment is already due pursuant to German insurance law. To be sure, Plaintiff does not explicitly allege that Insurer Defendants **\*432** have concluded their necessary inquires or that Plaintiff demanded partial payment —one or the other of which would be necessary to trigger Insurer Defendants' duty to pay. Plaintiff does, however, allege that it is in dire need of funds to finance its legal expenses. (FAC ¶¶ 6–7; *see also* Opp'n at 15 n.13, ECF No. 74.) Insurer Defendants do not controvert this fact. Global Art's president writes that "Plaintiff presently lacks the ability to pay the bills from Mr. Sterpi and the experts who have been retained to aid in the defense of the works," has "not yet been able to raise the funds necessary to pay those bills," and faces "greatly reduced" chances of success in litigation if it does not secure sufficient funds. (Guttmann Decl. ¶¶ 10–11, ECF No. 100-1.) The Court may reasonably infer that the cash-strapped Plaintiff took care to demand partial payment

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 41 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

at least once while making "repeated demands for payment under the Policy" (FAC ¶¶ 5, 8), to increase its prospects of timely access to legal funds. Because the due date for reimbursement of legal costs is determined pursuant to VVG § 14, Insurer Defendants have a present obligation to pay. The motion to dismiss on the basis that a contractual precondition to payment makes Global Art's claim unripe is denied.

### B. Postponement Clause

Insurer Defendants also contend that the contract's "postponement clause" entitles them to delay reimbursement of Global Art's legal costs to an as-yet-undetermined date. They assert that their right to postpone payment makes Global Art's claims unripe, justifying a Rule 12(b)(1) dismissal.[9] Section 15(6) of the Kuhn & Bülow Terms and Conditions states, "[t]he insurer can postpone the payment if (a) there is doubt about the policyholder's or the insured party's entitlement to receive payment; [or] (b) official or criminal proceedings are in progress against the policyholder or the insured party on account of the claim incident." (K&B Terms § 15(6).) Insurer Defendants argue that their right to postpone payment pursuant to this clause has been triggered both by "doubt" about whether Global Art is entitled to receive payment due to two coverage exclusions in the Policy and by ongoing "official or criminal proceedings." Both arguments fail.

### i. Doubt Regarding Global Art's Entitlement to Receive Payment

Two coverage exclusions form the basis for Insurer Defendants' arguments based on the "doubt" prong of the postponement clause.[10] The Kuhn & Bülow Terms and Conditions expressly exclude from the scope of insurance coverage "[l]oss or damage caused by," among other sources, "(a) inherent vice or the natural state and properties of the items on exhibition, shrinkage and the acquisition of odours" and "(j) intentional behaviour on the part **\*433** of the policyholder." (K&B Terms § 4(2)(a), (j).) The section discussing coverage of legal costs arising from the confiscation of insured works has a "natural state and properties" exclusion, as well. It excludes from cover "loss or damage which has arisen because of the natural state and properties of the goods, even if confiscation, deprivation of possession or other interventions on high authority has/have been the cause of such loss or damage." (*Id.* § 8(j)(4).)

**[11]** The first exclusion, for loss or damage caused by the "natural state and properties" of the insured works, does not apply. Neither party could identify a single instance of a German court interpreting the phrase *natürliche Beschaffenheit* ("natural state and properties") to refer to the authenticity or authorship of an item. (*See* Third Schöne Decl. ¶ 19; Siefarth Aff. ¶ 22.) Rather, the phrase refers to an item's *physical* properties, as is shown by the examples in section 4(2)(a) of the Kuhn & Bülow Terms and Conditions: "shrinkage and the acquisition of odours." (K&B Terms § 4(2)(a).) This interpretation accords with the traditional conception of the "natural state and properties" of goods that is used in German insurance law—a recent version of the German Insurance Contract Act [VVG] listed examples of losses from *natürliche Beschaffenheit* that included damage "caused by internal spoilage, shrinkage, ordinary leakage, as well as by defective packing of the goods or by rats or mice." (Siefarth Aff. ¶ 20 (quoting an English translation of the pre-2008 version of VVG § 131).)

**[12]** The second exclusion, for loss or damage caused by "intentional behaviour on the part of the policyholder" (K&B Terms § 4(2)(j)), does not apply either. Global Art President Joseph Guttmann and two individual co-defendants are accused of, *inter alia*, (i) placing forged works of art into circulation and (ii) misleading the Palazzo Ducale about the authenticity of those forgeries. (*See* Berman Decl., Ex. A at 4, ECF No. 66-1.) Insurer Defendants suggest that they may withhold payment until the conclusion of the criminal litigation because either alleged act might constitute "intentional behaviour." If so, they contend, Global Art's legal costs would be a "loss or damage" that was caused by this intentional behavior and that therefore is excluded from coverage. This argument falls short, because the alleged acts of Guttmann and his co-defendants are not "intentional behaviour" within the meaning of the Policy.

Based on the German-law experts' submissions, the exclusion clause's use of the word "intentional" refers to the intent *to cause* the insured event, not merely the intent *to commit an act* that ultimately results in the insured event. Insurer Defendants' expert writes that the exclusion clauses "include language that appears to be an English translation of predefined legal terms that can be found in statutory provisions of German law." (First Schöne Decl. ¶ 20.) He elaborates that the language of the "intentional behaviour" exclusion "highly corresponds with § 81(1) VVG, which states: 'The insurer shall not be obligated to effect payment if the policyholder intentionally causes the insured event.'

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 42 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

" (Third Schöne Decl. ¶ 21.) Both parties' experts provide judicial decisions that bear on the meaning of "intentional behaviour." All four of these judicial decisions are in alignment—each analyzes the intent to cause an insured event. (*See id.* ¶¶ 21, 23; Siefarth Aff. ¶¶ 26–27.)

Under German law, intent encompasses two elements: knowledge and will. (*See* Third Schöne Decl., Ex. K at 3, ECF No. 117-12.) In the insurance context, the knowledge element requires that a person "acted in the awareness that his actions could cause damage to another person." **\*434** (Third Schöne Decl., Ex. L at 3, ECF No. 117-13; *see also* Third Schöne Decl., Ex. K at 3 ¶ 60.) The will element requires, at a minimum, that the actor "approved or consciously accepted" that his or her actions would cause the insured event. (Third Schöne Decl., Ex. L at 3.) The "insured event" in the instant case is the incurrence of legal costs required to regain possession of insured works of art that have been confiscated. The will element would therefore be satisfied only if the policyholder "approved or consciously accepted" (*id.*) that its actions would cause it to incur reimbursable legal costs.

Insurer Defendants' argument that the conduct of Guttmann and his co-defendants could satisfy the will element fails for three reasons. First, the Policy excludes coverage only for losses and damage caused by "intentional behaviour *on the part of the policyholder.*" (K&B Terms § 4(2)(j) (emphasis added).) Insurer Defendants acknowledge that Skira is the policyholder (*see* Mem. at 1, 4, 10, 21) and provide no reason to believe that the exclusion would apply to the actions of Global Art. Insurer Defendants misstep by speculating about the intent of Guttmann and his individual co-defendants without explaining why those individuals' intent should be attributed to Skira. Second, it is implausible that Skira— or Global Art, for that matter—"approved or consciously accepted" that its actions would cause it to incur legal costs *due to the criminal prosecution of its chief corporate officers.* (*See* Berman Decl., Ex. A at 3.) Those officers are alleged to have committed fraud in the companies' core line of business (*see* FAC ¶¶ 34, 36), which can be expected to cause significant harm to the companies. Third, the conduct alleged is insufficient to support Insurer Defendants' claim that the conduct was intentional. Insurer Defendants emphasize that Guttmann was accused of misleading the Palazzo Ducale regarding the authenticity of the insured works of art. (*See* Mem. at 11.) But obscuring the inauthenticity of artwork indicates an attempt to keep the supposed fraud hidden and thereby *avoid* confiscation and litigation. If the co-defendants had successfully kept their purported fraud hidden, they

would have prevented the "insured event" from occurring— Plaintiff would never have incurred the legal costs at issue in this case. The co-defendants' actions belie the suggestion that they "approved or consciously accepted" that their conduct would cause the insured event.

Other provisions of the Policy further undermine Insurer Defendants' reliance on the "intentional behaviour" exclusion. The Policy contains separate, narrow remedies for instances in which covered works of art are found to be forgeries, or insured parties are discovered to have misrepresented the authenticity of covered works. One express provision lowers the insured value of works if they are revealed to be forgeries. (*See* K&B Terms § 7.) Another provision grants a remedy to insurers that discover that an insured party or policyholder submitted "incomplete and incorrect information" about "risk-significant circumstances"—such as the authenticity of a work. (*See id.* § 9(2).) In such cases, the insurers have a limited right to withdraw from the insurance policy. (*See id.* § 9(5).) It strains credulity to believe that the drafters of a contract would write a clause that merely *reduces* the insured value of forged works, and also create a *limited* remedy of withdrawal for non-disclosure of inauthenticity, if they intended to swallow both with an expansive definition of the "intentional behaviour" that affords a much more potent remedy—a complete excuse to performance.

Finally, the terminology used in the exclusion clauses bolsters the conclusion that neither of the Policy's coverage exclusions applies to the legal costs at issue. The **\*435** exclusion clauses carve out from coverage certain types of "loss or damage" (*id.* § 4(2)), but every reference to coverage for legal expenses uses a different term: "costs" (*see id.* §§ 4(2)(b), 8(j)(2); Written Agreements § 5). The use of these different terms appears to be deliberate: The distinction is made even in a single, two-sentence-long subsection. That passage reads, "*Loss or damage* caused by the following are excluded ... [b] direct *damage* to the items of art because of seizure and confiscation. The *costs* arising from this are, however, included in insurance cover as according to § 8, Sub-section j [the confiscation clause]." (K&B Terms § 4(2)(b) (emphases added).) The wording suggests that legal costs are not subject to any of the exclusions for "loss or damage."

### *ii. Official or Criminal Proceedings*

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 43 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

Insurer Defendants' invocation of their right to postpone payment when "official or criminal proceedings are in progress against the policyholder or the insured party on account of the claim incident" is unavailing. (*See* K&B Terms § 15(6).) First, although there are pending criminal proceedings that relate to the confiscation at issue, neither Global Art nor Skira is party to those proceedings; instead, the criminal proceedings are against *individuals*, including Guttmann and five others. (*See* Berman Decl., Ex. A at 3.)

Second, although the Palazzo Ducale brought a civil claim against Skira related to the confiscation (*see* Berman Decl., Ex. B at 2–4, ECF No. 66-2), Insurer Defendants provide no support for their contention that civil litigation is an "official ... proceeding[ ]" within the meaning of the postponement clause (K&B Terms § 15(6)). In fact, the parties' submissions suggest the opposite—that the phrase "official proceedings" excludes civil litigation and is closely associated with investigative efforts by governmental entities.

The final declaration by Insurer Defendants' German-law expert Friedrich Tobias Schöne states that German courts construe the phrase "official proceedings" to be related to an insurer's "enquiries necessary to establish the occurrence of the insured event and the extent of the insurer's liability." (Third Schöne Decl. ¶ 30 (quoting VVG § 14(1)).) Those enquiries must be completed before a full insurance payment becomes due pursuant to the German Insurance Contract Act. *See* VVG § 14(1). Schöne characterizes the judicial decisions he cites as reflecting the "well-established" legal principle that "official investigations," or *behördliche Ermittlungen*,[11] may "postpone the due date of payments if their outcome may in some way influence the insurer's obligation to indemnify." (Third Schöne Decl. ¶ 33.) He also directs the Court to a helpful leading commentary on the German Insurance Contract Act. The commentary first explains that it is permissible in principle for insurance contracts expressly to condition the due date for payment on the conclusion of "official investigative proceedings," because such proceedings often produce information that is material to the existence of an insured event. (Third Schöne Decl., Ex. P at 3 ¶ 30, ECF No. 117-17.) The commentary then appears to equate "official investigation proceedings" with "the investigative work of authorities" and, namely, "[i]nvestigation proceedings by the police and the public prosecutor's office." (*Id.* at 3 ¶¶ 20, 30.)

[13]  Taken as a whole, the materials provided suggest that the meaning of "official proceedings" in the Policy is limited

to proceedings initiated by a governmental **\*436** body, such as a prosecutor's office or regulatory agency. At a minimum, Insurer Defendants have provided no arguments or supporting authority affirmatively indicating that civil litigation initiated by a private party constitutes an "official proceeding." The civil claim that the Palazzo Ducale brought against Skira is therefore insufficient to trigger Insurer Defendants' right to delay payments pursuant to the Policy's postponement clause.

Insurer Defendants have failed to establish that Plaintiff's claim is unripe because a precondition to payment is not yet satisfied or because the Policy gives them the right to postpone payment under the present circumstances. Global Art's breach of contract claim thus presents a controversy within the subject-matter jurisdiction of this Court.

## II. *Forum Non Conveniens*

[14]   [15]   [16]   [17]   [18]  Insurer Defendants also move to dismiss under the doctrine of *forum non conveniens*, urging that Germany is the appropriate forum. "The doctrine of *forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." *Carey v. Bayerische Hypo–Und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (internal citation and quotation marks omitted). The exercise of the Court's discretion is guided by the three-step process set forth by Second Circuit:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001)). A defendant generally "bears a heavy burden" when it seeks to invoke *forum non conveniens*. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). Dismissal is warranted "only if the chosen forum is shown to be genuinely

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 44 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

inconvenient and the selected forum significantly preferable." *Iragorri*, 274 F.3d at 74–75. A court deciding a motion to dismiss for *forum non conveniens* may consider the pleadings as well as affidavits from both moving and opposing parties. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014).

### A. Step One: Deference to Plaintiff's Choice of Forum

 **[19]** **[20]** **[21]** **[22]** Courts give a high degree of deference to the plaintiff's choice of forum. *See Norex Petroleum*, 416 F.3d at 154. A court will increase or decrease the level of deference, depending upon whether the lawsuit was brought in the forum for legitimate reasons, such as "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," and whether "considerations of convenience favor the conduct of the lawsuit in the United States." *Iragorri*, 274 F.3d at 72. Great deference is given when a plaintiff sues in its home forum. *See id.* at 71. Global Art is thus entitled to a higher-than-typical degree of deference, given that its principal place of business is in Manhattan, within the geographic jurisdiction of its chosen forum, the Southern District of New York. *See N.H. Ins. Co. v. Sphere Drake Ins. Ltd.*, No. 01-CV-3226, 2002 WL 1586962, at *6 (S.D.N.Y. July 17, 2002) (Jones, J.), *aff'd in part, vacated in part on other grounds*, 51 F. App'x 342 (2d Cir. 2002).

 ***437** **[23]** Insurer Defendants' arguments for reduced deference to Plaintiff's choice of forum are unavailing. Courts afford less deference to a plaintiff's choice of forum when the plaintiff sought out business relationships in the alternative forum and therefore could reasonably expect to litigate there. *See Carey*, 370 F.3d at 238. Insurer Defendants contend that Plaintiff should not be surprised that it would be required to litigate insurance claims "in Europe" given its dealings on the continent. (Mem. at 13.) But Global Art hired an *Italian* company, Skira, to arrange insurance coverage for works of art to be exhibited in *Italy*. It was Skira that then placed Global Art's insurance policy with a German company, Kuhn & Bülow. (*See* FAC ¶ 38.) Seeking out relationships and doing business in Italy is not tantamount to consent to litigate in Germany. *See Petersen Energia Inversora S.A.U. v. Argentine Republic*, No. 15-CV-2739, 2020 WL 3034824, at *8 (S.D.N.Y. June 5, 2020) (Preska, J.) ("*Carey*'s holding is not that any plaintiff voluntarily conducting business internationally is automatically entitled to lesser deference with respect to her choice of forum.").

Global Art's strong showing at step one of the analysis entitles its choice of forum to a particularly high degree of deference. This deference "recalibrate[s] the balance for purposes of the remaining analysis," raising the bar that Insurer Defendants must surpass at steps two and three. *Norex Petroleum*, 416 F.3d at 157.

### B. Step Two: Adequacy of Alternative Forum

 **[24]** **[25]** With respect to the second step in the analysis, Germany is clearly an adequate alternative forum for this litigation. "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). Both conditions are met here. First, all Defendants either are German entities subject to service of process in Germany or have indicated their willingness to submit to the jurisdiction of a German court. (*See* FAC ¶¶ 17–22; Mem. at 14 n.9.) Second, German courts permit litigation of breach of contract claims such as the one Global Art has raised against Insurer Defendants. *See, e.g.*, *NCA Holding Corp. v. Norddeutsche Landesbank Girozentrale*, No. 96-CV-9321, 1999 WL 39539, at *2 (S.D.N.Y. Jan. 28, 1999) (McKenna, J.) (dismissing breach of contract claims on the basis of *forum non conveniens*, in favor of an alternative forum in Germany).

 **[26]** Plaintiff argues that several aspects of the German judicial process would make it financially impracticable to bring suit in that country. But an alternative forum is sufficient even if its procedures and causes of action differ from those in a plaintiff's chosen forum, unless the remedies in the foreign forum are "tantamount to no remedy at all." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009). Features such as the German requirement that plaintiffs post security for litigation costs and that the losing party in a lawsuit pays the attorneys' fees for the prevailing party do not meet that standard. Furthermore, Plaintiff was mistaken in raising concerns about German courts' prohibition of contingent-fee arrangements in the discussion of this factor. Such matters are properly considered in the balancing of interests during the third step of the *forum non conveniens* inquiry. *See Murray v. Brit. Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996). Germany is an adequate alternative forum for the instant litigation.

### C. Step Three: Balancing of Private and Public Interests

 **[27]** In the final step of the analysis, the Court weighs the private and public ***438** interests implicated by the choice of

Case 9:21-cv-00949-MAD-ML Document 102 Filed 10/29/24 Page 45 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

forum. "The defendant bears the burden of establishing ... that the balance of private and public interest factors tilts heavily in favor of the alternative forum." *Abdullahi*, 562 F.3d at 189. The showing required of Insurer Defendants in this case is even stronger than is usually necessary, because of the high degree of deference afforded Plaintiff's choice of its home forum.

### *i. Private Interests*

[28] [29] Balancing the private interests entails "a comparison between the hardships defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as the result of dismissal and the obligation to bring suit in another country." *Iragorri*, 274 F.3d at 74. The United States Supreme Court has set forth a non-exhaustive set of factors to consider. As relevant here, those factors include (1) "relative ease of access to sources of proof"; (2) availability of compulsory process to force the attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; and (4) "all other practical problems that make trial of a case easy, expeditious[,] and inexpensive." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

Each of the first three of these factors depends on the location of evidence necessary to a trial in this case and the difficulties associated with seeking to produce that evidence before a court in the Southern District of New York.[12] Success for Global Art on its breach of contract claim against Insurer Defendants would require, at minimum, establishing that a binding contract exists, determining the meaning of that contract with respect to coverage of legal expenses in the case of confiscated covered artwork, assessing whether Insurer Defendants' conduct was in breach of the agreement, and, if so, fixing the amount of damages owed to Plaintiff.

[30] The sources of proof for this claim are distributed across Germany, Italy, and the United States. With respect to the existence and meaning of the contract, the relevant documentary evidence and witnesses are concentrated in Germany and Italy. As stated previously, disputes regarding the meaning of contracts are resolved under German law by determining "the objective interpretation of the disputed provisions[,] ... based on the wording and accompanying circumstances of the agreement, taking into account the

custom of trade and the principle of good faith ... [and] the intentions of the parties[.]" (First Schöne Decl. ¶ 13.) Plaintiff alleges that Skira, an Italian firm, arranged for Kuhn & Bülow, a German firm, to procure an insurance policy for works of art to be shown in Genoa. (*See* FAC ¶ 38.) The lead underwriter for Insurer Defendants was employed by the German firm ERGO and states that he communicated solely with Kuhn & Bülow—not Skira or any of the **\*439** owners of the art, including Global Art. (Hummels Decl. ¶ 8, ECF No. 68.) Evidence that would assist the Court in deciding how the custom of trade, principle of good faith, and intentions of parties apply would thus be found largely in Germany, but also in Italy. In contrast, deciding whether Insurer Defendants' failure to pay constitutes breach of the contract would require determining the existence of a qualifying confiscation event in Italy, ascertaining whether the legal expenses American firm Global Art incurred for Italian counsel are within the scope of the Policy's coverage, and establishing that Global Art made appropriate demands for payment. The evidence and witnesses relevant to these questions would be found primarily in the United States and Italy. The evidence needed to determine the quantum of damages would be found in the United States and Italy, as well. The meaning of the contract could well be the most intensely contested of the aforementioned questions at trial. Even if it is, the ease of access to sources of proof would weigh only slightly in favor of a German forum.

Notably, Insurer Defendants do not contend that German courts would have a greater ability than this Court to secure evidence from non-parties in Italy through the use of compulsory process. They also do not identify non-party witnesses or custodians of documentary evidence who reside in Germany and who would be outside the reach of this Court's jurisdiction.[13] The availability of compulsory process is a neutral factor.

The cost of obtaining testimony from willing witnesses is, in the era of modern communications and transportation technology, a fairly minor factor. *See Petersen Energia*, 2020 WL 3034824, at \*11 n.11 ("[D]epositions can be conducted via videoconference; documents located overseas can be uploaded easily and reviewed by the parties via e-discovery platforms; and, if it comes to it, the parties can request that the Court allow trial witnesses to testify via video pursuant to the good cause exception in Fed. R. Civ. P. 43."). Because Insurer Defendants do not identify the witnesses whose attendance they would likely seek (and do not even estimate the number of likely witnesses from Germany) it is difficult to credit

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 46 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

their argument that the cost of obtaining testimony would be burdensome.

Finally, the Court notes that Insurer Defendants seem to have substantially more resources than Plaintiff with which to bear the inconveniences of distant litigation. Plaintiff asserts in its briefing that Global Art "is a very small company with modest means compared to the Insurer Defendants." (Opp'n at 15 n.13.) Plaintiff states that Germany's prohibition on contingent-fee arrangements for legal services, requirement that plaintiffs post security costs in advance, and rule that a losing party pays its adversary's legal costs make it "virtually impossible" for a firm of its size to litigate in Germany. (*Id.* at 15.) The unavailability of contingent-fee arrangements, along with the need for plaintiffs to post security, accentuates the financial burden Plaintiff would need to bear if litigating in Germany. *See Murray*, 81 F.3d at 292.

In contrast, the complaint alleges that four out of five Insurer Defendants are wholly owned subsidiaries of internationally prominent insurance providers. (FAC ¶¶ 18, 20–22.) For example, lead underwriter **\*440** ERGO is a subsidiary of global giant Munich Re. *Cf. Carey*, 370 F.3d at 238 ("For an individual of modest means, the obligation to litigate in a foreign country is likely to represent a considerably greater obstacle than for a large business organization—especially one maintaining a business presence in foreign countries."). The relative resources of the parties weigh slightly in favor of litigation in the Southern District of New York.

Insurer Defendants have not shown the private interest factors to weigh in favor of dismissal.

### ii. Public Interests

 **[31]** The final consideration is the public interests implicated by the choice of forum. Relevant factors include (1) "the administrative difficulties flowing from court congestion," (2) the " ' local interest in having localized controversies decided at home' " and "the unfairness of burdening citizens in an unrelated forum with jury duty," and (3) "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." *Piper Aircraft*, 454 U.S. at 241 n.6, 102 S.Ct. 252 (quoting *Gilbert*, 330 U.S. at 509, 67 S.Ct. 839).

 **[32]** The first factor, administrative difficulties flowing from court congestion, is neutral. The Southern District of New

York may have one of the nation's busiest dockets, but its administration is very efficient. Insurer Defendants do not contend that the relevant German courts have less congested dockets, and there is no basis to assume that they do. *See Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 774 (S.D.N.Y. 2006) (Leisure, J.). In any case, when a federal court has a "full complement of judges for the District," as the Southern District likely will soon, [14] it makes the concern of judicial burden "of little or no present significance." *Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 147 n.5 (2d Cir. 2000).

Second, New York has a stronger local interest in the controversy in this litigation. "New York has an extremely strong interest in ensuring that [foreign] insurers follow through on the commitments they make to New York citizens." *Twin City Fire Ins. Co. v. Harel Ins. Co.*, No. 10-CV-7842, 2011 WL 3480948, at \*3 (S.D.N.Y. Aug. 5, 2011) (Jones, J.). That interest is reflected by the state's requirement that unauthorized non-U.S. insurers post security before litigating against a New York resident in relation to an insurance contract—a provision that has already been addressed in this case. (*See* Op. at 4–6.) The statute imposing that requirement has the explicit legislative aim of providing New York residents with the option to resolve their insurance controversies in their home forum. *See* N.Y. Ins. L. § 1213(a) (describing a purpose of "subject[ing] certain insurers to the jurisdiction of the courts of this state" because of concerns that non-U.S. insurers would present to New York residents "the often insuperable obstacle of resorting to distant forums for the purpose of asserting [their] legal rights"). Germany certainly has an interest in the operations of companies that are organized under its laws and housed within its borders. But Insurer Defendants have not shown that Germany's interest in this litigation is as strong as that of New York. Trying the case before a New York jury would be an effectuation of New York public policy, not an unfair burden on the people of New York. The local **\*441** interest factor weighs in favor of the Court retaining jurisdiction over this case.

 **[33]** Third, the need to apply foreign law in this case weighs only slightly in favor of dismissal. Courts "must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform." *Manu Int'l, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 68 (2d Cir. 1981). The questions of German law in this case are relatively straightforward issues of contract interpretation and of the substantive law of insurance. They are not the type of novel

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 47 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

questions that deserve to be resolved in the first instance by a court of the relevant jurisdiction. *Cf. Finch v. Xandr, Inc.*, No. 21-CV-5964, 2021 WL 5910071, at *5 (S.D.N.Y. Dec. 14, 2021) (Marrerro, J.) (dismissing case presenting novel questions relating to the United Kingdom's General Data Protection Regulation). Accordingly, the Court gives this factor little weight.

In sum, the public factors weigh in favor of leaving Plaintiff's choice of forum undisturbed.

Insurer Defendants have not met their burden to show that balance of private and public factors tilts heavily in favor of an alternative forum in Germany. Particularly in light of the high degree of deference due Plaintiff's choice of its home forum, the Court will not disturb Global Art's decision to bring this case in the Southern District. Insurer Defendants' motion to dismiss for *forum non conveniens* is denied.

## CONCLUSION

For the foregoing reasons, the remainder of Insurer Defendants' motion to dismiss is DENIED. The parties are directed to submit by July 6, 2022 a joint proposed Scheduling Order and Discovery Plan, based on the templates found on this Court's individual web page. An Initial Pretrial Conference will be held in this case on July 20, 2022 at 2:00 p.m. in Courtroom 26A of the Daniel Patrick Moynihan United States Courthouse.

SO ORDERED.

## All Citations

607 F.Supp.3d 421

---

## Footnotes

1    There is ambiguity in the complaint regarding whether the number of Modigliani and Kisling works lent by or through Global Art totaled twelve or fourteen. What is clear is that there were nine such works originally from New York City that were lent by or through Global Art, insured by Insurer Defendants, and seized by Italian authorities. (*See* FAC ¶ 48.)

2    This Opinion is also accessible at ECF No. 93.

3    Insurer Defendants also move pursuant to Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, advancing two theories. First, they maintain that, because Insurer Defendants do not have a present obligation to pay pursuant to the contract, Plaintiff fails to state a breach of contract claim upon which relief can be granted. This argument mirrors those addressed in the analysis of Insurer Defendants' Rule 12(b)(1) motion. It is baseless for the same reasons outlined below. Second, Insurer Defendants attack two aspects of Plaintiff's prayer for relief: the prayer for punitive damages and the request for injunctive relief. Motions to dismiss aimed at prayers for relief are premature except when such relief is categorically barred. *See Doe v. Indyke*, 457 F. Supp. 3d 278, 283 (S.D.N.Y. 2020) (Engelmayer, J.). Insurer Defendants' briefing, which asserts that Plaintiff has not pled the elements necessary for punitive damages in a breach of contract claim under New York law, includes no such argument.

4    Some questions of ripeness implicate only prudential, and not jurisdictional concerns. *See Simmonds v. I.N.S.*, 326 F.3d 351, 354 n.2 (2d Cir. 2003) (Calabresi, J.). Such is not the case here—Insurer Defendants contend that Plaintiff's claims are contingent on events that may never come to pass. This argument poses the question of whether the claims present a "case or controversy" that falls within this Court's jurisdiction under Article III. Constitutional ripeness, unlike prudential ripeness, is a jurisdictional issue properly analyzed pursuant to Rule 12(b)(1). *Cf. In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 109–10 (2d Cir. 2013).

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 48 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

5    Plaintiff's German-law expert writes that the choice-of-law clause, which states that "the statutory regulations and provisions of German legislation shall apply" (Kuhn & Bülow Terms and Conditions § 24, ECF No. 55-1), is "not worded in the way a typical choice of law clause under German law would be drafted" (Siefarth Decl. ¶ 11, ECF No. 76). Insurer Defendants' expert explains persuasively that this language is a translation of a standard choice-of-law clause written in German. (*See* Second Schöne Decl. ¶ 6, ECF No. 83.) The Policy evinces the parties' clear intent that German law apply.

6    Insurer Defendants refer the Court to several judicial decisions in which courts have granted a Rule 12(b)(1) motion to dismiss breach of contract claims for lack of ripeness when a condition precedent has not yet been satisfied. These decisions, and other similar decisions the Court has reviewed, involve conditions precedent that were stated expressly or are otherwise clear and unambiguous. *See EMR (USA Holdings), Inc. v. Goldberg*, No. 18-CV-7849, 2019 WL 5537878, at *5 (S.D.N.Y. Oct. 25, 2019) (Ramos, J.) (plaintiff had not satisfied condition precedent that "is black letter law in New York"); *Beazley Ins. Co. v. Ace Am. Ins. Co.*, 150 F. Supp. 3d 345, 354–55 (S.D.N.Y. 2015) (Rakoff, J.) (policy stated that coverage obligations "attach ... only after" other coverage was exhausted); *MBIA*, 33 F. Supp. 3d at 356 (policy stated "[n]o action shall lie against Underwriters unless, as a condition precedent thereto, ... the amount of the Assureds' obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them"); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003) (Rakoff, J.) ("[T]he insurance contract between the parties expressly provides that defendant's payment obligation only arises 30 days after [submission of proofs of loss]."). Constitutional ripeness is a question of this Court's authority to hear a case pursuant to Article III. *See Simmonds*, 326 F.3d at 357. Accordingly, these authorities, rather than analogous decisions by German courts, bear on the question of how clearly a contractual precondition must be stated to deny the Court subject-matter jurisdiction. However, Insurer Defendants fail entirely to demonstrate that a condition precedent to their obligation to pay remains unsatisfied.

7    Insurer Defendants also assert without explanation that the contract's use of the word "reimburse" strengthens their argument that coverage is subject to a precondition of successful recovery of the confiscated works. The plain meaning of this term lends no support to this contention. *See* Reimburse, *New Oxford American Dictionary* 1472 (3d ed. 2010) (defining "reimburse" as "repay (a person who has spent or lost money)"). Global Art has incurred costs for legal services in the litigation regarding the authenticity of the covered works and it has made expenditures to the relevant counsel. (*See* Guttmann Decl. ¶¶ 9–11 ("I have no choice but to pay Mr. Sterpi's bills on a current basis to defend the authenticity of the works and resume possession of them.... Plaintiff has been forced to sell several of its other works to raise the funds necessary to continue to pay the bills from Mr[.] Sterpi and the experts.").) A payment from Insurer Defendants to Global Art today would thus fit within the meaning of "reimbursement."

8    All citations to the *Versicherungsvertragsgesetz*, or German Insurance Contract Act, refer to the English translation provided by the Federal Ministry of Justice (*Bundesministerium der Justiz*) at https://www.gesetze-im-internet.de/englisch_vvg/englisch_vvg.html.

9    Insurer Defendants do not provide support for the proposition that this type of "postponement clause"—in contrast to a clear contractual precondition to an obligation—should be analyzed as a jurisdictional issue. Their arguments fail even under the Rule 12(b)(1) standard, which allocates the burden of proof more favorably to a moving defendant than does the Rule 12(b)(6) standard. *See Williams v. Long Beach Mortg. Co.*, No. 15-CV-5952, 2016 WL 5720810, at *3 (S.D.N.Y. Sept. 30, 2016) (Karas, J.), *aff'd*, 709 F. App'x 92 (2d Cir. 2018). For this reason, the Court assumes without deciding that the issues presented by the postponement clause should be analyzed under the Rule 12(b)(1) standard.

10    Insurer Defendants also raise a meritless argument that "doubt" is created by the uncertainty about whether Global Art will regain possession of the insured works at the conclusion of the Italian proceedings. As

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 49 of 160

Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia..., 607 F.Supp.3d 421...

explained above, Global Art's entitlement to reimbursement is not contingent on first regaining possession of the insured works of art.

11    The parties' experts direct the Court to authorities discussing German phrases including *behördliche Ermittlungen, behördliches verfahren,* and *behördliche Ermittlungsverfahren* as relevant to the meaning of "official proceedings" in the Policy.

12    Insurer Defendants do not address at length whether the claims against Kuhn & Bülow, which has not appeared in this action, should be dismissed for *forum non conveniens.* The Court briefly notes that the questions posed by Kuhn & Bülow are similar to those discussed in the rest of the *forum non conveniens* analysis. First, Kuhn & Bülow is amenable to suit in Germany, like the other Defendants. (*See* First Schöne Decl. ¶ 28.) Second, the balance of private and public interests would be similar, given that the second and third causes of action premise Kuhn & Bülow's alleged liability largely upon Insurer Defendants' failure to pay Global Art for the legal fees it has incurred after the Modigliani and Kisling works were confiscated. The fourth asserted cause of action is inscrutable, as it does not explain how Kuhn & Bülow is alleged to be liable. (*See* FAC ¶¶ 88–90.)

13    The ability to obtain documentary evidence and testimony from the parties is of little concern. *See Fuji Photo Film Co. v. Lexar Media, Inc.,* 415 F. Supp. 2d 370, 375 (S.D.N.Y. 2006) (McMahon, J.) ("[P]arties can compel the testimony of their own employees without the need for subpoena.").

14    While the Southern District has several vacancies today, they are likely to be filled in short order. *See Current Judicial Vacancies,* U.S. Courts, https://www.uscourts.gov/judges-judgeships/judicial-vacancies/current-judicial-vacancies (last accessed June 14, 2022) (listing nominees for all three S.D.N.Y. vacancies that have been open for more than three months).

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Calix v. Pope, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 50 of 160

🚩 KeyCite Red Flag - Severe Negative Treatment

On Reconsideration  Calix v. Pope,  E.D.N.Y.,  September 30, 2023

2022 WL 4539511
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Andre CALIX, Plaintiff,
v.
Lieutenant Thomas POPE, Defendant.
Andre Calix, Plaintiff,
v.
United States of America, Defendant.

18-CV-3980 (RPK) (PK), 19-CV-6685 (RPK) (PK)
|
Signed September 28, 2022

**Attorneys and Law Firms**

Michael Kevin Pinkard, Sameer Nath, Sim & DePaola, LLP, Bayside, NY, for Plaintiff Andre Calix.

Matthew J. Modafferi, US Attorney's Office, Brooklyn, NY, for Defendants Lieutenant Thomas Pope, United States of America.

Sameer Nath, Sim & DePaola LLP, Bayside, NY, for Plaintiff Andre Calix.

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

**\*1** Plaintiff Andre Calix sues Lt. Thomas Pope of the Federal Bureau of Prisons ("BOP") and the United States of America for injuries he sustained when attacked by his cellmate at the Metropolitan Detention Center in Brooklyn ("MDC"). He raises an Eighth Amendment claim against Lt. Pope for failing to provide safe housing under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and a negligence claim against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). Defendants move for summary judgment on both claims, while plaintiff moves for summary judgment on his FTCA claim. For the reasons that follow, defendants' motion is granted as to plaintiff's *Bivens* claim. Neither party is entitled to summary judgment on the FTCA claim.

**BACKGROUND**

The following facts, taken from the parties' Rule 56.1 statements, depositions, and evidentiary filings, are uncontradicted by other evidence unless noted.

**A. Factual Background**

On May 22, 2018, without warning or provocation, plaintiff's cellmate, Inmate A, threw hot water on plaintiff. Consolidated R. 56.1 Statement ¶ 2, 4 (Dkt. #125-1) ("R. 56.1 Statement"). [1] Inmate A had only been in the MDC for several days, and until the assault, plaintiff and Inmate A had never fought or quarreled. *Id.* at ¶¶ 4, 7–8.

Neither inmate was assigned a substantially higher security-risk score than the other. *Compare* Decl. of Matthew J. Modafferi Ex. D (Dkt. #126-1) (Inmate A: risk of violence = 20, security level = medium), *with* Matthew J. Modafferi Ex. E (Dkt. #126-2) (plaintiff: risk of violence = 22, security level = medium). At the time of the attack, though, Inmate A was under investigation for an incident at his previous place of incarceration, Federal Medical Center ("FMC") Devins. R. 56.1 Statement ¶ 17. There, on April 20, 2018, BOP staff observed Inmate A arguing with his cellmate. *Id.* at ¶ 18. After corrections officers separated the men, Inmate A's cellmate alleged that a week earlier, Inmate A had performed a sex act on the cellmate without consent while he was asleep. *Id.* at ¶ 19. Inmate A denied the allegation and claimed that he fought his cellmate because his cellmate spat on him. *Id.* at ¶ 23; Decl. of Matthew J. Modafferi, Ex. L 1 (Dkt. #126-5) ("Greer-Pope Emails").

**\*2** During the investigation, Inmate A and his cellmate were separated and placed in the unit in FMC Devins called "N-1," R. 56.1 Statement ¶ 13, which is a "special unit" with "more staff, psychology, and twenty-four-hour health services care." Second Decl. of Matthew J. Modafferi, Ex. A 77:16–18 (Dkt. #123-18) ("Greer Dep."). Inmates may be placed in N-1 pending an investigation or to separate them from other inmates after a fight. Decl. of Matthew J. Modafferi, Ex. B 10 ¶ 18 (Dkt. #123-19).

On May 11, while the BOP was investigating the altercation at FMC Devins, the BOP transferred Inmate A to the MDC, where he was placed in the general population. R. 56.1 Statement ¶ 21. On May 21, the day before the attack, Lt.

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 51 of 160

Calix v. Pope, Not Reported in Fed. Supp. (2022)

Benjamin Greer of FMC Devins contacted Lt. Pope and asked him to interview Inmate A for the investigation. Greer-Pope Emails 2. Lt. Greer also communicated to Lt. Pope the substance of the allegations about Inmate A. *Ibid.* Lt. Pope conducted the interview and reported that Inmate A denied the sexual-assault allegations and stated that he attacked his cellmate for spitting on him. *Id.* at 1. The following day, Inmate A attacked plaintiff. R. 56.1 Statement ¶ 2.

The parties disagree over whether BOP policies permitted an inmate under investigation to be transferred from unit N-1 into general-population housing without the approval of a captain. *Compare* Decl. of Sameer Nath, Ex. 1, at 2 (Dkt. #124-4) ("If an inmate were released from N-1 to a general population unit during the pendency of a [Special Investigative Supervisor ("SIS")] investigation, SIS and the Captain would have to sign off on a release order.") *with* Second Decl. of Mathew J. Modafferi, Ex. C, at 4, 16 (Dkt. #123-20) ("BOP SHU Policies") (outlining BOP policies for releasing individuals from special housing units ("SHUs") and setting forth no specific sign-off requirement).

Ultimately, Lt. Greer determined that the sexual-assault allegations against Inmate A were unsubstantiated due to a lack of credible evidence. Decl. of Matthew J. Modafferi, Ex. M 4–5 (Dkt. #126-6). A captain signed off on the report on May 31, 2018, and a warden signed off on the report on June 8, 2018. *Id.* at 1.

### B. Procedural History

After the attack, plaintiff sued Lt. Pope and several other defendants. *See* Compl. (Dkt. #1). Then-presiding Judge Chen dismissed the defendants other than Lt. Pope. *See* Mem. & Order 5 (Dkt. #6); May 15, 2019 Minute Entry. Plaintiff then filed the operative amended complaint, *see* Am. Compl. (Dkt. #24), and obtained counsel, *see* Notice of Appearance (Dkt. #114). In 2019, plaintiff also filed the related suit against the United States, *see* Compl., *Calix v. United States*, No. 19-CV-6684 (RPK) (PK) (E.D.N.Y.) (Dkt. #1) ("*Calix v. United States* Compl."), which was then consolidated with the action against Lt. Pope, *see* Jan. 14, 2020 Order.

These complaints contain two claims: an Eighth Amendment deliberate-indifference claim against Lt. Pope for failing to provide safe housing under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), and a negligence claim against the United States under the FTCA, 28 U.S.C. § 2671 *et seq. See* Am. Compl.; *Calix v. United States* Compl. Defendants move for summary judgment on both claims, and plaintiff moves for summary judgment on the FTCA claim. *See* Mot. for Summ. J. (Dkt. #122); Mem. in Supp. (Dkt. #124-1).

### STANDARD OF REVIEW

**\*3** Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (citation omitted). In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant. *Ibid.* A nonmoving party can survive summary judgment only if there is sufficient evidence to permit a rational trier of fact to find in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

In assessing the record, I consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, [and] interrogatory answers." Fed. R. Civ. P. 56(c)(1)(A). I view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks, alterations, and citation omitted).

Defendants argue, in part, that this Court lacks subject-matter jurisdiction over plaintiff's negligence claim because the claim does not fall under the FTCA's waiver of sovereign immunity. Mot. for Summ. J. 19–22. When a motion for summary judgment includes a challenge to subject-matter jurisdiction, a district court "ha[s] broad discretion when determining how to consider [the] challenge[ ]." *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 441 (2d Cir. 2022) (citing *Gibbs v. Buck*, 307 U.S. 66, 71–72 (1939)); *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003). After discovery, if no

Calix v. Pope, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 52 of 160

genuine dispute of material facts exists as to jurisdiction, the matter may be resolved on the affidavits. *All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006). Conversely, "if a genuine dispute of material fact [does] exist[ ]," the court "may conduct a hearing limited to" jurisdiction or "proceed to trial and make its jurisdictional ruling at the close of the evidence." *Ibid.*

## DISCUSSION

Defendants' motion is granted in part and denied in part, and plaintiff's motion is denied in full. Plaintiff's deliberate-indifference claim fails for lack of a cause of action. However, genuine factual disputes preclude summary judgment for either side on plaintiff's FTCA claim.

### I. Plaintiff's *Bivens* Claim Fails

Plaintiff's claim for deliberate indifference falls short, because it does not fit within the narrow confines of a permissible *Bivens* claim. In *Bivens* itself, the Supreme Court recognized an implied damages action against federal narcotics officers for a Fourth Amendment violation arising from a warrantless arrest of a man in his home. *Bivens*, 403 U.S. at 389. The Court then extended *Bivens* by recognizing two more implied damages remedies: one against members of Congress under the Fifth Amendment for sex discrimination, *Davis v. Passman*, 442 U.S. 228, 249–50 (1979), and another against prison officials under the Eighth Amendment for a denial of medical care to a prisoner resulting in death, *Carlson v. Green*, 446 U.S. 14, 16 (1980). Those decisions "were the products of an era in which the Court routinely inferred 'causes of action' that were 'not explicit' in the text of the provision that was allegedly violated." *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020) (citation omitted). But since then, the Supreme Court has deemed the "expansion of *Bivens*" as "a disfavored judicial activity," *id.* at 742 (internal quotation marks and citation omitted), because "[a]t bottom, creating a cause of action is a legislative endeavor." *Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022).

**\*4** The Supreme Court has instructed courts to engage in a two-step inquiry in determining whether to recognize a cause of action under *Bivens*. First, the court should "ask whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningfully' different from the three cases in which the Court has implied a damages action." *Id.* at 1803 (quoting

*Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017)). Meaningful differences include

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Ziglar*, 137 S. Ct. at 1860.

If "a claim arises in a new context," the court must ask "whether there are any special factors that counsel hesitation" about extending *Bivens* to the new claim. *Hernandez*, 140 S. Ct. at 743 (internal quotation marks and brackets omitted). "[S]eparation-of-powers principles" are "central" to that inquiry. *Ibid.* (quoting *Ziglar*, 137 S. Ct. at 1857). A court must ask "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 137 S. Ct. at 1857–58. A court may consider whether the judiciary possesses the capacity to assess the impact of liability "on governmental operations," and whether "the case arises in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere." *Id.* at 1858. If any factor gives "reason to pause," *Bivens* may not be extended. *Hernandez*, 140 S. Ct. at 743. Indeed, if "a court likely cannot predict the 'systemwide' consequences of recognizing a cause of action," that "uncertainty alone is a special factor that forecloses relief." *Egbert*, 142 S. Ct. at 1803. While this inquiry formally proceeds in two steps, the Supreme Court has noted that in practice, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Ibid.*

**Calix v. Pope, Not Reported in Fed. Supp. (2022)**

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 53 of 160

As courts have consistently recognized, these principles bar "non-medical" *Bivens* claims under the Eighth Amendment like plaintiff's. *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 64 (E.D.N.Y. 2017), *aff'd*, 755 F. App'x 67 (2d Cir. 2018); *Cannenier v. Skipper-Scott*, No. 18-CV-2383 (LGS), 2019 WL 764795, at *5 (S.D.N.Y. Feb. 20, 2019) ("[T]here is no *Bivens* remedy for failure to protect or improper housing") (collecting cases); *White v. Hess*, No. 14-CV-3339 (CBA) (LB), 2020 WL 1536379, at *7 (E.D.N.Y. Mar. 31, 2020); *Crespo v. Hurwitz*, No. 17-CV-6329 (RRM) (PK), 2020 WL 7021658, at *5 (E.D.N.Y. Nov. 30, 2020). While the Court has previously recognized an Eighth Amendment claim relating to "failure to provide adequate medical treatment," *Ziglar*, 137 S. Ct. at 1855; *see Hernandez*, 140 S. Ct. at 741, plaintiff challenges decisions concerning prisoner housing and safety, not medical care. *See* Am. Compl. ¶¶ 1–5. And his claim implicates a distinct legal duty: not the duty to provide "adequate ... medical care," but the duty to "take reasonable measures to guaranty the safety of ... inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). Plaintiff's claim therefore arises in a new context. *See Hernandez*, 140 S. Ct. at 743.

**\*5** At least two "reason[s]" exist "to think that Congress might be better equipped to create a damages remedy" in this context than the courts. *Egbert*, 142 S. Ct. at 1803. First, prison housing placements and inmate separations involve complicated, policy-laden tradeoffs about housing resources, as well as difficult predictions of future risk. Given the complexity of that decision-making, a court is ill-placed to "predict the 'systemwide' consequences of recognizing a cause of action under *Bivens*" against the officials who make these decisions. *Ibid.* (citation omitted) This "uncertainty alone is a special factor that forecloses relief." *Id.* at 1804.

Second, Congress created an "alternative remedial structure" for federal prisoners' claims in the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, which omits "a standalone damages remedy against federal jailers," *Ziglar*, 137 S. Ct. at 1865. The Supreme Court has not decided whether the PLRA forecloses all prisoner *Bivens* suits. *Ibid.* But the Court has stated that "[i]t could be argued" that the enactment of the PLRA suggests that "Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Ibid.* In recent years, most courts in this circuit to confront that question have accepted that argument. *See Crespo*, 2020 WL 7021658, at *6; *Oneil v. Rodriguez*, No. 18-CV-3287 (AMD) (LB), 2020 WL 5820548, at *4 (E.D.N.Y. Sept. 30, 2020); *Herrera v.*

*United States*, No. 20-CV-10206 (PKC), 2022 WL 902090, at *8–*9 (S.D.N.Y. Mar. 27, 2022); *Sabir v. Williams*, No. 3:20-CV-0008 (VAB), 2020 WL 3489522, at *4 (D. Conn. June 26, 2020); *but see Turkmen v. Ashcroft*, No. 02-CV-2307 (DLI) (SMG), 2021 WL 4099495, at *4 (E.D.N.Y. Sept. 9, 2021) (adopting report and recommendation finding that "congressional intent [regarding the PLRA] is 'too ambiguous to provide meaningful support for either side's position' ") (citation omitted). Ultimately, the passage of the PLRA—with its limited remedies—"is enough to counsel hesitation" about the extension of *Bivens* to plaintiff's claim. *Crespo*, 2020 WL 7021658, at *6.

Plaintiff errs in contending that his *Bivens* claim may proceed because *Farmer* "clearly anticipated inmate on inmate violence in the context of *Bivens*," Pl.'s Mem. in Opp'n 10 (Dkt. #124). *Farmer* addressed the question of how "to define the term 'deliberate indifference' " under the Eighth Amendment. 511 U.S. at 829. While the dispute arose in the context of a civil suit by an inmate raising a claim relating to prisoner-on-prisoner violence, the Court did not address—but simply assumed—that a *Bivens* cause-of-action existed for such a claim. *See id.* at 830–31. Accordingly, in the years since, the Supreme Court has never construed *Farmer* to establish the availability of a *Bivens* remedy for such claims. *Ziglar*, 137 S. Ct. at 1855 ("These three cases —*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *accord Hernandez*, 140 S. Ct. at 742–43; *Egbert*, 142 S. Ct. at 1802. Because plaintiff's claim would extend *Bivens*, and because there is reason to pause before doing so in the context of failure-to-protect claims, *Bivens* does not extend to plaintiff's deliberate-indifference claim.

### II. Factual Disputes Preclude Summary Judgment on the FTCA Claim

Neither side is entitled to summary judgment on plaintiff's FTCA claim. "Absent an 'unequivocally expressed' statutory waiver, the United States ... [is] immune from suit based on the principle of sovereign immunity." *Cnty. of Suffolk v. Sebelius*, 605 F.3d 135, 140 (2d Cir. 2010) (citation omitted). The FTCA provides a limited waiver of federal sovereign immunity, permitting a plaintiff to sue the United States to recover damages

Calix v. Pope, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 54 of 160

**\*6**  for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). This waiver of sovereign immunity, though, is subject to what is known as the discretionary-function exception, which states that the FTCA's waiver of sovereign immunity does not apply to "any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). It covers acts by federal employees that "involve an element of judgment or choice" and are "based on considerations of public policy." *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991) (citations omitted). This exception is jurisdictional; if an action falls within it, the court may not hear the case. *Cangemi v. United States*, 13 F.4th 115, 130 (2d Cir. 2021).

Defendants seek summary judgment on plaintiff's FTCA claim on the ground that the discretionary-function exception covers housing decisions made by BOP officials. Defs.' Mem. in Supp. 19–25. Plaintiff, however, contends that the discretionary-function exception does not apply because BOP officials failed to comply with a mandatory policy preventing Inmate A from being released into the general population without a captain's approval. Pl.'s Mem. in Supp. 6–9. Because a genuine dispute of material fact exists as to whether the discretionary-function exception covers defendants' actions, summary judgment on this claim is denied to both parties.

In general, BOP's decisions regarding prisoner housing are discretionary. By statute, the BOP must "provide suitable quarters" for, "provide for the safekeeping" of, and "provide for the protection" of all federal inmates. 18 U.S.C. § 4042(a)(2)–(3). While "[t]his provision 'sets forth a mandatory duty of care[,] it does not ... direct the manner by which the BOP

must fulfill this duty." *Chen v. United States*, No. 09-CV-2306 (ARR), 2011 WL 2039433, at \*7 (E.D.N.Y. May 24, 2011) (quoting *Taveras v. Hasty*, No. 02-CV-1307 (DGT), 2005 WL 1594330, at \*3 (E.D.N.Y. July 7, 2005)), *aff'd*, 494 F. App'x 108 (2d Cir. 2012). Accordingly, decisions regarding prisoner housing and safety typically fall within the discretionary-function exception. *Ibid.*; *Farley v. United States*, No. 11-CV-198S, 2017 WL 3503727, at \*5–\*6 (W.D.N.Y. Aug. 16, 2017) (collecting cases); *Banks v. United States*, 2011 WL 4100454, at \*13 (S.D.N.Y. Sept. 15, 2011) (collecting cases), *report and recommendation adopted*, 2011 WL 5454550 (S.D.N.Y. Nov. 9, 2011); *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) (collecting cases from different circuits); *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) (same).

Nevertheless, when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary-function exception does not apply. *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Under such circumstances "the employee has no rightful option but to adhere to the directive," and failure to do so may result in liability. *Ibid.* (quoting *Berkovitz*, 486 U.S. at 536). Accordingly, the discretionary-function exception does not shield the United States from liability for the acts of employees who fail to comply with a mandatory BOP policy. *Riascos-Hurtado v. United States*, No. 09-CV-3 (RJD) (VMS), 2015 WL 3603965, at \*7 (E.D.N.Y. June 5, 2015) ("To the extent BOP employees failed to adhere to their own regulations, that too is evidence that these were not discretionary acts performed by BOP employees."); *Douglas v. United States*, 814 F.3d 1268, 1277 (11th Cir. 2016) (reversing dismissal of claim alleging BOP failed to follow mandatory regulations).

**\*7**  Here, factual disputes preclude summary judgment to either party under the FTCA because it is unclear whether a mandatory policy barred the BOP from releasing Inmate A into the general population without the approval of a captain. Defendants point to policies suggesting that BOP officers generally have discretion when deciding whether to segregate a prisoner from other inmates. BOP SHU Policies 4, 16; *see* Decl. of Matthew J. Modafferi, Ex. K 223:5–11 (Dkt. #123-13) (stating that an inmate facing allegations of misconduct may be housed in the MDC's general population because "without an incident report," the alleged misconduct remains only "an allegation"). But plaintiff points to defendants' deposition by written questions,

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 55 of 160

Calix v. Pope, Not Reported in Fed. Supp. (2022)

in which defendants themselves stated that "[i]f an inmate were released from N-1 to a general population unit during the pendency of an ... investigation, [the investigators] and the Captain *would have to* sign off on a release order." Decl. of Sameer Nath, Ex. 1, at 2 (emphasis added). And defendants have not suggested that a captain signed off on the release of Inmate A from N-1 into the general population —where Inmate A allegedly assaulted plaintiff—while the investigation of Inmate A's conduct was ongoing. *See* R. 56.1 Statement ¶¶ 13, 15; Decl. of Matthew J. Modafferi, Ex. M 1 (Dkt. #126-6). While defendants now dispute whether the sign-off requirement applies to release into the general population unit of a different facility, Defs' Reply at 9 (citing Greer Dep. 211:7–212:9, 264:1–265:25), the conflicting evidence gives rise to a material dispute of fact over whether BOP policy "specifically prescribes a course of action for an employee to follow," in this area, *Gaubert*, 499 U.S. at 322. In other words, there is a dispute of fact pertaining to whether the discretionary-function exception applies. Given this dispute, neither party is entitled to summary judgment on plaintiff's FTCA claims. Instead, I will allow the case to "proceed to trial and make [a] jurisdictional ruling at the close of the evidence." *All. For Env't Renewal, Inc.*, 436 F.3d at 88.

Moreover, because the discretionary-function exception is jurisdictional, *Cangemi*, 13 F.4th at 130, I cannot address the parties' alternative arguments on the merits, *All. For Env't Renewal*, 436 F.3d at 85 ("[A] district court must generally resolve material factual disputes and establish that it has federal constitutional jurisdiction ... before deciding a case on the merits."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *id.* at 110 (O'Connor, J., concurring) ("[F]ederal courts should be certain of their jurisdiction before reaching the merits of a case."). Accordingly, defendants' motion is denied as to this claim, and plaintiff's motion is denied in full.

## CONCLUSION

Defendants' motion is granted in part and denied in part, and plaintiff's motion is denied in full. Defendants are granted summary judgment on plaintiff's *Bivens* claim, but genuine disputes of material fact preclude summary judgment for either side on the FTCA claim. Because defendants prevail on the sole claim against Lt. Pope, Lt. Pope is dismissed from this action.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4539511

---

## Footnotes

1    The filings associated with the cross-motions for summary judgment in the consolidated cases, *Calix v. Pope* and *Calix v. United States* are identical. *Compare Calix v. Pope*, No. 18-CV-3980 (RPK) (PK) (E.D.N.Y.) (Dkts. #122–26) *with Calix v. United States*, No. 19-CV-6685 (RPK) (PK) (E.D.N.Y.) (Dkts. #63–67). Unless otherwise indicated, all documents are referred to by the docket numbers assigned in *Calix v. Pope*.

     Because the consolidated Rule 56.1 statement ("Rule 56.1 statement") omits paragraph numbering, the paragraph numbers stated in this order refer to the "facts" identified in the Rule 56.1 statement. Thus, "R. 56.1 Statement ¶ 1" refers to "Defendants' Undisputed Fact No. 1," "R. 56.1 Statement ¶ 2" refers to "Defendants' Undisputed Fact No. 2," and so forth.

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2039433

Only the Westlaw citation is currently available.

NOT FOR ELECTRONIC OR PRINT PUBLICATION

United States District Court,

E.D. New York.

Qui CHEN, Plaintiff,

v.

UNITED STATES of America and United States
Department of Justice Burea of Prisons, Defendants.

No. 09–CV–2306 (ARR).

|

May 24, 2011.

**Attorneys and Law Firms**

Robert M. Ginsberg, Ginsberg & Broome, P.C., New York,
NY, for Plaintiff.

Catherine Mary Mirabile, United States Attorneys Office,
Eastern District of New York, Brooklyn, NY, for Defendants.

*OPINION & ORDER*

ROSS, District Judge.

**\*1** On June 1, 2009, plaintiff Qin Chen[1] filed a complaint
against defendants, the United States of America and the
United States Department of Justice Bureau of Prisons
("BOP") (collectively, "defendants" or "the government"),
Plaintiff's complaint stems from an altercation between
plaintiff and another prisoner at the Metropolitan Detention
Center ("MDC"), a federal prison in Brooklyn, on January
29, 2008.[2] In his complaint, plaintiff alleges that certain
BOP officers were negligent and deliberately indifferent with
respect to the January 29 incident and that plaintiff sustained
injuries as a result of their actions. Plaintiff seeks monetary
damages in excess of $75,000.00 against defendants under
the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346,
2671 *et seq.* Presently before the court are plaintiff's motion
to amend his complaint pursuant to Federal Rule of Civil
Procedure 15(a) and defendants' motion to dismiss for lack
of subject matter jurisdiction pursuant to Rules 12(b)(1)
and 12(h) (3) or, in the alternative, for summary judgment
pursuant to Rule 56. For the reasons set forth below, plaintiff's
motion is denied and defendants' motion to dismiss is granted.

*BACKGROUND*[3]

I. *The January 29, 2008 Incident at MDC*

On January 29, 2008, plaintiff and Filemon Timana were
both inmates housed in Unit G 43 of the MDC (the "Unit").
Defendants' Local Rule 56.1 Statement of Undisputed Facts
("Def.56.1"), Dkt. No. 36, ¶ 16. Prior to that date, there
had been no altercations between plaintiff and Timana, and
plaintiff had never complained to any BOP officer about
Timana. *Id.* ¶¶ 18–20.

The January 29 altercation between plaintiff and Timana
occurred around evening meal time in the Unit. After
receiving his evening meal on the first floor of the Unit,
plaintiff went to the second floor to use a microwave, which
was located in the gym room. *Id.* ¶¶ 26–27. At the time,
no BOP officers were present in the gym room. *Id.* ¶ 36.
While plaintiff was using the microwave, Timana entered the
room. *Id.* ¶ 28. Immediately upon entering, Timana insulted
plaintiff and asked him if he wanted to fight. *Id.* ¶ 31. When
plaintiff tried to evade Timana, Timana used his arm to collar
plaintiff's neck. *Id.* Timana then dragged plaintiff further into
the room and pushed plaintiff to the floor. *Id.* ¶ 30. Plaintiff
immediately got up and ran downstairs to the first floor to
look for a BOP officer. *Id.* ¶ 34.

At approximately 5:22 p.m., plaintiff approached BOP
Counselor Glenford Edwards, who was supervising meal
distribution on the first floor of the Unit. *Id.* ¶¶ 22, 37.
Counselor Edwards was standing several feet away from the
main unit door, which leads to a corridor outside the Unit
that is commonly referred to as the "sally-port." *Id.* ¶¶ 5,
37. Plaintiff reported to Counselor Edwards that he had been
assaulted by Timana in the second floor gym room. *Id.* ¶ 40.
Plaintiff described how Timana had collared his neck, and he
showed Counselor Edwards a bruise to his neck and chin. *Id.*
Plaintiff asked Counselor Edwards for help. *Id.* ¶ 40.

**\*2** The government has submitted the January 29, 2008
surveillance video from the MDC that depicts the subsequent
assault by Timana against plaintiff. Mirabile Dec. Ex. J. The
video, which begins at 5:24:55 p.m., shows plaintiff standing
with Counselor Edwards several feet from the main unit door.
As Timana approaches them, Counselor Edwards turns and
walks towards the main unit door with plaintiff, as Timana
trails closely behind them. When the three individuals reach
the main unit door, Counselor Edwards is standing to the right
of Timana, Timana is standing in the middle, and plaintiff

is standing to the left of Timana. At 5:25:08 p.m., Timana punches plaintiff in the face with his right fist, and plaintiff drops to the floor. Following the assault, the video shows the Counselor Edwards standing by the main unit door while plaintiff lies on the floor and Timana paces back and forth in the hallway leading to the main unit door. At 5:25:40 p.m., another BOP officer enters the Unit and directs the other inmates away from the area of the assault. Counselor Edwards then escorts Timana out of the main unit door into the sally-port. At 5:26:22 p.m., six BOP officers enter the Unit and begin attending to plaintiff and securing the Unit. Subsequently, numerous additional officers enter the Unit. At 5:28:19 p.m., plaintiff is helped from the Unit by BOP officers.

At his deposition in this case, Counselor Edwards testified regarding the January 29 incident. He stated that, "anytime there is any indication of a fight, an assault between inmates, we have to make sure that not only we are safe but the inmates are safe." Mirabile Dec. Ex. C at 16. Thus, after plaintiff showed him the bruises to his neck and chin, in order to ensure that the area was safe, Counselor Edwards attempted to escort plaintiff outside the main unit door into the sally-port. *Id.* Ex. C at 16–17. Counselor Edwards testified that he was in the process of escorting plaintiff to the main unit door when inmate Timana approached him and plaintiff. *Id.* Ex. C at 18. As Timana approached, plaintiff identified him as the individual who attacked him in the gym room. *Id.* Timana then began speaking to Counselor Edwards about the incident, and Counselor Edwards gave Timana two direct orders to step back, which Timana disobeyed. *Id.* Ex. C at 16, 19. Although Counselor Edwards was wearing a body alarm —a device used to call for assistance from other officers— he did not activate it when Timana approached, because he was escorting plaintiff out of the Unit to separate him from Timana. *Id.* Ex. C at 16–17, 22. Timana then said "Fuck it, if I am going to go to Special Housing I may as well go for a reason." *Id.* Following his statement, "Inmate Timana threw a closed right fist striking Inmate Chen in the facial area." *Id.* Ex. C at 20. Counselor Edwards immediately activated his body alarm and called for assistance. Id Ex. C at 21. Following the arrival of other BOP officers, Counselor Edwards escorted Timana out of the Unit into the sally-port. *Id.* Ex. C at 24.

**\*3** Plaintiff also testified regarding the January 29 altercation at a deposition in this case, and his testimony corresponds to Counselor Edwards' testimony about the incident. Plaintiff testified that, after Timana attacked him in the gym room, he approached Counselor Edwards to report

the incident. Mirabile Dec. Ex. E at 130. After speaking to Counselor Edwards for one or two minutes, Timana approached them, and plaintiff identified him as the assailant. *Id.* Ex, E at 132. Timana then attempted to give Counselor Edwards an explanation of the incident. *Id.* Ex. E at 133. Counselor Edwards told Timana to step back several times, but Timana did not comply. *Id.* Ex. E at 135–136, 142. Plaintiff stood "very, very close" to Counselor Edwards because he was "very scared" of Timana. *Id.* Ex. E at 137. Plaintiff testified that Counselor Edwards told plaintiff to come with him, and they headed towards the main unit door. *Id.* Ex. E at 140. Before they got through the main unit door, Timana struck plaintiff, and plaintiff lost consciousness. *Id.* Ex. E at 143.

## II *Procedural History*
Following the January 29 incident, plaintiff filed an administrative tort claim with the BOP for the injuries he suffered at the MDC; the BOP sent plaintiff an acknowledgment of the claim on October 7, 2008. Compl. ¶ 7. On February 9, 2009, the BOP denied plaintiff's claim and informed him of his right to file a suit in federal district court within six months. Compl. Annex 2. Although plaintiff filed an administrative tort claim with the BOP, he did not file a complaint under the multi-tier BOP administrative remedy system. Def. 56.1 ¶¶ 64–66.

On June 1, 2009, plaintiff filed a timely complaint in this court. In his complaint, plaintiff alleges that he was assaulted by another prisoner at the MDC named "Phil" in January 2008. Compl. ¶ 10. He claims he reported this assault to Counselor Edwards and that "[a]bsolutely no action was taken." *Id.* Plaintiff alleges that he was then assaulted a second time by "Phil" in the presence of Counselor Edwards. *Id.* ¶ 10. He asserts that Counselor Edwards "permitted the assault to continue until the point plaintiff was severely injured." *Id.* ¶ 11. He also claims that the assault occurred while another BOP officer, Lieutenant Kevin Lopez, "was at or immediately outside of the doorway." *Id.* As a result of the second assault, plaintiff asserts that he "sustained blindness or virtual blindness of his right eye." *Id.* ¶ 12. Plaintiff brings two causes of action related to that injury: he claims that Counselor Edwards and Lieutenant Lopez were (i) "negligent in fulfilling their responsibilities as Correction Officers" and (ii) "committed deliberate indifference to plaintiff's situation in violation of [42 U.S.C.] § 1983 ...." *Id.* ¶¶ 13, 15. Plaintiff names the United States and BOP as defendants. Pursuant to the FTCA, plaintiff seeks monetary damages in excess of $75,000.00 against them.

**\*4** On July 9, 2010, plaintiff filed a motion to amend his complaint along with a proposed amended complaint. Dkt. No. 20–1. In that proposed complaint, plaintiff restates the allegations in his original complaint against Counselor Edwards and identifies Timana as the assailant during the January 29 incident. Plaintiff names the United States and Counselor Edwards as the sole defendants; he drops BOP as a defendant. Plaintiff also drops his allegations against Lieutenant Lopez, conceding that Counselor Edwards was the only BOP officer present during Timana's second assault on plaintiff. July 7, 2010 Amended Affirmation of Robert M. Ginsberg, Dkt. No. 20, ¶ 1. Plaintiff brings two causes of action in his amended complaint. First, he claims Counselor Edwards "was negligent in fulfilling his responsibilities as a Correction Officer." Dkt. No. 20–1 ¶ 13. Pursuant to the FTCA, he seeks monetary damages against the United States under his first cause of action. Second, he asserts that Counselor Edwards "committed deliberate indifference to plaintiff's situation in violation of the Eighth Amendment to the U.S. Constitution." *Id.* ¶ 15. Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), he seeks monetary damages against Counselor Edwards under his second cause of action. Plaintiff claims damages in excess of $75,000.00.

On December 2, 2010, defendants filed a motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment. In their motion, defendants contend that, under the discretionary function exception to the FTCA, this court lacks subject matter jurisdiction over plaintiff's first cause of action in his original complaint. With respect to plaintiff's second cause of action in his original complaint, defendants assert that this court lacks subject matter jurisdiction because the United States has not waived sovereign immunity with respect to constitutional tort claims. Defendants further argue that, even assuming this court has subject matter jurisdiction over the claims in plaintiff's original complaint, summary judgment is appropriate because, as a matter of law, plaintiff cannot establish negligence.

For the reasons set forth below, the court holds that (i) it lacks subject matter jurisdiction over both causes of action set forth in plaintiff's original complaint and (ii) plaintiff's proposed amendment to his complaint would be futile. Accordingly, defendants' motion to dismiss is granted and plaintiff's motion to amend is denied.

## DISCUSSION

*I. Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction*

*A. Legal Standard*

As the party seeking to invoke the jurisdiction of the court, plaintiff bears the burden of demonstrating that subject matter jurisdiction is proper based on facts existing at the time the complaint was filed. *Scelsa v. City Univ. of N.Y.,* 76 F.3d 37, 40 (2d Cir.1996). "In a motion to dismiss pursuant to Rule 12(b) (1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malay.,* 269 F.3d 133, 140 (2d Cir.2001) (citation omitted). "How the district court proceeds to resolve the motion to dismiss depends upon whether the motion presents a factual challenge." *Id.* (citation omitted). "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, ... the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff...." *Id.* (internal citations and quotation marks omitted). But where, as here, evidence relevant to the jurisdictional question is before the court, the court may refer to that evidence. *Id.* Specifically, for the purposes of defendants' motion to dismiss, the court may consider affidavits and other materials beyond the pleadings. *See id.* at 141 & n. 6. In evaluating that evidence, the court does not draw inferences favorable to plaintiff. *See Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998).

*B. The Court Lacks Subject Matter Jurisdiction over Plaintiff's First Cause of Action*

**\*5** In the first cause of action in his original complaint, with respect to the January 29 incident, plaintiff alleges that Counselor Edwards and Lieutenant Lopez "were negligent in fulfilling their responsibilities as Correction Officers." Compl. ¶ 13. Pursuant to the FTCA, he seeks monetary damages against the United States and BOP. Plaintiff has conceded that Lieutenant Lopez was not involved in the January 29 incident. Moreover, BOP is not a proper defendant against plaintiff's FTCA claim, because such a claim may only be brought against the United States. *Barnes v. Unites States,* No. 00–CV–3544 (SJF)(ASC), 2004 U.S. Dist. LEXIS 7071, at \*4–\*5, 2004 WL 957985 (E.D.N.Y. April 12, 2004) ("The [FTCA] authorizes suits only against the United States, 28 U.S.C. § 2680(a) (2000); *Sprecher v. Granber,* 716 F.2d 968, 973 (2d Cir.1983), and not against federal agencies and

federal officials acting in their official capacities, 28 U.S.C. §§ 2679(a), (b)(1); *Rivera v. United States,* 928 F.2d 592, 608 (2d Cir.1991).") Hence, the negligence claim against BOP and the negligence claim against the United States arising out of the alleged actions of Lieutenant Lopez must be dismissed. With respect to plaintiff's first cause of action then, the court need only consider the negligence claim against the United States arising out of the actions of Counselor Edwards.

In its motion to dismiss, defendants argue that plaintiff's first cause of action is barred by the discretionary function exception to the FTCA, because (i) "the acts or omissions alleged to be negligent involve elements of judgment of choice not compelled by federal statute, regulation or policy," and (ii) "the decisions regarding the supervision of inmates, and when and how to stop an inmate-on-inmate attack are susceptible to policy analysis...." Memorandum of Law in Support of Defendants' Motion ("Def.Mem."), Dkt. No. 39, at 2. In response, plaintiff argues that Counselor Edwards lacked discretion during the January 29 incident to take certain actions. Moreover, he asserts that certain of Counselor Edwards' actions were "careless" and thus the discretionary function exception to the FTCA does not apply.

The FTCA waives the sovereign immunity of the United States for personal injury suits "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). This waiver, however, is limited in several respects. The discretionary function exception is the relevant limitation in this instance. Under that exception, the United States cannot be held liable for claims based on "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). "This exception prevents 'judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Hartman v. Holder,* No. 00–CV–6107 (JG), 2005 U.S. Dist. LEXIS 20338, at *26, 2005 WL 2002455 (E.D.N.Y. Aug. 21, 2005) (*"Hartman I"*) (quoting *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991)). "If a claim falls within the exception, a federal court does not have subject matter jurisdiction over the claim." *Id.* (citation omitted).

**\*6** For the discretionary function exception to apply, two conditions must be met: (i) "the acts alleged to be negligent

must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation" and (ii) "the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." *Id.* (citations and internal quotation marks omitted). "The discretionary function exception is not limited to decisions made at the policy or planning level, but rather extends to decisions at the operations level that are in furtherance of governmental policy." *Id.* (citations omitted). "Day-to-day management ... regularly requires judgment as to which of a range of permissible courses is wisest." *Gaubert,* 499 U.S. at 325. Thus, "[i]t is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* (citation and internal quotation marks omitted).

The Supreme Court, however, has cautioned that not all discretionary acts performed by a government agent within the scope of his employment fall within this exception. *See Gaubert,* 499 U.S. at 325 n. 7. Indeed, the Second Circuit has held that, under the so-called "negligent guard theory," an official's "lazy or careless failure to perform his or her discretionary duties" are negligent acts that "neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy." *Coulthurst v. United States,* 214 F.3d 106, 109–110 (2d Cir.2000); *see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 476 (2d Cir.2006) (citing *Coulthurst* as articulating the "negligent guard theory"). "The negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction." *Triestman,* 470 F.3d at 476. Where the negligent guard theory applies, a plaintiff's claims are not barred by the discretionary function exception.

In this case, the court finds that both prongs of the discretionary function exception are satisfied and that the negligent guard theory is inapplicable. Thus, the court lacks subject matter jurisdiction over plaintiff's first cause of action under the discretionary function exception.

### i. The Discretionary Act Prong

Under the first prong of the discretionary function exception, the court must determine whether the acts in question involved an element of "judgment or choice." *Enigwe v. Zenk,* No. 03–CV–854 (CBA), 2007 U.S. Dist. LEXIS 68317, at *25, 2007 WL 2713849 (E.D.N.Y. Sept. 14, 2007) (citing *Gaubert,* 499 U.S. at 325; *Berkowitz v. United States,* 486 U.S. 531, 536, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531

(1988)). "That is, the Court must determine whether a statute, regulation, or policy mandates a specific course of action. If such a mandate exists, the discretionary function exception does not apply and the Court may consider the FTCA claim." *Id.* (citation omitted). But if a statute, regulation, or policy "is not sufficiently specific to control the conduct in question ..., or is not mandatory, there is room for discretion ...." *Fazi v. United States,* 935 F.2d 535, 538 (2d Cir.1991). When an employee acts under such a statute, regulation, or policy, his conduct is the product of judgment or choice, and the court must proceed to analyze the second prong of the discretionary function exception. *Id.*

**\*7** In this case, during the January 29 incident, Counselor Edwards actions were the product of judgment or choice. "[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The federal statute that prescribes the BOP's duties states, in relevant part, that the BOP must:

> provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States ... [and] provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States.

18 U.S.C. § 4042(a)(2)-(3). This provision "sets forth a mandatory duty of care[;] it does not ... direct the manner by which the BOP must fulfill this duty." *Taveras v. Hasty,* No. 02–CV–1307 (DGT), 2005 WL 1594330, at \*3 (E.D.N.Y. July 7, 2005) (internal quotation marks omitted). In particular, the statute "does not compel an officer to act in a particular way when supervising inmates or when confronted with inmate-on-inmate violence...." *Hartman I,* 2005 U.S. Dist. LEXIS 20338, at \*27–\*28, 2005 WL 2002455. Likewise, the federal regulations governing the protection and discipline of inmates are discretionary in nature. *See, e.g.,* 28 C.F.R. § 541.10 ("Staff shall take disciplinary action *at such times and to the degree necessary* to regulate an inmate's behavior within the Bureau rules and institution guidelines and to promote a safe and orderly institution environment.") (emphasis added); 28 C.F.R. § 541.22(a) ("The warden *may*

also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat ... to other inmates.") (emphasis added). Thus, "although prison officials have a statutory duty to protect inmates from harm, in general decisions regarding the best way to safeguard prisoners are discretionary in nature." *Enigwe,* 2007 U.S. Dist. LEXIS 68317, at \*26, 2007 WL 2713849. Accordingly, because Counselor Edwards acted under a statute and regulations conferring discretion, his actions during the January 29 incident were the product of judgment or choice.

### ii. The Public Policy Prong

Under the second prong of the discretionary function exception, a court must determine whether the actions at issue are grounded in public policy. "[I]f a regulation, rule, or statute 'allows the employee discretion,' a 'strong presumption' arises that the employee's acts 'are grounded in policy when exercising that discretion.' " *Enigwe,* 2007 U.S. Dist. LEXIS, at \*29, 2007 WL 2713849 (quoting *Gaubert,* 499 U.S. at 324). "That presumption can be rebutted, however, if 'the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.' " *King v. United States,* 491 F.Supp.2d 286, 297 (D.Conn.2007) (quoting *Gaubert,* 499 U.S. at 324–325). The analysis focuses on whether the actions in question involve "choices motivated by considerations of economy, efficiency, and safety." *Hartman I,* 2005 U.S. Dist. LEXIS 20338, at \*29, 2005 WL 2002455 (citing *Coulthurst,* 214 F.3d at 109–110). In conducting that analysis, "the court's inquiry is not on the 'agent's subjective intent in exercising the discretion conferred ... but on the nature of the actions taken and on whether they are susceptible to policy analysis.' " *King,* 491 F.Supp.2d at 297 (quoting *Gaubert,* 499 U.S. at 325) (ellipsis in original).

**\*8** Numerous courts have held that prison decisions regarding security matters are grounded in public policy. *See, e.g., Alfrey v. United States,* 276 F.3d 557, 565 (9th Cir.2002) (decisions about how to respond to a reported threat upon an inmate implicate social and public policy considerations); *Dykstra v. United States Bureau of Prisons,* 140 F.3d 791, 796 (8th Cir.1998) (prison officials' decisions about security levels, available resources, and classification of inmates "are inherently grounded in social, political, and economic policy."); *Ortiz v. United States,* No. 01 Civ. 4665(AKH), 2002 U.S. Dist. LEXIS 12621, at \*11, 2002 WL 1492115 (S.D.N.Y. July 11, 2002) (decision regarding inmate access to razor blades involves public policy considerations); *Green v.*

*United States,* Civ. A. No. 94–5706, 1995 U.S. Dist. LEXIS 14190, at \*10, 1995 WL 574495 (E.D.Pa. Sept.22, 1995) ("FTCA cases have uniformly held that prison decisions regarding security matters are protected by the discretionary function exception.") (collecting cases). In particular, courts have held that prison officials' decisions about how best to respond to violence between inmates implicate policy considerations. *See, e.g., Miller v. United States,* 992 F.2d 1223 (10th Cir.1993) ("The decisions of prison officials during a fight between two groups of prisoners ... remains the type of decision protected by the discretionary function exception to the FTCA."); *Taveras,* 2005 WL 1594330, at \*4 (official's "on-the-spot decision" to wait for backup, instead of breaking up a fight, reflected her personal judgment about the best course of action in that situation and was grounded in policy).

Here, Counselor Edwards actions during the January 29 incident were grounded in policy. To begin with, because his actions were taken under statutes and regulations conferring discretion upon prison officials to ensure prisoner safety, there is a "strong presumption" that his actions were grounded in policy. That presumption is confirmed by examining "the nature of the actions taken" by Counselor Edwards. *See King,* 491 F.Supp.2d at 297. In selecting a course of action to resolve the January 29 altercation between plaintiff and Timana, Counselor Edwards had to ensure that he, the inmates involved in the altercation, and the other inmates were safe. He had to assess the potential for further violence, the limited resources available to him, and the rights of the prisoners involved. Because the altercation had the potential to rapidly escalate, he had to weigh competing factors and make an immediate judgment regarding the most effective and efficient means to resolve the situation. Thus, Counselor Edwards' determination about how best to address the altercation between plaintiff and Timana involved "considerations of economy, efficiency, and safety." *Hartman I,* 2005 U.S. Dist. LEXIS 20338, at \*29, 2005 WL 2002455. The actions he took during the January 29 altercation between plaintiff and Timana were grounded in policy.

### iii. The Negligent Guard Theory

**\*9** Plaintiff appears to contend that certain actions taken by Counselor Edwards were careless and thus the negligent guard theory should apply to remove his conduct from the discretionary function exception. Specifically, plaintiff contends that it was careless for Counselor Edwards (i) to "walk away" from plaintiff and Timana towards the main unit door; (ii) to stand to the right of plaintiff and Timana,

rather than in between them; and (iii) to delay ringing his body alarm until after Timana struck plaintiff. Plaintiff argues that Counselor Edwards misjudged the seriousness of the altercation between plaintiff and Timana and pursued a course of action insufficient to address the threat that Timana posed to plaintiff. He contends that, if Counselor Edwards had not walked away from plaintiff, stayed in the middle of plaintiff and Timana, and activated his body alarm, Timana would not have struck plaintiff. Plaintiff argues that, because Counselor Edwards failed to take those actions, he was careless and the negligent guard theory applies in this case. The court disagrees.

Under the negligent guard theory, the Second Circuit has held that "certain negligent acts, such as those borne out of laziness, hastiness, or inattentiveness, fall so far outside the range of appropriate judgment that they can no longer be viewed as an exercise of discretion." *Enigwe,* 2007 U.S. Dist. LEXIS 68317, at \*29, 2007 WL 2713849 (citing *Triestman,* 470 F.3d at 476). The discretionary function exception to the FTCA does not bar negligence claims arising from such acts. *Id.; see* Coulthurst, 214 F.3d 109 (distinguishing between negligent decisions grounded in policy and those borne out of laziness, haste, or inattention under the discretionary function exception).

The application of the negligent guard theory in *Hartman v. Holder,* No. 00–CV–6107 (ENV)(JMA), 2009 U.S. Dist. LEXIS 23213, 2009 WL 792185 (E.D.N.Y. March 23, 2009) ("*Hartman II*"), is instructive in this case. There, plaintiff contended that a BOP officer negligently failed to prevent an assault on him by other inmates at the MDC. *Id.* at \*4–\*16. In support of his claim, plaintiff submitted evidence demonstrating that that the BOP officer: (i) failed to report threats against him that he relayed to the officer prior to the assault; (ii) went on rounds in a predictable, routine fashion in contravention of her training; and (iii) failed to respond to the attack for fifteen minutes despite plaintiff's calls for help. *Id.* at \*25–\*32. The court found that where a "plaintiff has argued, with supporting evidence, that an official has been careless or inattentive in the execution of her responsibilities, reliance by the government on that official's general discretionary authority is no bar to suit." *Id.* at \*32–\*33. Thus, the court held that it had subject matter jurisdiction to adjudicate plaintiff's FTCA claim under the negligent guard theory. *Id.*

The actions of the BOP officer in *Hartman II* stand in contrast to the actions of Counselor Edwards in this case. According

to the surveillance video of the January 29 incident and the deposition testimony of both Counselor Edwards and plaintiff, upon being informed of the threat to plaintiff's safety, Counselor Edwards immediately reacted to the situation and attempted to resolve it. Plaintiff testified that, prior to the January 29 incident, he had not complained to BOP officers about Timana. Counselor Edwards thus first became aware of the threat to plaintiff when plaintiff approached him following Timana's gym room attack. One or two minutes after being made aware of that threat, Counselor Edwards began escorting plaintiff out of the Unit in order to ensure his safety. Timana then approached Counselor Edwards and plaintiff. Counselor Edwards gave Timana multiple direct orders to step back, and he continued to move towards the main unit door with plaintiff. Counselor Edwards testified that he did not activate his body alarm when Timana approached, because he was attempting to separate the inmates by removing plaintiff from the Unit. Despite Counselor Edwards' efforts to resolve the altercation, thirteen seconds after Timana approached, as they stood directly outside the main unit door, Timana struck plaintiff. Thus, although Counselor Edwards' actions failed to prevent the attack, the undisputed evidence shows that he made an on-the-spot assessment of the situation and immediately pursued a course of action to resolve it. Unlike the BOP officer in *Hartman II,* Counselor Edwards did not act with laziness, haste, or inattention; there is no evidence in the record that he failed to address previous threats, contravened his training, or failed to respond to the situation.

 **\*10** Plaintiff may be correct that, if Counselor Edwards had taken different actions during the January 29 incident, he could have prevented Timana's assault on plaintiff. It is possible, as plaintiff suggests, that the wiser course of action would have been for Counselor Edwards to keep the inmates in the Unit, stand in between them, and activate his body alarm. In selecting a different course of action, Counselor Edwards may have misjudged the situation and acted imprudently, or even negligently, in light of the threat that Timana posed. But his decision to separate the inmates by escorting plaintiff out of the Unit was not so "far outside the range of appropriate judgment that [it] can no longer be viewed as an exercise of discretion." *Enigwe,* 2007 U.S. Dist. LEXIS 68317, at \*29, 2007 WL 2713849. Rather, faced with a difficult and rapidly escalating situation, Counselor Edwards "exercised his judgment as to which of a range of permissible courses [was] the wisest." *Gaubert,* 499 U.S. at 325. Such decisions, even if negligent, are shielded by the discretionary function exception. *See Miller,* 992 F.2d at 1223; *Taveras,*

2005 WL 1594330, at \*4 & n. 5. Under the FTCA, this court may not, through hindsight, second-guess the decisions that Counselor Edwards made during the January 29 incident.

Accordingly, because Counselor Edwards' actions satisfy both prongs of the discretionary function exception, and because the negligent guard theory does not apply in this case, this court lacks subject matter jurisdiction over plaintiffs first cause of action in his original complaint. Defendants' motion to dismiss is granted with respect to that claim.

### C. The Court Lacks Subject Matter Jurisdiction over Plaintiff's Second Cause of Action

The second cause of action set forth in plaintiff's original complaint alleges that "Correction Officer Edwards and Correction Lieutenant Lopez committed deliberate indifference to plaintiff's situation in violation of [42 U.S.C] § 1983." Compl. ¶ 15. Actions brought pursuant to 42 U.S.C. § 1983 are only available against state actors. Because plaintiff named the United States and BOP, a federal agency, as defendants, the court construes plaintiff's second cause of action as brought pursuant to *Bivens.* Plaintiff's *Bivens* claims against the United States and the BOP must be dismissed because the court lacks subject matter jurisdiction over such claims. *Keene Corp. v. United States,* 700 F.2d 836, 845 n. 13 (2d Cir.1983) (no subject matter jurisdiction over *Bivens* claims against the United States); *Newton v. Bureau of Prisons,* No. 10–CV–5046, 2011 U.S. Dist. LEXIS 46094, at \*8, 2011 WL 1636259 (E.D.N.Y. April 28, 2011) (no subject matter jurisdiction over *Bivens* claim against BOP). Accordingly, defendants' motion to dismiss plaintiff's second cause of action is granted.

## II. *Plaintiff's Motion to Amend his Complaint*

### A. Legal Standard

Where, as here, a petitioner is no longer entitled to amend his pleading as a matter of course, he may amend "only by leave of court or by written consent of the adverse party." Fed.R.Civ.P. 15(a). Although Rule 15(a) specifically provides that such "leave shall be freely given when justice so requires," *id.,* district courts have discretion to deny leave "where necessary to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive," *China v. United States,* 298 F.3d 174, 180 (2d Cir.2002), or "where amendment would be futile," *In re Tamoxifen Citrate Antitrust Litig.,* 429 F.3d 370, 404 (2d Cir.2005).

*B. Plaintiff's Proposed Amendment to His Complaint would be Futile*

**\*11** In his proposed amended complaint, plaintiff names the United States and Counselor Edwards as sole defendants and asserts two causes of action. First, he reiterates his FTCA negligence claim against the United States arising out of Counselor Edwards' conduct. Second, he asserts a *Bivens* claim against Counselor Edwards. Because this court is barred from considering either cause of action, allowing plaintiff to amend his complaint would be futile.

For the reasons discussed above, the first cause of action in plaintiff's proposed amended complaint is barred by the discretionary function exception to the FTCA. Thus, it would be futile to include that cause of action in an amended complaint.[4]

With respect to the second cause of action in plaintiff's proposed complaint—his *Bivens* claim against Counselor Edwards—plaintiff has failed to exhaust his administrative remedies. "Under the Prison Litigation Reform Act ("PLRA"), prisoners must first exhaust available administrative remedies before bringing an action alleging violations of federal law." *Hartman I,* 2005 U.S. Dist. LEXIS 20338, at \*10, 2005 WL 2002455 (citations omitted); 42 U.S.C. § 1997e(a) ("[N]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Hartman I,* 2005 U.S. Dist. LEXIS 20338, at \*10, 2005 WL 2002455 (citations and internal quotation marks omitted). "Thus, federal prisoners suing under [*Bivens* ], must first exhaust inmate grievance procedures ...." *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"Where a prisoner fails to exhaust administrative remedies but asserts a plausible reason for the failure, a court conducts a three-part inquiry." *Id.* "Specifically, it determines whether: (1) administrative remedies were in fact available; (2) defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it; or (3) defendants acted to inhibit the inmate from exhausting his remedies." *Id.* at \*13 (citation omitted). "Courts also consider whether

special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Id.* (citation and internal quotation marks omitted).

Here, it is undisputed that plaintiff did not file a complaint under the multi-tier BOP administrative remedy system. Plaintiff does not allege that this failure was due to the unavailability of administrative remedies or defendants' actions. Nor does plaintiff allege that defendants forfeited the non-exhaustion defense. Indeed, in his proposed amended complaint, plaintiff does not allege any facts regarding his non-exhaustion. Rather, in his memorandum of law in support his motion to amend, plaintiff argues that (i) because his claim arises out of a single incident, not prison conditions, he was not required to file an administrative claim, (ii) his medical treatment during the first month after the incident prevented him from filing an administrative claim, and (iii) he misunderstood the administrative process because his knowledge of the English language is extremely limited.

**\*12** Plaintiff's arguments fail to justify his non-compliance with BOP's administrative requirements. With respect to his first argument, the PLRA requires federal prisoners to utilize administrative procedures prior to filing any *Bivens* claim, even claims related to a single incident. *See Porter v. Nussle,* 534 U.S. at 524; *Hartman I,* 2005 U.S. Dist. LEXIS 20338, at \*10–\*12, 2005 WL 2002455. With respect to plaintiff's second argument, even assuming that delay due to medical treatment is an exception to the PLRA exhaustion requirement, plaintiff does not allege that he attempted to exhaust his claims following the delay due to his medical treatment; thus, that delay does not justify his non-exhaustion. *See Hahn v. Armstrong,* No. 10–1785, 2011 U.S.App. LEXIS 938, at \*, 2011 WL 135740 (8th Cir. Jan. 18, 2011) ("Finally this court has not recognized exceptions to the PLRA's exhaustion requirement for delay due to medical treatment or poor legal advice. Even were we to recognize these exceptions, they would not excuse the four year delay in this case."). With respect to plaintiff's third argument, "[w]hile [plaintiff's] unfamiliarity with the English language is sufficient to merit assistance in filing appeals, *see* 28 C.F.R. § 542.16, it does not amount to a special circumstance justifying departure from the exhaustion requirement of the [PLRA]." *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 179 (S.D.N.Y.2007), *aff'd* 278 Fed. Appx. 27 (2d Cir.2008). Lastly, although plaintiff does not raise the argument, the court notes that plaintiff's "filing of an administrative tort claim ... does not excuse [his] failure to

meet the separate exhaustion requirements for a *Bivens* claim under the PLRA." *Nwaokocha v. Sadowski,* 369 F.Supp.2d 363, 368 (E.D.N.Y.2005): *see Hartman I,* 2005 U.S. Dist. LEXIS 20338, at *19–*24, 2005 WL 2002455.

Because plaintiff failed to exhaust his *Bivens* claim under the multi-tier BOP administrative remedy system, the court is barred from adjudicating that claim. Thus, allowing plaintiff to amend his complaint to include his second cause of action would be futile. [5]

### CONCLUSION

For the foregoing reasons, the court holds that (i) it lacks subject matter jurisdiction over both causes of action set forth in plaintiff's original complaint and (ii) plaintiff's proposed amendment to his complaint would be futile. Accordingly, defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Rules 12(b)(1) and 12(h)(3) is granted and plaintiff's motion to amend his complaint pursuant to Rule 15(a) is denied.

The Clerk of Court is directed to enter judgment in favor of defendants. The Clerk of Court is further directed to amend the case caption to reflect the correct spelling of plaintiff's name, "Qin Chen."

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2039433

---

### Footnotes

1    While the caption identifies plaintiff as "Qui Chen," according to plaintiffs deposition testimony, the correct spelling of his name is "Qin Chen." Oct. 14, 2010 Declaration of AUSA Catherine M. Mirabile ("Mirabile Dec."), Dkt. No. 37, Ex. E at 25.

2    Plaintiff's complaint alleges that the incident took place on January 31, 2008; however, the parties do not dispute that the date stated in the complaint is incorrect and that the altercation in fact took place on January 29, 2008.

3    Unless otherwise noted, the following facts are not in dispute.

4    To the extent that plaintiff seeks to maintain a negligence claim against Counselor Edwards in his official capacity under this cause of action, the court is barred from considering such a claim. *Castro v. United States,* 34 F.3d 106, 110 (2d Cir.1994) ("[A] claimant's exclusive remedy for nonconstitutional torts by a government employee acting within the scope of his employment is a suit against the government under the FTCA."). Amending the complaint to include such a claim would be futile.

5    To the extent plaintiff's second cause of action seeks to assert a *Bivens* claim against the United States, that claim is barred. *Keene Corp.,* 700 F.2d at 845 n. 13. Amendment of the complaint to include such a claim would be futile.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4043069
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Charles HEAD, Plaintiff,
v.
Captain R. RAKOWSKI, Jr., et al., Defendants.

Civ. No. JKB-22-00566
|
Signed September 3, 2024

**Attorneys and Law Firms**

Benjamin S. Salsbury, Dylan Rogers Elliott, Salsbury
Sullivan, LLC, Baltimore, MD, for Plaintiff.

Megan Lynn Micco, Vickie Leduc, U.S. Attorney Office,
Baltimore, MD, Patrick Garrett Selwood, Holland & Knight
LLP, Washington, DC, for Defendant.

**MEMORANDUM**

James K. Bredar, United States District Judge

**\*1** In this action, Plaintiff Charles Head alleges various
violations of federal and state law related to his imprisonment
at the Federal Correctional Institution in Cumberland,
Maryland ("FCI Cumberland"). In September 2023, this
Court issued an order that, *inter alia*, stayed Plaintiff's
claims under the Federal Tort Claims Act ("FTCA") and
*Bivens* [1] relating to his alleged exposure to COVID-19
at FCI Cumberland (the "COVID-19 claims"). (ECF No.
38.) That stay was instituted because Plaintiff had brought
similar claims in a different case in this Court. Subsequently,
in February 2024, Judge Hurson of this Court dismissed
Plaintiff's COVID-19-related claims in that case. *Head v.
United States*, Civ. No. 22-00239-BAH, 2024 WL 520037 (D.
Md. Feb. 9, 2024) (*Head II*).

Now pending before the Court are: (1) Defendants' Motion
to Lift Stay of COVID-19 Claims (ECF No. 58); and (2)
Defendants' Motion to Dismiss COVID-19 Claims or, in the
Alternative, for Summary Judgment (ECF No. 59), which
the Court will construe as a motion to dismiss under Federal
Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defendants
argue that Plaintiff's FTCA claim should be dismissed on the
following grounds: (1) the claim is barred by res judicata;

(2) Plaintiff failed to administratively exhaust his claim; (3)
the claim is barred by the discretionary function exception;
and (4) the claim fails on the merits. (*See generally* ECF No.
59-1.) As to Plaintiff's *Bivens* claim, Defendants argue that it
is foreclosed by 28 U.S.C. § 2676, the FTCA's judgment bar
provision. (*Id.*)

Plaintiff has not filed an Opposition to either Motion, and
the time for doing so has elapsed. *See* Local Rule 104.2(a).
No hearing is necessary. *See id.* 105.6. The Court concludes
that Plaintiff's FTCA claim is barred by the discretionary
function exception, and that even if that exception did not
apply, he fails to state a claim on the merits. The Court further
concludes that his *Bivens* claim fails because of the FTCA's
judgment bar. [2] Accordingly, both Motions will be granted:
the stay on the COVID-19 claims will be lifted, and those
claims will be dismissed.

**I. FACTUAL AND PROCEDURAL BACKGROUND**
In the operative pleading (ECF No. 17), Plaintiff makes the
following allegations concerning his COVID-19 claims.

Plaintiff suffers from several medical conditions that make
him "extremely vulnerable" to COVID-19, including asthma,
a heart valve condition, and a high body mass index. (Am.
Comp. ¶ 8.) On February 3, 2022, Defendant Rakowski
entered the C-1 Housing Unit in FCI Cumberland, where
Plaintiff was incarcerated. (*Id.* ¶ 10.) The C-1 Unit "was
considered a 'quarantine unit' due to another Covid-19
outbreak" at FCI Cumberland. (*Id.*) Rakowski "did not don
any PPE [personal protective equipment] other than a blue
surgical mask," despite signing a form upon entering the C-1
Unit indicating that he did don all required PPE. (*Id.*) "BOP
policy required Rakowski to don all of the required PPE
before entering plaintiff's housing unit as part of the BOP's
Action Plan in effect on 2/3/22," which "included a gown,
face shield, N-95 mask, and gloves." (*Id.* ¶ 11.)

**\*2** At approximately 12:18 p.m. on February 3, 2022,
Rakowski entered Plaintiff's cell, "took off his blue surgical
mask" and threatened to "give [Plaintiff] about seventy write-
ups." (*Id.* ¶ 15.) Plaintiff asked Rakowski to put on his mask to
protect him from COVID infection, but Rakowski refused to
do so. (*Id.* ¶ 16.) Plaintiff also asked if he could be permitted to
put on a mask for himself, which Rakowski also refused. (*Id.*)
Rakowski then allegedly assaulted Plaintiff. (*Id.* ¶¶ 16 17.)

Rakowski, who had "knowledge of Plaintiff's vulnerability to Covid-19," then sent Plaintiff to the Segregated Housing Unit (the "SHU"), "where he was housed in a location in the SHU that had several quarantined (Covid-19 positive) inmates quartered there." (*Id.* ¶ 20.) Plaintiff was held in the SHU for two months, during which time he "was moved from cell to cell each week and forced to occupy cells previously occupied by Covid-19 positive and quarantined inmates," all on Rakowski's orders. (*Id.*) In particular, "Plaintiff was forced to occupy cells in which Covid-19 positive inmates and Covid-19 exposed inmates had occupied without said cells being sanitized." (*Id.*) Plaintiff believes that Rakowski's "actions were meant to expose plaintiff to Covid-19 as a form of retaliation against plaintiff for his complaints in court and to the BOP via the administrative remedy process." (*Id.*)

Plaintiff alleges that he submitted a tort claim under the FTCA to the BOP's Mid-Atlantic Regional Office in March 2022. (*Id.* ¶ 33.) He alleges that six months passed without his receiving a response. (*Id.*) Plaintiff filed this suit *pro se* on March 9, 2022 (ECF No. 1), and filed an Amended Complaint (ECF No. 17) on October 25, 2022.

In September 2023, this Court granted in part and denied in part a dispositive motion filed by Defendants. (ECF Nos. 37, 38.) The Court dismissed Plaintiff's claims for injunctive and declaratory relief and many of his *Bivens* and FTCA claims, with the exception of his FTCA claims for assault and battery.[3] And, as mentioned above, the Court stayed Plaintiff's COVID-19 claims under both *Bivens* and the FTCA. The Court also appointed counsel to represent Plaintiff in this matter. (ECF No. 42.)

## II. Legal Standards

### A. Standard for FTCA Claims

"The FTCA provides a limited waiver of sovereign immunity for civil actions against the United States." *Seaside Farm, Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016). To bring a claim under the FTCA, the plaintiff must allege that the claim is:

"[1] against the United States, [2] for money damages, ... [3] for injury or loss of property, or personal injury or death, [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [6] under circumstances where the United States, if a private

person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Brownback v. King*, 592 U.S. 209, 212 (2021) (alterations in original) (quoting *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)) (quoting 28 U.S.C. § 1346(b)). All six elements are jurisdictional requirements that a plaintiff must plausibly allege both to state a claim and to establish subject matter jurisdiction. *Id.* at 217. To determine whether the sixth element is satisfied, the Court must look to state substantive law—here, Maryland law—to determine whether the defendant would be liable for the alleged conduct if the defendant had been a private individual at the time of the conduct. *See Pledger v. Lynch*, 5 F.4th 511, 522–523 (4th Cir. 2021).

**\*3** The FTCA is "cabined by a list of exceptions," which, when applicable, "work to defeat the subject matter of the federal courts." *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (citing 28 U.S.C. § 2680). Relevant here is the discretionary function exception, which provides that there is no waiver of sovereign immunity for "[a]ny claim based upon an act or omission of an employee of the Government, ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The purpose of this exception "is to prevent 'judicial second-guessing' of decisions grounded in social and political policy." *Rich v. United States*, 158 F. Supp. 2d 619, 628 (D. Md. 2001) (quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)).

To determine whether the discretionary function exception applies, the Court must engage in a "two-step analysis." *Sanders v. United States*, 937 F.3d 316, 328 (4th Cir. 2019) (quotation omitted). First, the Court must determine whether "a federal statute, regulation, or policy specifically prescribes" the employee's course of action (in which case the "conduct cannot be discretionary") or whether the conduct "involves an element of judgment or choice" (in which case the conduct may be discretionary). *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Second, "[i]f the challenged conduct is the product of judgment or choice, this Court must then determine whether the decision made was based on considerations of public policy." *Sanders*, 937 F.3d at 328 (quotation omitted). The inquiry at this second stage focuses "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the

nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* (quoting *Gaubert*, 499 U.S. at 325). The discretionary function exception "shields decisions of a government entity made within the scope of any regulatory policy expressed in statute, regulation, or policy guidance, even when made negligently." *Id.* (quotation and alteration omitted).

## B. Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction

When the discretionary function exception to the FTCA applies, the Court "must dismiss the affected claims for lack of subject matter jurisdiction." *Indemnity Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009). A party may move to dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The plaintiff bears the burden of proving subject matter jurisdiction. *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347–48 (4th Cir. 2009). In deciding whether a complaint alleges facts sufficient to support subject matter jurisdiction, the Court generally assumes the truthfulness of the facts alleged. *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). But if the defendant argues that the jurisdictional facts alleged in the complaint are untrue, then "the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.*

## C. Standard for Dismissal for Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint's claims. *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021). When considering a motion to dismiss pursuant to Rule 12(b)(6), the Court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). However, conclusory allegations are not entitled to the assumption of truth, nor are legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009). To survive a motion to dismiss, the complaint "must include 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Langford*, 62 F.4th at 124 (quoting *Iqbal*, 556 U.S. at 678).

## III. DISCUSSION

### A. Plaintiff's FTCA Claim

### 1. Discretionary Function Exception

**\*4** The Court concludes that Plaintiff's COVID-19 claim under the FTCA is barred by the discretionary function exception because the BOP has discretion in how it maintains the health and safety of inmates in its custody, and because decisions about where and how to house inmates implicate public policy considerations.

Turning to the first prong of the discretionary function analysis, Plaintiff alleges that: "BOP policy required Rakowski to don all of the required PPE before entering plaintiff's housing unit as part of the BOP's Action Plan in effect on 2/3/22," which "included a gown, face shield, N-95 mask, and gloves." (Am. Comp. ¶ 11.) Plaintiff does not explain what the "Action Plan" is that he refers to, so the Court will assume that the "Action Plan" is a reference to the BOP's COVID-19 Pandemic Response Plan, which is the only document that appears to match Plaintiff's description.[4] *See* Bureau of Prisons, *COVID-19 Pandemic Response Plan* (2022), https://www.bop.eov/foia/docs/COVID_Pandemic_Response%20Plan_V.pdf. But that document does not purport to impose mandatory requirements on BOP officials. The document states that it "is designed to provide specific guidance on responding effectively to these challenges [*i.e.*, the challenges associated with COVID-19]—and limiting the spread of C0V1D 19, its impact on people's lives, and the BOP's missional and operational effectiveness." *Id.* at 3. Although the document occasionally uses the word "must," its overall tone is advisory rather than mandatory. *See, e.g.*, *id.*, Module 1 at 4 ("All individuals participating in congregate activities *should not* be in quarantine or isolation status due to COVID-19." (emphasis in original)); *id.*, Module 2 at 6 (stating when "N-95 respirators should be used"). Other courts in this Circuit have reached the same conclusion. *See Johnson v. United States*, Civ. No. TDC-22-1647, 2023 WL 7635083, at *5 ("The Court therefore finds that the CDC Guidance and the BOP Response Plan did not impose mandatory requirements relating to the acts and omissions underlying Johnson's FTCA claims during the period of his incarceration. Rather, they provided only guidance that permitted BOP officials ... to exercise discretion and judgment in deciding how specifically to address the COVID-19 pandemic."); *Bell v. United States*, Civ. No. 3:21-148, 2024 WL 2814699, at *6 (N.D.W. Va. Apr. 1, 2024) ("As to the Plaintiff's argument asserting the BOP's Pandemic Response Plan mandates specific action, the Court finds it

does not."). As Judge Hurson stated in the *Head II* opinion, "none of the policies Plaintiff highlights 'expressly prescribe or proscribe a particular course of action.' " 2024 WL 520037, at *8 (quoting *Bulger v. Hurwitz*, 62 F.4th 127, 143 (4th Cir. 2023)). Accordingly, the first prong of the discretionary function exception is met.

Turning to the second prong, decisions about how to properly protect prisoners against COVID-19 infection in a manner consistent with the BOP's other responsibilities necessarily implicate questions of public policy. The BOP has broad discretion to determine how best to implement its statutory responsibility to provide for the "protection," "safekeeping," and "care" of persons in its custody. *Rich v. United States*, 811 F.3d 140, 145 (4th Cir. 2015) (citing 18 U.S.C. § 4042(A)(2), (3)). As the Fourth Circuit has explained, "[f]actors such as available resources, proper classification of inmates, and appropriate security levels are inherently grounded in social, political, and economic policy." *Id.* at 146 (quotation omitted). And as the Court in *Head II* stated, "[t]he actions taken by Defendants in managing BOP's COVID-19 response, including their medical assessment of Plaintiff and implementation of sanitation and social distancing, were discretionary actions that fall under the FTCA's discretionary function exception." 2024 WL 520037, at *9 (collecting cases).

 *5 Finally, even if Plaintiff had adequately alleged that Defendants were negligent in failing to take adequate steps to protect him from COVID-19, that would not be enough to defeat the discretionary function exception. The Fourth Circuit has expressly held that the exception applies to discretionary governmental actions implicating public policy, "*even when made negligently.*" *Sanders*, 937 F.3d at 328 (emphasis added). Nor does it help Plaintiff that Rakowski's actions may have constituted an abuse of discretion, because the exception expressly applies to discretionary acts, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). And, it is of no moment that Captain Rakowski was a "low-level employee implementing policy" rather than "a high-level agency official making policy"; the discretionary function exception applies the same to both, so long as "nature of the conduct" implicates public policy concerns. *Wood v. United States*, 845 F.3d 123, 128–29 (4th Cir. 2017).

### *2. Merits*

Even if Plaintiff's COVID-19 claim were not barred by the discretionary function exception, it must nevertheless be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Plaintiff alleges that his exposure to COVID-19 constituted the tort of negligence. (Am. Comp. ¶ 39.) Under Maryland law, to establish a negligence claim, a plaintiff must show "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Wash. Metro. Area Trans. Auth. v. Seymour*, 874 A.2d 973, 976 (Md. 2005) (quotation omitted).

Here, assuming (without deciding) that Plaintiff has adequately alleged breach of duty, he has failed to plead that he suffered an "actual injury or loss." There is no allegation in the Amended Complaint that Plaintiff ever actually contracted COVID-19. Nor does he allege any severe emotional distress or any other injury as a result of his exposure. The Court is not aware of any authority stating that mere exposure to COVID-19, without actually contracting it, can give rise to a negligence claim—other than, perhaps, a claim for negligent infliction of emotional distress, which is not cognizable under Maryland law. *See Bond v. U.S. Postal Serv. Fed. Credit Union*, 164 F. Supp. 3d 740, 750 (D. Md. 2015) ("Maryland does not recognize an independent tort for negligent infliction of emotional distress" (quotation omitted)); *cf. Kantrow v. Celebrity Cruises, Inc.*, 533 F. Supp. 3d 1203, 1216–20 (S.D. Fla. 2021) (holding, as a matter of federal maritime law, that cruise ship passengers who were exposed to, but did not contract, COVID-19 failed to state a claim for negligence or negligent infliction of emotional distress).

Because Plaintiff fails to adequately allege an essential element of a negligence claim, his FTCA claim fails on the merits.

### B. Plaintiff's *Bivens* Claim

Under *Bivens* and its progeny, in certain limited instances a plaintiff may sue a federal official for violations of the United States Constitution. *See Bulger*, 62 F.4th at 135. However, a plaintiff who brings both an FTCA claim and a *Bivens* claim concerning the same underlying facts generally cannot proceed with the *Bivens* claim if his FTCA claim fails. That is the case because of the judgment bar provision of the FTCA, which provides that "[t]he judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject

matter, against the employee of the government whose act or omission gave rise to the claim." 28 U.S.C. § 2676. In general, a final determination that a court lacks subject matter jurisdiction over an FTCA claim is a "judgment" for the purpose of triggering the judgment bar provision. *Brownback,* 592 U.S. at 218. [5]

**\*6** Here, the facts underlying Plaintiff's *Bivens* claim and his FTCA claim entirely overlap. (*See* Am. Comp. ¶ 39 (stating that Defendant Rakowski's actions in exposing him to COVID-19 "constitutes both the tort of negligence and a violation of plaintiff's Eighth Amendment rights").) The Court has determined that the Court has no jurisdiction over his FTCA claim both because of the discretionary function exception and because it fails on the merits. [6] In these

circumstances, the Court's determination that it lacks subject matter jurisdiction triggers the judgment bar, and his *Bivens* claim must be dismissed. *See Unus v. Kane,* 565 F.3d 103, 122 (4th Cir. 2009).

### IV. CONCLUSION

For the foregoing reasons, a separate order will issue granting both Defendants' Motion to Lift Stay of COVID-19 Claims (ECF No. 58) and Defendants' Motion to Dismiss COVID-19 Claims or, in the Alternative, for Summary Judgment (ECF No. 59).

### All Citations

Slip Copy, 2024 WL 4043069

---

### Footnotes

1   *Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics,* 403 U.S. 388 (1971).

2   Because the Court determines that Plaintiff's claims must be dismissed on these grounds, the Court does not address Defendants' other arguments in favor of dismissal.

3   The litigation on Plaintiff's FTCA claims for assault and battery is ongoing; this Memorandum does not address those claims.

4   "A court may consider matters outside the pleadings in deciding whether it has jurisdiction." *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC,* 794 F. Supp. 2d 602, 511 (D. Md. 2011) (citing *Evans v. B. F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999)).

5   A court's determination that it lacks subject matter jurisdiction over an FTCA claim because of the discretionary function exception does not, on its own, trigger the judgment bar provision. *Simmons v. Himmelreich,* 578 U.S. 621, 627 (2016). However, here, the Court determines that the COVID-19 claim fails on the merits as well.

6   Recall that "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *Brownback,* 592 U.S. at 217. Thus, "where, as here, pleading a claim and pleading jurisdiction entirely overlap, a ruling that the court lacks subject-matter jurisdiction may simultaneously be a judgment on the merits that triggers the judgment bar." *Id.* at 218.

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 1159249
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Tramaine BROWN, Plaintiff

v.

UNITED STATES of America, et al., Defendants

No. 1:22-cv-00404
|
Filed March 18, 2024

**Attorneys and Law Firms**

Tramaine D. Brown, Melbourne, FL, Pro Se.

Michael Butler, United States Attorney's Office, Harrisburg, PA, for Defendant United States of America.

**MEMORANDUM**

Yvette Kane, District Judge

**\*1** Before the Court is Defendant the United States of America ("United States")'s motion to dismiss for lack of jurisdiction and/or for failure to state a claim upon which relief can be granted and/or for summary judgment filed pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure. (Doc. No. 40.) Also before the Court is Plaintiff Tramaine Brown ("Plaintiff")'s motion to permanently seal medical records filed by the United States in support of its motion to dismiss and/or for summary judgment. (Doc. No. 56.) For the reasons set forth below, the Court will grant the United States' motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1), strike the documents filed in support of the United States' motion for summary judgment, and deny as moot Plaintiff's motion to seal his medical records.

**I. BACKGROUND**

Plaintiff Tramaine Brown ("Plaintiff") is a prisoner in the custody of the Federal Bureau of Prisons ("BOP") and is currently under home detention overseen by the Orlando Residential Reentry Manager in Wildwood, Florida. On March 17, 2022, while he was incarcerated at Federal Correctional Institution Schuylkill in Minersville, Pennsylvania and designated to the satellite camp at that

institution, [1] he commenced the above-captioned action by filing a complaint against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, et seq. (Doc. No. 1.) Approximately one month later, on April 15, 2022, he filed an amended complaint, adding Ryan Miller ("Miller"), the "Executive Assistant/Camp Administrator/Public Information Officer" at FCI Schuylkill, as a defendant in this action. (Doc. No. 6 at 2, ¶ 5.) On that same date, Plaintiff also filed a motion for leave to proceed in forma pauperis (Doc. No. 7), as well as his prisoner trust fund account statement (Doc. No. 8).

On April 21, 2022, the Court granted Plaintiff leave to proceed in forma pauperis, deemed his amended complaint filed, and directed the Clerk of Court to issue a summons with a copy of Plaintiff's amended complaint to the United States Marshal for service upon the United States pursuant to Rule 4(i)(1) of the Federal Rules of Civil Procedure. (Doc. No. 10.) In addition, the Court directed the Clerk of Court to serve a copy of the amended complaint on Miller. (Id.) On May 16, 2022, the United States was served, and the summons was returned executed. (Doc. Nos. 13; 14 (indicating that, on May 18, 2022, a copy of the summons and the amended complaint was mailed to the United States Attorney General in Washington, D.C.).)

Following two (2) requests for an extension of time to respond to Plaintiff's amended complaint (Doc. Nos. 15, 17), which were granted by the Court (Doc. Nos. 16, 23), the United States filed a notice pursuant to 28 U.S.C. § 1679, stating that it was substituting itself as the proper defendant for Miller (Doc. No. 18). In its notice, the United States cited 28 U.S.C. § 2679. (Id. at 1.) That Section of Title 28 permits the Attorney General of the United States, or his or her designee, to certify that a federal employee—whose alleged negligent or wrongful act or omission gives rise to a plaintiff's claim—was acting within the scope of his or her employment. See 28 U.S.C. § 2679(d); 28 C.F.R. § 15.3(a). Upon this certification, the employee is dismissed from the action, the United States is substituted as the defendant in place of the employee, and the action is thereafter governed by the FTCA. See id.; Osborn v. Haley, 549 U.S. 225, 229–30 (2007).

**\*2** Plaintiff, however, subsequently filed a motion to strike the United States' notice of substitution for Miller, as well as a supporting brief. (Doc. Nos. 26, 27.) Thereafter, the United States filed a brief in opposition (Doc. No. 30), to which Plaintiff filed a reply brief (Doc. No. 31). Additionally, after the United States filed its notice of substitution,

Plaintiff filed a second amended complaint. (Doc. No. 20.) Plaintiff's second amended complaint once again named the United States and Miller as defendants and reasserted claims pursuant to the FTCA. (Id.) Plaintiff's second amended complaint also asserted for the first time, however, an Eighth Amendment claim against Miller pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens"). [2] (Id.)

In his second amended complaint, Plaintiff alleged that, in October of 2020, while he was housed at FCI Schuylkill and designated to SCP Schuylkill, he had a history of smoking and a BMI of 30, which put him in the "obese category" according to the Center for Disease Control and Prevention ("CDC"). (Id. at 6 (internal quotation marks omitted).) Plaintiff claimed that these factors put him at high risk of severe illness or death if he were to be exposed to COVID-19 and that the employees at FCI Schuylkill allegedly knew this. (Id. (internal quotation marks omitted).) Plaintiff further claimed that, in December of 2020, there was "a massive COVID-19 outbreak" at FCI Schuylkill, which "result[ed] in at least 160 inmates testing positive for COVID-19." (Id. (explaining that this outbreak originally started at the main camp at FCI Schuylkill and eventually made its way to SCP Schuylkill, where Plaintiff was housed).) Plaintiff alleged that, during this time, he was "forced into quarantine or transferred" into housing at the main camp, which had "a much higher security level" than to which he should have been exposed. (Id.) Plaintiff also alleged that the "[e]mployees ... failed to take any precautionary measures to prevent or stop the spread of the virus and continued working after being exposed to the virus[.]" (Id.) "[A]s a result of this persistent course of action," Plaintiff was exposed to (but did not contract) the virus on March 2, 2021, and again on September 1, 2021. (Id.)

In connection with these allegations, Plaintiff set forth five (5) counts in his second amended complaint. (Id. at 7–14.) The first two (2) counts were asserted against the United States for negligence and negligent infliction of emotional distress. (Id. at 7–8.) The final three (3) counts were asserted against Miller for assault and battery, intentional infliction of emotional distress, and a violation of the Eighth Amendment. (Id. at 9–14.) For relief, Plaintiff sought compensatory damages against the United States, and compensatory damages, general and special damages, and punitive damages against Miller. (Id. at 14.)

In response to Plaintiff's second amended complaint, the United States filed a motion to dismiss for lack of jurisdiction and/or for failure to state a claim upon which relief could be granted, as well as a supporting brief. (Doc. Nos. 21, 22.) Plaintiff filed a brief in opposition. (Doc. No. 28.) On March 24, 2023, the Court issued a Memorandum and Order resolving the United States' motion to dismiss, as well as Plaintiff's motion to strike the United States' notice of substitution. (Doc. Nos. 33, 34.)

**\*3** With regard to Plaintiff's motion to strike, the Court: (1) granted the motion as to Plaintiff's Eighth Amendment Bivens claim against Miller, concluding that the United States was not permitted to substitute itself for Miller; and (2) denied the motion as to Plaintiff's FTCA claims for assault, battery, and intentional infliction of emotional distress, concluding that the United States was permitted to substitute itself for Miller. (Id.) Regarding the United States' motion to dismiss for lack of jurisdiction (Doc. No. 21), the Court: (1) granted the motion to the extent that Plaintiff's FTCA claims were based upon allegations that the United States failed to adhere to 18 U.S.C. § 4042 and to CDC guidelines and recommendations; and (2) denied the motion to the extent that Plaintiff's FTCA claims were based upon allegations that the United States failed to adhere to the BOP's COVID-19 Pandemic Response Plan ("BOP Response Plan" or "Response Plan"). (Id.) And, finally, with regard to the United States' motion to dismiss for failure to state a claim, the Court granted the motion and dismissed, with prejudice, Plaintiff's FTCA claims against the United States for assault and battery, as well as Plaintiff's Eighth Amendment Bivens claims against Miller. (Id.) However, the Court dismissed, without prejudice, Plaintiff's FTCA claims against the United States for negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. (Id.) In addition, the Court afforded Plaintiff thirty (30) days in which to file a third amended complaint. (Id.)

On April 24, 2023, Plaintiff filed his third amended complaint under the FTCA against the United States and Miller (incorrectly identified as a Defendant), [3] asserting claims of negligence, negligent infliction of emotional distress, and intentional infliction of emotional distress. (Doc. No. 36.) Plaintiff again challenges the conditions of his confinement at FCI and SCP Schuylkill during the COVID-19 pandemic, for which he seeks compensatory damages, general and special damages, punitive damages, costs and attorney fees, and any other relief that the Court deems just and proper. (Id.) In support of his request for relief, Plaintiff sets forth the following allegations.

On March 23, 2020, the CDC issued guidance for officials operating correctional facilities in order to help stop the spread of COVID-19. (Id. at 2.) This guidance included recommendations about hygiene and cleaning practices, social distancing, evaluating symptoms, and the use of medical isolation and quarantine. (Id.); see also (id. at 2–4 (discussing the CDC's guidance)). The BOP "adopted" the CDC's guidance into its Response Plan and "mandated that all employees ... follow it to combat and prevent the spread of the virus into [its] facilities." (Id. at 4); see also (id. at 4–5 (discussing the Response Plan)).

Pursuant to the Response Plan, all employees, as well as individuals at SCP Schuylkill, were to be issued face makes and to wear them when social distancing could not be achieved. (Id. at 5.) However, the "BOP did not institute a policy requiring staff to wear face masks until August 27, 2020[.]" (Id.) In addition, "despite an internal memorandum" that prohibited the "busing of inmates to prison[,]" the BOP began busing inmates (on an unspecified date or dates) from Metropolitan Corrections Center ("MCC") in New York City to FCI and SCP Schuylkill. (Id.) Some of those inmates showed symptoms of COVID-19. (Id.)

Subsequently, on October 15, 2020, Plaintiff entered BOP custody and was housed at FCI Schuylkill. (Id. at 6.) Upon his arrival, he was screened by medical staff who became aware, via a physical examination, that he was at "high risk of serious illness or death" if he were to be exposed to COVID-19. (Id. at 6; id. at 6–7 (citing obesity, history of smoking, and race and ethnicity as factors that placed him at such risk).) Plaintiff alleges that medical staff communicated this information to Miller by documenting it in Plaintiff's official medical records. (Id.) As a result, Miller either knew or should have known—based upon CDC guidance that was incorporated into the BOP Response Plan—that these various factors placed Plaintiff at a higher risk of severe illness or death if he were to contract COVID-19. (Id. at 7.)

Also upon his arrival to FCI Schuylkill, Plaintiff was designated to SCP Schuylkill, which, Plaintiff alleges, was "a dangerous condition" for the following reasons: neither inmates nor staff had been tested for COVID-19; the facility was no longer screening any staff member when they entered the complex for work; inmates at SCP Schuylkill were required to work in the medium security portion at FCI Schuylkill, the "epicenter" of COVID-19, and to return to SCP Schuylkill without being screened for the virus; and neither Miller nor any other employee or inmate were wearing "mandatory face masks" or adhering to the Response Plan, "thereby causing the virus to mutate and spread among inmates at the facility[.]" (Id. at 8.)

**\*4** In connection with these allegations, Plaintiff claims that Miller "expos[ed] [him] to these dangerous living prison conditions at the time he arrived at the facility on October 15, 2020." (Id.) Plaintiff also claims that, as a result of Miller's failure to enforce and/or adhere to the Response Plan, "a massive COVID-19 outbreak occurred at the main FCI Schuylkill camp[,]" which "resulted in more than 160 inmates testing positive for [the virus]." (Id. at 8, 9.) On December 23, 2020, "the virus made its way" to SCP Schuylkill after Miller "permitted and/or required employees who were symptomatic and/or who had tested positive for the virus to show up for work and interact with inmates ... thereby resulting in the virus spreading throughout the facility[.]" (Id. at 8; id. at 9 (stating that Miller "required and/or permitted" employees who were "asymptomatic and/or symptomatic to continue entering the facility after being exposed to and/or testing positive for the virus")); see also (id. at 7 (alleging that "unknown FCI Schuylkill medical staff ... negligently and/or intentionally destroyed documents that reflected employees presenting COVID-19 symptoms so that symptomatic employees could continue working, in violation of the Response Plan")).

Despite the fact that the main camp was the "epicenter of the virus," and despite the fact that the main camp is a facility with a much higher severity level than Plaintiff should have been assigned, Miller forced Plaintiff to the main camp on December 23, 2020, "under the threat of disciplinary action[.]" (Id. at 9.) Although Plaintiff initially tested negative for the virus before being "forced into the epicenter of the virus[,]" he was exposed to and tested positive for the virus on February 1, 2021, while being housed at the main camp, which caused him to suffer from severe headaches, shortness of breath, loss of taste, smell and other severe symptoms. (Id. (claiming that he was "repeatedly exposed to the virus and placed at risk of infection and/or reinfection" on March 2, 2021, and September 1, 2021).)

In late March 2021, Miller consolidated SCP Schuylkill's two living quarters into one, making social distancing impossible and causing uninfected individuals to intermingle with those who had contracted COVID-19. (Id.) As a result, Plaintiff—despite having been fully vaccinated—was reinfected with the virus in mid-April 2022. (Id.) As a result, Plaintiff was extremely ill and bedridden for over a week and his pre-existing diagnosis of depression was "exacerbated[.]" (Id.

at 9–10.) And, in July 2022, and October 2022, there were "outbreak[s]" at FCI Schuylkill, which placed Plaintiff at risk to be "reinfected" with the virus. (Id. at 10.)

Based upon the foregoing, Plaintiff submitted an administrative claim to the BOP for the "injuries" he sustained as a result of Defendant Miller's failure to adhere to and/or enforce the Response Plan for "containment, mitigation[,] and prevention of the spread of" COVID-19 "into the facility" and for "exposing him to dangerous prison conditions that resulted in him contracting the virus[.]" (Id.) His administrative claim was denied on February 11, 2022. (Id.)

On June 7, 2023, in response to Plaintiff's third amended complaint, the United States filed a motion to dismiss for lack of jurisdiction and/or for failure to state a claim upon which relief can be granted and/or for summary judgment, along with a supporting brief, statement of material facts, and corresponding exhibits. (Doc. Nos. 40, 45, 46.) Plaintiff has since filed an opposition brief, as well as a responsive statement of material facts (Doc. Nos. 53, 54), to which the United States has a filed a reply (Doc. No. 58). In addition, Plaintiff has also filed a motion to permanently seal his medical records, which were filed by the United States in support of its motion to dismiss and/or for summary judgment. (Doc. Nos. 56; 57 (containing Plaintiff's supporting brief).) As reflected by the Court's docket, the United States has not filed a response to Plaintiff's motion.

And, finally, on November 23, 2023, Plaintiff filed a notice, explaining that he amended his administrative claim with the BOP. (Doc. No. 59 at 1 (explaining that he filed an original administrative tort remedy, SF-95, and claimed damages in the amount of $200,000, but that, in his amended administrative tort remedy, SF-95, he claims damages in the amount of $850,000).) Thus, the parties' respective motions are ripe for the Court's resolution.

## II. LEGAL STANDARD

**\*5**  "A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial or a factual attack." Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016). "A court ruling on a facial attack considers only the complaint, viewing it in the light most favorable to the plaintiff." Long v. SEPTA, 903 F.3d 312, 320 (3d Cir. 2018) (citation omitted). However, a court ruling on a factual attack, wherein the defendant contests the truth of the jurisdictional allegations,

"is a different matter: the court need not treat the allegations as true[.]" See id. (citations omitted).

"In reviewing a factual attack, the court may consider evidence outside the pleadings." Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted). Indeed, "[b]ecause at issue in a factual 12(b)(1) motion is the trial court's ... very power to hear the case[,] there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). In other words, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." See id.

## III. DISCUSSION

### A. The United States' Motion to Dismiss for Lack of Jurisdiction

The United States has filed a motion to dismiss Plaintiff's third amended complaint for lack of jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. (Doc. No. 40.) In support, the United States argues that the discretionary function exception applies to Plaintiff's FTCA's claims and thus immunizes the Government from suit. (Doc. No. 46 at 18–24.) Plaintiff argues, however, that this exception does not apply here. (Doc. No. 53 at 15–18.) The Court, having reviewed the parties' respective arguments and the law governing this exception to the FTCA, is persuaded by the United States' position.

As previously explained by this Court (Doc. No. 33 at 8–9, 16–18), "[t]he United States, 'as a sovereign, is immune from suit unless it consents to be sued.' " See S.R.P. ex rel. Abunabba v. United States, 676 F.3d 329, 332 (3d Cir. 2012) (quoting Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008)). The FTCA, however, authorizes suits against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." See 28 U.S.C. § 1346(b)(1).

Accordingly, "[t]he FTCA is a 'partial abrogation' " of the United States' sovereign immunity, see Abunabba, 676 F.3d

at 332 (quoting Gotha v. United States, 115 F.3d 176, 179 (3rd Cir. 1997)), because it authorizes suits against the United States for such negligent or wrongful acts or omissions of federal employees while acting within the scope of their employment. See 28 U.S.C. § 1346(b)(1); Rinaldi v. United States, 904 F.3d 257, 273 (3d Cir. 2018) (explaining that "[t]he FTCA offers a limited waiver of the federal government's sovereign immunity from civil liability for negligent acts of government employees acting within the scope of their employment" (citations omitted)).

**\*6** The FTCA, however, " 'imposes a significant limitation' " on this partial abrogation of sovereign immunity, see Abunabba, 676 F.3d at 332 (quoting Gotha, 115 F.3d at 179), by providing that the provisions of the Act shall not apply to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

See id. (emphasis added) (quoting 28 U.S.C. § 2680(a)); Baer v. United States, 722 F.3d 168, 172 (3d Cir. 2013) (explaining that "[t]he discretionary function exception limits [the waiver of the federal government's sovereign immunity by] eliminating jurisdiction for claims based upon the exercise of a discretionary function on the part of an employee of the government" (citing 28 U.S.C. § 2680(a)).

As explained by the Third Circuit, "[t]his discretionary function exception 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.' " See Abunabba, 676 F.3d at 332 (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984)). That said, this discretionary function exception "does not apply to every situation in which there is an actual option to choose between courses of action or inaction[,]"

but rather, "it immunizes from second-guessing legislative and administrative decisions grounded in social, economic, and political policy." See id. (citation, internal citation, and internal quotation marks omitted). And, ultimately, it is the federal government who bears the burden to show that the exception applies. See id. at 333 (citing Merando, 517 F.3d at 164).

Before determining whether the federal government has met its burden of showing that the exception applies to a plaintiff's FTCA claim, the Court must first identify the conduct at issue in that claim. See id. at 334 (citing Merando, 517 F.3d at 165). Once the Court has identified the conduct at issue, the Court is required to conduct a two (2)-part inquiry to determine whether the discretionary function exception immunizes the federal government from an FTCA suit arising out of such conduct. See id. at 332–33.

The first part of the inquiry requires the Court to determine whether the conduct giving rise to the alleged injury and, thus, the FTCA suit, involved "an element of judgment or choice." See id. at 333 (citations and internal quotation marks omitted). "[W]hen a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow[,]" the discretionary function exception does not apply because "the employee has no rightful option but to adhere to the directive." Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988); see also Gaubert, 499 U.S. at 324 (explaining that, if the employee violates, for instance, a mandatory regulation, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy"). If, however, a specific course of action is not prescribed for the employee to follow, then the Court proceeds to the second part of the inquiry. See Abunabba, 676 F.3d at 333.

**\*7** Under the second part of the inquiry, the Court must consider " 'whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield.' " See id. (quoting Gotha, 115 F.3d at 179) (some internal quotation marks omitted). Indeed, "[o]nly those decisions "susceptible to policy analysis" are protected by the exception." See id. at 336 (quoting Gaubert, 499 U.S. at 325). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." Gaubert, 499 U.S. at 324.

However, "[t]hat presumption ... can be rebutted." See Abunabba, 676 F.3d at 336 (citing Cestonaro v. United States, 211 F.3d 749, 755 n.4 (3d Cir. 2000)); see also Gaubert, 499 U.S. at 324–25 (instructing that a complaint can survive a motion to dismiss by alleging "facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of" a statute, regulation, or agency guidelines, and explaining that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis" (footnote omitted)).


### 1. Element of Judgment or Choice

Here, the Court begins, as it must, by identifying the conduct at issue. See Abunabba, 676 F.3d at 334. The crux of Plaintiff's third amended complaint is that Miller (and other unidentified employees) failed to adhere to the BOP Response Plan. (Doc. No. 36 (discussing the following acts and omissions that allegedly occurred at FCI and/or SCP Schuylkill: failing to test for COVID-19; failing to require employees and inmates to wear face masks; failing to screen employees when they entered the complex for work; allowing employees to continue working after being exposed to or testing positive for COVID-19 and destroying documentation reflecting such work; failing to require inmates to quarantine and practice social distancing; moving inmates back and forth from the satellite camp to the medium security portion of the facility; and authorizing consolidation of two living quarters into one at SCP Schuylkill).)

The United States argues that, because the BOP developed the Response Plan based upon CDC guidance, and because no federal law or agency mandated any particular conduct in the Response Plan, the alleged acts and/or omissions of the employees at FCI and SCP Schuylkill involved an element of judgment or choice. (Doc. No. 46 at 20–22.) And, because the employees' challenged conduct involved such an element of judgment or choice, the United States contends that it has satisfied the first part of the inquiry under the discretionary function exception. (Id.) The Court agrees.

Federal statutory law entrusts the BOP with the responsibility to "provide suitable quarters" and for "the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States[.]" See 18 U.S.C. § 4042(a)(2). Although this statutory law requires the BOP

to provide a general duty of care to manage and safekeep its prisoners, the Third Circuit has consistently held that the BOP retains discretion with respect to how it fulfills that general duty of care. See, e.g., Rinaldi, 904 F.3d at 273–74 (concluding that 18 U.S.C. § 4042 affords the BOP discretion in deciding suitable housing assignments for inmates); Ruiz v. United States, 664 F. App'x 130, 133 (3d Cir. 2016) (unpublished) (stating that "this statute leaves the implementation of these duties to the discretion of BOP officials ..."); Thrower v. United States, 528 F. App'x 108, 111 (3d Cir. 2013) (unpublished) (stating the same) (citations omitted); Donaldson v. United States, 281 F. App'x 75, 77 (3d Cir. 2008) (unpublished) (stating the same).

**\*8** However, although the BOP retains discretion in fulfilling this general duty of care, Plaintiff argues that Miller and other unidentified employees lacked discretion in how to contain, mitigate, and prevent the spread of COVID-19 at FCI and/or SCP Schuylkill because the BOP Response Plan is a mandatory policy that Miller was required to follow. (Doc. No. 53 at 16.) In support, Plaintiff cites to his third amended complaint (id.) wherein he asserts that the BOP "adopted" the Response Plan based upon CDC guidance and "mandated that all employes ... follow it to combat and prevent the spread of the virus into [BOP] facilities." (Doc. No. 36 at 4.) In further support, Plaintiff alleges that a BOP memorandum was issued on March 26, 2020, making the Response Plan mandatory at all BOP facilities, including FCI and SCP Schuylkill. (Id. at 6.)

At the outset, the Court observes that Plaintiff's third amended complaint fails to cite to any particular provision of the Response Plan, and, further, a copy of the Response Plan has not been attached to Plaintiff's third amended complaint or submitted in opposition to the United States' motion to dismiss and/or for summary judgment. In addition, although Plaintiff's third amended complaint generally cites to a URL link that contains numerous versions of the Response Plan (id. at 5), Plaintiff has neither specified which version(s) applies here, nor pointed to any particular provision contained in those versions. See (id. (citing https://www.bop.gov-/foia/docs/ COVID_pandemic_plan_docs_v6_2021_07_16.pdf, which consists of eight (8) versions and one-hundred and sixty-six (166) pages).) [4] Similarly, although Plaintiff's third amended complaint cites to another URL link that contains various BOP memoranda, spanning from January 2020 to May 2020, Plaintiff has not cited to any particular memorandum contained in that link. See (id. at 6 (citing https://

www.bop.gov/foia/docs/2020_COVID_memos.pdf, which contains one-hundred and twenty-eight pages (128) of various documents).) [5]

In addition, the BOP Response Plan, which appears to have been issued on August 31, 2020, and subsequently modified, came into effect well after any memoranda issued by the BOP on March 26, 2020. See, e.g., Response Plan, p.5 of 166. Further, the Court has reviewed the BOP memoranda contained in Plaintiff's cited URL link, including the memoranda dated March 26, 2020, and the Court finds that there is no explicit reference to or incorporation of the Response Plan or any other suggestion that the Response Plan constitutes a mandatory policy at BOP institutions. See BOP Memoranda, pp. 44–48 of 128. Thus, the Court is not persuaded by Plaintiff's broad and unsupported argument that a March 26, 2020 BOP memorandum made the Response Plan a mandatory policy at FCI and SCP Schuylkill. Furthermore, the Court, having reviewed the contents of the Response Plan, finds that it merely provides guidance and recommended approaches for, rather than imposing mandatory requirements on, BOP employees for managing COVID-19 at their correctional institutions. In support of this finding, the Court recounts some of its language below.

The Response Plan acknowledges the various challenges associated with the COVID-19 pandemic, "including knowledge gaps about the disease, rapidly changing guidance, no effective prevention (vaccine) or treatments, limitations in testing capacity, difficulty preventing its spread in residential settings like correctional and detention facilities, and severe impacts on institutional and organizational operations created by staffing and supply shortages or large numbers of sick patients." See Response Plan, p.6 of 166. The Response Plan also recognizes that the knowledge about COVID-19 and the public health guidance for responding to the pandemic continues to evolve, as it is "being developed and edited frequently to correspond to current guidance from the [CDC] and the World Health Organization [("WHO")][.]" See id. (stating that there are particularly unique challenges in the "confined correctional environment" because many individuals infected with COVID-19 do not display symptoms and, thus, the virus could be present in correctional facilities before infections are identified).

**\*9** In connection with these challenges, the Response Plan explicitly provides that "[it] is designed to provide specific guidance on responding effectively to these challenges—and limiting the spread of COVID-19, its impact on people's lives, and the BOP's missional and operational effectiveness." See id. p.7 of 166 (emphasis added). In addition, the Response Plan, which is divided into numerous modules, further provides that it "will be updated as needed, based on guidance from key stakeholders including the CDC, WHO, and [Department of Justice] and that "recommendations may be revised as new information becomes available." See id.; see also id. pp. 10–156 of 166 (referring, consistently, to the information contained in the Response Plan and the specific modules as "guidance" or "recommendations").

Furthermore, and particularly relevant here to Plaintiff's FTCA claims against the United States, the Response Plan provides the following guidance or recommendations: "[t]he medical management of COVID-19—including testing, housing, and treatment strategies—are clinical decisions and deference should be given to the [Regional Medical Director] regarding these decisions within the clinical context of each situation and scenario that presents at the respective institution[,]" see id. p.11 of 166; "[r]ecommended [personal protective equipment] for incarcerated/detained individuals and staff in a BOP facility will vary" based upon a number of enumerated factors, see id. p.25 of 166; "[v]arious administrative measures should be implemented to maximize social distancing (reduce contact between people) and thereby reduce the chance of spreading viruses[,]" see id. p.15 of 166; referring to COVID-19 screening and testing protocols, as well as isolation and quarantine measures, as "guidance" or recommended "plan[s,]" see id. pp. 64, 67, 68, and 111 of 166; discussing "housing considerations[,]" such as "reassigning bunks to provide more space between individuals, "[i]f space allows[,]" opening vacant housing units to decrease population density, when feasible[,]" and "[m]inimizing the number of individuals housed in the same room as much as possible[,]" see id. p.99 of 166.

Accordingly, for all of these reasons, the Court finds that the BOP Response Plan contains guidance and recommendations and, therefore, does not proscribe or prescribe a mandatory course of conduct for BOP employees to follow in connection with the COVID-19 pandemic. Thus, because the United States has demonstrated that the challenged conduct in Plaintiff's third amended complaint involves an element of judgment or choice, the United States has satisfied the first prong of the discretionary function exception to the FTCA. See, e.g., Johnson v. United States, No. 22-cv-01647, 2023 WL 7635083, at *5 (D. Md. Nov. 14, 2023) ("Johnson") [6] (concluding that "the CDC Guidance and the BOP Response Plan did not impose mandatory requirements

relating to the acts and omissions underlying [plaintiff's] FTCA claims during the period of his incarceration[,]" but rather, "they provided only guidance that permitted BOP officials, including those at FCI-Schuylkill and SCP-Schuylkill, to exercise discretion and judgment in deciding how specifically to address the COVID-19 pandemic"); Head v. United States, No. 22-cv-00238, 2024 WL 520037, at *8 (D. Md. Feb. 9, 2024) (explaining that the BOP Response Plan provides "guidance" not "mandatory requirements" and, thus, does not command a particular course of action); Thieme v. United States, No. 21-cv-00682, 2023 WL 8271766, at *5 (D.N.J. Nov. 30, 2023) (finding that the BOP Response Plan "confirm[s] the discretion inherent in testing and quarantine procedures"); Brown v. United States, No. 22-cv-00124, 2023 WL 4744597, at *7 (N.D. W. Va. July 25, 2023) (overruling objection to Report and Recommendation and stating that "[t]he BOP's own description of its [Response Plan] makes clear that the protocols are not mandatory ..."). [7]

## 2. Public Policy Considerations

**\*10** Because the Court has concluded that the conduct at issue involved an element of judgment or choice, the Court must next determine, under the second part of the inquiry, whether such judgment or choice is of the kind that the discretionary function exception to the FTCA was designed to protect. See Abunabba, 676 F.3d at 336 (instructing that, "[o]nly those decisions 'susceptible to policy analysis' are protected by the exception" (quoting Gaubert, 499 U.S. at 325)); see also Gaubert, 499 U.S. at 324 (explaining that, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion").

Here, because the BOP Response Plan afforded its employees discretion in the development, implementation, and management of health and safety protocols concerning COVID-19 at its correctional institutions, the Court finds that the alleged acts and omissions of Miller and other unidentified employees at FCI and SCP Schuylkill were discretionary and, thus, were presumptively grounded in policy when those employees exercised that discretion. See Johnson, 2023 WL 7635083, at *5 (concluding the same and explaining, inter alia, that BOP decisions on "whether to bus inmates from the MCC to SCP-Schuylkill during the pandemic, what levels of occupancy to have in particular

units within SCP-Schuylkill during the pandemic, whether and when to designate [plaintiff] to either SCI-Schuylkill or FCI-Schuylkill during a COVID-19 outbreak[,] whether to consolidate two separate living quarters within SCP-Schuylkill during the pandemic[,]" whether to provide certain personal protective equipment to staff, and "whether staff would be called upon to work in the same time frame that they had COVID-19 symptoms[,]" were all discretionary decisions not mandated by federal statute, CDC guidance, the "BOP Response Plan[,]" or "Internal COVID-19 Memoranda").

In addition, the United States argues (Doc. No. 46 at 23–24), and the Court agrees, that the BOP's development, implementation, and management of protocols, taken to safeguard the health and safety of those confined to and working in its correctional institutions during the COVID-19 pandemic, is grounded in policy considerations that are appropriately left to the discretion of prison officials and administrators. See also Santiago v. United States, No. 21-cv-00436, 2022 WL 790805, at *3 (W.D. Va. Mar. 14, 2022) (concluding that "the BOP's handling of COVID-19" and the "development and implementation of safety protocols" that it put into place were "based on considerations of public policy" and explaining, inter alia, that "[t]he BOP must balance its duty to protect inmates from COVID-19 with its duty to protect inmates from each other, to safeguard staff, and to protect the public"); Murillo v. United States Dep't of Just., No. 21-cv-00425, 2022 WL 16745333, at *10 (D. Ariz. Nov. 7, 2022) (concluding that BOP decisions regarding the implementation of any particular infectious disease measure for COVID-19 in any particular institution were "unquestionably based on considerations of public policy" (citation and internal quotation marks omitted)). Thus, because the United States has demonstrated that the challenged conduct in Plaintiff's third amended complaint involves the type of judgment or choice that the discretionary function exception to the FTCA was designed to protect, the Court concludes that the United States has satisfied the second prong of the exception.

In reaching this conclusion, the Court upholds the long-standing principles that: "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform[;]" that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government[;]" and that this "task that has been committed to the responsibility of those branches, and separation of powers

concerns counsel a policy of judicial restraint." See Turner v. Safley, 482 U.S. 78, 84–85 (1987) (internal citation and internal quotation marks omitted). Deference is, therefore, appropriately afforded to BOP prison officials and employees with respect to their decision-making in the development, implementation, and management of COVID-19 at their institutions. See id.; Whitley v. Albers, 475 U.S. 312, 321–22 (1986) (stating that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security" (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979))).

### 3. Conclusion as to the United States' Motion to Dismiss for Lack of Jurisdiction

**\*11** For all of these reasons, the Court concludes that the United States has met its burden of demonstrating that the FTCA's discretionary function exception applies to Plaintiff's allegations that Miller and other unidentified FCI and SCP Schuylkill employees failed to adhere to the BOP Response Plan during the COVID-19 pandemic. As such, the Court is divested of jurisdiction to consider Plaintiff's allegations. The Court will, therefore, dismiss Plaintiff's third amended complaint. (Doc. No. 36.) Additionally, because the Court has resolved the United States' motion to dismiss on jurisdictional grounds, and not on any merits-related arguments, the Court will strike the documents filed in support of the United States' motion for summary judgment and deny as moot Plaintiff's motion to seal his medical records. (Doc. No. 56.)

## IV. CONCLUSION

Accordingly, for the foregoing reasons, the Court will grant the United States' motion to dismiss for lack of jurisdiction. (Doc. No. 40.) In addition, the Court will strike the documents filed in support of the United States' motion for summary judgment and deny as moot Plaintiff's motion to seal his medical records. (Doc. No. 56.) An appropriate Order follows.

### All Citations

Slip Copy, 2024 WL 1159249

---

## Footnotes

1    Generally speaking, Plaintiff appears to refer to the institution, as a whole, as "FCI Schuylkill," and to the satellite camp, specifically, as "SCP Schuylkill." See, e.g., (Doc. Nos. 1, 6, 20, 36). For consistency purposes, the Court will do the same.

2    Because Plaintiff, a federal prisoner, sought monetary damages against Miller, a federal official, the Court construed Plaintiff's second amended complaint as asserting his Eighth Amendment claim against Miller pursuant to Bivens. (Doc. No. 33 at 3 n.1 (citing Doc. No. 20 at 13–14).)

3    As set forth above, the Court previously ruled that the United States was permitted to substitute itself for Miller with respect to Plaintiff's state law tort law claims against Miller. (Doc. No. 33 at 8–14.)

4    The Court will cite to this URL link as the Response Plan and indicate the page number upon which the cited information appears in the link. This page number is located at the top of the link and will be identified by the Court as "p.[the number] of 166."

5    The Court will cite to this URL link as the BOP Memoranda and indicate the page upon which the information appears in the link. This page number is located at the top of the link and will be identified by the Court as "p. [the number] of 128."

6    In <u>Johnson</u>, the pro se plaintiff's fourth amended complaint sets forth parties, claims, and factual allegations that are strikingly similar to those asserted, here, by Plaintiff. <u>See</u> <u>Johnson v. United States of America,</u> No. 8:22-cv-01647 (D. Md. June 8, 2023), ECF No. 28.

7    As set forth above, the Court previously ruled that the FTCA's discretionary function exception applied to Plaintiff's allegations that the United States' employees at FCI and SCP Schuylkill failed to follow CDC guidelines and recommendations during the COVID-19 pandemic. (Doc. No. 33 at 21–23.) The Court explained that CDC statements concerning, <u>inter alia</u>, mask wearing, social distancing, and quarantining are advisory in nature and, thus, do not prescribe mandatory conduct for the United States' employees to follow. (<u>Id.</u> at 21 (citations omitted).) The BOP Response Plan, much like the CDC guidelines and recommendations, does not impose a mandatory policy, or mandatory requirements, upon BOP employees for managing COVID-19 at their correctional institutions.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

2023 WL 7635083
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

Joe JOHNSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civil Action No. TDC-22-1647
|
Signed November 14, 2023

**Attorneys and Law Firms**

Joe Johnson, Fort Washington, MD, Pro Se.

Kelly M. Marzullo, United States Attorney's Office, Baltimore, MD, for Defendant.

**MEMORANDUM OPINION**

THEODORE D. CHUANG, United States District Judge

**\*1** Plaintiff Joe Johnson has filed a Fourth Amended Complaint against Defendant United States of America ("the Government") alleging violations of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2674 (2018), and a violation of the Eighth Amendment to the United States Constitution arising from the alleged failure to manage properly the impact of the COVID-19 pandemic at a federal prison at which Johnson was incarcerated. The Government has filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED, and this case will be DISMISSED.

**BACKGROUND**

From August 10, 2020 to November 24, 2021, Johnson was incarcerated at the Federal Correctional Institution Schuylkill ("FCI-Schuylkill") in Minersville, Pennsylvania following convictions in the United States District Court for the Eastern District of Pennsylvania for aggravated identity theft and false statements. Specifically, Johnson was designated to a satellite camp at that prison ("SCP-Schuylkill"). Throughout this period, Ryan Miller was an administrator at SCP-Schuylkill with "primary responsibility over the operation as well as individuals confined at that facility." Fourth Am. Compl. ("FAC") at 1, ECF No. 28.

Johnson's period of incarceration coincided with the COVID-19 pandemic. Johnson contends that during the pandemic. Miller exposed him to dangerous living conditions by failing to adhere to applicable guidance in managing SCP-Schuylkill, including guidance issued by the Centers for Disease Control and Prevention ("CDC"), the Bureau of Prisons ("BOP") COVID-19 Pandemic Response Plan ("the BOP Response Plan"), and internal federal government memoranda relating to the COVID-19 pandemic ("the Internal COVID-19 Memoranda"). Among other failures, Johnson alleges that SCP-Schuylkill continued to bus inmates who had COVID-19 symptoms from the Metropolitan Corrections Center ("MCC") in New York City to SCP-Schuylkill; failed to provide personal protective equipment ("PPE") to correctional officers and staff or require them to wear face masks; allowed correctional officers and staff to continue to work after being exposed to or testing positive for COVID-19 and destroyed documents reflecting such work; and allowed overcrowding within the camp. Johnson further alleges that because of these acts and omissions, there was a COVID-19 outbreak at FCI-Schuylkill beginning on or about December 23, 2020, and that Johnson was sent to FCI-Schuylkill from SCP-Schuylkill for disciplinary reasons despite the outbreak. According to Johnson, he was at high risk for severe illness from COVID-19 because he had hypertension, was prediabetic, and was obese. Johnson also alleges that Miller's March 2021 decision to consolidate living quarters at SCP-Schuylkill increased the risk of viral transmission.

On June 25, 2021, Johnson filed an administrative claim with the BOP in which he alleged that Miller's failure to mitigate and contain COVID-19 exposed Johnson to dangerous living conditions. Then, on November 23, 2021, Johnson's convictions and sentences were reversed, resulting in his release from SCP-Schuylkill the next day. Johnson asserts that although he was fully vaccinated, he was neither tested nor screened for COVID-19 upon his departure from SCP-Schuylkill, and that he subsequently tested positive for the coronavirus. On February 11, 2022, several months after Johnson's release from SCP-Schuylkill, the BOP denied Johnson's administrative claim.

**\*2**  On July 5, 2022, Johnson filed the original Complaint in this case in the United States District Court for the District of Maryland, in which he asserted claims against the United States relating to the conditions at SCP-Schuylkill, as well as claims of malicious prosecution, false arrest, and related claims against the prosecutor and an investigator who participated in the criminal case resulting in his conviction in the Eastern District of Pennsylvania. On July 20, 2022, the case was transferred to the Eastern District of Pennsylvania. Upon transfer, Johnson voluntarily dismissed his claims against the prosecutor and investigator. The Eastern District of Pennsylvania then dismissed Johnson's case based on improper venue **but** granted Johnson leave to decide whether to re-file his complaint in either the District of Maryland or the Middle District of Pennsylvania, in which FCI-Schuylkill is located.

On January 16, 2023, Johnson filed a Second Amended Complaint in the District of Maryland that included only the United States as a defendant and asserted tort claims pursuant to the FTCA. On May 31, 2023, Johnson filed a Third Amended Complaint with additional factual allegations regarding Miller. On June 8, 2023, Johnson filed the presently operative Fourth Amended Complaint in which he asserts the following claims in the following numbered counts: (1) negligence; (2) negligence *per se*; (3) negligent infliction of emotional distress; (4) intentional infliction of emotional distress: and (5) a violation of the Eighth Amendment.

### DISCUSSION

In its Motion to Dismiss, the Government argues that: (1) the discretionary function exception to liability under the FTCA bars the common law tort claims in Counts 1 through 4 of the Fourth Amended Complaint; (2) Johnson has not exhausted administrative remedies relating to any tort claims arising after June 14, 2021 and any claim that he contracted COVID-19 at FCI-Schuylkill; (3) Johnson has not suffered sufficient physical injury to recover under the FTCA; and (4) sovereign immunity bars the Eighth Amendment claim in Count 5.

### I. Legal Standard

The Government moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. It is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal upon a belief that the plaintiff has failed to make that showing. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192. The court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (quoting *Richmond Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

### II. FTCA Claims

The Government first seeks dismissal of the tort claims in Counts 1-4 based on the discretionary function exception to the FTCA. Generally, the United States government is immune from suit unless it has expressly waived sovereign immunity. *Fed. Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA provides a limited waiver of sovereign immunity to permit a suit for damages against the United States for "personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2674. This waiver of sovereign immunity is subject to certain exceptions. *See id.* § 2680. As relevant here, the FTCA's waiver does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duly on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* § 2680(a).

**\*3**  This discretionary function exception, like other exceptions to the FTCA's immunity waiver, "work to defeat the subject matter jurisdiction of the federal courts." *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020). "Thus, the burden is on the plaintiff in ... a[n] [FTCA]

suit to establish 'that the discretionary function exception does not foreclose their claim.' " *Id.* (quoting *Seaside Farm. Inc. v. United States*, 842 F.3d 853, 857 (4th Cir. 2016)). To determine whether the discretionary function exception applies, courts engage in a two-step analysis. *Bulger v. Hurwitz*, 62 F.4th 127, 142 (4th Cir. 2023). First, the court considers whether the acts in question "are discretionary in nature" in that they involve "an element of judgment or choice." *Blanco Ayala*, 982 F.3d at 214 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). Conduct generally involves an element of judgment or choice "unless a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Bulger*, 62 F.4th at 142 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Second, a court "must determine whether the challenged governmental actions and decisions were based on considerations of public policy." *Id.* (quoting *Berkovitz*, 486 U.S. at 537). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 143 (quoting *Gaubert*, 499 U.S. at 324). So long as the general nature of the challenged decision is one expected to be "inherently grounded in considerations of policy," the exception bars recovery. *See Blanco Ayala*, 982 F.3d at 215 (quoting *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993)).

The United States Court of Appeals for the Fourth Circuit has applied the discretionary function exception to FTCA claims based on the assertion that BOP officials in a federal prison failed adequately to protect an inmate from physical harm. *Bulger*, 62 F.4th at 145. In *Bulger*, the court upheld the dismissal of an FTCA claim based on the failure of prison officials to prevent inmates from killing James "Whitey" Bulger, an organized crime leader from Boston, Massachusetts, when he was incarcerated at the United States Penitentiary Hazelton in West Virginia, because the federal statutes requiring the BOP to provide for the "safekeeping" and "care" of federal prisoners allowed BOP officials to "exercise broad discretion in safeguarding and protecting inmates." *Id.* at 133, 143. Likewise, in *Rich v. United States*, 811 F.3d 140 (4th Cir. 2015), the court dismissed, pursuant to the discretionary function exception, an FTCA claim based on the failure to protect an inmate after he was placed in a recreation cage with other inmates who then brutally attacked him. *Id.* at 145-46. The court held that under the applicable statutes and regulations, "[p]rison officials are afforded discretion in determining where to place inmates"

and whether to keep them "separated from one another." *Id.* at 146.

Although the actions of BOP officials in caring for and safeguarding federal prisoners are generally discretionary functions, Johnson argues that Miller and other officials at FCI-Schuylkill lacked discretion in how to address the COVID-19 pandemic because they were bound to follow certain written guidance applicable to the BOP, specifically the CDC guidance, the BOP Response Plan, and the Internal COVID-19 Memoranda.

The CDC guidance referenced by Johnson, entitled "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities," ("the CDC Guidance"), states at the outset that it "is intended to provide guiding principles for ... administrators of correctional and detention facilities" and that it "will not necessarily address every possible custodial setting." National Center for Immunization and Respiratory Diseases (U.S.), Division of Viral Diseases, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* at 2, Centers for Disease Control and Prevention (Dec. 31, 2020), https://stacks.cdc.gov/view/cdc/100951 ("CDC Guidance"); *see* FAC at 3, ECF No. 28 (citing this Guidance). The CDC Guidance emphasizes that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." CDC Guidance at 2. Furthermore, the CDC Guidance explicitly describes its provisions as "guidance" and "[r]ecommendations" that should be applied "based on the progress of the outbreak in a particular facility and the surrounding community." *Id.* at 6. Thus. the CDC Guidance docs not impose mandatory requirements on BOP officials, including those operating FCI-Schuylkill and SCP-Schuylkill.

**\*4** As to the specific issues identified by Johnson, such as the failure to provide correctional staff with PPE or to require staff to wear face masks, the CDC Guidance frames its identified prevention practices as measures that "should" be undertaken, and in some instances only "[w]hen feasible and consistent with security priorities." *Id.* at 15. As to face masks, the CDC Guidance recommends that correctional staff be "encourage[d] ... to wear a cloth face mask as much as safely possible ...." *Id.* at 12. Although Johnson focuses on the alleged busing of inmates with COVID-19 symptoms from MCC to SCP-Schuylkill, the CDC Guidance

states that "transfers of incarcerated/detained persons to and from other jurisdictions and facilities" should be suspended "unless necessary for medical evaluation, medical isolation/ quarantine, health care, extenuating security concerns, release, or to prevent overcrowding," thereby requiring the exercise of judgment and discretion in determining whether transfers are necessary and appropriate. *Id.* at 18.

As for the BOP Response Plan, first issued on August 31, 2020 and later modified, it states that it was "designed to provide specific guidance on responding to" COVID-19 and that the medical management of COVID-19 at federal prison facilities consists of "clinical decisions" subject to deference to the Regional Medical Director "within the clinical context of each situation and scenario." BOP Response Plan at 11, [1] Opp'n Ex. 1, ECF No. 37-2. Rather than impose specific requirements on the use of PPE, the BOP Response Plan provides only "[r]ecommended levels of PPE" and states that recommended forms of PPE for both incarcerated individuals and staff "will vary" based on factors such as "the type of contact with inmates" and "the type of procedure being performed." *Id.* at 26-27. In discussing steps to be taken when staff has potential exposure to COVID-19, the BOP Response Plan provides only "[g]uidance" without imposing mandatory requirements. *Id.* at 109. Thus, the BOP Response Plan, like the CDC Guidance, does not impose mandatory requirements for addressing COVID-19 at BOP prisons.

The Internal COVID-19 Memoranda referenced by Johnson consist of 48 memoranda issued by various United States Department of Justice ("DOJ") and BOP officials, including: the Attorney General of the United States; the Deputy Attorney General: the Assistant Attorney General for Administration; the Director of the BOP; the National Health Systems Administrator of the BOP Health Services Division; the Medical Director of the BOP Health Services Division, and the Assistant Director of the BOP Health Services Division. The memoranda were issued during the early stages of the COVID-19 pandemic, from January 2020 to May 2020. Johnson argues that the Internal COVID-19 Memoranda "made the [BOP] Response Plan at all BOP facilities ... mandatory." Opp'n at 8, ECF No. 37-1.

Upon review of the Internal COVID-19 Memoranda, the Court finds that many do not relate to the BOP Response Plan or the issues raised by Johnson in the Fourth Amended Complaint. Those that address those topics, in many instances, provide similar levels of discretion to prison officials as provided by the CDC Guidance and the BOP

Response Plan. For example, an April 6, 2020 memorandum entitled "Coronavirus (COVID-19) Update – Use of Face Masks," stated that "staff should be issued two face masks" and that "[s]taff and inmates should be advised that masks are to be used in interacting with persons when social distancing is not possible." Internal COVID-19 Memoranda at 80, Opp'n Ex. 3, ECF No. 37-4. More importantly, although several of the Internal COVID-19 Memoranda address one or more of the COVID-19 response issues identified by Johnson, none explicitly or implicitly state that the BOP Response Plan was generally mandatory, or that its provisions should be read to be mandatory. Indeed, the first version of the BOP Response Plan was not even issued until August 2020, three months after the last of the Internal COVID-19 Memoranda was issued.

**\*5** The Internal COVID-19 Memoranda include several memoranda that appear to be precursors to the BOP Response Plan and impose certain mandates or requirements, including a March 13, 2020 memorandum entitled "Coronavirus (COVID-19) Phase Two Action Plan" that suspended social visits, legal visits, and internal movements of prisoners for 30 days; and a March 26, 2020 "Coronavirus (COVID-19) Phase Four Action Plan," which mandated screening of inmates newly admitted to the BOP and of staff and visitors to BOP prisons. However, the topics addressed by the mandatory provisions in these earlier memoranda are addressed in the BOP Response Plan in a non-mandatory manner. Moreover, several documents containing certain mandatory provisions, including the Phase Five, Phase Six, and Phase Seven Action Plans, facially remained in effect until June 30, 2020, over a month before the BOP Response Plan was first established and over a month before Johnson was first incarcerated in a BOP facility. Thus, the Court does not find grounds to conclude that the terms of these memoranda, or any other Internal COVID-19 Memoranda, rendered the terms of the BOP Response Plan mandatory at the time of Johnson's incarceration.

The Court therefore finds that the CDC Guidance and the BOP Response Plan did not impose mandatory requirements relating to the acts and omissions underlying Johnson's FTCA claims during the period of his incarceration. Rather, they provided only guidance that permitted BOP officials, including those at FCI-Schuylkill and SCP-Schuylkill, to exercise discretion and judgment in deciding how specifically to address the COVID-19 pandemic. Notably, multiple federal district courts have likewise concluded that the CDC Guidance and the BOP Response Plan were discretionary

in nature and thus dismissed FTCA claims by federal prisoners alleging an inadequate response to the COVID-19 pandemic based on the discretionary function exception. *See, e.g.*, *Brown v. United States*, No. 22-0124-GMG, 2023 WL 4744597, at *1, *7 (N.D. W. Va. July 25, 2023) ("The BOP's own description of its document makes clear that the protocols are not mandatory, and the BOP even acknowledges that it may be impossible to establish or enforce mandatory uniform policies."); *Santiago v. United States*, No. 21-0436-JPJ, 2022 WL 790805. at *2-3 (W.D. Va. Mar. 14, 2022) ("I find that the BOP's handling of COVID-19 and the protective measures it put into place involved an element of judgment or choice.... CDC guidance was just that—guidance."); *Sanford v. United States*, 21-2552-RMG, 2022 WL 17369375, at *1, *3 (D.S.C. Dec, 2, 2022) ("The Magistrate Judge correctly noted that the evidence regarding the BOP's COVID-19 policies does not suggest there was a mandatory course of action to be followed.").

More specifically, the Court further finds that, whether subject to the general statutes governing the operation of federal prisons or to the specific CDC Guidance and BOP Response Plan relating to the COVID-19 pandemic, the specific acts and omissions identified by Johnson as bases for FTCA liability are discretionary in nature and are thus presumptively grounded in public policy considerations. *See Blanco Ayala*, 982 F.3d at 214. For example, decisions on whether to bus inmates from the MCC to SCP-Schuylkill during the pandemic, what levels of occupancy to have in particular units within SCP-Schuylkill during the pandemic, whether and when to designate Johnson to enter SCI-Schuylkill or FCI-Schuylkill during a COVID-19 outbreak, and whether to consolidate two separate living quarters within SCP-Schuylkill during the pandemic are discretionary decisions not mandated by statute, the CDC guidance, BOP Response Plan, or the Internal COVID-19 Memoranda. As access to PPE was understood by relevant guidance to vary based on needs and capacity, decisions at SCP-Schuylkill regarding whether to provide certain PPE to correctional staff, as well as decisions on whether staff would be called upon to work in the same time frame that they had COVID-19 symptoms, were similarly discretionary, requiring some judgment or choice, and therefore not subject to liability under the FTCA. Because the alleged tortious conduct consists of actions subject to the discretionary function exception, the Court will grant the Motion to Dismiss as to the FTCA claims in Counts 1-4.

**\*6** Given that the Court will grant the Motion as to Counts 1-4 based on the discretionary function exception, it need not

and will not address the alternative arguments for dismissal of those counts.

### III. Eighth Amendment Claim

The Government seeks dismissal of Count 5, a claim against the United States for a violation of the Eighth Amendment right to be free from cruel and unusual punishment, as barred by sovereign immunity. The United States Supreme Court has held that the FTCA's waiver of sovereign immunity does not extend to constitutional tort claims. *See, e.g.*, *Meyer*, 510 U.S. at 478 ("[T]he United States simply has not rendered itself liable under [the FTCA] for constitutional tort claims."); *see also Reinbold v. Evers*, 187 F.3d 348, 355 n.7 (4th Cir. 1999) ("Because the United States has not waived sovereign immunity in suits claiming constitutional torts, [Plaintiff's] Fourth Amendment claim against the United States necessarily fails."). Therefore, Count 5 will be dismissed for lack of subject matter jurisdiction.

Johnson requests that in the event of such a dismissal, the Court should grant him leave to file a Fifth Amended Complaint to add Miller as the defendant for the Eighth Amendment claim in Count 5. Generally, a court should "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts deny leave to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986).

Here, the Court finds that the proposed amendment would be futile. An Eighth Amendment claim asserted against a federal official such as Miller would constitute a claim pursuant to *Bivens v. Six Unknown Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), in which the Supreme Court held that the plaintiff had an implied cause of action for damages based on an alleged violation of the Fourth Amendment arising from an arrest allegedly conducted without probable cause and with the use of unreasonable force. *Id.* at 389, 397. In *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court extended *Bivens* and held that a former congressional staff member who asserted a sex discrimination claim under the Fifth Amendment had an implied cause of action for damages. *Id.* at 231, 248-49. In *Carlson v. Green*, 446 U.S. 14 (1980), the Supreme Court further extended *Bivens* and held that the estate of a federal prisoner who died in custody had an implied cause of action for damages under the Eighth Amendment based on alleged deliberate indifference to serious medical needs. *Id.* at 16 & n.1, 18-19, 25.

In 2022, however, the Supreme Court held in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), that a two-step inquiry governs whether a *Bivens* claim may proceed. *Id.* at 1803. First, a court asks whether the case presents "a new *Bivens* context" in that it is "meaningful[ly]" different from the three cases in which the Court has implied a damages action. *Id.* at 1803 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 139 (2017)). Among the potential differences to be considered are the constitutional right at issue, the rank of the officers involved, the statutory or other legal mandate under which the officer was operating, and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Ziglar v. Abbasi*, 582 U.S. 120, 139-40 (2017). Second, "if a claim arises in a new context, a *Bivens* remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.' " *Egbert*. 142 S. Ct. at 1803 (quoting *Ziglar*, 582 U.S. at 136).

**\*7** Following *Egbert*, in *Tale v. Harmon*, 54 F.4th 839 (4th Cir. 2022), the Fourth Circuit concluded that a prisoner's Eighth Amendment conditions-of-confinement claim involved a new *Bivens* context different from that of the Eighth Amendment inadequate medical care claim in *Carlson* and thus declined to permit such a *Bivens* claim to proceed. *Id.* at 845-46. Here, where Johnson has not alleged that he actually had COVID-19 while in federal prison, or any other serious medical need that went untreated, his Eighth Amendment claim can be construed only as a claim of unconstitutional conditions of confinement based on the conditions that resulted from the COVID-19 pandemic. The Fourth Circuit, however, in declining to extend *Bivens* to claims of unconstitutional conditions of confinement, concluded that where the plaintiff has "alleged neither serious physical injury nor any particularized damage from the conditions he challenges ... 'Congress is in a better position to decide whether or not the public interest would be served by imposing a damages action' against such officials." *Id.* at 846 (quoting *Egbert*, 142 S. Ct. at 1807). Where Johnson has likewise alleged neither serious physical injury nor particularized damage from his conditions of confinement, the Court concludes that an amendment to add a *Bivens* claim against Miller for unconstitutional conditions of confinement would be futile. The Court therefore denies leave to amend the complaint.

## CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction, ECF No. 31, will be GRANTED. A separate Order shall issue.

**All Citations**

Slip Copy, 2023 WL 7635083

---

## Footnotes

1    All references to the BOP Response Plan use the pagination generated by the Court's Case Management / Electronic Case Files ("CM/ECF") system.

---

End of Document    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 790805
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Roanoke Division.

Marcos F. SANTIAGO, Plaintiff,

v.

UNITED STATES of America, Defendant.

Case No. 7:21CV00436
|
Signed 03/14/2022

**Attorneys and Law Firms**

Marcos F. Santiago, Pro Se Plaintiff;

Krista Consiglio Frith, Assistant United States Attorney, Roanoke, Virginia, for Defendant.

### OPINION AND ORDER

James P. Jones, Senior United States District Judge

**\*1** In this civil case, the plaintiff, a federal prison inmate, sues the United States under the Federal Tort Claims Act because he contracted COVID-19 while incarcerated. The United States has moved to dismiss for lack of jurisdiction. Because the discretionary function exception to government liability bars the plaintiff's claim, this court lacks subject-matter jurisdiction, and I will grant the defendant's motion.

### I.

Plaintiff Marcos F. Santiago is an inmate at United States Penitentiary, Lee County, Virginia ("USP Lee"), a Federal Bureau of Prisons ("BOP") facility. He alleges that BOP officials were negligent in failing to protect him against COVID-19, causing him to contract COVID-19 in December 2020 and to suffer various symptoms.[1] He asserts that USP Lee officials did not follow guidance from the Centers for Disease Control and Prevention ("CDC") or comply with executive orders issued by the Governor of Virginia or the President of the United States regarding pandemic restrictions. Specifically, he contends that USP Lee officials failed to ensure social distancing and mask-wearing and did not provide sufficient cleaning supplies. Santiago further

alleges that USP Lee personnel failed to provide him adequate medical treatment after he tested positive for COVID-19.

The United States has moved to dismiss the Complaint pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction because the discretionary function exception to the Federal Tort Claims Act ("FTCA") applies here, and the United States therefore has not waived its sovereign immunity as to the type of claim Santiago asserts. The motion is fully briefed[2] and ripe for decision.[3]

### II.

Federal courts have limited jurisdiction and are empowered to act only in the specific instances authorized by Congress. *Bowman v. White*, 388 F.2d 756, 760 (4th Cir. 1968). The court must determine questions of subject-matter jurisdiction before it can address the merits of a case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The plaintiff bears the burden of proving the existence of subject-matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F. 3d 642, 647 (4th Cir. 1999). "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). A court should grant a motion to dismiss for lack of subject-matter jurisdiction "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.*

**\*2** Federal courts do not have jurisdiction over actions against the United States unless Congress has expressly waived the United States' sovereign immunity. *United States v. Sherwood*, 312 U.S. 584, 586–87 (1941). A waiver of sovereign immunity "will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996).

The FTCA waives the United States' sovereign immunity and makes the government liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. However, this waiver does not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 87 of 160

Santiago v. United States, Not Reported in Fed. Supp. (2022)

discretion involved be abused." 28 U.S.C. § 2680(a). The plaintiff bears the burden of proving that the discretionary function exception does not apply to the function or duty at issue. *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009). If the exception does apply, a court must dismiss the claim for lack of subject-matter jurisdiction. *Id.*

To determine if the discretionary function exception applies, the court must perform a two-step analysis. *Clendening v. United States*, 19 F.4th 421, 432 (4th Cir. 2021). First, the court must decide whether the challenged conduct "involves an element of judgment or choice." *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) (citation omitted). Conduct does not involve an element of judgment or choice if a federal statute, regulation, or policy specifically prescribes it. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Second, the court must determine whether the conduct is "based on considerations of public policy." *Suter*, 441 F.3d at 311 (quoting *Berkovitz*, 486 U.S at 537). To make this determination, the court is to "look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993). "[W]hen a statute, regulation, or agency guideline permits a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Suter*, 441 F.3d at 311 (internal quotation marks and citation omitted). The plaintiff bears the burden of proving that the government's conduct is not grounded in considerations of public policy. *Indem. Ins. Co. of N. Am.*, 569 F.3d at 181.

First, I find that the BOP's handling of COVID-19 and the protective measures it put into place involved an element of judgment or choice. Santiago has pointed to no federal statute, regulation, or policy that was binding on BOP or USP Lee officials. Executive orders issued by the Governor of Virginia did not apply to the federal government. *See Medina v. United States*, 259 F.3d 220, 225-26 (4th Cir. 2001). CDC guidance was just that — guidance. And Santiago has not identified any particular executive order of the President that he contends USP Lee violated. He references the President's Coronavirus Guidelines for America, but these were also simply guidelines and were not binding on anyone. He references 18 U.S.C.

§ 4042(a)(2), which requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," but that statutory command grants significant discretion to BOP as to how to satisfy the directive. *Rich v. United States*, 811 F.3d 140, 145 (4th Cir. 2015) ("Under the statute's broad directives, the BOP retains discretion regarding the implementation of those mandates."). Santiago similarly fails to point to any statute, regulation, or policy that would have required USP Lee officials to give him pain medication or other specific forms of medical treatment.

**\*3** Second, the development and implementation of safety protocols in federal prisons is unquestionably based on considerations of public policy. Federal prisons have limited space and resources, so social distancing is not always possible. As the government notes, items such as hand sanitizer can pose their own safety concerns, as they can be used by inmates as weapons or drugs. The BOP must balance its duty to protect inmates from COVID-19 with its duty to protect inmates from each other, to safeguard staff, and to protect the public. "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Whitley v. Albers*, 475 U.S. 312, 321–22 (1986) (citation omitted).

Santiago has not met his burden of proving that the discretionary function exception to FTCA liability is inapplicable here. I thus conclude that the United States has not waived its sovereign immunity as to Santiago's claim, and the court lacks subject-matter jurisdiction to resolve this case.

III.

For the foregoing reasons, it is **ORDERED** that the Motion to Dismiss, ECF No. 13, is GRANTED. A separate Order dismissing the plaintiff's action without prejudice will be entered herewith. [4]

**All Citations**

Not Reported in Fed. Supp., 2022 WL 790805

---

## Footnotes

1    In briefs filed with the court, Santiago suggests that BOP personnel were not just negligent, but acted with deliberate indifference or perhaps even intentionally sought to infect him. Because these allegations are not contained in his Complaint, I do not consider them. The magistrate judge previously denied Santiago's motions to amend his complaint. ECF No. 34.

2    After the government filed its reply brief, the plaintiff filed another response brief without leave of court. ECF No. 33. The government then responded to that brief, ECF No. 35, and the plaintiff filed yet another brief, ECF No. 37. Although these additional filings did not comply with the rules of court, I have nevertheless reviewed them.

3    I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

4    The plaintiff also filed two motions, ECF Nos. 40 and 43, seeking orders directing the Warden to end the practice of locking down entire units under the false pretense of the Special Housing Unit being full. These motions are not germane to this action and the Clerk shall terminate them as moot.

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 89 of 160

2022 WL 16745333
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Gabriel MURILLO, Plaintiff,

v.

UNITED STATES DEPARTMENT
OF JUSTICE, et al., Defendants.

No. CV 21-00425-TUC-CKJ
|
Signed November 4, 2022
|
Filed November 7, 2022

**Attorneys and Law Firms**

Gabriel Murillo, Tucson, AZ, Pro Se.

Denise Ann Faulk, Katherine V. Foss, U.S. Attorneys Office, Tucson, AZ, for Defendant United States of America.

**ORDER**

Cindy. K. Jorgenson, United States District Judge

**I. Procedural History**

 **\*1**  Plaintiff Gabriel Murillo, who is confined in the United States Penitentiary-Tucson (USP-Tucson), brought this pro se civil rights proceeding under the Federal Tort Claims Act ("FTCA"). On December 20, 2021, Plaintiff filed his First Amended Complaint. In a January 19, 2022 Order, the Court ordered service of the First Amended Complaint on Defendant United States and required the parties to file supplemental briefs regarding the applicability of the discretionary function exception to Plaintiff's FTCA claims. Defendant filed its supplemental brief on February 18, 2022. Plaintiff sought and was granted an extension of time to file his supplemental brief.

On March 31, 2022, Plaintiff filed a Motion to Compel Filing and Serving of all Records Government Relied and Referenced in its Answer and to Complete the Record. On April 11, 2022, Plaintiff filed a Request for Production of Documents and a Motion for Extension of Time to Complete Discovery. On April 21, 2022, Defendant filed a Response to Plaintiff's Motions. In a May 9, 2022 Order, the Court

denied Plaintiff's Motions and gave him 45 days to file his supplemental brief.

On June 21, 2022, Plaintiff filed his supplemental brief. Defendant then sought and was granted an extension of time to file a reply brief. On August 8, 2022, Defendant filed its Reply Brief. Plaintiff sought leave to file a Sur-Reply, which the Court denied in an August 30, 2022 Order.

The Court will dismiss the First Amended Complaint and this action for lack of jurisdiction.

**II. Plaintiff's Allegations**

In his two-count First Amended Complaint, Plaintiff sues the United States. He asserts claims under the FTCA and seeks money damages, among other relief.

In Count One, Plaintiff alleges that USP-Tucson officers were not screened for COVID-19 "in an effective and appropriate manner," although staff were aware that there had been no cases of COVID-19 at USP-Tucson, and therefore, any new case "would have to come from the surrounding community." Officers were screened only after Plaintiff contracted COVID-19 and after prisoners began filing grievances. Plaintiff claims the failure to "be[ ] proactive" led to his COVID-19 infection.

Plaintiff also alleges that he was not provided adequate airway protection. He was given what appeared to be "homemade" masks instead of N-95 masks, which were "touted as the industry standard for protection against COVID-19." The "improper donning that resulted" from the design of these "rudimentary" mask "negated their protective function." Prisoners whose eyeglasses fogged if the masks were worn properly began to leave their noses uncovered. According to Plaintiff, this was compounded by staff's failure to enforce "the almost universally improperly donned masks" and led to his COVID-19 infection.

Associate Warden (AW) Segar allegedly failed to wear a face mask, "despite the COVID-19 pandemic being in full swing and the CDC guidelines being specific" regarding compulsory mask-wearing. When another prisoner questioned AW Segar about his failure to wear a face mask, the prisoner was taken to the SHU "for punishment for apparent insubordination." According to Plaintiff, numerous other officers "followed in the AW's footsteps," including Officer Dunham, who worked in the compound and was in close contact with many prisoners. Plaintiff claims Officer

Dunham "introduced and infected" a larger number of prisoners with COVID-19 and that Dunham had never been "subjected to any form of screening." Even after numerous other officers were infected, the institution did not initiate screening; screening was only implemented after the infection "ran rampant in the inmate population."

**\*2** Plaintiff further alleges that officials failed to secure and prevent the theft of cleaning materials. When Plaintiff informed officers about missing disinfectants, no action was taken. Plaintiff contends the lack of cleaning agents and supplies contributed to the propagation of COVID-19, resulting in his infection.

Plaintiff alleges that fingerprint scanners in the unit did not function properly. When the staff members responsible for the care and maintenance of the scanners were notified, "their response was for [Plaintiff] to rub [his] nose and then retry the scanner." There was no means to clean the keyboards, and no covers were provided.

Plaintiff also alleges that he did not see a medical provider when he had COVID-19. Although institution staff "thought it necessary to send [him] to a COVID unit, they never at any stage had [him] examined or evaluated by a medical provider," and he was not given antiviral medication. As his injury, Plaintiff alleges he has experienced persistent fatigue, shortness of breath while walking to and from the dining hall or attempting exercise, difficulty sleeping, lassitude, depressive symptoms, and general muscle and joint aches that do not respond to ibuprofen or naproxen.

In Count Two, Plaintiff alleges that he was not permitted to take his blood pressure and cholesterol medications when prison officials ordered him to go the COVID unit. Plaintiff was without his medications "for quite a few days" before medical staff reissued them. While Plaintiff had COVID, he was given just one blanket, although his cell was freezing, and he had two blankets at his previous unit. Plaintiff's requests for more blankets were ignored. In addition, the water in the showers was frigid for "the first week or two." Plaintiff claims there was fecal matter in his cell from overflowing sewer drains, and unit officers refused to let him out, even as raw sewage seeped into his cell. Plaintiff was left to "inhale the putrid air for hours" and was not given any means to clean out his cell. After "numerous" hours, an officer used a squeegee to get the lumps of feces out of the cell, smearing the matter on the floor in the process. Plaintiff was not given water, mops,

disinfectants, or deodorants to clean the cell and was "left in the stench for days."

### III. FTCA and Discretionary Function Exception

The FTCA waives the United States' sovereign immunity from suit for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his or her office or employment, under the circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1). Thus, relief under the FTCA may be sought for negligent acts or omissions of employees or agents of the federal government. *See Vander v. U.S. Dep't of Justice*, 268 F.3d 661, 663 (9th Cir. 2001); *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992). The Supreme Court has noted that "[t]he broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not leave just treatment to the caprice and legislative burden of individual private laws." *Indian Towing Co. v. United States*, 350 U.S. 61, 68 (1955).

**\*3** The United States' waiver of sovereign immunity is limited, however. Liability cannot be imposed under the FTCA if the tort claims stem from a federal employee's exercise of a "discretionary function." 28 U.S.C. § 2680(a). Section 2680(a) provides that the FTCA waiver of immunity does not extend to any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. *See also Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) ("Even if the decision is an abuse of the discretion granted, the exception will apply.").

Courts may consider the applicability of an FTCA exception whether a party has raised the issue. *See, e.g., Mirmehdi v. United States*, 689 F.3d 975, 984 n.7 (9th Cir. 2012) (as amended) ("[B]ecause the applicability of an FTCA exception affects our jurisdiction, we must consider it sua sponte.") (citation omitted) *Bedell v. United States*, 669 F. App'x 620 (3d Cir. 2016) (per curiam) (district court did not err in

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 91 of 160

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

considering applicability of discretionary function exception sua sponte since exception is "jurisdictional") (citing, in part, *id.*); *see generally United States v. Hays*, 515 U.S. 737, 742 (1995) ("federal courts are under an independent obligation to examine their own jurisdiction") (citation omitted). In considering whether the Court has subject matter jurisdiction, it may consider extrinsic evidence demonstrating or refuting the existence of jurisdiction without converting the proceeding into a motion for summary judgment. *See Wolfe v. Strankman*, 392 F.2d 358, 362 (9th Cir. 2004). The Court can review all relevant evidence to resolve any factual disputes concerning the existence of jurisdiction. *See Ruffino v. United States*, 374 F. Supp. 3d 961 (E.D. Cal. 2019).

The government bears the burden of showing that the discretionary function exception applies. *Bear Medicine v. U.S. ex rel. Sec'y of the Dep't of the Interior*, 241 F.3d 1208, 1213 (9th Cir. 2001). To make that showing, the government must prove that each of the allegedly wrongful acts, by each allegedly negligent actor, is covered by the discretionary function exception. *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002) ("when determining whether the discretionary function exception is applicable, '[t]he proper question to ask is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance' ") (quoting *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995)).

To determine whether the discretionary-function exception bars a particular claim, the Court applies a two-part test. *Id.* First, the Court must decide whether the challenged conduct is discretionary, that is, whether it "involv[es] an element of judgment or choice." *Fang v. United States*, 140 F.3d 1238, 1241 (9th Cir. 1998) (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "This element is not met 'when a federal statute, regulation or policy specifically prescribes a course of action for an employee to follow,' " *id.*, because " 'the employee has no rightful option but to adhere to the directive,' " *Nieves Martinez v. United States*, 997 F.3d 867, 876 (9th Cir. 2021) (quoting *Berkovitz*, 486 U.S. at 536).

Second, if the challenged conduct is discretionary, the Court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. "[I]f the judgment involves considerations of social, economic, or political policy, the exception applies." *Nieves Martinez*, 997 F.3d at 876. On the other hand, "matters of scientific and professional judgment – particularly judgments concerning safety – are rarely

considered to be susceptible to social, economic, or political policy." *Whisnant v. United States*, 400 F.3d 1177, 1180-81 (9th Cir. 2005).

**\*4**  "The primary focus of the second part of the test is on 'the nature of the actions taken and on whether they are susceptible to policy analysis.' " *Fang*, 140 F.3d at 1241 (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)). "When a statute, regulation or agency guideline allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993) (citing *Gaubert*, 499 U.S. at 324). But the discretionary function exception does not apply when "the claim is for negligence in performing a function that is analogous to functions performed by professionals in the private sphere every day." *Sigman v. United States*, 217 F.3d 785, 795-96 (9th Cir. 2000).

## IV. Discussion

### A. Relevant Facts

#### 1. BOP Infectious Disease Management Protocol

The Federal Bureau of Prisons (BOP) has an Infectious Disease Management Protocol, set forth in Program Statement P6190. [1]  The Program Statement, issued in June 2014, provides that BOP "will manage infectious diseases in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures." The Program Statement primarily addresses management of HIV and tuberculosis.

#### 2. DOJ Guidelines

The Department of Justice (DOJ) guidelines regarding the COVID-19 pandemic provides that its employees are to wear face masks "to the extent practicable." DOJ's guidelines provides that individuals "*may* remove a face covering when working in a private office, cubicle, or workspace where at least six feet of social distance can be maintained, and that individuals may need to lower their face covering in order to pass through security checkpoints." [2]

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 92 of 160

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

### 3. CDC COVID-19 Guidance

On March 23, 2020, the Centers for Disease Control and Prevention (CDC) issued Guidance on Prevention and Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities ("CDC Guidance"). [3] The CDC Guidance was updated on February 19, 2021, May 6, 2021, June 9, 2021, February 10, 2022, and May 3, 2022.

The CDC Guidance specifies COVID-19 prevention strategies for prisons, including testing, vaccines, hygiene, quarantine, treatment, isolation, masking, and ventilation. The CDC Guidance does not contain any recommendations with respect to cleaning or sanitization in prisons. With respect to masks, the CDC Guidance suggests requiring masks indoors when risk is higher; it does not specify that prisoners or prison staff should be issued N-95 masks. The CDC Guidance also suggests enhanced ventilation when risk is higher. [4] The CDC Guidance recognizes that "[p]revention is not 'one size fits all' " and that "[i]t may not be feasible to use all enhanced strategies because of resources, facility characteristics." Thus, the CDC Guidance advises that prisons add as many enhanced strategies as possible during periods of higher risks.

### 4. BOP COVID-19 Pandemic Response Plan

On August 31, 2020, BOP implemented its own COVID-19 Pandemic Response Plan ("BOP Plan") setting forth certain operational modifications to be put in place at each BOP facility. [5] The operational modifications to be employed are determined by the institution's "operational level," which is, in turn, based on three factors: (1) the institution's medical isolation rate; (2) the facility vaccination rate; and (3) the community transmission rate. BOP's Operational Modifications Matrix provides that at Level 3, the following modifications are necessary: Follow the full COVID-19 Pandemic Plan including facility-wide use of face coverings, surgical or N95 masks as indicated for prisoners and staff; practice social distancing in all areas; implement daily staff symptom screening, including a temperature check prior to entry into the institution. [6] In addition, regardless of operation level, prisoners are tested for COVID-19 when they are symptomatic, asymptomatic but exposed, during movements, and when surveillance is needed.

**\*5** The BOP Plan states that institution staff "should be educated to stay home if they have any COVID-19 associated symptoms." If employees become sick at work, they should be advised to promptly report this to their supervisor and go home. When the BOP COVID-19 Modified Operations Matrix indicates—that is, at Level 3—all employees must be screened upon arrival with a temperature check, as well as questions about respiratory and other COVID-related symptoms and whether they have had contact with a known COVID-19 case.

With respect to face coverings, the BOP Plan does not require all staff and prisoners to wear N-95 masks. Rather, the BOP Plan specifies that surgical masks and N-95 respirators are reserved for environments requiring PPE such as staff working in quarantine unit or providing care to inmates in medical isolation. In all other locations, surgical, KN-95, or KF-94 masks may be dispensed and worn. The BOP Plan specifies that all staff and prisoners "are to continue wearing a well-fitting mask to protect themselves and others from the spread of COVID-19. All staff and inmates are expected to be able to wear their chosen face covering throughout the day and tolerate wearing it in public indoor settings." Two-layer cloth face coverings are recommended; single-layer face coverings are not recommended.

The BOP Plan provides that a "sufficient stock of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) should be on hand and available, and a plan should be in place to restock as needed if COVID-19 transmission occurs within the facility." The BOP Plan also specifies that providers "should consult with their Regional Medical Director and monitor updates from the CDC on the latest treatment guidelines."

### B. Analysis [7]

### 1. Plaintiff's Alternative Bases for Jurisdiction

The Court will first address Plaintiff's suggested "alternative" bases for the Court's jurisdiction over this case: 28 U.S.C. § 1346(b) and 28 U.S.C. § 2680(h). (Doc. 23 at 2.) Section 1346(b), Title 28 U.S.C., is part of the FTCA. Therefore, this statute does not present an "alternative" basis for jurisdiction.

Plaintiff also cites § 2680(h), which sets forth what is known as the intentional tort exception. (*Id.*) Section 2680(h)

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 93 of 160

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

exempts from the United States' waiver of sovereign immunity "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." Plaintiff has not alleged any facts to support a conclusion that a BOP employee committed any of the enumerated intentional torts. Plaintiff also fails to cite any authority to support that prison officials' decisions regarding preventing and controlling disease in prisons can support an intentional tort claim, and the Court is aware of none.

**\*6** Thus, the Court rejects Plaintiff's suggested alternative bases for this Court's jurisdiction over his claims.

### 2. Plaintiff's FTCA Claims Implicate the Discretionary Function Exception

The Court also dispenses with Plaintiff's misguided suggestion that the Court should not even consider whether the discretionary function exception applies to his claims. Plaintiff contends the Court should not consider "some randomly invented discretionary function" but should instead examine "tenets of science, medicine, and common sense," to determine "the scope of duty owed by the prison staff to the inmate." (Doc. 23 at 10.)

This argument is unavailing for two reasons. First, the discretionary function was not "randomly invented"; rather, the FTCA expressly includes the discretionary function exception in the text of the statute. Second, "tenets of science, medicine, and common sense" have no relevance to the jurisdictional question here, which is focused on the existence of a statute or regulation that imposes a non-discretionary duty.

In sum, Plaintiff's claims implicate the discretionary function exception. Thus, the Court will consider whether the exception applies in this case.

### 3. *Berkovitz* Test

### a. Count One

### (1) Challenged Conduct

In Count One, Plaintiff challenges the following conduct by USP-Tucson officials: (1) officials failed to screen officers for COVID-19 in an effective and appropriate manner; (2) Plaintiff was not provided adequate airway protection, specifically, N-95 masks; (3) the masks that were provided were rudimentary and were not properly worn; (4) officials failed to secure cleaning materials and failed to prevent their theft, which contributed to the propagation of COVID-19, resulting in his infection; (5) officials never had Plaintiff examined or evaluated by a medical provider, and he did not receive antiviral medication when he contracted COVID-19.

### (2) Whether Conduct was Discretionary

As discussed above, the first step in the *Berkovitz* test requires the Court to decide whether the challenged conduct "involv[es] an element of judgment or choice." *Fang*, 140 F.3d at 1241. Plaintiff contends Defendant's conduct was not discretionary for four reasons. First, Plaintiff argues that there is no evidence in the history of the FTCA or the natural reading of the statute that supposes that Congress intended to shield "malice," "intentional," or "deliberate indifference" from tort liability. (Doc. 23 at 1.) Second, Plaintiff asserts there is no evidence in the history of the FTCA that Congress "envisioned the alleged act to be discretionary, because COVID-19 itself is a novel virus." (*Id.*) Third, Plaintiff contends the BOP Director "claim[ed] ability to protect from COVID-19," thereby "suggest[ing] and indicat[ing] that there was no discretion to exercise, but a mandatory duty to perform." (*Id.*) Fourth, Plaintiff argues that the government does not have authority to create policies and guidelines that violate the Constitution or to "specifically incorporate provisions such that its agents can 'abuse their discretion' in performance of such." (*Id.*)

Plaintiff's arguments are misplaced. Whether the challenged conduct was intentional, done with malice, or amounted to deliberate indifference is irrelevant to the jurisdictional question presented here. These concepts might apply to constitutional claims, but they do not apply here because the FTCA expressly provides a remedy for *negligent* conduct, and a constitutional claim under the FTCA is not cognizable. *See FDIC v. Meyer*, 510 U.S. 471, 478 (1994) ("the United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims," and thus, such claims are "not cognizable"). In addition, Plaintiff's contention that Congress did not intend Defendant's response to the COVID-19 pandemic to be discretionary because COVID-19

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 94 of 160

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

is a novel virus misses the mark. Whether the circumstances surrounding the challenged conduct arise in an unprecedented context is distinct from the question whether the conduct taken in response to that situation was discretionary.

**\*7** Moreover, the Ninth Circuit has consistently concluded that actions taken in prisons fall under the discretionary function exception. [8] *See Alfrey v. United States*, 276 F.3d 557 (9th Cir. 2002) (concluding discretionary function exception barred plaintiff's FTCA claim based on the death of her husband, a federal prisoner, who was killed by another prisoner); *see also Gladney v. United States*, 858 F. App'x 221, 223 (9th Cir. 2021) (concluding that discretionary function exception barred transgender prisoner's FTCA claim stemming from her alleged sexual assault because choices about how to monitor prisoners involve the type of policy judgment protected by the discretionary-function exception); *Hernandez v. United States*, 83 F. App'x 206, 207 (9th Cir. 2003) (concluding that the discretionary function exception applied to a claim that the United States Marshals Service acted negligently in overseeing security at a federal facility while the plaintiff was awaiting trial and failed to take proper measures to protect his life).

Next, Plaintiff identifies several purported statutes, regulations, or policies that prescribe a specific course of conduct with respect to the COVID-19 pandemic. First, Plaintiff cites 18 U.S.C. § 4042, without elaboration, and appears to argue that § 4042 imposes a non-discretionary duty on the BOP. (Doc. 23 at 4.) Section 4042 entrusts the BOP with responsibility to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042. The Ninth Circuit has concluded that § 4042 outlines federal prison officials' general duty of care toward prisoners but does not prescribe a specific course of conduct that leaves "no room for choice or judgment." *See Barian v. United States*, 728 F. App'x 703, 705 (9th Cir. 2018) (quoting *Gaubert*, 499 U.S. at 324). Thus, § 4042 does not include any mandatory and specific directive with respect to management of the COVID-19 pandemic. *See Nanouk v. United States*, 974 F.3d 941, 946 (9th Cir. 2020) (holding that "absence of a mandatory and specific directive" prevented plaintiff from prevailing).

Plaintiff also cites BOP's Infectious Disease Management Protocol, set forth in Program Statement P6190, which he contends "require[s] screening, testing, monitoring, aggressively investigating, surveilling and treating"

prisoners. [9] (*Id.* at 11.) (*Id.*) Specifically, Plaintiff contends that Program Statement 6190.04 "requires creation of a team headed by the Infection Control Officer who surveill[s] the facility, monitor[s] CDC guidelines and quickly adapt[s] to the needs. (*Id.* at 5.) Plaintiff asserts P6190 includes "containment plans, quarantine plans, outbreak records, quarterly improvement programs, reviews, Quarantine Procedures, staff education, protection, inmate population protection from outbreaks." (*Id.*) Plaintiff asserts "there is absolutely no discussion of exercising discretion" in Program Statement 6190.04, and "discretion itself does not appear in the program statements, nor there is any sembl[a]nce to it." [10] (*Id.* at 12.)

**\*8** First, as discussed above, BOP Program Statement 6190.04 concerns prevention of transmission of HIV and tuberculosis and predates the COVID-19 pandemic by six years. Second, even if Program Statement 6190.04 could be construed as governing USP-Tucson officials' decisions regarding COVID-19, Plaintiff has not cited any provision in the Program Statement that prescribes a specific course of action that leaves "no room for choice or judgment." *Id.* Plaintiff cites a portion of the Program Statement that provides, "Only those institutions equipped with the proper engineering protocols to house inmates in a negative pressure isolation room (NPIR) that comply with the CDC recommendations, have the option to isolate and treat inmates with suspected TB or other airborne disease (requiring airborne precautions) that may remain suspended in the air and be spread by casual contact." But this provision explicitly states that institutions equipped with an NPIR have an *option* to isolate and treat prisoners with suspected TB or other airborne disease. If officials have an option to take a course of action, the choice is necessarily discretionary. And other provisions in the Program Statement permit discretionary decisions. For example, the Program Statement provides, "It is *recommended* that the TB skin test be placed during intake screening. Inmates with a documented previously positive tuberculin skin test, *should not* be retested, but *should* be screened for active TB disease by chest radiograph." Whether an applicable regulation or policy includes the word "discretion" is not dispositive of whether the regulation or policy permits officials to make discretionary decisions, and the use of the words "recommended," "should not," and "should" demonstrate that Program Statement 6190.04 does not prescribe a *mandatory* course of conduct.

Plaintiff cites two federal regulations, 28 C.F.R. § 549.10, and 29 C.F.R. § 1910. Section 549.10 provides, "The Bureau

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 95 of 160

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

will manage infectious diseases in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures." Plaintiff contends § 1910 "controls employees wearing protective gear at BOP to protect themselves and inmate."

Neither of these regulations precludes the applicability of the discretionary function exception in this case. Section 549.10 refers to the purpose and scope of the ensuing BOP regulations regarding infectious disease management; it does not prescribe any specific course of conduct BOP must take to achieve management of infectious diseases in its facilities. Section 1910 sets forth Occupational Health and Safety Administration regulations. Section 1910.132(a) provides, "Protective equipment, including personal protective equipment for eyes, face, head, and extremities, protective clothing, respiratory devices, and protective shields and barriers, shall be provided, used, and maintained in a sanitary and reliable condition *wherever it is necessary* by reason of hazards of processes or environment, chemical hazards, radiological hazards, or mechanical irritants encountered in a manner capable of causing injury or impairment in the function of any part of the body through absorption, inhalation or physical contact." (Emphasis added.) This regulation permits discretion to determine when personal protective equipment is necessary.

Next, Plaintiff contends each institution is required to have an Exposure Control Plan (ECP) in compliance with federal regulations and to train staff regarding compliance with the ECP. (*Id.* at 15.) Plaintiff does not identify the source of this requirement, state that USP-Tucson had an ECP, or identify any provision in the ECP that prescribes a specific course of conduct that USP-Tucson officials were required to follow with respect to the COVID-19 pandemic or conditions in the COVID-19 unit.

As Defendant argues, the CDC Guidance is "just that – guidance." *Santiago v. United States*, 2022 WL 790805 (W.D. Va. Mar. 14, 2022). The BOP Plan likewise does not prescribe any mandatory, specific requirement with respect to the COVID-19 pandemic. Rather, the BOP Plan is "designed to provide specific *guidance* on responding effectively" to the challenges presented by the COVID-19 pandemic.

Other federal courts concluded that the discretionary function exception barred FTCA claims stemming from the COVID-19 pandemic. *See, e.g., Farmer v. United States*,

2022 WL 35000363, at *5 (D.S.C. Aug. 18, 2022) (dismissing FTCA claim regarding prison's failure to follow statutory and CDC guidelines with respect to COVID-19 under discretionary function exception); *Sanford v. United States*, 2022 WL 1210717 (D.S.C. Apr. 25, 2022) (same); *Santiago*, 2022 WL 790805 (concluding that the discretionary function exception barred the plaintiff's FTCA claim regarding BOP's handling of COVID-19); *Motton v. Bureau of Prisons*, 2020 WL 8766062 (E.D. Tex. Nov. 12, 2020) (same); *see also Nichols v. United States*, 2022 WL 989467, at *3 (5th Cir. Apr. 1, 2022) (concluding that the discretionary function exception applied to prisoner's claim that the government failed to establish, maintain, and follow policies related to controlling infectious diseases maintaining care, custody, and control of prisoners and negligently maintained care, custody, and control of him).

**\*9** In sum, the Court finds Defendant has met its burden of showing that there are no *mandatory* statutes, regulations, or policies prescribing BOP's course of action with respect to the COVID-19 pandemic. The Defendant has established the first prong of the *Berkovitz* test: the conduct is discretionary, i.e., involving an element of judgment or choice.

### (3) Nature of Discretionary Conduct

With respect to the second *Berkovitz* factor, the Ninth Circuit has observed that the challenged decision "need not actually be grounded in policy considerations so long as it is, by its nature, susceptible to a policy analysis." *Gonzalez v. United States*, 814 F.3d 1022, 1028 (9th Cir. 2016). Where federal regulations or policies expressly give prison officials discretion in how to respond to issues relating to prisoners, it must be presumed that the officials' choices were based in public policy. *See Alfrey*, 276 F.3d at 559. In *Alfrey*, the Ninth Circuit concluded that even in the absence of a presumption, the challenged conduct of prison officials involved the type of policy judgment protected by the discretionary function exception. *Id.*

The Ninth Circuit has, in some FTCA cases, distinguished the design of a governmental action, which is shielded by the discretionary function, from implementation of that course action, which is not shielded. *See Whisnant*, 400 F.3d at 1181 n.1. Thus, the Ninth Circuit has noted that, "although an agency's decision to adopt certain safety precautions as opposed to others may be based in policy considerations, generally, 'the implementation of those precautions is not.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 96 of 160

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

Safety measures, once undertaken, cannot be shortchanged in the name of policy.' " *Bailey v. United States*, 623 F.3d 855, 861 (9th Cir. 2010) (quoting *Whisnant*, 400 F.3d at 1182). In addition, balancing competing safety considerations is a protected policy judgment. *Id.* at 862 (citing *Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998)). The Ninth Circuit in *Gonzalez* warned that it has "cautiously applied this doctrine" and has "applied it largely in cases involving public health and safety, in circumstances where a private party would likely be held liable for the same conduct or omission." 814 F.3d at 1035. Moreover, "the doctrine does not permit liability where, as here, 'the implementation itself implicates policy concerns.' " *Id.* (quoting *Whisnant*, 400 F.3d at 1182 n.3). "To conclude otherwise would simply swallow the two-step, discretionary act and policy judgment analysis" set forth in *Berkovitz. Id.*

Defendant argues that "BOP's decisions regarding whether to implement any particular infectious disease measure in a particular institution are grounded in public policy considerations," (Doc. 13 at 9), including the following:

> [T]he need to provide for the safety and security of inmates, BOP staff, and the public at large; preserving the rights of inmates to circulate, socialize and participate in outdoor recreation; how best to allocate limited resources both in terms of money and manpower; the potential impact of any mitigation measure on the security and orderly operation of a correctional institution; whether any mitigation measures would impact BOP personnel's ability to respond to emergency situations; the severity of the risk presented by the disease; and the likely effectiveness of any preventative measure.

**\*10** *Id.*

The Court agrees that the decisions at issue here were grounded in public policy considerations. In *Alfrey*, the Ninth Circuit rejected the plaintiff's argument that the prison officials' choices involved merely occupational or professional judgment, reasoning that "the acts of performing a cell search and of responding to a report of inmate misconduct are unique to the context of prisons." *Id.* at 566 (citing *Sigman*, 217 F.3d at 796). "Those acts are core prison functions for which there are no private-sector analogues" and that "federal regulations grant prison officials discretion to determine how to search a cell and how to respond to a threat. As a result, the Government is entitled to a presumption that those determinations are based on policy considerations." *Id.* The Ninth Circuit recognized that in some sense, the prison officials' choices involved professional judgment but stated that "that fact alone does not remove the decisions from the realm of policy-based judgments."

Here, the applicable guidelines allowed BOP officials to exercise discretion; therefore, the Court must presume the BOP officials' acts were grounded in policy when exercising that discretion. *See Weissich*, 4 F.3d at 814 (citing *Gaubert*, 499 U.S. at 324). And as the district court in *Santiago* concluded, "the development and implementation of safety protocols in federal prisons is unquestionably based on considerations of public policy." 2022 WL 790805, at \*3.

Moreover, Plaintiff's claim that BOP officials negligently failed to protect him from exposure to COVID-19 is not analogous to functions performed by professionals in the private sphere every day. *See Sigman*, 217 F.3d at 795-96. Rather, decisions regarding the COVID-19 pandemic in the prison system "are unique to the context of prisons," and there is no private-sector analogue to those functions. *See Alfrey*, 276 F.3d at 566 (citing *Sigman*, 217 F.3d at 796). Thus, Defendant is entitled to a presumption that those determinations are based on policy considerations.

For the foregoing reasons, the Court concludes that Plaintiff's claims in Count One are barred by the discretionary function exception.

### b. Count Two

In Count Two, Plaintiff challenges the following conduct: (1) Plaintiff was not permitted to take his blood pressure and cholesterol medications when prison officials ordered him to go the COVID unit; (2) while Plaintiff had COVID, he was given just one blanket, although his cell was freezing, and the water in the showers was frigid; (3) there was fecal matter in his cell from overflowing sewer drains, and while raw sewage seeped into his cell, unit officers refused to let him out.

Murillo v. United States Department of Justice, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 97 of 160

For the reasons discussed above with respect to Count One, the Court concludes the discretionary function exception applies to Plaintiff's conditions-of-confinement claims in Count Two. *See, e.g., Blank v. United States,* 713 F. App'x 400, 401 (5th Cir. 2018) (concluding that discretionary function exception applied to prisoner's claim regarding his medical classification and assignment to a non-medical prison facility); *Brown v. United States Dep't of Justice,* 271 F. App'x 142, 145 (3d Cir. 2008) (concluding that discretionary function exception applied to prisoner's claims regarding exposure to environmental tobacco smoke because federal regulations instruct BOP to restrict areas where smoking is permitted at its facilities, and thus, the "explicit grant of discretion means that an element of judgment or choice was involved in the challenged conduct" and policy considerations relating to improving the air and protecting the health and safety of staff and prisoners made the judgment the kind that the discretionary function exception is meant to shield).

**\*11** In sum, the Court finds Plaintiff's FTCA claims are barred by the discretionary function exception. The Court will therefore dismiss the First Amended Complaint and this action for lack of jurisdiction.

**Accordingly,**

**IT IS ORDERED** that the First Amended Complaint (Doc. 8) and this action are **dismissed** for lack of jurisdiction. The Clerk of Court must enter Judgment accordingly and close this case.

**IT IS FURTHER ORDERED** that the docket shall reflect that the Court, pursuant to 28 U.S.C. § 1915(a)(3) and Federal Rules of Appellate Procedure 24(a)(3)(A), has considered whether an appeal of this decision would be taken in good faith and finds Plaintiff may appeal in forma pauperis.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 16745333

---

## Footnotes

1    *See* https://www.bop.gov/policy/progstat/6190_004.pdf (last accessed Sept. 1, 2022).

2    The current version of the DOJ COVID-19 Workplace Safety Plan is available at https://www.justice.gov/doj/page/file/1471931/download.

3    *See* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Oct. 27, 2022).

4    *Id.*

5    *See* https://www.bop.gov/foia/docs/COVID_Pandemic_Response% 20Plan_V.pdf (last visited Oct. 27, 2022). The BOP Plan is divided into various "modules," including, as relevant to this case, Infection Prevention and Control Measures; Personal Protective Equipment; Screening and Testing; Medical Isolation and Quarantine; Surveillance; Inmate Movement; and BOP Employee Management.

6    *See* https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Oct. 28, 2022).

7    Plaintiff asserts that the Court should not resolve the jurisdictional question now because the jurisdictional facts are "intertwined with the merits" of this case. (Doc. 23 at 9.) He is mistaken. It is true that where issues of jurisdiction and substance "intertwine," and the issues are "so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits," the Court applies a summary judgment standard. *Autery v. United States,* 424 F.3d 944, 956 (9th Cir. 2005). However, here, whether the discretionary function exception applies—the jurisdictional issue—is not "intertwined" with the merits of Plaintiff's FTCA claim. *Ruffino,* 374 F. Supp. 3d at 968 (concluding in FTCA case that the dispositive

issues involved jurisdictional facts that were not intertwined with the substance of plaintiff's case because determining whether the defendant had discretion to act is separate from determining how it in fact acted).

8　　Given the recentness of the COVID-19 pandemic, federal appellate courts, including the Ninth Circuit, have not had much opportunity to grapple with FTCA claims regarding exposure to COVID-19 in prisons. The Court finds the decision in *Santiago v. United States*, 2022 WL 790805 (W.D. Va. Mar. 14, 2022). There, the district court concluded that the discretionary function exception barred the plaintiff's FTCA claim. Applying the *Berkovitz* test, the district court reasoned that BOP's handling of COVID-19 and the protective measures it put into place involved an element of judgment or choice. *Id.* at *2. The district court noted that CDC guidance regarding COVID-19 "was just that—guidance." *Id.* The district court further noted that the statutory command in 18 U.S.C. § 4042(a)(2)—which requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States"—grants significant discretion to BOP as to how to satisfy the directive. *Id.* While this case is not precedential authority, the Court finds the logic and reasoning in *Santiago* persuasive.

9　　Plaintiff also contends that "any discussion with respect to discretionary function should involve a complete and thorough discovery leading to evidentiary hearing prior to determine of the same ... Otherwise, it will violate Plaintiff's due process rights." (Doc. 23 at 11.) Whether to conduct an evidentiary hearing is left to the Court's discretion and does not implicate any due process rights Plaintiff might have.

10　　Whether an applicable regulation or policy includes the word "discretion" is not dispositive of whether the regulation or policy permits officials to make discretionary decisions.

---

**End of Document**　　　　　　　　　　　　　© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 99 of 160

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

2015 WL 4508362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Margaret P. YETMAN, Plaintiff,
v.
CAPITAL DIST. TRANSP. AUTH., a/
k/a Capital Dist. Transit Auth.; and David
A. Palmer, Individually, Defendants.

No. 1:12–CV–1670 (GTS/CFH).
|
Signed July 23, 2015.

**Attorneys and Law Firms**

Gleason Dunn Walsh & O'Shea, Daniel A. Jacobs, Esq., Ronald G. Dunn, Esq., of Counsel, Albany, NY, for Plaintiff.

Jackson Lewis P.C., Clemente J. Parente, Esq., Kristi M. Rich Winters, Esq., of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this employment civil rights action filed by Margaret P. Yetman ("Plaintiff") against the Capital District Transportation Authority and David A. Palmer ("Defendants"), is Defendants' motion for summary judgment. (Dkt. No. 38.) For the reasons set forth below, Defendants' motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint

Plaintiff filed her original Complaint in this action on November 9, 2012. (Dkt. No. 1.) She filed an Amended Complaint on January 22, 2013. (Dkt. No. 13.)

Generally, Plaintiff's Amended Complaint alleges that, during her employment as a bus driver between November of 2007 and July of 2010, Defendants interfered with her employment and retaliated against her, based on her taking leave to undergo treatment for her own health conditions, and to provide care and support (as a single parent) for her children's

serious health conditions and/or disabilities, resulting in her constructive discharge. (Id.)

Based on these factual allegations, Plaintiff's Complaint asserts four claims against Defendants: (1) a claim that Defendants unlawfully interfered with, restrained and/or denied Plaintiff's rights in violation of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2611 et seq.; (2) a claim that Defendants discriminated against Plaintiff based on her children's disabilities in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111 et seq.; (3) a claim that Defendant Capital District Transportation Authority ("CDTA") discriminated against Plaintiff based on her children's disabilities in violation of the New York Human Rights Law ("Human Rights Law"), New York Executive Law § 296; and (4) a claim that Defendant Palmer is individually liable under the Human Rights Law. (Id.)

Familiarity with these claims, and the factual allegations supporting them, is assumed in this Decision and Order, which is intended primarily for the review of the parties. (Id.)

### B. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law in Chief

Generally, in their memorandum of law, Defendants argue that they are entitled to judgment as a matter of law based on the current record for four reasons. (Dkt. No. 38, Part 6 [Defs.' Memo. of Law] .) First, Defendant argues, Plaintiff's FMLA interference and retaliation claims fail as a matter of law for the following reasons: (a) as an initial matter, Plaintiff's FMLA claims fail because all of those claims (even those arising under her failure to be rehired) are barred by the governing limitations period of two years, given that a three-year limitations period is reserved for "willful" or reckless conduct, none of which occurred here; (b) in the alternative, Plaintiff's FMLA interference claim fails because she was afforded all rights to which she was entitled under the FMLA; and (c) moreover, Plaintiff's FMLA retaliation claim fails because she cannot establish that she suffered an adverse employment action as a result of her exercise of her FMLA rights. (Id.)

 **\*2** Second, Defendant argues, Plaintiff's disability discrimination claims fail as a matter of law for the following reasons: (a) as an initial matter, the majority of Plaintiff's disability claims fail because they are time barred; (b) in the alternative, Plaintiff's written warnings and resignation

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 100 of 160

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

do not constitute adverse employment actions; (c) moreover, Plaintiff was not disabled at the time of any alleged adverse employment actions; (d) furthermore, Plaintiff was not subject to an adverse employment action because of her disability; and (e) finally, there is no admissible record establishing that the legitimate nondiscriminatory reason for CDTA's employment decisions were a pretext for disability discrimination. (*Id.*)

Third, Defendant argues, Plaintiff's association disability discrimination claims fail as a matter of law for the following reasons: (a) as an initial matter, the Human Rights Law does not prohibit association disability discrimination; and (b) turning to Plaintiff's association disability discrimination claim under the ADA, that claim fails because she cannot establish that she suffered an adverse employment action, nor can she establish that any such adverse employment action was caused by her children's alleged disabilities. (*Id.*)

Fourth, Defendant argues, as a matter of law, Plaintiff's claim for individual liability against Defendant Palmer fails as a matter of law because Plaintiff cannot establish that Defendant Palmer either was an "employer" under the Human Rights Law or aided and abetted violations of the Human Rights Law. (*Id.*)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff asserts two arguments. (Dkt. No. 41, Attach. 1 [Plf.'s Opp'n Memo. of Law] .) First, Plaintiff argues, there are triable issues of fact as to whether Defendants constructively discharged Plaintiff in violation of the FMLA for the following reasons: (a) Defendant Palmer is an "employer" under the FMLA; (b) Defendants failed to timely designate Plaintiff's FMLA leave; (c) Defendants directly penalized Plaintiff for, and discouraged her from taking, FMLA protected leave; (d) Plaintiff's constructive discharge claims are timely, because record evidence of Defendants' continuous course of interference with, and retaliation for, Plaintiff's exercise of her FMLA rights between November 15, 2007, and her resignation on July 6, 2010, reveals a reckless disregard for her FMLA rights, warranting a three-year, not two-year, limitations period; and (e) Plaintiff was constructively discharged from CDTA employment. (*Id.*)

Second, Plaintiff argues, there are triable issues of fact as to whether Defendants refused to rehire Plaintiff in violation of the FMLA, ADA and Human Rights Law for the following reasons: (a) Defendants refused to rehire Plaintiff because

Defendant Palmer considered her history of FMLA protected leave to be a "negative factor," in violation of the FMLA; and (b) Defendants refused to rehire Plaintiff because they misbelieved that her and her son Walter's disabilities would distract her from performing her job as a CDTA bus driver. (*Id.*)

### 3. Defendants' Reply Memorandum of Law

**\*3** Generally, in their reply memorandum of law, Defendants assert two arguments. (Dkt. No. 47, Attach. 3 [Defs.' Memo. of Law].) First, Defendants argue, there is no genuine dispute of material fact precluding summary judgment as to Plaintiff's claim of constructive discharge in violation of the FMLA for the following reasons: (a) Plaintiff's FMLA claims are time barred, because (i) there is no admissible record evidence establishing that Defendant CDTA's conduct was reckless (especially given the evidence that Defendant CDTA approved Plaintiff's requests for FMLA leave of which it received sufficient notice for several years prior to her voluntary resignation), and (ii) there is no admissible record evidence establishing that Defendant Palmer was an "employer" as defined by the FMLA; (b) Plaintiff's FMLA interference claim must be dismissed for the alternative reason that she did not provide additional notice of her intention to take FMLA leave and, even if she did, she was afforded all of the rights to which she was entitled under the FMLA; (c) moreover, Plaintiff's FMLA retaliation claim must be dismissed for the alternative reason that she was not constructively discharged nor subjected to any other adverse employment action as a result of her exercise of her FMLA right. (*Id.*)

Second, Defendant argues, there is no question of fact precluding summary judgment as to Plaintiff's claim of failure to rehire in violation of the FMLA, ADA and Human Rights Law for the following reasons: (a) because of Plaintiff's reliance on inadmissible evidence such as double hearsay, there is no admissible record evidence establishing that Plaintiff's prior FMLA leave was a "negative factor" in Defendant Palmer's decision not to rehire her, which was caused by her overall work record, her attendance, her failure to report an incident on her bus, and personal issues between her and a supervisor other than Defendant Palmer; and (b) there is no admissible record evidence establishing that Defendants refused to rehire her because of her perceived disability or her son's alleged disability. (*Id.*)

### C. Statement of Undisputed Material Facts

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 101 of 160

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

The following material facts have been asserted and supported by Defendants in their Statement of Material Facts, and not denied in a matching numbered paragraph with a supporting record citation by Plaintiff in her response thereto, and thus admitted pursuant to Local Rule 7.1 of the Local Rules of Practice for this Court, as explained below in Part II.A. of this Decision and Order. (*Compare* Dkt. No. 38, Attach. 5 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 41, at Part B [Plf.'s Rule 7.1 Response].)

**1. Plaintiff's Employment with CDTA**

1. Plaintiff worked as a part-time driver for CDTA's Special Transit Available by Request ("STAR") Program from June 2000 until she resigned in November 2000.

2. CDTA rehired Plaintiff as a Bus Operator in November 2004.

3. Bus Operators, including Plaintiff, were covered by a Collective Bargaining Agreement ("CBA").

**\*4** 4. David Palmer was Plaintiff's supervisor. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 4 [Defs.' Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 41, at ¶ B.4 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

5. When she came back to CDTA in 2004, Plaintiff received a copy of CDTA's employee handbook which contained its policies on Attendance, FMLA and Preventing Harassment in the Workplace. Page 26 of the handbook, which is subtitled "***OPERATING POLICY ON THE FAMILY AND MEDIAL LEAVE ACT*** " states as follows, in pertinent part:

> **FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to "eligible" employees for certain family and medical reasons.**
>
> ...
>
> Unpaid leave must be granted for any of the following reasons:
>
> ...
>
> • *to care for the employee's ... son or daughter ... who has a serious health condition; or*
>
> • *for a serious health condition that makes the employee unable to perform the employee's job.*

> **[T]he employee may be required to provide advance leave notice and medical certification. Taking of leave may be denied if requirements are not met.**
>
> • *The employee ordinarily must provide 30 days advance notice when the leave is "foreseeable."*
>
> • *An employer may require medical certification to support a request for leave because of a serious health condition, and may require second or third opinions and a fitness for duty report to return to work.*
>
> ...
>
> If you have any questions about FMLA or would like to see the CDTA FMLA procedure manual, please contact your immediate supervisor or the Human Resources Department.

(*Compare* Dkt. No. 38, Attach. 5, at ¶ 5 [Defs.' Rule 7.1 Statement, citing record evidence that establishes above-stated fact] *with* Dkt. No. 41, at ¶ B.5 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

6. In addition, at some point when Keith Strait was a union representative from 2007 to 2009, an FMLA notice was posted in the "crew room" of CDTA's garage in Schenectady, although Plaintiff did not see it there during that time. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 6 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.6 [Plf.'s Rule 7.1 Response, denying fact but failing to support denial with accurate record citation, but a citation to record evidence in which she states that she concludes that "[t]here was nothing ever posted in Schenectady" because "I never saw it" "when I was working there," which evinces a lack of personal knowledge that is insufficient to create a genuine dispute of material fact].)

7. On November 7, 2007, Plaintiff was terminated after she did not report an incident on her bus within 24 hours, as is usually required by CDTA's policies and procedures, because she left work early to attend to her son's medical condition and as a result was not focused on the requirement to report the incident. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 7 [Defs.' Rule 7.1 Statement, citing record evidence that establishes above-stated facts] *with* Dkt. No. 41, at ¶ B.7 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated facts].)

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 102 of 160

**\*5** 8. After filing a grievance contesting the termination, Plaintiff was reinstated on December 15, 2007.

### 2. CDTA's Attendance Policies and Procedures

9. Given the important services that CDTA provides to the public, CDTA depends on its employees to have regular, dependable attendance habits.

10. Pursuant to CDTA's Attendance Discipline Policy, "[s]ubstandard attendance will be defined as an employee having more than two (2) deviations per calendar month or more than twelve (12) occurrences in a twelve month period (rolling calendar)."

11. The Policy defines a "deviation" as "missed time due to lateness, illness, or any unexcused absence from work resulting in lost time."

12. An employee with substandard attendance will be subject to progressive discipline, including "(1) Verbal Warning (2) Written Warning (3) 1 Day Administrative Suspension (4) 5 Day Administrative Suspension & Final Warning (5) Termination."

13. Further, a "miss" or "pattern of attendance deviations may accelerate or compress the corrective action steps."

14. Pursuant to CDTA's Station Rules—General, if an operator does not notify the dispatcher in person or by personal phone call "10 minutes prior to scheduled report time" it will be marked as a "miss."

15. According to the training that Defendant Palmer received from CDTA employees, approved FMLA leave is not considered in CDTA's disciplinary process for attendance. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 15 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.15 [Plf.'s Rule 7.1 Response, denying fact but failing to cite record evidence that controverts above-stated fact].)

16. Plaintiff was at least constructively aware of CDTA's policies and procedures on attendance. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 16 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 41, at ¶ B.16 [Plf.'s Rule 7.1 Response, denying fact but failing to cite record evidence that controverts above-stated fact.)

17. When Plaintiff called in, she always had to give the dispatcher a reason for her absence.

18. As of at least December 2009, if an employee was calling in and the absence was for approved FMLA leave, all the employee needed to tell the dispatcher was "FMLA" and it would be recorded as such.

19. By December 2009, Plaintiff was aware that, if her absence was covered under the FMLA, she would need to call and designate it as "FMLA."

### 3. Plaintiff's Requests for FMLA Leave

20. During her employment, Plaintiff made numerous requests for FMLA leave for her daughter Dorothy Yetman's ovarian cysts and for her son Walter Yetman's autism, seizure disorder and aggressive behavior.

21. In each case that Plaintiff made a request for FMLA leave, and CDTA had documents for the request, CDTA approved the request. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 21 [Defs.' Rule 7.1 Statement, asserting facts and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.21 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated facts].)

**\*6** 22. Plaintiff admitted that sometimes she would call in and tell the dispatcher that it was a "sick day" instead of FMLA because she was embarrassed and did not want it to look like she was always taking time off for her children.

23. She alleges that she would then bring documentation in to prove the absence should be treated as FMLA.

24. Plaintiff also believed that, when she called in and said the reason for her absence was "family emergency," the dispatcher should have assumed it related to her FMLA leave.

### a. Plaintiff's Requests for FMLA Leave for Her Own Medical Conditions

25. In November 2007, Plaintiff made a request for FMLA leave for a radical hysterectomy in connection with her cervical cancer diagnosis.

26. CDTA approved Plaintiff's FMLA leave from November 15, 2007, to January 15, 2008.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 103 of 160

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

27. In April 2008, Plaintiff made a second request for FMLA leave for her medical condition of morbid obesity, which required abdominal surgery.

28. Plaintiff was granted additional FMLA leave from March 20, 2008, through April 21, 2008.

29. In May 2008, Plaintiff made a third request for FMLA leave.

30. Plaintiff was granted additional FMLA leave for her medical condition from May 7, 2008, through June 16, 2008.

31. Plaintiff never made any subsequent requests for FMLA leave relating to either of her medical conditions. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 31 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 41, at ¶ B.31 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated facts].)

### b. Plaintiff's Requests for FMLA Leave for Her Daughter Dorothy Yetman's Ovarian Cysts

32. In March 2007, Plaintiff requested intermittent FMLA leave to care for her daughter Dorothy's ovarian cysts.

33. Plaintiff was granted intermittent FMLA leave to care for her daughter Dorothy's ovarian cysts beginning on March 12, 2007.

34. No specific end date was given.

### c. Plaintiff's Requests for FMLA Leave for Her Son Walter Yetman's Autism, Seizure Disorder and Aggressive Behavior

35. Plaintiff first requested intermittent FMLA leave to care for her son Walter's autism, seizure disorder and aggressive behavior in March 2007.

36. Plaintiff was granted intermittent FMLA leave to care for her son Walter's conditions as necessary.

37. Plaintiff was informed that she needed to provide recertification.

38. In January 2009, Plaintiff again requested intermittent FMLA leave to care for her son Walter's autism, seizure disorder, and aggressive behavior.

39. CDTA granted Plaintiff's request for intermittent FMLA leave beginning January 6, 2009.

40. While there was no specific end date given for this leave, Plaintiff was informed that she needed to provide periodic reports to CDTA and recertification.

41. In December 2009, Plaintiff's son Walter began living at Eagleton, a residential school in Great Barrington, New York, and Plaintiff saw him only twice a month between December 2009 and July 2010.

### 4. Plaintiff's Receipt of Discipline for Her Excessive Absenteeism

 **\*7** 42. Plaintiff admits that there were times when she was absent from work and it was not related to her FMLA leave.

43. Plaintiff had attendance issues throughout her employment and had received written warnings and a one-day administrative suspension for her attendance in 2006.

44. Plaintiff claims that Defendant Palmer would come in and look at her as if to say, "Oh you came in today," and made comments to her about her attendance, including "Why can't you make it to work."

45. Plaintiff also claims that her co-workers would give her looks and make comments under their breath that she was always taking off for her kids and they would have to do her work.

46. Plaintiff admits that she never complained about this conduct pursuant to CDTA's Policy Statement on Preventing Harassment in the Workplace.

47. On March 10, 2009, Plaintiff received a written warning for her attendance issues.

48. According to the written warning, Plaintiff had "in excess of 12 deviations in the last 12 months" and also had a "pattern of absence by marking off six Fridays in the last 12 month period and by extending [her] scheduled days off on six occasions."

49. Also in the written warning, Plaintiff was warned that, if she did not improve her attendance, she would be subject to "increased disciplinary action including suspension and/or termination of [her] employment."

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 104 of 160

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

50. After speaking to Defendant Palmer about the written warning, Plaintiff just accepted the warning and did not speak with her union representative about it. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 50 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.50 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

51. Despite receiving a written warning, Plaintiff did not improve her attendance.

52. On August 12, 2009, Plaintiff was issued a one-day administrative suspension because she had 12 deviations in the past 12 months, two of which were misses.

53. Plaintiff was also given a copy of CDTA's Attendance Discipline Policy and Operating Policy Statement on Attendance, with the intent of ensuring that she was aware of CDTA's policies on attendance.

54. Plaintiff signed the suspension letter and initialed that she "acknowledge [d] and agree[d] with the actions taken and [understood] the consequences that will result from future violations."

55. Plaintiff was also informed that, if she disagreed with the suspension, she had the right to pursue it under Article 29 of the CBA.

56. When Plaintiff's attendance did not improve, she was issued a five-day administrative suspension and final warning on March 16, 2010.

57. The final warning stated that Plaintiff had four attendance deviations in the past 12 months and also had a measurable pattern of attendance issues, extending her weekend on four occasions.

58. Plaintiff was further warned that, if she did not make an immediate improvement in her attendance, she would be subject to termination.

 **\*8**  59. Plaintiff signed the final written warning and acknowledged that, if she disagreed with the final written warning, she had the right to pursue it under the CBA.

60. Plaintiff never filed a grievance disputing the progressive discipline she received.

**5. Plaintiff's Resignation**

61. On June 26, 2010, Plaintiff failed to call the dispatcher on time and thus was considered a miss.

62. In her deposition, Plaintiff admitted that "it was ultimately [her] fault" and that she did not call in on time because she had an issue with her daughter Dorothy, which she does not claim entitled her to FMLA leave.

63. Nevertheless, Plaintiff still provided Defendant Palmer with phone records of the time of her call.

64. Defendant Palmer asked to meet with Plaintiff because there was a disagreement over the time of her call.

65. The phone records that Plaintiff provided did not coincide with CDTA's phone records. As a result, when Plaintiff could not access her phone records online in Defendant Palmer's office, he asked her to provide an official phone record from her service provider.

66. Thereafter, Plaintiff submitted a resignation letter to Defendant Palmer dated July 5, 2010, resigning effective July 6, 2010.

67. In her resignation letter, Plaintiff stated that she decided to resign because "[t]he constant stress of me possibly losing my job because of an autistic child and other family and legal issues, has been overwhelming."

**6. Plaintiff's Applications for Reemployment**

68. After Plaintiff's resignation, Defendant Palmer made the decision to state "NO" under "Eligible for Rehire" in CDTA's Human Resource Payroll Change Form.

69. Defendant Palmer made this decision based on Plaintiff's overall work record, her attendance, her failure to report the incident on her bus, and the personal issues, including "significant animosity," between her and another supervisor, Christine Plott. (*Compare* Dkt. No. 38, Attach. 5, at ¶ 69 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citation] *with* Dkt. No. 41, at ¶ B.69 [Plf.'s Rule 7.1 Response, failing to cite record evidence that controverts above-stated fact].)

70. In December 2010, Plaintiff submitted an application for Bus Operator and, in June 2011, she submitted applications

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 105 of 160

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

for Service Technician (Cleaner) and Customer Service Operator/Call Taker.

71. When Defendant Palmer was contacted by Human Resources about hiring Plaintiff, he told them that she was not eligible for rehire.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed.R.Civ.P. 56(a),(c),(e).

**\*9** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.*[1] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[2] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[3]

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to be admitted, to the extent that those facts are supported by evidence in the record, where the nonmoving party has willfully failed to properly respond to that statement.[4]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[5] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y. Oct.30, 2009) (Suddaby, J.) (collecting cases);

*Este–Green v. Astrue,* 09–CV–0722, 2009 WL2473509, at *2 & n. 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Standards Governing Plaintiff's Claims

**\*10** Because the parties have (in their memoranda of law) indicated their understanding of the correct legal standards governing Plaintiff's claims and Defendants' defenses, the Court will not repeat those standards in this Decision and Order, which (again) is intended primarily for the review of the parties.

### III. ANALYSIS

After carefully considering the matter, the Court grants Defendants' motion for each of the alternative reasons stated in Defendants' memoranda of law. *See, supra,* Part I.B. of this Decision and Order. To those reasons the Court adds four points.

First, in response to at least 31 paragraphs of facts asserted by Defendants in their Rule 7.1 Statement, Plaintiff denies certain "implications" purportedly contained therein. (*See, e.g.,* Dkt. No. 41, at ¶¶ 5, 10, 11, 12, 13, 17, 18, 19, 22, 24, 26, 28, 30, 33, 36, 37, 39, 40, 41, 42, 43, 46, 51, 53, 54, 55, 56, 58, 59, 61, and 67.) Of course, "arguing over the possible implications stemming from an otherwise undisputed fact does not render that fact in dispute." *Blakes v. Illinois Bell Tel. Co.,* 11–CV–0336, 2015 WL 135028, at *1 (N.D.Ill. Jan.9, 2015). This is because the summary judgment procedure is based on the *assertion* of facts and their disputation, not the *implication* of facts and their disputation. *See, e.g.,* Fed.R.Civ.P. 56(e) (setting forth consequences "[i]f a party fails to properly support an *assertion of fact* or fails to properly address another party's *assertion of fact* ") (emphasis added); N.D.N.Y. L.R. 7.1(a)(3) (requiring that facts be "set forth," "listed" and "assert[ed]"); *cf. Habben v. City of Fort Dodge,* 472 F.Supp.2d 1142, 1147, n. 2 (N.D.Iowa 2007) ("Even if it were proper for the plaintiff to object to 'implications,' the defendants' statement cannot give rise to the 'implication' that the plaintiff finds objectionable, because the defendants' statement does not address the plaintiff's hiring at all ."). As a result, to the extent Plaintiff responds to Defendants' properly supported factual assertions solely by denying "implications" contained therein, the Court deems the factual assertions admitted.

Second, in response to facts asserted in at least 29 paragraphs contained in Defendants' Rule 7.1 Statement,

Plaintiff attempts to incorporate by reference record citations contained in a 34–page outline that precedes her Rule 7.1 Response. (*See, e.g.,* Dkt. No. 41, at ¶¶ 9, 10, 11, 12, 17, 18, 21, 22, 24, 26, 28, 30, 36, 37, 42, 43, 48, 49, 51, 52, 54, 56, 57, 61, 62, 66, 67, 69 and 70.) This unusual practice violates the spirit, if not the letter, of Local Rule 7.1, which requires that "[e]ach denial ... set forth a specific citation to the record where the factual issue arises," not a citation to a portion of an outline that in turn contains many factual assertions and record citations, some of which are completely immaterial to the fact originally asserted in the Rule 7.1 Statement. N.D.N.Y. L.R. 7.1.(a)(3). Nonetheless, out of solicitude to Plaintiff as a civil rights litigant, the Court has tracked down the record cites in the outline and carefully reviewed the evidence cited therein. However, it does not save her claims from dismissal.

**\*11** Third, Plaintiff's timeliness argument hinges on, *inter alia,* whether Defendant CDTA possessed "actual knowledge" of the legal requirement that it grant her FMLA leave. *See, supra,* Part I.B.2. of this Decision and Order. (*See also* Dkt. No. 41, Attach. 1, at 24 [attaching page "18" of Plf.'s Opp'n Memo. of Law].) Plaintiff argues that such actual knowledge existed because (1) Defendants "knew the law of [the] FMLA" and (2) Defendants "were well aware of [Plaintiff's] and her children's medical conditions and need for leave (including FMLA leave) to care for those conditions between November 15, 2007 and January 6, 20[10]." (Dkt. No. 41, Attach. 1, at 225 [attaching page "18" and "19" of Plf.'s Opp'n Memo. of Law].) The problem is that the record evidence cited by Plaintiff establishes not recklessness but due care by Defendant CDTA for Plaintiff's rights under the FMLA. At the very most, to the extent that Defendant CDTA received certain communications from Plaintiff in the past that could reasonably be construed as transforming other communications from her in the future as FMLA requests, and to the extant that Defendant CDTA did not treat those transformed communications as FMLA requests, the evidence suggests only ordinary negligence.[6]

Fourth, even if the Court were to find a genuine dispute of fact regarding whether there was *ever* an FMLA notice posted in the "crew room" of CDTA's garage in Schenectady, the Court would find such a dispute to be immaterial to Defendants' motion. This is because, even if Plaintiff had a private right of action for a failure to post an FMLA notice (which she does not),[7] it is undisputed that, when Plaintiff came back to CDTA in 2004, she received a copy of CDTA's employee handbook which contained, *inter alia,* its Operating

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 107 of 160

Policy on the Family and Medical Leave Act. *See Geromanos v. Columbia Univ.,* 322 F.Supp.2d 420, 430 (S.D.N.Y.2004) (finding that plaintiff failed to make out an FMLA claim for interference based on lack of notice because, inter alia, "it appears plaintiff did have notice of [defendant's] policy concerning FMLA leave, which appears in [defendant's] online employee handbook"). In the alternative, the Court finds that Plaintiff has not shown that any lack of notice failure somehow affected her leave. *See Geromanos,* 322 F.Supp.2d at 430–31 ("[T]he right to notice under the act is not an independent right giving rise to suit where failure to notify in no way affected the employee's leave.").

For all of these reasons, the Court grants Defendants' motion for summary judgment.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 38) is granted.

The Clerk is directed to issue a Judgment for Defendants and close this action.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 4508362

---

## Footnotes

1    *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.2009) (Suddaby, J.) (citing cases).

2    *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

3    *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

4    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

5    *See, e.g., Beers v. GMC,* 97–CV–0482, 1999 U.S. Dist. LEXIS 12285, at *27–31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02–CV–0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

6    It should be noted that, according to Plaintiff's own deposition testimony, her daughter Dorothy's pregnancy (which Anthony Bonaquisto was advised presented "some issues," and which Randy Fitch was advised was "high risk") did not even start until "sometime in January–February of 2010."

7    *See Gilmore v. Univ. of Rochester Strong Mem'l Div.,* 654 F.Supp.2d 141, 147 (W.D.N.Y.2009) ("[I]t is well settled that an employee has no private right of action where an employer has failed to post the [required FMLA] notice."); *Cinelli v. Oppenheim–Ephratah Cent. Sch. Dist.,* 07–CV–0235, 2008 WL 111174, at *5 n. 14 (N.D.N.Y. Jan.7, 2008) (DiBianco, M.J.) (noting that "the FMLA provides a statutory penalty for employers who fail to willfully fail to post notice of the pertinent FMLA provisions," and "itself[ ] does not impose a private right of action by the employee") (emphasis removed).

Yetman v. Capital Dist. Transp. Auth., Not Reported in F.Supp.3d (2015)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 108 of 160

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2002 WL 1906029
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diane F. GOLDSTICK, Plaintiff,

v.

THE HARTFORD, INC., et ano., Defendants.

No. 00 Civ. 8577(LAK).
|
Aug. 19, 2002.

**Synopsis**
Defendants moved to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint. The District Court, Kaplan, J., held that statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative.

Motion granted in part.

West Headnotes (1)

**[1]**     **Summary Judgment** 🔑 Form and requisites

Plaintiff's statement submitted in opposition to defendants' motion for summary judgment failed to comply with local rule by adding argumentative and often lengthy narrative, the object of which was to "spin" the impact of the admissions plaintiff had been compelled to make; additionally, statement was 41 pages long, a manifest evasion of the page limitation. Local Civ. R. 56.1.

66 Cases that cite this headnote

ORDER

KAPLAN, J.

**\*1** Defendants move to strike plaintiff's Rule 56.1 Statement, submitted in opposition to defendants' motion for summary judgment dismissing the complaint, on the ground that it fails to comply with Local Civ. R. 56.1 in that it goes beyond admitting or denying that the propositions of fact set forth in defendants' Rule 56.1 Statement in fact are undisputed and contains a great deal of extraneous, argumentative material, much allegedly based on inadmissible evidence.

"A proper 56.1 statement submitted by a non-movant should consist of a paragraph-by-paragraph response to the movant's 56.1 statement, much like an answer to a complaint. If the non-movant asserts that a fact claimed by the movant to be undisputed is actually in dispute, the non-movant *must* cite evidence on the record to support its contention. It is permissible for the non-movant to provide a separate statement, apart from this paragraph-by-paragraph response, in which it lists other facts it claims to be in dispute. However, this separate statement is *not* a substitute for the paragraph-by-paragraph response. The non-movant, particularly if represented by counsel, should not leave it to the Court to cull from this separate statement the pieces of evidence which would support the contentions of the non-movant asserted in its paragraph-by-paragraph response without citation.

*"Rule 56.1 statements are not argument.* They should contain factual assertions, with citation to the record. They should not contain conclusions, and they should be neither the source nor the result of 'cut-and-paste' efforts with the memorandum of law. A rule 56.1 statement that contains the same turns of phrase, if not the identical whole paragraphs, as the memorandum of law is improper." *Rodriguez v. Schneider,* No. 95 Civ. 4083(RPP,) 1999 WL 459813, \*1 n. 3 (S.D.N.Y. June 29, 1999).

The plaintiff's Rule 56.1 Statement here does not comply with the rule. While in most cases it does admit or deny defendants' descriptions of the allegedly uncontested facts on a paragraph-by-paragraph basis, it adds argumentative and often lengthy narrative in almost every case the object of which is to "spin" the impact of the admissions plaintiff has been compelled to make. In consequence, the response to the 84 number assertions set forth in defendants' Rule 56.1 Statement is 41 pages long and, whether so intended or not, a manifest evasion of the page limitation on plaintiff's memorandum in opposition to the motion for summary judgment.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 110 of 160

**Goldstick v. The Hartford, Inc., Not Reported in Fed. Supp. (2002)**

Accordingly, defendants' motion is granted to the extent that so much of plaintiff's responses as consists of anything more than (a) the admission or denial of the assertions set forth in defendants' Rule 56.1 Statement and the citations to the record, and (b) the section headed "additional facts" is stricken. It is denied in all other respects.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2002 WL 1906029

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 111 of 160

2016 WL 7116126
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

O'Dell WILLIS, Plaintiff,
v.
The COUNTY OF ONONDAGA, Defendant.

5:14-CV-1306 (GTS/ATB)
|
Signed 12/06/2016

**Attorneys and Law Firms**

OFFICE OF K. FELICIA DAVIS, P.O. Box 591, OF COUNSEL: K. FELICIA DAVIS, ESQ., Syracuse, NY 13201-3049, Counsel for Plaintiff.

HON. ROBERT A. DURR, Onondaga County Attorney, John H. Mulroy Civic Center, 10th Floor, 421 Montgomery Street, OF COUNSEL: CAROL L. RHINEHART, ESQ., Deputy County Attorney, Syracuse, NY 13202, Counsel for Defendant.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

\*1 Currently before the Court, in this employment civil rights action by Odell Willis ("Plaintiff") against the County of Onondaga ("Defendant"), is Defendant's motion for summary judgment. (Dkt. No. 13.) For the reasons set forth below, Defendant's motion is granted and Plaintiff's Complaint is dismissed.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Complaint

Generally, in his Complaint, Plaintiff alleges that, between approximately December 2011 and October 2014, he has been racially and sexually discriminated against and harassed during his employment at the Onondaga County Sheriff's Office in numerous ways including, but not limited to, the following: (1) unwanted sexual touching and attention by Sgt. B and fellow deputies; (2) graphic sexual comments by Sgt. B and fellow deputies; (3) racially hostile comments, epithets and jokes by fellow deputies; (4) racially and sexually motivated abuse of authority by Sgt. B., including retaliation

for making a complaint of racial and sexual discrimination; and (5) a failure by Defendant to take effective action to stop such harassment. (*See generally* Dkt. No. 1.)

Based on these allegations, Plaintiff asserts six claims against Defendant: (1) a claim that Defendant discriminated against him based on his race and/or sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; (2) a claim that Defendant discriminated against him based on his race and/or sex, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); (3) a claim that Defendant subjected him to intentional infliction of emotional distress, in violation of New York State common law; (4) a claim that Defendant subjected him to negligent infliction of emotional distress, in violation of New York State common law; (5) a claim of breach of contract in violation of New York State common law, arising from Defendant's breach of the anti-harassment provision of its collective bargaining agreement with the Deputy Sheriff's Benevolent Association, under which Plaintiff is a covered employee; and (6) a claim that Defendant harassed him based on his race and/or sex, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). (*Id.*)

As relief for these violations, Plaintiff requests, *inter alia*, punitive damages under Section 1981, and the NYSHRL. (*Id.*)

## B. Undisputed Material Facts

Unless otherwise noted, the following facts were asserted and supported by Defendant in its statement of material facts and either expressly admitted or inadequately denied by Plaintiff in his response thereto. (*Compare* Dkt. No. 13, Attach. 21 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 19 [Plf.'s Rule 7.1 Response].)

The Parties

1. Odell Willis ("Plaintiff") is an African-American heterosexual male.

2. Plaintiff has been employed as a deputy sheriff for Onondaga County Sheriff's Office Custody Department since October 26, 1987.

\*2 3. He is one of two African-Americans who work in the Transport Unit of the Custody Department.[1]

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 112 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

4. The County of Onondaga ("Defendant") is a municipal corporation duly incorporated pursuant to the laws of the State of New York, and employs more than 15 employees.


_The Onondaga County Sheriff's Office_

5. The Onondaga County Sheriff's Office is a paramilitary organization with Sheriff Conway serving as its highest ranking official.

6. The chain of command beneath the Sheriff in descending order includes undersheriff, chief, assistant chief, captain, lieutenant, sergeant and deputy.

7. The Sheriff's Office Duty Manual contains the written standards of conduct for all members of the Sheriff's Office. [2]

**\*3**  8. The Sheriff's Office Policy and Procedure Directives Manual is the official compilation of written statements of policy and procedures. [3]

9. Employees of the Sheriff's Office must comply with all provisions of the Duty Manual and all provisions of the Policy and Procedure Directives Manual. [4]

10. Employees of the Sheriff's Office who fail to comply with the Duty Manual and/or the Policy and Procedures Directives Manual are subject to disciplinary action. [5]

11. Generally, such disciplinary action is progressive and ranges in severity beginning with a counseling or supervisor's memorandum (which is the least severe action), an oral warning, a written reprimand, and an article charge (which is the most severe action). [6]

12. Supervisor's memoranda are not formal discipline and may be issued by a sergeant or higher ranking officer without the Administration's approval. [7]

**\*4**  13. Any other form of discipline (i.e., oral warning, written reprimand or Article charges) may not be issued by a sergeant or lieutenant without the Administration's approval. [8]

14. All deputy sheriffs are members of the local union, which is the Deputy Sheriff's Benevolent Association of Onondaga County, Inc. ("DSBA"), and are subject to the terms of the Collective Bargaining Agreement between Defendant and the DSBA.

15. The Collective Bargaining Agreement sets forth the Grievance and Arbitration Procedure for resolving grievances.

16. The Sheriff's Office Directive entitled "Harassment" states the office's written policy against harassment, discrimination and retaliation in the work place, defines the prohibited conduct, and sets forth the procedures for resolving incidents of discrimination. [9]

17. All newly hired deputy sheriffs receive cultural diversity training as part of their training for employment as deputies. [10]

**\*5**  18. In addition, this cultural diversity training is reinforced through yearly "in-service training" sessions. [11]

19. Plaintiff is familiar with the Sheriff's Office Written Directive addressing Harassment and Retaliation as well as Defendant's Harassment and Anti-Retaliation Policy and has received cultural diversity training through the Sheriff's Office. [12]


_Plaintiff's Litigation History Against Defendant County_

20. During Plaintiff's employment with Defendant, he has been involved in three civil rights employment actions in which he has made allegations of a racially hostile work environment, a sexually hostile work environment and/or retaliation. [13]

**\*6**  21. More specifically, in 1997, Plaintiff was one of several African-American deputy sheriffs who brought a civil rights action against Defendant claiming a racially hostile work environment; that action was dismissed with prejudice in 2001. [14]

22. In 2004, Plaintiff was one of a number of African-American deputy sheriffs who again brought a civil rights action claiming that the County knowingly permitted a racially hostile work environment to exist and continue. [15]

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 113 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

23. In that action, Plaintiff alleged that he was subjected to the following: (1) a racially hostile environment and disparate treatment; (2) a sexually hostile work environment and disparate treatment; and (3) retaliation for having complained about the foregoing violations. [16]

24. Also in that action, Plaintiff gave sworn testimony of the following: (1) that sometime in 2000 Deputy A made vulgar sexual comments to him including requests to perform oral sex; (2) that in August of 2000 Deputy A pushed a pen into Plaintiff's anus and that, when Plaintiff jumped, Deputy A stated "What's that, an orgasm?"; (3) that sometime in 2000 Deputy D.B. grabbed Plaintiff in a bear hug, forced him over a table and humped him in a sexual manner; and (4) that Deputy D.B. did this because Plaintiff is a black man.

*7 25. Plaintiff's hostile work environment claim proceeded to a jury trial in February 2010; however, he was precluded from offering testimony on his claims regarding sexual harassment because he failed to assert those claims in his EEOC complaint.

26. On February 24, 2010, a jury rendered a verdict in favor of Plaintiff on his hostile environment claim and awarded him $1.00 in damages.

27. After the trial concluded, Plaintiff continued to work in the Transport Unit; he claims that he was harassed during the first three weeks of that continued work. [17]

28. More specifically, Plaintiff claims that, at some point during the first or second day after the trial concluded, he found spit on the door of his locker.

29. Plaintiff also claims that, within one week of the conclusion of the trial, he discovered the contents of his mailbox in the trash.

30. Plaintiff also claims that, approximately three weeks after the trial in February 2010, a picture of Martin Luther King that was taped to the outside door of his locker was ripped off, leaving just the four corners of the picture remaining taped to the locker.

31. Plaintiff reported this incident to Sgt. Marshall, who was one of Plaintiff's supervisors at the time. [18]

32. The day after Plaintiff reported the picture incident, Sgt. Marshall gave him a copy of a computer image of Martin Luther King, which Plaintiff placed on the front of his locker, and it has remained there since.

*8 33. Further, several days after the picture incident, Sergeant Ames directed deputies during roll call to keep their hands off other people's property. [19]

34. Thereafter, according to Plaintiff, the harassment abated; as he testified in his deposition on November 25, 2015, "Well, now people pretty much stay [away]—you get little comments; you know, but [it's] a long time in taking a toll." [20]

Plaintiff's Current Claims

*9 35. On March 12, 2014, Sgt. B, one of the day supervisors, ordered Plaintiff and several white deputies to go outside, shovel snow off of the transport vehicles, and move them into the Everson Museum parking garage because of a snow storm. [21]

36. Approximately five to ten minutes after all of the white deputies had gone outside to comply with the order, Plaintiff informed Sgt. B that there were no keys left. [22]

37. Sgt. B responded that no keys were left because the other deputies had them, and again ordered Plaintiff to go outside to assist the other deputies with the detail. [23]

*10 38. Plaintiff felt he was being pushed and "everything [he] was holding in ... just sort of came out"; approaching Sgt. B, he said, "We need to talk" and "I'm tired of the way you've been talking to me." [24]

39. In response, Sgt. B directed Plaintiff to write a report addressing this incident. [25]

40. On or about March 14, 2014, Plaintiff wrote a report regarding the incident, and also made a number of accusations against Sgt. B regarding inappropriate conduct; included in this report were three instances of physical contact that allegedly occurred between December 2011 and March 2014. [26]

41. According to Plaintiff, the first instance of physical contact occurred in mid-to-late December 2011 in the presence of 15 to 20 transport members and allegedly

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 114 of 160

involved Sgt. B swiping a bladed hand between Plaintiff's buttocks, creating a wedgie in Plaintiff's uniform pants. The second incident of physical contact occurred in mid-February 2014 and involved Sgt. B allegedly grabbing Plaintiff's buttocks as Sgt. B fell or stumbled; Plaintiff did not report this second incident at the time. The third incident of physical contact occurred during the first week of March 2014 and involved Sgt. B allegedly putting his hands on Plaintiff's shoulders; Plaintiff did not report this third incident at the time. [27]

**\*11** 42. Plaintiff acknowledges that Sgt. B did not take these actions "to be sexual with [Plaintiff]" but to get Plaintiff to react. [28]

43. Plaintiff submitted the report to Sgt. B on or about March 17, 2014.

44. Sgt. B also wrote a report, which addressed Plaintiff's failure to follow his orders; he then submitted the report to Lt. Raus, requesting that formal disciplinary action be taken against Plaintiff. [29]

45. The matter was investigated and, on April 7, 2014, Plaintiff was issued a supervisor's memorandum for failing to obey orders, being loud and argumentative toward Sgt. B and making derogatory comments.

46. Plaintiff admits that, while he initially went to the key box to grab car keys, he never complied with Sgt. B's order to assist shoveling snow off the transport vehicles and assist moving them to the garage; Plaintiff now claims he was still cold from when he came into work. [30]

47. Because Plaintiff's Miscellaneous Report of March 14, 2014, also included allegations of inappropriate conduct by Sgt. B, Plaintiff was directed by Sgt. Marshall to submit separate reports addressing each of the allegations against Sgt. B.

**\*12** 48. Plaintiff complied with Sgt. Marshall's request and submitted five separate Miscellaneous Reports.

49. The five Miscellaneous Reports allege the following incidents, which were perceived by Plaintiff to be racial harassment, sexual harassment or bullying:

(i) On or about April 17, 2012, Sgt. B directed Plaintiff to place mail in the appropriate mailboxes; although

Plaintiff perceived this to be a form of bullying, he did not report this to any Transport Supervisors at the time. (Plaintiff admits that this was not racial or sexual harassment.) [31]

(ii) On May 16, 2012, Sgt. B interrupted Plaintiff by not allowing him to speak during roll call when Plaintiff attempted to address a claim that Plaintiff had been skipped for an overtime assignment; Plaintiff perceived this incident to be a form of bullying. (Plaintiff believes that he was skipped for overtime because of his race.);

(iii) During the first week of April 2014, Plaintiff claims that Sgt. B grabbed Plaintiff's buttocks in an apparent attempt to prevent falling; Plaintiff did not report this incident to any Transport Supervisor at the time; [32]

(iv) On May 30, 2012, in the presence of several transport members, Sgt. B blocked Plaintiff's path down an aisle requiring Plaintiff to verbally request to get by; although Plaintiff perceived this as an attempt to harass and intimidate Plaintiff, he did not report the incident to any Transport Supervisors. (Plaintiff admits that this was neither racial nor sexual harassment.); and

(v) Sometime during the third week of December 2011, Sgt. B walked behind Plaintiff and with a bladed hand swiped the crack of Plaintiff's buttocks creating a wedgie in Plaintiff's uniform pants. Plaintiff claims that he spoke to Sgt. Marshall about this incident and they typed a report together but Plaintiff did not submit the report; Plaintiff also claims that he spoke to Lt. Raus about the incident and that the incident was addressed with Sgt. B. Plaintiff claims that Sgt. B left him alone after this. [33]

**\*13** 50. Sgt. Marshall investigated the allegations in each of Plaintiff's Miscellaneous Reports. [34]

51. The investigation included interviewing Plaintiff, Sgt. B and several other members of the Transport Unit, and searching records maintained by Sgt. Marshall and the Sheriff's Office. [35]

52. Sgt. B strongly denied Plaintiff's allegations of harassment, sexual harassment and bullying. [36]

**\*14** 53. After investigating the incidents, Sgt. Marshall found no merit to Plaintiff's allegations and submitted his investigative findings to Lt. Raus.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 115 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

54. Thereafter, Captain Caiella directed Lt. Raus to investigate the matter further.

55. Lt. Raus then interviewed all members of the Transport Unit regarding Plaintiff's allegations and submitted his investigation packet to the Captain; no further action was taken.

56. Defendant has addressed incidents of inappropriate conduct in the Transport Unit when Plaintiff has complained and even when he has not complained. [37]

57. In November 2013, there was an incident of inappropriate conduct in the Transport Unit involving a rookie deputy being pushed in a shopping cart up and down the hallways while handcuffed to the cart. [38]

58. The matter was investigated and the individuals involved were issued supervisor's memorandum.

59. In September 2014, Plaintiff complained that Dep. A punched him in the thigh; he also complained about what he perceived as inappropriate conduct involving Dep. A and several deputies. [39]

60. This matter was investigated and Dep. A was issued a supervisor's memorandum. [40]

 *15  61. Finally, in June 2015, Sgt. Marshall witnessed an incident in which a deputy played a video on his cell phone in the roll call room while in the presence of several deputies including Plaintiff; Sgt. Marshall observed, at the conclusion of the video, a racial slur being repeated numerous times. [41]

62. Sgt. Marshall immediately addressed the incident with Plaintiff and the deputy who played the video. [42]

63. The deputy who played the inappropriate video was issued a supervisor's memorandum. [43]

Plaintiff's Human Rights Complaint
and Federal Court Action

 *16  64. On June 3, 2014, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant has discriminated against him on the basis of his race and sex; Plaintiff also claimed retaliation for having complained about discriminatory conduct. [44]

65. After investigation, the EEOC determined that it was unable to conclude that the information obtained established a violation of the statutes; the EEOC dismissed the Charge and issued Plaintiff a right to sue letter on July 24, 2014.

66. Thereafter, on October 24, 2014, Plaintiff filed this employment civil rights action in United States District Court for the Northern District of New York alleging six causes of action against Defendant for violations of Title VII, Section 1981 and the NYSHRL.

## C. Summary of Parties' Arguments

### 1. Defendant's Memorandum of Law in Chief

Generally, in its memorandum of law, Defendant asserts six arguments. (Dkt. No. 13, Attach. 22 [Def.'s Memo. of Law].)

First, Defendant argues, Plaintiff's First Cause of Action (asserting a hostile work environment claim) must be dismissed for the following reasons: (a) to save that portion of his Title VII claim based on events allegedly occurring before August 7, 2013 (i.e., 300 days before Plaintiff filed his EEOC complaint on June 3, 2014), he must rely on the continuing violation doctrine, but he cannot do so because he cannot establish either (i) that a specific policy or practice caused the alleged discrimination or (ii) that the post-August 7, 2013, portion of his claim (specifically the portion of his claim based events occurring on or after March 14, 2014) is continuous in time with the pre-August 7, 2013, portion of his claim; (b) he cannot establish a sexual harassment claim because (i) the incidents of sexual harassment that he alleges, which constitute mere male-on-male teasing, are not severe enough to alter the conditions of the workplace, and (ii) the incidents in question are too few in number and spread out over too long a time to be pervasive enough to alter the conditions of the workplace; (c) similarly, he cannot establish a racial harassment claim because (i) the incidents of racial harassment that he alleges, the majority of which have only a speculative connection to race, are not severe enough to alter the conditions of his employment, and (ii) the incidents in question are too few in number and spread out over too long a time to be pervasive enough to alter

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 116 of 160

the conditions of his employment; and (d) in any event, Defendant cannot be liable for either sexual harassment or racial harassment because Plaintiff cannot establish a specific basis for imputing the conduct to Defendant, which had policies prohibiting sexual and racial harassment, reasonable avenues for complaining of such harassment, and a record of investigating and addressing such complaints (commensurate with the evidence discovered). (*Id.*)

Second, Defendant argues, Plaintiff's Second, Third and Fourth Causes of Action (asserting claims of discrimination under NYSHRL, intentional infliction of emotional distress, and negligent infliction of emotional distress) must be dismissed because of his failure to comply with N.Y. County Law § 5, which requires that a notice of claim be filed within 90 days of the incident giving rise to the claim. (*Id.*)

**\*17** Third, Plaintiff's Fifth Cause of Action (asserting a breach-of-contract claim) must be dismissed because (a) under New York State law, an employee may litigate a collective-bargaining-agreement issue directly against an employer only when the employee's union has failed in its duty of fair representation, and (b) here, the collective bargaining agreement has a grievance procedure, and Plaintiff has not asserted a claim against the union. (*Id.*)

Fourth, Plaintiff's Sixth Cause of Action (asserting a claim of sexual and racial harassment under Section 1981) must be dismissed because (a) Section 1981 deals only with race-based forms of discrimination, and (b) he has failed to establish a racially hostile environment that resulted from the execution of a racially discriminatory policy or custom, for the reasons discussed above in Defendant's first argument. (*Id.*)

Fifth, Plaintiff cannot establish a claim of retaliation under Title VII because (a) none of Plaintiff's six causes of action assert a claim of retaliation, and the only paragraph of the Complaint that mentions retaliation is Paragraph 21, (b) even if the Complaint could be construed as asserting a claim of retaliation, Plaintiff cannot establish a prima facie case of retaliation (which requires him to demonstrate, *inter alia*, a causal link between his protected activity and an employment action or decision that is adverse to Plaintiff), and (c) even if he did so, he cannot establish that Defendant's articulated reason for issuing a supervisor's memorandum was a pretext for retaliation rather than the result of his own misconduct (e.g., his failure to comply with an order to assist other deputies in moving the transport vehicles). (*Id.*)

Sixth, Plaintiff is not entitled to punitive damages because, while punitive damages will normally lie in cases where persons who are sued in their personal capacity recklessly or carelessly disregarded the plaintiff's rights, punitive damages will never lie against a municipality. (*Id.*)

## 2. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff asserts three arguments. (Dkt. No. 18, Attach. 3 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiff argues, his Title VII claim is not time barred because those events occurring before August 7, 2013, were continuous in time with, and are of the same nature and character as, the events occurring after August 7, 2013. (*Id.*)

Second, Plaintiff argues, he makes out claims for a sexually and racially hostile work environment under Title VII, Section 1981 and the NYSHRL, for the following reasons: (a) evidence exists that the incidents of sexual and racial harassment that he alleges were severe enough to alter the conditions of his employment (i.e., the fact that he has been subjectively and reasonably offended by being sexually touched by others including his superior officer, his having a poster of Martin Luther King Jr. ripped down, his hearing a video played that repeatedly used the racial slur "n——," and others offering him a dollar after they engaged in racially offensive conduct); (b) evidence exists that the incidents in question were pervasive enough to alter the conditions of his employment (i.e., the fact that he hears sexual jokes on a daily basis, he witnesses sexual touching between males in the Unit, and he has been paired with Deputy A for years despite Plaintiff's reports of sexual touching by Deputy A); (c) a specific basis exists for imputing the harassment to Defendant under Title VII and NYSHRL (i.e., Lt. Raus' inadequate investigation of Plaintiff's claim of sexual harassment by Sgt. B coupled with Lt. Raus' remark that alpha dogs control a pack by making the other dogs submit, as well as Captain Caiella's endorsement of Sgt. Marshall's responding to the racial-slur incident by merely issuing a supervisor's memorandum instead of formal discipline); and (d) evidence exists that the harassment derived from a municipal policy or practice sufficient to render Defendant liable under Section 1981 (i.e., the severity of the individual incidents and/or the continuous and concerted nature of the incidents). (*Id.*)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 117 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

**\*18** Third, Plaintiff argues, he can establish a claim for retaliation under Title VII because (a) evidence exists that Plaintiff complained of Sgt. B's conduct to supervisors in early 2012 and again on March 14, 2014, (b) evidence exists that Plaintiff was disciplined by receiving a supervisor's memorandum from Sgt. B on April 7, 2014, and (c) the Second Circuit has found a causal connection between protected activity and adverse action where a delay of eighth months existed between the two events. (*Id.*)

### 3. Defendant's Reply Memorandum of Law

Generally, his its reply memorandum of law, Defendant asserts three arguments. (Dkt. No. 22, Attach. 1 [Def.'s Reply Memo. of Law].)

First, Defendant argues, Plaintiff has failed to meet the standard necessary to defeat Defendant's motion for summary judgment for the following reasons: (a) Plaintiff cannot create a genuine dispute of material fact by relying on the allegations of his unverified Complaint; (b) Plaintiff cannot create a genuine dispute of material fact by relying on self-serving affidavit testimony of May 16, 2016, that contradicts his deposition testimony of November 25, 2015, and December 9, 2015; (c) Plaintiff cannot create a genuine dispute of material fact by relying on years-old events that were referenced for the first time in his affidavit and were never alleged in either his Complaint or interrogatory responses; (d) Plaintiff cannot create a genuine dispute of material fact by relying on evidence that he promised to but failed to produce (specifically, the copy of the written report that he alleges was typed in December 2011 with the assistance of Sgt. Marshall, who Marshall denies having provided such assistance); and (e) Plaintiff cannot create a genuine dispute of material fact by relying the affidavit testimony of Brian Hall stating that, on one occasion "[s]ometime between 2013-2014," *Hall* witnessed three superior officers laughing and "grabbing each other's butts." (*Id.*)

Second, Defendant argues, Plaintiff cannot establish a retaliation claim for the following reasons: (a) Defendant has clearly presented a legitimate, non-discriminatory reason for issuing Plaintiff a supervisor's memorandum of April 7, 2014 (i.e., Plaintiff's admitted failure to comply with a direct order to assist other deputies in moving the transport vehicles on March 12, 2014); (b) because Defendant has articulated a legitimate, non-discriminatory reason for issuing Plaintiff a supervisor's memorandum, the presumption of discrimination

dissipates and Defendant is entitled to summary judgment unless Plaintiff can produce evidence that reasonably supports a finding of retaliation; (c) the closest that Plaintiff comes to producing such evidence is his bald assertion that his fellow deputies were directed to write false reports (between March 13, 2014, and April 7, 2014), which is completely speculative and not based on personal knowledge. (*Id.*)

Third, Defendant argues, Plaintiff's Second, Third, Fourth, Fifth and Sixth Causes of Action should be dismissed, because (a) Defendant challenged those claims in its memorandum of law in chief, (b) Plaintiff did not respond to those challenges in his opposition memorandum of law, and (c) under such circumstances, courts may deem such claims to be abandoned, *see Taylor v. City of New York*, 269 F. Supp.2d 68, 75 (E.D.N.Y. 2003). (*Id.*)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [45] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

**\*19** In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 118 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

perform an independent review of the record to find proof of a factual dispute. [46]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion,* 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement. [47]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3). [48] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue,* 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B. Legal Standard Governing Plaintiff's Claims

**\*20**  Because the parties have (in their memoranda of law) demonstrated an adequate familiarity with the legal standards governing Plaintiff's claims, the Court will not recite in detail those legal standards in this Decision and Order, which is intended primarily for the review of the parties. Rather, the

Court will discuss those legal standards only where necessary below, in Part III of this Decision and Order.

## III. ANALYSIS

### A. Plaintiff's First Causes of Action (Asserting Claim Under Title VII)

#### 1. Alleged Sexual Harassment

Beginning with the continuing violation doctrine, the Court has trouble finding that admissible record evidence exists from which a rational fact-finder could conclude that many of the pre-August 7, 2013, events giving rise to Plaintiff's Title VII sexual-harassment claim were continuous in time with the post-August 7, 2013, events giving rise to that claim (such that they may be considered by the Court in evaluating the merits of Plaintiff's Title VII sexual-harassment claim).

Granted, Plaintiff has adduced evidence that some of the misconduct has occurred continually, that is, both before and after August 7, 2013 (i.e., 300 days before Plaintiff filed his EEOC complaint on June 3, 2014): (1) Deputy A allegedly poking his finger in Plaintiff's ear on a daily basis; [49] (2) Plaintiff's allegedly witnessing sexually explicit graffiti involving a man's penis on the dry-erase board in the Roll Call Room on a continual basis; [50] and (3) Plaintiff's allegedly hearing sexually laced language, including language about "blow jobs," used by deputies (particularly Deputy A) on a continual basis. [51] However, the first form of misconduct hardly appears to be sexual in nature; and the second and third forms of misconduct were apparently not directed exclusively at male deputies. [52]

Furthermore, Plaintiff has adduced evidence that perhaps the most-egregious misconduct occurred before August 7, 2013: (1) Deputy A allegedly giving Plaintiff the "polish handshake" (which Plaintiff describes as a man reaching underneath another man's buttocks from behind and grabbing the other man's penis) on one occasion in 2000-2001 (or perhaps on multiple occasions first in 2008 or 2009); [53] (2) Deputy A allegedly pushing a writing pen into Plaintiff's anus on another occasion in 2000-2001; [54] and (3) Deputy B allegedly grabbing Plaintiff in a "bear hug," collapsing him over a table and "hump[ing]" him from behind in 2000-2002. [55] However, these claims could have been asserted in Plaintiff's prior employment civil rights action,

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 119 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

triggering the doctrine of claim preclusion. Moreover, the bulk of this alleged misconduct predates the post-August 7, 2013, misconduct by more than a decade.[56]

**\*21** Having said that, the Court finds that Sgt. B's alleged misconduct of December 2011 (in which he allegedly "swiped his hand up [Plaintiff's] butt") is sufficiently close in time and similar in nature to the alleged post-August 7, 2013, events (which are alleged to have occurred on an almost-daily basis, as of at least August 7, 2013) to be appropriately considered.[57] Moreover, the Court finds that the alleged "polish handshake" of 2000-2001 (or perhaps 2008 or 2009) may be appropriately considered to the extent it explains Plaintiff's allegedly re-victimization at having to witness Deputy A give other deputies the "polish handshake" on an almost-daily basis after August 7, 2013.[58]

As a result, the Court finds that the following alleged misconduct may be considered in support of Plaintiff's Title VII sexual-harassment claim: (1) Sgt. B's allegedly "swip[ing] his hand up [Plaintiff's] butt" in December 2011;[59] (2) Sgt. B's allegedly grabbing Plaintiff's buttocks near a fax machine as Sgt B pretended to fall or stumble in the Transport Control Room at some point between 2012 and April 2014;[60] (3) Sgt. B's allegedly putting his hands on Plaintiff's shoulders at a fax machine as Sgt. B was exiting the Transport Control Room during the first week of March 2014;[61] (4) Plaintiff's allegedly witnessing of a photograph posted in the Transport Roll Call Area showing a male rookie officer inside of, and handcuffed to, a grocery cart in the spring of 2014;[62] (5) Deputy A's allegedly punching Plaintiff in the right thigh in an unprovoked manner in an apparent effort to give him a "charlie horse" on October 25, 2014;[63] (6) Plaintiff's allegedly being paired with Deputy A even after his complaint of Deputy's A punching him;[64] and (7) Plaintiff's allegedly witnessing Deputy A give other deputies the "polish handshake" on an "almost daily" basis, which makes Plaintiff "re-live [his] experiences [of 2000-2001 or perhaps 2008-2009] with [Deputy A]."[65]

**\*22** Turning to the merits of Plaintiff's Title VII sexual-harassment claim, the first issue that the Court must address is whether the above-listed alleged conduct was "because of [Plaintiff's] sex" under Title VII. The fact that the alleged conduct occurred among males and was heterosexual in nature is not determinative. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (Scalia, J.)

("[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex.... A same-sex harassment plaintiff may ..., of course, offer direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."). Rather, the issue is whether the alleged conduct was "because of [Plaintiff's] sex" under Title VII. The Court can find little, if any, sex-based motivation with regard to the photograph and thigh-punching incident. However, the Court notes that some of the other alleged conduct involved direct contact with intimate body parts. Moreover, the Court notes that the alleged direct contact occurred between males, and that there appears to be a dearth of record evidence that females received similar physical treatment (e.g., involving the grabbing of their genitalia) by males. Under the circumstances, for the sake of brevity, the Court will assume that admissible record evidence exists (albeit barely) from which a rational fact-finder could conclude that this conduct was "because of [Plaintiff's] sex" under Title VII. *See, e.g., Barrows v. Seneca Foods Corp.*, 512 Fed.Appx. 115, 116, 119 (2d Cir. 2013) (finding question of fact existed regarding male plaintiff's Title VII sex-discrimination claim based on, *inter alia*, record evidence that heterosexual male supervisor grabbed male plaintiff's testicles on one occasion during a work-related argument, and that male supervisor hit male plaintiff and other male employees in the crouch on other occasions).

The second issue that the Court must address is whether the alleged conduct was sufficiently severe to alter the conditions of the workplace. In deciding this issue, the Court must take into account the fact that the conduct is allegedly occurring in a sheriff's office that Plaintiff has conceded is a paramilitary organization. *See Oncale*, 523 U.S. at 81-82 ("In same-sex ... harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office.") (internal quotation marks and citation omitted). However, the Court must also remember that the Second Circuit has explicitly held that "[d]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 180 (2d Cir. 2012). As a result, again for the sake of brevity, the Court will assume that the first, second and seventh forms of alleged misconduct described above were, when considered together, sufficiently severe

Case 9:21-cv-00949-MAD-ML     Document 102     Filed 10/29/24     Page 120 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

to alter the conditions of Plaintiff's workplace (again albeit barely). [66]

The third issue that the Court must address is whether the alleged conduct was sufficiently pervasive to alter the conditions of the workplace. While the first and second forms of alleged misconduct (which occurred in December 2011 and February 2014) were hardly pervasive, they must be considered together with the seventh form of alleged misconduct, which Plaintiff allegedly witnessed on an "almost daily" basis as of May 2016 (the date of his affidavit). Under the circumstances, again for the sake of brevity, the Court will assume that the alleged misconduct was sufficiently pervasive to alter the conditions of Plaintiff's workplace (again albeit barely).

The final issue that the Court must address is whether admissible record evidence exists from which a rational fact-finder could conclude that a specific policy or practice caused the alleged sexual discrimination, sufficient to impute the conduct to Defendant. After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Defendant in its memoranda of law (including the fact that Defendant had policies prohibiting sexual harassment, reasonable avenues for complaining of such harassment, and a record of investigating and addressing such complaints, commensurate with the evidence discovered). *See, supra,* Part I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds the following analysis (which is meant to supplement and not supplant Defendant's reasons).

**\*23** Beginning with the first and second forms of alleged misconduct, while these forms of misconduct were committed by a supervisor, they do not evidence a policy or practice of Defendant causing the alleged sexual discrimination because (setting aside Defendant's written policy prohibiting such misconduct) Plaintiff's complaint about the misconduct resulted in a rather thorough investigation by Defendant (involving, *inter alia,* Sgt. Marshall's interviews of Plaintiff, Sgt. B and several other members of the Transport Unit, Sgt. Marshall's search of records, and Lt. Raus's interviews of all members of the Transport Unit). The mere fact that Plaintiff disagrees with the conclusions drawn by Sgt. Marshall and Lt. Raus does not mean that Defendant had a policy or practice that caused the alleged misconduct. *See Frenkel v. New York City Off-Track Betting Corp.,* 701 F. Supp.2d 544, 553 (S.D.N.Y. 2010) ("Plaintiff vehemently disagrees with the conclusions reached as a result of those investigations,

but neither his disagreement with those conclusions nor his own conclusory allegations of insufficient investigation or bias are sufficient to make out the requisite demonstration of policymaker acquiescence in a longstanding discriminatory policy or custom.").

Turning to the seventh form of alleged misconduct, Plaintiff witnessed this form of misconduct being committed during the time in question by a fellow deputy (not a supervisor); furthermore, no admissible record evidence exists that Plaintiff *complained* to Defendant about witnessing this alleged misconduct during the time in question. In his deposition, Plaintiff testified that he reported Deputy A's giving the "polish handshake" *to Plaintiff* in *2008 or 2009,* not that he reported witnessing (and feeling victimized by) Deputy A's giving the "polish handshake" to *other deputies* subsequently, specifically, *between August 2013 and May 2015.* (Dkt. No. 13, Attach. 4, at 68-69, 71, 123-24 [attaching pages "67," "68," "70," "122" and "123" of Plf.'s Depo. Tr.].) [67] Moreover, in his deposition, Plaintiff testified that *in 2008-2009* "people" (including Sgt. B) witnessed the alleged misconduct, not that *subsequently* (again, between August 2013 and May 2015) supervisors witnessed it. (*Id.* at 123 [attaching page "123" of Plf.'s Depo. Tr.].) Similarly, in his affidavit, Plaintiff asserts that he "see[s] [Deputy A] ... [give the 'polish handshake'] to others," not that his supervisors see Deputy A do it. [68]

In any event, more importantly, the reports filed by Plaintiff do not complain about witnessing this alleged misconduct between others. (*See generally* Dkt. No. 13, Attach. 11, at 2-10 [Exs. C-1 through C-7 to Caiella Affid.]; Dkt. No. 13, Attach. 15, at 2 [Ex. G to Caiella Affid.]; Dkt. No. 13, Attach. 16, at 5 [Ex. H-4 to Caiella Affid.]; Dkt. No. 13, Attach. 17, at 2 [Ex. I to Caiella Affid.].) If Defendant was not notified that Plaintiff was feeling victimized by witnessing this alleged misconduct between others, it is difficult to conclude that Defendant is responsible for failing to appropriately respond to the feeling of victimization. [69] Under the circumstances, the Court finds that, based on the current record, no rational fact-finder could conclude that Defendant had a specific policy or practice that caused the alleged sexual discrimination.

For all of these reasons, Plaintiff's Title VII sexual-harassment claim is dismissed.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 121 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

### 2. Alleged Racial Harassment

Beginning with the continuing violation doctrine, the Court has trouble finding that admissible record evidence exists from which a rational fact-finder could conclude that the pre-August 7, 2013, portion of Plaintiff's Title VII racial-harassment claim was continuous in time with the post-August 7, 2013, portion of that claim, given the nearly twenty-six-month lapse between the alleged misconduct in mid-to-late December 2011 (involving Sgt. B's alleged swiping of a bladed hand in between Plaintiff's buttocks) and the alleged misconduct in mid-February 2014 (involving Sgt. B's alleged grabbing Plaintiff's buttocks as Sgt. B fell or stumbled). Moreover, it is difficult to imagine how the first form of alleged misconduct (or the second one) is racial in nature.

**\*24**  Having said that, the Court finds that certain other conduct, which pre-dates December 2011, appears sufficiently racial in nature and proximate to August 7, 2013, in time to be considered by the Court in evaluating the merits of Plaintiff's Title VII racial-harassment claim: specifically, Plaintiff finding spit on his locker, his finding his mail thrown in the trash, his finding his picture of Martin Luther King, Jr., torn down from his locker, and his being told "Let me give you my dollar now" a few days after his prior trial ended in February 2010. [70]

As a result, the Court finds that the following alleged misconduct may be considered in support of Plaintiff's Title VII racial-harassment claim: (1) Plaintiff allegedly finding spit on his locker, his finding his mail thrown in the trash, his finding his picture of Martin Luther King, Jr., torn down from the outside of his locker, and his being old "Let me give you my dollar now" during the weeks after his prior race-discrimination trial ended in February 2010; [71] (2) Plaintiff allegedly being passed over for overtime on several unspecified occasions in 2012 by Sgt. B, Sgt. Marshall, Sgt. Ames and Lt. Raus, while a white deputy with less seniority (Deputy Feldman) was given more overtime; [72] (3) Sgt. B's allegedly blocking Plaintiff's way as Plaintiff was attempting to pass on an unidentified occasion in approximately 2013, requiring Plaintiff to ask permission to pass; [73] (4) Sgt. B's allegedly grabbing Plaintiff's buttocks near the fax machine as Sgt B pretended to fall or stumble in the Transport Control Room at some point between 2012 and April 2014; [74] (5) Lt. Raus allegedly smirking when Plaintiff said he thought Lt. Raus was a racist on an unidentified occasion in 2013

or 2014; [75] (6) Sgt. B's allegedly putting his hands on Plaintiff's shoulders at the fax machine as Sgt. B was exiting the Transport Control Room in the first week of March 2014; [76] (7) Sgt. B's allegedly assigning Plaintiff to shovel snow off of, and move, transport vehicles on March 12, 2014; [77] (8) Deputy A's allegedly punching Plaintiff in the right thigh in an unprovoked manner in an apparent effort to give him a "charlie horse" on October 25, 2014; [78] (9) Plaintiff's allegedly being paired with Deputy A even after his complaint of Deputy A's punching him; [79] (10) Plaintiff's alleged viewing of a video in which the word "N——" was used in June 2015; [80] (11) the alleged coercion by four or five white deputies of other white deputies not to work with Plaintiff; [81] and (12) Plaintiff allegedly being assigned by Sgt. B to put fliers or paperwork in a mailbox on one or more unidentified occasions, while white deputies were not assigned to do so. [82]

**\*25**  Turning to the merits of Plaintiff's Title VII sexual-harassment claim, the first issue that the Court must address is whether the above-listed alleged conduct was "because of [Plaintiff's] sex" under Title VII. The Court can find little, if any, race-based motivation with regard to the third, fourth, sixth, eighth and ninth forms of alleged misconduct. However, the Court notes that Plaintiff's theory appears to be that he was singled out for attention and abuse because he was the only African-American on his shift, casting the aforementioned forms of alleged misconduct in a different light. Moreover, the remaining forms of alleged misconduct, while sometimes vague, appear more clearly motivated by race. As a result, under the circumstances, for the sake of brevity, the Court will assume that admissible record evidence exists from which a rational fact-finder could conclude that this conduct was "because of [Plaintiff's] race" under Title VII.

The second issue that the Court must address is whether the alleged conduct was sufficiently severe to alter the conditions of the workplace. The Court can find little, if any, severity with regard to the third, fourth, fifth, sixth, eighth and ninth forms of alleged misconduct. However, the Court cannot render the same finding with regard to the first, second, seventh, tenth, eleventh and twelfth forms of alleged misconduct. As a result, for the sake of brevity, the Court will assume that the forms of alleged misconduct described above were, when considered together, sufficiently severe to alter the conditions of Plaintiff's workplace.

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 122 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

The third issue that the Court must address is whether the alleged conduct was sufficiently pervasive to alter the conditions of the workplace. Most of the forms of alleged misconduct were relatively spread out, occurring in around February 2010 (first form), one or more times in 2012 (second form), sometime in 2013 (third form), at some point between 2012 and April 2014 (fourth form), sometime in 2013 or 2014 (fifth form), the first week of March 2014 (sixth form), second week of March 2014 (the seventh form), the end of October 2014 (the eighth form), and June 2015 (the tenth form). However, the remaining forms of alleged misconduct occurred on a continual basis (the ninth, eleventh and twelfth forms). Under the circumstances, again for the sake of brevity, the Court will assume that the alleged misconduct was sufficiently pervasive to alter the conditions of Plaintiff's workplace.

The final issue that the Court must address is whether admissible record evidence exists from which a rational fact-finder could conclude that a specific policy or practice caused the alleged racial discrimination, sufficient to impute the conduct to Defendant. After carefully considering the matter, the Court answers this question in the negative for the reasons stated by Defendant in its memoranda of law (including the fact that Defendant had policies prohibiting racial harassment, reasonable avenues for complaining of such harassment, and a record of investigating and addressing such complaints, commensurate with the evidence discovered). *See, supra,* Part I.C.1. and I.C.3. of this Decision and Order. To those reasons, the Court adds the following analysis (which is meant to supplement and not supplant Defendant's reasons).

The record before the Court contains copious evidence of both (1) Defendant's efforts to investigate the selected forms of alleged misconduct that Plaintiff chose to report,[83] and (2) Defendant's response to what it found to be inappropriate conduct.[84] As stated above in Part III.A. of this Decision and Order, Defendant cannot fairly be held responsible for conduct that was not reported to it. Furthermore, the mere fact that Plaintiff disagrees with the conclusions drawn by Defendant after its investigations does not mean that Defendant had a policy or practice that caused the alleged misconduct. *Frenkel,* 701 F. Supp.2d at 553. Under the circumstances, the Court finds that, based on the current record, no rational fact-finder could conclude that Defendant had a specific policy or practice that caused the alleged racial discrimination.

**\*26** For all of these reasons, Plaintiff's Title VII racial-harassment claim is dismissed.

### B. Plaintiff's Second, Third, Fourth and Fifth Causes of Action (Asserting Claims of Violation of the NYSHRL, Intentional Infliction of Emotional Distress, Negligent Infliction of Emotional Distress, and Breach of Contract)

In this District, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07-CV-0279, 2009 WL 3672105, at \*1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue,* 09-CV-0722, 2009 WL2473509, at \*2 & nn.2, 3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

Alternatively, the court can deem a challenged but undefended claim abandoned (regardless of the facial merit of the unresponded-to argument). *See Jackson v. Fed. Exp.,* 766 F.3d 189, 197-98 (2d Cir. 2014) ("Where a partial response to a motion is made—i.e., referencing some claims or defenses but not others—a distinction between *pro se* and counseled responses is appropriate. In the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate. In contrast, in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned. In all cases in which summary judgment is granted, the district court must provide an explanation sufficient to allow appellate review. This explanation should, where appropriate, include a finding of abandonment of undefended claims or defenses.").

Here, after carefully considering the matter, the Court dismisses Plaintiff's Second, Third, Fourth and Fifth Causes of Action (asserting claims of discrimination under the NYSHRL, intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract), because Defendant's challenges to them have facial merit (for the reasons stated in Defendant's memorandum of law in chief (*see, supra,* Part I.C.1. of this Decision and

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 123 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Order) and Plaintiff has failed to oppose those challenges. Alternatively, the Court dismisses Plaintiff's Second, Third, Fourth and Fifth Causes of Action as abandoned, finding that the choice of Plaintiff's counsel to carefully defend some claims but not others was deliberate.

For all of these reasons, Plaintiff's Second, Third, Fourth and Fifth Causes of Action are dismissed.

### C. Plaintiff's Sixth Cause of Action (Asserting Claim Under Section 1981)

As an initial matter, the Court disagrees with Defendant that Plaintiff has abandoned his claim under Section 1981, because he references it three times in his opposition memorandum of law. (Dkt. No. 18, Attach. 3, at 10, 11, 13 [attaching page "8," "9" and "11" of Plf.'s Opp'n Memo. of Law].)

**\*27** However, the Court agrees with Defendant for the reasons stated in its memorandum of law in chief (*see, supra,* Part I.C.1. of this Decision and Order) that, to the extent Plaintiff's Section 1981 claim is based on alleged sex-based discrimination, that claim must be dismissed because Section 1981 regards only race-based discrimination.

With regard to that portion of Plaintiff's Section 1981 claim based on alleged race-based discrimination, the Court finds that Plaintiff has not adduced admissible evidence from which a rational fact-finder could conclude that Defendant had a racially discriminatory policy or custom that caused a racially hostile environment. The Court renders this finding for the reasons stated in Defendant's memoranda of law and the reasons the Court rejected Plaintiff's Title VII racial-harassment claim. *See, supra,* Parts I.C.1., I.C.3. and III.A. of this Decision and Order

For all of these reasons, Plaintiff's sixth cause of action is dismissed.

### D. Plaintiff's Request for Punitive Damages

After carefully considering the matter, the Court dismisses Plaintiff's request for punitive damages on the alternative ground that Defendant's challenge to the request has facial merit (for the reasons stated in Defendant's memorandum of law in chief (*see, supra,* Part I.C.1. of this Decision and Order) and Plaintiff has failed to oppose that challenge. In addition to the case cited by Defendant, the Court relies on *Johnson v. New York City Health & Hosp. Corp.*, 98-CV-5505, at

*3 (S.D.N.Y. Aug. 2, 2000) ("It is equally well settled that punitive damages are unavailable against municipalities in actions under Title VII and §§ 1981 and 1983.") and *Brennan v. City of White Plains*, 67 F. Supp.2d 362, 378 (S.D.N.Y. 1999) ("Punitive damages cannot be recovered under the Human Rights Law against any defendant....") (citation omitted). Alternatively, the Court dismisses Plaintiff's request for punitive damages as abandoned, finding that the choice of Plaintiff's counsel to carefully defend some claims but not that request was deliberate.

For all of these reasons, Plaintiff's request for punitive damages is dismissed.

### E. Any Retaliation Claim Asserted by Plaintiff

As argued by Defendant, the word "retaliate" appears only twice in Plaintiff's Complaint (i.e., in the first and sixth sentences of Paragraph 21) and nowhere in its Causes of Action Section. (*See generally* Dkt. No. 1, ¶¶ 7-51 [Plf.'s Compl.].) While a *pro se* complaint must be extra-liberally construed as asserting all claims consistent with its factual allegations,[85] a counseled litigant's complaint need not be so construed. Rather, a counseled litigant is the master of his own complaint,[86] which need be construed with only ordinary liberality.[87] Here, even liberally construing Plaintiff's Complaint, the Court finds that the omission of the word "retaliate" (or the notion of retaliation) from the well-pleaded Causes of Action Section of the Complaint is conspicuous, reasonably leading a defendant (and the Court) to conclude that Plaintiff had consciously chosen *not* to assert a claim of retaliation.[88] For this reason alone, this late-blossoming claim can be, and is, dismissed.

**\*28** In any event, even if the Court were to liberally construe the Complaint as asserting such a claim, it would dismiss the claim for the reasons stated by Defendant in its memoranda of law: Plaintiff cannot establish a causal link between his protected activity on March 14, 2014, and his receipt of a supervisor's memorandum on April 7, 2014, which would have been issued by Sgt. B anyway due to Plaintiff's admitted failure to comply with a direct order to assist other deputies in moving the transport vehicles (even after he came on duty, according to his own version of events). *See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order. The Court notes that three of the reports written by Plaintiff's fellow deputies to Sgt. B (regarding the incident on March 12, 2014) were dated March 13, 2014—a day before Plaintiff wrote his report of March 14, 2014, regarding the

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 124 of 160

incident—further establishing that the impetus for Sgt. B's supervisor's memorandum predated Plaintiff's report. (Dkt. No. 13, Attach. 10, at 7, 8, 9.)

As yet another alternative ground for dismissing this claim, the Court finds that, by itself, the receipt of a supervisor's memorandum (which was not formal discipline and could be, and was, issued by a sergeant or higher ranking officer without the Administration's approval) was not a sufficiently serious adverse employment action for purposes of Plaintiff's retaliation claim. *Cf. Vandesande v. Miami-Dade Cty.*, 431 F. Supp.2d 1245, 1254 (S.D. Fla. 2006) (finding that supervisor's memorandum to county firefighter regarding his excessive cell phone usage during training and other aspects of his behavior that were allegedly bordering on insubordination did not constitute "adverse employment actions" necessary to support retaliation claim under Fair Labor Standards Act, because memorandum did not cause firefighter any present or foreseeable future injury).

For all of these reasons, any retaliation claim asserted by Plaintiff is dismissed.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 13) is **GRANTED**, and Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7116126

---

## Footnotes

1   After expressly admitting the fact asserted by Defendant, Plaintiff attempts to assert another fact. (Dkt. No. 19, at ¶ 3 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted. *See Washington v. City of New York*, 05-CV-8884, 2009 WL 1585947, at *1 n.2 (S.D.N.Y. June 5, 2009) (holding that "the statement provided by Defendants is taken as true because Plaintiff[']s initial response in each instance is 'Admit' "); *CA, Inc. v. New Relic, Inc.*, 12-CV-5468, 2015 WL 1611993, at *2 n.3 (E.D.N.Y. Apr. 8, 2015) (holding that "the Court will consider the statement provided by [Plaintiff] as undisputed because [Defendant's] initial response in each instance is, in fact, 'Undisputed' "). Setting aside that the additional fact that Plaintiff attempts to assert follows an express admission, the additional fact will be ignored for each of two alternative reasons. First, to the extent that it attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, that the words "who work in the Transport Unit" mean "who work the same shift in the Transport Unit"), that attempt is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *See Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (Suddaby, J.) (citing authority for the point of law that the summary judgment procedure involves the disputation of *asserted* facts, not the disputation of *implied* facts); *cf. Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (noting that plaintiff's responses failed to comply with the court's local rules where "Plaintiff's purported denials ... improperly interject arguments and/or immaterial facts in response to facts asserted by Defendants, often speaking past Defendants' asserted facts without specifically controverting those same facts"); *Goldstick v. The Hartford, Inc.*, 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking plaintiff's Rule 56.1 Statement, in part, because plaintiff added "argumentative and often lengthy narrative in almost every case the object of which is to 'spin' the impact of the admissions plaintiff has been compelled to make"). Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

2   (*Compare* Dkt. No. 13, Attach. 21, at ¶ 7 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 7 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML     Document 102     Filed 10/29/24     Page 125 of 160

3    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 8 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 8 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

4    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 9 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 9 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].)

5    Plaintiff attempts to deny what he asserts is an "implication" of the fact asserted by Defendant (specifically, the implication that the term "disciplinary action" means "adequate disciplinary action"). (Dkt. No. 19, at ¶ 10 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman,* 2015 WL 4508362, at *10; *cf. Baity,* 51 F. Supp. 3d at 418; *Goldstick,* 2002 WL 1906029, at *1. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a) (3), which it was not.

6    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 11 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 7 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

7    Plaintiff attempts to deny what he asserts is an "implication" of the fact asserted by Defendant. (Dkt. No. 19, at ¶ 12 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

8    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 13 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *See Aktas v. JMC Dev. Co., Inc.,* 877 F. Supp. 2d 1, 5 n.3 (N.D.N.Y. 2012) (D'Agostino, J.) (accepting the third-party defendants' statement of material facts as true because the defendant/third-party plaintiff failed to respond to it in accordance with Local Rule 7.1[a][3] ). Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "may not be issued" also mean "may not be recommended"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

9    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 16 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 16 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

10    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 17 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas,* 877 F. Supp. 2d at 5 n.3. Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "cultural diversity training" means training that was more than

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 126 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

"brief" and "cursory"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

11    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 18 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 18 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].) Either Plaintiff's denial attempts to challenge what he perceives to be an implication of the term "reinforced" (specifically, the implication that the term means that the training was neither "cursory" nor "inadequate"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

12    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 19 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas, 877 F. Supp. 2d at 5 n.3.* Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "cultural diversity training" mean training that was "adequate"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

13    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 20 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 20 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].) While Plaintiff asserts that his claims in "the lawsuit" were for racial discrimination, he does not identify which lawsuit he is referencing, nor does he cite record evidence that precludes the possibility that *other* allegations (i.e., allegations of sexual discrimination and retaliation) were made in the 1997 and 2004 actions. In any event, the allegations in the above-stated fact are listed in the disjunctive, rendering the above-stated fact true (given that Plaintiff's current action asserts claims of not only of racial discrimination but also of sexual discrimination and retaliation).

14    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 21 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing ¶ 17 of Rhinehart Aff., which establishes above-stated fact] *with* Dkt. No. 19, at ¶ 21 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact "in part".].) Plaintiff denies the fact asserted by Defendant "in part" on the ground that his "initial lawyer withdraw and black deputies were left without representation leaving them procedurally vulnerable." This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas, 877 F. Supp. 2d at 5 n.3.* Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted (specifically, the implication that Plaintiff was at all times represented by counsel during the proceeding), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

15    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 22 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing ¶ 17 instead of ¶ 18 of Rhinehart Aff., which cites record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 22 [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact]; *see also Barksdale v. Onondaga Cty. Sheriff's Dep't,* 04-CV-0828, Am. Compl. at ¶¶ 97-107 [N.D.N.Y. filed Aug. 5, 2004] [supporting above-stated fact].)

16    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 23 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing ¶ 18 instead of ¶ 19 of Rhinehart Aff., which establishes above-stated fact] *with* Dkt. No. 19, at ¶ 23 [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact]; *see also Barksdale v. Onondaga*

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 127 of 160

*Cty. Sheriff's Dep't*, 04-CV-0828, Am. Compl. at ¶¶ 34-39, 97-107 [N.D.N.Y. filed Aug. 5, 2004] [supporting above-stated fact].)

17    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 27 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 27 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].)

18    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 31 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 31 [Plf.'s Rule 7.1 Response, admitting above-stated fact "in part"].) In addition to his admission of the fact asserted by Defendant "in part," Plaintiff states that, "even with reporting the incidents[,] to Plaintiff's knowledge there was no investigation into the events." Any partial denial by Plaintiff is ineffective for each of four alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas, 877 F. Supp. 2d at 5 n.3.* Third, either the response attempts to challenge what Plaintiff perceives to be an implication of the fact asserted (specifically, the implication that a "report" of the incident necessarily involves an "investigation" of the incident), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order. Fourth, in any event, in support of his additional factual assertion, Plaintiff cites a paragraph of his affidavit which is expressly qualified by a lack of personal knowledge. (Dkt. No. 18, Attach. 1, at ¶ 25.)

19    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 33 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 33 [Plf.'s Rule 7.1 Response, admitting above-stated fact "in part"].) In addition to his admission of the fact asserted by Defendant "in part," Plaintiff states that "no effort was made to address the racial nature of the evidence which occurred concerning Plaintiff." Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas, 877 F. Supp. 2d at 5 n.3. Aktas, 877 F. Supp. 2d at 5 n.3.* Third, either the response attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the "direct[ion]" by Sergeant Ames involved an "effort ... to address the racial nature of the events which occurred concerning Plaintiff"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

20    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 34 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 34 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) The Court notes that, in paragraph 26 of an affidavit sworn to on May 16, 2016, Plaintiff asserts that (1) after the mail incident occurred, "[t]he racial harassment continued" and the picture incident occurred, and (2) "White deputies in my unit ... [continue to] say things to me that [are] inappropriate," such as " 'Let me give you my dollar now' " (referencing the dollar in damages that he was awarded by a jury in his second employment civil rights action). (Dkt. No. 18, Attach. 1, at ¶ 26.) With regard to the first assertion, even read with the utmost of special liberality, the assertion means merely that the racial harassment continued until the picture incident occurred. With regard to the second assertion, for the sake of brevity, the Court will not address the issue of, without being accompanied by something else, the statement "Let me give you my dollar now" is racial harassment. More important is that, on page 18 of his deposition taken on November 25, 2015, in response to the question, "[The harassment continued] [f]rom the day after the judgment until

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 128 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

present?" Plaintiff testified, "Well, now people pretty much stay—you get little comments, you know, but a long time in taking a toll." (Dkt. No. 13, Attach. 4, at 19 [attaching page "18" of Plf.'s Depo. Tr.].) Of course, as pointed out by Defendant, to the extent that Plaintiff attempts in his affidavit to contradict his deposition testimony, he may not do so. *Mack v. United States,* 814 F.2d 120, 21 (2d Cir. 1987).

21   (*Compare* Dkt. No. 13, Attach. 21, at ¶ 35 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 35 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact "in part"].) In addition to his denial of the variation of the fact asserted by Defendant "in part," Plaintiff states that "Plaintiff's shift had not started yet, and no order to him should have been made." Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas,* 877 F. Supp. 2d at 5 n.3. Second, either the response attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the order was made during Plaintiff's shift), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order. Third, Plaintiff's account of events in his affidavit contradict his own written report, in which he stated that Sgt. B gave Plaintiff the order "seconds after I had punched in...." (Dkt. No. 13, Attach. 11, at 2.) Moreover, even by Plaintiff's own account of events, after he received the order approximately five minutes before his shift started, he spent approximately three to five minutes finishing his conversation with his mother on his cell phone, and then (after spending some time trying to talk to Sgt. B) *still* refused to comply with the order. (Dkt. No. 13, Attach. 4, at 51-56 [attaching pages "50" through "55" of Plf.'s Depo. Tr.]; Dkt. No. 18, Attach. 1, at ¶ 56 [Plf.'s Affid.].) The Court notes that, to the extent that Plaintiff attempts in his affidavit to contradict his deposition testimony, he may not do so.

22   (*Compare* Dkt. No. 13, Attach. 21, at ¶ 36 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 36 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Setting aside the lack of a citation to record evidence actually supporting a denial of the above-stated fact, the Court notes that the citations provided by Plaintiff are to portions of his affidavit that regard his assertion that the order was made before the start of his shift, which is ineffective for the reasons stated above in note 21 of this Decision and Order.

23   (*Compare* Dkt. No. 13, Attach. 21, at ¶ 37 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 37 [Plf.'s Rule 7.1 Response, denying variation of the above-stated fact but failing to cite record evidence actually supporting denial].) Setting aside the lack of a citation to record evidence actually supporting a denial of the variation of the above-stated fact, the Court notes that the citations provided by Plaintiff are to portions of his affidavit that regard his assertion that the order was made before the start of his shift, which is ineffective for the reasons stated above in note 21 of this Decision and Order.

24   (*Compare* Dkt. No. 13, Attach. 21, at ¶ 38 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 38 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].)

25   (*Compare* Dkt. No. 13, Attach. 21, at ¶ 39 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 38 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].)

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 129 of 160

26    Plaintiff attempts to deny what he asserts is an "implication" of the fact asserted by Defendant (specifically, the implication that the word "accusations" means "new accusations"). (Dkt. No. 19, at ¶ 40 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

27    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 41 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 33 [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact "in part"].) Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas*, 877 F. Supp. 2d at 5 n.3. *Aktas*, 877 F. Supp. 2d at 5 n.3. Third, even if Plaintiff's response could be construed as a partial denial of a specific fact, it fails to cite record evidence actually supporting a denial of the above-stated fact and indeed cites record evidence that supports the above-stated fact. The Court notes that, to the extent that Plaintiff attempts in his affidavit to contradict his deposition testimony, he may not do so.

28    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 42 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 42 [Plf.'s Rule 7.1 Response, denying part of a variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports above-stated fact].) Setting aside the lack of a citation to record evidence actually supporting a denial of part of the above-stated fact, the Court notes that Plaintiff does not expressly deny the remainder of the fact asserted by Defendant, as required under Local Rule 7.1(a)(3).

29    After expressly admitting the fact asserted by Defendant, Plaintiff attempts to assert another fact. (Dkt. No. 19, at ¶ 44 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted. *Washington*, 2009 WL 1585947, at *1 n.2; *CA, Inc.*, 2015 WL 1611993, at *2 n.3. The additional fact that Plaintiff attempts to assert will be ignored for each of two alternative reasons stated above in note 1 of this Decision and Order. First, to the extent that it attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, an implication that the writing and submission of the report was wholly without instruction from Lt. Raus), that attempt is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

30    (*Compare* Dkt. No. 13, Attach. 46, at ¶ 7 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 46 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].)

31    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 49[i] [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas*, 877 F. Supp. 2d 1, 5 n.3. Second, even if Plaintiff's response could be construed as a partial denial of a specific fact, it fails to cite record evidence actually supporting such a denial and indeed cites record evidence that supports the above-stated fact.

32    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 49[iii] [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 49[iii] [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact "in part"].) In addition to his admission of a variation of

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 130 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

the fact asserted by Defendant "in part," Plaintiff states, "Plaintiff did report this incident." Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas,* 877 F. Supp. 2d at 5 n.3. Third, to the extent Plaintiff asserts that he eventually complained about this incident a year after the incident, that assertion is taken into account in the variation adopted by the Court.

33    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 49[v] [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 49[iv] [Plf.'s Rule 7.1 Response, admitting variation of above-stated fact "in part"].) Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas,* 877 F. Supp. 2d at 5 n.3. Third, even if Plaintiff's response could be construed as a partial denial of a specific fact, it fails to cite record evidence actually supporting such a denial and indeed cites record evidence that supports the above-stated fact.

34    After expressly admitting the fact asserted by Defendant, Plaintiff attempts to assert another fact. (Dkt. No. 19, at ¶ 50 [Plf.'s Rule 7.1 Response].) The fact asserted by Defendant will be deemed admitted. *Washington,* 2009 WL 1585947, at *1 n.2; *CA, Inc.,* 2015 WL 1611993, at *2 n.3. Setting aside that the additional fact that Plaintiff attempts to assert follows an express admission, the additional fact will be ignored for each of two alternative reasons. First, to the extent that it attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "investigated" means "investigated adequately"), the attempt is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman,* 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

35    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 51 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of three alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas,* 877 F. Supp. 2d 1, 5 n.3. Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "interviewing both Plaintiff and Sgt. B as well as several other members of the Transport Unit" means that Plaintiff sat in on the interviews of the other persons referenced, and the implication that the sentence somehow means that Plaintiff's fellow deputies were *not* "set on a mission by Lt. Raus to sabotage him"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order. Third, the record evidence cited by Plaintiff supports, *at most,* the second fact asserted by him, not the first.

36    Plaintiff denies the fact asserted by Defendant "in part." (Dkt. No. 19, at ¶ 52 [Plf.'s Rule 7.1 Response].) This partial denial is ineffective for each of two alternative reasons. First, it fails to specify which part of the fact is denied as required by Local Rule 7.1(a)(3). *Aktas,* 877 F. Supp. 2d 1, 5 n.3. Second, either the partial denial attempts to challenge what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "strongly denied" means "correctly denied"), which is insufficient to create a genuine dispute of material fact, or it attempts to assert an additional material fact that the non-movant contends is in dispute, which must be asserted in a separately numbered paragraph (but was not). *See, supra,* note 1 of this Decision and Order.

37    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 56 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 56 [Plf.'s Rule 7.1 Response, denying variation of above-stated fact but failing to cite record evidence that supports denial or controverts

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 131 of 160

above-stated fact].) The Court notes that the record evidence cited by Plaintiff appears to challenge what he perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "addressed" means "addressed to Plaintiff's satisfaction"). As stated above in note 1 of this Decision and Order, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10.

38    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 57 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 57 [Plf.'s Rule 7.1 Response, denying part of variation of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact and indeed citing record evidence that supports denial of above-stated fact].)

39    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 59 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 59 [Plf.'s Rule 7.1 Response, denying above-stated fact but failing to cite record evidence actually supporting such denial].) The Court notes that the record evidence cited by Plaintiff appears to attempt to assert additional material facts that he contends are in dispute. As stated above in note 1 of this Decision and Order, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

40    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 60 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 60 [Plf.'s Rule 7.1 Response, denying perceived implication of part of above-stated fact but failing to cite record evidence actually supporting denial of above-stated fact].) Plaintiff's response denies what he perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "investigated" means "adequately investigated"). As stated in note 1 of this Decision and Order, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. *Yetman*, 2015 WL 4508362, at *10. Moreover, the Court notes that the record evidence cited by Plaintiff does not actually support his assertion that the investigation was not adequate, but supports an assertion that the *discipline* was not adequate (a fact that was never asserted by Defendant).

41    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 61 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] *with* Dkt. No. 19, at ¶ 61 [Plf.'s Rule 7.1 Response, denying part of variation of above-stated fact but failing to cite record evidence that supports denial or controverts above-stated fact].) The Court notes that the affidavit cited by Plaintiff in his response speculates that Sgt. Marshall "must have watched" the prior portion(s) of the video in which the racial slur was also repeated. (Dkt. No. 18, Attach. 1, at ¶ 72 [Plf.'s Affid., stating that Sgt. Marshall "must have watched the entire thing"].) However, that testimony, which is based on a lack of personal knowledge, is inadmissible.

42    (*Compare* Dkt. No. 13, Attach. 21, at ¶ 62 [Def.'s Rule 7.1 Statement, asserting and supporting above-stated fact] *with* Dkt. No. 19, at ¶ 62 [Plf.'s Rule 7.1 Response, admitting above-stated fact "in part"].) Any partial denial by Plaintiff is ineffective for each of three alternative reasons. First, it fails to expressly state that any part of the fact is denied as required by Local Rule 7.1(a)(3). Second, it fails to specify which part of the fact is denied as also required by Local Rule 7.1(a)(3). *Aktas*, 877 F. Supp. 2d at 5 n.3. Third, the record evidence cited by Plaintiff does not actually controvert the fact that Sgt. Marshall addressed the incident; rather, it appears to challenge the timeliness and adequacy of Sgt. Marshall's response. However, Plaintiff's challenge to the timeliness of Sgt. Marshall's response is not based on personal knowledge but mere speculation, as discussed above in note 41 of this Decision and Order. Moreover, his challenge to the adequacy of Sgt. Marshall's response is a challenge to what Plaintiff perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the word "addressed" means "adequately addressed"). As stated above in note 1 of this Decision and Order, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1, and any additional material fact that a non-movant

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 132 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)
(3), which it was not.

43    Plaintiff attempts to deny what he perceives to be an implication of the fact asserted by Defendant (specifically, the implication that the words "was issued a supervisor's memorandum" means "was adequately disciplined"). (Dkt. No. 19, at ¶ 63 [Plf.'s Rule 7.1 Response].) This denial is ineffective for each of the two alternative reasons stated above in note 1 of this Decision and Order. First, a challenge to an implied fact is insufficient to create a genuine dispute of material fact for trial under Local Rule 7.1. Yetman, 2015 WL 4508362, at *10. Second, any additional material fact that a non-movant contends is in dispute must be asserted in a separately numbered paragraph pursuant to Local Rule 7.1(a)(3), which it was not.

44    (Compare Dkt. No. 13, Attach. 21, at ¶ 64 [Def.'s Rule 7.1 Statement, asserting variation of above-stated fact and citing record evidence establishing above-stated fact] with Dkt. No. 19, at ¶ 64 [Plf.'s Rule 7.1 Response, denying part of variation of above-stated fact but failing to cite record evidence that controverts above-stated fact].)

45    As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).

46    Cusamano v. Sobek, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

47    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

48    See, e.g., Beers v. GMC, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3] ); Devito v. Smithkline Beecham Corp., 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

49    (Dkt. No. 18, Attach. 1, at ¶ 11 [Plf.'s Affid.].)

50    (Dkt. No. 18, Attach. 1, ¶¶ 6, 20, 21 [Plf.'s Affid.].)

51    (Dkt. No. 18, Attach. 1, at ¶¶ 6, 74 [Plf.'s Affid.].)

52    (Dkt. No. 18, Attach. 1, ¶¶ 20-23, 75 [Plf.'s Affid.].) Indeed, the Court notes that Plaintiff admits that such sexual jokes are made while both males and females are present, and that on one occasion a female deputy overheard one of the sexual jokes. (Dkt. No. 18, Attach. 1, at ¶ 75 [Plf.'s Affid.].)

53    (Dkt. No. 18, Attach. 1, ¶¶ 6, 8, 10 [Plf.'s Affid.]; cf. Dkt. No. 13, Attach. 4, at 68 [attaching page "67" of Plf.'s Depo. Tr., stating the "first time" he was given the "polish handshake" was "[b]ack in 2008, 2009" by Deputy A].)

54    (Dkt. No. 18, Attach. 1, ¶¶ 6, 8 [Plf.'s Affid.].)

Case 9:21-cv-00949-MAD-ML   Document 102   Filed 10/29/24   Page 133 of 160

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

55     (Dkt. No. 18, Attach. 1, ¶¶ 6, 10, 12 [Plf.'s Affid.].)

56     The Court notes that this misconduct was not alleged in Plaintiff's Complaint; and, despite being asked for in Defendant's interrogatory responses, it was not asserted in Plaintiff's interrogatory responses. (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 13, Attach. 6, at 3 [Plf.'s Interrogatory Response Nos. 3, 7].) However, it was subsequently asserted during Plaintiff's deposition. (*See, e.g.,* Dkt. No. 13, Attach. 4, at 22, 33, 67-69, 123, 143 and 152 [attaching pages "21," "32," "66," "67," "68," "122," "142," and "151" of Plf.'s Depo. Tr.].) While the Court disapproves of such a litigation practice, it will not preclude this late-blossoming deposition testimony absent a motion to preclude it.

57     (Dkt. No. 18, Attach. 1, ¶ 27 [Plf.'s Affid.].)

58     (Dkt. No. 18, Attach. 1, at ¶¶ 6, 10 [Plf.'s Affid.].) The Court renders this finding with some reservation, because Plaintiff's witnessing of the almost-daily misconduct by Deputy A was not alleged in Plaintiff's Complaint; and, despite being asked for in Defendant's interrogatories, it was not asserted in Plaintiff's interrogatory responses. (*See generally* Dkt. No. 1 [Plf.'s Compl.]; Dkt. No. 13, Attach. 6, at 3 [Plf.'s Interrogatory Response Nos. 3, 7].) Nor has Plaintiff pointed to any page of his deposition transcript in which he testified that he witnesses Deputy A give other deputies the "polish handshake" on an almost-daily basis. Rather, he testified in his deposition that he witnessed *Deputy B* engage in such conduct. (Dkt. No. 13, Attach. 4, at 33 [attaching page "32" of Plf.'s Depo. Tr.].) Moreover, he testified that the experience of witnessing such conduct did not bother Plaintiff: "I witnessed [Deputy B] touch other people.... But as long as it wasn't happening to me I was okay." (Dkt. No. 13, Attach. 4, at 33 [attaching page "32" of Plf.'s Depo. Tr.].) However, the Court reads Plaintiff's deposition testimony as referring to his experience of witnessing other deputies receiving a "polish handshake" from Deputy B, *before* Plaintiff himself received a "polish handshake" from Deputy A. Again, while the Court disapproves of the practice of adducing late-blossoming affidavit testimony, the Court will not preclude this particular piece of testimony under the circumstances absent a motion to preclude it.

59     (Dkt. No. 18, Attach. 1, ¶ 27 [Plf.'s Affid.].)

60     (Dkt. No. 18, Attach. 1, at ¶¶ 49-51 [Plf.'s Affid.]; Dkt. No. 13, Attach. 11, at 2 [attaching Ex. C-1 to Caiella Affid.]; Dkt. No. 13, Attach. 11, at 7 [attaching Ex. C-4 to Caiella Affid.].)

61     (Dkt. No. 18, Attach. 1, at ¶ 51 [Plf.'s Affid.].)

62     (Dkt. No. 18, Attach. 1, at ¶ 64 [Plf.'s Affid.].)

63     (Dkt. No. 13, Attach. 16, at 4-5 [Ex. H to Caiella Affid.].)

64     (Dkt. No. 18, Attach. 1, at ¶ 65 [Plf.'s Affid.].)

65     (Dkt. No. 18, Attach. 1, at ¶¶ 6, 10 [Plf.'s Affid.].)

66     The Court notes that, while Plaintiff asserts that witnessing the alleged misconduct re-victimizes him, the last time that he received a so-called "polish handshake" was, by his own account, in 2000-2001 (or perhaps 2008-2009).

67     The Court notes that Plaintiff acknowledges that, after he filed the above-described report (of which he does not have a copy), the conduct stopped happening to him. (Dkt. No. 13, Attach. 4, at 71-72 [attaching pages "70" and "71" of Plf.'s Depo. Tr.].)

68     (Dkt. No. 18, Attach. 1, at ¶ 10 [Plf.'s Affid.].)

Willis v. County of Onondaga, Not Reported in Fed. Supp. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 134 of 160

69    The Court notes that Plaintiff acknowledges that, in 2007-2008, in response to being told by Deputy W to "scratch" his balls, Plaintiff grabbed Deputy W's groin and pulled. (Dkt. No. 18, Attach. 1, ¶ 18 [Plf.'s Affid.].) This fact would appear to make it even less reasonable to hold Defendant liable for failing to intuit Plaintiff's feeling of vicarious victimization.

70    (Dkt. No. 18, Attach. 1, at ¶¶ 25-26 [Plf.'s Affid.].)

71    (Dkt. No. 18, Attach. 1, at ¶¶ 25-26 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 171, 173, 175 [attaching pages "169," "171" and "173" of Plf.'s Depo. Tr.].)

72    (Dkt. No. 18, Attach. 1, at ¶¶ 43-46 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 198-99 [attaching pages "196" and "197" of Plf.'s Depo. Tr.].)

73    (Dkt. No. 18, Attach. 1, at ¶¶ 53-55 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 38-39 [attaching pages "36" and "37" of Plf.'s Depo. Tr.].)

74    (Dkt. No. 18, Attach. 1, at ¶¶ 49-51 [Plf.'s Affid.]; Dkt. No. 13, Attach. 11, at 2 [attaching Ex. C-1 to Caiella Affid.]; Dkt. No. 13, Attach. 11, at 7 [attaching Ex. C-4 to Caiella Affid.]; Dkt. No. 13, Attach. 4, at 99 [attaching page "97" of Plf.'s Depo. Tr.].)

75    (Dkt. No. 18, Attach. 1, at ¶ 63 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 201-03 [attaching pages "199" through "201" of Plf.'s Depo. Tr.].)

76    (Dkt. No. 18, Attach. 1, at ¶ 51 [Plf.'s Affid.].)

77    (Dkt. No. 18, Attach. 1, at ¶¶ 56-61 [Plf.'s Affid.].)

78    (Dkt. No. 13, Attach. 16, at 4-5 [Ex. H to Caiella Affid.].)

79    (Dkt. No. 18, Attach. 1, at ¶ 65 [Plf.'s Affid.].)

80    (Dkt. No. 18, Attach. 1, at ¶ 70 [Plf.'s Affid.].)

81    (Dkt. No. 18, Attach. 1, at ¶ 19 [Plf.'s Affid.].)

82    (Dkt. No. 18, Attach. 1, at ¶ 48 [Plf.'s Affid.]; Dkt. No. 13, Attach. 4, at 37-38 [attaching pages "35" and "36" of Plf.'s Depo. Tr.].)

83    *See, supra,* Fact Nos. 45, 50, 51, 53-55, 58, 60 in Part I.B. of this Decision and Order. (*See also* Dkt. No. 13, Attach. 10 [Exs. B-1 through B-14 to Caiella Affid.]; Dkt. No. 13, Attach. 11 [Exs. C-1 through C-18 to Caiella Affid.]; Dkt. No. 13, Attach. 12 [Ex. D to Caiella Affid.]; Dkt. No. 13, Attach. 13 [Ex. E to Caiella Affid.]; Dkt. No. 13, Attach. 14 [Ex. F to Caiella Affid.]; Dkt. No. 13, Attach. 15 [Ex. G to Caiella Affid.]; Dkt. No. 13, Attach. 16 [Ex. H to Caiella Affid.]; Dkt. No. 13, Attach. 17 [Ex. I to Caiella Affid.]; Dkt. No. 13, Attach. 18 [Ex. J to Caiella Affid.].)

84    *See, supra,* Fact Nos. 32, 33, 47, 55, 56, 62, 63 in Part I.B. of this Decision and Order.

85    The Court notes that *all* claims must be liberally construed. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). It is only claims by *pro se* litigants (or civil rights litigants) that must be *extra-liberally* construed, that is, construed with special solicitude or special leniency. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619 (2d Cir. 1999); *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).

86    *See Hochroth v. William Penn Life Ins. Co. of New York*, 03-CV-7286, 2003 WL 22990105, at *2 (S.D.N.Y. Dec. 19, 2003) ("It is well established that the plaintiff is the 'master of his complaint' and may characterize his causes of action as he pleases.").

87    *See, supra,* note 49 of this Decision and Order.

88    This conclusion is especially reasonable when one considers Plaintiff's experience of suffering the consequences, in a prior action before the undersigned, of failing to assert a claim of sexual harassment in his EEOC complaint. *Willis v. Onondaga Cty. Sheriff's Dep't*, 04-CV-0828, Minute Entry for Day 1 of Jury Trial (N.D.N.Y. filed Feb. 22, 2010).

---

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1039581
Only the Westlaw citation is currently available.

***NOT FOR PUBLICATION***

United States Bankruptcy Court, S.D. New York.

IN RE: Asher HOROWITZ, Debtor.

Burberry Limited and Burberry USA, Defendant.

v.

Asher Horowitz, Defendant.

Case No. 14–36884 (CGM)

|

Adv. No. 15–09002 (CGM)

|

Signed March 14, 2016

|

Filed March 15, 2016

**Attorneys and Law Firms**

Reich Reich & Reich, P.C., 235 Main Street, Suite 450, White Plains, N.Y. 10601, Counsel for Plaintiffs, By: Jeffrey A. Reich

Eric Streich, P.C., 235 Main Street, Suite 420, White Plains, N.Y. 10601, Co-counsel for Plaintiffs, By: Eric Streich

Genova & Malin, Attorneys, The Hampton Center, 1136 Route 9, Wappingers Falls, N.Y. 12590–4332, Counsel for Defendant, By: Andrea B. Malin Thomas Genova

### MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CECELIA G. MORRIS, CHIEF UNITED STATES BANKRUPTCY JUDGE

**\*1** Before the Court is Burberry Limited and Burberry USA's (collectively "Burberry" or "Plaintiff") motion for summary judgment on Plaintiff's first, fourth and fifth causes of action, seeking determinations of dischargeability. *See* Compl. ¶¶ 54–89, Feb. 6, 2015, ECF No. 1; Pl.'s Mot. Summ. J. 1, Nov. 23, 2015, ECF No. 15 ("Pl.'s Mot."). [1] On summary judgment, Plaintiff asserts it is owed a non-dischargeable debt by Defendant Asher Horowitz ("Debtor" or "Defendant"), pursuant to 11 U.S.C. § 523(a)(6). *See* Pl.'s Mot. 1. In the alternative, Plaintiff seeks a global denial of discharge under

11 U.S.C. § 727(a)(2)(A) or § 727(a)(4)(A). *See id.* For the following reasons, the Court grants Plaintiff's motion for summary judgment on the grounds that Defendant's debt to Plaintiff is non-dischargeable under § 523(a)(6).

### Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and the Standing Order of Reference signed by Chief Judge Loretta A. Preska dated January 31, 2012. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I), "determinations as to the dischargeability of particular debts" and (J), "objections to discharges[.]"

### Background

On September 15, 2014, Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. *See* Petition, *In re Horowitz,* No. 14–36884 (Bankr.S.D.N.Y. Sept. 15, 2014), ECF No. 1. The last day to file any objections to discharge was July 9, 2015. *See* Stip., *In re Horowitz,* No. 14–36884, ECF No. 39. On February 6, 2015, Plaintiff filed a complaint against the Defendant, seeking a determination of the dischargeability of particular debt and Defendant's eligibility for discharge. Compl. ¶¶ 54–89.

Plaintiff "is an international luxury brand involved in the design, manufacture, advertising, distribution and sale of high quality apparel and accessories under its principal trademarks...." Pl.'s Statement of Facts ¶ 1, Nov. 23, 2015, ECF No. 15–28 ("Pl.'s SMF"). [2] Before filing for bankruptcy, Defendant operated an unincorporated, online retail business under the name Designers Imports. *See* Pl.'s SMF ¶¶ 2, 4 (citing Pl.'s Mot. Ex. B, at 2, Ex. C, Ex. D, at ¶¶ 18–21). While operating Designers Imports, Defendant "violated Burberry's intellectual property rights by selling counterfeit Burberry merchandise on his website," www.designersimports.com. *Id.* at ¶¶ 2–3 (citing Pl.'s Mot. Ex. B, at 5). On March 29, 2005, Defendant, on behalf of himself and Designers, entered into a settlement agreement with Burberry. *Id.* at ¶ 5 (citation omitted); *see also* Pl.'s Mot. Ex. C, at ¶ 6.2, 10–11. In the settlement, Defendant promised that he had ceased purchasing merchandise from verified counterfeit sources and further agreed not to knowingly infringe on Burberry's trademarks in the future. *See* Pl.'s Mot. Ex. C, at ¶¶ 2.1–2.6. After Defendant executed the settlement agreement with Burberry, Defendant incorporated his retail company under

the name Designers Imports, Inc. ("Designers"). Pl.'s SMF at ¶ 7 (citing Pl.'s Mot. Ex. F, at ¶¶ 19–21). Defendant was the sole shareholder of Designers. *Id.* at ¶ 8 (citing Pl.'s Mot. Ex. F, at ¶ 18).

**\*2** Despite entering into the settlement agreement, Defendant continued to purchase and sell counterfeit Burberry goods through his website. Pl.'s SMF ¶ 6 (citing Pl.'s Mot. Ex. E, at 12); *see also* Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 7, 2007, more than two years after entering into the settlement agreement, Burberry notified Defendant that Designers was the subject of an ongoing investigation by the United States Customs and Border Protection. Pl.'s Mot. Ex. G, at 2, 5, 7, 9. On May 22, 2007, Burberry filed a complaint in the United States District Court for the Southern District of New York against Designers (the "First Federal Action"). Pl.'s SMF ¶ 10 (citing Pl.'s Mot. Ex. H). Burberry made claims for trademark counterfeiting and infringement, false designation of origin and dilution, breach of the settlement agreement, trademark infringement and unfair competition under New York common law, and asserted a likelihood of injury to business reputation as well as deceptive acts and practices under the New York General Business Law. *Id.* at ¶ 11 (citing Pl.'s Mot. Ex. H).

After a trial in the First Federal Action, the court issued a decision finding Designers committed willful trademark infringement "based on its conduct spanning several years during which Defendant repeatedly sold a variety of counterfeit Burberry merchandise." *Burberry Ltd. v. Designers Imps., Inc.,* 2010 U.S. Dist. LEXIS 3605, at \*13 (S.D.N.Y. Jan. 19, 2010). The federal court found Designers liable for $1,500,000.00 in statutory damages, plus reasonable attorneys' fees and costs. *Id.* at \*32. In a *nunc pro tunc* Amended Final Judgment and Permanent Injunction ("Amended Final Judgment"), filed on July 29, 2010, the federal court set the final amount of damages at $2,592,070.89 and permanently enjoined Designers from infringing on Burberry trademarks. Pl.'s Mot. Ex. I.

On February 3, 2010, prior to the entry of the Amended Final Judgment, Defendant incorporated a new company, RTC Fashion Inc. ("RTC"), and created a new website. Pl.'s SMF ¶¶ 22–23 (citing Pl.'s Mot. Ex. B, at 2, Ex. J). Designers itself ceased to do business on February 26, 2010, before the federal court issued the Amended Final Judgment. *Id.* at ¶ 27 (citing Pl.'s Mot. Ex. L, at 66:2–5). Instead, on May 4, 2010, Defendant leased the old Designers' website to RTC for $500 a year. *Id.* at ¶ 29 (citing Pl.'s Mot. Ex. M). RTC continued to

sell designer clothes and accessories through the new website. *Id.* at ¶ 24; *Burberry Ltd. v. RTC Fashion Inc.,* No. 110615/11, 2014 N.Y. Slip Op. 31232(U), at 2 (N.Y.Sup.Ct. May 9, 2014) ("*RTC*").

On September 16, 2011, Burberry filed a state court action (the "State Action") against RTC and Defendant personally, with its first cause of action seeking to pierce Designers' corporate veil to impose personal liability on Defendant "for the unsatisfied amount of the judgment entered in the Federal Action against Designers in the sum of $2,591,778.49." Pl.'s SMF ¶¶ 30–31 (citing Pl.'s Mot. Ex. N); *see also RTC,* 2014 N.Y. Slip Op. at 2. On May 9, 2014, the state court awarded summary judgment to Burberry on its first cause of action. *RTC,* 2014 N.Y. Slip Op. at 3. The state court saw fit to pierce the corporate veil, determining that "as a matter of law, equity will intervene to pierce the corporate veil and permit the imposition of personal liability in order to avoid fraud or injustice...." *Id.* (internal citation and quotation marks omitted).

Prior to the state court's final determination, Plaintiff filed a second federal action (the "Second Federal Action") against Defendant in his personal capacity. *See* Def.'s Mem. Law in Opp'n 7, Jan. 19, 2016, ECF No. 25; Pl.'s Reply 5, Feb. 16, 2016, ECF No. 33; Def.'s Opp'n SMF Ex. B, at 1. In the Second Federal Action, Burberry sought a judgment that Defendant had personally committed willful trademark infringement by selling the same counterfeit products from the First Federal Action. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43 (2d Cir. 2013). On appeal, the Second Circuit held that the Second Federal Action was barred on *res judicata* grounds. *Id.* at 46–47.

**\*3** Before this Court, Plaintiff alleges that Defendant's personal liability on Designers' debt to Burberry for willful trademark infringement is non-dischargeable under 11 U.S.C. § 523(a)(6), as a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Pl.'s Mot. 8–11; 11 U.S.C. § 523(a)(6). Plaintiff claims summary judgment is appropriate under 11 U.S.C. § 523(a) (6) based on collateral estoppel grounds. Pl.'s Mot. 5–10. Plaintiff asserts that the First Federal Action found Designers willfully violated the Lanham Act and further found the elements necessary to establish maliciousness in the § 523(a) (6) context. *Id.* at 8–11. Defendant contends the State Court Action holds Defendant personally liable for the debts of Designers so as to satisfy 11 U.S.C. § 523(a)(6)'s requirement that the injury be caused by the Debtor. Pl.'s Reply 7–8.

In the alternative, Plaintiff seeks to deny the Debtor's discharge pursuant to § 727(a)(2)(A) for transferring, destroying, and/or concealing property within one year of filing the bankruptcy petition, and § 727(a)(4)(A) for making a false oath in connection with the case. Pl.'s Mot. 11–19. Under § 727(a)(2)(A) a discharge may be denied if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate ..., has transferred, removed, destroyed, mutilated, or concealed ... (A) property of the debtor, within one year before the date of the filing of the petition;....

11 U.S.C. § 727(a)(2). Plaintiff argues that Defendant should be denied a discharge under § 727(a)(2)(A) for initially omitting the Designers website and licensing agreement from his assets listed in his bankruptcy schedules, for concealing his interests in certain real property, and for intentionally misrepresenting the nature of a $3,000 transaction. Pl.'s Mot. 11–15.

Plaintiff argues that a global denial of discharge is also warranted under § 727(a)(4)(A), pursuant to which a discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account...." 11 U.S.C. § 727(a)(4)(A). Plaintiff argues Defendant failed to accurately disclose information to the estate, including failing to name certain creditors, and for misrepresenting his income and expenses, all with the intent to defraud his creditors. Pl.'s Mot. 15–19.

In opposition, Defendant states that neither the First Federal Action nor the State Action considered whether Defendant engaged in willful and malicious trademark infringement. Def.'s Mem. Law in Opp'n 2. Defendant contends the First Federal Action only considered whether Designers was liable to Burberry for Designers' willful trademark infringement. Id. at 9. Defendant argues the First Federal Action was only brought against Designers and, as such, is not applicable to Defendant on the issues litigated and decided therein. Id. at 9–10. Defendant asserts that the only action entitled to collateral estoppel is the Second Federal Action, and that it estops Plaintiff from litigating whether Defendant engaged in willful and malicious trademark infringement. Id. at 8–

9. Defendant further argues that the standard for willful trademark infringement is not the same as the standard for willful and malicious injury under § 523(a)(6). Id. at 17–18.

Defendant asserts the State Action only held Defendant personally liable for Designers' damages to the extent they arose out of Defendant's transfer of assets from Designers to RTC. Id. at 13–14. According to Defendant, the State Action's determination to pierce the corporate veil is not enough for collateral estoppel here. Id.

Defendant further opposes the entry of an order denying Defendant a global discharge on the grounds that Plaintiff has not met its burden to show by a preponderance of the evidence that Defendant intended to defraud his creditors by concealing assets, or that Defendant knowingly and fraudulently made a false oath in the Defendant's bankruptcy case. Id. at 19, 25.

### *Discussion*

**\*4** Federal Rule of Civil Procedure 56(a), made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Bankr.P. 7056. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted).

The moving party has the initial burden to establish the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 322–23 (citations omitted). In determining whether the moving party has met this burden, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." Gallo v. Prudential Residential Servs., Ltd. Pshp., 22 F.3d 1219, 1223 (2d Cir. 1994) (citations omitted). To establish the absence of a genuine issue of material fact, the moving party need not support its motion with affidavits. Celotex, 477 U.S. at 323. This is due to the fact that Rule 56 "does not require the moving party to *negate* the elements of the nonmoving party's case...." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990) (quoting Celotex, 477 U.S. at 323).

Once the moving party has shown there are no genuinely disputed material facts, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (citations omitted). On a motion for summary judgment, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A court must grant a motion for summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

Collateral estoppel and the related doctrine of *res judicata* "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (citations omitted). Where there is a final judgment on the merits, *res judicata* prevents the parties from asserting claims based on the same cause of action. *See Montana v. United States,* 440 U.S. 147, 153 (1979) (citations omitted). "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94 (citation omitted). The doctrine of offensive collateral estoppel permits "a plaintiff [to] foreclose a defendant from relitigating an issue the defendant has previously litigated but lost against another plaintiff." *S.E.C. v. Monarch Funding Corp.,* 192 F.3d 295, 303 (2d Cir. 1999) (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 329 (1979)).

Where the standard of proof on the issue in question requires proof by at least a preponderance of the evidence, "a bankruptcy court could properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and that were actually litigated and determined in the prior action." *Grogan v. Garner,* 498 U.S. 279, 284 (1991). In bankruptcy, the party objecting to discharge must prove its claim by a preponderance of the evidence. *See, e.g., Grogan,* 498 U.S. at 286; *In re Renshaw,* 222 F.3d 82, 86 (2d Cir. 2000). Although the standard of proof to prevail on a claim for non-dischargeabilty is a preponderance of the evidence,

"exceptions to discharge are to be narrowly construed and genuine doubts should be resolved in favor of the debtor." *In re Hyman,* 502 F.3d 61, 66 (2d Cir. 2007) (citing *In re Renshaw,* 222 F.3d at 86; *In re Hayes,* 183 F.3d 162, 167 (2d Cir. 1999)).

**\*5** Under 11 U.S.C. § 523(a)(6), a discharge will not be effective against any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity...." To successfully plead a claim for non-dischargeability pursuant to § 523(a)(6), a plaintiff must establish that the debtor "acted willfully in committing the injury," and that the debtor "acted maliciously in committing the injury." *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar*), 368 B.R. 120, 127 (Bankr. E.D.N.Y. 2007) (citations omitted). The Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger,* 523 U.S. 57, 61 (1998). The requirement that the injury be willful "may be satisfied if the debtor had actual knowledge that he or she was violating the law and the intent to bring about injury." In re Akhtar, 368 B.R. at 127–28.

The Second Circuit has interpreted malicious to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996) (citations omitted). Malice may be implied based on the surrounding circumstances, or found constructively. *Ball,* 451 F.3d at 69 (citations omitted); *Navistar,* 94 F.3d at 88 (citing *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1164 (11th Cir. 1995); *First Nat'l Bank v. Stanley (In re Stanley),* 66 F.3d 664, 668 (4th Cir. 1995)).

"Malice may be found where the debtor breached a legal duty 'wilfully in the sense of acting with deliberate intent, in circumstances where it is evident that the conduct will cause injury to the plaintiff and under some aggravating circumstance to warrant the denial of a discharge.' " *Yash Raj Films (USA) v. Ahmed (In re Ahmed),* 359 B.R. 34, 42 (Bankr. E.D.N.Y. 2005) (citations omitted). Courts have found malicious conduct where the Defendant was on notice and yet "continued to infringe the plaintiffs' copyrights in spite of, and indeed in defiance of numerous warnings." *In re Ahmed,* 359 B.R. at 42. Additionally, malice may also be implied where "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties

in the ordinary relationships among people, and injurious to another." *Voyatzoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr. E.D.N.Y. 2005) (internal quotations and citations omitted).

Plaintiff alleges that the willful and malicious elements of § 523(a)(6) were decided in the First Federal Action, and that Defendant is now collaterally estopped from relitigating those issues here. "[T]he application of the collateral estoppel doctrine differs based on the forum in which first judgment was entered." *Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 800 (Bankr. E.D.N.Y. 2014). The federal standard for collateral estoppel governs the preclusive effect of a federal decision resolving issues of federal law. *See Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006). Collateral estoppel under federal law requires that "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Purdy v. Zeldes,* 337 F.3d 253, 258 (2d Cir. 2003). The party arguing for the application of collateral estoppel has the burden to establish all four elements. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir. 1995) (citing *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir. 1986)); *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001) (citations omitted).

**\*6** Plaintiff has shown the identity of the issues for willful and malicious injury. To show the identity of the issues, the Court must analyze "whether the issues presented by this litigation are in substance the same as those resolved against the" Defendant previously. *Montana v. United States,* 440 U.S. 147, 155 (1979). The first element is willfulness. Under the Lanham Act, a person is liable for trademark infringement when, without the consent of the trademark holder, that person

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....

15 U.S.C. § 1114(1)(a). Although liability for trademark infringement does not require a finding of willfulness, the statutory damages for willful trademark infringement increase to $2,000,000 per infringement. *See* 15 U.S.C. § 1117(b), (c); *Hermes Int'l v. Kiernan,* 2008 U.S. Dist. LEXIS 70506, at \*10 (E.D.N.Y. Aug. 28, 2008). Willfulness requires a finding that "the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." *Kepner–Tregoe, Inc. v. Vroom,* 186 F.3d 283, 288 (2d Cir. 1999) (quoting *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.,* 996 F.2d 1366, 1382 (2d Cir. 1993)) (internal quotation marks omitted).

Here, the First Federal Action found Designers acted willfully based on Designers' continuing sales of counterfeit Burberry merchandise, despite the fact Burberry "repeatedly placed Defendant on notice that Defendant was violating the trademark law by selling counterfeit Burberry merchandise." *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*13. In making a finding of willfulness, the court further found that Designers had repeatedly and knowingly violated the settlement agreement with Burberry. *Id.* at 25. Additionally, the court determined Designers "willfully failed to investigate the bona fides of Burberry-branded goods it purchased for sale," and failed to implement procedures to prevent the sale of counterfeit merchandise. *Id.* The court also found that Designers was aware Burberry had placed a test order, and instead of filling the order from its own stock, sent Defendant's wife, Mrs. Horowitz, "to an authorized Burberry store to purchase items to fill the order." *Id.* at 26.

The findings in the First Federal Action satisfy the legal definition for willfulness in bankruptcy. Pursuant to the federal standard for willfulness, Designers knew it was violating the law and intended to cause injury to Burberry. *Kawaauhau,* 523 U.S. at 61; *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar),* 368 B.R. 120, 127–28 (Bankr.E.D.N.Y.2007). Burberry had repeatedly put Designers on notice of its illegal conduct, and Designers signed a settlement agreement promising to stop further violations. The federal court found Designers violated this settlement agreement knowingly, and continued to violate the law by selling counterfeit merchandise. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at \*25. Designers failed to implement any security measures to prevent future violations and failed to investigate its purchases of Burberry-branded goods. *Id.* The injury caused by trademark infringement is the act of infringement. *Star's Edge, Inc. v. Braun (In re Braun),* 327 B.R. 447, 451 (Bankr.N.D.Cal.2005). The Ninth

Case 9:21-cv-00949-MAD-ML Document 102 Filed 10/29/24 Page 141 of 160

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Circuit has held that in an action for trademark infringement, "intentional infringement is tantamount to intentional injury under bankruptcy law." *Smith v. Entrepreneur Media, Inc. (In re Smith),* 2009 Bankr.LEXIS 4582, at *26 (B.A.P. 9th Cir. Dec. 17, 2009). Designers intentionally infringed on Burberry's trademark. This is sufficient to constitute a willful injury.

**\*7** Here, malice may be inferred from the First Federal Action's determination that Designers willfully, continually and deliberately infringed on Burberry's trademarks. Designers had repeated notice of its infringement. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at *13. Designers knew that the infringement was "contrary to commonly accepted duties in the ordinary relationships among people," as it had signed a settlement agreement acknowledging its infringement and promising to take steps to refrain from future infringements. *Voyazoglou v. Hambley (In re Hambley),* 329 B.R. 382, 402 (Bankr.E.D.N.Y.2005). Even going beyond intentional infringement, Designers actively tried to deceive and mislead Burberry by falsely filling Burberry's test order with inventory purchased from a legitimate Burberry retailer. *Burberry Ltd.,* 2010 U.S. Dist. LEXIS 3605, at *26. The federal court also found that "[s]ince there was willful infringement and no 'extenuating circumstances,'" Burberry was entitled to attorneys' fees and costs. *Id.* at *30–31. In other words, Designers' conduct was "wrongful and without just cause or excuse...." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996). The elements of willful trademark infringement present the same issues required to show willful and malicious injury under § 523(a)(6). Plaintiff has satisfied its burden to show the identity of the issues for willful and malicious injury under § 523(a)(6).

The Court also finds that Plaintiff has met its burden on the second element required for collateral estoppel under federal law. The issues of willful and malicious injury were actually litigated in the First Federal Action. The Defendant participated in the litigation, and the federal court's determination was the result of a full-fledged trial. *See, e.g., Guggenheim Capital, LLC v. Birnbaum (In re Birnbaum),* 513 B.R. 788, 801 (Bankr. E.D.N.Y. 2014) (internal citations omitted).

The Court finds that Defendant had a full and fair opportunity to litigate the issues of willful and malicious injury in the First Federal Action. In the Second Federal Action, the Second Circuit dismissed the case on *res judicata*

grounds, holding that Defendant and Designers were in privity. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. 41, 43–45 (2d Cir. 2013). The Second Circuit relied on several undisputed facts, including that Defendant was "the sole shareholder of, officer of and decision maker for[ ] the Designers Imports corporation," that Defendant "controlled and directed Designers[ ] Imports['] participation" in the First Federal Action, that Defendant "instructed the corporation's lawyers, made all client decisions for Designer Imports as a litigant in the case, and otherwise controlled the participation of Designers Imports in the lawsuit." *Id.* at 44 (internal citations and quotation marks omitted). It cannot be disputed that Defendant had a full and fair opportunity to litigate the issues underpinning willful and malicious injury in the First Federal Action.

The final element required for collateral estoppel on the issues of willful and malicious injury is that the federal court's findings were necessary to support the Amended Final Judgment. A finding of willful trademark infringement results in increased statutory penalties. *See* 15 U.S.C. § 1117(b), (c). The Amended Final Judgment in the First Federal Action determined the amount of liability based on a finding of willful trademark infringement. *See* Pl.'s Mot. Ex. I. Additionally, the Amended Final Judgment awarded Plaintiff reasonable attorneys' fees and costs based on the finding that there were no extenuating circumstances for Designers' conduct. *See id.*; *see also Burberry,* 2010 U.S. Dist. LEXIS 3605, at *30–31. Defendant does not dispute this element. Accordingly, Plaintiff has met its burden to preclude the relitigation of willful and malicious injury.

Although Defendant had a full and fair opportunity to litigate whether Designers' caused willful and malicious injury in the First Federal Action, the injury must be attributable to Defendant's conduct for the debt to be non-dischargeable under 11 U.S.C. § 523(a)(6). Although Defendant's conduct prior to the settlement agreement with Burberry is not part of the debt at issue here, the First Federal Action found that Defendant, in his individual capacity, sold counterfeit Burberry merchandise through the Designers website, entered into the settlement agreement with Burberry, agreed to cease all counterfeit sales, and paid damages to Burberry. Pl.'s SMF ¶¶ 2–7; *see also* Debtor's Aff. in Opp'n to Summ. J. ¶¶ 3–7, Jan. 21 2016, ECF No. 27–5. The First Federal Action found Designers sold additional counterfeit Burberry merchandise after entering into the settlement agreement, committing willful trademark infringement. *Burberry,* 2010 U.S. Dist. LEXIS 3605, at *10, 13–15, 25–26. To find the damages

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 142 of 160

In re Horowitz, Not Reported in B.R. Rptr. (2016)

ordered by the First Federal Action to be non-dischargeable, Plaintiff must show that the Defendant is collaterally estopped from relitigating the issue of his personal liability based on the State Action.

**\*8** Where the issues to be precluded were determined by a state court, the law of the state where the underlying proceedings took place controls the standard for collateral estoppel. *See* 28 U.S.C. § 1736; *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380 (1985). In New York, "collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo,* 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.,* 482 N.E.2d 63, 67 (N.Y. 1985); *Khandhar v. Elfenbein,* 943 F.2d 244, 247 (2d Cir. 1991)). To establish the identity of the issues, the matter must have been " 'actually litigated and determined' in a prior action." *Kaufman,* 482 N.E.2d at 67 (citations omitted). Further, "the issue that was raised previously must be decisive of the present action." *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir. 2002) (internal citations and quotation marks omitted).

In New York, the proponent of collateral estoppel has the burden to establish the identity of the issues, that the issues were actually litigated and determined, and that they are decisive of the present action. *In re Dunn,* 27 N.E.3d 465, 468 (N.Y.2015) (citations omitted); *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir. 2000). The party opposing collateral estoppel has the burden "to establish the absence of a full and fair opportunity to litigate." *D'Arata v. N.Y. Cent. Mut. Fire Ins. Co.,* 564 N.E.2d 634, 636 (N.Y.1990) (citing *Kaufman,* 482 N.E.2d at 67); *see also Evans,* 469 F.3d at 281–82 (citations omitted).

The Court finds that the Plaintiff has met its burden to show Defendant's personal liability for willful and malicious injury was actually litigated and decided in the State Action, and that the issue is decisive of this non-dischargeability action under § 523(a)(6). Defendant's main argument in opposition is that Defendant's responsibility for Designers' willful and malicious conduct is an issue that has not been previously litigated. Defendant's argument is misplaced. The State Action determined that Defendant controlled Designers to such an extent that Defendant may be held liable for the acts of Designers. *Burberry Ltd. v. RTC Fashion Inc.,* No.

110615/11, 2014 N.Y. Slip Op. 31232(U), at 5 (N.Y.Sup.Ct. May 9, 2014).

The issue of Defendant's culpability for willful and malicious injury was previously litigated and decided by the state court's determination to pierce the corporate veil. As federal courts have recognized, "New York courts have made clear that the veil-piercing standard is demanding. The Court of Appeals has repeatedly emphasized that '[t]hose seeking to pierce a corporate veil ... bear a heavy burden.' " *Am. Federated Title Corp. v. GFI Mgmt. Servs.,* 2015 U.S. Dist. LEXIS 114787, at *29 (S.D.N.Y. Aug. 28, 2015) (internal citations and quotation marks omitted). New York law will permit disregard of the corporate form where there is either "a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties." *Wm. Passalacqua Builders v. Resnick Developers S.,* 933 F.2d 131, 138 (2d Cir. 1991) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir. 1990)). In other words, the corporate veil may "be pierced either when there is fraud or when the corporation has been used as an alter ego...." *ITEL Containers,* 909 F.2d at 703; *see also Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir. 1979).

To pierce the corporate veil in New York based on the alter ego theory of liability, the individual to be held liable must "(1) have exercised such control that the subsidiary 'has become a mere instrumentality' of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Wm. Passalacqua Builders,* 933 F.2d at 138 (citing *Lowendahl v. Baltimore & Ohio R.R. Co.,* 287 N.Y.S. 62 (N.Y.App.Div.1936), *aff'd,* 6 N.E.2d 56 (1936). Per the very language of the standard, a determination of liability based on the alter ego theory is a determination that the party in control is the "real actor." *See id.* "By definition, an alter ego corporation possesses no independent volition." *Lisa Ng v. Adler (In re Adler),* 494 B.R. 43, 53 (Bankr.E.D.N.Y.2013).

**\*9** Here, the state court based its determination to pierce the corporate veil on the alter ego theory of liability. According to the state court, "piercing the corporate veil generally 'requires a showing that the individual defendants 1) exercised complete dominion and control over the corporation, and 2) used such dominion and control to commit a fraud or wrong against the plaintiff which resulted in injury.' " *RTC,* 2014 N.Y. Slip Op. at 3 (quoting *Damianos Realty Group, LLC v. Fracchia,* 825 N.Y.S.2d 274, 276 (N.Y.App.Div.2006)). The state court held that "[Defendant] completely dominated

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 143 of 160

and controlled [Designers], and abused the corporate form to advance his own personal interests." *RTC,* 2014 N.Y. Slip Op. at 5. The state court further held that "Plaintiffs have shown that [Defendant] exercised his control to commit a wrong against the plaintiffs by dissolving Designers assets and transferring its domain name to his new company RTC, thereby rendering Designers incapable to satisfy the Federal Action judgment." *Id.* The state court granted summary judgment on Plaintiff's first cause of action, which it summarized as "piercing the corporate veil, in order to hold [Defendant] liable for the Federal Action judgment." *Id.* at 3.

The state court's determination to pierce the corporate veil was a finding that Defendant was responsible for the prepetition actions of Designers. The State Action found Designers to be an alter ego of Defendant on May 9, 2014, prior to Defendant's bankruptcy filing. *See RTC,* 2014 N.Y. Slip Op. at 6. As a result, and for purposes of conduct attributable to the Debtor under § 523(a)(6), "the Debtor always remained inseparable from th[e] corporate fiction[ ]. The actions and property of [Designers] were thus the actions and property of the Debtor...." *Lisa Ng,* 494 B.R. at 53. The state court's determination to pierce the corporate veil is sufficient for a finding under § 523(a)(6) that Defendant was responsible for willful and malicious injury to Burberry.

Further, the Second Circuit's decision in the Second Federal Action weighs in favor of collateral estoppel on Defendant's personal liability. The Second Circuit found that the veil-piercing claim in the State Action was the appropriate means to impose liability on Defendant. *Burberry Ltd. v. Horowitz,* 534 Fed.Appx. at 46. The Second Circuit dismissed Burberry's Second Federal Case against Defendant, holding that Defendant and Designers had been in privity during the

First Federal Action. *Id.* at 43–45. As previously noted, the Second Circuit relied on Defendant's extensive relationship with Designers in the First Federal Action, including the fact that Defendant directed Designers' lawyers how to proceed. *Id.* at 44. The Second Circuit reasoned that "Burberry has already filed a veil-piercing action in New York state court, through which it seeks to hold Horowitz personally liable for the outstanding federal judgment against Designers Imports. That litigation provides the appropriate vehicle for resolution of Burberry's claims against Horowitz individually." *Id.* According to the Second Circuit, the State Action would determine Defendant's personal responsibility for the injuries inflicted on Burberry. This Court finds that Plaintiff has met its burden to show the issue of Defendant's liability for the conduct at issue was previously litigated, decided, and is decisive of the current dispute under § 523(a)(6).

In the alternative to the non-dischargeability claim under § 523(a)(6), Plaintiff seeks to deny Defendant a global discharge pursuant to § 727(a)(2)(A) or § 727(a)(4)(A). Pl.'s Mot. 1. As the Court has found Defendant's debt to Plaintiff to be non-dischargeable under § 523(a)(6), the Court will not address Plaintiff's alternate arguments at this time.

### Conclusion

For the foregoing reasons, the Plaintiff's motion for summary judgment on its first cause of action is granted. The parties are to submit an order in conformity herewith.

**All Citations**

Not Reported in B.R. Rptr., 2016 WL 1039581

---

### Footnotes

1    Unless otherwise indicated, references to documents filed in this case can be found on the docket of adversary proceeding 15–09002.

2    In response to Plaintiff's Statement of Facts, numbering 76 paragraphs, Defendant's Response to Plaintiff's Undisputed Material Facts ("Defendant's Response Statement"), made only four general types of denials. Defendant "denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in" certain paragraphs of the Plaintiff's Statement of Facts, "denies the allegations contained in," several other paragraphs, "neither denies or admits" paragraphs 11 and 12 of Plaintiff's Statement of Facts, and "neither denies or admits the allegations contained in" the remaining paragraphs of Plaintiff's Statement

In re Horowitz, Not Reported in B.R. Rptr. (2016)

Case 9:21-cv-00949-MAD-ML    Document 102    Filed 10/29/24    Page 144 of 160

of Facts, "as the documents speak for themselves." Def.'s Resp. to Pl.'s Statement of Facts ¶¶ 1–4, Jan. 19, 2016, ECF No. 23 ("Def.'s Resp. SMF").

Local Bankruptcy Rule for the Southern District of New York ("Local Bankruptcy Rule") 7056–1(b) requires a party moving for summary judgment to submit a statement of material facts. Local Bankruptcy Rule 7056–1 also requires that

> (c) Papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short, and concise statement of additional material facts as to which it is contended that there is a genuine issue to be tried.

> (d) Each numbered paragraph in the statement of material facts required to be served by the moving party shall be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

> (e) Each statement by the movant or opponent pursuant to subdivisions (b) or (c) of this rule, including each statement controverting any statement of material fact by a movant or opponent, shall be followed by citation to evidence which would be admissible.

S.D.N.Y. LBR 7056–1(c)–(e). On a motion for summary judgment, denials based on a lack of knowledge or information sufficient to form a belief are insufficient to contest a disputed fact. *See, e.g., Cooper v. New Rochelle,* 925 F.Supp.2d 588, 605 (S.D.N.Y. 2013); *Aztar Corp. v. N.Y. Entm't, LLC,* 15 F.Supp.2d 252, 254 n.1 (E.D.N.Y. 1998) (citing *Toyomenka Pac. Petroleum, Inc. v. Hess Oil V.I. Corp.,* 771 F.Supp. 63, 67 (S.D.N.Y.1991)). Similarly, a response contending to neither admit or deny an allegation does not create a genuine issue of fact. *See, e.g., Universal Calvary Church v. New York,* 2000 U.S. Dist. LEXIS 15153, at *7 n.6 (S.D.N.Y. Oct. 13, 2000) (citations omitted). Statements denying allegations without a citation to any supporting evidence are also insufficient to contest a disputed fact. *See Guglielmo v. Marchon Eyewear, Inc.,* 2006 U.S. Dist. LEXIS 9146, at *1 n.1 (E.D.N.Y. Feb. 15, 2006). Here, Defendant's Response Statement contains denials without citing the record, attempts to deny based on lack of knowledge or information and neither admits nor denies a variety of factual statements. As such, these purported "denials" do not suffice to create a genuine dispute of material fact.

In addition to Defendant's Response Statement, Defendant also submitted a Statement of Undisputed Material Facts in Opposition to the Plaintiff's Request for the Entry of an Order for Summary Judgment ("Defendant's Opposition Statement"). Def.'s Statement of Facts in Opp'n, Jan. 21, 2016, ECF No. 27 ("Def.'s Opp'n SMF"). To the extend Defendant does not allege a significantly different version of facts in its Opposition Statement, supported by discernable evidence, the Court must treat Plaintiff's Statement of Facts as undisputed.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4188312
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

2741 BROTHERS DELI
GROCERY INC., et al., Plaintiffs,
v.
UNITED STATES DEPARTMENT
OF AGRICULTURE, FOOD AND
NUTRITION SERVICE, Defendant.

22-CV-9317 (OTW)
|
Signed September 13, 2024

**Attorneys and Law Firms**

Joseph A. Bahgat, The Privacy Firm, Philadelphia, PA, for
Plaintiffs.

Leslie A. Ramirez-Fisher, United States Attorney's Office,
New York, NY, for Defendant.

**MEMORANDUM OPINION & ORDER**

ONA T. WANG, United States Magistrate Judge:

**I. INTRODUCTION**

 **\*1**  Plaintiffs 2741 Brothers Deli Grocery and Abdulkafi
M. Al Muntaser (together, "**Plaintiffs**") bring this action
pursuant to the Food and Nutrition Act, 7 U.S.C. §§
2011–2036a, seeking judicial review of a decision by the
United States Department of Agriculture and its subagency
the Food and Nutrition Service (together, the "**Government**")
permanently disqualifying 2741 Brothers Deli Grocery from
the Supplemental Nutrition Assistance Program. (ECF 1 at ¶
1). The Government now moves: (1) to dismiss the complaint
for lack of subject matter jurisdiction pursuant to Fed. R. Civ.
P. 12(b)(1); or, in the alternative, (2) to dismiss the complaint
for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6);
or, in the alternative (3) for summary judgment. (ECF 30).

For the following reasons, the Government's motion to
dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject
matter jurisdiction is **GRANTED**.

**II. BACKGROUND**

**A. Factual History** [1]

The Supplemental Nutrition Assistance Program ("**SNAP**")
is a federal program administered by the United States
Department of Agriculture (the "**USDA**") "to safeguard the
health and well-being of the Nation's population by raising
levels of nutrition among low-income households." 7 U.S.C.
§ 2011. Under SNAP, the USDA's Food and Nutrition Service
(the "**FNS**") is authorized to

> [P]ermit low-income households to
> obtain a more nutritious diet through
> normal channels of trade by increasing
> food purchasing power for all
> eligible households who apply for
> participation. That program includes
> as a purpose to assist low-income
> adults in obtaining employment
> and increasing their earnings. Such
> employment and earnings, along
> with program benefits, will permit
> low-income households to obtain a
> more nutritious diet through normal
> channels of trade by increasing
> food purchasing power for all
> eligible households who apply for
> participation.

7 U.S.C. § 2011; 7 C.F.R. § 271.3.

Plaintiffs are former participants in SNAP who were
permanently disqualified from participation after the USDA
found that store employees had engaged in SNAP trafficking.
(ECF 1). Plaintiff Al Muntaser owns and operates Plaintiff
2741 Brothers Deli Grocery, a convenience store in the Bronx
(the "**Store**"). (ECF 1 at ¶¶ 2–4). In early 2022, the FNS
initiated an investigation into the Store based on data patterns
in purchases at the Store that were consistent with possible
SNAP trafficking. A.R. 375–412; (ECF 1-1).

Based on the findings of this investigation, the FNS issued
a trafficking charge letter to Plaintiffs on June 23, 2022
(the "**Charge Letter**"), informing Plaintiffs that the FNS
had compiled evidence that the Store had violated SNAP
regulations. A.R. 375–412; (ECF 1-1). The Charge Letter
warned Plaintiffs that, if the FNS determined that the Store
had committed the identified violations, Plaintiffs would be

permanently disqualified from participating in SNAP, and that a civil money penalty might be issued under 7 C.F.R. § 278.6(i). A.R. 375; (ECF 1-1). The Charge Letter attached three reports detailing transactions that, according to the FNS, "establish clear and repetitive patterns of unusual, irregular and inexplicable activity." A.R. 375; (ECF 1-1).

**\*2** On July 5, 2022, Plaintiffs responded to the Charge Letter by email, attaching a letter dated June 30, 2023. A.R. 415–23; (ECF 1-2 at 1–4). In their June 30 letter, Plaintiffs: (1) denied that they had violated any SNAP regulations; (2) attached photographs of the Store; and (3) requested documents in connection with the investigation pursuant to the Freedom of Information Act, 5 U.S.C. § 552. A.R. 415–23 (ECF 1-2 at 1–4).

On August 16, 2022, the FNS issued a determination letter (the "**Determination Letter**"), in which it informed Plaintiffs that it had decided that (1) the violations alleged in the Charge Letter had in fact occurred and (2) it would impose a sanction of permanent disqualification from SNAP for SNAP trafficking. A.R. 434–39; (ECF 1 at ¶ 15). On August 27, 2022, Plaintiffs' counsel requested administrative review of the agency's determination and an extension of time to submit evidence and a brief in support of an administrative appeal. A.R. 442–44; (ECF 31 at ¶ 26). On September 12, 2022, the FNS issued a letter (the "**Acknowledgement Letter**") in which it acknowledged receipt of Plaintiffs' request and set a deadline of October 3, 2022, by which time Plaintiffs were required to submit information in support of its position. A.R. 445–46; (ECF 31 at ¶ 27). Plaintiffs never responded to the Acknowledgement Letter or submitted any information or briefing in support of their administrative review request. A.R. 447; (ECF 31 at ¶ 28). On October 26, 2022, the FNS issued a Final Agency Decision (the "**Final Agency Decision**"), informing Plaintiffs' counsel that it had made a final decision to permanently disqualify 2741 Brothers Deli from participating in SNAP. A.R. 447–49; (ECF Nos. 1 at ¶18, 1-3).

### B. Procedural History

Plaintiffs initiated this action on October 31, 2022, seeking judicial review of the Final Agency Decision. (ECF 1). On April 28, 2023, the parties consented to my jurisdiction for all purposes. (ECF 15). On December 22, 2023, the Government filed a copy of the underlying administrative record under seal. (ECF Nos. 27, 28, 29, 34). Simultaneously, the Government moved: (1) to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)

(1); (2) to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6); or, in the alternative; (3) to grant the Government summary judgment. (ECF Nos. 30, 31, 32, 33). Plaintiffs filed their opposition on February 2, 2024. (ECF Nos. 39, 40, 41). The Government filed their reply on February 26, 2024. (ECF 42). [2]

## III. DISCUSSION

A case must be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate it. Fed. R. Civ. P. 12(b)(1). A plaintiff asserting subject matter jurisdiction bears the burden of proving by a preponderance of the evidence that subject-matter jurisdiction is present. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). Although the Court generally must accept the factual allegations in the complaint as true, the Court does not draw all reasonable inferences in the plaintiff's favor on a motion to dismiss under Rule 12(b)(1). *See J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113 (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)). "Indeed, where jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings such as affidavits, documents, and testimony to determine whether jurisdiction exists." *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 415 (S.D.N.Y. 2012) (citing *Kamen*, 791 F.2d at 1011).

**\*3** The Government argues that this Court lacks subject-matter jurisdiction for two reasons: (1) because the United States has not waived sovereign immunity for suits against the USDA, which is the only named defendant in this action (ECF 32 at 8); and (2) because Plaintiffs failed to exhaust their administrative remedies, as required by 7 U.S.C. § 2023(a) (ECF 32 at 9–14). The Court agrees. As discussed below, the Court finds that subject-matter jurisdiction is lacking both (1) because the United States has not waived sovereign immunity for suits against the USDA and (2) because Plaintiffs failed to exhaust their administrative remedies.

### A. The United States Has Not Waived Sovereign Immunity Against the USDA

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Navajo Nation*, 537 U.S.

488, 502 (2003) (quoting *United States v. Mitchell*, 463 U.S. 206, 212 (1983)). Additionally, "waivers of sovereign immunity must be strictly construed and limited in scope in favor of the sovereign." *Cooke v. United States*, 918 F.3d 77, 82 (2d Cir. 2019). The United States has waived its own sovereign immunity with respect to claims seeking judicial review of final agency determinations regarding SNAP benefits. 7 U.S.C. § 2023(a)(13) ("If the store ... feels aggrieved by such final determination, it may obtain judicial review thereof by filing a complaint against the United States [in a competent district court] within thirty days after the date of delivery or service of the final notice of determination upon it, requesting the court to set aside such determination."). The United States has not, however, waived sovereign immunity with respect to claims asserted against the USDA or the FNS. *Brother's Mini Mkt. Inc. v. United States Dep't of Agric., Food & Nutrition Serv.*, 23-CV-10646 (JMF), 2024 WL 2802127, at *1 (S.D.N.Y. 2024); *Capellan v. United States*, 17-CV-9342 (AT), 2020 WL 1047907, at *3 (S.D.N.Y. 2020); *Muazeb v. United States*, 17-CV-6754 (DF), 2019 WL 1613433, at *7 (S.D.N.Y. 2019); *Arias v. United States*, 13-CV-8542, 2014 WL 5004409, at *14 (S.D.N.Y. 2014).

Thus, the United States would have been the only proper defendant in this action. As Plaintiffs have failed to name United States as a party, the action lacks a proper defendant, and, accordingly, this Court lacks subject-matter jurisdiction over this lawsuit.

### B. Plaintiffs Failed to Exhaust Their Administrative Remedies [3]

**\*4** Even if Plaintiffs had named a proper defendant, Plaintiffs' complaint would still fail because Plaintiffs failed to exhaust their administrative remedies. Section 2023(a) (3) provides a process by which a store must obtain administrative review of an FNS decision prior to seeking judicial review. 7 U.S.C. § 2023(a)(3). First, upon receiving a notice of disqualification, a retail store has ten days to request an opportunity to submit information in support of its position with the FNS. *Id.*; 7 C.F.R. § 279.2(c). If the store makes such a request, it then has thirty days to submit information which "shall be reviewed by the person or persons designated by the Secretary, who shall ... make a determination which shall be final." 7 U.S.C. § 2023(a)(5). *See* 7 U.S.C. § 2023(a)(4); 7 C.F.R. §§ 278.6(n), 279.2(c). The decision of the Secretary's designee is subject to judicial review, and a store may obtain such review by filing a complaint in a competent district court within thirty days of the delivery or service of the final notice

of determination. 7 U.S.C. §§ 2023(a)(5), (13); 7 C.F.R. § 279.7.

Conversely, "[i]f such a request is not made or if such store ... fails to submit information in support of its position after filing a request, the administrative determination shall be final." 7 U.S.C. § 2023(a)(4). "The determination of FNS shall be final and not subject to further administrative or judicial review unless a written request for review is filed within [thirty days]." 7 C.F.R. § 278.6(n), § 279.2(c). In other words, where Section 2023(a)(4) applies, the plaintiff fails to exhaust their administrative remedies. *See Ade v. United States*, 13 CV-2334 (WHP), 2014 WL 1333672, at *2 (S.D.N.Y. 2014) (collecting cases). *See also Khan v. United v. States*, 16-CV-209, 2016 WL 3220523, at *2 (W.D. Pa. 2016) ("In 7 U.S.C. § 2023, Congress enunciated the jurisdictional requirements for a federal court to review the administrative decisions relating to the Food Stamp Program."). *Cf. Lugo v. United States*, 08-CV-2960 (RJS), 2009 WL 928136, at *3 (S.D.N.Y. 2009) ("A firm disqualified from participation in the [Supplemental Nutrition Assistance] Program may obtain judicial review after exhaustion of administrative remedies.").

Plaintiffs failed to timely exhaust their administrative remedies in connection with the FNS's Determination Letter. Plaintiffs did not follow the appeal process under the SNAP statute. Although Plaintiffs did timely submit their request for administrative review within the ten-day period, they failed to submit information in support of their request by the October 3, 2022 deadline, as required under 7 U.S.C. § 2023(a)(5). Indeed, Plaintiffs did not even respond to the FNS's Acknowledgement Letter. Consequently, the FNS's August 16 Determination Letter constitutes a final determination not subject to further administrative or judicial review under 7 U.S.C. § 2023(a)(4). *Id.*; 7 C.F.R. § 278.6(n); § 279.2(c). Thus, Plaintiffs failed to exhaust their administrative remedies, and their case would be dismissed even if the Court had the jurisdiction to hear it.

### C. Amendment Would Be Futile

Under Fed. R. Civ. P. 15(a), leave to amend a complaint should be freely given when justice requires, but should be denied when amendment would be futile. *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Here, amendment would be futile. As discussed above (*supra* § III.B), even if Plaintiffs were to amend their Complaint to substitute the United States as Defendant, Plaintiffs' Complaint would fail because they did not exhaust their administrative remedies. Thus, there is no

set of facts that Plaintiffs can plead that would entitle them to relief.

**IV. CONCLUSION**

For the reasons stated above, Plaintiffs' action is dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and leave to amend is denied.

**\*5  SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4188312

---

## Footnotes

1   "[W]here jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings such as affidavits, documents, and testimony to determine whether jurisdiction exists." *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 415 (S.D.N.Y. 2012) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). The facts here are thus derived from the entire record in this action as well as the administrative record below (identified with the prefix "A.R.")).

2   A status conference was held on March 12, 2024, at which the Government, but not Plaintiffs, appeared. (ECF Nos. 47, 48). On March 4, 2024, I issued an order directing Plaintiffs' counsel to show cause by March 29, 2024, why I should not dismiss the case for failure to prosecute under Fed. R. Civ. P. 41(b) or that Plaintiffs' opposition to the Government's motion for summary judgment be deemed withdrawn. (ECF 44). Plaintiffs' counsel responded to the Court's order on March 29, 2024, stating, essentially that, he had been preoccupied with criminal trials and confused this action with another. (ECF 45).

3   There is disagreement within this District as to whether the failure to exhaust administrative remedies under the SNAP statute constitutes a jurisdictional defect or a claim-processing defect. *Compare Brother's Mini Mkt*, 2024 WL 2802127, at *1, *with Ade v. United States*, 13-CV-2334 (WHP), 2014 WL 1333672, at *2 (S.D.N.Y. 2014) (collecting cases). The Court need not address this question here. Irrespective of whether the SNAP statute's language provides a jurisdictional bar to review, Plaintiffs' claims must be dismissed for lack of subject-matter jurisdiction anyway because the United States has not waived sovereign immunity with respect to the USDA or the FNS. *See infra* § III.A. Even if the SNAP statute's language does represent a "claims-processing rule," under the Court's framework in *Santos-Zacaria v. Garland*, Plaintiffs' claims would fail on the merits even if Plaintiffs were given leave to amend. 598 U.S. 411 (2023). Although lack of subject-matter jurisdiction generally precludes a court from addressing merits issues, it is proper to do so "in connection with deciding whether Plaintiffs should be granted leave to amend." *Brother's Mini Mkt. Inc.*, 2024 WL 28912127 at n.2. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) ("Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim ...."); *Steele v. SSA*, 14-CV-7104 (ENV) (MDG) 2016 WL 4688850 (E.D.N.Y. 2016) ("The Court ... need not afford [the] opportunity [to amend] where it is clear from the face of the complaint that the Court lacks subject matter jurisdiction or that a claim cannot be stated as a matter of law.").

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   4

2024 WL 1704697
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Maria F. GIOIA, Plaintiff,
v.
PATTERSON, BELKNAP,
WEBB & TYLER, Defendant.
Maria F. Gioia, Plaintiff,
v.
SouthEnd Psychiatry, Defendant.
Mariafrancesca Gioia, Plaintiff,
v.
Johnson and Johnson, Defendant.
Maria F. Gioia, Plaintiff,
v.
SouthEnd Psychiatry, Defendant.

2:23-cv-08163 (NJC) (SIL), 2:23-cv-08164 (NJC) (SIL),
2:24-cv-1912 (NJC) (SIL), 2:24-cv-2259 (NJC) (SIL)
|
Signed April 19, 2024

**Attorneys and Law Firms**

Maria F. Gioia, Princeton, NJ, Pro Se.

Mariafrancesca Gioia, Princeton, NJ, Pro Se.

Rachel Beth Sherman, Patterson Belknap Webb & Tyler LLP, New York, NY, for Defendant in 2:24-cv-1912.

Maria F. Gioia, East Patchogue, NY, Pro Se.

**MEMORANDUM AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

**\*1** Plaintiff Maria F. Gioia ("Gioia") has brought nine actions before this Court relating to injuries that she allegedly sustained as a result of taking Invega, a drug manufactured by a wholly-owned subsidiary of Defendant Johnson & Johnson ("J&J") and prescribed to Gioia by SouthEnd Psychiatry ("SEP"): *Gioia v. Janssen Pharm.*, No. 2:2:19-cv-4629 ("Gioia I") and *Gioia v. Janssen Pharm.*, No. 2:19-cv-5377 ("Gioia II") (together the "2019 Actions"); *Gioia v. Janssen Pharm.*, No. 2:23-cv-1187 ("Gioia III"); *Gioia v. SouthEnd Psychiatry*, No. 2:23-cv-1419 ("Gioia IV"); *Gioia*

*v. Patterson, Belknap, Webb, & Tyler*, No. 2:23-cv-3353 ("Gioia V"); *Gioia v. Patterson, Belknap, Webb & Tyler*, No. 2:23-cv-8163 ("Gioia VI"); *Gioia v. SouthEnd Psych.*, No. 2:23-cv-8164 ("Gioia VII"); *Gioia v. Johnson & Johnson*, No. 2:24-cv-1912 ("Gioia VIII"); *Gioia v. SouthEnd Psych.*, No. 2:24-cv-2259 ("Gioia IX"). This Court dismissed Gioia I–II for failure to state a claim, Gioia III for failure to prosecute, and Gioia IV–V for lack of subject matter jurisdiction. The four currently pending cases, Gioia VI–IX, duplicate the allegations of the previously dismissed cases.

Before the Court are four pending items: (1) Gioia's failure to respond to a November 7, 2023 order to show cause in Gioia VI and VII; (2) J&J's letter requesting a pre-motion conference (Gioia VIII, ECF No. 8); (3) Gioia's motion to remand to state court (Gioia VIII, ECF No. 10); and (4) Gioia's motion to proceed in forma pauperis ("IFP") (Gioia IX, ECF No. 2). For the following reasons, the Court finds that it lacks subject matter jurisdiction over Gioia VI–IX. Accordingly, IFP is granted in Gioia IX, the complaints in Gioia VI, VII, and IX are dismissed without prejudice pursuant to Fed. R. Civ. P. 12(h)(3), and leave to amend these complaints is denied. Pursuant to 28 U.S.C. § 1447(c), the complaint in Gioia VIII is remanded to the New York State Supreme Court, Suffolk County. Gioia is warned that if any further complaints regarding her allegations about Invega are filed in or removed to this Court, the Court will order her to show cause why she should not be barred under 28 U.S.C. § 1651 from filing new civil actions.

**BACKGROUND**

Given the litigation history between the parties in the state and federal courts, a brief review is warranted.

**I. The Prior Actions**

A. The Court Dismisses Gioia I and II for Failure to State a Claim

In 2019, Gioia filed two complaints in the Supreme Court of the State of New York, Nassau County against Janssen Pharmaceutical ("Janssen") for injuries that Gioia allegedly sustained after taking Invega, a drug manufactured by Janssen. (Gioia I, ECF No. 1-1; Gioia II, ECF No. 1-1.) [1] Janssen, represented by Patterson, Belknap, Webb & Tyler LLP ("PBWT"), removed the 2019 Actions to this Court on the basis of diversity subject matter jurisdiction. (Gioia I, ECF

No. 1; Gioia II, ECF No. 1.) The parties then briefed Janssen's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and on February 16, 2021, the Court dismissed Gioia's complaints in the 2019 Actions in one Memorandum and Order. (*See* Mem., Gioia I, ECF No. 39.)[2]

**\*2**  In the Memorandum and Order, the Court liberally construed Gioia's "bare-boned" complaints to allege lack of informed consent and failure to warn claims and granted Janssen's motion as to both claims. (Mem. at 2.) First, the Court dismissed Gioia's lack of informed consent claim against Janssen with prejudice because, under New York law, the duty to warn a plaintiff directly of the potential risks or side effects of taking Invega lies with a plaintiff's physician, not the drug manufacturer. (*Id.* at 4–5.) Second, the Court dismissed Gioia's failure to warn claim without prejudice because Gioia failed "to allege any facts to suggest that her treating physician was not informed of the risks associated with Invega" and because the FDA-approved package insert described the very side effects of which Gioia complained. (*Id.* at 6–8.) In an abundance of caution and in light of Gioia's pro se status, the Court granted leave to amend the failure to warn claim and explained that Gioia "must provide nonconclusory allegations as to why defendant failed to provide adequate warnings to her physician." (*Id.* at 8.)

Plaintiff filed an amended complaint in the 2019 Actions. (Gioia I, ECF No. 40; Gioia II, ECF No. 33.) The parties briefed Janssen's motions to dismiss the amended complaints and on November 21, 2021, the Court issued a Memorandum and Order granting Janssen's motions and dismissing Gioia's failure to warn claim with prejudice in both cases. (Mem., Gioia I, ECF No. 58.)[3]  The Court found that Gioia's amended complaint failed to "cure the deficiencies of her failure to warn claim because the amended allegations, like the original allegations, do not identify what warnings were provided to plaintiff's physician or how the provided warnings were inadequate." (*Id.* at 4.) And, because "nearly all of the alleged side effects [Gioia] experienced are identified in Invega's FDA-approved package insert," the Court ruled that Gioia's "conclusory allegations coupled with [her] allegations of suffering from the very side effects of which [Janssen] warns, requires dismissal of [Gioia]'s claim." (*Id.* at 5–6.)

The Court also determined that further leave to amend would be futile in light of Gioia's failure to correct the deficiencies noted in the order dismissing her original complaints. (*Id.* at 6.) Judgment was entered accordingly on November 23, 2021 in each case. (Gioia I, ECF No. 60; Gioia II, ECF No. 51.)

After receiving an extension of time to file an appeal, Gioia appealed to the Second Circuit. (Gioia I, ECF Nos. 61–62, Elec. Order, Jan. 19, 2022; Gioia II, ECF Nos. 53–54, Elec. Order, Jan. 19, 2022.) The Circuit dismissed her appeal on August 5, 2022 "because it lack[ed] an arguable basis in either law or fact." (Mandate, Gioia I, ECF No. 63.)

**B. The Court Dismisses Gioia III for Failure to Prosecute**
Notwithstanding the dismissal of Gioia's lack of informed consent and failure to warn claims with prejudice, on February 13, 2023, Gioia filed another complaint against Janssen, this time in the State of New York, Supreme Court of the State of New York, Suffolk County. (Gioia III, ECF No. 1-1.) Janssen removed Gioia III to this Court and requested a pre-motion conference in anticipation of filing a motion to dismiss the complaint because it was identical to the 2019 Actions and therefore barred by res judicata and collateral estoppel. (Gioia III, ECF Nos. 1, 11.) Janssen also asserted that the Gioia III complaint lacked merit because the failure to warn claim did not allege what warning her physicians received and how those warnings were inadequate. (Gioia III, ECF No. 11-1 at 2–3.) Janssen also requested that the Court enter a litigation injunction given that Gioia had filed a third, repetitive lawsuit *after* her two prior complaints were dismissed on the merits and that dismissal was affirmed on appeal. (*Id.* at 3.) Gioia responded by filing a letter requesting that her complaint be withdrawn from this Court and claimed "bullying" from Janssen's lawyers. (Gioia III, ECF No. 18.)

At a conference before Magistrate Judge Locke, Janssen opposed Gioia's request to withdraw her Gioia III complaint and pressed for a litigation injunction because the case was Gioia's third attempt to pursue two previously-dismissed claims. (Gioia III, ECF No. 19.) Magistrate Judge Locke deferred ruling on Gioia's claim of unspecified "bullying," explaining that because "the Court takes such claims seriously, this conference is adjourned in order to give Plaintiff another opportunity to explain the bases for her position sufficient that it be addressed by the Court." (*Id.*) Although Gioia was informed of the adjourned teleconference date, she did not appear. (Gioia III, ECF No. 24.) Accordingly, Magistrate Judge Locke stayed discovery in Gioia III pending determination of Janssen's request for a premotion conference and/or Gioia's motion to withdraw or remand her complaint. (*Id.*) On April 13, 2023, Janssen requested a briefing schedule for its anticipated motion to dismiss and for entry of a filing injunction; Gioia did not respond to that application. (Gioia III, ECF No. 25.)

**\*3**  Given this history and Gioia's apparent intention to withdraw her complaint, the Court ordered Gioia to show cause on or before October 12, 2023 why the complaint should not be dismissed with prejudice pursuant to Fed. R. Civ. P. 41(b). (Gioia III, ECF No. 30.) The order required Gioia to explain her failure to appear at conferences, to respond to Janssen's pre-motion conference letter, and to participate in the prosecution of the case. (*Id.*) The Court also required Gioia to state whether she sought to withdraw the complaint. (*Id.*) The Court warned Gioia that failure to timely respond to the order "will lead to the dismissal of her complaint with prejudice pursuant to Federal Rule of Civil Procedure 41(b)." (*Id.*)

Gioia did not respond to the order to show cause, which was mailed to her address of record and not returned as undeliverable. Accordingly, on November 16, 2023, the Court dismissed the Gioia III complaint with prejudice for failure to prosecute under Fed. R. Civ. P. 41(b) and judgment was entered. (Gioia III, Elec. Order, Nov. 16, 2023; Judgment, Gioia III, ECF No. 35.) Gioia did not appeal.

### C. The Court Dismisses Gioia IV–V for Lack of Subject Matter Jurisdiction

On February 22, 2023, eight days after Gioia filed Gioia III, she filed a new complaint and application to proceed in forma pauperis in this Court, this time against SEP. (Gioia IV, ECF Nos. 1–2, 11.) Shortly thereafter, on May 1, 2023, Gioia filed another complaint and application to proceed in forma pauperis naming PBWT, the law firm that represented Janssen in Gioia I–III. (Gioia V, ECF Nos. 1–2.) The Court granted Gioia's IFP applications in Gioia IV and V and, on October 12, 2023, issued a Memorandum and Order dismissing both complaints sua sponte and without prejudice for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h) (3). (Mem., Gioia IV, ECF No. 16.)[4]

Although these complaints, "like at least three of her prior complaints, relate to prior litigation arising from alleged side effects of a prescription anti-psychotic medication," the Court did not reach issue of preclusion. (Mem. at 2.) Rather, the Court determined it lacked subject matter jurisdiction under both 28 U.S.C. §§ 1331 and 1332. First, the Court found it lacked federal question jurisdiction because Gioia's claims against SEP for "medical malpractice" and "negligence" and "abuse of power" as well as her claims against PBWT for "abuse of power, bullying, malpractice, denying my civil rights to a fair trial, negligence, failure to acknowledge

and realize facts and failure to do research; ignoring and bullying Pro Se Plaintiff; lying and cheating for favoritism/ easier channels; manhandling; changing course of plans as and when convenient" did not arise under a federal law, treaty, or the Constitution of the United States. (Mem. at 9–10.) Second, in an abundance of caution in light of Gioia's pro se status, the Court considered whether it had diversity jurisdiction and found that it did not because "the parties are all domiciled in New York."[5] (Mem. at 10 (citing *Advani Enters., Inc. v. Underwriters at Lloyds,* 140 F.3d 157, 160 (2d Cir. 1998) (noting that diversity is complete when the complaint "demonstrate[s] that [the plaintiff] does not share citizenship with any of the defendants.")).) Given Gioia's pattern of filing repetitive lawsuits concerning the same subject matter, the Court warned Gioia:

> [F]uture, frivolous lawsuits arising from or relating to her prior litigation involving Janssen Pharmaceutical will not be tolerated by the Court. In short, given Plaintiff's well-documented history of litigation in this Court, Plaintiff is cautioned that sanctions may be imposed, including in the form of a litigation injunction, should she continue in this course of conduct. *Should Plaintiff file another complaint arising from or relating to her prior litigation involving Janssen Pharmaceutical, the Court will order Plaintiff to show cause why a litigation bar should not be entered. Plaintiff is further warned that frivolous complaints concerning any other subject matter may also result in the Court ordering Plaintiff to show cause why a litigation bar should not be entered.*

**\*4**  (Mem. at 12 (emphasis added).) Judgment was entered on October 18, 2023 in each case and Gioia did not appeal in either case. (Gioia IV, ECF No. 16; Gioia V, ECF No. 18.)

## II. The Pending Actions

### A. Gioia VI Against PBWT and Gioia VII against SEP

Undeterred, Gioia filed four more complaints. On October 26, 2023, just eight days after judgment was entered in Gioia IV and V, Gioia filed another complaint against PBWT (Gioia VI, ECF No. 1) and another complaint against SEP (Gioia VII, ECF No. 1). Gioia filed applications to proceed in forma pauperis in both actions. (Gioia VI, ECF No. 2; Gioia VII, ECF No. 2.) On November 7, 2023, the Court ordered Gioia to show cause in both cases within thirty days why "an order should not be entered barring the acceptance of any future filings from Plaintiff related to Plaintiff's litigation involving Janssen Pharmaceutical in this Court without Plaintiff first obtaining leave of the Court." (Gioia VI, Elec. Order, Nov. 7, 2023; Gioia VII, Elec. Order, Nov. 7, 2023.) The orders to show cause was mailed to Gioia at her address of record, 12311 Cornerstone Lane, Princeton, New Jersey 08540. (Gioia VI, Elec. Order, Nov. 8, 2023; Gioia VII, Elec. Order, Nov. 8, 2023.) These orders have not been returned to the Court as undeliverable. To date, Gioia has not responded to the order to show cause in either case.

B. Gioia VIII Against J&J

On March 15, 2024, J&J removed to this Court a complaint filed by Gioia against it on October 25, 2023,[6] in the Supreme Court of the State of New York, Suffolk County, under Index No. 6264459/2023. (Gioia VIII, ECF Nos. 1, 1-1.) Though difficult to decipher and comprehend, Gioia appears to allege that J&J promoted:

> a novel drug Invega without regards to patient population or FDA protocol of post-approval recommendations and procedure of a post-clinical trial base of 10-year [indecipherable] before such lax promotion. The pharmaceutical company failed to warn about important side effect as well as the common outcome often irreversible of subclinical hypothyroidism. The correlation of thyroid function on scholastic performance has been solidifiedg [sic] accepted as pivitol [sic] on aspects such as exam performance. While taking that medicine I was unknowingly why or how producing unrepresentative academic performance even if I

studied and knew the material very well and it caused me to have to repeat my USMLE Step 2 exam only to pass after multiple attempts even though that isn't the most difficult of exams and I studied for longer periods of time. Residency programs inevidably [sic] rule out multiple attempt candidates most easily due to the heavily competitive nature of the Residency Match Process. Hence, I did not get into any Medical Residency Programs and had to terminate my lifelong goal and career as a physician due to pharmaceutical company negligence to patient population. FDA Post Approval Process and timeline as well as failure to warn about important side effects as well as ultimate outcome of subclinical hypothyroidism. In addition, while looking for a lawyer to pursue this case in July 2019 they pretended to be lawyers to update their database and website Invega.com with my information and medical knowledge (M.D.) without consent yet promised me $12–17 million in compensation for the losses, damage, and information (medical M.D. & experience).

**\*5** (State Ct. Rec. at 2–4, Gioia VIII, ECF No. 1-1.) In the space that calls for the damages suffered as a result, Gioia wrote: "loss of career as a medical doctor + subclinical hypothyroidism + loss of [indecipherable] neural stability and facial/body expressive self-stability and representation" for which she seeks to recover a damages award in the sum of $16,999,999.00. (Id. at 5.)

On March 1, 2024, before Gioia VIII was removed to this Court, Gioia had filed an amended complaint against J&J alleging that "Johnson and Johnson failed to warn about important side effects and ultimate outcome of medication Invega while rapidly promoting it during preliminary phased approval by FDA which normally takes 10 years." (Id. at 34.) Gioia alleges that the "failure to warn about important side effects as well as ultimate outcome of subclinical

hypothyroidism caused misrepresentation of my academic knowledge through misrepresentation of exam scores which caused me to have multiple attempts at exact exams while taking that medical while being disillusioned." (*Id.*) In the space that calls for the elements of the cause of action on the form complaint, Gioia wrote:

> Failure to warn about important side effects and ultimate outcome + widely, quickly, and vastly promoting the novel drug + pretending to be lawyers in 07/2019 when they took my medical knowledge and information to update their database and website Invega.com without my prior consent however while promising me compensation as between 12–17 million hence me suing for $16,999,999.00.

(*Id.* at 37.) This time, Gioia listed a Suffolk County address in East Patchogue on the amended complaint. (*Id.* at 38.) Gioia also listed that address on all subsequent papers that she filed in the state court, and those that were notarized show that she signed them in Suffolk County, New York. (*Id.* at 43–52.)

On March 21, 2024, J&J, represented by PBWT, filed a letter motion requesting a premotion conference in anticipation of a motion to dismiss the amended complaint and for the entry of a filing injunction. (Gioia VIII, ECF No. 8.) In this pending letter motion, J&J argues that Gioia has named J&J rather than its "wholly owned subsidiary" Jansen in an apparent effort to bypass the Court's "express warning not to bring any more cases against Janssen." (*Id.*) On March 22, 2024, the Court ordered Gioia to file a response to J&J's letter by March 29, 2024. (Gioia VIII, Elec. Order, Mar. 22, 2024.) To date, Gioia has not responded to J&J's letter. The Court's order was mailed to Gioia at her address of record in New Jersey and has not been returned to the Court as undeliverable. (Gioia VIII, Notice, Mar. 25, 2024.)

On April 1, 2024, Gioia filed a pending motion to remand Gioia VIII to the New York State Supreme Court, Suffolk County. (Gioia VIII, ECF No. 10.) Gioia includes her New Jersey and New York addresses (*id.* at 8) and asserts that she:

has residence in both NJ and NY. In fact, most of her correspondences with this case even upon index number purchase were from/to the address where she lives with her mom 12311 Cornerstone Lane Princeton, NJ. She filed in Suffolk County Supreme Court because her fiancée lives there, she used to live there, she works there part-time, and this is where she first started the case against Jansen [sic] in 2019 while living in Holbrook and then Ronkonkoma ....

**\*6** (*Id.* at 2.) On April 11, 2024, J&J opposed the motion, arguing that there is diversity jurisdiction because it is a New Jersey citizen and Gioia is a New York citizen as is evident from her repeated assertions that she is a New York resident and various indicia of her intent to return there. (Gioia VIII, ECF No. 12 at 3–5.) J&J also requests a filing injunction against Gioia. (*Id.* at 5.)

### C. Gioia IX Against SEP

On March 22, 2024, Gioia filed another complaint against SEP along with an in forma pauperis application. (Gioia IX, ECF Nos. 1–2.) Gioia alleges that, during the period December 10, 2022 through December 30, 2022, she was "assign[ed]"a "test consecutively for weeks"—which she parenthetically explains was an "at home urine collection"—which "was wrong and inapropriate [sic]," and unspecified "psychiatric medication" was "withh[e]ld[ ]" from her. (Compl. ¶ III, Gioia IX, ECF No. 1.) Gioia checked the box on the form complaint to invoke this Court's federal question subject matter jurisdiction and wrote "medical malpractice and negligence U.S. Code 20137" in the space that calls for "the specific federal statutes, federal treaties, and/or provisions of the United States Constitution are at issue in this case." (*Id.* ¶ IIA.) Although Gioia left blank the section on the form complaint that asks for the citizenship of each party, she included a residential address for herself in East Patchogue, Suffolk County, New York and an address for SEP in the Bronx, New York. (*Id.* ¶¶ I A–B.)

**LEGAL STANDARDS**

A district court must dismiss a complaint filed by a plaintiff proceeding in forma pauperis if the action is "frivolous or malicious," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i–iii). The court "shall" dismiss the action as soon as it makes such a determination. *Id.* At the pleading stage, the court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010), *aff'd* 569 U.S. 108 (2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009)).

This Court is required to construe pleadings "filed by *pro se* litigants liberally and interpret them to raise the strongest arguments that they suggest." *Hunter v. McMahon*, 75 F.4th 62, 67 (2d Cir. 2023) (quotation marks omitted). "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Ceara v. Deacon*, 916 F.3d 208, 213 (2d Cir. 2019) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

Nevertheless, a complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements ... are not entitled to the assumption of truth." *Id.* at 678–79 (citation omitted). While "detailed factual allegations" are not required, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

**\*7** If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint at least once. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citations omitted). If, however, amendment of the complaint would not cure the substantive defects of the claim, leave to amend should be denied. *Id.*

**DISCUSSION**

**I. Subject Matter Jurisdiction**

Notwithstanding the liberal pleading standard afforded pro se litigants, a district court "must dismiss the action" if it "determines at any time that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3); *see Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000) ("If subject matter jurisdiction is lacking, the action must be dismissed.") (citations omitted); *In re Tronox Inc.*, 855 F.3d 84, 95 (2d Cir. 2017) (noting that courts have an "independent obligation to consider the presence or absence of subject matter jurisdiction sua sponte.") (quotation marks omitted). The party "asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Searles v. Robert*, No. 21-2836, 2023 WL 7271832, at \*1 (2d Cir. Nov. 3, 2023) (quotation marks omitted).

With these standards in mind, the Court examines subject matter jurisdiction in each of Gioia's pending cases.

A. The Court Lacks Subject Matter Jurisdiction over Gioia VI, Gioia VII, and Gioia IX

As an initial matter, the Court has reviewed Gioia's IFP application in Gioia IX and finds that Gioia has established that she is qualified by her financial status to commence that action without the prepayment of the filing fee. (IFP App., Gioia IX, ECF No. 2). Therefore, the application to proceed IFP is granted.

Given that Gioia filed the complaints in Gioia VI, VII, and IX directly in this Court, she bears the burden of establishing subject matter jurisdiction. *See Searles*, 21-2836, 2023 WL 7271832, at \*1. In each of those complaints, Gioia checked the box to invoke this Court's federal question subject matter jurisdiction. (Compl. ¶ II, Gioia VI, ECF No. 1; Compl. ¶ II, Gioia VII, ECF No. 1; Compl. ¶ II, Gioia IX, ECF No. 1.) In Gioia VI, in the space that calls for the specific provision of federal law at issue, Gioia alleged "Unauthorized practice of Law CFR 776.57 (Best interest of client + Due Process of service to legal owners) Service Process on Entities § 113 – 29-104.12: 'A represented entity may be served ... permitted by law by serving its registered agent.' " (Compl. ¶ II.A, Gioia VI, ECF No. 1.) In Gioia VII, Gioia's response to that question was "Medical malpractice and negligence U.S. Code 20137." (Compl. ¶ II.A, Gioia VII, ECF No. 1.) In Gioia IX against SEP, Gioia responded in the same way she had in

Gioia VII: "Medical malpractice and negligence U.S. Code 20137." (Compl. ¶ II.A, Gioia IX, ECF No. 1.)

None of these complaints alleges a plausible federal question.[7] Given Gioia's pro se status and in an abundance of caution, the Court has also considered whether any of the complaints plausibly allege any federal question such that subject matter jurisdiction pursuant to 28 U.S.C. § 1331 could be invoked. Even upon a liberal construction, the Court discerns no such claim.

**\*8** The Court also does not have diversity jurisdiction under 28 U.S.C. § 1332 because Defendants PBWT and SEP are citizens of New York, and Gioia has failed to plausibly allege that she is not also a citizen of New York. In the Gioia VI and VII complaints, Gioia wrote that her address is 12311 Cornerstone Lane, Princeton, New Jersey 08540, but left blank the section that asks for the state where the plaintiff is a citizen. (*See* Compl. ¶¶ I, II.B.1(a), Gioia VI, ECF No. 1; Compl. ¶¶ I, II.B.1(a), Gioia VII, ECF No. 1.) Both complaints also allege that PBWT and SEP are New York citizens. (Compl. ¶ II.B.2(b), Gioia VI, ECF No. 1 (providing a New York address and alleging that PBWT is incorporated in the State of New York and has its principal place of business also in New York); Compl. ¶ II.B.2(b), Gioia VII, ECF No. 1 (alleging that SEP is located in the Bronx, New York, is incorporated in New York and also has its principal place of business there).) The Gioia IX complaint lists Gioia's address as 1 1ˢᵗ Street in East Patchogue, New York, 11772 and leaves blank the section of the complaint that asks for the state where the plaintiff is a citizen. (Compl. ¶¶ I, II.B.1(a), Gioia IX, ECF No. 1.) That complaint repeats the allegations that SEP is a New York corporation located in New York. (*Id.* ¶ II.B.2(b).)

The first requirement of diversity jurisdiction—that there is complete diversity of citizenship between the plaintiff and the defendants—means that a plaintiff cannot be a citizen of the same state as any of the defendants. *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005). In determining diversity jurisdiction, "a corporation is considered a citizen of the state in which it is incorporated and the state of its principal place of business." *Bayerische Landesbank v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 48 (2d Cir. 2012) (citations omitted). An individual party's citizenship depends on its domicile, which "is the place where that individual has a true, fixed home and principal establishment, and to which, whenever that person is absent from the jurisdiction, he or she has the intention of returning." 13E Charles Alan Wright & Arthur R. Miller, Federal Practice

and Procedure § 3612 (3d ed. 2021); *see also Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 53 (2d Cir. 2019). It is well-established that "residence alone is insufficient to establish domicile for jurisdictional purposes." *Van Buskirk*, 935 F.3d at 54 (citation omitted); *accord Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 103 (2d Cir. 1997) ("[I]t is well-established that allegations of residency alone cannot establish citizenship ....").

Here, Gioia has not met her burden of establishing that diversity jurisdiction lies in this Court because she has not plausibly alleged that she is a citizen of New Jersey. Instead, her complaints allege her residences, rather than her domicile.[8] Although Gioia listed a New Jersey address on the complaints in Gioia VI and VII, she provided a Suffolk County area phone number and alleged that she was working in East Patchogue, Suffolk County until September 1, 2023. (*See* IFP App. ¶ 2, Gioia VI, ECF No. 2; IFP App. ¶ 2, Gioia VII, ECF No. 2.) None of the complaints in Gioia VI, VII, or IX allege that Gioia intends to return to her "true fixed home and principal establishment" in New Jersey. *Van Buskirk*, 935 F.3d at 53. Indeed, Gioia later indicated in her motion to remand in Gioia VIII that she maintains residences in both New York and New Jersey. (Remand Mot. at 2, Gioia VIII, ECF No. 10.) Given that allegations of residency alone are insufficient to establish diversity jurisdiction, Gioia has not properly invoked this Court's diversity subject matter jurisdiction. *See, e.g., Jacobs v. Pat. Enf't Fund, Inc.*, 230 F.3d 565, 567 (2d Cir. 2000) (finding that plaintiffs initially failed to allege diversity in complaint because "they had alleged only the residence, and not the citizenship (or domicile), of the parties").

**\*9** Because Gioia has not plausibly alleged a federal question or complete diversity, she has not met her burden of establishing that subject matter jurisdiction lies in this Court. Accordingly, the Court dismisses the VI, VII, and IX complaints without prejudice pursuant to Rule 12(h)(3), Fed. R. Civ. P. *See, e.g., Diaz v. Judge Advoc. Gen. of the Navy*, 413 F. App'x 342, 344 (2d Cir. 2011) ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice.") (quotation marks omitted).

B. The Court Remands Gioia VIII for Lack of Subject Matter Jurisdiction

As the party seeking to invoke federal subject matter jurisdiction in this removal action, J&J bears the burden of establishing that subject matter jurisdiction lies in this Court.

*Winter v. Novartis Pharms. Corp.*, 39 F. Supp. 3d 348, 350 (E.D.N.Y. 2014) ("In a case removed to federal court from state court, the removal statute is to be interpreted narrowly, and the burden is on the removing party to show that subject matter jurisdiction exists ....") (citing *Lupo v. Human Affairs Int'l, Inc.*, 28 F.3d 269, 274 (2d Cir. 1994)). "All doubts should be resolved against removability." *Lupo*, 28 F.3d at 274. As detailed above, "residence alone is insufficient to establish domicile for jurisdictional purposes." *Van Buskirk*, 935 F.3d at 54 (citation omitted). Courts evaluate diversity by examining the "parties' domicile at the time the complaint was filed," *Van Buskirk*, 935 F.3d at 53, and "[a]n individual's citizenship, within the meaning of the diversity statute, is determined by his domicile." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000). In this context, domicile is defined as "the place where a person has his true fixed home ... and to which, whenever he is absent, he has the intention of returning." *Id.* (quotation marks and citation omitted).

J&J has not properly invoked this Court's diversity subject matter jurisdiction because it alleges only Gioia's residency, not her domicile. J&J's Notice of Removal argues that diversity jurisdiction exists because (1) Gioia's amended complaint and summons state that she was a resident of Suffolk County, (2) J&J is a New Jersey corporation, and (3) the amount in controversy exceeds $75,000. (Not. of Removal ¶¶ 5–7, Gioia VIII, ECF No. 1.) J&J fails to account for the fact that Gioia has used both a Suffolk County and New Jersey address throughout the prosecution of the state court action. For example, Gioia listed 12311 Cornerstone Lane, Princeton, New Jersey, 08540 as her address on the summons, below her signature on page 6, on the request for judicial intervention, and on her motion for default judgment. (State Ct. Rec. at 6, 8–9, 10–11, 18–19, Gioia VIII, ECF No. 1-1.) The affidavit in support of Gioia's motion for default judgment filed in the state court includes a notarization of Gioia's signature in New Jersey. (*Id.* at 10–11, 18–9.) In denying the motion for default judgment, Acting Supreme Court Justice Quinn listed both Gioia's New Jersey and Suffolk County, New York addresses, noting that "[t]he summons and complaint states Plaintiff's address is in Ronkonkoma, however, every other document filed indicates Plaintiff's address as a New Jersey address and the documents notarized are all from a New Jersey notary." (*Id.* at 29.)

Gioia's later filings also allege her residences, rather than her domicile. For example, every paper Gioia filed in the state court, beginning with the March 1, 2024 amended complaint, lists Gioia's Suffolk County address in East Patchogue, New York. (*Id.* at 38, 43–52; *see also id.* at 32, (showing that Gioia signed notarized papers in Suffolk County, New York).) Gioia's Motion to Remand states that she has two residences, one in New York and the other in New Jersey, but includes no facts suggesting that New York is the place that she intends to remain indefinitely. (Remand Mot. at 2, Gioia VIII, ECF No. 10.) Instead, she explains that, although her fiancée resides in Suffolk County, New York, and that she "used to live there," she also lives with her mother in New Jersey. (*Id.*) Contrary to J&J's argument, these facts do not reveal an intent to remain in New York indefinitely and are therefore insufficient to show her domicile in New York.

**\*10** The removed action does not allege a federal question such that this Court's federal question subject matter jurisdiction could properly be invoked. The amended complaint alleges that J&J "failed to warn about important side effects and ultimate outcome of medication Invega while rapidly promoting it during preliminary phased approval by FDA" and that this failure to warn "caused misrepresentation of my academic knowledge through misrepresentation of exam scores which caused me to have multiple attempts at exact exams while taking that medical while being disillusioned." (State Ct. Rec. at 35, Gioia VIII, ECF No. 1-1.) Even upon a liberal construction, Gioia does not allege a colorable federal claim and the Court discerns none. Instead, she continues to pursue her unsuccessful state law lack of informed consent and failure to warn claims.

Because this Court has neither diversity nor subject matter jurisdiction over Gioia VIII, it must remand this case sua sponte. 28 U.S.C. 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction [over a case removed from state court], the case shall be remanded.") Accordingly, Gioia VIII is remanded to the New York State Supreme Court, Suffolk County, pursuant to 28 U.S.C. § 1447(c). The Court does not reach whether dismissal for failure to prosecute under Fed. R. Civ. P. 41(b) is warranted where Gioia failed to respond to J&J's March 21, 2024 pre-motion conference letter in which J&J argues that Gioia has named J&J rather than Janssen in an apparent effort to bypass the Court's "express warning not to bring any more cases against Janssen." (Gioia VIII, ECF No. 8.)

### II. Warning to Gioia

As demonstrated above, the complaints in Gioia VI–IX repeat the allegations and jurisdictional defects of the previously-dismissed complaints in Gioia I–V. Gioia cannot repeatedly file the same claims in an attempt to obtain a different

result. "Every paper filed with the Clerk of this Court, no matter how repetitious or frivolous, requires some portion of the institution's limited resources. A part of the Court's responsibility is to see that these resources are allocated in a way that promotes the interests of justice." *In re McDonald*, 489 US 180, 184 (1989). If Gioia files another complaint about the same subject matter as Gioia I–IX, including allegations arising from or relating to the medication Invega, the Court will order Gioia to show cause why she should not be barred under 28 U.S.C. § 1651 from filing new civil actions without prior permission from the Court. This warning applies to any complaints filed directly in this Court or properly removed here.

### III. Leave to Amend Would be Futile

"Although district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings, leave to amend need not be granted when amendment would be futile." *Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016). Granting leave to amend here would be unproductive because even if Gioia properly alleged a basis for diversity jurisdiction, her lack of informed consent and failure to warn claims are not plausible and that determination has been affirmed on appeal. (*See* Mem., Gioia I, ECF. No. 58; Mandate, Gioia I. ECF No. 63.) Additionally, Gioia's failure to respond to this Court's orders in Gioia VI, VII, and IX raises failure-to-prosecute concerns and any further litigation between the parties arising from Gioia's use of the medication Invega would likely be precluded. [9]

### CONCLUSION

For the reasons stated above, this Court grants Gioia's motion to proceed IFP (Gioia IX, ECF No. 2) and dismisses the complaints in Gioia VI, VII, and IX without prejudice pursuant to Fed. R. Civ. P. 12(h)(3). Leave to amend these complaints is denied. Pursuant to 28 U.S.C. § 1447(c), the complaint in Gioia VIII is remanded to the New York State Supreme Court, Suffolk County. The Clerk of the Court shall: (1) forward a certified copy of this Memorandum and Order to the Clerk of the New York State Supreme Court, Suffolk County; (2) enter judgment accordingly in each case; and (3) mail a copy of this Memorandum and Order to Gioia at her addresses of record in Suffolk County and New Jersey and note such mailing on the docket.

**\*11 Gioia is warned that, if she files another complaint about the same subject matter as Gioia I–IX, including allegations arising from or relating to the medication Invega, the Court will order her to show cause why she should not be barred under 28 U.S.C. § 1651 from filing new civil actions without prior permission from the Court. This warning applies to any complaints filed directly in this Court or properly removed here.**

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

**All Citations**

Slip Copy, 2024 WL 1704697

---

### Footnotes

1    Gioia filed two motions in each case to remand these cases to state court and, upon denial of her second round of motions, the Court warned Gioia that, should "she submit[ ] any further frivolous filings concerning remand, the Court may sanction her by dismissing her claims with prejudice." (*See* Mem., Gioia I, ECF No. 39 at 3.)

2    The Court also filed the Memorandum and Order in Gioia II, ECF No. 32.

3    Also filed in Mem., Gioia II, ECF No. 49.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

4       The Memorandum and Order was also filed in Gioia V as ECF No. 17.

5       The Court found that, at the time Gioia filed these complaints, she had alleged that she was a citizen of New York and that SEP and PBWT were also citizens of New York. (*See* Mem. & Order at 4, 10; *see also* Gioia V, Compl. ¶¶ II.B.1.a & 2.b.)

6       This was the day before Gioia filed her complaints in Gioia VI and Gioia VII in this Court.

7       Indeed, the Court understands that the Gioia VI complaint references 32 CFR § 776.57, which addresses the unauthorized practice of law for attorneys practicing under the supervision of the Judge Advocate General and has no application here. Further, to the extent Gioia intended to cite 20 U.S.C. § 137 in the Gioia VII complaint, that section was repealed in 1968 and governed contracts and purchases, the executive officer, and annual reports at the National Training School for Boys which operated until May 15, 1968 when it was closed pursuant to order of the Attorney General. 20 U.S.C. § 137 Historical Notes. Thus, Gioia has no colorable federal claim under 20 U.S.C. § 137 either.

8       Indeed, Gioia includes a telephone number in these complaints with a "631" area code, which is the same Suffolk County area code included in the 2019 Actions where she alleged her residence was in Suffolk County, New York. (*See* 2019 Actions, Compls.) Further, of note, Gioia alleged that she was working in East Patchogue, New York, until September 1, 2023. (*See* IFP App. ¶ 2, Gioia VI, ECF No. 2; IFP App. ¶ 2, Gioia VII, ECF No. 2.) However, Gioia filed those complaints on October 26, 2023 and the Court evaluates diversity "by examining citizenship as of the time suit is commenced." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 42 (2d Cir. 2000).

9       Given the lack of subject matter jurisdiction, the Court does not reach whether res judicata or collateral estoppel would preclude adjudication of Gioia's present claims, or whether Gioia's failure to respond to the Court's orders merits dismissal under Fed. R. Civ. P. 41(b).

---

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 809890
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Thomas RIMINI, Plaintiff,
v.
J.P. MORGAN CHASE & CO., Defendant.

21 Civ. 7209 (JPC)
|
Signed February 27, 2024

*** Start Section

.... Complaint at 5, 7. In his Complaint, Rimini alleged that JPMC "employees violated employment policies and provided a bad job reference by stating to a prospective employer that there are better people to hire than [him]," which "evidences ... blacklisting and discrimination." *Id.* at 5. Rimini contended that JPMC employees "have interfered severely with [his] new employment opportunities for many years causing loss of income and other challenges." *Id.*

**\*2** On September 29, 2022, the Court issued an Opinion and Order dismissing this action for lack of subject matter jurisdiction because Rimini "failed to satisfy the administrative exhaustion requirements with respect to his 2016 OSHA Complaint." *Rimini v. J.P. Morgan Chase & Co.*, No. 21 Civ. 7209 (JPC), 2022 WL **4585651**, at \*5 (S.D.N.Y. Sept. 29, 2022); *see Daly v. Citigroup Inc.*, 939 F.3d 415, 427 (2d Cir. 2019) (holding that satisfaction of SOX's administrative exhaustion requirements is "a jurisdictional prerequisite to suit in federal court"). [3] The Court explained that OSHA's October 14, 2016 findings gave Rimini thirty days to appeal to the ALJ, after which OSHA's findings became final and not subject to judicial review, yet he waited 4.5 years before appealing to the OALJ. *Rimini*, 2022 WL **4585651**, at \*5.

On September 30, 2022, the day after the Court's Opinion and Order, Rimini sought reconsideration of the dismissal, contending that he did not receive OSHA's findings because they were mailed to the wrong address. Dkt. 78 at 1. [4] This Court denied reconsideration on October 31, 2022. *Rimini v. J.P. Morgan Chase & Co.*, No. 21 Civ. 7209 (JPC), 2022 WL 20613700 (S.D.N.Y. Oct. 31, 2022). Specifically, the Court rejected Rimini's claimed lack of notice of OSHA's preliminary findings, explaining that, "even assuming that Rimini did not receive OSHA's preliminary findings when

they were first issued in October 2016," *id.* at \*1, JPMC served a copy of a brief, with those findings attached, on Rimini on June 4, 2018, *id.* at \*2. As the Court explained, this...

*** Start Section

... to be: "[1] statute of limitations because of service in an exhibit, a New York State matter, [2] vexatiousness and [3] ALJ McGrath's initial proceedings, which are in fact unrelated to this matter by law." *Id.* at 1. Even more confusingly, he further "ask[s] that the Court consider whether the 2 findings of bad faith are indeed appropriate," and contends that "[t]he Court states in its decision that the entire matter is predicated on decisions made by ALJ McGrath in a 2015 administrative matter." *Id.* at 2. However, and as discussed above, the Court dismissed Rimini's Complaint because subject matter jurisdiction was lacking on account of his failure "to satisfy the administrative exhaustion requirements with respect to his 2016 OSHA Complaint." *Rimini*, 2022 WL **4585651**, at \*5.

In any event, Rimini's motion plainly fails under Rule 60(b). In the interest of completeness, the Court will address each subsection of Rule 60(b) to explain why relief is not warranted. In short, nothing in Rimini's motion calls into question the Court's conclusion as to the fundamental defect of his Complaint: the failure to establish this Court's subject matter jurisdiction.

### A. Rule 60(b)(1)

Rule 60(b)(1) permits a court to grant relief from a final judgment in the case of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). Generously construed, Rimini may be suggesting that the Court made a "mistake" when it determined that JPMC's service of OSHA's preliminary findings satisfied 29 C.F.R. § 1980.105(b). *See* Motion at...

*** Start Section

... omitted)).

Rule 60(b)(4) plainly does not apply. Because the Court did not reach the merits of the Complaint upon its determination that jurisdiction was lacking, it could not have improperly exercised jurisdiction over Rimini or his claims. Nor did the Court act in a manner inconsistent with due process. Rimini contends that "[t]he Court should only consider the 2016 Administrative Complaint here, not the many unrelated filings Defendants have made, including because statements there violate due process." Motion at 1. But the Court did

not consider any such materials; rather, the Court found subject matter jurisdiction to be lacking because Rimini failed to satisfy the administrative exhaustion requirements with respect to his 2016 OSHA Complaint. *Rimini*, 2022 WL 4585651, at *5.

### E. Rule 60(b)(5)

Rule 60(b)(5) also does not afford Rimini an avenue for relief. The judgment in this case has not "been satisfied, released, or discharged," nor is it "based on an earlier judgment that has been reversed or vacated." Fed. R. Civ. P. 60(b)(5). This is also not a situation where applying the judgment "prospectively is no longer equitable." *Id.* While almost "every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect," to satisfy Rule 60(b)(5) an order must be "executory," or involve "the supervision of changing conduct or conditions." *Tapper v. Hearn*, 833 F.3d 166, 172 (2d Cir. 2016) (citation omitted). The judgment in this case is not one with prospective application...